

# Impact of Minimum Wage Increase
# To Los Angeles Hotel Workers

**June 2014**

PKF Consulting USA | 865 S. Figueroa Street, Suite 3500 | Los Angeles, CA  90017

TEL:  213-680-0900 | FAX:  213-623-8240 | www.pkfc.com

**Executive Summary**

This report provides an analysis of the potential economic impact of the proposed Living Wage increase on hotels in the City of Los Angeles (LA). Our methodology included a review of the impact of similar ordinances, including the LAX-area Living Wage and Service Worker Retention Ordinances, Proposition N in Long Beach, Proposition 1 in Seattle (SeaTac Airport area) and the recently passed $15.00 minimum wage for the entire City of Seattle. In addition, we interviewed hotel General Managers at properties within the City of LA and also sent out electronic surveys to members of the Hotel Association of Los Angeles with 100 or more rooms. This report is presented subject to the statement of assumptions and limiting conditions included as Addendum K at the end of the report.

Based upon our analysis and the third-party research summarized herein, we have significant doubts about the economic benefit of the ordinance to workers and the City of LA. We believe that the ordinance, if implemented, should be designed so that it benefits the greatest number of people, without placing an overly onerous burden on businesses. Thus we believe an approach inclusive of all businesses in the City of LA to increase the wages over several years will spread out the financial and operational impacts, allowing all businesses to adjust gradually to the increasing wages. This approach would hopefully prevent the loss of jobs that were experienced in the LAX, Long Beach and SeaTac markets. Additionally, we believe the prudent thing to do would be to include a provision for benefit credits and exclusion of tipped employee job classifications in the final wording of the ordinance. Tipped employees should be exempt as nearly all of these employees already earn in excess of $15.37 per hour. Without these considerations, many of the employees that the ordinance is designed to help could end up losing their jobs due to the certainty of lay-offs that have been previously experienced in the precedent markets.

## Background

The Los Angeles City Council introduced a motion on February 18, 2014 that would increase the minimum hourly minimum wage to $15.37 at only hotels in the City of LA with 100 or more guestrooms. The motion was co-sponsored by Council Members Mike Bonin (West LA - District 11), Nury Martinez (Northeast San Fernando Valley – District 6) and Curren Price (South LA and parts of Downtown – district 9). A copy of the motion is included as Addendum A at the end of this report.

## Precedent Ordinances

The table on the following page provides a comparison of the proposed LA ordinance with previously enacted legislation in the LAX Airport area, Long Beach, SeaTac Airport and the just-approved Seattle city-wide measure. The text of these ordinances can be found in Addenda E – M at the end of this report.

| Comparison of the LA Proposal to Previously Enacted Living Wage Ordinances | | | | | |
|---|---|---|---|---|---|
| | LA (proposed) | LAX | Long Beach | SeaTac Airport | Seattle |
| **Effective Date** | TBD | Jan-97 | Jan-12 | Jan-14 | 3-7 years beginning in April 2015, depending on size of business |
| **Increase Amount on Effective Date** | $8.00 to $15.37 | $6.75 To $10.64 | $8.00 to $13.00 | $9.19 to $15.00 | $9.32 to $15.00 |
| **% Increase on Effective Date** | 92.1% | 36.6% | 62.5% | 63.2% | 61.0% |
| **Minimum wage as of July 1, 2014** | $9.00 | $10.91 + $4.76 health benefits = $15.57 | $13.53 | $15.00 | $9.32 |
| **Industries Affected** | Hotels | Hospitality, Transportation | Hotels | Hospitality, Transportation | All but Non-Profits |
| **Hotel Exemptions** | < 100 rooms | < 50 rooms | < 100 rooms | < 100 rooms < 30 non-mgmt staff | None |
| **Tip Consideration** | Silent | Silent | Silent | No tip credit | No tip credit |
| **Service Charges** | Silent | Paid to employees providing the service, excluding managerial / supervisory staff | Paid to employees providing the service, excluding managerial / supervisory staff | Paid to employees providing the service, excluding managerial / supervisory staff | Silent |
| **Union Hotels** | Silent | Exempt | Exempt | Not Exempt | Not Exempt |

Source: PKF Consulting USA

The above table shows that the proposed LA ordinance would result in the largest percentage increase of any of the ordinances passed to-date. Additionally, the proposal as currently written does not address key issues, such as the treatment of tipped employees or accounting for hotel service charges on banquets and room service. The Long Beach ordinance is the only precedent that applies only to Hotels, but it does exclude union

hotels and those with less than 100 rooms. When it was enacted in January 2012, it applied to all hourly job positions with an hourly wage less than $13. The Seattle ordinance applies to all industries and the SeaTac and LAX ordinances include airport staff and certain contract workers. None of these ordinances have a provision for a consideration for tipped employees (including declared employee tips as part of the total wage), and the airport-area ordinances includes airport restaurants and retail workers. Both of the Seattle ordinances apply to both union and non-union hotels.

Since the implementation of these ordinances, the affected hotels have taken operational steps to mitigate some of the incremental payroll costs. Some of the operational changes have included but are not limited to the following:

Operational impact of the LAX ordinance on the affected hotels:

- ❖ The affected hotels have not been able to pass the increased payroll costs on to the guest through increased prices. Thus, cost-saving measures such as reduced staffing, benefits, and cutting back on hotel amenities have been implemented.
- ❖ Most all affected hotels have experienced reduced staffing levels, with food and beverage receiving the largest portion of the cuts. One hotel reported a reduction of 84 hourly full-time equivalent employees (FTEs) since the ordinance was implemented, with 52 percent of these reductions occurring in food and beverage.
- ❖ Hotels have decreased food and beverage outlet operating hours, including not opening the restaurant and offering dinner service in the lounge.
- ❖ Many of the affected hotels have eliminated room service and banquet and service charges, and have built these fees into the menu pricing. This makes it challenging for the sales team as they must explain the difference in pricing to potential clients. This also impacts banquet servers and bartenders as they are now paid a flat rate.
- ❖ The LAX hotels are now operating with a competitive disadvantage because some of their competitive set hotels, such as those in El Segundo, were not impacted by the ordinance.

Operational impact of the Long Beach ordinance on the affected hotels:

- ❖ At least two hotels have removed rooms from inventory in order to fall below the 100-room threshold.
- ❖ Another hotel has cut 25 FTEs (55,000 man hours) at the same time that occupancy has increased 7 points. The majority of these cuts were in the food and beverage department.
- ❖ One full-service hotel has calculated that the annual financial impact post-reduction of staff is approximately $785,000 in incremental wages, benefits, and payroll taxes. This impact would have been $1.5 million annually if the staff reductions had not been implemented.

❖ In many cases, the staff reductions have resulted in increased workloads, which have impacted service levels.
❖ Room service and banquet service charges are now built into menu pricing, which makes it difficult for the sales team to sell against Anaheim hotels.

Operational impact of the SeaTac ordinance on the affected hotels:

❖ The annual financial impact at a 128-room hotel and a 178-room hotel was calculated to be approximately $795,000 and $1,012,000, respectively. This analysis did not include consideration for tipped employees because the Seattle ordinance applies to all hotel employees.
❖ Managers are assuming greater responsibilities instead of hiring more workers.
❖ Businesses have laid-off workers or have eliminated plans to hire more.
❖ Area parking now comes with a "living wage" service charge.
❖ Hotels have cut employee benefits, free meals and overtime.
❖ Affected companies have seen a marked increase in job applicants, most hoping to benefit from the higher wage. But, this has NOT translated into increased employment.
❖ Less qualified (entry-level staff) are not getting hired.

## Potential Impact of the Proposed Wage Increase on the City of LA Hotels

### General Manager Interviews

We interviewed several General Managers within the City of LA to determine what the likely operational changes would be if the proposed wage increase is enacted as currently written. The following are comments from those interviews.

❖ The incremental payroll costs will not likely be fully passed-on to the consumer, especially since not all hotels are impacted evenly. Customers seeking the best rates will choose hotels outside the City of LA which will reduce occupancies and the amount of transient occupancy taxes (TOT) paid to the City.
❖ Because these incremental costs cannot all be passed on to the consumer, all properties surveyed said that the ordinance would lead to staffing cut-backs, work load increases, and/or the elimination of entry level positions in order to avoid exposure to potential wage increases.
❖ The impacted amenities would include eliminating mini bars and overnight room service, and closing the gift shop and specialty restaurant. These actions would force cut-backs of not only servers and bussers, but kitchen staff as well. At one hotel, the resulting cuts in food and beverage would total 25 hourly FTEs, plus 1.3 managers.
❖ The lunch buffet would be eliminated and replaced with an ala-carte menu.

- ❖ A competitive disadvantage with non-City of LA hotels (Pasadena, Beverly Hills, West Hollywood, Carson, Torrance, etc.) because the non-LA hotels would not be subject to the higher wages and would therefore not have to increase menu pricing as a result.
- ❖ Luxury hotels cannot cut amenities, so the only alternative will be staff cuts.
- ❖ A competitive disadvantage will result with local restaurants that will not be impacted. For example, the Hilton Universal City will not be able to create a competitive menu as it will have to charge higher prices than the "City Walk" restaurants. This disadvantage will lead to reduced covers and job cuts.
- ❖ The proposed ordinance will negatively impact restaurant and banquet servers, bartenders and bussers who are currently making well in excess of $15.37 because many of these employees will lose their jobs.
- ❖ The minimum wage increase will cause an imbalance in overall pay scales. A server will be earning the same wage or more as a skilled Sous Chef. Thus, this would lead to additional pay raises in non-impacted positions resulting in inflation through the industry.
- ❖ Significant loss of food and beverage FTEs, due to closing restaurants for lunch & dinner, which would be served in the lounge only.
- ❖ With reduced margins, owners (especially public companies with stockholders) will reduce CapEx funding to make up some of the losses. Properties will not be maintained at current levels which would likely have a negative impact on hotel occupancies.
- ❖ One General Manager stated: "My biggest dread is having to tell a faithful 20-year employee that I have to let them go!"

### Impact on Third-Party Contracts

In addition to the loss of hotel employees, the impact will also be felt by third-party vendors such as night cleaners, valet parking services and others. Several hotel General Managers indicated that third-party contracts would likely be cut back or eliminated altogether, which would significantly affect these contractor companies, possibly resulting in the closure of some of these businesses.

## The Financial Impact of the Proposed Ordinance

### Direct Financial Impact on Affected Hotels

In order to calculate the financial impact of the proposed ordinance on local hotels, including the extent to which the inclusion of a consideration for tipped employees would mitigate this impact, we utilized the calendar year 2013 payroll information of a local, full-service hotel. This hotel is non-union, has more than 400 rooms and a total of 63 hourly job positions, which represent approximately 213 FTEs combined. Of these 63 positions, 40 (23 tipped positions) of them are currently paying an average wage that is less than $15.37 according to the wage survey. Applying the recent wage survey to the hotel's current staffing model, the incremental annual payroll costs that would be incurred by this hotel under the proposed ordinance would be approximately $1.1 million. When declared

tips from the employees' W-2 forms were added to the average hourly wages, the number of positions with an average wage less than $15.37 dropped from 40 to 27, which is approximately 43 percent of the total positions. The total annual incremental impact including credit for these declared tips would be approximately $650,000. Because the tips used in the calculation are only those reported on the employees' W-2 forms, these 27 positions would be further reduced based upon undeclared tips earned by bell staff, concierge staff and valet parking attendants. All of the interviewees stated that the decreased incremental payroll costs associated with the inclusion of a consideration for tipped employees would save jobs, especially in the food and beverage department. The full analysis is provided in Addendum B at the end of this report.

### Other Financial Impact

If the proposed wage increase is implemented on hotels in the City of LA, the total impact will be greater than just the direct impact felt by the affected hotels. According to a recent study commissioned by the American Hotel & Lodging Association, the total financial impact of the proposed $15.37 wage ordinance could potential result in an overall loss of more than $255 million. The full study is included as Addendum C.

The study, entitled "Extreme Wage Initiatives & the Hotel Industry: Impact on Local Communities and the Nation," was published in June 2014 and was authored by Dr. John O'Neill, Director of the School of Hospitality Management at The Pennsylvania State University. In this study, Dr. O'Neill used the knowledge from previous research to assess the impact of an extreme minimum wage increase on the nation and the US hotel industry. The study points out the following drawbacks of a material increase in minimum wage on any industry.

1. Increased consumer prices, if the cost can be passed on at all.
2. The typical effect of a relatively high minimum wage is an adverse effect on employment. Economists have well-established a link between a high minimum wage and increases in unemployment.
3. When unemployment occurs as the result of a minimum wage increase, people take on more informal or "under-the-table" work, which puts the burden on the worker to pay for health insurance per the Affordable Care Act, and they do not have access to workers comp or other unemployment benefits.
4. Workers that do not lose their jobs will likely be subject to decreases in their benefits in order to offset the increased labor costs.

The study points out the following drawbacks of a material increase in minimum wage on the hotel industry specifically.

1. If the minimum wage is increased to $15.37, it is likely that not all of the additional costs can be passed on to the consumer (high rates), which will result in decreased profitability.

2. The decreased profitability will be made up through charging higher rates, accepting lower profit margins, implementation of cost-cutting measures. One, or a combination of these tactics, may be implemented.
3. Charging higher rates could lead to reduced demand.
4. Staffing levels will likely be reduced to mitigate the lost profit.
5. Reduced staffing levels could lead to higher workloads, high stress and health care costs, and greater turnover, as well as a reduction in guest satisfaction scores.
6. Cuts will be made in the less-profitable segments such as food and beverage.
7. Overhead expenses such as maintenance costs will be cut back.
8. Lower industry profits will also impact hotel brokers, construction workers, food suppliers, guestroom amenity vendors.
9. Lower industry profits will directly impact the hotel investment community, including reduced hotel values and less investment in new-build properties.

At the national level, the study found that the implementation of the proposed wage increase could result in reduced room night demand that could result in a total combined loss of $2.53 billion as follows:

1. A loss of $612.3 million in annual guestroom revenue;
2. Annual food and beverage revenue reduced by $214.3 million;
3. Loss of housekeeping and food and beverage jobs - $320.2 million;
4. $145.7 million less spent on hotel amenities and supplies;
5. $70.4 million in reduced hotel occupancy taxes (TOT);
6. $146.2 million less corporate taxes paid; and
7. A loss of $1.02 billion in hotel values.

Dr. O'Neil then studied the existing LA wage proposal in order to quantify the financial impact on the local hotel industry and the local economy as a whole. In order to accomplish this, he considered the impact of the increased pay rates on the operation of a hotel, including raising room rates to mitigate a portion of the increased costs, and the resulting impact on hotel demand (occupancy). He based his projections of the LA's city-wide hotel performance for 2013; the study found that the implementation of the proposed waged increase could result in the following:

❖ If implemented, the proposed wage increase in LA will decrease employment (particularly entry-level positions) and opportunities for upward mobility within the hospitality industry.
❖ The proposed $15.37 minimum wage will put the City of LA hotels with 100 rooms or more at a competitive disadvantage compared with their competition in Pasadena, Beverly Hills, West Hollywood, El Segundo, etc., as the neighboring hotels will be able to maintain their profit margins.

❖ The LA hotels will likely have to pass some of the increased costs on to the guest through higher rates, thereby creating another disadvantage. Increasing rates could lead to reduced transient and group demand as these guests may go elsewhere.

❖ Reduced occupancies will likely lead to staff cuts in a city with unemployment that is already above ten percent.

❖ The trickle-down effect from reduced occupancies will also hurt other tourism industries, such as shopping, taxis, and tour operators.

❖ Reduced occupancies will reduce the TOT paid to the City, which will impact the available funding for LA Tourism, which is already disadvantaged with less marketing dollars compared to Anaheim, San Diego or San Francisco.

Based upon the city-wide performance for LA in 2013, the study found that the implementation of the proposed waged increase could result in a total annual loss of $255.4 million to the local LA economy as follows:

1. A total loss of 1,394 staff positions - $55.7 million;
2. A loss of $106.1 million in annual guestroom revenue;
3. Reduced annual food and beverage revenue of $37.1 million;
4. $17.1 million less spent on hotel amenities and supplies;
5. $16.4 million in lost hotel TOT;
6. $2.9 million in lower corporate taxes; and

In summation, the report stated that those in the hotel industry who would be most negatively affected by extreme wage increases would be small business entrepreneurs who only own one or two hotels as their primary source of income. Additionally, extreme wage increases could severely inhibit future growth and cost the economy billions of dollars, which is why the U.S. Senate has refused to take action on a national minimum wage increase after the Congressional Budget Office estimated that such an increase would result in the loss of 500,000 jobs nationwide. Hospitality is at the forefront of providing good jobs to working class Americans. Hoteliers offer entry-level opportunities that few other industries make available to young people, creating access to the workforce and providing the foundation for successful career paths. This living wage proposal would have a destructive impact on these entry-level opportunities.

The following compromise suggestions were presented in the report:

❖ Apply the ordinance to all industries, not just hotels.
❖ Union hotels should not be exempt.
❖ Carve out tipped-employees and third-party vendors

**Impact on New Hotel Development**

Based upon our research, we have determined that there are owners and potential investors who have slowed the progression of potential deals, and are waiting to see what

is going to happen with the proposed ordinance. For example, the London Hotel was for sale, but potential buyers got nervous and did not close the transaction. Three projects have been curtailed in Downtown alone, including the proposed boutique near the ACE Hotel, the proposed hotel at 8th and Olive Streets, and the proposed Kimpton hotel. One interviewee suggested that adaptive reuse (conversion) projects should be carved out as a redevelopment incentive.

It should be noted that the compounded average annual growth rate for new hotel supply in the City of LA is 0.7 percent from 1988 to the present day. This growth rate is significantly below the national average and the result is an under-supply of hotel rooms in the market, particularly in Downtown. At present, the convention center is under-utilized due to its inability to attract larger groups because of a lack of hotel rooms in the immediate area. The issue with a lack of adequate new supply in Downtown is that it is currently not economically feasible to develop a hotel in Downtown and the proposed ordinance would only exacerbate the problem.

**PKF Survey Results**

In an effort to capture input from more local hotels that we could interview, PKF created an electronic survey with 13 questions related to the impact of $15.37 wage proposal. The following comments summarize the results of the 18 surveys received as of June 9, 2014. The full survey responses are included as Addendum D at the end of this report.

The majority of the respondents' hotels have 101-300 keys (71 percent) and 16 are non-union properties. Approximately 21 percent of the respondents are located in City Council District 11; another 21 percent are located in City Council District 14. At the two union hotels, the unionized departments are primarily engineering, banquets, and housekeeping. At both union and non-union hotels, the hourly FTEs that are currently being paid less than $15.37 on average are located primarily in the front desk, housekeeping, and food and beverage areas as shown in the following table:

| Departments with Hourly FTEs Earning < $15.37/Hr | |
|---|---|
| **Rooms - Position** | **% Respondents** |
| Front Desk / Concierge | 76.5% |
| Bell Staff | 76.5% |
| Section / Public Space Housekeepers | 70.6% |
| Laundry Staff | 58.8% |
| Valet Parking | 47.1% |
| PBX | 35.3% |
| **Food & Beverage - Position** | |
| Servers | 82.4% |
| Bartenders / Bar Backs | 64.7% |
| Cashiers / Hosts | 52.9% |
| Cooks | 41.2% |
| Stewards | 41.2% |

Source: PKF Consulting USA

The following table reflects the annual financial impact reported by the respondent hotels.

| | Annual Financial Impact Of | | |
|---|---|---|---|
| | Proposed $15.37 Minimum Hourly Wage* | | |
| Keys | Excluding Tip Consideration | Including Tip Consideration | % Reduction with Tip Consideration |
| -- | $3,000,000 | -- | -- |
| 100 - 300 | $1,174,226 | $750,000 | 36.1% |
| 501 - 700 | $1,010,880 | $850,882 | 15.8% |
| 100 - 300 | $900,000 | -- | -- |
| 301 - 500 | $881,503 | $381,105 | 56.8% |
| 301 - 500 | $750,000 | -- | -- |
| 100 - 300 | $541,602 | $352,235 | 35.0% |
| 100 - 300 | $305,000 | -- | -- |
| 100 - 300 | $280,000 | $62,400 | 77.7% |
| 301 - 500 | $180,000 | $110,000 | 38.9% |
| 100 - 300 | $150,000 | -- | -- |
| 301 - 500 | $71,697 | -- | -- |
| **Average** | **$770,409** | **$570,294** | **26.0%** |

*Does not include benefit burden or additional payroll taxes for most hotels

Source: PKF Consulting USA

The table above shows the incremental costs of the proposed wage ordinance on the respondent hotels. The financial impact reported (excluding a consideration for tips) ranged from approximately $72,000 to $3,000,000 with an average payroll increase of $770, 409. Only half of the reporting hotels calculated the impact including a consideration for tips. With this consideration, the reported impact ranged from approximately $62,000 to

$851,000, with an average increase in payroll of $570,294, which does not include additional benefit burden or payroll tax liabilities. For the six hotels that calculated the financial impact both with and without a consideration for tips, a consideration would reduce the financial impact by an average of 26.0 percent, with a reduction of 15.8 percent to 77.7 percent for the individual reporting hotels.

With the magnitude of the financial impact shown in the table above, survey respondents made it very clear that there will be significant operational impacts as a result of the increased payroll costs. The potential operational impacts include, but are not limited to those shown in the following table.

| Operational Impact Of Proposed $15.37 Minimum Hourly Wage | | |
|---|---|---|
| Impact | My Hotel | Market |
| Staff Cuts | 100% | 71% |
| Shift From Full-time to Part-time Staff | 100% | 71% |
| Competitive Disadvantage with Non-LA Hotels | 94% | 75% |
| Close Outlets or Cut-Back Hours | 92% | 85% |
| Preventive Maintenance Delayed/Cancelled | 91% | 82% |
| Reduced Employee Amenities | 86% | 71% |
| CapEx Projects Delayed/Cancelled | 86% | 71% |
| Increase Employee Workloads | 83% | 75% |
| Unable to Participate in City-Wide Blocks | 80% | 80% |
| Eliminate 3rd-Party Contracts | 67% | 78% |
| New Hotels Will Not Get Built | -- | 100% |
| Source: PKF Consulting USA | | |

All respondents stated that jobs would be lost, primarily in housekeeping and food and beverage, and there would be a shift from full-time to part-time staff with the cutback of hours. It is clear that the employees have a significant amount to lose with job cuts, increased workloads, and the reduction/elimination of employee benefits. The competitive disadvantage resulting from competing hotels and restaurants that would not be subject to the wage ordinance would result in fewer covers and contribute to the staff cutbacks. Maintenance and CapEx projects would like be delayed or canceled, which could also lead to reduced occupancies if the guest experience is negatively impacted. The need to increase room rates would preclude select hotels from participating in lower-rate city-wide convention blocks which could reduce overall bookings at the convention center.

Respondents were asked to present a compromise proposal and following are a sample of the suggestions.

- ❖ Increase the room threshold to include only large hotels (not-defined)
- ❖ Apply the ordinance to each and every business operator in the City of LA
- ❖ We would accept any minimum wage increase that affects ALL workers in CA

- ❖ Apply the current Living Wage Ordinance for LAX-area hotels to ALL businesses in LA
- ❖ Apply to ALL businesses, phase in over 3-5 years, give credits for certain benefits given to employees, and give credits for hotels not located near the City's investment in Downtown and Convention Center, give credits to hotels NOT subsidized by the City.
- ❖ Apply to all businesses using a tiered approach, phased in over several years.

*ADDENDUM A*

*CURRENT LA CITY COUNCIL MOTION*

FEB 1 8 2014

ECONOMIC DEVELOPMENT

## M O T I O N

By maintaining free public tourist attractions like Hollywood Boulevard, Griffith Park and Venice Beach, modernizing LAX, upgrading the Convention Center and helping to build the public transportation system that will carry visitors around the city, to and from hotels, the City of Los Angeles has made significant financial investments to create a climate that has allowed the hospitality industry to thrive in Los Angeles. The City's investments have proven helpful for the hospitality industry, which has enjoyed three consecutive years of growth, and which boasts an occupancy rate of 75.4% (far better than the national average of 62%) and a "revenue per room available" rate of $100 – a 12-year high for LA. Since hotels receive definite benefits from City assets and investments, it is fair and reasonable that these hotels pay their employees a fair wage - especially when doing so would so greatly benefit the people of and the economy in Los Angeles.

According to the Economic Development Department, 43% of the people who work in hotels in Los Angeles earn wages that still put them far below the federal poverty line. Wages paid to hotel employees are economically restrictive and prevent many hospitality employees from having purchasing power at local businesses, which has a devastating toll on Los Angeles' local economy. According to research done by the Economic Policy Institute, increasing wages for hotel workers could generate more than $70 million in economic activity for Los Angeles.

Income inequality is one of the most pressing economic, social and civil rights issues facing Los Angeles, and establishing a fair wage for hotel employees will help raise thousands of Angelenos out of poverty. Economic studies have made the circumstances of those living paycheck to paycheck clear, and hotel employees should not be forced to work two or three jobs to provide food and shelter for their families.

Several cities, including Santa Monica and West Hollywood, have realized the value in providing enhanced wages for employees in the hotel and tourism industry, and voters in the City of Long Beach adopted a living wage for hotel workers by a nearly 2-1 margin just last year.

In 2007, the Los Angeles City Council passed a living wage ordinance for workers employed in hotels near LAX, and in 2009 passed an ordinance that raised the wages for airport employees. The living wage for airport employees has resulted in higher pay and real benefits for low-income families, and the hotels around LAX have continued to thrive. In recent years, LAX passenger traffic has steadily increased (4.7% increase in 2013, following a 3% increase in 2012) as the city has invested in infrastructure that draws tourists to Los Angeles.

**I THEREFORE MOVE** that the City Council instruct the CLA to secure a study and provide for public input of the Citywide economic impacts of imposing a living wage of $15.37 for hotel employees at hotels with more than 100 rooms; and

**I FURTHER MOVE** that, if supported by the study, the City Council request the City Attorney to work with the CLA and CAO in preparing and presenting an ordinance that requires a living wage for hotel workers at hotels with more than 100 rooms.

PRESENTED BY:

| | | |
|---|---|---|
| MIKE BONIN | NURY MARTINEZ | CURREN D. PRICE, Jr. |
| Councilmember, 11th District | Councilmember, 6th District | Councilmember, 9th District |

SECONDED BY:

FEB 1 8 2014

*ADDENDUM B*

*FINANCIAL IMPACT ANALYSIS*

## Living Wage Analysis
### City of Los Angeles
### Incremental Hourly Labor Costs With a $15.37 Minimum Wage (Excluding & Including Tips)

| | | Hourly Wages EXCLUDING Tips | | | | Hourly Wages INCLUDING Tips | | |
|---|---|---|---|---|---|---|---|---|
| | FTEs (1) | Minimum Rate* | Maximum Rate | Average Rate | Incremental Average Rate @ $15.37/Hr | Average W-2 Tips | Average Rate (3) | Incremental Average Rate @ $15.37/Hr |
| **Rooms Department** | | | | | | | | |
| **Front Desk & Uniformed Services** | | | | | | | | |
| Front Desk Clerk | 3.8 | $14.70 | $15.83 | $15.12 | $1,976 | | $15.12 | $1,976 |
| Reservations Agent | 1.6 | $14.77 | $14.84 | $14.81 | $1,864 | | $14.81 | $1,864 |
| Concierge | 3.3 | $14.31 | $16.33 | $15.81 | $0 | $0.56 | $16.37 | $0 |
| PBX Operator | 4.3 | $13.58 | $14.71 | $13.93 | $12,879 | | $13.93 | $12,879 |
| Bell Staff | 6.0 | $9.34 | $11.09 | $9.76 | $70,013 | $1.98 | $11.74 | $45,302 |
| Door Staff | 2.6 | $12.98 | $13.61 | $13.23 | $11,573 | $1.14 | $14.37 | $5,408 |
| Valet / Garage Attendants | 12.6 | $9.43 | $10.71 | $9.82 | $145,454 | $0.76 | $10.58 | $125,536 |
| Garage Cashier | 4.8 | $13.10 | $13.23 | $13.10 | $22,664 | | $13.10 | $22,664 |
| Parking Lot Attendant | 1.0 | $9.00 | $10.00 | $9.50 | $12,210 | | $9.50 | $12,210 |
| **Housekeeping & Laundry** | | | | | | | | |
| Dispatcher | 2.4 | $14.34 | $14.97 | $14.56 | $4,056 | | $14.56 | $4,056 |
| Night Houseperson | 1.2 | $13.11 | $14.19 | $13.41 | $4,900 | | $13.41 | $4,900 |
| Public Space Attendant | 2.7 | $12.36 | $13.77 | $13.14 | $12,540 | | $13.14 | $12,540 |
| Houseperson | 8.0 | $12.31 | $13.58 | $12.67 | $44,873 | | $12.67 | $44,873 |
| Floor Supervisor | 0.9 | $15.28 | $16.09 | $15.80 | $0 | | $15.80 | $0 |
| Room Attendant | 35.1 | $12.47 | $13.72 | $13.03 | $170,758 | $0.18 | $13.21 | $157,616 |
| Turndown Attendant | 3.9 | $12.44 | $13.73 | $12.98 | $19,361 | | $12.98 | $19,361 |
| Laundry Supervisor | 0.9 | $14.94 | $14.94 | $14.94 | $805 | | $14.94 | $805 |
| Laundry Attendant | 10.5 | $12.18 | $14.06 | $13.56 | $39,530 | | $13.56 | $39,530 |
| **Food & Beverage** | | | | | | | | |
| **CULINARY** | | | | | | | | |
| Pastry Cook I | 0.9 | $16.53 | $16.53 | $16.53 | $0 | | $16.53 | $0 |
| **MAIN KITCHEN / BANQUETS** | | | | | | | | |
| Banquet Cook | 3.4 | $13.94 | $16.65 | $15.68 | $0 | | $15.68 | $0 |
| Buffet/Food Runner | | $10.86 | $10.86 | $10.86 | $0 | | $10.86 | $0 |
| **GOURMET or SPECIALTY RESTAURANT** | | | | | | | | |
| Lead Cook (Cook I) | 6.0 | $17.62 | $18.63 | $18.02 | $0 | | $18.02 | $0 |
| **MAIN RESTAURANT** | | | | | | | | |
| Main Cook (Cook II) | 3.5 | $13.65 | $18.35 | $14.47 | $6,552 | | $14.47 | $6,552 |
| Prep Cook (Cook III) | 3.5 | $12.08 | $15.41 | $14.48 | $6,479 | | $14.48 | $6,479 |
| **EMPLOYEE CAFETERIA** | | | | | | | | |
| Cook | 0.5 | $15.09 | $15.47 | $15.28 | $96 | | $15.28 | $96 |
| Server | 1.9 | $11.93 | $13.32 | $12.60 | $10,960 | | $12.60 | $10,960 |
| **STEWARDING** | | | | | | | | |
| Steward | 9.8 | $12.18 | $13.28 | $12.70 | $54,448 | | $12.70 | $54,448 |
| **ROOM SERVICE - IN ROOM DINING** | | | | | | | | |
| Supervisor | 0.9 | $16.25 | $16.25 | $16.25 | $0 | $0.22 | $16.47 | $0 |
| Order Taker | 1.5 | $12.87 | $13.43 | $13.13 | $6,989 | $0.75 | $13.88 | $4,649 |
| Server | 7.1 | $8.93 | $9.43 | $9.18 | $91,488 | $10.31 | $19.48 | $0 |
| Bus Person | 0.9 | $9.45 | $9.95 | $9.70 | $10,614 | $6.22 | $15.92 | $0 |
| **GOURMET RESTAURANT** | | | | | | | | |
| Host Person/Greeter | 0.7 | $14.83 | $14.87 | $14.84 | $772 | $1.21 | $16.05 | $0 |
| Server | 2.4 | $8.82 | $8.82 | $8.82 | $32,723 | $16.30 | $25.12 | $0 |
| Bus Person | 3.3 | $11.12 | $11.53 | $11.23 | $28,417 | $9.20 | $20.43 | $0 |
| **CAFÉ or MAIN RESTAURANT** | | | | | | | | |
| Supervisor | 1.0 | $16.81 | $17.37 | $17.12 | $0 | $2.57 | $19.69 | $0 |
| Restaurant Cashier | 3.2 | $11.93 | $12.78 | $12.41 | $19,713 | $1.14 | $13.55 | $12,125 |
| Server | 3.2 | $8.92 | $9.39 | $9.03 | $42,232 | $18.14 | $27.17 | $0 |
| Bus Person | 3.4 | $9.74 | $11.00 | $10.04 | $37,685 | $6.13 | $16.17 | $0 |
| **MINI BAR** | | | | | | | | |
| Attendant | 3.4 | $13.22 | $13.44 | $13.27 | $14,823 | | $13.27 | $14,823 |
| **BEVERAGE OUTLETS** | | | | | | | | |
| Bartender | 3.3 | $10.20 | $11.56 | $10.58 | $32,879 | $12.00 | $22.58 | $0 |
| Cocktail Server | 2.7 | $8.92 | $9.17 | $8.94 | $36,139 | $13.14 | $22.08 | $0 |
| Bar Back | 0.9 | $10.57 | $11.07 | $10.76 | $8,638 | $8.04 | $18.80 | $0 |
| **BANQUET FOOD SERVICE** | | | | | | | | |
| Captain | 1.8 | $12.46 | $14.17 | $13.20 | $8,143 | $26.24 | $39.44 | $0 |
| Server | 8.4 | $10.44 | $11.31 | $10.76 | $80,480 | $18.95 | $29.71 | $0 |

**Living Wage Analysis**
City of Los Angeles
**Incremental Hourly Labor Costs With a $15.37 Minimum Wage (Excluding & Including Tips)**

| | | Hourly Wages EXCLUDING Tips | | | | Hourly Wages INCLUDING Tips | | |
|---|---|---|---|---|---|---|---|---|
| | FTEs (1) | Minimum Rate* | Maximum Rate | Average Rate | Incremental Average Rate @ $15.37/Hr | Average W-2 Tips | Average Rate (3) | Incremental Average Rate @ $15.37/Hr |
| BANQUET BEVERAGE SERVICE | | | | | | | | |
| Bartender | 1.4 | $11.73 | $13.10 | $12.29 | $8,969 | $10.24 | $22.53 | $0 |
| BANQUET SET UP | | | | | | | | |
| Lead Houseperson | 0.8 | $11.87 | $13.59 | $12.09 | $5,462 | $7.20 | $19.29 | $0 |
| Houseperson | 3.8 | $11.37 | $12.39 | $11.77 | $28,430 | | $11.77 | $28,430 |
| *Other Departments* | | | | | | | | |
| ENGINEERING | | | | | | | | |
| Supervisor | 0.8 | $25.21 | $25.66 | $25.43 | $0 | | $25.43 | $0 |
| Painter | 1.0 | $18.92 | $19.76 | $19.63 | $0 | | $19.63 | $0 |
| Engineer 1 (low skill) | 4.4 | $16.01 | $17.42 | $16.71 | $0 | | $16.71 | $0 |
| Engineer 2 (medium skill) | 3.5 | $18.34 | $20.18 | $19.02 | $0 | | $19.02 | $0 |
| Engineer 3 (high skill) | 1.8 | $22.23 | $23.76 | $23.43 | $0 | | $23.43 | $0 |
| SALES, MKT, CATERING & CONV SVCS | | | | | | | | |
| Administrative Assistant | 0.9 | $18.41 | $19.70 | $19.10 | $0 | | $19.10 | $0 |
| OFFICE & CLERICAL | | | | | | | | |
| HR Coordinator | 1.0 | $18.42 | $19.82 | $19.65 | $0 | | $19.65 | $0 |
| HR Representative/Clerk | 0.9 | $15.34 | $15.34 | $15.34 | $56 | | $15.34 | $56 |
| Exec Admin Asst to GM | 1.0 | $24.43 | $24.43 | $24.43 | $0 | | $24.43 | $0 |
| Admin Asst to a Manager | 1.3 | $14.83 | $17.83 | $16.33 | $0 | | $16.33 | $0 |
| FINANCE | | | | | | | | |
| Payroll Clerk | 0.9 | $22.33 | $22.33 | $22.33 | $0 | | $22.33 | $0 |
| Accounts Payable Clerk | 0.9 | $16.64 | $18.99 | $18.58 | $0 | | $18.58 | $0 |
| Accounts Receivable Clerk | 1.4 | $17.33 | $19.27 | $18.29 | $0 | | $18.29 | $0 |
| Day Auditor | 0.9 | $19.40 | $19.60 | $19.60 | $0 | | $19.60 | $0 |
| STOREROOM | | | | | | | | |
| Receiving Clerk | 0.9 | $15.21 | $15.36 | $15.28 | $165 | | $15.28 | $165 |

| | | | |
|---|---|---|---|
| Total Incremental Payroll with no tip credit: | $1,149,772 | Total with a tip credit: | $651,269 |

Notes:  1) Positions highlighted in blue are typically tipped positions
2) Wages highlighted in red are those below the proposed $15.37 threshold

| **Excluding Tips** | | | **Including Tips** | | |
|---|---|---|---|---|---|
| Total Hourly Positions | 63 | | Total Hourly Positions | 63 | |
| Hourly Positions below $15.37 | 40 | 63.5% | Hourly Positions below $15.37 | 27 | 42.9% |
| Total Hourly Tipped Positions | 23 | 36.5% | Total Hourly Tipped Positions | 23 | 36.5% |
| F&B Tipped Positions below $15.37 | 23 | 57.5% | F&B Tipped Positions below $15.37 | 8 | 29.6% |

*ADDENDUM C*

*REPORT: EXTREME WAGE INITIATIVES & THE HOTEL*

*INDUSTRY: IMPACT ON LOCAL COMMUNITIES*

*AND THE NATION*



# EXTREME WAGE INITIATIVES & THE HOTEL INDUSTRY:

## IMPACT ON LOCAL COMMUNITIES AND THE NATION

John W. O'Neill, Ph.D.
Director
School of Hospitality Management
The Pennsylvania State University
201 Mateer Building
University Park, PA 16802
814-863-8984
jwo3@psu.edu

JUNE 2014

# TABLE OF CONTENTS

Key Conclusions ................................................................................................ 1

Introduction ...................................................................................................... 7

Background ........................................................................................................ 8

Economic Impact ............................................................................................ 23

Appendix .......................................................................................................... 33

References ........................................................................................................ 35

The author gratefully acknowledges the assistance of Sean McGinley.

## Key Conclusions

Extreme minimum wage rates would not only decrease employment, but also decrease opportunities for upward mobility in the hospitality industry. Entry-level, hourly roles are traditional "routes to the top" in the hotel industry where there are numerous egalitarian stories of people starting in hourly positions and rising to high level, executive leadership positions (Cleveland, O'Neill, Himelright, Harrison, Crouter & Drago, 2007).

The effects of extreme minimum wage increases would have different results in different cities. To provide a demonstration, two relatively generalizable metropolitan areas of different sizes and located in different regions of the U.S. are evaluated as explanatory cases in this report.

- With the minimum wage rate of $10.10 per hour proposed in the U.S., hotels in Biloxi, for example, would be affected to a far greater degree than hotels in nearby New Orleans because Biloxi would lose its competitive advantage of relatively low prices as hotel managers in Biloxi probably would raise their room rates making the destination significantly more expensive. The increase in the minimum wage would narrow the gap between what hotels in New Orleans and Biloxi charge, potentially driving more business to New Orleans, further reducing employment in Biloxi.  Biloxi hotel managers would be forced to lay off employees to maintain their profit margins.

- With the higher minimum wage proposed strictly for hotel workers of $15.37 per hour in Los Angeles (Rainey, 2014a), other destinations in California would not be required to comply with the new wage rate.  Hotels in Anaheim, for example, would be able to maintain their profit margins and rates, while hotel managers in Los Angeles probably would be forced to increase prices, and travel demand most likely would weaken as transient and group travelers would seek better deals elsewhere. Further, job losses could increase in this city which already has an unemployment rate over ten percent. Likewise, other enterprises that receive business from tourists would be negatively affected, other tax revenues would be reduced and improvements to urban infrastructure relying on tax revenues could be compromised.

The following table outlines the total estimated economic impact to the L.A. hotel industry as a result of an extreme minimum wage increase to $15.37 per hour.

**Economic Impact of Extreme Minimum Wage Increase on the L.A. Hotel Industry and Community**

| Affecting Factor | Impact | Result in Dollars |
|---|---|---|
| Lower Demand | Reduced annual guest room revenue | $106.1 million |
| Lower Demand | Reduced annual food & beverage revenue | $37.1 million |
| Lower Demand | Fewer guest rooms occupied resulting in less money spent for supplies | $17.1 million |
| Lower Demand | Loss of housekeeping and F&B jobs | $55.7 million[1] |
| Lower Demand | Loss of hotel values | $20.1 million |
| Lower Demand | Lower hotel occupancy taxes collected | $16.4 million |
| Lower Profitability | Lower corporate taxes paid | $2.9 million |
| **Total** | | **$255.4 million** |

---

[1] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments.

The following chart displays the types and quantities of negative economic impact anticipated in L.A. from a minimum wage increase to $15.37 per hour.



3

Nationwide, the total negative economic impact of a minimum wage increase to $10.10 per hour is estimated to be $2.53 billion and would be a significant strain on the U.S. economy, resulting in sluggish hotel industry performance. The following table outlines the total estimated economic impact to the U.S. hotel industry as a result of the proposed minimum wage increase.

**Economic Impact of Extreme Minimum Wage Increase on the Hotel Industry and Nation**

| Affecting Factor | Impact | Result in Dollars |
|---|---|---|
| Lower Demand | Reduced annual guest room revenue | $612.3 million |
| Lower Demand | Reduced annual food & beverage revenue | $214.3 million |
| Lower Demand | Fewer guest rooms occupied resulting in less money spent for supplies | $145.7 million |
| Lower Demand | Loss of housekeeping and F&B jobs | $320.2 million[2] |
| Lower Demand | Loss of hotel values | $1.02 billion |
| Lower Demand | Lower hotel occupancy taxes collected | $70.4 million |
| Lower Profitability | Lower corporate taxes paid | $146.2 million |
| **Total** | | **$2.53 billion** |

---

[2] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments.

4

The following chart displays the types and quantities of negative economic impact anticipated in the U.S. from a minimum wage increase to $10.10 per hour.



National effects of extreme minimum wage increases may include a decrease in hotel property values and a slowing of hotel construction in local areas. Profitability has been linked to the market value of hotels (O'Neill, 2004), and therefore, with relatively low profit margins, newly constructed hotels would have decreased market values and could be sold at lower prices, further stunting local economies. If the industry's business model produces lower returns, business for hotel brokers, construction workers, hotel workers, food suppliers, guest room amenity suppliers, laundry companies, etc., would be hurt as a trickle-down effect.

Research on the hotel industry suggests extreme minimum wage increases could contribute to a vicious cycle of high wages leading to high turnover, high stress and high health care costs. Turnover would be compounded because such wage increases would hasten the elimination of restaurants and room service in hotels and corresponding job losses because many hotel owners would not continue such operations at a loss.

In summary, the total initial estimated economic impact to the hotel industry as a result of the proposed extreme minimum wage increase, considering reduced revenue, loss of jobs,

loss of money going back into the economy, i.e., "trickle-down effect," loss in property value, and the reduction in payment of taxes would equate to roughly $2.53 billion in the U.S.[3] It is important to note that those in the hotel industry who would be most negatively affected by extreme minimum wage increases would be small business entrepreneurs who only own one or two hotels as their primary source of income.

---

[3] Note that this estimate is a conservative one assuming the national $10.10 minimum wage increase is passed, and no higher local minimum wage legislation goes into effect.  Also, other local taxes were not considered in the national number; therefore, the total economic impact is likely greater than $2.53 billion.

## Introduction

Employment and careers compose a key function in modern society and communities, and they significantly benefit the people who have them. According to a report from the Robert Wood Johnson Foundation (2013), employment has been linked to relatively healthier lives, healthier home environments, safer neighborhoods, better nutrition, higher quality childcare, and more educational opportunities. Conversely, unemployment and underemployment (inconsistent or unstable work) lead to negative outcomes such as increases in blood pressure, unhealthy coping behaviors, and increased depression (Robert Wood Johnson Foundation, 2013). Additionally, laid-off Americans are 83 percent more likely than their fully employed counterparts to develop stress-related health conditions (Robert Wood Johnson Foundation, 2013).

Employment also leads to positive psychological benefits. Graetz (1993) found that those who were employed reported a 23 percent lower level of psychological distress than those who were unemployed. Reemployment may reverse the negative psychological effects caused by unemployment, including reducing depression (Kessler, Turner, & House, 1988). A recent report, commissioned by the National Institutes of Health, suggested that gaining employment and consequently getting off of welfare programs, reduced mothers' drinking problems and rates of depression (Zabkiewicz & Schmidt, 2009). Damaske (2011) suggested that employment has positive familial outcomes beyond income, such as strengthening familial bonds and creating a sense of contribution to the family by each worker.

While employment plays a role in a community's psychological and physical health, it also influences the economic vitality of a community. Wages significantly affect how people are able to gain employment and can influence job losses.

The federal proposal to increase the minimum wage by 39 percent from the current level of $7.25 to $10.10 per hour (U.S. CBO, 2014) represents a significant change. A report by the U.S. Congressional Budget Office (2014) of the U.S. Congress, estimated the current administration's proposed extreme minimum wage increase to $10.10 per hour would increase levels of unemployment and negatively affect the nation's budget deficits. This report discusses the potential benefits and pitfalls of increasing the minimum wage, and presents economic impact analyses for the U.S.

overall, and for the city of Los Angeles with a focus on the L.A. proposal for an extreme increase to $15.37 per hour.

## Background

Evidence of both positive and negative effects of raising minimum wages has been reported both within and outside the United States. This literature review focuses on the American perspective regarding the economic impacts that could result from significant increases in minimum wages, i.e., extreme minimum wage increases. This perspective focuses on effects specific to the hotel industry, an industry that in some geographic areas has been singled out for local minimum wage increases (Rainey, 2014a). An executive summary of this literature review is included in the appendix to this report.

*Benefits of a Minimum Wage Increase*

Raising the minimum wage has recently been heralded as a way to aid labor markets and the overall economy in the U.S. Claims in the popular press have been made that raising the minimum wage will reduce poverty (Konczal, 2014), increase employment (Berman, 2013), and provide relief for workers earning a low wage (Rainey, 2014b). Claims of benefits of an extremely high increase in the minimum wage are reported to be grounded in empirical data.

One reported benefit of a higher minimum wage is positive effects on employment conditions. It has been demonstrated that a rise in the minimum wage may increase the ratio of permanent to temporary workers in organizations as they convert more workers to full-time status (Dolado, Kramarz, Machin, Manning, Margolis, Teulings, & Keen, 1996). Dolado et al (1996) posit the reason for this conversion is an attempt by employers to increase the output of each person on the payroll when wages are relatively high. Unlike temporary workers, permanent workers have a significant cost of severance, which tends to lead to relatively higher employment levels in slumping organizations. Dolado et al (1996), however, are silent as to the effect regarding those who are not converted from part-time to full-time status within an organization; it is

8

possible that those who do not get converted to full-time employment lose employment altogether.

Brenner (2005) echoes the positive employment benefit of relatively high minimum wages by suggesting that in conditions of relatively high minimum wages, firms may be more likely to employ relatively fewer part time employees and engage more full-time workers.   Reducing part-time employment for the sake of full-time employment may be beneficial; however, it could lead to detrimental outcomes for certain members of communities.   Many women after child rearing are either forced or choose to "pull back" from the workforce by taking on part-time employment (Damaske, 2011).   Additionally, 78 percent of young adults with autism who were able to graduate from high school, were only able to find part-time employment (Taylor & Seltzer, 2011). If an increase in the minimum wage converts part-time employment opportunities to full-time opportunities, communities may suffer as mothers, autistic individuals, and others who seek part-time work may find it more difficult to secure suitable employment.

Currently, what is being proposed in some municipalities such as Los Angeles, and was enacted on January 1, 2014, at SeaTac (Seattle airport area), is an extreme increase in minimum wage levels to approximately $15 per hour.   The city of Seattle is now considering a minimum wage of $15.00 per hour (Wilson, 2013).   Washington State's minimum wage is currently over $9.00 per hour, and is the highest in the country. If the latest Seattle proposal is passed, the minimum wage would increase by 61 percent. In Los Angeles, the proposed increase in the minimum wage would apply to workers employed at hotels of 100 rooms or more, and would increase the minimum wage rate from the state minimum of $8.00 to $15.37 per hour, for a 92 percent increase (Rainey, 2014a) as shown in the following graph.

9



Also, the San Diego city council proposal to increase the minimum wage to $13.09 per hour would result in a 64 percent increase (Horn, 2014), and the proposal being considered by the Providence, RI, city council to increase the minimum wage to $15.00 per hour for hotel workers would result in an 88 percent increase (Fredericks, 2014).

Another reported benefit of an extreme increase in the minimum wage is the increased earnings, and in turn, spending power of those who are employed at the higher wage rate. In a study at the San Francisco airport (where a 22 percent increase in the minimum wage took place in 2000) conducted after the substantial minimum wage increase, workers were reported to have had lower levels of absenteeism and turnover, and higher levels of morale and productivity (Reich, Hall & Jacobs, 2005). A reduction of turnover and absenteeism is a logical outcome, in this instance, as the workers could easily see that similar employment anywhere else in the city would result in an earnings reduction. However, an extreme increase in the minimum wage may not have the same effect at the state or national level.

It has been reported that a proposed 39 percent increase in the federal minimum wage from $7.25 to $10.10 per hour would raise an estimated 900,000 people out of poverty (U.S. CBO, 2014), and an increase (similar to that of the San Francisco airport workers) of 24 percent to $9.00 per hour, would raise an estimated 300,000 people out of poverty (U.S. CBO, 2014).   Being able to legislate a reduction in poverty levels is tempting, but the same report indicates that doing so would reduce overall employment, suggesting an extreme rise in the minimum wage may merely cycle different people in and out of poverty.   Economists have observed this issue for decades. As Stigler (1946, p. 363) stated, "The connection between hourly wages and the standard of living of the family is thus remote and fuzzy.   Unless the minimum wage varies with the amount of employment, number of earners, non-wage income, family size, and many other factors, it will be an inept device for combatting poverty even for those who succeed in retaining employment.   And if the minimum wages varies with all these factors, it will be an insane device."

It has been suggested that improved earnings of workers would contribute in a small way to reducing federal budget deficits in the short term by decreasing the number of people eligible for federal assistance programs (U.S. CBO, 2014).   The caveat to this short-term reduction of the federal budget deficit is that in the long term, the deficit is expected to increase if those who lose their jobs are unable to secure new employment in the labor market with the higher minimum wage (U.S. CBO, 2014).

*Drawbacks of a Minimum Wage Increase*

While some benefits of an extremely high minimum wage have been posited, significant drawbacks have also been reported.   One such drawback is increased prices to consumers.   In two studies regarding the restaurant industry, minimum wage increases resulted in increased prices for consumers (Aaronson, 2001; Aaronson, French & MacDonald, 2008).   Aaronson et al (2008) concluded that every one percentage point increase in the lowest wage results in a .07 percent increase in prices.   For businesses with a relatively higher proportion of employees earning the minimum wage, such as fast food, the estimated price increase is 1.6 percent for every 10.0 percent increase in the

11

minimum wage. Aaronson (2001) suggested that in markets where prevailing low-skill wages far exceed minimum wages, minimum wage increases have limited effects on market wages and costs; however, where the opposite is true, the effect is significant.

In a study of the San Francisco airport area, additional costs were passed on as a result of a minimum wage hike. The companies who serviced the airport charged higher fees to the airlines flying into and out of San Francisco at the rate of an additional $1.42 per arriving passenger (Reich, Hall & Jacobs, 2005). In a study of firms in Boston after the city passed a minimum wage increase that applied only to firms with a large portion of revenues from city contracts, prices did not increase, but rather profitability declined (Brenner, 2005). It appears that the affected firms in Boston may not have had the ability to increase prices due to the nature of their business contracts with the city. In conclusion, there appears to be a consistent relationship between an increase in the wage floor and an increase in prices to consumers. Even nominal increases to the minimum wage are expected to flow through either to consumers or the profit margins of companies.

In the current debate regarding minimum wage increases, governmental entities are proposing what could be classified as an extreme minimum wage increase. Increases being proposed in Seattle would increase the minimum wage by 61 percent (Wilson, 2013), in Los Angeles by 92 percent (Rainey, 2014b), in San Diego by 64 percent (Horn, 2014), in Providence by 88 percent (Fredericks, 2014), and nationally by 39 percent (U.S. CBO, 2014). The stark increase may have unique outcomes in the national and local economies, especially as it pertains to employment levels.

The typical effect of a relatively high minimum wage is an adverse impact on employment. Economists have long understood the link between high minimum wage increases and increases in unemployment. Stigler (1946) suggested that the link was present because the cost of labor increases, which in turn decreases the amount that is produced by an individual per dollar in wages. An established minimum wage above the wage equilibrium level has been shown to lead to a fall in employment in the U.S. (Brown, Gilroy and Kohn 1982; Card, Katz, and Drueger, 1993). Stewart (2004) showed

a link that for all workers (men and women, youth and adult), an increase in the minimum wage reduced employment, and did so even for those who were earning greater than a ten percent premium over the minimum wage prior to the increase. Evidence from Russia (a nation experiencing rapid increases in minimum wages) shows that every 1.0 percent increase in the Kaitz ratio[4] leads to a 0.047 percent increase in unemployment (Muravyev & Oshchepkov, 2013). Russia experienced increases of the Kaitz ratio of approximately 100 percent in one year due to increases in the minimum wage, resulting in an overall 4.7 percent increase in unemployment (Muravyev & Oshchepkov, 2013).

An increase in the U.S. minimum wage to $10.10 per hour would change the American Kaitz ratio from .35 to .49,[5] or a 40 percent increase. If the minimum wage were increased to $10.10 per hour, an estimated 500,000 people would lose their jobs, and if the minimum wage increased to $9.00 per hour, an estimated 100,000 people would lose their jobs (U.S. CBO, 2014). An historical example of how the minimum wage can adversely affect employment can be found in the Americas when Puerto Rico increased its minimum wage to be consistent with the mainland U.S. In the late 1970s and early 1980s, the extreme minimum wage increase significantly increased unemployment, particularly in low wage sectors of the Puerto Rican labor market (Castillo-Freeman & Freeman, 1992). Migration from Puerto Rico to the mainland U.S. increased during this time from the unemployed population after the minimum wage hike, particularly among relatively uneducated and low-skilled migrants (Castillo-Freeman & Freeman, 1992).

Muravyev and Oshchepkov (2013) found that when unemployment occurs due to increases in the minimum wage, people take on more informal, i.e., "under-the-table" work, where they do not pay taxes or receive legal protections, and typically earn below the minimum wage. Informal work increased in Russia when minimum wages increased (Muravyev and Oshchepkov, 2013). Increasing informal work may lead to immeasurable outcomes, such as a lack of access to affordable health care. After the Supreme Court of

---

[4] The Kaitz ratio is the ratio of the minimum wage to the average wage.

[5] The Kaitz ratio was calculated using the average wage in the United States based on the Social Security Administration's estimation.

the U.S. upheld the individual mandate of the Affordable Care Act requiring all citizens to have health insurance (Sacks, 2012), those who have gained informal work will have to pay out of pocket to become compliant.   Additionally, engaging in informal work will put people at risk by not having access to workers compensation claims, unemployment benefits, and they may not be able to cite their experience on their resumes when searching for better jobs.

Wage growth actually slowed in the United Kingdom during periods following minimum wage increases (Stewart, 2004).  When the federal minimum wage increased in the U.S. in 1991, the restaurant industry in Texas experienced a narrowing of the wage dispersion (Katz & Krueger, 1992).   This narrowing occurred largely because those workers who were earning the lowest wages received a raise, but managers were reluctant to significantly increase the wages of the highest paid workers resulting in relatively more low-wage workers.   Wage growth is only one part of remuneration that could decrease as a result of an extreme minimum wage increase.

Along with wages, hotel employers often offer benefits such as health insurance, paid time off, job training, free meals, free parking and retirement plans.  However, low-wage workers are less likely to have access to most types of employment benefits than high-wage workers as outlined in Table 1. As a result, the previously discussed creation of relatively more low-wage workers in the U.S. hotel industry as a result of wage rate increases could mean that relatively more hotel workers would be vulnerable to the effects of benefit decreases.

**Table 1 - Employment Benefits Access by Wage Group**

| Benefit | Low-Wage Workers | Mid-Wage Workers | High-Wage Workers |
|---|---|---|---|
| Health coverage for an individual | 42% | 87% | 94% |
| Health coverage for individuals and families | 34% | 78% | 87% |
| Paid time off for illness | 39% | 74% | 90% |
| Paid vacation | 51% | 89% | 88% |
| Paid holidays | 46% | 86% | 89% |
| Defined benefit pension | 16% | 39% | 48% |
| Retirement plan with employer contributions | 32% | 72% | 87% |
| Job training or education | 45% | 64% | 81% |

Adapted from: Families and Work Institute, 2006

In countries such as the United Kingdom and Japan, where the government regulates benefits like vacation days, paid time off for illness, and health insurance, employers have limited discretion regarding how benefits are provided, and there is no relationship between minimum wage and benefit changes (Kanki, 2013). Similarly, in France where the government regulates such benefits, the minimum wage is increased and decreased in conjunction with these "social security" benefits (Kanki, 2013). The U.S., however, does not have laws regarding most benefits and employment, with the major exception being the recent Affordable Care Act which was upheld by the Supreme Court of the U.S. (Sacks, 2012). It is conceivable given the flexibility that American employers have in paying benefits, (that employers in the United Kingdom, France, and Japan do not), that with large increases in minimum wages, benefits will be reduced. Evidence from Chile suggests that as minimum wages increased, the matching individual contributions from employers to deferred benefits like unemployment insurance for workers declined (Ferrada, 2010). As in the U.S., employers in Chili have flexibility regarding employment benefits. Considering the evidence from Chile and the freedom U.S. employers have to offer benefits, it is quite possible that workers in the U.S. would

15

experience a reduction in the total benefits to which they have access as a result of an extreme increase in the minimum wage. Early evidence from SeaTac suggests that benefit reductions may have already occurred in that area as a result of the January 1, 2014, extreme minimum wage increase (Ng, 2014).

*The Hotel Industry*

Increasing the minimum wage would create conditions where hotels would operate under a higher cost structure. Unfortunately, even to the extent some costs could be passed along to guests in the form of higher room rates, hotel operators would be likely to experience decreased profitability. O'Neill and Mattila (2007) found that hotels with relatively higher room rates are no more profitable than hotels with lower room rates. Competent hotel managers are always trying to maximize their room rates (Noone, Kimes, Mattila & Wirtz, 2009). Under conditions where management is already maximizing rates, they may not be able to increase rates to make up for increased labor costs resulting from an extreme minimum wage increase. If a hotel operation were to reduce employment levels to control costs, or to keep staffing levels in line with a decrease in business levels, the outcome may backfire, further hurting profitability. Employees in the hotel industry sometimes work long hours and report high levels of stress, so reducing staff levels could contribute to work overloads, and in turn, drive turnover (O'Neill & Davis, 2011). Furthermore, if staffing levels are reduced, employee stress levels in hotels could increase as a result of longer and more unpredictable hours (Cleveland, O'Neill, Himelright, Harrison, Crouter & Drago, 2007), contributing to a vicious cycle of high wages leading to high turnover, high stress and high health care costs. Turnover has been estimated to reduce profitability in hotels by an average of $7,500 per hotel property for every 1.0 percent increase in turnover (Simons & Hinkin, 2001).

Such reductions in profitability may not seem to be a significant impact to large companies like Hilton Worldwide or Marriott International. However, according to STR (formerly Smith Travel Research, 2013), as of year-end 2012, Hilton Worldwide franchised 3,102 hotels while directly managing only 272 hotels, and Marriott franchised 2,404 hotels while only directly managing 697 hotels. This model of franchising their

16

properties has evolved as the primary method of operation of American hotel companies, and most hotel companies franchise at an even higher rate than Hilton and Marriott (STR, 2013). Out of these two companies, a total of 5,506 hotels were owned and managed by entities other than the parent companies. The owners may be large real estate companies, but more likely would be small business entrepreneurs who only own one or two hotels as their primary source of income. If turnover were to increase by a modest amount of five percent, a single hotel owner would see a reduction of $37,500 in profitability.

The effects of extreme minimum wage increases may be particularly acute in certain less profitable sectors of the hotel industry. For example, hotels owners with food and beverage operations may simply close their restaurants rather than attempt to operate them in a highly unprofitable fashion. Such operations are labor intensive, so closing them could result in very high levels of unemployment.

Room service departments are becoming less profitable in today's market (Brancatelli, 2013). Given a reduction in overall demand, entire room service departments may be cut to reduce costs, as has already occurred at the Hilton New York in response to high wage rates, and is being considered by a number of other U.S. hotel operators with food and beverage services (Brancatelli, 2013). Hotel restaurants account for a significant portion of revenue (35 percent on average) for full-service hotels (Schmidgall, 2006); however, they are often underperforming and are at risk of being eliminated from hotels in instances of rising costs (Canina & Carvell, 2005) such as wage rates. Hotel room departments typically operate at an average departmental profit margin of 74 percent, whereas food and beverage departments' profit margin is typically 32 percent, and much of that profit is in the more lucrative catering and events business, rather than in restaurant operations.

Once non-departmental overhead expenses are considered, such as utility costs, marketing expenditures, maintenance expenses, and other administrative costs, typical hotel food & beverage operations barely break even. Schmidgall (2006) found that hotel restaurants are highly labor intensive. Therefore, a large increase in the minimum wage would be a particularly negative event, and it is plausible that an extreme increase in the minimum wage would hasten the elimination of restaurants and room service in hotels

17

and corresponding job losses because many hotel owners would not continue such operations at a loss.

*Los Angeles and Biloxi*

The effects of extreme minimum wage increases would have different results in different cities. To provide a demonstration, two relatively generalizable metropolitan areas of different sizes and located in different regions of the U.S. are evaluated as explanatory cases in this paper. Namely, in Biloxi, MS, and Los Angeles, CA, the effects of extreme minimum wage increases would be deleterious to the health of the hotel industry in both municipalities, but for different reasons.

Biloxi employment has not fully recovered from the most recent economic recession or from the two Gulf tragedies of Hurricane Katrina and the Deep Water Horizon oil spill. Biloxi's unemployment rate was at 8.2 percent in 2013, up from 5.2 percent in 2004, the year before Hurricane Katrina (U.S. BLS, 2014a). Los Angeles' employment levels have been deeply affected by the most recent recession. The unemployment level in Los Angeles was 4.8 and 5.6 percent in 2006 and 2007, respectively, however, it increased to 10.7 percent in 2013 (U.S. BLS, 2014a). Both Biloxi and Los Angeles had unemployment levels higher than the national average in 2013, which was 6.7 percent (U.S. BLS, 2014a). In fact, as of December 2013, Los Angeles had the 305th lowest level of employment and Biloxi had the 248th lowest level of employment of any metropolitan area in the U.S. (U.S. BLS, 2014b). Each of these two labor markets would be a prime candidate for employment market improvements.

Both cities also have strong hotel markets, with Biloxi being a Gulf coast resort destination, and Los Angeles being the country's second largest city, and a hub of commerce and culture. The examples of Biloxi and Los Angeles highlight how other areas of the nation may be adversely affected by extreme minimum wage increases, as well.

In Biloxi, the minimum wage would increase due the raising of the federal minimum wage. This 39 percent increase in the minimum wage would result in higher hotel prices for this Gulf coast resort destination. Biloxi has a low wage model in the hotel industry compared to the nearby alternative of New Orleans. Table 2 compares the

differences in median wages for hotel employees between the two cities, national median wages, and percentage change in the wage that would be required based on a proposed increase in the minimum wage to $10.10 per hour.

**Table 2 - Median Wage Differences between Biloxi, MS and New Orleans, LA**

| Position | Biloxi | Percent Change to $10.10 | New Orleans | Percent Change to $10.10 | National | Percent Change to $10.10 |
|---|---|---|---|---|---|---|
| Hotel Front Desk | $9.60 | 5.2 % | $11.13 | N/A | $10.56 | N/A |
| Bellhops | $8.52 | 18.5% | $9.17 | 10.1% | $9.64 | 4.8% |
| Housekeeping | $9.44 | 7.0% | $9.72 | 3.9% | $10.49 | N/A |
| Concierge | $8.60 | 17.4% | $9.63 | 4.9% | $13.10 | N/A |

Source: U.S. BLS, 2014b

With an increase in the minimum wage to $10.10 per hour, hotels in Biloxi, would be affected to a far greater degree than hotels in New Orleans and would be affected more than average hotels nationally. Hotel managers in Biloxi would most likely raise their room rates making the destination significantly more expensive. The increase in the minimum wage would narrow the gap between what hotels in New Orleans and Biloxi charge, potentially driving more business to New Orleans, further reducing employment in Biloxi. If hotels in Biloxi were unable to raise their rates, they would be forced to lay off employees to maintain their profit margins. In either scenario, the city of Biloxi would not only lose out on hotel business and earned income tax of the workers who would lose their jobs, but the city would also lose out on occupancy tax from overnight hotel guests, and sales taxes from whatever those guests purchased while in town. The national minimum wage in the case of Biloxi would be detrimental, as Dolando et al (1996, p. 329) state, "a single national minimum wage is then an extremely blunt policy instrument, being set too low in some markets (employment could be raised by having a higher minimum) and too high in other markets (employment is reduced)."

The city of Los Angeles is proposing a new, higher minimum wage strictly for

hotel workers of $15.37 per hour (Rainey, 2014a).  The increase for the city of Los Angeles would apply only locally, so other destinations in California would not be required to comply with the new wage rate.  Hotels in Anaheim, for example, would be able to maintain their profit margins and rates, while hotels in Los Angeles would be forced to either accept lower profit margins, charge higher rates, or both.  If a result of the proposed wage increase in Los Angeles were to be an increase in prices at hotels, travel demand most likely would weaken as transient and group travelers would seek better deals elsewhere.

If the proposals for increases in the minimum wages for both Los Angeles and the U.S. are passed, the wages in Los Angeles would rise much higher than elsewhere in the country.  Table 3 outlines how much wages would increase in hotels in Los Angeles and Anaheim based on the new minimum wage structures.

**Table 3 - Median Wage Differences between Los Angeles and Anaheim**

| Position | Los Angeles | Percent Change to $15.37 | Anaheim | Percent Change to $10.10 |
|---|---|---|---|---|
| Hotel Front Desk | $10.95 | 40.4 % | $11.26 | N/A |
| Bellhops | $9.59 | 54.5% | $9.63 | 4.8% |
| Housekeeping | $10.23 | 50.2% | $14.26 | N/A |
| Concierge | $14.22 | 8.1% | $9.98 | 1.2% |

Source: U.S. BLS, 2014b

The increase in the cost structure would impact Los Angeles in a much more notable way than other cities in southern California.  The hotels in the city of Anaheim would see a negligible increase in labor costs, while hotels in the city of Los Angeles would experience increases of over 50 percent in some departments as noted in Table 2.  Given such increases in the wages for Los Angeles hotels, hotel prices would be likely to increase, and group and transient business would be likely to go to other markets.  The city of Los Angeles currently has unemployment levels greater than 10 percent (U.S.

BLS, 2014a), and could ill afford to put more of its population out of work. The city of Anaheim, however, may experience a windfall in occupancy, tax dollars, and employment due to higher demand in their local hotels. Other enterprises that receive business from tourists in L.A. would be negatively affected, other tax revenues would be reduced and improvements to urban infrastructure relying on tax revenues could be compromised.

### Summary Regarding Extreme Wage Rate Increases

Legislation which proposes extreme minimum wage increases would have detrimental effects on the hotel industry, and as the examples of Biloxi and Los Angeles show, these effects would not be uniform. Hotel prices would increase while profitability would decrease as a result of national or local extreme minimum wage laws. Additionally, due to lower profitability, the industry would be forced into layoffs, and/or to maintain profitability, hotel guests would experience higher prices. Even if higher prices were to be charged, the potential exists for hotels to lose guests to competitors as is likely in such cities as Biloxi and Los Angeles. Even more detrimental to the hotel industry would be if rates are increased, and as a result, trips are canceled altogether. If there are fewer travelers, all markets and hotels would lose out on revenues, hamstringing the industry across the nation.

If hotel managers in such cities as Biloxi and Los Angeles were unable to adjust their rates according to their new cost structures, employment would suffer as more expensive labor would need to be cut. Some hotels may not be able to survive the new environment and would close their doors altogether, negatively affecting employment and tax revenue.

An additional detrimental outcome may be a slowing of hotel construction in local areas. Profitability has been linked to the market value of hotels (O'Neill, 2004), and therefore, with relatively low profit margins, newly constructed hotels would have decreased market values and could be sold at lower prices, further stunting local economies. If the industry's business model produces lower returns, business for hotel brokers, construction workers, hotel workers, food suppliers, guest room amenity

suppliers, laundry companies, etc., could suffer, especially in the case of hotel closures. Ultimately, investment in hotels would decrease, and the value of existing properties would decline, further contributing to sluggish industry performance.  O'Neill (2004) found that the net operating income (a common metric for measuring hotel unit profitability) determines a hotel market value by a product of 5.615, so every $1,000 loss in profitability would result in a $5,615 value decrease per hotel guest room.  Lower profitability of hotels would produce lower levels of employment in the industry, lower levels of employment in the industries that support and are supported by the hotel industry, lower levels of investment in hotels, and lower tax revenues for the municipalities in which hotels are located.  An estimate of the economic impact is presented in the next section of this report.

Beyond the business side of the hotel industry, there is a human element, as well. The hotel industry is one where entrepreneurs can get started, and where hard work and humble beginnings turn into massive success stories.  Take Isadore Sharp and Four Season Hotels as one such example of entrepreneurial success.  On March 20, 1961, Mr. Sharp entered the hotel industry while still in his 20s with a 125-room motel in Toronto, Canada (Four Season History, 2014).  It took Mr. Sharp more than five years to get enough investors behind his vision to start his hotel career, and through persistent work and dedication, he was able to turn that single motel into one of the most recognizable luxury brands in the world.  Creating a less profitable environment through extremely high minimum wages may prevent people such as Isadore Sharp from convincing investors to create the next great hotel company.

The hotel industry is more than a vehicle for entrepreneurship because there is a strong tradition of promoting and progressing careers from within.  For example, Bob McCarthy, Marriott International's chief operations officer who retired in February of 2014, spent 38 years with the company starting as an hourly waiter in a Marriott hotel restaurant outside Philadelphia, PA (Marriot News Center, 2013).  Such entry-level roles as Mr. Sharp and Mr. McCarthy held, are seen as traditional "routes to the top" in the hotel industry where there are numerous egalitarian stories of people starting in hourly positions and rising to high level, executive leadership positions (Cleveland et al, 2007).

### An Estimate of the Economic Impact of an Extreme Minimum Wage Increase on the Hotel Industry

According to the U.S. Congressional Budget Office (2014), the effects of extreme increases in the minimum wage would be both positive and negative. Overall, real family income[6] would increase by $2 billion, with 16.5 million workers being directly affected by having their wages increase; however, per person, this increase amounts to only $121 per worker in real income. The U.S. Congressional Budget Office (CBO) report (2014) also suggests that 900,000 people would be raised above the poverty line by an increase of the minimum wage to $10.10 per hour, while 500,000 would lose their jobs. The same report (U.S. CBO, 2014) suggests that there also would be 15.6 million workers who experience wage rate increases, but who still would not pay federal income taxes, due to relatively low family income. The U.S. CBO (2014) anticipates corporate profits to decline due to slimmer profit margins which would reduce tax revenues overall through reductions in corporate income and personal income taxes paid by those who own businesses. Higher prices for goods and services would decrease demand, and lower demand might also reduce local sales taxes, such as hotel occupancy taxes. Additionally, more workers would become eligible for federally subsidized health insurance under the nation's new Affordable Care Act, and in states that have not accepted the insurance exchanges, the workers would remain eligible for Medicaid (U.S. CBO, 2014).

Based on the proposed minimum wage increases, hotels in Biloxi and Los Angeles, for example, would experience average daily rate increases of between 2.7 percent and 6.4 percent,[7] assuming rates could be increased. If rates were successfully raised, demand would decrease resulting in lower occupancies for hotels in those areas. Demand nationally may decrease, as well, as hotel prices become more expensive overall. If prices were not increased, then profit margins would decrease as a product of more expensive labor costs. As a result of reduced demand and/or profitability, hotel values would decrease and development would slow.

---

[6] Family income after adjusting for inflation and taxes

[7] Aaronson (2001) found that prices increase 7% of the increase in the wage floor; i.e., in Biloxi, a 39% increase in the minimum wage from $7.25 to $10.10 per hour, multiplied by 7%, equals a 2.7% increase in prices (0.39 x 0.07 = 0.027, or 2.7%); in L.A., a 92% increase in the minimum wage from $8.00 to $15.37 per hour, multiplied by 7%, equals a 6.4% increase in prices (0.92 x 0.07 = 0.064, or 6.4%)

A Corgel and Lane (2013) study on price elasticity in the U.S. lodging market found that lodging demand would be reduced by 16 percent of an average daily rate increase, absent economic growth.   As previously discussed, the proposed extreme minimum wage increase in Los Angeles would result in a 6.4 percent increase in hotel room rates. This increase would result in a 2.4 percent decrease in demand.[8] In 2013, 27.2 million hotel room nights were occupied in Los Angeles (Los Angeles Tourism & Convention Board, 2014). Thus, the decrease in occupied room nights in Los Angeles due to the proposed extreme minimum wage increase would be 652,800[9] room nights for the year.  With the L.A. city average daily rate of $162.53 (Baltin, 2014), an estimated $106.1 million would be lost in hotel room revenue, and an estimated $16.4 million would be lost in city occupancy taxes, using the 15.5 percent hotel occupancy tax rate for L.A.  To make up the expected lost revenue of $106.1 million, hotel owners would look to reduce costs, most likely resulting in layoffs

Demand for hotels may decline in a market with an extreme minimum wage because prices have been shown to rise with increases in the minimum wage (Aaronson 2001: Aaronson et al., 2008).  The current proposal is to increase the minimum wage by 39 percent in the United States, as previously discussed.  However, research by Katz and Kruegar (1992) observed that in an environment where increases to the minimum wage are occurring, the effects of raising the minimum wage also effect workers who earn up to a 10 percent premium on the new minimum, essentially raising the wage floor of low wage workers above the newly established minimum wage.  Katz and Kruegar (1992) suggest this effect occurs because employers maintain a certain amount of their wage hierarchies; therefore, the increase in the wage floor (an artificial bottom for wages in a given market, not necessarily the true minimum wage) may actually be a 49 percent increase (39% + 10% where 39% is the true increase and 10% is the assumed premium on low wage workers).  The 49 percent increase in the wage floor would be expected to raise prices in hotels by 3.4 percent.[10]  Corgel and Lane (2013) suggested that an artificial increase in prices (an increase in prices not brought about due to increased demand or

---

[8] 6.4% (price increase) x 16% (demand reduction) = 2.4% demand reduction
[9] 27.2 million room nights x .024 (demand reduction) = 652,800 lost room nights
[10] 0.49 x 0.07 = 0.034, or 3.4%, where 49% is the percent of wage increase and 7% is the Aaronson (2001) price flow through factor, as previously presented

other market factors) would lower demand by a factor of 16 percent of the price increase, as previously discussed. Based on the calculated price increase of 3.4 percent, and Corgel and Lane's (2013) assumption of the prices for hotels being relatively inelastic at the rate of 0.16, then a 0.5 percent decrease (0.034 x -0.16 = -0.005, or 0.5 percent) in hotel demand would be expected where 3.4 percent is the anticipated rate at which prices would increase, and 16 percent is the Corgel and Lane (2013) finding regarding the rate at which demand would fall.

In 2013, the average daily rate for a hotel in the U.S. was $110.33, and approximately 3,040,000 hotel room nights were occupied in the U.S. per day, or 1.11 billion room nights for the year (PWC, 2014). Therefore, based on these figures, 5,550,000 room nights would be lost due to the extreme minimum wage increase,[11] and $612,330,000 in room revenue would be lost.[12] In the U.S., local hotel room occupancy taxes range from 6.0 to 17.0 percent of the room rate, with an average of 11.5 percent (Proto Planning Travel Agency, 2014). Thus, approximately $70.4 million would be lost in hotel room taxes nationally due to the $612,330,000 reduction in room revenue.[13]

As a result of wage rate increases, the hotel industry would not only earn less, but spend less as a result of lower demand. Hotels spend an estimated $25 to $38 per occupied room (Toh, DeKay & Raven, 2011) to cover expenses. After removing estimated housekeeping labor expenses (assuming a half hour of wages at the national median wage rate for housekeepers of $10.49 per hour as presented in Table 2), that leaves $19.75 to $32.75 that hotels spend per occupied room on items such as guest room amenities (soap, shampoo, conditioner, lotion, etc.), energy (electricity, water, natural gas, etc.), and laundry services (cleaning the sheets, linens, towels, etc.). Assuming that an extreme increase in the minimum wage decreases national demand for hotel rooms by an estimated 5,550,000 room nights annually as presented previously, U.S. hotels would spend an estimated $145.7[14] million dollars less in the overall economy due to a reduction in need for items like soap, cleaning supplies, water, and laundry services. L.A.

---

[11] 1.11 billion total room nights x 0.5% = 5,550,000 room nights lost
[12] 5,550,000 room nights x $110.33 ADR = $612,330,000 lost room revenue
[13] $612,330,000 lost room revenue x 0.115 = $70.4 million
[14] ($19.75 + $32.75) / 2 (average cost per occupied room) x 5,550,000 (estimated reduction in rooms sold) = $145.7 million

25

hotels would spend an estimated $17.1[15] million dollars less in the overall economy based on its extreme minimum wage proposal.

A reduction in hotel demand would have deleterious effects on employment in the industry, as well. An estimated 1,586 housekeepers would lose their jobs in the U.S. due to the drop off in demand nationally,[16] and approximately 187 housekeepers would lose their jobs in L.A.[17] Housekeeping would not be the only department to experience reduced employment numbers, but other room department positions like front office attendants, bellhops, and concierges could be cut, as well. Additionally, support departments like reservations may experience a decline in employment levels to adjust the costs appropriately for lower demand. Finally, with fewer guests in hotels, fewer meals would be served, reducing food and beverage staff, and possibly elimination of struggling services like room service, as previously discussed. The loss in revenue in food and beverage may contribute to even more job losses through continuing the trend of eliminating the service from hotels altogether (Canina & Carvell, 2005). An estimated $214.3 million would be lost in hotel food and beverage revenue as a result of lower hotel demand in the U.S.,[18] and an estimated $37.1 million would be lost in hotel food and beverage revenue in the city of L.A.[19] To compensate for the reduced food and beverage revenues, hotel operators in the U.S. would need to eliminate 21.2 million wage hours at the $10.10 rate, or 10,609 food and beverage jobs would be lost.[20] In L.A., hotel operators would need to cut 2.4 million wage hours at the $15.37 rate, or 1,207 food and

---

[15] ($19.75 + $32.75) / 2 (average cost per occupied room) x 652,800 (estimated reduction in rooms sold) = $17.1 million

[16] 5,550,000 room nights (estimated reduction in national demand per year) / 14 (number of rooms a housekeeper cleans in an average day) = 396,429 shifts; 396,429 / 250 (number of shifts worked in a year based on 5 shifts per week for 50 weeks per year) = 1,586 people

[17] 652,800 room nights (estimated reduction in L.A. demand per year) / 14 (number of rooms a housekeeper cleans in an average day) = 46,629 shifts; 46,629 / 250 (number of shifts worked in a year based on 5 shifts per week for 50 weeks per year) = 187 people

[18] $612,330,000 (total estimate of annual lost rooms revenue to the hotel industry) x 35% (average percent of F&B revenue to rooms revenue; Schmidgall, 2006) = $214,320,000 in lost F&B revenue

[19] $106,100,000 (total estimate of annual lost rooms revenue in L.A.) x 35% (average percent of F&B revenue to rooms revenue; Schmidgall, 2006) = $37,100,000 in lost F&B revenue

[20] $214.3 million / $10.10 per hour = 21.2 million wage hours / 40 (hours worked per week) / 50 (number of weeks worked per year) = 10,609 F&B jobs lost

beverage jobs would be lost.[21] In summary, at least 12,195 jobs would be lost (1,586 + 10,609) in the U.S., and 1,394 jobs would be lost in L.A. (187 + 1,207).[22]

In addition to the negative effects of job losses, lower revenues, less money being circulated back into the economy by paying suppliers, and reduced hotel room tax collections, the hotel industry would suffer from a loss of hotel valuation. O'Neill (2003) found that for every percentage point in occupancy lost, a hotel value would drop by $690 per room. The previously discussed 0.5 percent reduction in national hotel demand would result in a 0.3 percent reduction in occupancy based on the 2013 U.S. occupancy level of 62.3 percent (PWC, 2014), or a $207 loss in value per room.[23] Based on the 4.92 million hotel rooms in the U.S. (PWC, 2014), the reduction in value would be $1.02 billion.[24] Based on the 97,032 hotel rooms in L.A., the reduction in value would be $20.1 million.[25] It is plausible that the reduction in value would be even greater than $20.1 million at the 87 L.A. hotels with 100 or more guest rooms if they were required to implement the extreme $15.37 per hour minimum wage.

On average, every one percentage point in occupancy equates to $61,864 in hotel profitability (O'Neill & Mattila, 2007). Given the previously discussed 0.3 percent reduction in occupancy, hotel profitability would be would be reduced by $18,559.[26] Given the 52,529 hotels in the U.S. (STR, 2013), the total profitability reduction in the U.S. would be $974.9 million.[27] Assuming a 15 percent corporate tax rate, if U.S. hotel profitability decreased by $974.9 million, corporate taxes would be reduced by $146.2 million. Given 1,038 hotels in L.A., the total profitability reduction in L.A. would be $19.3 million,[28] and assuming a 15 percent corporate tax rate, corporate taxes would be reduced by $2.9 million. It is possible that the reduction in taxes would be even greater than $2.9 million at the 87 L.A. hotels with 100 or more guest rooms if they were

---

[21] $37.1 million / $15.37 per hour = 2.4 million wage hours / 40 (hours worked per week) / 50 (number of weeks worked per year) = 1,207 F&B jobs lost

[22] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments

[23] 62.3% x 0.5% = 0.3%

[24] $207 value loss per room x 4.92 million rooms = $1.02 billion

[25] $207 value loss per room x 97,032 rooms = $20.1 million

[26] $61,864 x 0.3 = $18,559

[27] $18,559 x 52,529 hotels = $974.9 million

[28] $18,559 x 1,038 hotels = $19.3 million

required to implement the extreme $15.37 per hour minimum wage.

The total economic impact of an extreme minimum wage increase would be a significant strain on the U.S. economy, and would result in sluggish hotel industry performance. Table 4 outlines the total estimated economic impact to the U.S. hotel industry as a result of an extreme minimum wage increase to $10.10 per hour.

**Table 4 - Economic Impact of Extreme Minimum Wage Increase on the Hotel Industry and Nation**

| Affecting Factor | Impact | Result in Dollars |
|---|---|---|
| Lower Demand | Reduced annual guest room revenue | $612.3 million |
| Lower Demand | Reduced annual food & beverage revenue | $214.3 million |
| Lower Demand | Fewer guest rooms occupied resulting in less money spent for supplies | $145.7 million |
| Lower Demand | Loss of housekeeping and F&B staff (total job loss at 12,195)[29] | $320.2 million[30] |
| Lower Demand | Loss of hotel values | $1.02 billion |
| Lower Demand | Lower hotel occupancy taxes collected | $70.4 million |
| Lower Profitability | Lower corporate taxes paid | $146.2 million |
| **Total** | | **$2.53 billion** |

---

[29] 12,195 (number of lost jobs) x $21,008 (full-time annual salary at $10.10 per hour) x 1.25 (the calculation assumes a 25% premium for benefits at the new $10.10 minimum wage rate) = $320,200,000

[30] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments.

The following chart displays the types and quantities of negative economic impact anticipated in the U.S. from a minimum wage increase to $10.10 per hour.



29

Table 5 outlines the total estimated economic impact to the L.A. hotel industry as a result of an extreme minimum wage increase to $15.37 per hour.

**Table 5 - Economic Impact of Extreme Minimum Wage Increase on the L.A. Hotel Industry and Community**

| Affecting Factor | Impact | Result in Dollars |
|---|---|---|
| Lower Demand | Reduced annual guest room revenue | $106.1 million |
| Lower Demand | Reduced annual food & beverage revenue | $37.1 million |
| Lower Demand | Fewer guest rooms occupied resulting in less money spent for supplies | $17.1 million |
| Lower Demand | Loss of housekeeping and F&B staff (total job loss at 1,394)[31] | $55.7 million[32] |
| Lower Demand | Loss of hotel values | $20.1 million |
| Lower Demand | Lower hotel occupancy taxes collected | $16.4 million |
| Lower Profitability | Lower corporate taxes paid | $2.9 million |
| **Total** | | **$255.4 million** |

---

[31] 1,394 (number of lost jobs) x $31,970 (full-time annual salary at $15.37 per hour) x 1.25 (the calculation assumes a 25% premium for benefits at the new $15.37 minimum wage rate) = $55,700,000

[32] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments.

The following chart displays the types and quantities of negative economic impact anticipated in L.A. from a minimum wage increase to $15.37 per hour.



In summary, the total estimated initial economic impact to the U.S. hotel industry as a result of the proposed extreme minimum wage increase to $10.10 per hour, considering loss of revenue, loss of jobs, loss of money going back into the economy, i.e., "trickle-down effect," loss in property value, and the reduction in payment of taxes would equate to roughly $2.53 billion dollars.[33] In L.A., the total estimated initial economic impact to the hotel industry as a result of the proposed extreme minimum wage increase to $15.37 per hour is estimated at $255.4 million. Such impact does not include the likely

---

[33] Note that this estimate is a conservative one assuming the national $10.10 minimum wage increase is passed, and no higher local minimum wage legislation goes into effect. Also, other local taxes were not considered in the national number; therefore, the total economic impact is likely greater than $2.53 billion.

effects of extreme minimum wage increase on promoting an underground economy, i.e., "under-the-table" work. Further, these figures represent estimated economic impact during the initial year; long-term effects would be greater.

## Appendix - Executive Summary of Literature Review

A literature review regarding extreme minimum wages revealed the following:

- Extreme minimum wage increases are being proposed in Los Angeles that would increase the minimum wage by 92 percent (Rainey, 2014), and nationally by 39 percent (U.S. CBO, 2014).
- In Los Angeles, the proposed increase in the minimum wage would apply only to hotel workers, and would increase the minimum wage rate from the state minimum of $8.00 to $15.37 per hour (Rainey, 2014).
- After approval of an extreme minimum wage at the Seattle airport area (SeaTac), the city of Seattle is considering a local minimum wage of $15.00 per hour (Wilson, 2013). Washington State's minimum wage is currently over $9.00 per hour, the highest in the country.
- Additional extreme minimum wage increases have been proposed in San Diego at $13.09 per hour (Horn, 2014), and in Providence, RI, at $15 per hour for hotel workers only (Fredericks, 2014).
- The federal proposal would increase the minimum wage from the current level of $7.25 to $10.10 per hour (U.S. CBO, 2014).
- Researchers have long questioned the value and benefits of minimum wages, in general, and extreme minimum wage increases, in particular. Stigler (1946) stated, "Unless the minimum wage varies with the amount of employment, number of earners, non-wage income, family size, and many other factors, it will be an inept device for combatting poverty even for those who succeed in retaining employment. And if the minimum wages varies with all these factors, it will be an insane device."
- In the restaurant industry, minimum wage increases resulted in increased prices for consumers (Aaronson, 2001; Aaronson, French & MacDonald, 2008).
- In the San Francisco airport area, additional costs were passed on from a minimum wage hike. The companies who serviced the airport charged higher fees at the rate of $1.42 per arriving passenger (Reich, Hall & Jacobs, 2005).
- In Boston, after the city passed a minimum wage increase that applied only to firms with a large portion of revenues from city contracts, prices did not increase, but profitability declined (Brenner, 2005).
- If the federal minimum wage were increased to $10.10 per hour, an estimated 500,000 people would lose their jobs. If the minimum wage increased to $9.00 per hour, an estimated 100,000 people would lose their jobs (U.S. CBO, 2014).
- Evidence from Russia (a nation experiencing rapid increases in minimum wages) shows that every 1.0 percent increase in the Kaitz ratio[34] leads to a 0.047 percent increase in unemployment (Muravyev & Oshchepkov, 2013). Russia experienced increases of the Kaitz ratio of approximately 100 percent in one year due to increases in the minimum wage, resulting in an overall 4.7 percent increase in unemployment (Muravyev & Oshchepkov, 2013).
- Muravyev and Oshchepkov (2013) found that when unemployment occurs due to

---

[34] The Kaitz ratio is the ratio of the minimum wage to the average wage.

33

increases in the minimum wage, people take on more informal, i.e., "under-the-table" work, where they do not pay taxes or receive legal protections, and typically earn below the minimum wage. Informal work increased in Russia when minimum wages increased. Increasing informal work may lead to unmeasurable outcomes, such as a lack of access to affordable health care.

- Jobs are linked to functional communities, including relatively safe neighborhoods, healthy home environments, healthy lives, good nutrition, high quality childcare, and educational opportunities. Conversely, unemployment leads to negative outcomes such as increases in blood pressure, unhealthy coping behaviors, stress related conditions and increased depression (Robert Wood Johnson Foundation, 2013).

- After the Supreme Court of the U.S. upheld the individual mandate of the Affordable Care Act (Sacks, 2012), those who have gained informal work will have to pay out of pocket to become compliant. Additionally, engaging in informal work will put people at risk by not having access to workers compensation claims, unemployment benefits, and they may not be able to cite their experience on their resumes when searching for better jobs.

- In the late 1970s and early 1980s, the extreme minimum wage increase in Puerto Rico significantly increased unemployment, particularly in low wage sectors. (Castillo-Freeman & Freeman, 1992). Migration from Puerto Rico to the mainland U.S. increased, particularly among relatively uneducated and low-skilled migrants (Castillo-Freeman & Freeman, 1992).

- Workers in the U.S. hospitality industry could be particularly vulnerable to the effects of benefit decreases as a result of extreme wage rate increases because unlike countries in Europe and Asia, the U.S. has limited laws regarding linking most benefits and employment, with the primary exception being the Affordable Care Act. Such benefit decreases occurred in South America in concert with minimum wage increases (Ferrada, 2010).

34

## References

Aaronson, D. (2001). Price pass-through and the minimum wage. *Review of Economics and Statistics 83* (1): 158-169.

Aaronson, D. French, E. & MacDonald, J. (2008). The minimum wage, restaurant prices, and labor market structure. *Journal of Human Resources 43* (3): 688 - 720.

Baltin, B. (2014). GHN market report: Los Angeles County. *Global Hospitality Resources.* Proprietary Report.

Brancatelli, J. (2013, July 17). It's the end of hotel rooms service as we know it, and I feel fine. *The Business Journals* Retrieved from http://www.bizjournals.com/bizjournals/blog/seat2B/2013/07/room-service-part-of-hotel-adaption.html?page=all.

Berman, J. (2013, December 19). $10.10 minimum wage would actually create new jobs: Study. *Huffington Post* Retrieved from http://www.huffingtonpost.com/2013/12/19/1010-minimum-wage_n_4474183.html.

Brenner, M. D. (2005). The Economic Impact of the Boston Living Wage Ordinance. *Industrial Relations: A Journal of Economy and Society 44* (1): 59 - 83.

Brown, C. Gilroy, C. & Kohen, A. (1982). The effect of the minimum wage on employment and unemployment. *Journal of Economic Literature* 20 (2): 487 – 528.

Canina, L. & Carvell, S. (2005). Lodging demand for urban hotels in major metropolitan markets. *Journal of Hospitality and Tourism Research* 29: 291 – 311.

Card, D. L. Katz, L. F. & Kruegar, A. B. (1993). An evaluation of recent evidence of the federal minimum wage. *Industrial and Labor Relations Review* 46 (1): 38 – 54.

Castillo-Freeman, A., & Freeman, R. B. (1992). When the minimum wage really bites: the effect of the U.S.-level minimum on Puerto Rico. In *Immigration and the workforce: Economic consequences for the United States and source areas* (pp. 177-212). University of Chicago Press.

Cleveland, J. N., O'Neill, J. W. Himelright, J. L. Harrison, M. M. Crouter, A. C. & Drago, R. (2007). Work and family issues in the hospitality industry: Perspectives of entrants, managers, and spouses. *Journal of Hospitality & Tourism Research 31* (3): 275 - 298.

Corgel, J. & Lane, J. (2013). Hotel Industry Demand Curves. *PKF Consulting – Hotel Horizons:* 7 – 13.

Damaske, S. (2011). *For the Family: How Class and Gender Shape Women's Work.* New York, N.Y.: Oxford University Press.

Dolado, J. Kramarz, F. Machin, S. Manning, A. Margolis, D., Teulings, C. & Keen, M. (1996). The economic impact of minimum wages in Europe. *Economic policy* 319-372.

Families and Work Institute (2006). What do we know about entry-level, hourly employees" *Research Brief No. 1* Retrieved from http://familiesandwork.org/eproducts/brief1.pdf.

Ferrada, C. (2010). Individual savings accounts in Chile: Income vs. substitution effects and saving responses. *Manuscript, Chicago University.*

Freeman, A. C. & Freeman, R. B. (1991). Minimum wages in Puerto Rico: Textbook case of a wage floor?  NBER Working Paper no. 3759. Cambridge, Mass. National Bureau of Economic Research, June.kat.

Four Seasons History (2014). Retrieved from http://www.fourseasons.com/about_four_seasons/1960_to_1969/.

Fredericks, Z. (2014). Hotel workers petition to raise minimum wage. *The Brown Daily Herald* April 15.

Graetz, B. (1993). Health consequences of employment and unemployment: Longitudinal evidence for young men and women. *Social Science & Medicine* 36 (6): 715 – 724.

Horn, J. (2014). Is minimum wage hike right for San Diego? *The San Diego Union Tribune* April 26.

Kanki, C. (2011). Legal structure of, and issues with, Japan's regional minimum wage system: Comparative study of the UK and French systems, including the social security systems. *Minimum Wage in Japan 8* (2): 55 – 70.

Katz, L. F. & Krueger, A. B. (1992). *The effect of the minimum wage on the fast food industry* (No. w3997). National Bureau of Economic Research.

Kessler, R. C. Turner, J. B. & House, J. S. (1988). Effects of unemployment on health in a community survey: Main, modifying, and mediating effects. *Journal of Social Issues* 44(4): 69 – 85.

Konczal, M. (2014, January 4). Economists agree: Raising the minimum wage reduces poverty. *The Washington Post* Retrieved from http://www.washingtonpost.com/blogs/wonkblog/wp/2014/01/04/economists-agree-raising-the-minimum-wage-reduces-poverty/.

Los Angeles Tourism & Convention Board. (2014, May 9). L.A. tourism board announces tourism job growth and record visitor spending during national travel & tourism week celebration. Press Release.

Marriott New Center (2013).  Retrieved from http://news.marriott.com/2013/09/marriott-chief-operations-officer-robert-bob-mccarthyto-retire-in-february.html.

Muravyev, A. & Oshchepkov, A. (2013). Minimum wages and labor market outcomes: evidence from the emerging economy of Russia. *Higher School of Economics* Research Paper No. WP BRP, 29.

Ng, A. (2014). What SeaTac tells us about $15 minimum wage. *Northwest Asian Weekly* May 22.

Noone, B. Kimes, S. Mattila, A. & Wirtz, J. (2009). Perceived service encounter pace and customer satisfaction: An empirical study of restaurant experiences. *Journal of Service Management* 20 (4): 380 – 403.

O'Neill, J. W. & Mattila, A. S. (2007). The debate regarding profitability: hotel unit and hotel brand revenue and profit relationships. *Journal of Travel & Tourism Marketing, 21* (2-3): 131 - 135.

O'Neill, J. W. & Davis, K. (2011). Work stress and well-being in the hotel industry. *International Journal of Hospitality Management 30* (2): 385 - 390.

O'Neill, J. W. (2004). An automated valuation model for hotels. *Cornell Hotel and Restaurant Administration Quarterly* 45 (3): 260 - 268.

O'Neill, J. W. (2003). ADR rule of thumb: Validity and suggestions for its application. *Cornell Hotel and Restaurant Administration Quarterly* 44 (4): 7-16.

Proto Planning Travel Agency (2014). Hotel occupancy tax rates for U.S. cities. Proprietary Report.

PWC (2014, January). *PricewaterhouseCoopers Hospitality Directions*. Proprietary report.

Rainey, J. (2014a, February 18). L.A. council to consider hiking minimum wage to $15.37 at big hotels. *Los Angeles Times* Retrieved from http://www.latimes.com/local/lanow/la-me-ln-minimum-wage-20140217,0,1713172.story#axzz2thzfIuUz.

Rainey, J. (2014b, February 14). For workers on the bottom rung, wage hike could make big difference. *Los Angeles Times* Retrieved from http://www.latimes.com/business/la-me-la-wage-hike-20140215,0,1788883.story?track=rss#axzz2tNQvTlCz.

Reich, M. Hall, P. & Jacobs, K. (2005). Living wage policies at the San Francisco airport: Impacts on workers and businesses. *Industrial Relations: A Journal of Economy and Society 44* (1): 106 - 138.

Robert Wood Johnson Foundation. (2013). *Stable jobs = healthier lives* [Brochure]. Retrieved from http://www.rwjf.org/en/blogs/new-public-health/2013/01/stable_jobs_health.html.

Sacks, M. (2012, June, 28).  Supreme court health care decision:  Individual mandate survives. *Huffington Post* Retrieved from http://www.huffingtonpost.com/2012/06/28/supreme-court-health-care-decision_n_1585131.html.

Schmidgall, R. (2006). *Hospitality industry managerial accounting* (6th ed.). Lansing, MI: Educational Institute of the American Hotel & Lodging Association.

Simons, T. & Hinkin, T. (2001). The Effect of Employee Turnover on Hotel Profits A Test Across Multiple Hotels. *Cornell Hotel and Restaurant Administration Quarterly 42* (4): 65 - 69.

STR (2013). Hotel Industry Foundations. Presented at the International Council of Hotel Restaurant and Institutional Educators Conference, St. Louis, MO.

Statistica (2012).  Hotel average daily rate in Los Angeles from Q1 2010 to Q1 2013. Retrieved from http://www.statista.com/statistics/202389/average-daily-rate-of-hotels-in-los-angeles/.

Stewart, M. B. (2004). The impact of the introduction of the UK minimum wage on the employment probabilities of low-wage workers. *Journal of the European Economic Association 2* (1): 67 - 97.

Stigler, G. J. (1946). The economics of minimum wage legislation. *The American Economic Review* 358 - 365.

Taylor, J. L. & Seltzer, M. M. (2011). Employment and post-secondary educational activities for young adults with autism spectrum disorders during the transition to adulthood. *Journal of Autism and Developmental Disorders* 41 (5): 566 – 574.

Toh, R. S. DeKay, D. F. & Raven, P. (2011).  Travel planning searching for and booking hotels on the internet.  *Cornell Hospitality Quarterly* 52 (4): 388 – 398.

U.S. Bureau of Labor Statistics. (2014a). *Databases, Tables & Calculators by Subject.* Retrieved from http://data.bls.gov/timeseries/LAUMT282506000000004?data_tool=XGtable.

U.S. Bureau of Labor Statistics. (2014b). *Local Area Unemployment Statistics.* Retrieved from http://www.bls.gov/web/metro/laummtrk.htm.

U.S. Bureau of Labor Statistics. (2014c). *At a glance:  Accommodations and food service sector.* Retrieved from http://www.bls.gov/iag/tgs/iag72.htm.

U.S. Congressional Budget Office. (2014). *The effects of a minimum wage increase on employment and family income.* Retrieved from http://www.cbo.gov/sites/default/files/cbofiles/attachments/44995-MinimumWage.pdf.

Wilson, R. (2013, September 25). Is Seattle headed for a $15 minimum wage? *The Washington Post* Retrieved from http://www.washingtonpost.com/blogs/govbeat/wp/2013/09/25/is-seattle-headed-for-a-15-minimum-wage/.

Zabkiewicz, D. & Schmidt, L. A. (2009). The mental health benefits of work: do they apply to welfare mothers with a drinking problem? *The Journal of Behavioral health Services & Research* 36 (1): 96 – 110.

*ADDENDUM D*

*PKF INDUSTRY SURVEY*

Los Angeles Living Wage Ordinance

## Q2 How many keys is your property?

Answered: 17   Skipped: 1



| Answer Choices | Responses | |
|---|---|---|
| Less than 100 | 5.88% | 1 |
| 101 to 300 | 70.59% | 12 |
| 301 to 500 | 5.88% | 1 |
| 501 to 700 | 17.65% | 3 |
| 701 to 900 | 0.00% | 0 |
| More than 900 | 0.00% | 0 |
| Total | | 17 |

Los Angeles Living Wage Ordinance

## Q3 In which City Council district is your hotel located?

Answered: 15    Skipped: 3



| Answer Choices | Responses |
|---|---|

## Los Angeles Living Wage Ordinance

| | | |
|---|---|---|
| 1 | **0.00%** | 0 |
| 2 | **6.67%** | 1 |
| 3 | **0.00%** | 0 |
| 4 | **6.67%** | 1 |
| 5 | **6.67%** | 1 |
| 6 | **0.00%** | 0 |
| 7 | **0.00%** | 0 |
| 8 | **0.00%** | 0 |
| 9 | **0.00%** | 0 |
| 10 | **0.00%** | 0 |
| 11 | **20.00%** | 3 |
| 12 | **0.00%** | 0 |
| 13 | **0.00%** | 0 |
| 14 | **20.00%** | 3 |
| 15 | **0.00%** | 0 |
| Not Sure | **40.00%** | 6 |
| **Total** | | 15 |

Los Angeles Living Wage Ordinance

## Q4 Is your hotel a union property?  If so, indicate which departments are unionized. (check all that apply)

Answered: 18    Skipped: 0



| Answer Choices | Responses | |
|---|---|---|
| Our hotel is Non-Union | 88.89% | 16 |
| Housekeeping | 5.56% | 1 |
| Servers | 0.00% | 0 |
| Cooks | 0.00% | 0 |
| Banquets | 5.56% | 1 |
| Engineering | 11.11% | 2 |
| Other (please specify) | 0.00% | 0 |
| Total Respondents: 18 | | |

| # | Other (please specify) | Date |
|---|---|---|
| | There are no responses. | |

Los Angeles Living Wage Ordinance

## Q5 How many Full-Time Equivalent Employees (FTEs) does your hotel currently have?

Answered: 18   Skipped: 0



| Answer Choices | Responses | |
|---|---|---|
| Less than 50 | 16.67% | 3 |
| 51 to 100 | 22.22% | 4 |
| 101 to 200 | 38.89% | 7 |
| 201 to 400 | 16.67% | 3 |
| More than 400 | 5.56% | 1 |
| Total | | 18 |

Los Angeles Living Wage Ordinance

## Q6 How many of your hourly employees (expressed as FTEs) are currently making less than $15.37 per hour, EXCLUDING tips? (please express as FTEs)

Answered: 18    Skipped: 0

| # | Responses | Date |
|---|---|---|
| 1 | 120 | 6/7/2014 10:30 AM |
| 2 | 150 | 6/6/2014 1:57 PM |
| 3 | approx. 30 | 6/6/2014 11:48 AM |
| 4 | 111 | 6/6/2014 10:51 AM |
| 5 | 81 | 6/6/2014 9:26 AM |
| 6 | 175 | 6/5/2014 5:42 PM |
| 7 | 70 | 6/5/2014 3:53 PM |
| 8 | 47 | 6/4/2014 8:56 PM |
| 9 | 163 FTEs | 6/4/2014 2:53 PM |
| 10 | Almost all of them. | 6/4/2014 2:09 PM |
| 11 | 15 | 6/4/2014 12:42 PM |
| 12 | 110 | 6/4/2014 11:47 AM |
| 13 | 89 | 6/4/2014 11:41 AM |
| 14 | 55 | 6/4/2014 11:26 AM |
| 15 | 57 | 6/4/2014 11:13 AM |
| 16 | 30 | 6/3/2014 4:28 PM |
| 17 | 50 | 6/3/2014 4:11 PM |
| 18 | 23 | 6/3/2014 4:03 PM |

Los Angeles Living Wage Ordinance



## Q7 In which departments are these employees earning less than $15.37 per hour? (select all that apply)

Answered: 18   Skipped: 0

| Answer Choices | Responses | |
|---|---|---|
| Front Desk/Concierge | **77.78%** | 14 |
| Bell Staff | **72.22%** | 13 |
| Valet Parking | **44.44%** | 8 |
| Section/Public Space Housekeepers | **72.22%** | 13 |

# Los Angeles Living Wage Ordinance

| | | |
|---|---|---|
| Laundry Staff | **61.11%** | 11 |
| Cooks | **44.44%** | 8 |
| Stewards | **44.44%** | 8 |
| Servers | **83.33%** | 15 |
| Bartenders/Barbacks | **66.67%** | 12 |
| Cashier/Host | **55.56%** | 10 |
| PBX | **38.89%** | 7 |
| Admin Assistant | **27.78%** | 5 |
| Other (please specify) | **38.89%** | 7 |
| **Total Respondents: 18** | | |

| # | Other (please specify) | Date |
|---|---|---|
| 1 | Reservations, Security, Barista | 6/6/2014 1:57 PM |
| 2 | engineering | 6/6/2014 11:48 AM |
| 3 | Sales admin, Receivers, Maintanence | 6/6/2014 10:51 AM |
| 4 | Pool Attendants, Bussers,Runners,Massage Therapist, Esthetician | 6/5/2014 5:42 PM |
| 5 | Spa Therapists | 6/5/2014 3:53 PM |
| 6 | Landscapers and Engineering | 6/4/2014 11:47 AM |
| 7 | Housekeeping Supervisor | 6/4/2014 11:26 AM |

Los Angeles Living Wage Ordinance

## Q8 How many of the employees (expressed as FTEs) in #6 and #7 above are making more than $15.37 per hour, INCLUDING tips?

Answered: 18    Skipped: 0

| #  | Responses  | Date               |
|----|------------|--------------------|
| 1  | 30         | 6/7/2014 10:30 AM  |
| 2  | 59         | 6/6/2014 1:57 PM   |
| 3  | approx. 20 | 6/6/2014 11:48 AM  |
| 4  | 17         | 6/6/2014 10:51 AM  |
| 5  | 20         | 6/6/2014 9:26 AM   |
| 6  | 150        | 6/5/2014 5:42 PM   |
| 7  | 64         | 6/5/2014 3:53 PM   |
| 8  | 24         | 6/4/2014 8:56 PM   |
| 9  | 82         | 6/4/2014 2:53 PM   |
| 10 | 3          | 6/4/2014 2:09 PM   |
| 11 | 0          | 6/4/2014 12:42 PM  |
| 12 | 55         | 6/4/2014 11:47 AM  |
| 13 | 34         | 6/4/2014 11:41 AM  |
| 14 | 15         | 6/4/2014 11:26 AM  |
| 15 | 3          | 6/4/2014 11:13 AM  |
| 16 | 41         | 6/3/2014 4:28 PM   |
| 17 | all        | 6/3/2014 4:11 PM   |
| 18 | 2          | 6/3/2014 4:03 PM   |

Los Angeles Living Wage Ordinance

## Q9 If you have calculated the annual financial impact to your hotel assuminig the minimimum hourly wage of $15.37, what is the annual increase in labor costs at your currently-staffed level of operations?

Answered: 11   Skipped: 7

| Answer Choices | Responses | |
|---|---|---|
| With no tip credit (all tipped and non-tipped hourly employees must be paid $15.37 per hour) | 90.91% | 10 |
| With a tip credit (reported tips for tipped hourly employees can be added to the hourly wage) | 54.55% | 6 |

| # | With no tip credit (all tipped and non-tipped hourly employees must be paid $15.37 per hour) | Date |
|---|---|---|
| 1 | 3000000 | 6/6/2014 1:57 PM |
| 2 | 541,602 | 6/6/2014 9:26 AM |
| 3 | $280,000 | 6/5/2014 3:53 PM |
| 4 | $150,000 | 6/4/2014 8:56 PM |
| 5 | 71,697 | 6/4/2014 2:53 PM |
| 6 | $1,174,22.64 | 6/4/2014 11:47 AM |
| 7 | 100% | 6/4/2014 11:26 AM |
| 8 | $900,000 | 6/4/2014 11:13 AM |
| 9 | $1,010,880 | 6/3/2014 4:28 PM |
| 10 | $305,000 | 6/3/2014 4:03 PM |
| # | With a tip credit (reported tips for tipped hourly employees can be added to the hourly wage) | Date |
| 1 | 1,248,000 | 6/7/2014 10:30 AM |
| 2 | 352,235 | 6/6/2014 9:26 AM |
| 3 | $62,400 | 6/5/2014 3:53 PM |
| 4 | $750,000.00 | 6/4/2014 11:47 AM |
| 5 | 100% | 6/4/2014 11:26 AM |
| 6 | $850,882 | 6/3/2014 4:28 PM |

Los Angeles Living Wage Ordinance

## Q10 Does the financial impact above include additional benefits and payroll tax burdens?

Answered: 14   Skipped: 4



| Answer Choices | Responses | |
|---|---|---|
| Yes | 21.43% | 3 |
| No | 78.57% | 11 |
| Total | | 14 |

| # | Comment: | Date |
|---|---|---|
| 1 | Does not include benefits or other taxes | 6/4/2014 2:53 PM |
| 2 | yes, Includes impact from Work Comp insurance and Payroll Tax as both of those costs are based on Employee Earnings..not number of employees. | 6/4/2014 11:47 AM |
| 3 | Benefits and payroll taxes would be on top of the $900,000. | 6/4/2014 11:13 AM |
| 4 | This amounts to a 35% increase in Payroll Dollars. Without taxes and benefits. | 6/3/2014 4:03 PM |

Los Angeles Living Wage Ordinance

## Q11 Which of the following are likely to occur if the $15.37 Living Wage Ordinance is implemented? (check all that apply for your hotel and the market in general)

Answered: 17    Skipped: 1



# Los Angeles Living Wage Ordinance



**We will not be able to...**

**New hotels will not get...**

0%  10%  20%  30%  40%  50%  60%  70%  80%  90% 100%

My Hotel    The Market

| | My Hotel | The Market | Total Respondents |
|---|---|---|---|
| We will have to reduce our staff. | 100.00% 15 | 66.67% 10 | 15 |
| We will shift from full-time staff to more part-time staff. | 100.00% 15 | 66.67% 10 | 15 |
| We will increase the workload for existing employees (i.e. increase section hskpg credits). | 83.33% 10 | 75.00% 9 | 12 |
| We will have to cut back on employee amenities, such as free meals, transportation, departmental and annual parties, etc. | 86.67% 13 | 66.67% 10 | 15 |
| If contract staff are included in this ordinance, we may have to bring this function in-house. | 66.67% 6 | 77.78% 7 | 9 |
| We will cut back operating hours and/or close outlets. | 92.86% 13 | 78.57% 11 | 14 |
| We have competitors in our primary competitive set that are located outside the City of LA. These hotels will not have the same labor burden, so this will put us at a competitive disadvantage. | 94.12% 16 | 70.59% 12 | 17 |
| On-going schedule maintenance will be delayed or cancelled. | 91.67% 11 | 75.00% 9 | 12 |
| Capital improvement projects will be delayed or cancelled due to reduced investment returns for owners. | 85.71% 12 | 71.43% 10 | 14 |
| We will not be able to participate in large city-wide convention blocks due to the low rates. | 80.00% 8 | 80.00% 8 | 10 |
| New hotels will not get built because the required investment returns will not be reached. | 50.00% 7 | 92.86% 13 | 14 |

| # | Please give details. For example, how many FTEs would be cut? Which outlets (restaurant, room service, etc.?) would be closed or have its hours cut back? How else might your hotel's operation be impacted? | Date |
|---|---|---|
| 1 | We would have to pass this cost on to the consumer which will have a drastic effect on demand in the market creating a slow down in business and less hours available for staff to work. | 6/7/2014 10:30 AM |
| 2 | Hours of service would be cut, in room service, food and beverage outlets, housekeeping and events. Staff would need to be cut in all line-level positions from doormen to front desk. | 6/6/2014 1:57 PM |

## Los Angeles Living Wage Ordinance

| | | |
|---|---|---|
| | events. Staff would need to be cut in all mid-level positions, from doorman to front desk, reservations to food and beverage. | |
| 3 | Approx. 12- 15 | 6/6/2014 11:48 AM |
| 4 | In order to save on benefits to recoup some of wage increase, we will likely hire more part time employees than full time. We will eliminate a few positions in our Executive Office and rely more on our salaried managers. We generally spend upwards of $30K in the community for staff events, picnics, holiday parties, manager outings. This money being spent in the city of LA will be drastically reduced thus impacting businesses we would normally be doing business with. Perks such as parking, cell phones, cafeteria offerings will likely be reduced and the costs passed on to employees. We operate a 24 hour restaurant and room service. We would likely need to cut our hours overnight and eliminate those positions. It will make it increasingly difficult for a hotel on the border of Glendale, WeHo, Beverly Hills to compete with properties that might be across the street that are not included in this ordinance. We will need to raise our rates, thus making us less competitive for City Wide blocks, and that would severely impact the overall convention business coming into LA, which is already struggling to compete with newer convention centers across the country. | 6/6/2014 10:51 AM |
| 5 | Our financial impact numbers in question 9 assume that nobody gets a raise that is currently making $15.37 or more per our. Only raising those below $15.37 per hour to the $15.37 per hour. This will cause nothing but big employee morale issues as those that are making more than $15.37 will not be happy. Busboys with tips will be making more than line cooks, etc. If you take the $541,602 impact with a 7.5% cap rate, we are talking about reducing the value of the hotel by $7.2 million which is at least 20% of the overall hotel value - Dramatic! What will happen when interest rates start going up, recession/earthquake/terrorism causes business to drop back to 2009 levels. I will never consider buying another hotel in Los Angeles if this living wage goes into affect. | 6/6/2014 9:26 AM |
| 6 | unsure | 6/5/2014 5:42 PM |
| 7 | Unsure | 6/5/2014 3:53 PM |
| 8 | At the moment not sure who would be cut, but there will definetly be budget cuts. Most likely starting with restaurant, room service, and bellman. These associates would receive the highest increase since they are currently at minimum wage. | 6/4/2014 2:53 PM |
| 9 | Because of the cuts I will outline below, our Upscale LifeStyle Hotel would cease to be competitive against all the hotels in our comp-set because those hotels are smaller or outside the City. With the cuts we would need to survive, we could not demand higher rates when our comp set could afford to provide amenities and staffing levels required for higher rated business. About 29 employee positions would be eliminated throughout all departments. 3 new budgeted Admin Assistant positions would not be started. Reductions in QUALITY and SERVICE to our Tourists and Guests would occur For Example: Room Service discontinued (2 employees) Breakfast reduced to Buffet only (3 employees) One of our 2 bars would be closed (3 employees) No cocktail server in remaining bar (1 employee) Housekeeper Supervisors eliminated (4 employees) Housekeeper workload would increase and management would have to lower expectations for fine Room detailing. Valet parking would be eliminated (2 employees) Landscape department eliminated (3 employees) and out sourced. Guest Concierge position eliminated (2 employees) Gift shop closed (2 employees) Engineering department scaled back (1 employee) Mid-Level managers (a position hospitality workers strive for) eliminated (3 employees) COMMUNITY Affects: No longer provide donated meeting space/event discounts to NON-Profits: YMCA, Chamber of Commerce, Rotary, Religious groups, Voting Poll space, ADJUNCT BUSINESS affects: No longer hire/pay or patron Public Relations Agency, Advertising Agency, Marketing Agency, EMPLOYEE quality of job affects: Reduce Medical Benefit contribution to minimum required Reduce Medical provider to least expensive. Discontinue 24/7 Free meal program ($90,000) Discontinue Holiday Employee Gift giving ($20,000) Discontinue Safety Incentive Give aways ($15,000) Discontinue Training and Staff Development programs ($15-20,000) Discontinue Team Building/Morale programs ($10,000) We are quickly becoming the first Boutique property in the San Fernando valley. This proposal would reduce us back to limited service. It is very conceivable that we would actually eliminate all the jobs and re-appropriate the property into apartments/retail. | 6/4/2014 11:47 AM |
| 10 | Restaurant. Will minimize hours of operation. | 6/4/2014 11:41 AM |
| 11 | Approx half of the hotel staff. Housekeeping and Food & Beverage hours will be cut drastically. We may have to lease F&B outlet or close down meal period (ie. breakfast, lunch, or dinner). | 6/4/2014 11:26 AM |
| 12 | The would be a major shift to part time FTE's vs. Full time FTE's. We are currently working on a $7 million renovation that would be delayed or cancelled. Food and Beverage operations would be | 6/4/2014 11:13 AM |

## Los Angeles Living Wage Ordinance

| | | |
|---|---|---|
| | million renovation that would be delayed or cancelled. Food and beverage operations would be leased out to third party operators. | |
| 13 | We would cut at least 20 FTE's across the board because the room rates would not be able to move fast enought to counter balance this HUGE increase. We just renovated and re-opened 4 new F&B outlets, adding approximately 12 new FTE's. We would restructure menus and reduce hours in all of those outlets taking back the 12 FTE's we just added. Then we would reduce the other 8 FTE's by further complexing jobs with our local sister hotels.....i.e. accounting, HR, and sales. This would reduce the head coun another 8 FTE's. Only then would ownership be satisfied with the return on their $20 million investment just made in the hotel. Cuts would be made for sure to achieve the appropriate return. | 6/3/2014 4:28 PM |
| 14 | we would cut 4 FTE's It will take us from operating in the black finally after a few tough years and move us in the red. Thus eliminating our ability to borrow money and renovate our hotel to be competitive. We will reduce to below 100 rooms | 6/3/2014 4:03 PM |

Los Angeles Living Wage Ordinance

## Q12 Is there a compromise proposal that you would recommend to City Council if you could?

Answered: 12    Skipped: 6

| # | Responses | Date |
|---|-----------|------|
| 1 | City needs to work on job creation instead of job elimination. | 6/7/2014 10:30 AM |
| 2 | increase the room threshold the ordinance would apply to, to truly large hotels | 6/6/2014 11:48 AM |
| 3 | If the city really wants to improve the lives of it's residents through this ordinance, then it should apply to each and every business operator in the city. Singling out Hotels is unfair and hurts our ability to compete with restaurants and bars in our neighborhood that do not have the same wage implications. | 6/6/2014 10:51 AM |
| 4 | We would support any minimum wage increase that affects all works in the State Of California in the same manner. Other than that, we cannot support any measure that would impact only one industry and only part of that industry. | 6/6/2014 9:26 AM |
| 5 | use the state minimum wage | 6/5/2014 5:42 PM |
| 6 | Use the state minimum wage | 6/5/2014 3:53 PM |
| 7 | Apply the current Living Wage that is paid by the hotels in the Century Blvd. corridor to all hotels | 6/4/2014 8:56 PM |
| 8 | Wage change for ALL Businesses Wage increase phased in gradually over 3-5 years Credits given to businesses that already provide certain benefits to employees. Credits given to Hotels that are geographically far from the City's investment in Downtown and Convention Center. Credits given to Hotels that are NOT Subsidized by City. | 6/4/2014 11:47 AM |
| 9 | Offer standard increase. | 6/4/2014 11:26 AM |
| 10 | Only raise the living wage 30% over State minimum wage. | 6/4/2014 11:13 AM |
| 11 | Yes - move everyone to the same living wage ordinance as at LAX.....and not just hotels....all businesses!!! | 6/3/2014 4:28 PM |
| 12 | Yes, A minimun wage for all business. A tiered approach phased in over several years. | 6/3/2014 4:03 PM |

Los Angeles Living Wage Ordinance

## Q13 Do you have any other comments, questions, or concerns?

Answered: 10   Skipped: 8

| # | Responses | Date |
|---|-----------|------|
| 1 | in addition to increased labor costs & decreased staffing levels, the cost of doing business will require higher prices which will hurt business as well. | 6/6/2014 1:57 PM |
| 2 | Tipped employees often make far more than $15.37 per hour. There should be a carve out for tipped employees, unless their hourly rate and tips combined are less than $15.37 for any particular shift. | 6/6/2014 10:51 AM |
| 3 | Very big concern if this were to go into affect. Even if the tipped credit goes into affect (which I do not think is legally possible), we would still have big issues as valet attendants, bus boys and bellman's tips are not reported on their W-2 and thus would not be considered. | 6/6/2014 9:26 AM |
| 4 | thank you | 6/5/2014 5:42 PM |
| 5 | Thank you | 6/5/2014 3:53 PM |
| 6 | I have re-financed my property and I am using its equity to re-model and improve the property. This proposal would destroy my bank pro-forma. Financiers, and other developers I know, are either scaling their future projects back to under 100 rooms or not getting funding at all. I know one developer has managed to re-assess his property so that it falls in the County and not the City. So, if this proposal goes, the City will really find it does get more hotel rooms, renovated rooms, upscale rooms and the Jobs they provide, but neighboring cities will thrive. To target one business and only a sub-set of that business in a way that will eliminate jobs, competitive advantage, reduce property values, close businesses, hurt community partnerships appears to me to be illegal. NOT all hotels are equal in how they care for or manage their employees or the things the type of guests they serve. Having paid the City for 45 years, I believe it is the City's responsibility to dig very deeply into this proposal and clearly articulate how this proposal as it stands, would benefit anybody. Comparisons to Long Beach and Airport hotels is misleading. These Hotels are not serving the level of tourism and entertainment accounts that occur for my Hotel. Thank you for taking this Survey. I am so shocked that City has not asked me for this information themselves. | 6/4/2014 11:47 AM |
| 7 | This will force hotels to cut their staffing level and reduce guest satisfaction. It will deter guests from coming to the city. | 6/4/2014 11:26 AM |
| 8 | If the living wage increase goes into effect, delay the start for at least three years and then phase it in over 3 to 5 years depending on the final amount of the increase. | 6/4/2014 11:13 AM |
| 9 | Yes.....why do only hotel workers get a living wage?? Don't others deserve that as well?? | 6/3/2014 4:28 PM |
| 10 | Tour and Travel Business / Low rated international business will move outside the city to other areas | 6/3/2014 4:03 PM |

*ADDENDUM E*

*LOS ANGELES ADMINISTRATIVE CODE*

*ARTICLE 11, SECTION 10.37*

*LAX LIVING WAGE ORDINANCE*

# ⌑ARTICLE 11
# LIVING WAGE

Section
10.37    Legislative Findings.
10.37.1   Definitions.
10.37.2   Payment of Minimum Compensation to Employees.
10.37.3   Health Benefits.
10.37.4   Notifying Employees of Their Potential Right to the Federal Earned Income Credit.
10.37.5   Retaliation Prohibited.
10.37.6   Enforcement.
10.37.7   Administration.
10.37.8   Exclusion of Service Contracts from Competitive Bidding Requirement.
10.37.9   Coexistence with Other Available Relief for Specific Deprivations of Protected Rights.
10.37.10   Expenditures Covered.
10.37.11   Timing of Application.
10.37.12   Supersession by Collective Bargaining Agreement.
10.37.13   Liberal Interpretation of Coverage; Rebuttable Presumption of Coverage.
10.37.14   Severability.

## ⌑Sec. 10.37.  Legislative Findings.

The City awards many contracts to private firms to provide services to the public and to City government.  Many lessees or licensees of City property perform services that affect the proprietary interests of City government in that their performance impacts the success of City operations.  The City also provides financial assistance and funding to others for the purpose of economic development or job growth.  The City expends grant funds under programs created by the federal and state governments.  Such expenditures serve to promote the goals established for those programs by such governments and similar goals of the City.  The City intends that the policies underlying this article serve to guide the expenditure of such funds to the extent allowed by the laws under which such grant programs are established.

Experience indicates that procurement by contract of services has all too often resulted in the payment by service contractors to their employees of wages at or slightly above the minimum required by federal and state minimum wage laws.  Such minimal compensation tends to inhibit the quantity and quality of services rendered by such employees to the City and to the public. Underpaying employees in this way fosters high turnover, absenteeism, and lackluster performance.  Conversely, adequate compensation promotes amelioration of these undesirable conditions.  Through this article the City intends to require service contractors to provide a minimum level of compensation that will improve the level of services rendered to and for the City.

The inadequate compensation typically paid today also fails to provide service employees with resources sufficient to afford life in Los Angeles.  It is unacceptable that contracting decisions

involving the expenditure of City funds should foster conditions placing a burden on limited social services. The City, as a principal provider of social support services, has an interest in promoting an employment environment that protects such limited resources. In requiring the payment of a higher minimum level of compensation, this article benefits that interest.

Nothing less than the living wage should be paid by the recipients of City financial assistance themselves. Whether they be engaged in manufacturing or some other line of business, the City does not wish to foster an economic climate where a lesser wage is all that is offered to the working poor. The same adverse social consequences from such inadequate compensation emanate just as readily from manufacturing, for example, as service industries. This article is meant to protect these employees as well.

The City holds a proprietary interest in the work performed by many employees employed by lessees and licensees of City property and by their service contractors and subcontractors. In a very real sense, the success or failure of City operations may turn on the success or failure of these enterprises, for the City has a genuine stake in how the public perceives the services rendered for them by such businesses. Inadequate compensation of these employees adversely impacts the performance by the City's lessee or licensee and thereby does the same for the success of City operations. By the 1998 amendment to this article, recognition is given to the prominence of this interest at those facilities visited by the public on a frequent basis, including but not limited to, terminals at Los Angeles International Airport, Ports O'Call Village in San Pedro, and golf courses and recreation centers operated by the Department of Recreation and Parks. This article is meant to cover all such employees not expressly exempted.

Requiring payment of the living wage serves both proprietary and humanitarian concerns of the City. Primarily because of the latter concern and experience to date regarding the failure of some employers to honor their obligation to pay the living wage, the 1998 amendments introduce additional enforcement mechanisms to ensure compliance with this important obligation. Non-complying employers must now face the prospect of paying civil penalties, but only if they fail to cure non-compliance after having been given formal notice thereof. Where non-payment is the issue, employers who dispute determinations of non-compliance may avoid civil penalties as well by paying into a City holding account the monies in dispute. Employees should not fear retaliation, such as by losing their jobs, simply because they claim their right to the living wage, irrespective of the accuracy of the claim. The 1998 amendments strengthen the prohibition against retaliation to serve as a critical shield against such employer misconduct.

SECTION HISTORY

Article and Section Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.1.  Definitions.

The following definitions shall apply throughout this article:

(a)  "**Airport**" means the Department of Airports and each of the airports which it operates.

(b)  "**Airport Employer**" means an Employer, as the term is defined in this section, at the Airport.

(c)  "**Airport Employee**" means an Employee, as the term is defined in this section, of an Airport Employer.

(d)  "**Awarding authority**" means that subordinate or component entity or person of the City (such as a department) or of the financial assistance recipient that awards or is otherwise responsible for the administration of a service contract or public lease or license, or, where there is no such subordinate or component entity or person, then the City or the City financial assistance recipient.

(e)  "**City**" means the City of Los Angeles and all awarding authorities thereof, including those City departments which exercise independent control over their expenditure of funds, but excludes the Community Redevelopment Agency of the City of Los Angeles ("**CRA**"). The CRA is urged, however, to adopt a policy similar to that set forth in this article.

(f)  "**City financial assistance recipient**" means any person who receives from the City discrete financial assistance for economic development or job growth expressly articulated and identified by the City, as contrasted with generalized financial assistance such as through tax legislation, in accordance with the following monetary limitations. Assistance given in the amount of one million dollars ($1,000,000) or more in any twelve-month period shall require compliance with this article for five years from the date such assistance reaches the one million dollar ($1,000,000) threshold. For assistance in any twelve-month period totaling less than one million dollars ($1,000,000) but at least one hundred thousand dollars ($100,000), there shall be compliance for one year if at least one hundred thousand dollars ($100,000) of such assistance is given in what is reasonably contemplated at the time to be on a continuing basis, with the period of compliance beginning when the accrual during such twelve-month period of such continuing assistance reaches the one-hundred thousand dollar ($100,000) threshold.

Categories of such assistance include, but are not limited to, bond financing, planning assistance, tax increment financing exclusively by the City, and tax credits, and shall not include assistance provided by the Community Development Bank. City staff assistance shall not be regarded as financial assistance for purposes of this article. A loan shall not be regarded as financial assistance. The forgiveness of a loan shall be regarded as financial assistance. A loan shall be regarded as financial assistance to the extent of any differential between the amount of the loan and the present value of the payments thereunder, discounted over the life of the loan by the applicable federal rate as used in 26 U.S.C. Sections 1274(d), 7872(f). A recipient shall not be deemed to include lessees and sublessees.

A recipient shall be exempted from application of this article if:

(1)  it is in its first year of existence, in which case the exemption shall last for one (1) year,

(2)   it employs fewer than five (5) employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, or

(3)   it obtains a waiver as provided herein.

A recipient - who employs the long-term unemployed or provides trainee positions intended to prepare employees for permanent positions, and who claims that compliance with this article would cause an economic hardship - may apply in writing to the City department or office administering such assistance, which department or office which shall forward such application and its recommended action on it to the City Council.  Waivers shall be effected by Council resolution.

(g)   "**Contractor**" means any person that enters into:

(1)   a service contract with the City,

(2)   a service contract with a proprietary lessee or licensee or sublessee or sublicensee, or

(3)   a contract with a City financial assistance recipient to assist the recipient in performing the work for which the assistance is being given. Vendors, such as service contractors, of City financial assistance recipients shall not be regarded as contractors except to the extent provided in Subsection (i).*

*Technical correction due to re-lettering of subsections: "Subsection (f)" corrected to "Subsection (i)".

(h)   "**Designated Administrative Agency (DAA)**" means the Department of Public Works, Bureau of Contract Administration, who shall bear administrative responsibilities under this article.

(i)   "**Employee**" means any person - who is not a managerial, supervisory, or confidential employee and who is not required to possess an occupational license - who is employed

(1)   as a service employee of a contractor or subcontractor on or under the authority of one or more service contracts and who expends any of his or her time thereon, including but not limited to: hotel employees, restaurant, food service or banquet employees; janitorial employees; security guards; parking attendants; nonprofessional health care employees; gardeners; waste management employees; and clerical employees;

(2)   as a service employee - of a public lessee or licensee, of a sublessee or sublicensee, or of a service contractor or subcontractor of a public lessee or licensee, or sublessee or sublicensee - who works on the leased or licensed premises;

(3)   by a City financial assistance recipient who expends at least half of his or her time on the funded project; or

(4)   by a service contractor or subcontractor of a City financial assistance recipient and who expends at least half of his or her time on the premises of the City financial assistance recipient directly involved with the activities funded by the City.

(j)   "**Employer**" means any person who is a City financial assistance recipient, contractor, subcontractor, public lessee, public sublessee, public licensee, or public sublicensee and who is required to have a business tax registration certificate by Los Angeles Municipal Code §§ 21.00 - 21.198 or successor ordinance or, if expressly exempted by the Code from such tax, would otherwise be subject to the tax but for such exemption; provided, however, that corporations organized under §501(c)(3) of the United States Internal Revenue Code of 1954, 26 U.S.C. §501(c)(3), whose chief executive officer earns a salary which, when calculated on an hourly basis, is less than eight (8) times the lowest wage paid by the corporation, shall be exempted as to all employees other than child care workers.

(k)   "**Person**" means any individual, proprietorship, partnership, joint venture, corporation, limited liability company, trust, association, or other entity that may employ individuals or enter into contracts.

(l)   "**Public lease or license**".

(a)   Except as provided in (l)(b)*, "**Public lease or license**" means a lease or license of City property on which services are rendered by employees of the public lessee or licensee or sublessee or sublicensee, or of a contractor or subcontractor, but only where any of the following applies:

*Technical correction due to re-lettering of subsections: "(i)(b)" corrected to "(l)(b)".

(1)   The services are rendered on premises at least a portion of which is visited by substantial numbers of the public on a frequent basis (including, but not limited to, airport passenger terminals, parking lots, golf courses, recreational facilities); or

(2)   Any of the services could feasibly be performed by City employees if the awarding authority had the requisite financial and staffing resources; or

(3)   The DAA has determined in writing that coverage would further the proprietary interests of the City.

(b)   A public lessee or licensee will be exempt from the requirements of this article subject to the following limitations:

(1)   The lessee or licensee has annual gross revenues of less than the annual gross revenue threshold, three hundred fifty thousand dollars ($350,000), from business conducted on City property;

(2)   The lessee or licensee employs no more than seven (7) people total in the company on and off City property;

(3)  To qualify for this exemption, the lessee or licensee must provide proof of its gross revenues and number of people it employs in the company's entire workforce to the awarding authority as required by regulation;

(4)  Whether annual gross revenues are less than three hundred fifty thousand dollars ($350,000) shall be determined based on the gross revenues for the last tax year prior to application or such other period as may be established by regulation;

(5)  The annual gross revenue threshold shall be adjusted annually at the same rate and at the same time as the living wage is adjusted under section 10.37.2 (a);

(6)  A lessee or licensee shall be deemed to employ no more than seven (7) people if the company's entire workforce worked an average of no more than one thousand two-hundred fourteen (1,214) hours per month for at least three-fourths (3/4) of the time period that the revenue limitation is measured;

(7)  Public leases and licenses shall be deemed to include public subleases and sublicenses;

(8)  If a public lease or license has a term of more than two (2) years, the exemption granted pursuant to this section shall expire after two (2) years but shall be renewable in two-year increments upon meeting the requirements therefor at the time of the renewal application or such period established by regulation.

(m)  "**Service contract**" means a contract let to a contractor by the City primarily for the furnishing of services to or for the City (as opposed to the purchase of goods or other property or the leasing or renting of property) and that involves an expenditure in excess of twenty-five thousand dollars ($25,000) and a contract term of at least three (3) months; but only where any of the following applies:

(1)  at least some of the services rendered are rendered by employees whose work site is on property owned by the City,

(2)  the services could feasibly be performed by City employees if the awarding authority had the requisite financial and staffing resources, or

(3)  the DAA has determined in writing that coverage would further the proprietary interests of the City.

(n)  "**Subcontractor**" means any person not an employee that enters into a contract (and that employs employees for such purpose) with

(1)  a contractor or subcontractor to assist the contractor in performing a service contract or

(2)  a contractor or subcontractor of a proprietary lessee or licensee or sublessee or sublicensee to perform or assist in performing services on the leased or licensed premises. Vendors, such as

service contractors or subcontractors, of City financial assistance recipients shall not be regarded as subcontractors except to the extent provided in Subsection (i).*

*Technical correction due to re-lettering of subsections: "Subsection (f)" corrected to "Subsection (i)".

(o)  **"Willful violation"** means that the employer knew of his, her, or its obligations under this article and deliberately failed or refused to comply with its provisions.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (e), Ord. No. 176,155, Eff. 9-22-04; Subsec. (e), Ord. No. 176,283, Eff. 12-25-04, Oper. 9-22-04; Subsecs. (a) through (l) re-lettered (d) through (o), respectively and new Subsecs. (a), (b), and (c) added, Ord. No. 180,877, Eff. 10-19-09.

## Sec. 10.37.2.  Payment of Minimum Compensation to Employees.

(a)  **Wages.**  Employers shall pay Employees a wage of no less than the hourly rates set under the authority of this article.  The initial rates were seven dollars and twenty-five cents ($7.25) per hour with health benefits, as described in this article, or otherwise eight dollars and fifty cents ($8.50) per hour without health benefits.  With the annual adjustment effective July 1, 2009, together with all previous annual adjustments as provided by this subsection, such rates are ten dollars and thirty cents ($10.30) per hour with health benefits or, if health benefits are not provided, then fourteen dollars and eighty cents ($14.80) per hour for Airport Employees and eleven dollars and fifty-five cents ($11.55) per hour for all other Employees.  The hourly rate with health benefits to be paid to all Employees and the hourly rate without health benefits to be paid to Airport Employees shall be adjusted annually to correspond with adjustments, if any, to retirement benefits paid to members of the Los Angeles City Employees Retirement System (LACERS), made by the CERS Board of Administration under § 4.1040.  The Office of Administrative and Research Services shall so advise the DAA of any such change by June 1 of each year and of the required new hourly rates, if any.  On the basis of such report, the DAA shall publish a bulletin announcing the adjusted rates, which shall take effect upon such publication.

(b)  **Compensated Days Off.**  Employers shall provide at least twelve (12) compensated days off per year for sick leave, vacation, or personal necessity at the employee's request.  Employers shall also permit employees to take at least an additional ten (10) days a year of uncompensated time to be used for sick leave for the illness of the employee or a member of his or her immediate family where the employee has exhausted his or her compensated days off for that year.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (a), Ord. No. 173,285, Eff. 6-26-00, Oper. 7-1-00; Subsec. (a), Ord. No. 180,877, Eff. 10-19-09.

### Sec. 10.37.3.  Health Benefits.

(a) **Health Benefits.**  The health benefits required by this article shall consist of the payment of at least four dollars and fifty cents ($4.50) per hour by Airport Employers and at least one dollar and twenty-five cents ($1.25) per hour by all other Employers towards the provision of health care benefits for Employees and their dependents.  Proof of the provision of such benefits must be submitted to the awarding authority to qualify for the wage rate in Section 10.37(a) for Employees with health benefits.  Airport Employees cannot waive the health benefits offered by an Airport Employer when the Airport Employer does not require an out-of-pocket contribution by the Airport Employee.  Consistent with and as shall be reflected in the hourly rates payable to Airport Employees as provided in 10.37.2(a) above, the amount of payment for health benefits by Airport Employers shall be adjusted annually to correspond with adjustments, if any, to retirement benefits paid to members of the Los Angeles City Employees Retirement System (LACERS), made by the CERS Board of Administration under § 4.1040.  The Office of Administrative and Research Services shall so advise the DAA of any such change by June 1 of each year and of the required new hourly payments, if any.  On the basis of such report, the DAA shall publish a bulletin announcing the adjusted payment, which shall take effect upon such publication.

(b) **Periodic Review.**  At least once every three years, the Office of Administrative and Research Services shall review the health benefit payment by Airport Employers set forth in 10.37.3(a) to determine whether the payment accurately reflects the cost of health care and to assess the impacts of the health benefit payment on Airport Employers and Airport Employees and shall transmit a report with its findings to the Council.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99; In Entirety, Ord. No. 180,877, Eff. 10-19-09.

### Sec. 10.37.4.  Notifying Employees of their Potential Right to the Federal Earned Income Credit.

Employers shall inform employees making less than twelve dollars ($12) per hour of their possible right to the federal Earned Income Credit ("**EIC**") under Section 32 of the Internal Revenue Code of 1954, 26 U.S.C. Section 32, and shall make available to employees forms informing them about the EIC and forms required to secure advance EIC payments from the employer.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.5.  Retaliation Prohibited.

Neither an employer, as defined in this article, nor any other person employing individuals shall discharge, reduce in compensation, or otherwise discriminate against any employee for complaining to the City with regard to the employer's compliance or anticipated compliance with this article, for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99.

## Sec. 10.37.6.  Enforcement.

(a)   An employee claiming violation of this article may bring an action in the Municipal Court or Superior Court of the State of California, as appropriate, against an employer and may be awarded:

(1)   For failure to pay wages required by this article - back pay for each day during which the violation continued.

(2)   For failure to pay medical benefits - the differential between the wage required by this article without benefits and such wage with benefits, less amounts paid, if any, toward medical benefits.

(3)   For retaliation - reinstatement, back pay, or other equitable relief the court may deem appropriate.

(4)   For willful violations, the amount of monies to be paid under (1) - (3) shall be trebled.

(b)   The court shall award reasonable attorney's fees and costs to an employee who prevails in any such enforcement action and to an employer who so prevails if the employee's suit was frivolous.

(c)   Compliance with this article shall be required in all City contracts to which it applies, and such contracts shall provide that violation of this article shall constitute a material breach thereof and entitle the City to terminate the contract and otherwise pursue legal remedies that may be available.  Such contracts shall also include a pledge that there shall be compliance with federal law proscribing retaliation for union organizing.

(d)   An employee claiming violation of this article may report such claimed violation to the DAA which shall investigate such complaint.  Whether based upon such a complaint or otherwise, where the DAA has determined that an employer has violated this article, the DAA shall issue a written notice to the employer that the violation is to be corrected within ten (10)

days.  In the event that the employer has not demonstrated to the DAA within such period that it has cured such violation, the DAA may then:

(1)  Request the awarding authority to declare a material breach of the service contract, public lease or license, or financial assistance agreement and exercise its contractual remedies thereunder, which are to include, but not be limited to, termination of the service contract, public lease or license, or financial assistance agreement and the return of monies paid by the City for services not yet rendered.

(2)  Request the City Council to debar the employer from future City contracts, leases, and licenses for three (3) years or until all penalties and restitution have been fully paid, whichever occurs last.  Such debarment shall be to the extent permitted by, and under whatever procedures may be required by, law.

(3)  Request the City Attorney to bring a civil action against the employer seeking:

(i)  Where applicable, payment of all unpaid wages or health premiums prescribed by this article; and/or

(ii)  A fine payable to the City in the amount of up to one hundred dollars ($100) for each violation for each day the violation remains uncured.

Where the alleged violation concerns non-payment of wages or health premiums, the employer will not be subject to debarment or civil penalties if it pays the monies in dispute into a holding account maintained by the City for such purpose.  Such disputed monies shall be presented to a neutral arbitrator for binding arbitration.  The arbitrator shall determine whether such monies shall be disbursed, in whole or in part, to the employer or to the employees in question.  Regulations promulgated by the DAA shall establish the framework and procedures of such arbitration process.  The cost of arbitration shall be borne by the City, unless the arbitrator determines that the employer's position in the matter is frivolous, in which event the arbitrator shall assess the employer for the full cost of the arbitration.  Interest earned by the City on monies held in the holding account shall be added to the principal sum deposited, and the monies shall be disbursed in accordance with the arbitration award.  A service charge for the cost of account maintenance and service may be deducted therefrom.

(e)  Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (d), Para. (1), Ord. No. 173,747, Eff. 2-24-01.

**Sec. 10.37.7.  Administration.**

The City Council shall by resolution designate a department or office, which shall promulgate rules for implementation of this article and otherwise coordinate administration of the requirements of this article ("**designated administrative agency**" - DAA). The DAA shall monitor compliance, including the investigation of claimed violations, and shall promulgate implementing regulations consistent with this article. The DAA shall also issue determinations that persons are City financial assistance recipients, that particular contracts shall be regarded as "**service contracts**" for purposes of Section 10.37.1.(j), and that particular leases and licenses shall be regarded as "**public leases**" or "**public licenses**" for purposes of Section 10.37.1(i), when it receives an application for a determination of non-coverage or exemption as provided for in Section 10.37.13. The DAA shall also establish employer reporting requirements on employee compensation and on notification about and usage of the federal Earned Income Credit referred to in Section 10.37.4. The DAA shall report on compliance to the City Council no less frequently than annually.

During the first, third, and seventh years of this article's operation since May 5, 1997, and every third year thereafter, the Office of Administrative and Research Services and the Chief Legislative Analyst shall conduct or commission an evaluation of this article's operation and effects. The evaluation shall specifically address at least the following matters:

   (a)  how extensively affected employers are complying with the article;

   (b)  how the article is affecting the workforce composition of affected employers;

   (c)  how the article is affecting productivity and service quality of affected employers;

   (d)  how the additional costs of the article have been distributed among workers, their employers, and the City. Within ninety days of the adoption of this article, these offices shall develop detailed plans for evaluation, including a determination of what current and future data will be needed for effective evaluation.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99; Ord. No. 173,285, Eff. 6-26-00, Oper. 7-1-00; Ord. No. 173,747, Eff. 2-24-01.

### Sec. 10.37.8.  Exclusion of Service Contracts from Competitive Bidding Requirement.

Service contracts otherwise subject to competitive bid shall be let by competitive bid if they involve the expenditure of at least two-million dollars ($2,000,000). Charter Section 372 shall not be applicable to service contracts.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99; Ord. No. 173,285, Eff. 6-26-00, Oper. 7-1-00.

### Sec. 10.37.9. Coexistence with Other Available Relief for Specific Deprivations of Protected Rights.

This article shall not be construed to limit an employee's right to bring legal action for violation of other minimum compensation laws.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.10. Expenditures Covered.

This article shall apply to the expenditure - whether through aid to City financial assistance recipients, service contracts let by the City, or service contracts let by its financial assistance recipients - of funds entirely within the City's control and to other funds, such as federal or state grant funds, where the application of this article is consonant with the laws authorizing the City to expend such other funds.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.11. Timing of Application.

(a) **Original 1997 Ordinance.** The provisions of this article as enacted by City Ordinance No.171,547, effective May 5, 1997, shall apply to

(1) contracts consummated and financial assistance provided after such date,

(2) contract amendments consummated after such date and before the effective date of the 1998 ordinance which themselves met the requirements of former Section 10.37.1(h) (definition of "**service contract**") or which extended contract duration, and

(3) supplemental financial assistance provided after May 5, 1997 and before the effective date of the 1998 ordinance which itself met the requirements of Section 10.37.1(c).

(b) **1998 Amendment.** The provisions of this article as amended by the 1998 ordinance shall apply to

(1) service contracts, public leases or licenses, and financial assistance agreements consummated after the effective date of such ordinance and

(2)   amendments, consummated after the effective date of such ordinance, to service contracts, public leases or licenses, and financial assistance agreements that provide additional monies or which extend term.

(c)   **2000 amendment.**  The provisions of this article as amended by the 2000 ordinance shall apply to

(1)   service contracts, public leases or public licenses and City financial assistance recipient agreements consummated after the effective date of such ordinance and

(2)   amendments to service contracts, public leases or licenses and City financial assistance recipient agreements which are consummated after the effective date of such ordinance and which provide additional monies or which extend the term.

(d)   **2009 Amendment.**  The provisions of this article as amended by the 2009 ordinance shall become operative ninety (90) days following the effective date of the 2009 ordinance.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (b), Subsec. (c) Added, Ord. No. 173,747, Eff. 2-24-01; Subsec. (d) Added, Ord. No. 180,877, Eff. 10-19-09.


## Sec. 10.37.12.  Supersession by Collective Bargaining Agreement.

Parties subject to this article may by collective bargaining agreement provide that such agreement shall supersede the requirements of this article.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99.


## Sec. 10.37.13.  Liberal Interpretation of Coverage; Rebuttable Presumption of Coverage.

The definitions of **"City financial assistance recipient"** in Section 10.37.1(c), of **"public lease or license"** in Section 10.37.1(i), and of **"service contract"** in Section 10.37.1(j) shall be liberally interpreted so as to further the policy objectives of this article.  All recipients of City financial assistance meeting the monetary thresholds of Section 10.37.1(c), all City leases and licenses (including subleases and sublicenses) where the City is the lessor or licensor, and all City contracts providing for services that are more than incidental, shall be presumed to meet the corresponding definition just mentioned, subject, however, to a determination by the DAA of non-coverage or exemption on any basis allowed by this article, including, but not limited to, non-coverage for failure to satisfy such definition.  The DAA shall by regulation establish procedures for informing persons engaging in such transactions with the City of their opportunity

to apply for a determination of non-coverage or exemption and procedures for making determinations on such applications.

SECTION HISTORY

Added by Ord. No. 172,336, Eff. 1-14-99.
Amended by: Ord. No. 173,747, Eff. 2-24-01.


## Sec. 10.37.14.  Severability.

If any provision of this article is declared legally invalid by any court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

SECTION HISTORY

Added by Ord. No. 172,336, Eff. 1-14-99.

*ADDENDUM F*

*LOS ANGELES MUNICIPAL CODE CHAPTER 18, ARTICLE 3*

*LAX HOTEL WORKER RETENTION ORDINANCE*

# ⬚ARTICLE 3
# HOTEL WORKER RETENTION ORDINANCE

### (Added by Ord. No. 178,083, Eff. 12/30/06.)

Section
183.00   Purpose.
183.01   Definitions.
183.02   Hotel Employers' Responsibilities.
183.03   Transition Employment Period.
183.04   Notice of Change in Control.
183.05   Retaliatory Action Prohibited.
183.06   Enforcement.
183.07   Exemption for Collective Bargaining Agreement.
183.08   No Waiver of Rights.
183.09   Severability.

## ⬚SEC. 183.00.  PURPOSE.

The Los Angeles International Airport (LAX) is among the world's busiest airports, hosting millions of travelers every year.  The City of Los Angeles is responsible for the maintenance and operation of LAX, and as a result of this support, the businesses in the area adjacent to LAX reap significant economic benefits.  In particular, the hotels in the LAX area enjoy the highest occupancy rate of all Los Angeles hotels due to their proximity to the airport.

Past business practices at Los Angeles hotels have resulted in mass layoffs of hotel workers. Historically, when corporate ownership or management of a hotel changes, the new operator closes the hotel for renovations and reopens with a new workforce; very few, if any, of the former hotel's employees are retained, and hundreds of workers are displaced.  While this practice has become less common most areas in Los Angeles, it nonetheless occurred at an LAX-area hotel during the transfer of the LAX Wyndham to Pacifica Host Hotels.  The Wyndham was reopened as the current LAX Radisson, and virtually none of the Wyndham workers were retained to continue performing basic services that are common at every hotel.

A transitional retention period upon change of ownership, control, or operation of hotels ensures employment stabilization for a segment of the community.  It also alleviates the demands for social services provided by the City and other local governments due to any worker displacement and resulting unemployment.  Through this ordinance, the City seeks to maintain the welfare and stability of the LAX-area hotel workforce.  Whereas the LAX-area hotels derive a distinct benefit from their location near the airport, they have both the ability and responsibility to support the local workforce by engaging in fair employment practices.

# SEC. 183.01.  DEFINITIONS.

The following definitions shall apply to this chapter:

A.  **"City"** means the City of Los Angeles.

B.  **"Change in Control"** means any sale, assignment, transfer, contribution, or other disposition of all or substantially all of the assets used in the operation of a Hotel or a discrete portion of the Hotel that continues in operation as a Hotel, or a controlling interest (including by consolidation, merger, or reorganization) of the Incumbent Hotel Employer or any Person who controls the Incumbent Hotel Employer (IHE Parent).

C.  **"Employment Commencement Date"** means the date on which a Hotel Worker retained by the Successor Hotel Employer pursuant to this chapter commences work for the Successor Hotel Employer in exchange for benefits and compensation under the terms and conditions established by the Successor Hotel Employer or as required by law.

D.  **"Hotel"** means a residential building located within the area designated by ordinance as the Gateway to LA (Century Corridor) Property Business Improvement District (Century Corridor PBID) that is designated or used for lodging and other related services for the public, and containing 50 or more guest rooms, or suites of rooms.  "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose, or providing services at the building.  If the Century Corridor PBID ceases to exist, the boundaries at the time of dissolution shall remain in effect for purposes of this article.

E.  **"Hotel Worker"** means any individual (1) whose primary place of employment is at a Hotel subject to a Change in Control, (2) who is employed directly by the Incumbent Hotel Employer, or by a Person who has contracted with the Incumbent Hotel Employer to provide services at the Hotel subject to a Change in Control, and (3) who has worked for the Incumbent Hotel Employer for at least one month prior to the execution of the Transfer Document.  "Hotel Worker" does not include a managerial, supervisory, or confidential employee.

F.  **"Incumbent Hotel Employer"** means the Person that owns, controls, and/or operates a Hotel subject to a Change in Control prior to the Change in Control.

G.  **"Person"** means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

H.  **"Successor Hotel Employer"** means the Person that owns, controls, and/or operates a Hotel subject to a Change in Control after the Change in Control.

I.  **"Transfer Document"** means the purchase agreement or other document(s) creating a binding agreement to effect the Change in Control.

**SEC. 183.02.  HOTEL EMPLOYERS' RESPONSIBILITIES.**

A.  The Incumbent Hotel Employer shall, within 15 days after the execution of a Transfer Document, provide to the Successor Hotel Employer the name, address, date of hire, and employment occupation classification of each Hotel Worker.

B.  The Successor Hotel Employer shall maintain a preferential hiring list of Hotel Workers identified by the Incumbent Hotel Employer as set forth in Subsection A. of this section, and shall be required to hire from that list for a period beginning upon the execution of the Transfer Document and continuing for six months after the Hotel is open to the public under the Successor Hotel Employer.

C.  If the Successor Hotel Employer extends an offer of employment to a Hotel Worker, the Successor Hotel Employer shall retain written verification of that offer for no fewer than three years from the date the offer was made. The verification shall include the name, address, date of hire, and employment occupation classification of each Hotel Worker.

**SEC. 183.03.  TRANSITION EMPLOYMENT PERIOD.**

A.  A Successor Hotel Employer shall retain each Hotel Worker hired pursuant to this chapter for no fewer than 90 days following the Hotel Worker's Employment Commencement Date. During this 90-day transition employment period, Hotel Workers shall be employed under the terms and conditions established by the Successor Hotel Employer or as required by law. The Successor Hotel Employer shall provide Hotel Workers with a written offer of employment. This offer shall remain open for at least ten business days from the date of the offer.

B.  If, within the period established in Section 183.02 B., the Successor Hotel Employer determines that it requires fewer Hotel Workers than were required by the Incumbent Hotel Employer, the Successor Hotel Employer shall retain Hotel Workers by seniority within each job classification to the extent that comparable job classifications exist.

C.  During the 90-day transition employment period, the Successor Hotel Employer shall not discharge without cause a Hotel Worker retained pursuant to this chapter.

D.  At the end of the 90-day transition employment period, the Successor Hotel Employer shall perform a written performance evaluation for each Hotel Worker retained pursuant to this article.  If the Hotel Worker's performance during the 90-day transition employment period is satisfactory, the Successor Hotel Employer shall consider offering the Hotel Worker continued employment under the terms and conditions established by the Successor Hotel Employer or as required by law.  The Successor Hotel Employer shall retain a record of the written performance evaluation for a period of no fewer than three years.

**SEC. 183.04.  NOTICE OF CHANGE IN CONTROL.**

A.   The Incumbent Hotel Employer shall post written notice of the Change in Control at the location of the affected Hotel within five business days following the execution of the Transfer Document.  Notice shall remain posted during any closure of the Hotel and for six months after the Hotel is open to the public under the Successor Hotel Employer.

B.   Notice shall include, but not be limited to, the name of the Incumbent Hotel Employer and its contact information, the name of the Successor Hotel Employer and its contact information, and the effective date of the Change in Control.

C.   Notice shall be posted in a conspicuous place at the Hotel so as to be readily viewed by Hotel Workers, other employees, and applicants for employment.

## SEC. 183.05.  RETALIATORY ACTION PROHIBITED.

No Hotel Employer employing Hotel Workers shall discharge, reduce in compensation, or otherwise discriminate against any Hotel Worker for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

## SEC. 183.06.  ENFORCEMENT.

A.   Hotel Workers may bring an action in the Superior Court of the State of California against the Incumbent Hotel Employer or the Successor Hotel Employer for violations of this article and may be awarded:

1.   Hiring and reinstatement rights pursuant to this article, with the 90-day transition employment period not commencing until the Hotel Worker's Employment Commencement Date with the Successor Hotel Employer.

2.   Front pay or back pay for each day during which the violation continues, which shall be calculated at a rate of compensation not less than the higher of:

a.   The average regular rate of pay received by the Hotel Worker during the last three years of the Hotel Worker's employment in the same occupation classification; or

b.   The most recent regular rate received by the Hotel Worker while employed by either the Incumbent Hotel Employer or the Successor Hotel Employer.

3.   Value of the benefits the Hotel Worker would have received under the Successor Hotel Employer's benefit plan.

B.   If a Hotel Worker is the prevailing party in any legal action taken pursuant to this section, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C.  Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

## SEC. 183.07.  EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT.

All of the provisions of this article, or any part of, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in the agreement in clear and unambiguous terms.  Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute, or be permitted, as a waiver of all or any part of the provisions of this article.

## SEC. 183.08.  NO WAIVER OF RIGHTS.

Except for bona fide collective bargaining agreements, any waiver by a Hotel Worker of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable.  Any attempt by an Incumbent or Successor Hotel Employer to have a Hotel Worker waive rights given by this article shall constitute a violation of this article.

## SEC. 183.09.  SEVERABILITY.

If any provision of this article is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

*ADDENDUM G*

*LOS ANGELES MUNICIPAL CODE CHAPTER 18, ARTICLE 4*

*LAX HOTEL SERVICE CHARGE REFORM ORDINANCE*

# 🏛ARTICLE 4
# HOTEL SERVICE CHARGE REFORM ORDINANCE

### (Added by Ord. No. 178,084, Eff. 12/30/06.)

Section
184.00   Purpose.
184.01   Definitions.
184.02   Hotel Employers' Responsibilities.
184.03   Retaliatory Action Prohibited.
184.04   Enforcement.
184.05   Exemption for Collective Bargaining Agreement.
184.06   No Waiver of Rights.
184.07   Coexistence with Other Available Relief for Specific Deprivations of Protected Rights.
184.08   Severability.
184.09   Administration.

## 🏛SEC. 184.00.  PURPOSE.

The Los Angeles International Airport (LAX) is among the world's busiest airports, hosting millions of travelers every year.  The City of Los Angeles (City) operates and maintains LAX, and as a result of this support the businesses in the area adjacent to LAX reap significant economic benefits.  In particular, the hotels in the LAX area enjoy the highest occupancy rate of all Los Angeles hotels due to their proximity to LAX.

Despite the high occupancy rates of hotels in the LAX area, many of these hotels fail to pay their service workers a living wage which in the City is currently $10.64 per hour without health benefits or $9.39 per hour with health benefits.  Because of the low hourly wages paid by these hotels, service employees naturally rely on gratuities paid by hotel customers.

In recent years, hotels in the LAX area have instituted the practice of adding a "service charge" of 15% to 20% of the bill for banquets and other large group events.  The service charge is typically listed as a line item on the bill.  Some hotels pass a portion of the service charge to the workers who actually performed the services, while other hotels retain the entire service charge.  Currently, there is nothing illegal about this practice.  Since hotels have instituted the practice of adding service charges to bills, many hotel workers have reported a significant reduction in the gratuities they receive from hotel guests.  Thus, many hotel customers reduce or eliminate gratuities (tips) they would otherwise pay to service workers because they assume that the workers receive the "service charges," which are added to their bills.

By way of this ordinance, the City seeks to improve the welfare of service workers at the LAX-area hotels by ensuring that they receive decent compensation for the work they perform.  Accordingly, to the extent that LAX-area hotels institute or continue the practice of charging

their customers "service charges," they will be required by this ordinance to pass the entire service charge on to the workers who actually performed the services for which the service charges are billed. Whereas the LAX-area hotels derive a distinct benefit from their location near LAX, they have both the ability and responsibility to support the local workforce by engaging in fair employment practices.

## SEC. 184.01.  DEFINITIONS.

The following definitions shall apply to this chapter:

A.  **"City"** means the City of Los Angeles.

B.  **"Hotel"** means a residential building located within the area designated by ordinance as the Gateway to LA (Century Corridor) Property Business Improvement District (Century Corridor PBID) that is designated or used for lodging and other related services for the public, and containing 50 or more guest rooms, or suites of rooms.  "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose, or providing services at the building.  If the Century Corridor PBID ceases to exist, the boundaries at the time of dissolution shall remain in effect for purposes of this article.

C.  **"Hotel Employer"** means a Person who owns, controls, and/or operates a Hotel, or a Person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the Hotel's purpose, or a Person who provides services at the Hotel.

D.  **"Hotel Worker"** means any individual (1) whose primary place of employment is at a Hotel, (2) who is employed directly by the Hotel Employer or by a Person who has contracted with the Hotel Employer to provide services at the Hotel, and (3) who performs a service for which the Hotel Employer imposes a Service Charge.  "Hotel Worker" does not include a managerial, supervisory, or confidential employee.

E.  **"Person"** means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

F.  **"Service Charge"** means all separately-designated amounts collected by a Hotel Employer from customers that are for service by Hotel Workers, or are described in such a way that customers might reasonably believe that the amounts are for those services, including but not limited to those charges designated on receipts under the term "service charge," "delivery charge," or "porterage charge."

G.  **"Willful Violation"** means that the Hotel Employer deliberately failed or refused to comply with its provisions of this article.

## ⬚ SEC. 184.02.  HOTEL EMPLOYERS' RESPONSIBILITIES.

A.  Service Charges shall not be retained by the Hotel Employer but shall be paid in the entirety by the Hotel Employer to the Hotel Worker(s) performing services for the customers from whom the Service Charges are collected.  No part of these amounts may be paid to supervisory or managerial employees.  The amounts shall be paid to Hotel Worker(s) equitably and according to the services that are or appear to be related to the description of the amounts given by the hotel to the customers.  The amounts shall be paid to the Hotel Workers in the next payroll following collection of an amount from the customer.  Without limitation of the foregoing:

1.  Amounts collected for banquets or catered meetings shall be paid equally to the Hotel Workers who actually work the banquet or catered meeting; and

2.  Amounts collected for room service shall be paid to the Hotel Workers who actually deliver food and beverage associated with the charge.

3.  Amounts collected for porterage service shall be paid to the Hotel Workers who actually carry the baggage associated with the charge.

B.  This section does not apply to any tip, gratuity, money, or part of any tip, gratuity, or money that has been paid or given to or left for a Hotel Worker by customers over and above the actual amount due for services rendered or for goods, food, drink, or articles sold or served to the customer.

## ⬚ SEC. 184.03.  RETALIATORY ACTION PROHIBITED.

A.  No Hotel Employer employing Hotel Workers shall discharge, reduce in compensation, or otherwise discriminate against any Hotel Worker for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

## ⬚ SEC. 184.04.  ENFORCEMENT.

A.  A Hotel Worker claiming violation of this article may bring an action in the Superior Court of the State of California, as appropriate, against a Hotel Employer and may be awarded:

1.  For failure to pay Service Charges required by this article – Service Charge reimbursement for each violation.

2.  For retaliatory action – reinstatement, back pay, Service Charge reimbursement or other equitable relief the court may deem appropriate.

3.  For Willful Violations, the amount of monies to be paid under Paragraphs 1 and 2 shall be trebled.

B.  If a Hotel Worker is the prevailing party in any legal action taken pursuant to this article, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C.  Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

## SEC. 184.05.  EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT.

All of the provisions of this article, or any part of this article, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in the agreement in clear and unambiguous terms.  Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute, or be permitted, as a waiver of all or any part of the provisions of this article.

## SEC. 184.06.  NO WAIVER OF RIGHTS.

Except for bona fide collective bargaining agreements, any waiver by a Hotel Worker of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable.  Any attempt by a Hotel Employer to have a Hotel Worker waive rights given by this article shall constitute a violation of this article.

## SEC. 184.07.  COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR SPECIFIC DEPRIVATIONS OF PROTECTED RIGHTS.

This article shall not be construed to limit a Hotel Worker's right to bring legal action for violation of other minimum compensation laws.

## SEC. 184.08.  SEVERABILITY.

If any provision of this article is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

## SEC. 184.09.  ADMINISTRATION.
**(Added by Ord. No. 181,199, Eff. 7/24/10.)**

The City Council shall by resolution designate the Bureau of Contract Administration to promulgate rules for implementation of this article and otherwise coordinate administration of the requirements of this article.

*ADDENDUM H*

*LONG BEACH MUNICIPAL CODE*

*TITLE 5, CHAPTER 4.8, SECTION 4.8.020*

*PAYMENT OF MINIMUM COMPENSATION AND SICK DAYS TO HOTEL WORKERS*

**CHAPTER 5.48 HOTELS AND MOTELS**

**5.48.020 Payment of minimum compensation and sick days to hotel workers.**

(a)  Each hotel employer shall pay hotel workers a wage of not less than the hourly rates set forth in this Section. The rate upon enactment shall be thirteen dollars ($13.00) per hour worked. This rate shall be adjusted by the amount of increases in the federal minimum wage over the amount in effect on December 31, 2011, or, if greater, by the cumulative increase in the cost of living. The cost of living increase shall be measured by the percentage increase as of December 31 in any year over the level as of December 31, 2011 of the Consumer Price Index (All Urban Consumers, Los Angeles-Riverside-Orange County) as published by the Bureau of Labor Statistics, U.S. Department of Labor or the successor index or federal agency. If in any calendar year there is no increase in the federal minimum wage and the increase in the Consumer Price Index is less than two percent (2%), then the rate shall be adjusted by an increase of two percent (2%). The Mayor or the city agency designated by the Mayor shall publish a bulletin by April 1 of each year announcing the adjusted rates, which shall take effect the following July 1. Such bulletin will be made available to all hotel employers and to any other person who has filed with the Mayor or the designated agency a request to receive such notice but lack of notice shall not excuse noncompliance with this Section. An hotel employer shall provide written notification of the rate adjustments to each of its hotel workers and make the necessary payroll adjustments by July 1 following the publication of the bulletin. Tips or gratuities received by hotel workers and service charges or commissions shall not be credited as being any part of or offset against the wage rates required by this Section.

(b)  Service charges shall not be retained by an hotel employer but shall be paid in the entirety by the hotel employer to the hotel worker(s) performing services for the customers from whom the service charges are collected. No part of these amounts may be paid to supervisory or managerial employees. The amounts shall be paid to the hotel worker(s) equitably and according to the services that are or appear to be related to the description of the amounts given by the hotel employer to the customers. The amounts shall be paid to the hotel worker(s) in the next payroll following collection of an amount from the customer. Without limitation of the foregoing:

(1)  Amounts collected for banquets or catered meetings shall be paid equally to the hotel worker(s) who actually work the banquet or catered meeting; and

(2)  Amounts collected for room service shall be paid to the hotel worker(s) who actually deliver food and beverage associated with the charge; and

(3)  Amounts collected for porterage service shall be paid to the hotel worker(s) who actually carry the baggage associated with the charge.

This Subsection does not apply to any tip, gratuity, money, or part of any tip, gratuity, or money that has been paid or given to or left for an hotel worker by customers over and above the actual amount due for services rendered or for goods, food, drink, or articles sold or served to the customer.

(c)  An hotel employer shall pay every hotel worker sick pay out of the employer's general assets as follows:

(1)  At least five (5) compensated days off per calendar year for sick leave at the hotel worker's request. The hotel worker need not present certification of illness to claim compensated time off, provided that such hotel worker has accrued the requested days of compensated time at the time of the request. An hotel worker shall be paid his or her normal daily compensation for each compensated day off;

(2)  An hotel worker shall accrue five-twelfths (5/12) of a day of compensated time for each full month in a calendar year that the hotel worker has been employed by the hotel employer. An hotel worker is entitled to use any accrued days of compensated time as soon as those days have accrued;

(3)   If any hotel worker has not utilized all of his or her accrued compensated time by the end of any calendar year, the hotel employer shall pay that hotel worker a lump sum payment at the end of the calendar year equivalent to the compensation due for any unused compensated time.

(d)   The provisions of this Section may not be waived by agreement between an individual hotel worker and an hotel employer. All of the provisions of this Section, or any part hereof, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in such agreement in clear and unambiguous terms. Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute, or be permitted, as a waiver of all or any part of the provisions of this Section. An hotel employer shall not discharge, reduce the compensation of or otherwise discriminate against any hotel worker for using any civil remedies to enforce this Section or otherwise asserting his or her rights under this Section.

(e)   An hotel worker claiming violation of this Section may bring an individual or class action against his or her employer in Superior Court to enforce the provisions of this Section and shall be entitled to all remedies available under the law or in equity appropriate to remedy any violation of this Section, including but not limited to lost compensation, damages, reinstatement or injunctive relief. An hotel worker who prevails in any action to enforce this Section shall be awarded his or her reasonable attorney's fees and costs.

(f)   If any provision of this Section is declared illegal, invalid or inoperative, in whole or in part, by the final decision of any court of competent jurisdiction, the remaining provisions and all portions not declared illegal, invalid or inoperative shall remain in full force or effect, and no such determination shall invalidate the remaining provisions or portions of the provisions of this Section.

(g)   Definitions:

"Compensation" includes any wages, tips, bonuses, and other payments reported as taxable income paid by the hotel employer to the hotel worker.

"Hotel" means a residential building that is designated or used for lodging and other related services for the public, and containing one hundred (100) or more guest rooms, or suites of rooms.

"Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose, or providing services at the building.

"Hotel employer" means a person who owns, controls, and/or operates a hotel in the City of Long Beach, or a person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the hotel's purpose, or a person, other than a hotel worker, who provides services at the hotel.

"Hotel worker" means any individual (1) whose primary place of employment is at one or more hotels and (2) who is employed directly by the hotel employer or by a person who has contracted with the hotel employer to provide services at the hotel.

"Person" means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

"Service charge" means all separately-designated amounts, regardless of name or label, that are added to the base charge for food or beverages, banquets, porterage or parking services and collected by a hotel employer from customers, except taxes and fees levied by federal, state or local government.

(Measure N , 2012)

*ADDENDUM J*

*SEATAC MUNICIPAL CODE CHAPTER 7.45*

*MINIMUM EMPLOYMENT STANDARDS FOR HOSPITALITY AND
TRANSPORTATION INDUSTRY EMPLOYERS*

**ORDINANCE SETTING MINIMUM EMPLOYMENT STANDARDS FOR HOSPITALITY AND TRANSPORTATION INDUSTRY EMPLOYERS**

**Section 1. Findings.** The following measures are necessary in order to ensure that, to the extent reasonably practicable, all people employed in the hospitality and transportation industries in SeaTac have good wages, job security and paid sick and safe time.

**Section 2.** That a new Chapter, 7.45, be added to the SeaTac Municipal Code to read as follows:

**7.45   MINIMUM EMPLOYMENT STANDARDS FOR HOSPITALITY AND TRANSPORTATION INDUSTRY EMPLOYERS**

**7.45.010        Definitions**

As used in this Chapter, the following terms shall have the following meaning:

A.       "*City*" means the City of SeaTac.

B.       "*Compensation*" includes any wages, tips, bonuses, and other payments reported as taxable income from the employment by or for a Covered Worker.

C.       "*Covered Worker*" means any individual who is either a Hospitality Worker or a Transportation Worker.

D.       "*Hospitality Employer*" means a person who operates within the City any Hotel that has one hundred (100) or more guest rooms and thirty (30) or more workers or who operates any institutional foodservice or retail operation employing ten (10) or more nonmanagerial, nonsupervisory employees. This shall include any person who employs others providing services for customers on the aforementioned premises, such as a temporary agency or subcontractor.

E.       "*Hospitality Worker*" means any nonmanagerial, nonsupervisory individual employed by a Hospitality Employer.

F.       "*Hotel*" means a building that is used for temporary lodging and other related services for the public, and also includes any contracted, leased, or sublet premises connected to or operated in conjunction with such building's purpose (such as a restaurant, bar or spa) or providing services at such building.

G.       "*Institutional foodservice or retail*" is defined as foodservice or retail provided in public facilities, corporate cafeterias, conference centers and meeting facilities, but does not include preparation of food or beverage to be served in-flight by an airline. Restaurants or retail

operations that are not located within a hotel, public facility, corporate cafeteria, conference facility or meeting facility are not considered a hospitality employer for the purpose of this Chapter.

H.     *"Person"* means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, or any other legal or commercial entity, whether domestic or foreign, other than a government agency.

I.     *"Predecessor Employer"* means the Hospitality or Transportation Employer that provided substantially similar services within the City prior to the Successor Employer.

J.     *"Retention Employee"* means any Covered Worker who:

    1) was employed by a Predecessor Employer for at least 30 workdays; and

    2) was either:

        a) laid off or discharged for lack of work due to the closure or reduction of a Hospitality or Transportation Employer's operation during the preceding two years; or

        b) is reasonably identifiable as a worker who is going to lose his/her job due to the closure or reduction of the Hospitality or Transportation Employer's operation within the next 6 months.

K.     *"Service charge"* is defined as set forth in RCW 49.46.160(2)(c).

L.     *"Successor Employer"* means the new Hospitality or Transportation Employer that succeeds the Predecessor Employer in the provision of substantially similar services within the City.

M.     *"Transportation Employer"* means:

    1) A person, excluding a certificated air carrier performing services for itself, who:

        a) operates or provides within the City any of the following: any curbside passenger check-in services; baggage check services; wheelchair escort services; baggage handling; cargo handling; rental luggage cart services; aircraft interior cleaning; aircraft carpet cleaning; aircraft washing and cleaning; aviation ground support equipment washing and cleaning; aircraft water or lavatory services; aircraft fueling; ground transportation management; or any janitorial and custodial services, facility maintenance services, security services, or customer service

performed in any facility where any of the services listed in this paragraph are also performed; and

b) employs twenty-five (25) or more nonmanagerial, nonsupervisory employees in the performance of that service.

2) A transportation employer also includes any person who:

a) operates or provides rental car services utilizing or operating a fleet of more than one hundred (100) cars; shuttle transportation utilizing or operating a fleet of more than ten (10) vans or buses; or parking lot management controlling more than one hundred (100) parking spaces; and

b) employs twenty-five (25) or more nonmanagerial, nonsupervisory employees in the performance of that operation.

N.      "*Transportation Worker*" means any nonmanagerial, nonsupervisory individual employed by a Transportation Employer.

O.      "*Tips*" mean any tip, gratuity, money, or part of any tip, gratuity, or money that has been paid or given to or left for a Covered Worker by customers over and above the actual amount due for services rendered or for goods, food, drink, or articles sold or served to the customer.

### 7.45.020      Paid Leave For Sick and Safe Time

Each Hospitality or Transportation Employer shall pay every Covered Worker paid leave for sick and safe time out of the employer's general assets as follows:

A.      A Covered Worker shall accrue at least one hour of paid sick and safe time for every 40 hours worked as an employee of a Hospitality Employer or Transportation Employer. The Covered Worker is entitled to use any accrued hours of compensated time as soon as those hours have accrued.

B.      The Covered Worker need not present certification of illness to claim compensated sick and safe time, provided that such Covered Worker has accrued the requested hours of compensated time at the time of the request. A Covered Worker shall be paid his or her normal hourly compensation for each compensated hour off.

C.      The Covered Worker shall not be disciplined or retaliated against for use of accrued paid sick and safe time. This includes a prohibition on any absence control policy that counts earned sick and safe time as an absence that may lead to or result in discipline against the Covered Worker.

D.      If any Covered Worker has not utilized all of his or her accrued compensated time by the end of any calendar year, the Hospitality Employer or Transportation Employer shall

pay this  worker a lump sum payment at the end of the calendar year equivalent to the compensation due  for any unused compensated time.

E.      Accrued paid sick time shall be provided to a Covered Worker by a Hospitality Employer  or Transportation Employer for the following reasons:

> 1) An absence resulting from a Covered Worker's mental or physical illness, injury or  health condition; to accommodate the Covered Worker's need for medical diagnosis care,  or treatment of a mental or physical illness, injury or health condition; or a Covered  Worker's need for preventive medical care;

> 2) To allow the Covered Worker to provide care of a family member with a mental or  physical illness, injury or health condition; care of a family member who needs medical  diagnosis, care, or treatment of a mental or physical illness, injury or health condition;  or  care of a family member who needs preventive medical care.

F.      Accrued paid safe time shall be provided to a Covered Worker by a Hospitality Employer  or Transportation Employer for the following reasons:

> 1) When the Covered Worker's place of business has been closed by order of a public  official to limit exposure to an infectious agent, biological toxin or hazardous material;

> 2) To accommodate the Covered Worker's need to care for a child whose school or place  of care has been closed by order of a public official for such a reason;

> 3) For any of the following reasons related to domestic violence, sexual assault, or  stalking, as set forth in RCW 49.76.030:

>> a) To enable the Covered Worker to seek legal or law enforcement assistance or remedies to ensure the health and safety of the Covered Worker or the Covered Worker's family members including, but not limited to, preparing for, or participating in, any civil or criminal legal proceeding related to or derived from  domestic violence, sexual assault, or stalking;

>> b) To enable the Covered Worker to seek treatment by a health care provider for physical or mental injuries caused by domestic violence, sexual assault, or stalking, or to attend to health care treatment for a victim who is the Covered  Worker's family member;

>> c) To enable the Covered Worker to obtain, or assist a family member in obtaining, services from a domestic violence shelter, rape crisis center, or other  social services program for relief from domestic violence, sexual assault, or  stalking;

d) To enable the Covered Worker to obtain, or assist a family member in obtaining, mental health counseling related to an incident of domestic violence, sexual assault, or stalking, in which the Covered Worker or the Covered Worker's family member was a victim of domestic violence, sexual assault, or stalking; or

e) To enable the Covered Worker to participate in safety planning, temporarily or permanently relocate, or take other actions to increase the safety of the Covered Worker or Covered Worker's family members from future domestic violence, sexual assault, or stalking.

## 7.45.030        Promoting Full-Time Employment

If a Hospitality or Transportation Employer has additional hours of work to provide in job positions held by Covered Workers, then it shall offer those hours of work first to existing qualified part-time employees before hiring additional part-time employees or subcontractors.

## 7.45.040  Require That Service Charges and Tips Go To Those Performing The Service

A.     Any service charge imposed on customers of, or tips received by employees of, a Hospitality Employer shall be retained by or paid to the nonmanagerial, nonsupervisory Hospitality or Transportation Workers who perform services for the customers from whom the tips are received or the service charges are collected.

B.     The amounts received from tips or service charges shall be allocated among the workers who performed these services equitably; and specifically:

1) Amounts collected for banquets or catered meetings shall be paid to the worker(s) who actually work with the guests at the banquet or catered meeting; and

2) Amounts collected for room service shall be paid to the worker(s) who actually deliver food and beverage associated with the charge; and

3) Amounts collected for porterage service shall be paid to the worker(s) who actually carry the baggage associated with the charge.

## 7.45.050  Establishing A Living Wage For Hospitality Workers and Transportation Workers

A.     Each Hospitality Employer and Transportation Employer shall pay Covered Workers a living wage of not less than the hourly rates set forth in this section. The rate upon enactment shall be fifteen dollars ($15.00) per hour worked.

B.     On January 1, 2015, and on each following January 1, this living wage shall be adjusted to maintain employee purchasing power by increasing the current year's wage rate by the rate of inflation. The increase in the living wage rate shall be calculated to the

nearest cent using the consumer price index for urban wage earners and clerical workers, CPI-W, or a successor index, for the twelve months prior to each September 1st as calculated by the United States department of labor. The declaration of the Washington State Department of Labor and Industries each September 30 regarding the rate by which Washington State's minimum wage rate is to be increased effective the following January 1, pursuant to RCW 49.46.020(4)(b), shall be the authoritative determination of the rate of increase to be applied for purposes of this provision.

C.     The City Manager shall publish a bulletin by October 15 of each year announcing the adjusted rates. Such bulletin will be made available to all Hospitality Employers and Transportation Employers and to any other person who has filed with the City Manager a request to receive such notice but lack of notice shall not excuse noncompliance with this section.

D.     Each Hospitality Employer and Transportation Employer shall provide written notification of the rate adjustments to each of its workers and make the necessary payroll adjustments by January 1 following the publication of the bulletin. Tips, gratuities, service charges and commissions shall not be credited as being any part of or be offset against the wage rates required by this Chapter.

## 7.45.060 Setting Additional Labor Standards for City Hospitality Workers and Transportation Workers

A.     <u>Notice to Employees</u>. No less than 60 days prior to the termination of a Predecessor Employer's contract, the Predecessor Employer shall notify all Retention Employees in writing that they have been placed on a qualified displaced worker list and that the Successor Employer may be required to offer him/her continued employment. The notice shall include, if known, the name, address, and contact information of the Successor Employer. A copy of this notice, along with a copy of the qualified displaced worker list, shall also be sent to the City Manager.

B.     <u>Retention Offer</u>. Except as otherwise provided herein, the Successor Employer shall offer employment to all qualified Retention Employees. A Successor Employer who is a Hospitality Employer shall, before hiring off the street or transferring workers from elsewhere, offer employment to all qualified retention employees of any predecessor employer that has

provided similar services at the same facility. If the Successor Employer does not have enough positions available for all qualified Retention Employees, the Successor Employer shall hire the Retention Employees by seniority within each job classification. For any additional positions which become available during the initial ninety-day period of the new contract, the Successor Employer will hire qualified Retention Employees by seniority within each job classification.

C.     <u>Retention Period</u>. A Successor Employer shall not discharge a Retention Employee without just cause during the initial ninety-day period of his/her employment.

D.     An employee is "qualified" within the meaning of this Section if he/she has performed similar work in the past (and was not discharged for incompetence) or can reasonably be trained for the duties of a position through an amount of training not in excess of the training that has been provided by the employer to workers hired off the street.

E.     The requirements of this Chapter shall not be construed to require any Hospitality Employer or Transportation Employer to offer overtime work paid at a premium rate nor to constrain any Hospitality Employer or Transportation Employer from offering such work.

**7.45.070     Employee Work Environment Reporting Requirement**

A.     Hospitality Employers and Transportation Employers shall retain records documenting hours worked, paid sick and safe time taken by Covered Workers, and wages and benefits provided to each such employee, for a period of two years, and shall allow the City Manager or designee access to such records, with appropriate notice and at a mutually agreeable time, to investigate potential violations and to monitor compliance with the requirements of this Chapter.

B.     Hospitality Employers and Transportation Employers shall not be required to modify their recordkeeping policies to comply with this Chapter, as long as records reasonably indicate the hours worked by Covered Workers, accrued paid sick and safe time, paid sick and safe time taken, and the wages and benefits provided to each such Covered Worker. When an issue arises as to the amount of accrued paid sick time and/or paid safe time available to a Covered Worker under this chapter, if the Hospitality Employers and Transportation Employers does not maintain or retain adequate records documenting hours worked by the Covered Worker and paid sick and safe time taken by the Covered Worker, it shall be presumed that the Hospitality Employers and Transportation Employers has violated this chapter.

C.     Records and documents relating to medical certifications, re-certifications or medical histories of Covered Worker or Covered Workers' family members, created for purposes of this chapter, are required to be maintained as confidential medical records in separate files/records from the usual personnel files. If the Americans with Disabilities Act (ADA) and/or the Washington Law Against Discrimination (WLAD) apply, then these records must comply with the ADA and WLAD confidentiality requirements.

**7.45.080     Waivers**

The provisions of this Chapter may not be waived by agreement between an individual Covered Worker and a Hospitality or Transportation Employer. All of the provisions of this Chapter, or any part hereof, including the employee work environment reporting requirement set forth herein, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in such agreement in clear and unambiguous terms. Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute, or be permitted, as a waiver of all or any part of the provisions of this chapter.

**7.45.090 Prohibiting Retaliation Against Covered Workers For Exercising Their Lawful Rights**

A.      It shall be a violation for a Hospitality Employer or Transportation Employer or any other person to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right protected under this Chapter.

B.      It shall be a violation for a Hospitality Employer or Transportation Employer to take adverse action or to discriminate against a Covered Worker because the Covered Worker has exercised in good faith the rights protected under this Chapter. Such rights include but are not limited to the right to file a complaint with any entity or agency about any Hospitality Employer's or Transportation Employer's alleged violation of this chapter; the right to inform his or her employer, union or other organization and/or legal counsel about a Hospitality Employer's or Transportation Employer's alleged violation of this section; the right to cooperate in any investigation of alleged violations of this chapter; the right to oppose any policy, practice, or act that is unlawful under this section; and the right to inform other Covered Workers of their rights under this section. No Covered Worker's compensation or benefits may be reduced in response to this Chapter or the pendency thereof.

C.      The protections afforded under subsection B shall apply to any person who mistakenly but in good faith alleges violations of this Chapter.

**7.45.100      Enforcement of Chapter**

A. Any person claiming violation of this chapter may bring an action against the employer in King County Superior Court to enforce the provisions of this Chapter and shall be entitled to all remedies available at law or in equity appropriate to remedy any violation of this chapter, including but not limited to lost compensation for all Covered Workers impacted by the violation(s), damages, reinstatement and injunctive relief. A plaintiff who prevails in any action to enforce this Chapter shall be awarded his or her reasonable attorney's fees and expenses.

9

B.      The City shall adopt auditing procedures sufficient to monitor and ensure compliance by Hospitality Employers and Transportation Employers with the requirements of this Chapter. Complaints that any provision of this Chapter has been violated may also be presented to the City Attorney, who is hereby authorized to investigate and, if it deems appropriate, initiate legal or other action to remedy any violation of this chapter; however, the City Attorney is not obligated to expend any funds or resources in the pursuit of such a remedy.

C.      Nothing herein shall be construed to preclude existing remedies for enforcement of Municipal Code Chapters.

**7.45.110      Exceptions**

The requirements of this Chapter shall not apply where and to the extent that state or federal law or regulations preclude their applicability. To the extent that state or federal law or regulations require the consent of another legal entity, such as a municipality, port district, or county, prior to becoming effective, the City Manager is directed to formally and publicly request that such consent be given.

**Section 3**. That the effective date of this Ordinance shall be January 1, 2014.

**Section 4**. The Code Reviser is authorized to change the numbering and formatting this Ordinance to conform with the SeaTac Municipal Code codification in a manner that is consistent with the intent and language of this Ordinance.

**Section 5**. Severability. If any provision of this Ordinance is declared illegal, invalid or inoperative, in whole or in part, or as applied to any particular Hospitality or Transportation Employer and/or in any particular circumstance, by the final decision of any court of competent jurisdiction, then all portions and applications of this Ordinance not declared illegal, invalid or inoperative, shall remain in full force or effect to the maximum extent permissible under law.

*ADDENDUM K*

*STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS*



**PKF**
CONSULTING
USA

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS

*This report is made with the following assumptions and limiting conditions:*

**Economic and Social Trends** - The consultant assumes no responsibility for economic, physical or demographic factors which may affect or alter the opinions in this report if said economic, physical or demographic factors were not present as of the date of the letter of transmittal accompanying this report. The consultant is not obligated to predict future political, economic or social trends.

**Information Furnished by Others** - In preparing this report, the consultant was required to rely on information furnished by other individuals or found in previously existing records and/or documents. Unless otherwise indicated, such information is presumed to be reliable. However, no warranty, either express or implied, is given by the consultant for the accuracy of such information and the consultant assumes no responsibility for information relied upon later found to have been inaccurate. The consultant reserves the right to make such adjustments to the analyses, opinions and conclusions set forth in this report as may be required by consideration of additional data or more reliable data that may become available.

**Hidden Conditions** - The consultant assumes no responsibility for hidden or unapparent conditions of the property, subsoil, ground water or structures that render the subject property more or less valuable. No responsibility is assumed for arranging for engineering, geologic or environmental studies that may be required to discover such hidden or unapparent conditions.

**Hazardous Materials** - The consultant has not been provided any information regarding the presence of any material or substance on or in any portion of the subject property or improvements thereon, which material or substance possesses or may possess toxic, hazardous and/or other harmful and/or dangerous characteristics. Unless otherwise stated in the report, the consultant did not become aware of the presence of any such material or substance during the consultant's inspection of the subject property. However, the consultant is not qualified to investigate or test for the presence of such materials or substances. The presence of such materials or substances may adversely affect the value of the subject property. The value estimated in this report is predicated on the assumption that no such material or substance is present on or in the subject property or in such proximity thereto that it would cause a loss in value. The consultant assumes no responsibility for the presence of any such substance or material on or in the subject property, nor for any expertise or engineering knowledge required to discover the presence of such substance or material. Unless otherwise stated, this report assumes the subject property is in compliance with all federal, state and local environmental laws, regulations and rules.

**Zoning and Land Use** - Unless otherwise stated, the projections were formulated assuming the hotel to be in full compliance with all applicable zoning and land use regulations and restrictions.

**Licenses and Permits** - Unless otherwise stated, the property is assumed to have all required licenses, permits, certificates, consents or other legislative and/or administrative authority from any local, state or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

**Engineering Survey** - No engineering survey has been made by the consultant. Except as specifically stated, data relative to size and area of the subject property was taken from sources considered reliable and no encroachment of the subject property is considered to exist.

**Subsurface Rights** - No opinion is expressed as to the value of subsurface oil, gas or mineral rights or whether the property is subject to surface entry for the exploration or removal of such materials, except as is expressly stated.

**Maps, Plats and Exhibits** - Maps, plats and exhibits included in this report are for illustration only to serve as an aid in visualizing matters discussed within the report. They should not be considered as surveys or relied upon for any other purpose, nor should they be removed from, reproduced or used apart from the report.

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS
(continued)

---



**Legal Matters** - No opinion is intended to be expressed for matters which require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate consultants.

**Right of Publication** - Possession of this report, or a copy of it, does not carry with it the right of publication. Without the written consent of the consultant, this report may not be used for any purpose by any person other than the party to whom it is addressed. In any event, this report may be used only with proper written qualification and only in its entirety for its stated purpose.

**Testimony in Court** - Testimony or attendance in court or at any other hearing is not required by reason of rendering this appraisal, unless such arrangements are made a reasonable time in advance of said hearing. Further, unless otherwise indicated, separate arrangements shall be made concerning compensation for the consultant's time to prepare for and attend any such hearing.

**Archeological Significance** - No investigation has been made by the consultant and no information has been provided to the consultant regarding potential archeological significance of the subject property or any portion thereof. This report assumes no portion of the subject property has archeological significance.

**Compliance with the American Disabilities Act** - The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We assumed that the property will be in direct compliance with the various detailed requirements of the ADA.

**Definitions and Assumptions** - The definitions and assumptions upon which our analyses, opinions and conclusions are based are set forth in appropriate sections of this report and are to be part of these general assumptions as if included here in their entirety.

**Dissemination of Material** - Neither all nor any part of the contents of this report shall be disseminated to the general public through advertising or sales media, public relations media, news media or other public means of communication without the prior written consent and approval of the consultant(s).

**Distribution and Liability to Third Parties** - The party for whom this report was prepared may distribute copies of this appraisal report only in its entirety to such third parties as may be selected by the party for whom this report was prepared; however, portions of this report shall not be given to third parties without our written consent. Liability to third parties will not be accepted.

**Use in Offering Materials** - This report, including all cash flow forecasts, market surveys and related data, conclusions, exhibits and supporting documentation, may not be reproduced or references made to the report or to PKF Consulting in any sale offering, prospectus, public or private placement memorandum, proxy statement or other document ("Offering Material") in connection with a merger, liquidation or other corporate transaction unless PKF Consulting has approved in writing the text of any such reference or reproduction prior to the distribution and filing thereof.

**Limits to Liability** - PKF Consulting cannot be held liable in any cause of action resulting in litigation for any dollar amount, which exceeds the total fees collected from this individual engagement.

**Legal Expenses** - Any legal expenses incurred in defending or representing ourselves concerning this assignment will be the responsibility of the client.