1  Kristina S. Azlin (SBN 235238)
   John A. Canale (SBN 287287)
2  HOLLAND & KNIGHT LLP
   400 South Hope Street, 8th Floor
3  Los Angeles, California 90071
   Telephone 213.896.2400
4  Facsimile 213.896.2450
   E-mail: kristina.azlin@hklaw.com,
5  john.canale@hklaw.com

6  Michael Starr (*Pro Hac Vice*)
   Katherine H. Marques (*Pro Hac Vice*)
7  HOLLAND & KNIGHT LLP
   31 West 52nd Street
8  New York, NY 10019
   Telephone: 212.513.3200
9  Facsimile: 212.385.9100
   E-mail: michael.starr@hklaw.com,
10 Katherine.marques@hklaw.com

11 Attorneys for Plaintiffs
   American Hotel & Lodging Association and
12 Asian American Hotel Owners Association

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| AMERICAN HOTEL & LODGING ASSOCIATION and ASIAN AMERICAN HOTEL OWNERS ASSOCIATION<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES,<br><br>Defendant. | CASE NO. 2:14-cv-09603-AB-SS<br>Assigned to Hon. Andre Birotte Jr.<br><br>**DECLARATION OF**<br>**ZEV J. EIGEN**<br><br>Date: March 23, 2015<br>Time: 10:00 am<br>Dept.: 790, Roybal<br><br>Complaint Filed: December 16, 2014 |

1

DECLARATION OF ZEV J. EIGEN

I, ZEV J. EIGEN, the undersigned, hereby declare and state as follows:

1. I have been retained by counsel for Plaintiffs American Hotel & Lodging Association ("AH&LA") and Asian American Hotel Owners Association ("AAHOA") as an expert in the above-captioned action. I submit this declaration in connection with Plaintiffs' Motion for Preliminary Injunction. I am being compensated at a rate of $550 per hour.

2. I have been asked to review documents and associated files provided to me and to render an opinion about whether and to what extent Ordinance No. 183241, entitled, "Citywide Hotel Worker Minimum Wage Ordinance" (hereafter, the "Hotel Workers Act" or the "Act") interferes with labor relations, union organizing, and/or collective bargaining. It is my opinion that the Act as currently drafted interferes with all three areas of interaction among employees, labor organizations, and employers.

3. In this declaration, I briefly articulate my qualifications and then give the basis for my opinion. If called as a witness, I could testify thereto under oath. My opinion is based either upon my own knowledge or from the documents in this case specified below.

**Professional Credentials**

4. I am the Irving S. Ribicoff Visiting Professor of Law at Yale Law School, and Visiting Professor of Law at NYU School of Law. I am also an Associate Professor of Law at Northwestern University School of Law, an Associate Professor of Management and Strategy (by courtesy) at Kellogg School of Management, and a Research Fellow at NYU Law School's Center for Labor and Employment Law.

5. I hold a PhD in management from Massachusetts Institute of Technology, a JD from Cornell Law School, and a BS in industrial and labor relations (with honors) from Cornell University. I have practiced labor and employment law in California (CA Bar # 205910) since 1999, working first as an

associate with Littler Mendelson in San Francisco, and then as Senior Counsel, Labor Relations with Twentieth Century Fox Film Corporation in Los Angeles. My academic training includes advanced statistical analysis, research methods, survey research, economics, labor economics, and related subjects. I have been awarded grants from the National Science Foundation, Northwestern University, and Harvard Law School (among other sources) to fund my research. I frequently appear in the media as an expert on labor, employment, and contracts. I regularly present my research in academic conferences and workshops all over the country, and internationally. I regularly attend conferences at which I am invited to present on topics related to labor relations in the hospitality industry. My curriculum vitae is available online at this URL: http://zeveigen.com/?page_id=51.

6. Starting in 1997, when I worked as a graduate teaching assistant at the Statler Hotel School at Cornell University, I have been involved in labor and employment related issues in the hospitality industry. Since that time, I regularly attend labor and employment law in the hospitality industry conferences, where I present research findings related to the industry, and otherwise present on labor and employment law issues that relate to the industry. For instance, I recently presented research on hotel performance metrics comparing unionized to non-unionized hotels at an HR in Hospitality conference in Las Vegas, Nevada. Industry conferences provide me opportunities to interact with and hear from unionized hotel operators, hotel HR practitioners, attorneys with specialized practices, other academics in this field, and from labor organizers about labor and employment related issues in the industry. I also frequently write articles in the Cornell Hotel and Restaurant Administrative Quarterly (a journal dedicated to hospitality industry issues) summarizing labor and employment law issues pertinent to the hospitality industry.

DECLARATION OF ZEV J. EIGEN

7. I have worked as a consultant and/or expert on cases involving labor and employment related matters. Over the past eight years, I have been engaged by both plaintiff and defense counsel.

**Interference with Labor Relations, Union Organizing, and Collective Bargaining**

8. Plaintiffs' counsel has asked me to review the following records and materials: the Civil Complaint in AH&LA et al. v. City of Los Angeles, Declarations of Michael Czarcinski, dated January 22, 2015; Kevin Gleason, dated January 23, 2015; Robert Hannigan, dated January 23, 2015; David Hsu, dated January 21, 2015; Raymond Martz, dated January 23, 2015; Israel Mora, dated January 22, 2015; Mitchell Roberts, dated January 22, 2015; Robert Rowling, dated January 22, 2015; Linda Stigter, dated January 23, 2015; Michael Wlodkowski, dated January 21, 2015; Peter Zen, dated January 23, 2015, which I am informed are being submitted by Plaintiffs in support of their Motion for Preliminary Injunction, I have reviewed these materials.

9. Based on my review of the materials, and drawing on my experience, education, training, and relevant knowledge, I have concluded that the Hotel Workers Act significantly interferes with union organizing, collective bargaining, and labor relations in the Los Angeles hotel industry. My opinions are based on the significance of the Act's likely effects in light of certain labor law principles and practices, which effects would not likely be obvious to individuals who are not familiar with these principles and practices.

10. The Act interferes with union organizing by enabling labor organizations to coerce non-unionized Hotel Employers (as defined by the Act) to choose between agreeing to a "neutrality agreement" or being subject to the labor costs imposed on them by the Act.

4

DECLARATION OF ZEV J. EIGEN

11. The Act interferes with collective bargaining and labor relations in several ways. First, it gives unions a "bargaining chip" that they would not otherwise have by affording them the discretion of granting a waiver to a hotel with which it has a collective bargaining agreement ("CBA"), or refusing to do so. This decision will likely turn on whether the union is successful in extracting some concession from the hotel that it feels is sufficiently valuable to exchange for the waiver. Further, by its purported prohibition on unilateral implementation of waivers, the Act could be construed in such a way as to interfere with collective bargaining as it customarily occurs at the expiration of a CBA.

12. It is my opinion that the Act interferes with labor relations broadly, by statutorily empowering unions with unilateral discretion and control over the application of the terms of the statute, and by making it a "willful violation" of the statute for a Hotel Employer to even attempt to achieve the same ends without a union allowing the waiver.

**The Hotel Workers Act**

13. The Hotel Workers Act includes a wage provision that becomes effective for covered hotels in Los Angeles of a certain size as of July 1, 2015 and for all covered hotels on July 1, 2016. That provision requires all Hotel Workers (as defined by the Hotel Workers Act) at covered hotels to be paid a wage rate of at least $15.37 per hour. That required wage rate must be paid irrespective of gratuities, service charges, or any other payments that hotels make to their employees..

14. The Hotel Workers Act further provides that any covered hotel is permitted to obtain an exemption from any or all of the Act's requirements, but only if such hotel is party to what the Act calls a "bona fide" CBA and only if such a waiver is explicitly granted by means of clear and unambiguous language written into the parties' CBA.

15. It is important first to note that the term "bona fide" as used to describe a CBA has no recognized meaning in labor relations law. In contrast, the term "collective bargaining agreement" means an agreement entered into between an employer and a labor organization that has been certified or recognized pursuant to the provision of section 9(b)(1) or 9(b)(2) of the National Labor Relations Act, by the National Labor Relations Board, or which is the certified representative of the employees under the provisions of the NLRA (see, e.g. CFR 29(B)(V)(A) §531.6(b)) concerning wage, hours and the terms and conditions of employment for the unit of employees represented by that labor organization. The Hotel Workers Act would involve state courts' having to construe CBAs to see whether they are "bona fide," which is inconsistent with federal labor policy requiring a body uniform, nationwide and federal law for the interpretation of CBAs. (*See, e.g., Livadas v. Bradshaw*, 114 S.Ct. 2068 (1994)).

16. In my opinion, the Act's immediate effect on CBAs is unusual as compared to other statutes setting labor standards (as opposed to regulating labor relations). It is more common and typical for such labor standards statutes to exempt parties from coverage until the expiration of a CBA that is already in place and governing the relationship between an employer and employees. Examples of this are the Family Medical Leave Act (29 U.S.C. § 2601, et seq.) and Employee Retirement Income Security Act (29 U.S.C. §§ 1001, et seq.).

17. That section of the Act continues, stating that "[u]nilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute or be permitted as a waiver of all or any part of the provisions of this article." This section could be interpreted as a prohibition against hotels' unilaterally continuing a previously granted union waiver after the expiration of a CBA.

6

DECLARATION OF ZEV J. EIGEN

18. On its face, the Act appears well-intentioned. Part of the Act purports to increase compensation to hotel employees. I am personally in favor of raising the minimum wage when it is appropriate.

19. The parts of the Act that are particularly problematic are Section 186.08 "Exemption for Collective Bargaining Agreement", and Section 186.10, "No Waiver of Rights." These two sections transmogrify the Act into a sword wieldable by labor organizations to coerce employers and circumnavigate the rights of employees. These sections permit unions to discriminate against employees who wish to exercise their legal right not to organize. This discrimination, among other things, undermines the Act's legitimacy.

**Definition of Hotel Workers under the Act**

20. Employees excluded from coverage under the National Labor Relations Act, (Pub. L. No. 74-198, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151–69 (2006)) (the Wagner Act)) ("NLRA"), include supervisors, managerial employees, confidential employees, as well as other categories of employees not relevant here.

21. The terms "managerial" and "confidential" carry specific meaning in federal labor law. They are not as laden with this unique meaning in typical minimum wage statutes. In *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 270-272 (1974), the Court discussed the history of the development of the term "managerial" employee noting that Congress intended to exclude from coverage of the NLRA employees so closely related or aligned with management as to place the employee in a position of conflict of interest between his employer on the one hand and his fellow workers on the other. In *NLRB v. Yeshiva University*, 444 U.S. 672 (1980), the Court found that full-time faculty members of a private university were managerial employees and therefore not proper personnel for a collective bargaining agreement.

DECLARATION OF ZEV J. EIGEN

22. Similarly, the category of "confidential employees" has no analogue at all to minimum wage statutes, but rather is a concept created by the National Labor Relations Board ("NLRB") and later approved by the Supreme Court. It is intended to exclude from union representation individuals who have access to confidential information relevant to an employer's labor relations strategy. Confidential employees can include relatively low paid clerical workers in an employer's human relations department, who are not exempt from coverage under federal and state minimum wage statutes. There can be several clerical workers in a Human Resources office at the same salary level, but if only one deals with information having a "labor nexus," then only that individual would be a "confidential employee" under the NLRA.

23. Parroting these terms from labor law, the Hotel Workers Act excludes from coverage any workers who are "supervisory, managerial and confidential employees".

24. Therefore, according to the plain meaning of the Act, the subset of employees who may be organized by unions are covered, but those who may not be organized by unions are excluded from coverage. It is difficult to explain why a seemingly well-intentioned minimum standards act would exclude non-organizable employees. For instance, why are human resources employees who may hold confidential employer information or "labor news" information less deserving of the benefits afforded to employees covered by the Act?

**Collective Bargaining and Labor Relations**

25. The NLRA requires employers and unions to bargain collectively regarding "wages, hours and other terms and conditions of employment." (Pub. L. No. 74-198, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151–69 (2006)) (the Wagner Act)). Once a union has been chosen to be the exclusive bargaining representative of a unit of employees, the employer and the union are

8

DECLARATION OF ZEV J. EIGEN

obligated to meet at reasonable times to bargain in good faith about so called "mandatory subjects" of bargaining. The NLRA does not, however, require either party to agree to a proposal or make a concession. See 29 U.S.C. § 158 (d) ("such obligation does not compel either party to agree to a proposal or require the making of a concession").

26. A fundamental tenet of labor law is the careful balance among the interests of employees, employers, and labor organizations. Much of the law in this area has developed by deferring to the parties to negotiate their own rights and remedies. The law defers to the parties most clearly in the principle of "free collective bargaining." This balancing of rights is important because courts do not favor government action that tilts the scales in a way that tramples on fundamental rights that are part and parcel of this three-way balancing (see, Eigen, Sherwyn, A Moral/Contractual Approach to Labor Law Reform, 63 Hastings L. J. 101 (2012). A state or municipal enactment that has that effect is fundamentally at odds with federal labor policy.

27. It is now a well-accepted principle of federal labor law that, while tactics used by employers and unions can be regulated, the substantive terms of their agreement are to be based only on matters on which they agree or can induce the other to accept by permitted economic actions. In my opinion, a municipal ordinance that gives either labor or management additional economic leverage interferes with this bedrock principle of careful balancing of rights, and most clearly with the principle of "free collective bargaining."

28. The duty to bargain in good faith also applies at the expiration of a collective bargaining agreement. When a deadlock or "impasse" occurs following good faith efforts to negotiate new terms, unilateral changes in terms and conditions of employment by the employer are lawful, provided the CBA at issue has expired and the unilateral changes are reasonably encompassed by the employer's pre-

impasse proposals. According to the NLRB, "[i]f after sufficient good faith efforts, no agreement can be reached, the employer may declare impasse, and then implement the last offer presented to the union" (http://nlrb.gov/rights-we-protect/employerunion-rights-and-obligations) (see, e.g. *NLRB v. Katz*, 369 U.S. 736 (1962); *Crest Floors & Plastics*, 274 NLRB 1230 (1985); and generally, William B. Gould, A Primer on American Labor Law (1982)). Parties are obligated to bargain over "wages, hours, and other terms and conditions of employment" under §8(d). The NLRB distinguishes between mandatory subjects of bargaining, which are covered by §8(d), and non-mandatory subjects that are not covered. A party who insists on a non-mandatory subject to the point of deadlock commits an unfair labor practice, regardless of its good faith (see, e.g. *NLRB v. Columbus Printing Pressmen & Assistants' Union*, 543 F.2d 1161 (1976)). Indeed, once the parties reach an impasse during bargaining, an employer is permitted to implement its final offer. This is known as "unilateral implementation."

29. Section 7 of the NLRA protects employees' "concerted activities for the purpose of collective bargaining or other mutual aid or protection." Strikes are included among the concerted activities protected by this section. Unions may call strikes in order to obtain from the employer some economic concession for wages, hours or working conditions. This is called an "economic" strike, as opposed to an "unfair labor practice" strike that protests an unfair labor practice allegedly committed by the employer. Employers may opt to withstand an economic strike and operate under the status quo. Employers may want to change the status quo in their favor (*e.g.*, changing work rules or seniority rules), and that is part of the balancing of rights critical to a free collective bargaining process.

30. The right to unilateral implementation is an essential and integral component of collective bargaining and labor relations generally. Unilateral implementation breaks the bargaining impasse and requires further negotiations

DECLARATION OF ZEV J. EIGEN

between the parties. The threat of unilateral implementation is part of the balancing of rights in the negotiation process set out over years of labor law. As quoted in a 1997 article by Ellen J. Dannin, "'[i]mpasse and implementation is the dominant consideration of virtually every negotiation' that he has been involved in, said Samuel McKnight, a union attorney…" (15 Hofstra Lab. & Emp. L.J.11 (1997). In my experience representing employers in collective bargaining, I can say that the threat of impasse and implementation frequently helped the parties reach agreement, where otherwise a work stoppage might have resulted, or delay in bargaining would have contributed to stymying negotiating progress, either or both of which would have cost employees, the employer and the union valuable time and money.

31. The effect of the implementation of the "unilateral implementation" provision may be that a Hotel Employer will feel uncertain as to whether it must immediately put into effect each and every requirement of the Hotel Workers Act for which it had previously been granted a waiver, notwithstanding that doing this would cause an immediate increase in labor costs on Hotel Employers who do not accept a union's demands prior to the expiration of an applicable CBA.

32. The "unilateral implementation" provision further interferes with federal labor law, which requires employers to continue in effect all economic terms and conditions of an expired collective bargaining agreement during negotiations of a successor agreement. In the seminal case of *NLRB v. Katz*, 369 U.S. 736 (1962), the Supreme Court ruled that an employer cannot make unilateral changes to the terms and conditions of employment, once a union is legally authorized, except after bargaining to a good faith impasse. Later, in *Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 544 (1988), the Court extended the *Katz* ruling to an instance in which an existing agreement expired and negotiations on a new one had yet to be completed, and clarified that the employer could neither lower nor raise hourly wage rates without the consent of the affected

11

DECLARATION OF ZEV J. EIGEN

employees' collective-bargaining representative. Labor lawyers sometimes refer to these cases and their progeny as the "*Katz* doctrine". For a fuller discussion of these issues, see 1 DEVELOPING LABOR LAW 894-902; 1049-1067 (John E. Higgins, Jr., ed., 6th ed. 2012). The DEVELOPING LABOR LAW holds a status similar to a Restatement or treatise for many labor law practitioners and labor arbitrators. I have seen it cited authoritatively and persuasively in labor arbitrations and court decisions.

33. In these ways, the "unilateral impasse" provision, if construed to require covered Hotels to implement the provisions of the Act following expiration of a CBA that contains a previously granted waiver, ignores more than fifty years of labor law precedent carefully constructed by the courts, and strips employers of a fundamental component of bargaining – the fundamental right of an employer to unilaterally implement terms following impasse.

34. Another direct and tangible way in which the Act interferes with collective bargaining and labor relations in the hospitality industry is related to the typical custom and practice with respect to service charges for hotel operating expenses and paying tipped employees. It is my understanding that service charges are a percentage add-on to bills. They are automatically added percentage payments above the base charge for services being provided by the hotel. It is my understanding that tipped employees are frequently paid a lower base salary than non-tipped employees. Depending on the position, shift, and market, employees might prefer to receive a lower base salary plus tips or service charges rather than a higher static base wage without tips or service charges.

35. The Act would require a union to grant Hotel Employers a waiver in order to maintain economic terms of existing collective bargaining agreements, including but not limited to provisions dealing with wage rates for tipped employees, or arrangements by which portions of service charges are used to cover operating costs.

12

DECLARATION OF ZEV J. EIGEN

36. The language of Section 186.08 of the Act specifies that the waiver provided in a "bona fide collective bargaining agreement" has to be "explicitly set forth in that agreement" in "clear and unambiguous terms." I interpret this to mean that the Union must be asked and it must expressly approve of the waiver. Without the express language in the CBA, employers would be barred from arguing for an implied waiver. This places an unusually high bar on the criteria for the waiver by essentially granting to unions the sole discretion to allow express language to be included to exempt the employer from coverage. Covered Hotel employers would be required to approach the union to request of them to grant the inclusion of this language. Either the union would do so benevolently, or it would do so for some price to be extracted at the negotiating table.

37. It appears from what I think is a reasonable way to interpret the Act that it could restrict Hotel Employers bargaining with the Union for a first contract, or in the midst of collective bargaining, from continuing pre-existing practices such as retaining a portion of service charges for operating expenses, or allowing employees to trade off a higher base-wage rate for a lower rate plus tips. Continuing such practices during negotiations is a right reserved to employers under federal law. The inability to continue ongoing practices interferes with both the Employer's ability to collectively bargain, and it interferes with Hotel Employees' rights to continue to be compensated as they have been without the Act's imposition of changes of fundamental terms of employment without the Union's say-so.

**Union Organizing**

38. It appears to me that the Act interferes with union organizing by enabling labor organizations to coerce non-unionized Hotel Employers to choose between the Scylla of agreeing to a "neutrality agreement", or the Charybdis of being subject to the labor costs imposed on them by the Act.

39. Neutrality agreements come in several forms. The common denominator for all of them is an agreement between an employer and a union to obligate the employer to stand by passively while a union organizes a unit of the employer's employees. I have described what they are and what they do in greater detail in a law review article (see, Eigen & Sherwyn, A Moral/Contractual Approach to Labor Law Reform, 63 Hastings L. J. 127-137 (2012)).

40. While most neutrality agreements contain a definition of neutrality, the definitions vary widely. Most Communication Workers of America, United Auto Workers, and United Steelworkers of America agreements define neutrality as "neither helping nor hindering" the union's organizing effort, yet still allow employers to communicate facts to the employees (see Adrienne E. Eaton & Jill Kriesky, Union Organizing Under Neutrality and Card Check Agreements, 55 Indus. & Lab. Rel. Rev. 42, 47 (2001)). A different approach is apparent from the Hotel Employees and Restaurant Employees Union (HERE) agreements that prohibit the employer from communicating any opposition to the union. *Id.* The union previously called "HERE" merged some years ago with a union called "UNITE" and is now called UNITE HERE.

41. Normally, during the "campaign" period between the time the union files for certification and the secret ballot election, employees hear reasons why they should vote for the union from union organizers, and they hear counter-balancing arguments from the employer. When the employer stands down, the odds of the union ending up representing the unit of employees goes up substantially. Even with an employer standing down during the campaign period, unions prefer not to leave things in the hands of employees in a secret ballot election. Unions prefer to avoid the uncertainty of an election supervised by the NLRB.

42. Neutrality agreements come in many forms, but generally have the following elements. By agreeing to stand idly by while the union campaigns, the

employer also agrees that it will not exercise its rights under the NLRA to demand that the NLRB hold a certification (secret ballot) election.  Most neutrality agreements include this "card check" provision, which requires the employer to "voluntarily" recognize the union if a majority of the bargaining unit employees sign authorization cards (Eigen & Sherwyn, at 128; Eaton & Kriesky at 47; tbl 1 (finding that 73% of neutrality agreements contained card-check language)). This is referred to as a "card check recognition clause."

43.     Neutrality agreements often provide that the union may access the employer's premises. This goes beyond restrictions under federal labor law, which provides for more limited access to employees. This combination is designed to drastically improve the chances that the union will represent the employees. Obtaining employees' signatures on authorization cards is not an anonymous procedure. Employees are frequently face to face with union representatives, and are asked to sign cards on the spot. There is no one present to ensure that the cards are explained correctly or to ensure that no coercion or deception happens. In contrast, a secret ballot election run by Board agents ensures that no one will know how any individual employee votes, and it reduces the likelihood of coercion and deception in exercising the important right to select the exclusive bargaining representative of the employees.

44.     In a typical card check/neutrality agreement situation, once the union has unfettered access to employees, campaigns unopposed, and is no longer encumbered by the power of a free, anonymous secret ballot election, the odds of the union winning dramatically improve. This occurs at the cost of the free choice of employees, which is at the heart of the NLRA. When I discuss this with supporters of card check/ neutrality provisions, they tend not to dispute the curtailment on employees' freedom to choose whether to be represented by a union or not, but instead paternalistically explain that union win rates in the private sector are low, and

15

DECLARATION OF ZEV J. EIGEN

that must be because of employer coercion, so this is a way to even the odds. I disagree. I do not think it wise to trample on the rights of employees to freely choose whether to be represented by a union in order to increase union win rates.

45. I agree with the following quote from an article in the Cornell Hotel and Restaurant Administrative Quarterly about the degree to which unions in the hospitality industry have turned to other means besides secret ballot elections in order to augment their membership numbers: "… [T]he industry has entered an era in which unions use their political strength to circumvent the election process established under the law by lobbying local governments for favorable legislation like labor-peace and living-wage ordinances, or by otherwise inducing employers into signing neutrality agreements under threats of construction and other work delays" (Arch Stokes, Robert L. Murphy, Paul E. Wagner, & David S. Sherwyn, Neutrality Agreements: How Unions Organize New Hotels without an Employee Ballot, 42 Cornell Hotel & Rest. Admin. Q. 86-96 (2001)). This quote conforms with my understanding of the strategy of hospitality unions in the past decade to resort to lobbying, changing laws to make it easier to gain membership, and pressuring employers to voluntarily recognize employees with a card-check/neutrality agreement. I would add that from a careful reading of this ordinance, combined with the knowledge of the specific labor relations terms used therein, in light of my understanding of labor relations practices in the hospitality industry, and the effect of the ordinance to exclude from coverage non-organizable employees, and grant to unions the sole and exclusive power to decide to whom this statute applies, that this statute appears to be created for unions and likely was created at the behest of unions.

46. Given the desirous outcome (from the union's perspective) of avoiding the uncertainty of hotel workers not actually wanting to be represented by a union and the reduced intimidation and coercion associated with secret ballot elections that improve the chances of employees expressing their desire not to be represented by a

union, it should not be surprising that unions in the hospitality industry (like many other unions in the United States faced with low win rates in elections) have turned to the above-mentioned tactics.  Indeed, neutrality agreements radically change the landscape of union organizing (Eigen & Sherwyn, at 128). With the aid of such agreements, unions in one study prevailed in 78% of the situations in which they attempted to organize, compared to only a 46% success rate in contested elections (Eigen & Sherwyn, at 128; Eaton & Kriesky at 52 & tbl. 3).

47. As I have written elsewhere, the difference between these two rates likely understates the effect of neutrality agreements, in part because the sampled populations for the two figures are different. This is referred to as "sampling bias." Elections only occur when the union can show that a minimum of 30% of the employees have signed authorization cards. In almost every situation in which a union goes to election, it has more than 50% of the employees sign cards. Thus, the sampled population in the 46% win figure includes only companies where it is likely that at least 60% of the employees signed cards. Companies where the union could not get at least 51% of the employees to sign cards did not go to election and never became part of that figure. Conversely, the sampled population in the neutrality side of the study includes all employers who signed such agreements. Those employers whose employees had no interest represent the 22% of companies that remained nonunion. In other words, it is likely that 100% of the companies that went to election would have been unionized under a neutrality with card check, and the 22% of those under card-check agreements would never have gone to election. The net effect is quite simple. Assuming there is enough employee interest to warrant an election in the first place, the company's chances of becoming unionized are less than 50% under the NLRB's election procedures and nearly guaranteed under a neutrality agreement with a card-check provision (Eigen & Sherwyn 128-29).

48. For a further review of the empirical studies identifying common elements of a neutrality agreement, see, James J. Brudney, Neutrality Agreements and Card Check Recognition: Prospects for Changing Paradigms, 90 Iowa L. Rev. 819, 824–40 (2005); Eigen & Sherwyn, A Moral/Contractual Approach to Labor Law Reform, 63 Hastings L. J. 127-137 (2012)).

49. Section 186.08 of the Hotel Workers Act allows hotels to obtain a waiver from complying with any and all of the Act's provisions but only when such waivers have been obtained by means of "a bona fide collective bargaining agreement." This means that a waiver is available only to unionized hotels.

50. The straight-forward effect of this provision will be to favor hotels that have collective bargaining agreements and be a significant detriment to non-unionized hotels. The provision will have the unavoidable outcome of applying a coercive pressure to the labor relations policies of non-unionized hotels. More specifically, the coercive pressure of the Hotel Workers Act will inevitably economically pressure hotels to enter neutrality agreements with the union in order to benefit from the waiver provision of the Hotel Workers Act. In this way, the Hotel Workers Act regulates union organizing in ways contrary to the policies embedded in federal labor law. The rights of employees to both refrain from organizing or to choose to organize, the concomitant right to receive information both for and against unionization, and the policy favoring the promotion of robust debate concerning labor relations are all pushed aside by the provisions of the Act.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 25th day of January, 2015, at Chicago, IL.

By: _____
Zev J. Eigen

# **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 400 S. Hope St., 8th Floor, Los Angeles, California 90071.

On January 26, 2015, I served the document described as **DECLARATION OF ZEV J. EIGEN** on the interested parties in this action as follows:

**[X]** (**BY Electronic Transfer to the CM/ECF System**) In accordance with Federal Rules of Civil Procedure 5(d) (3), Local Rule 5-4, and the U.S. District Court of the Central District's General Order governing electronic filing, I uploaded via electronic transfer a true and correct copy scanned into an electronic file in Adobe "pdf" format of the above-listed documents to the United States District Court Central District of California' Case Management and Electronic Case Filing (CM/ECF) system on this date. It is my understanding that by transmitting these documents to the CM/ECF system, they will be served on all parties of record according to the preferences chosen by those parties within the CM/ECF system. The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on January 26, 2015, Los Angeles, California.

By: _____//S//_____
Kristina S. Azlin