Kristina S. Azlin (SBN 235238)
John A. Canale (SBN 287287)
HOLLAND & KNIGHT LLP
400 South Hope Street, 8th Floor
Los Angeles, California  90071
Telephone 213.896.2400
Facsimile  213.896.2450
E-mail:  kristina.azlin@hklaw.com,
john.canale@hklaw.com

Michael Starr (*Pro Hac Vice*)
Katherine H. Marques (*Pro Hac Vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
Telephone: 212.513.3200
Facsimile: 212.385.9100
E-mail: michael.starr@hklaw.com,
katherine.marques@hklaw.com

Attorneys for Plaintiffs
American Hotel & Lodging Association and
Asian American Hotel Owners Association

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| AMERICAN HOTEL & LODGING ASSOCIATION and ASIAN AMERICAN HOTEL OWNERS ASSOCIATION<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES,<br><br>Defendant. | CASE NO. 2:14-cv-09603-AB-SS<br>Assigned to Hon. Andre Birotte Jr.<br><br>DECLARATION OF MICHAEL CZARCINSKI<br><br>IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Date:   March 23, 2015<br>Time:  10:00 am<br>Dept.:  790, Roybal<br><br>Complaint Filed: December 16, 2014 |

Holland & Knight LLP
400 South Hope Street, 8ᵗʰ Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

# DECLARATION OF MICHAEL CZARCINSKI

I, Michael Czarcinski, hereby declare and state as follows:

1.      I give this declaration in support of the Motion For Preliminary Injunction filed in the above captioned matter by Plaintiffs the American Hotel & Lodging Association ("*AHLA*") and Asian American Hotel Owners Association ("*AAHOA*").  I have personal knowledge of the matters stated below except for those stated on information and belief, which I am informed and believe are true.  I could testify to each of the facts stated below under penalty of perjury if called upon to do so.

2.      I am the Managing Director of the Westin Bonaventure Hotel & Suites, a hotel property located at 404 South Figueroa Street, Los Angeles, California 90071 (hereinafter, the "*Westin Bonaventure*" or the "*Hotel*"), a position I have held since 2007.  As the Managing Director, I operate as the General Manager of the Hotel and, as such, am responsible for all of the Hotel's operations and personnel and am familiar with its business practices, business records, pay practices, staffing, and accounting.

3.      I have 38-years of experience in the hotel and hospitality industry.  Before joining the Westin Bonaventure, other key roles I have held include Executive Vice President of the Pinehurst Resort and Country Club, a world class golf resort in Pinehurst, North Carolina, and Director of Operations of The Woodlands Resort Conference Center and Country Club in Woodlands, Texas.  Prior to those positions, I also served in various capacities with Marriott International for 10-years.  I am also currently serving as the Chairman of the Hotel Association of Los Angeles ("HALA"), a local industry association devoted to the success of hotel and hospitality businesses in the region.

4.      As the Chairman of HALA, I am familiar with the Hotel and Lodging Industry in the City of Los Angeles and surrounding areas.  HALA has over 65 hotel and affiliated members.  We work closely with our members to monitor local,

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

2

regional, state and national legislation that may impact the Los Angeles Hotel Industry. We partner with both The CHLA and AHLA to proactively train industry executives with the latest tools for all areas of our industry. The Association also monitors legislation that may not be fair to our employees, owners and other stakeholders. We want to ensure the Hotel industry has the knowledge available to deliver safe and value added products to our members, employees and clients.

**The Westin Bonaventure**

5.      The Westin Bonaventure is a AAA Four Diamond Award winning resort hotel located in the Financial District of Downtown Los Angeles. With 35 floors in three towers, all centered on a seven-story atrium lobby, the Hotel evokes the feeling of being in a "city within a city". As the largest hotel in the city, the Westin Bonaventure offers over 110,000 square feet of meeting space, 1,358 guest rooms and suites, and the largest hotel ballroom in Los Angeles.

6.      The Westin Bonaventure Hotel is owned by Today's IV, Inc., an entity that is licensed to use the "Westin" brand, which then contracts with Interstate Hotels, LLC, a hotel management company ("Interstate" or the "Manager"), to operate and manage the Hotel portion of the property. Net operating income of the Hotel is retained by Today's IV, Inc. (hereinafter, the "Owner"), which pays a fee for the services provided by Interstate.

7.      The Westin Bonaventure has been open and operating since 1976. As part of its agreement with the Owner, Interstate operates and manages only those operations related to the running of the Hotel (the "*Hotel Operations*"). Hotel Operations include all guest rooms, room service, catering and banquet services, laundry, front office, the gym and pool facilities, and four restaurants and lounges on the property, including LA Prime, the Bonavista Lounge (a revolving cocktail lounge with commanding city views on the 34th floor), Lakeview Bistro and the Lobby Court. The Hotel also includes a parking garage, however, we contract with a third

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

party company, Encore, to operate and provide the parking and garage services; as such, those employees are not employed by Interstate.

8.      Catering and banquet services comprise a significant portion of the Hotel Operations.  As noted above, the Hotel has over 110,000 square feet of meeting space, which includes 35 separate breakout and ball rooms that can seat anywhere from 20 to 3000 guests.

9.      The property that the Westin Bonaventure is located on occupies about one square city block.  In addition to the Hotel Operations, the space also includes a galleria, which currently has one medium/large size restaurant, the Bonaventure Brewing Company, and an assortment of fifty additional shops and small restaurants, including a Subway, many "mom-and-pop" type eateries, a day-spa, various small boutique stores, and office spaces (hereinafter, the "*Galleria*").  It is my understanding that about 75% of the Galleria space is currently occupied, with the remainder of the space sitting empty.  Each of the Galleria businesses is operated independently from the Hotel and are not managed by Interstate; as such, I have no involvement with, or authority over, those businesses, and have only limited knowledge of their activities.  Interstate's only direct interaction with the Galleria businesses is that the Hotel engineers may at times do maintenance on the building in a common area that requires the engineers to coordinate with those businesses, such as fixing broken or faulty pipes, ventilation, etc.  However, any costs associated with providing those common maintenance services are charged back to the Owner in a flat fee and, as such, Interstate does not deal with the Galleria businesses directly.  It is my understanding that those businesses lease their spaces directly from the Owner.

**Hotel Workers Act**

10.      I have reviewed the new "Citywide Hotel Worker Minimum Wage Ordinance" (the "*Hotel Workers Act*"), as codified in Article 6, Chapter XVIII of the Los Angeles Municipal Code, and am familiar with its provisions that most directly affect the Westin Bonaventure.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

4

DECLARATION OF MICHAEL CZARCINSKI

11.     Notably, the Hotel Workers Act includes a wage provision that becomes effective as to the Westin Bonaventure on July 1, 2015.  That provision requires *all* Hotel Workers (as defined by the ordinance) at hotels with more than 300 rooms, like the Westin Bonaventure, to be paid a wage rate of at least $15.37 per hour.  It is my understanding that the required wage rate must be paid irrespective of gratuities, service charges, or any other payments that the Hotel makes to its employees.

12.     Contrary to the established practice in the hospitality industry in Los Angeles – and in other major cities and throughout the United States – the wage rate mandated by the Hotel Workers Act fails to distinguish between tipped employees (such as, banquet waiters, bartenders, bell persons) and non-tipped employees (such as housekeeping staff, cooks, and kitchen stewards).  As set forth below, this feature of the Hotel Workers Act would have a dramatic impact on the net operating income of the Westin Bonaventure.

13.     It is also my understanding that the Hotel Workers Act includes a provision forbidding any covered hotel from retaining any portion of a "service charge" billed to customers.  Instead, the provision requires both that the service charge in its entirety be paid to the hotel workers performing the services for the customer who paid the service charge and also that it be paid "equitably" among them; there is no explanation for how the equitable distribution requirement is to be applied.  This provision, too, is contrary to accepted practices in the hotel industry in Los Angeles.

14.     The Hotel Workers Act allows hotels to obtain a waiver from complying with any and all of its provisions, but such a waiver is only available when it is explicitly set forth in a collective bargaining agreement ("*CBA*").  For the Westin Bonaventure, as more fully discussed below, this necessarily means that it is not enough that the Hotel is already subject to an existing CBA, since the Hotel must now receive a new "explicit" waiver from the union which represents hourly associates involved in Hotel Operations.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

5

DECLARATION OF MICHAEL CZARCINSKI

## Union Organizing Practices

15.    The Westin Bonaventure currently employs approximately 900 associates, including management staff.  All of those associates are employees of Interstate.

16.    Interstate has recognized UNITE HERE! Local 11 ("Local 11" or the "Union") as the exclusive bargaining representative for certain hourly associates employed at the Hotel.[1]  For that reason, the Westin Bonaventure is regarded as a "unionized" hotel and, in fact, is the largest unionized hotel in the City of Los Angeles.  Interstate and the Union have been parties to successive collective bargaining agreements, the most recent of which expires on November 30, 2018, with an automatic yearly renewal thereafter unless modified or reopened for alteration in accordance with the terms of the agreement.  The Westin Bonaventure has had a longstanding relationship with Local 11, and it is my understanding and belief that the Hotel has been unionized for at least 30-years.

17.    Of the 900 employees at the Hotel, about 650 are covered under the current CBA with Local 11.  Of those 650 employees, approximately 100 work in banquet and catering positions, 125 work in restaurant services (including servers, greeters, cashiers, and bartenders), 300 work in housekeeping positions, and another 125 occupy various other positions, including in the front office and kitchen.  The 250 employees not covered under the CBA with Local 11 include sales, engineering, administrative, accounting, and management positions.

18.    The Westin Bonaventure values its employees and pays them accordingly.  Indeed, other than "tipped-employees", which I will address below, all of the hourly employees are already paid more than $15.37 per hour.  For instance, under the current CBA, laundry employees are paid from $16 to $20 an hour, kitchen

---

[1] The engineering employees are organized under a separate agreement with the International Union of Operating Engineers, Local 501; also, it is my understanding that the parking and garage employees are organized under an agreement between Encore and the International Brotherhood of Teamsters.

DECLARATION OF MICHAEL CZARCINSKI

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

workers are paid from $17 to $22 an hour, housekeepers receive at least $16/hour, and office workers receive about $17 to $20 an hour. These amounts are also subject to annual increases based on a formula set forth in the CBA. To the best of my knowledge, the hourly rates paid to these employees are on par with what is paid by other large or luxury hotels in Downtown Los Angeles for non-tipped employees. This wage-rate for non-tipped employees is, obviously, already greater than what is required by the new hotel worker ordinance.

19.   The wage-rates agreed to in the current CBA between the Hotel and Local 11 recognize the distinction between tipped and non-tipped employees, as is common in the hospitality industry. So, for example, while non-tipped employees are paid at the rates set forth above, the only employees at the Westin Bonaventure who currently are paid a wage rate of less than $15.37 an hour are some of the "tipped" employees. This includes those who regularly receive gratuities directly from guests, such as bell-persons, dining room servers and bartenders, as well as employees, like banquet servers and room-service servers, that receive a percentage of the service charges billed to customers, as set forth in the CBA, or those who receive some combination of gratuities and service charges. Such tipped employees are currently paid from $9 to $19 per hour (with the higher wage rate given to employees who generally receive less money in gratuities). The $9 an hour amount will be raised on January 1, 2016 to at least $10 per hour in compliance with the minimum wage requirement of the State of California. With the inclusion of tips and/or service charges, even the lowest paid tipped employees at the Westin Bonaventure all earn more than $16 an hour. In fact, many earn far in excess of this amount.

20.   For example, although we do not yet have the final numbers for 2014, the typical banquet server earned an average pay equivalent of $42.50 for each hour worked in 2013, with the typical banquet bartender earning an average of $33.67 per hour. Other banquet employees (such as the bussers, food runners, set-up people,

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

DECLARATION OF MICHAEL CZARCINSKI

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

etc.) earned an average pay equivalent of $37.00 for each hour worked in 2013. These numbers represent the combination of the hourly wages paid by Interstate plus the employee's distributed portion of service charges under the current CBA, which I would expect to be higher for 2014, since the base pay for most positions was increased last year.

21.     All employees at the Westin Bonaventure also receive other benefits related to their employment, including, *inter alia*, annual vacation and paid time off, holiday pay, and contributions to our retirement plan(s).  The union employees at the Westin Bonaventure receive additional benefits including contributions to legal services, 401(k) plan(s) and a training and education fund.

**Dealings With The Union Regarding The Act**

22.     At the beginning of the Summer, on June 9, 2014, I had lunch with Tom Walsh, the President of Local 11, and Kurt Peterson, a union organizer for UNITE HERE!.  Shelli Mahan, the Director of Human Resources for the Westin Bonaventure was also present.  The lunch was held at the Lakeview Bistro, a restaurant located at the Hotel, and lasted just over an hour.

23.     During that lunch, I raised the subject of the Hotel Living Wage Ordinance, as it was being referred to at the time, as I was aware from news reports and other information I received as an officer of the HALA that it was being considered by the City Council.  In particular, I asked how the "waiver" issue was going to work and how the Union would determine which hotels would get a waiver. In response, Mr. Walsh informed us that "all of the hotels that are in good standing will get a waiver."  Although he did not explain exactly what he meant by "good standing", he went on to state that "the Westin Bonaventure is a Hotel in good standing" and specifically said that, when the ordinance was enacted, we "will get a waiver."  It was my understanding from that conversation with Mr. Walsh that the Union was intending to use the new Ordinance to organize other hotels.

24.     My next discussion on this subject with Tom Walsh came some months later.  On Wednesday, November 5, 2014, a few weeks after the Hotel Workers Act was passed and just five days before portions of it were set to take effect, I spoke at a ribbon cutting ceremony for the Los Angeles Hospitality Training Academy, a trade school that provides training to workers in a variety of areas related to the hospitality industry.  When I arrived, I ran in to Tom Walsh, who was also speaking at the event.  As we were walking from the parking area to where the ceremony was being held, I asked Mr. Walsh when we could expect to receive the Westin Bonaventure's waiver.  In response, Mr. Walsh told me that "we need to talk about some other things first"; he then went on to tell me that the Union wants our help in convincing Mr. Peter Zen to agree to unionize the Holiday Inn Torrance (a hotel that is not managed by Interstate) and in getting all of the Galleria businesses to unionize with Local 11 because, Mr. Walsh said, they too "are subject to the ordinance."  (By way of background, Peter Zen is the asset manager for the owners of two hotel properties in the City, namely, the Westin Bonaventure and the Holiday Inn in Torrance).

25.     I was particularly struck by Tom Walsh's comment.  Despite previously telling me that the Westin Bonaventure is a hotel "in good standing" and would get a waiver from the ordinance when passed, Mr. Walsh now seemed to be implying that the Union would not give us the waiver without our "help" on these two other matters.

26.     In response to Mr. Walsh's statements, I told him that neither Interstate (nor myself) has any power or authority to speak on behalf of Mr. Zen, the Holiday Inn Torrance, or any of the Galleria businesses and, therefore, that we could not be of help to Local 11 on those matters.  I also told Mr. Walsh that many of the Galleria businesses are small, "mom-and-pop" type shops that do not generate a ton of business and that, as such, they will probably go out of business if they had to pay the over $15 an hour wage rate that applied, initially, only to the largest Los Angeles hotels.  Mr. Walsh responded that if some of the Galleria businesses are forced to

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

9

DECLARATION OF MICHAEL CZARCINSKI

close, it will benefit the Westin Bonaventure because "more people will eat at the Hotel businesses instead." I told Mr. Walsh that I did not believe that was true because those smaller businesses really do not compete with any of the Hotel's food or beverage operations and that those businesses customers would likely just be diverted to other similar businesses in the area (including many of the small eateries located across the street from the Hotel). I was also, frankly, disturbed by that comment because the Hotel has a good relationship with the stores in the Galleria and would not want to cause them economic harm even if it would benefit the Hotel. We did not discuss the waiver further at that time.

27.     A couple of days later, on Friday, November 7, 2014, I called Mr. Walsh to inquire, again, as to the status of the Westin Bonaventure's waiver. Given that the Act was set to take effect on the next business day, I explained to Mr. Walsh that we wanted to get the issue settled so that the Hotel could properly follow the wages and benefits set forth in the CBA (which, as discussed elsewhere in this declaration, differ from with the requirements of the Act). During that call, Mr. Walsh again stated that the Union wanted our help in getting Mr. Zen to agree to the unionization of the Holiday Inn Torrance; like before, I told Mr. Walsh that neither Interstate nor I have any ability to speak on behalf of the Holiday Inn Torrance and that, as such, they should contact Mr. Zen and/or that hotel directly. At the end of the call, Mr. Walsh requested that I send him a draft waiver for the Westin Bonaventure.

28.     In response to Mr. Walsh's request, I emailed him a draft waiver later that same day in the form of an "Addendum" to the Westin Bonaventure CBA; the Hotel's attorney, Mr. Matt Wakefield of Ballard, Rosenberg, Golper & Savitt, LLP, was also copied on that email so that any changes or questions could be resolved quickly. The November 7 proposed waiver provided as follows:

> "The Employer and the Union agree that the employees subject to the primary collective bargaining agreement and the laundry collective bargaining agreement between the parties are receiving a superior total wage and benefit package compared

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

10

DECLARATION OF MICHAEL CZARCINSKI

to that required by Article 6, Chapter XVIII of the Los Angeles Municipal Code, Citywide Hotel Worker Minimum Wage Ordinance ("Ordinance"). Accordingly, pursuant to Section 186.08 of the Ordinance, the Employer and the Union hereby agree to waive all provisions of the Ordinance."

29.    Mr. Walsh did not immediately respond to the proposed waiver. Instead, on November 14, 2014, I received an email from Mr. Peter Zen forwarding an email that he had received on that same date from Mr. Walsh's assistant, Ms. Ely Esber, of Local 11.  Ms. Esber's email to Mr. Zen provided as follows:

"Tom Walsh, the President of UNITE HERE Local 11 would like an appointment to meet with you.  He would like to discuss the implementation of the new minimum wage law Raise LA at the Westin Bonaventure Hotel.

Please send me some available dates and times so that we can coordinate this meeting."

30.    Given that I have been interfacing with Local 11 for the past 7-years on behalf of the Westin Bonaventure, that Mr. Zen is not involved in such activities, and that Mr. Walsh and I had already specifically discussed the Westin Bonaventure's waiver from the Act, I was surprised that Mr. Walsh had reached out to Mr. Zen directly to discuss this issue.  Mr. Zen, however, told me that he wanted me to be present at the requested meeting, and I agreed to do that.

31.    At noon on Monday, November 17, 2014, Mr. Zen and I met with Mr. Walsh, as requested.  As before, the meeting was held at the Lakeview Bistro, a restaurant located at the Hotel, and lasted about an hour and a half.  Mr. James Elmendorf was also present at the meeting although I had not been told that he would be there.  Mr. Elmendorf is a former community organizer with UNITE HERE! and current Deputy Director for LAANE (one of the largest proponents of the Act).  No explanation was given as to the reason for Mr. Elmendorf's presence; he said during the meeting, however – and with apparent pride and satisfaction – that he had helped to draft what he called the Hotel Living Wage Ordinance.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

11

DECLARATION OF MICHAEL CZARCINSKI

32.     I did not actually need Mr. Elmendorf to tell me that he was heavily involved in drafting the new hotel worker's ordinance.  From my position and activity for HALA, I was quite aware that Local 11 was using LAANE to push this ordinance through the City Council.

33.     Although Mr. Walsh's assistant had said in her email to Mr. Zen requesting the November 17 meeting that it was "to discuss the implementation of the new minimum wage law … at the Westin Bonaventure Hotel", it was quickly apparent that the meeting was actually to discuss Local 11's desire to unionize the Holiday Inn Torrance and the Galleria businesses – topics that I had already informed Mr. Walsh have no connection to the Westin Bonaventure's operations.  In fact, Mr. Walsh did not waste much time in raising these topics.

34.     He first asked Mr. Zen about the Holiday Inn Torrance, explaining that Local 11 would like to unionize the employees at that hotel.  Mr. Zen stated that the Holiday Inn Torrance could not afford to unionize because it is not able to pay the high wage rates and other benefits provided for under the Union's usual CBA terms. In response, Mr. Walsh told Mr. Zen that the Holiday Inn Torrance will have to raise its wage rates regardless because it is covered by the new hotel workers ordinance and that, if it is organized, the wage rates that it will have to pay under a Union contract will likely be different (and lower) than the rates and work rules that the Union has demand in other areas of the city because of the lower wage rates paid by other hotels in the Torrance area.  Both Mr. Elmendorf and Mr. Walsh then took turns extolling the benefits of being a unionized hotel.

35.     When it was clear that Mr. Zen was not going to agree to unionize the Holiday Inn Torrance during that meeting, they then asked for his help in unionizing the Galleria businesses.  In so doing, both Mr. Elmendorf and Mr. Walsh said that the new ordinance was drafted to apply, and would apply, to all of the Galleria businesses (regardless of size) because they are "connected" to a covered hotel.  Mr. Zen informed them that he disagreed with their interpretation of the new ordinance

DECLARATION OF MICHAEL CZARCINSKI

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

and that, if it were to apply to those businesses, many of them are very small, low-margin businesses that would probably have to go out of business or move.  Mr. Zen also explained that he believes in paying the people of Los Angeles fairly and that he would be happy to support a Living Wage Ordinance for the entire City – but that he believes it is unfair for a wage ordinance to be applied only to one industry, such as how the new hotel workers ordinance is being applied here.  Neither Mr. Walsh nor Mr. Elmendorf responded to these points and the meeting thereafter came to an end.

**The Union's Waiver Letter**

36.    On the following Monday, November 24, 2014, I finally heard back from Mr. Walsh about the requested waiver.  Rather than signing the proposed waiver that I had circulated on November 7, Mr. Walsh proposed the following different format and language for the waiver, explaining that this is a waiver "that [the Union] can sign":

> "This side letter is entered into by and between _____ Hotel (hereinafter referred to as the "Employer") and UNITE HERE Local 11 (hereinafter referred to as the "Union").
>
> The parties acknowledge that their collective bargaining agreement, effective _____ to _____ is a bona fide collective bargaining agreement.  As such the Employer is specifically exempt from Los Angeles' Raise LA Ordinance (Los Angeles Ordinance No. 183241).  The union and bargaining unit employees hereby waive all rights, privileges and entitlements under the provisions of this law for the period _____ through _____."

37.    Although Mr. Walsh stated that he believed this version to be "very similar" to the waiver I had previously circulated, I disagreed.  Notably, unlike the waiver that we had proposed, this new waiver was to contain a specified expiration date corresponding to the expiration date of the CBA.  However, based on my experience, I did not believe that such an automatic "expiration date" would be

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

13

DECLARATION OF MICHAEL CZARCINSKI

appropriate because, among other reasons, it would place the Westin Bonaventure in an untenable position at the expiration of every CBA.  Specifically, it is my understanding that the Hotel Workers Act contains a ban prohibiting the unilateral implementation of a waiver; this could be interpreted to mean that, if the Union were to refuse to extend the waiver upon the expiration of a CBA (even if the terms of a new CBA were still being negotiated), the Hotel might have to immediately implement the mandatory minimum wage (and other requirements of the Act) or risk being subject to a lawsuit by associates who were not paid those amounts.  However, doing that would run afoul of the standard rules governing labor relations, which provide that employers violate federal labor law if they make any change in the terms and conditions of employment during the interim period when a new CBA is being negotiated, even if the change is favorable toward their employees.

38.    I also feel that such an expiration date on the waiver would give the Union an unfair bargaining advantage since the Union could simply threaten not to extend the waiver unless the Hotel agreed to everything that it was demanding in bargaining.  Such a bargaining chip would largely undercut much of the security and stability that unionization is supposed to bring – both for Interstate and its employees.  And, too, the ability to implement new employment terms if bargaining reaches an impasse – and the possibility that this could happen – is an economic tactic employers have to counter the union tactic of a strike or a threat to strike.  For these reasons, making the expiration of the waiver simultaneous with the end of the CBA fundamentally distorts the way labor negotiations at the end of a contract term typically are conducted.

39.    Since Mr. Walsh and I appeared to have reached an impasse on the waiver, the Westin Bonaventure's counsel, Mr. Matt Wakefield, began reaching out to UNITE HERE's counsel, Mr. Richard McCracken, in order to discuss the Hotel and its waiver under the Act.  On December 16, 2014, I saw news reports that a press conference had been held early that morning announcing that AH&LA and AAHOA

14

DECLARATION OF MICHAEL CZARCINSKI

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

had filed this lawsuit.  Later that same day, Mr. Wakefield finally received a call-back from Mr. McCracken.  It is my understanding that Mr. McCracken stated during that call that Local 11 was willing to remove the stated expiration date from the waiver, but that they were not willing to allow any waiver to extend past a CBA expiration date without a separate extension of the CBA.  That, though, would have the same disruptive effect on collective bargaining as would the Union's original proposal.  On the issue of the Act applying to other businesses "connected" to a hotel, it is my understanding that the Union was (now) taking the position that the Act requires a clear connection between operations, such as a mutual promotion between the hotel and the other business (which is not mentioned in the Act), and that, as such, the Union does not believe that the Act applies to businesses that merely have a physical connection with a covered hotel, such as the Galleria businesses.

40.     On the next day, December 17, 2014, Mr. McCracken sent a "new" Union revised draft of a proposed waiver for the Westin Bonaventure.  Consistent with Mr. McCracken's statements on the previous day, the new proposed waiver no longer contained a stated "expiration date", but this is not really a change from the prior version since the expiration of the waiver is still explicitly tied to the expiration of the CBA.  (This results from the Union's idea that the waiver would constitute an "amendment" to the CBA, which means that it would expire or be extended in tandem with this CBA).  As a practical matter, that would eliminate the ability of the Hotel to use unilateral implementation on its bargaining proposals, or the threat of doing so, as an economic lever.  Also, the uncertainty that arises when a CBA expires without an agreement in place and the uncertainty as to whether and the extent to which a subsequent agreement will be retroactively applied, is effective in pushing both sides to make the concessions needed for an agreement to be reached.

41.     The revised proposed waiver did contain one new—and very significant—change from the Union's prior proposal: Namely, the Union added a new provision that any hotel that challenges the legality or enforceability of the Hotel

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

15

DECLARATION OF MICHAEL CZARCINSKI

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

Workers Act or "give[s] support of any sort to such a contest" will "automatically" lose the waiver.

42.     In whole, the December 17 waiver proposed by the Union provides as follows:

> "The Employer and the Union are parties to a collective bargaining agreement ("CBA") covering a unit of employees represented by the Union. The CBA is effective December 1, 2013 to November 30, 2018 and is a bona fide collective bargaining agreement. The Union hereby waives all provisions of the City of Los Angeles Citywide Hotel Worker Minimum Wage Ordinance (Los Angeles Ordinance No. 183241)("Ordinance"), commencing on the effective date of the Ordinance, because the CBA provides a superior package of wages, benefits and job protections to the employees the Union represents. The CBA is hereby deemed amended to include this waiver. The Employer agrees that it will not contest the legality or enforceability of the Ordinance or give support of any sort to such a contest, and agrees that the Union's waiver shall be automatically deemed rescinded if the Employer breaches this promise."

43.     The Westin Bonaventure did not agree to the Union's December 17 proposed waiver.  In my opinion, not only is the waiver manifestly unfair to the Hotel because, as set forth above, it would expire at the end of the CBA term, but the added requirement that the Hotel has to forfeit any legal rights that it has to challenge the Hotel Workers Act or risk the waiver being "automatically deemed rescinded" is absurd.  In all of my 30-plus years of experience in the hospitality industry, I have never encountered a more egregious demand from a Union representative, nor do I believe that the City should be able to arm the Union with the right to wield such a threat.

44.     On Thursday, January 8, 2015, it is my understanding and belief that a meeting was held between Shelli Mahan, the Director of Human Resources for the Westin Bonaventure, and Tom Walsh to discuss various employee related business at

the Hotel. No mention was made during that meeting of the December 17 proposed waiver sent by Mr. McCracken to the Hotel's attorney.

45.    Prior to Ms. Mahan's meeting with Mr. Walsh, I signed what I thought was a copy of the proposed waiver that I had emailed to Mr. Walsh on November 7, 2014, and asked Ms. Mahan to give the waiver to Mr. Walsh, which she did. Unfortunately, shortly thereafter, I realized that I had accidentally signed the Union's November 24 version of the proposed waiver, which we do not agree with. I telephoned Mr. Walsh, explained to him what happened and apologized for the mistake. In response, Mr. Walsh confirmed that Union will treat the waiver issue as unresolved and that it will not hold the Hotel to the mistaken signature. As such, as of this date, the Westin Bonaventure and the Union have not reached agreement on a form of a waiver that both parties agree to.

**Effects of the Act on Labor Relations**

46.    As part of the CBA between Local 11 and the Westin Bonaventure, the parties have also entered into a "Memorandum of Agreement Concerning Economic Increases" (hereinafter the "*MOA*"), which provides that Interstate will each year increase its contribution to employee pay or benefits by a pre-determined amount of so-many cents an hour. The Union has the right to select how that increase will be allocated between hourly wages and contributions to certain Union benefit funds, which are calculated as a certain dollar amount for each hour worked. For instance, the Union may indicate that it wants the entire amount of the increase to go to health insurance contributions, the pension fund, or to wages, or a breakdown to include multiple categories. In this way, the CBA requires the Hotel to increase its per-hour "economic package" each year, as allocated by the Union, but it also provides that the Hotel will not be required to pay any more than that amount.

//
//
//

17
DECLARATION OF MICHAEL CZARCINSKI

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

47.     The MOA is clear on this point and says:

> "*Each annual total economic package increase* to be committed by the Employer as set forth herein *is an absolute maximum*.  Notwithstanding any change in applicable law or conditions or circumstances, whether contemplated by the parties or not (including but not limited to changes in circumstances relating to the implementation of or modifications to applicable laws regulating health care or benefit funding requirements *or minimum wage payments*), the amount of the annual total economic package increase shall not exceed the amounts set forth [herein]." (emphasis added)

In other words, the total increase specified for each year of the agreement is both a "floor" and a "ceiling" to additional labor costs at the Westin Bonaventure.  The contract guarantees that the Hotel total labor costs will not increase more than the specified amount even if there's a change in the laws applicable to the underlying wages and/or benefits.

48.     Prior to the passage of the Act, the Hotel intended to honor the CBA and, as agreed, increase wages and benefit fund contributions according to the schedule set forth in the MOA.  The Act, however, will impose a contradictory obligation on the Hotel beginning in July if the Union does not provide a waiver.  Specifically, the Hotel will be required, on the one-hand, to increase the wages and service charge allocations for various tipped-employees substantially, while, on the other hand, the Hotel is guaranteed under its agreement with the Union that its labor cost increases for the year (including changes necessitated by a change in minimum wage laws) will not exceed the capped amount.  The only way to reconcile these two competing obligations would be for the Union to substantially re-allocate (and reduce) the benefit packages being offered to non-tipped employees.

49.     If the Hotel is forced to comply with the terms of the Hotel Workers Act because it is unable to secure a waiver from Local 11, the primary beneficiaries of the wage provision will be employees who are already earning far in excess of the $15.37

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

18

DECLARATION OF MICHAEL CZARCINSKI

hourly wage (as set forth above), such as the banquet servers and bartenders. However, non-tipped employees, like room attendants, kitchen workers, and laundry workers, who have a higher wage rate but lower total pay, will likely not get any increase at all and, actually, could have their pay reduced (so that there is money for the increase in compensation for the tipped employees). This will almost certainly result in a great deal of conflict and a loss of morale among all of the employees, since some will benefit at the expense of others, and those that will benefit are already receiving the higher rates of pay. If this were to take place, and to avoid that very adverse consequence of the operations of the Hotel, we may have to consider giving some wage increase to those non-tipped employees – which would mean that we would not be able to enjoy the "cap" on the total economic package that was one of the benefits that the Hotel got from the last round of bargaining in exchange for giving the Union some things that it wanted. Essentially, this would be a lose-lose situation for the Hotel, no matter what.

50.     The Westin Bonaventure has calculated that the expected cost of compliance with the Act's hourly wage requirement will likely be about $1.8 million dollars a year, assuming no-waiver and not accounting for the MOA cap set forth above (which will limit costs due to the wage component for the first couple of years). The increased payroll costs resulting from compliance with the Act's requirements will also raise the cost of additional benefits provided by the Hotel, e.g., increasing the value of PTO, 401(k) matching contributions, and payroll taxes.

51.     The service-charge requirement of the Hotel Workers Act will also deprive the Hotel of a significant amount of operating income and further disrupt the compensation structure set forth in the CBA. Under California wage rules, amounts designated as gratuities must be paid entirely to the employees who perform the pertinent services. The Westin Bonaventure fully complies with this requirement. However, "service charges", such as the charges applied to catering and banquet services, are recognized under the CBA to be the property of the Hotel. While the

largest portion (about 70%) of all such service charge(s) are paid out to the employees, a portion (about 30%) is retained by the Hotel to cover non-itemized expenses. We have estimated that the cost of forfeiting the Hotel's portion of the service charge(s) would be approximately another $600,000 a year, bringing the total cost to about $2.4 million.

52.     Further, the Hotel Workers' Act also mandates that all such service charges must be paid directly to, and shared equitably among, only the hotel employees who perform the services *for the customer* who is paying the service charge. The problem, is that under the current system, the collected service charge is distributed among a wider array of employees than just those providing direct services to the customer, such as the other members of the banquet staff which includes bussers, the set-up crew, the food-runners, etc. Under federal labor law, changing how service charges are distributed is a "term and condition of employment" that the Hotel is required to bargain about with the Union.

53.     We anticipate considerable morale and retention issues to arise when the non-tipped employees learn of the higher wages being paid to the tipped employees at their expense, both due to the wage and service charge components of the Act.

54.     If the $15.37 minimum wage takes effect, the Hotel may be able to take steps to mitigate the harms of the Act's penalty by controlling costs in other ways. Yet the Hotel's business decisions require adherence to brand standards to provide the customer service and experience expected across the Westin brand, as well as compliance with the applicable CBA. As a result, the Hotel is not pragmatically free to make significant changes to its operations without causing collateral harm to its business and/or potentially violating the terms of the CBA or of the Owner's franchise agreement with the Westin brand. And, of course, whenever we do anything that lowers the level of services to our guests, we jeopardize our Four Diamond and other hospitality industry ratings, which we have worked hard to achieve and maintain.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

DECLARATION OF MICHAEL CZARCINSKI

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

55.     If the Hotel cannot reasonably find a way to operate more economically under the financial constraints of the Hotel Workers Act, it may have to pass on the increased costs to its customers through higher prices.  Those increased costs will make the Hotel less competitive in the market, potentially driving down revenues.  The increase might also impact convention bookings, given the higher cost to patrons.  As such, the Hotel will need to know whether it will have to begin complying with the wage and service charge provisions of the Hotel Workers Act as soon as possible.

56.     If the restaurants operating at the Hotel must adjust prices to comply with the Act, they will be placed at a competitive disadvantage with respect to area restaurants that are not subject to the Act and the hotels who are able to obtain a waiver from complying with the Hotel Workers Act through their CBA.  As a result, the option to raise prices could render the Hotel less competitive in its direct market and cause its business to suffer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration was executed on January 22, 2015, in Los Angeles, California.

_____
Michael Czarcinski

21

DECLARATION OF MICHAEL CZARCINSKI

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 400 S. Hope St., 8th Floor, Los Angeles, California 90071.

On January 26, 2015, I served the document described as **DECLARATION OF MICHAEL CZARCINSKI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** on the interested parties in this action as follows:

**[X]** (**BY Electronic Transfer to the CM/ECF System**) In accordance with Federal Rules of Civil Procedure 5(d) (3), Local Rule 5-4, and the U.S. District Court of the Central District's General Order governing electronic filing, I uploaded via electronic transfer a true and correct copy scanned into an electronic file in Adobe "pdf" format of the above-listed documents to the United States District Court Central District of California' Case Management and Electronic Case Filing (CM/ECF) system on this date.  It is my understanding that by transmitting these documents to the CM/ECF system, they will be served on all parties of record according to the preferences chosen by those parties within the CM/ECF system. The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on January 26, 2015, Los Angeles, California.

By: _____
                              //S//
                    Kristina S. Azlin

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

PROOF OF SERVICE