Kristina S. Azlin (SBN 235238)
John A. Canale (SBN 287287)
HOLLAND & KNIGHT LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Telephone 213.896.2400
Facsimile 213.896.2450
E-mail: kristina.azlin@hklaw.com,
john.canale@hklaw.com

Michael Starr (*Pro Hac Vice*)
Katherine H. Marques (*Pro Hac Vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
Telephone: 212.513.3200
Facsimile: 212.385.9100
E-mail: michael.starr@hklaw.com,
Katherine.marques@hklaw.com

Attorneys for Plaintiffs
American Hotel & Lodging Association and
Asian American Hotel Owners Association

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| AMERICAN HOTEL & LODGING ASSOCIATION and ASIAN AMERICAN HOTEL OWNERS ASSOCIATION<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES,<br><br>Defendant. | CASE NO. 2:14-cv-09603-AB-SS<br>Assigned to Hon. Andre Birotte Jr.<br><br>DECLARATION OF KEVIN GLEASON<br><br>IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Date: March 23, 2015<br>Time: 10:00 am<br>Dept.: 790, Roybal<br><br>Complaint Filed: December 16, 2014 |

1

DECLARATION OF KEVIN GLEASON

# DECLARATION OF KEVIN GLEASON

I, KEVIN GLEASON, hereby declare and state as follows:

1. I give this declaration in support of the Motion For Preliminary Injunction filed in the above captioned matter by Plaintiffs the American Hotel & Lodging Association and Asian American Hotel Owners Association. I have personal knowledge of the matters stated below except for those stated on information and belief, which I am informed and believe are true. I could testify to each of the facts stated below under penalty of perjury if called upon to do so.

2. I am the Director of Labor Relations – West Coast for Starwood Hotels & Resorts Worldwide, Inc. ("*Starwood*"). I submit this declaration in support of the motion of plaintiffs in the above-referenced action for preliminary injunction. I am fully familiar with the facts asserted herein.

3. I have over thirty years of experience in labor relations in the hospitality industry. Through this experience, I have directly observed many union-organizing efforts and I have negotiated dozens of collective bargaining agreements over the years, many of which have been with UNITE HERE Local 11 ("*Local 11*" or the "*Union*"). Over the past 12 months, I have actively engaged in labor negotiations with various local unions affiliated with UNITE HERE in California and elsewhere on the West Coast.

4. Starwood currently manages five hotels in the City of Los Angeles ("*Los Angeles*" or the "*City*"), as well as several other hotels in or around Los Angeles. This has given Starwood an opportunity to build a positive working relationship with Local 11.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

**Hotel Workers Act**

5. I have reviewed an ordinance passed by Los Angeles called the "Citywide Hotel Worker Minimum Wage Ordinance" (the "*Hotel Workers Act*"). I am familiar with its provisions as they affect Starwood's labor relations issues in Los Angeles.

6. I understand that the Hotel Workers Act includes a wage provision requiring *all* hotel employees at covered hotels to be paid a wage of $15.37 per hour. Contrary to the hospitality industry practice, this wage rate provides no distinction between tipped employees (like bartenders, restaurant servers, and bell persons) and non-tipped employees (like housekeeping staff and cooks).

7. The Hotel Workers Act allows hotels to obtain a waiver from complying with any and all of its provisions, but such a waiver is only available when it is explicitly set forth in conjunction with a collective bargaining agreement ("*CBA*").

## WESTIN LOS ANGELES AIRPORT

**Ownership and Operations**

8. Starwood, through Westin Operator LLC, one of its affiliated companies, operates a hotel known as the Westin Los Angeles Airport ("*Westin LAX*" or the "*Hotel*"). The Hotel is located in an area of the City near the Los Angeles International Airport along the Century Boulevard business corridor, which is commonly referred to as the "LAX Corridor."

9. The Hotel is situated on property owned by a real estate investment trust called Host Hotels and Resorts, Inc. ("Host"), which has leased it to one of its affiliated companies called HST Lessee LAX LP. That entity, which I will refer to as the "Owner" of the Hotel, has entered into a hotel management agreement with Westin Operating LLC. I will refer to Westin Operating LLC or Starwood as the "Operator" of the Hotel or sometimes, for the sake of simplicity, as just "Starwood."

3

DECLARATION OF KEVIN GLEASON

10. Under the terms of that management agreement, the Owner receives the net income from operations of the Westin LAX, after payment of fees to the Operator. Labor costs are a major expense item for the Hotel and significantly affect net operating income. Consequently, the ability of the Operator to control labor costs relates directly to the revenues received by the Owner and, thus, the net return on investment that Host earns from its ownership of the property on which the Westin LAX is located.

11. The Westin LAX is a luxury hotel with over 700 rooms. The hotel has 50,000 square feet of banquet space, and 38 banquets rooms, including the Grand Ballroom, which can accommodate up to 1200 guests. There is a restaurant at the hotel called the "Daily Grill." The Daily Grill is a full-service restaurant open for three meals a day and operated by the Owner's sub-lessee. The Daily Grill is not affiliated with either the Owner or Starwood.

**Labor-Management Relations**

12. Starwood has operated the Westin LAX since 1996. It employs about 300 full and part-time employees. Initially, none of the workers at the Hotel were represented by any union, and the Hotel was, as we say in the industry, a "non-union" hotel.

13. In 2007, Los Angeles enacted an ordinance applicable only to hotels in the LAX Corridor. That ordinance set a minimum wage significantly higher than the California minimum wage for covered hotel workers. Because, as noted above, the Westin LAX is in the LAX Corridor, it had to comply with the 2007 ordinance. However, that ordinance included a provision that allowed a covered hotel to obtain a waiver from compliance with its terms if such a waiver was provided by a union in a collective bargaining agreement.

14. In 2007, Starwood signed a "card-check/ neutrality agreement" with Local 11. The effect of the card-check/ neutrality agreement was that Starwood

4

DECLARATION OF KEVIN GLEASON

consented to recognize the Union as the collective bargaining representative of the Hotel's employees upon a showing that a majority of the eligible employees had signed authorization cards.

15. The card-check/ neutrality agreement applied only to Starwood employees who worked at the Hotel. It did not apply to the Daily Grill restaurant located at the Westin LAX, which is operated by a company that was not affiliated with Starwood. Daily Grill workers are employed by that other company.

16. The first CBA applicable to the Westin LAX was entered into following the Operator's recognition of Local 11. That CBA expired in March 2013. Just prior to its expiration, the Union and Starwood signed an agreement extending the expiring CBA, which was to be "automatically extended on a monthly basis unless either party gives to the other party a five (5) day written notice prior to the next month of their desire to cancel this extension". The Union exercised this termination option in January 2014.

17. It is customary in labor-management relations for the parties to a labor agreement to formally extend that agreement while they are negotiating in good faith. It is not customary for the union to rescind that extension before an agreement or impasse is reached. One reason for a union to rescind an extension is that it can call a strike and not violate the no-strike clause of the labor agreement. That did not happen in this instance, at least, not initially.

**Anticipated Effect of New Ordinance**

18. At my request, the Hotel's finance manager has made projections of what it would cost the Hotel to comply with the City's new hotel workers ordinance. According to that projection, if the Hotel has to pay all employees a $15.37 wage rate beginning in July 2015 and comply with the additional requirements imposed by the Act, the cost to the Westin LAX for 2015 alone will be over $500,000. However, this amount represents increased wages for only half a year, since the mandatory

5

DECLARATION OF KEVIN GLEASON

minimum of $15.37 per hour does not take effect until July 1, 2015. Consequently, the annual cost of compliance will increase very substantially in 2016 and later years.

19. The Hotel will be forced to incur this additional cost if it is unable to reach agreement on and execute a new CBA with the Union that contains a waiver exempting the Hotel from compliance with the City's new hotel-only minimum wage law.

20. The Hotel Worker Act therefore has the effect of altering the relative bargaining power of the Union and the Hotel while a new CBA is being negotiated. It is fair to say that the new minimum wage requirement has effectively given the Union a $500,000 bargaining chip that it can now use at the bargaining table. In fact, as I explain below, it already has.

**The Union's Efforts to Organize the Daily Grill**

21. I have been Starwood's bargaining representative for a successor CBA since 2013, when the earlier one expired. Starwood has bargained in good faith for a new CBA with the Union since February 2014, which is when Local 11 first requested bargaining for a successor CBA. The two sides have met for purposes of collective bargaining about fifteen times, but we have been unable to reach agreement.

22. As part of its bargaining proposals, Starwood has made many positive bargaining proposals consisting of $2.10 per hour in increased wages for non-tipped associates incrementally through 2018, a $0.35 per hour lump-sum bonus for non-tipped workers for hours worked in 2013, $0.20 per hour increase payable towards a 401k plan, adoption of the pension preferred schedule which increases the Hotel's pension contributions incrementally from $0.21 to $0.31 per hour worked over the life of the agreement, several increases in services charges for bellman including guest deliveries and luggage delivery for groups, and increased service charges for

6

DECLARATION OF KEVIN GLEASON

banquet and room service employees. The Union has accepted very few of these proposals in their entirety.

23. One of the issues preventing an agreement, despite all of the negotiations, is the status of the Daily Grill. The Union's bargaining representative, Austin Lynch, has told me more than once that the Union's president, Tom Walsh, wants the Westin LAX's CBA to apply to the Daily Grill's employees. That was also made clear when, in its initial bargaining proposal, the Union included the restaurant workers in the proposed bargaining unit. (Under federal labor law, the scope of the bargaining unit, which is to say, the particular employees and job classifications that the CBA applies to, can be a subject of bargaining, but only if all the employees in the proposed bargaining unit are employed by the same employer.)

24. In response to the Union's proposal to extend the CBA to cover jobs at the Daily Grill, I said that these individuals are not Starwood employees. (To be absolutely precise, they are not employees of Westin Operator, LLC, but in my dealing with Local 11, I refer to Starwood as the employer, even if, formally, the employer is a Starwood-affiliated company.) That meant that Starwood had no authority to make such an agreement extending the Westin LAX's CBA to workers at the Daily Grill.

25. On one occasion, I said to a Union official that if the Union wants to represent the restaurant workers, they should hold a secret-ballot election to win representative status. It has not done so and shows no inclination that it ever intends to seek representative status through a secret-ballot election.

26. This is consistent with Local 11's customary practice, as I understand it from my own work for Starwood and discussion with others in the hospitality industry about labor relations issues. Specifically, the Union avoids secret-ballot elections to establish representative status. Rather, it attempts to obtain card-check/ neutrality agreements. So far as I am aware, all of the hotels organized by Local 11

in and around Los Angeles for the last several years have been organized by recognition following a card-count procedure.

27. Under Local 11's typical neutrality agreements, the employer agrees to recognize the Union as the employees' bargaining representative if the Union presents to a neutral person authorization cards signed by a majority of the employees in the proposed bargaining unit. These agreements almost always contain a provision whereby the employer commits that it will not petition the National Labor Relations Board for a government-supervised election when it hears of the Union's request for recognition. This is something that employers would be permitted to do under federal labor laws if they had not signed a neutrality agreement.

**The Union's Demand for Work-Rule Changes**

28. Over the past year, the Union has unsuccessfully attempted to obtain certain concessions from the Hotel using the economic weapons that were available to support its requests for new work-rules prior to the ordinance's enactment. A major issue for Local 11 in bargaining for a new Westin CBA has been its proposal to change certain work-rules related to what we call the Housekeeping Department. For example, Austin Lynch, the Union's chief negotiator, has asked the Hotel to raise the "credits" that 45 hotel guest rooms are worth under the room attendant quota system from one to two. This requested change would have the effect of requiring the Hotel to hire approximately four new full-time room attendants to perform the same amount of work that is currently done by its existing staff.

29. Let me explain how that works. Under the Westin CBA, as is common in virtually all UNITE HERE collective bargaining agreements, room attendants have a "quota" or minimum number of rooms that must be cleaned on each of their shifts. That quota is stated as a certain number of "credits." Generally speaking, each room represents one credit. Sometimes, the CBA allocates two or more credits for particular guest rooms if they are especially large rooms, or for other reasons.

DECLARATION OF KEVIN GLEASON

30. If the Hotel gives two credits to certain rooms, that means that each existing room attendant will be cleaning fewer rooms on her shift but still be filling her daily quota. The Hotel will have to hire new room attendants to make up the difference between the number of rooms currently cleaned each day by the existing staff and the fewer number of rooms that would be cleaned with that staff if the Union's proposal on housekeeping credits were adopted.

31. The Union also asked in the recent bargaining for a rule restricting the individual who stuffs duvets from being able to respond to guest room requests during a duvet-stuffing shift, as is the current practice. This would require hiring an additional person to sit on call for guest requests, overlapping with an individual who will already be working. The Hotel believes that the current duvet-stuffer has enough time during the workday to complete her duties and still help out with guest room requests as needed. As the Hotel sees it, the Union's proposal would require the Hotel to hire two people to do a one-person job.

32. The Hotel has calculated that making the work-rule changes proposed by the Union would add about $300,000 to the Hotel's labor costs each year. The Hotel has not agreed to these proposals and, except for a small modification to the credit system of approximately 16 of the 45 rooms, has not included any version of these work-rule changes in its own bargaining proposals.

33. In October 2014, the Union organized a one-day strike at the Hotel to protest recent employee discipline and advocate for work-rule changes that would dramatically increase the staffing obligations for the Hotel. These changes are part of the Union's bargaining proposals – proposals which the Hotel has not agreed to.

34. The Hotel declined to change its work-rules to conform to the Union's desires in response to the strike. The workers then returned to work. Thus, the ordinary tactics of Local 11 have not been successful in obtaining Starwood's consent to its bargaining demands. However, the impending higher labor costs that the Hotel

9

DECLARATION OF KEVIN GLEASON

will incur in July if it cannot obtain a waiver from the Union, now provides the Union with leverage to obtain in bargaining what its regular economic actions could not.

35. At a bargaining session for a new CBA for the Westin LAX in late October, some weeks after the new ordinance was passed, I once again stated that the Hotel was not willing to accept the Union's proposals concerning either the Daily Grill or the work-rule changes. The Union's representative, Austin Lynch, stated that Local 11 would wait to reach a deal "because in July you'll have to pay the wages" required under the new Los Angeles hotel workers ordinance. At the end of our scheduled bargaining sessions in October of 2014, I asked the representative to contact me when he wanted to schedule future sessions. He did not communicate with me until January 5th of this year in an email that stated the Union would like to meet, but that it was not willing to make any movement on any outstanding issues.

## W LOS ANGELES WESTWOOD

### Hotel Operations

36. The W Los Angeles Westwood (the "W Westwood") hotel is another Starwood-branded hotel in the City of Los Angeles. The hospitality industry refers to it as a boutique luxury hotel, and its desired clientele are trend-conscious travelers who expect extraordinary service and are willing to pay for it. (I will sometimes for convenience refer to the W Westwood as the "Hotel." I believe that the context will be clear when I am referring to the W Westwood and when I am referring to the Westin LAX.)

37. For reasons that I will explain shortly, it is important to note that although the W Westwood is located within the borders of the City of Los Angeles, it is actually less than one mile from Beverly Hills. However, the direct competitors of the W Westwood (like the Beverly Grand and the Beverly Wilshire) are located within the boundaries of Beverly Hills, and the city of Santa Monica, municipalities

that are not subject to the new hotel workers ordinance that applies to all Los Angeles hotels.

38. The property on which the Hotel stands is owned by Pebblebrook Real Estate Investment Trust ("*Pebblebrook*"). Pebblebrook leases the premises to an affiliated company that I will refer to as the Owner, and that company has a management agreement with the Sheraton Operating LLC. I will refer to this entity and Starwood as the "Operator" of the W Westwood or sometimes, just, "Starwood."

39. The fundamental economic nature of the hotel management agreement between Sheraton Operating Corporation and the owner of the W Los Angeles is not substantially different from that which exists between the Operator of the Westin LAX and its owner. I will not repeat that here.

**Labor Relations**

40. The W Westwood opened in 1997 and shortly after that, the Operator entered into a neutrality agreement with Local 11 and, in accordance with those procedures, recognized the Union at the bargaining representations for the Hotel's employees.

41. Until about ten years ago, a hotel trade association bargained with Local 11 for a city-wide deal. At that time, Starwood did not have an individual CBA with Local 11 for the W Westwood. Now it does. The most recent CBA for the Hotel was entered into as of December 1, 2013. It is a five-year deal that does not expire until November 2018.

42. The wage-rates agreed to in the 2013 CBA recognize the distinction between tipped and non-tipped employees, which is common in the hospitality industry. So, for example, banquet servers are paid between $9.00 and $10.00, but non-tipped employees are paid at least $15.37 an hour, and that amount is subject to annual increases based on a formula set forth in the CBA. This wage-rate for non-

tipped employees is, obviously, already greater than what is required by the new hotel worker ordinance.

**The Request for a Waiver**

43.  As part of a multi-year, national deal between UNITE HERE and Starwood, the parties have agreed that each year, Starwood will increase its contribution to employee pay or benefits by a pre-determined amount of so-many cents an hour.  The Union has the right to select how that increase will be allocated between hourly wages and contributions to certain Union benefit funds, which are calculated as a certain dollar amount for each hour worked.  For instance, Local 11 may ask for the entire amount of the increase to go to health insurance contributions, the pension fund, or to wages, or a breakdown to include multiple categories.  The CBA requires the Hotel to increase its per-hour "economic package" each year, as allocated by the Union, but it also provides that the Hotel will not be required to pay any more than that amount.  In that way, the amount specified for each year of the agreement is both a "floor" and a "ceiling" to additional labor costs at the W Westwood.

44.  Prior to the passage of the new ordinance, Starwood intended to honor its CBA and, without reservation, increase wages and benefit funds contributions as allocated by the Union.  The ordinance, however, imposes a contradictory set of increased economic obligations on the Hotel beginning in July, if the Union does not provide a waiver.

45.  On October 30, 2014, in anticipation of wage and benefit-fund increases scheduled for December 1st, Local 11 began the process contemplated by the CBA.  It sent the Hotel an "allocation" letter stating that so-many cents an hour should be added to the wages of non-tipped employees and so-many cents an hour added to the Hotel's contribution to Union benefit funds.  There is an agreed-upon formula for the hourly wage increases for tipped employees based on the wage increase for non-

tipped employees. The details of that formula are not pertinent to this lawsuit, except to note that the formula represents the mutual understanding for both the Hotel and the Union that for tipped employees, only a portion of their pay comes from wages paid by the Hotel, and therefore receive a lower wage-rate increase than is given to tipped employees.

46. I responded to this requested allocation by speaking to the Union President, Tom Walsh, at a scheduled benefit-fund meeting. I told him that the Hotel could not pay the wage increase scheduled for December 1st because of the City's new hotel-worker ordinances. I also handed him a letter explaining in more detail the potential impact of the new ordinance and the reasons for the Hotel's decision. That letter stated, in part, that, "because of the required increase for tipped employees, the Hotel will not be able to give any increase to non-tipped employees and may not be able to pay the increase allocated to the Health Benefit Fund."

47. My letter also served as a formal request for a waiver from complying with the ordinance. As to that, the letter stated that, "because of Starwood's positive labor-relations history with Local 11, we are requesting that Local 11 agree to amend its collective bargaining agreement with the Hotel to explicitly waive all provisions of the new City Ordinance for the duration of the current agreement and for any modification or successor agreement that we negotiate going forward."

48. It was not until January 13, 2015 that I was able to speak with Mr. Walsh. He told me that he is amenable to a waiver, but only if it expires at the end of the current CBA. This means that the Union could use the ordinance as an economic lever in bargaining by asserting or raising the possibility that the Hotel will be in violation of the Act once the Union withdrew from contract extensions, as it had done at the Westin LAX. In that situation, the W Westwood would be bargaining under the cloud of exposure for potential significant costs if it did not reach agreement on the Union's terms. So, for example, if banquet servers filed a lawsuit for not being paid

$15.37 an hour (or whatever the number would be at that time), the Hotel would be at risk for three times the alleged underpayment because, as I understand, the Act calls for treble damages. Just the possibility of that exposure would put heavy pressure on the Hotel to settle on terms favorable to the Union.

49. In response to my follow-up inquiries, Mr. Walsh referred me to his attorney, Richard McCracken. I have made phone calls to Mr. McCracken, but have not yet received a response from him.

50. Without a waiver granted by the Union, the Hotel cannot make the wage increases that it would have readily started on December 1st because it is now facing an increase for tipped employees on July 1st that is mandated by the City's new hotel-worker ordinance. That increase would, in effect, "eat up" the entire amount (and then some) of the increase in wages and benefits that, under the CBA, was to be the maximum increase that the Hotel would be required to make for this year. So, the Hotel's employees are waiting for their wage increase, and the Hotel is waiting for a waiver.

51. As a labor-relations professional with over 30 years of experience in the hospitality industry, I can say without hesitation that this situation is disruptive to collective bargaining and labor relations far beyond the normal give and take of labor-management relations. It puts in jeopardy years of effort by Starwood to create a positive and cooperative relationship with Local 11. That disruption will end in an instant if the Court would grant the injunction requested by the plaintiffs in this lawsuit.

14

DECLARATION OF KEVIN GLEASON

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 23, 2015, in Los Angeles, California.

_____
Kevin Gleason

#34344419

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

DECLARATION OF KEVIN GLEASON

# **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 400 S. Hope St., 8th Floor, Los Angeles, California 90071.

On January 26, 2015, I served the document described as **DECLARATION OF KEVIN GLEASON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** on the interested parties in this action as follows:

**[X] (BY Electronic Transfer to the CM/ECF System)** In accordance with Federal Rules of Civil Procedure 5(d) (3), Local Rule 5-4, and the U.S. District Court of the Central District's General Order governing electronic filing, I uploaded via electronic transfer a true and correct copy scanned into an electronic file in Adobe "pdf" format of the above-listed documents to the United States District Court Central District of California' Case Management and Electronic Case Filing (CM/ECF) system on this date. It is my understanding that by transmitting these documents to the CM/ECF system, they will be served on all parties of record according to the preferences chosen by those parties within the CM/ECF system. The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on January 26, 2015, Los Angeles, California.

By:       //S//
      Kristina S. Azlin

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450