MICHAEL N. FEUER, City Attorney (SBN 111529)
JAMES P. CLARK, Chief Deputy City Attorney (SBN 64780)
THOMAS H. PETERS, Chief Assistant City Attorney (SBN 163388)
RONALD S. WHITAKER, Managing Assistant City Attorney (SBN 110160)
SARA UGAZ, Deputy City Attorney (SBN 239031)
200 North Main Street, City Hall East, Room 916
Los Angeles, California 90012
Tel: (213) 473-6878
Fax: (213) 473-6818
Email: Sara.Ugaz@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| AMERICAN HOTEL & LODGING ASSOCIATION and ASIAN AMERICAN HOTEL OWNERS ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES,<br><br>Defendant. | Case No.  CV 14-9603 AB(SSx)<br>Honorable André Birotte Jr.<br><br>Complaint Filed:  December 16, 2014<br>Trial Date:  Not Set<br><br>DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION<br><br>Hearing Date:  April 6, 2015<br>Hearing Time:  10:00 a.m.<br>Courtroom:  4-Spring Street<br><br>[Filed Concurrently with Opposition to Motion for Preliminary Injunction, Declaration of Sharon Dickinson, Notice of Motion and Motion to Strike, and Objections to Plaintiffs' Evidence; Notice of Lodging] |

Pursuant to FEDERAL RULE OF EVIDENCE 201(b), Defendant City of Los Angeles hereby seeks judicial notice of the following documents:

**Exhibit 1**: Ordinance number 172336, entitled "Living Wage," that Los Angeles City Council passed on November 25, 1998.

1

**Exhibit 2**:  Los Angeles Administrative Code section 10.37, et seq., which codifies Ordinance number 172336.

**Exhibit 3**:  Ordinance number 178084, entitled "Hotel Service Charge Reform Ordinance," that  Los Angeles City Council passed on November 22, 2006.

**Exhibit 4**:  Los Angeles Municipal Code section 184.00, et seq., which codifies Ordinance number 178084.

**Exhibit 5**:  Ordinance number 178432, entitled "Airport Hospitality Enhancement Zone Ordinance," that Los Angeles City Council passed on February 21, 2007.

**Exhibit 6**:  Los Angeles Municipal section 104.01, which codified Ordinance number 178432, up until it was repealed by the passage of the Citywide Hotel Worker Minimum Wage Ordinance on November 10, 2014.

**Exhibit 7**:  The Central District Court's "Statement of Reasoning Outlining Prior Denial of Application for Temporary Order" in the case of *Fortuna v. City of Los Angeles*, CV 08-4373.

Under Federal Rule of Evidence 201, a court may take judicial notice of laws, regulations, and rules such as city ordinances because they are matters of public record. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n. 2 (9th Cir. 2006).  Thus, Exhibits 1-6 are proper subjects of judicial notice.  The Court can also take judicial notice of prior court proceedings, including the determinations of district courts.  *See, e.g., Emrich v. Touche Ross & Co.*, 846 F. 2d 1190, 1198 (9th Cir. 1988).  Thus, Exhibit 7 is a proper subject of judicial notice.

//

//

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

For all these reasons, Defendant's request for judicial notice for Exhibits 1-7, which are public ordinances and/or court documents capable of ready authentication, should be granted.


DATED:      March 9, 2015

                              Respectfully submitted,

                              MICHAEL N. FEUER, City Attorney
                              JAMES P. CLARK, Chief Deputy City Attorney
                              THOMAS H. PETERS, Chief Assistant City Attorney
                              RONALD S. WHITAKER, Managing Assistant City Attorney

                              By: _____/s/_____
                              SARA UGAZ, Deputy City Attorney
                              Attorneys for Defendant
                              CITY OF LOS ANGELES

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

EXHIBIT 1

ORDINANCE NO. _____ 172336

1          An ordinance amending Article 11 to Chapter 1 of Division 10 of the Los Angeles
2  Administrative Code concerning the requirement that nothing less than a prescribed minimum level
3  of compensation (a "living wage") be paid to employees of the City's service contractors, of certain
4  of its lessees and licensees, and of its financial assistance recipients.

## THE PEOPLE OF THE CITY OF LOS ANGELES

### DO ORDAIN AS FOLLOWS:

12          Section 1. The Los Angeles Administrative Code is hereby amended by revising
13  Article 11 to Chapter 1 of Division 10 to read as follows:

## ARTICLE 11
## LIVING WAGE

**Sec. 10.37 Legislative Findings**

      The City awards many contracts to private firms to provide services to the public and to City government. Many lessees or licensees of City property perform services that affect the proprietary interests of City government in that their performance impacts the success of City operations. The City also provides financial assistance and funding to others for the purpose of economic development or job growth. The City expends grant funds under programs created by the federal and state governments. Such expenditures serve to promote the goals established for those programs by such governments and similar goals of the City. The City intends that the policies underlying this article serve to guide the expenditure of such funds to the extent allowed by the laws under which such grant programs are established.

      Experience indicates that procurement by contract of services has all too often resulted in the payment by service contractors to their employees of wages at or slightly above the minimum required by federal and state minimum wage laws. Such minimal compensation tends to inhibit the quantity and quality of services rendered by such employees to the City and to the public. Underpaying employees in this way fosters high turnover, absenteeism, and lackluster performance. Conversely, adequate compensation promotes amelioration of these undesirable conditions. Through this article the City intends to require service contractors to provide a minimum level of compensation that will improve the level of services rendered to and for the City.

!

Exhibit 1 Page 04

The inadequate compensation typically paid today also fails to provide service employees with resources sufficient to afford life in Los Angeles. It is unacceptable that contracting decisions involving the expenditure of City funds should foster conditions placing a burden on limited social services. The City, as a principal provider of social support services, has an interest in promoting an employment environment that protects such limited resources. In requiring the payment of a higher minimum level of compensation, this article benefits that interest.

Nothing less than the living wage should be paid by the recipients of City financial assistance themselves. Whether they be engaged in manufacturing or some other line of business, the City does not wish to foster an economic climate where a lesser wage is all that is offered to the working poor. The same adverse social consequences from such inadequate compensation emanate just as readily from manufacturing, for example, as service industries. This article is meant to protect these employees as well.

The City holds a proprietary interest in the work performed by many employees employed by lessees and licensees of City property and by their service contractors and subcontractors. In a very real sense, the success or failure of City operations may turn on the success or failure of these enterprises, for the City has a genuine stake in how the public perceives the services rendered for them by such businesses. Inadequate compensation of these employees adversely impacts the performance by the City's lessee or licensee and thereby does the same for the success of City operations. By the 1998 amendment to this article, recognition is given to the prominence of this interest at those facilities visited by the public on a frequent basis, including but not limited to, terminals at Los Angeles International Airport, Ports O'Call Village in San Pedro, and golf courses and recreation centers operated by the Department of Recreation and Parks. This article is meant to cover all such employees not expressly exempted.

Requiring payment of the living wage serves both proprietary and humanitarian concerns of the City. Primarily because of the latter concern and experience to date regarding the failure of some employers to honor their obligation to pay the living wage, the 1998 amendments introduce additional enforcement mechanisms to ensure compliance with this important obligation. Non-complying employers must now face the prospect of paying civil penalties, but only if they fail to cure non-compliance after having been given formal notice thereof. Where non-payment is the issue, employers who dispute determinations of non-compliance may avoid civil penalties as well by paying into a City holding account the monies in dispute. Employees should not fear retaliation, such as by losing their jobs, simply because they claim their right to the living wage, irrespective of the accuracy of the claim. The 1998 amendments strengthen the prohibition against retaliation to serve as a critical shield against such employer misconduct.

**Sec. 10.37.1  Definitions.**

The following definitions shall apply throughout this article:

2

Exhibit 1 Page 05

(a)   "Awarding authority" means that subordinate or component entity or person of the City (such as a department) or of the financial assistance recipient that awards or is otherwise responsible for the administration of a service contract or proprietary lease or license, or, where there is no such subordinate or component entity or person, then the City or the City financial assistance recipient.

(b)   "City" means the City of Los Angeles and all awarding authorities thereof, including those City departments which exercise independent control over their expenditure of funds, but excludes the Community Redevelopment Agency of the City of Los Angeles ("CRA"). The CRA is urged, however, to adopt a policy similar to that set forth in this article.

(c)   "City financial assistance recipient" means any person who receives from the City discrete financial assistance for economic development or job growth expressly articulated and identified by the City, as contrasted with generalized financial assistance such as through tax legislation, in accordance with the following monetary limitations. Assistance given in the amount of one million dollars ($1,000,000) or more in any twelve-month period shall require compliance with this article for five years from the date such assistance reaches the one million dollar ($1,000,000) threshold. For assistance in any twelve-month period totaling less than one million dollars ($1,000,000) but at least one hundred thousand dollars ($100,000), there shall be compliance for one year if at least one hundred thousand dollars ($100,000) of such assistance is given in what is reasonably contemplated at the time to be on a continuing basis, with the period of compliance beginning when the accrual during such twelve-month period of such continuing assistance reaches the one-hundred thousand dollar ($100,000) threshold.

Categories of such assistance include, but are not limited to, bond financing, planning assistance, tax increment financing exclusively by the City, and tax credits, and shall not include assistance provided by the Community Development Bank. City staff assistance shall not be regarded as financial assistance for purposes of this article. A loan shall not be regarded as financial assistance. The forgiveness of a loan shall be regarded as financial assistance. A loan shall be regarded as financial assistance to the extent of any differential between the amount of the loan and the present value of the payments thereunder, discounted over the life of the loan by the applicable federal rate as used in 26 U.S.C. §§ 1274(d), 7872(f). A recipient shall not be deemed to include lessees and sublessees.

A recipient shall be exempted from application of this article if (1) it is in its first year of existence, in which case the exemption shall last for one (1) year, (2) it employs fewer than five (5) employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, or (3) it obtains a waiver as provided herein. A recipient -- who employs the long-term unemployed or provides trainee positions intended to prepare employees for permanent positions, and who claims that compliance with this article would cause an economic hardship -- may apply in writing to the City department or office administering such assistance, which department or office which shall forward such application and its recommended action on it to the City Council. Waivers shall be effected by Council resolution.

3

Exhibit 1 Page 06

    **(d)**    "Contractor" means any person that enters into (1) a service contract with the City, (2) a service contract with a proprietary lessee or licensee or sublessee or sublicensee, or (3) a contract with a City financial assistance recipient to assist the recipient in performing the work for which the assistance is being given. Vendors, such as service contractors, of City financial assistance recipients shall not be regarded as contractors except to the extent provided in subsection (f).

    **(e)**    "Designated administrative agency (DAA)" means that City department or office designated by Council resolution to bear administrative responsibilities under section 10.37.7. The City Clerk shall maintain a record of such designations.

    **(f)**    "Employee" means any person -- who is not a managerial, supervisory, or confidential employee and who is not required to possess an occupational license -- who is employed (1) as a service employee of a contractor or subcontractor on or under the authority of one or more service contracts and who expends any of his or her time thereon, including but not limited to: hotel employees, restaurant, food service or banquet employees; janitorial employees; security guards; parking attendants; nonprofessional health care employees; gardeners; waste management employees; and clerical employees; (2) as a service employee -- of a proprietary lessee or licensee, of a sublessee or sublicensee, or of a service contractor or subcontractor of a proprietary lessee or licensee, or sublessee or sublicensee -- who works on the leased or licensed premises; (3) by a City financial assistance recipient who expends at least half of his or her time on the funded project; or (4) by a service contractor or subcontractor of a City financial assistance recipient and who expends at least half of his or her time on the premises of the City financial assistance recipient directly involved with the activities funded by the City.

    **(g)**    "Employer" means any person who is a City financial assistance recipient, contractor, subcontractor, proprietary lessee, proprietary sublessee, proprietary licensee, or proprietary sublicensee and who is required to have a business tax registration certificate by Los Angeles Municipal Code §§ 21.00-21.198 or successor ordinance or, if expressly exempted by the Code from such tax, would otherwise be subject to the tax but for such exemption; provided, however, that corporations organized under § 501(c)(3) of the United States Internal Revenue Code of 1954, 26 U.S.C. §501(c)(3), whose chief executive officer earns a salary which, when calculated on an hourly basis, is less than eight (8) times the lowest wage paid by the corporation, shall be exempted as to all employees other than child care workers.

    **(h)**    "Person" means any individual, proprietorship, partnership, joint venture, corporation, limited liability company, trust, association, or other entity that may employ individuals or enter into contracts.

    **(i)**    "Proprietary lease or license" means a lease or license of City property on which services are rendered by employees of the proprietary lessee or licensee or sublessee or sublicensee, or of a contractor or subcontractor, but only where any of the following applies: (1) the services are rendered on premises at least a portion of which is visited by substantial numbers of the public on

4

Exhibit 1 Page 07

a frequent basis (including, but not limited to, airport passenger terminals, parking lots, golf courses, recreational facilities), (2) any of the services could feasibly be performed by City employees if the awarding authority had the requisite financial and staffing resources, or (3) the DAA has determined in writing that coverage would further the proprietary interests of the City; provided, however, that a proprietary lessee or licensee having annual gross revenues of less than two-hundred thousand dollars ($200,000) from business conducted on the premises and employing no more than seven (7) employees will be exempt from this article, except that for proprietary leases or licenses having a term of more than two (2) years, the exemption shall expire after two (2) years but shall be renewable in two-year increments upon meeting the requirements therefor at the time of the renewal application. To qualify for this exemption, the proprietary lessee or licensee must provide proof of its gross revenues and number of employees to the awarding authority of the proprietary lease or license as required by regulation. The determination of whether annual gross revenues are less than two-hundred thousand dollars ($200,000) shall be based on the gross revenues for the last tax year prior to application or such other period as may be established by regulation. Such annual gross revenue ceiling of two-hundred thousand dollars ($200,000) shall be adjusted annually at the same rate and at the same time as the living wage is adjusted under section 10.37.2(a). A proprietary lessee or licensee shall be deemed to be employing no more than seven (7) employees if its workforce worked an average of no more than one-thousand, two-hundred, and fourteen (12 14) hours per month for at least three-fourths of the time period upon which the revenue limitation is measured. Proprietary "leases" and "licenses" shall be deemed to include subleases and sublicenses. Proprietary "lessees" and "licensees" shall be deemed to include their sublessees and sublicensees.

(j)     "Service contract" means a contract let to a contractor by the City primarily for the furnishing of services to or for the City (as opposed to the purchase of goods or other property or the leasing or renting of property) and that involves an expenditure in excess of twenty-five thousand dollars ($25,000) and a contract term of at least three (3) months; but only where any of the following applies: (1) at least some of the services rendered are rendered by employees whose work site is on property owned by the City, (2) the services could feasibly be performed by City employees if the awarding authority had the requisite financial and staffing resources, or (3) the DAA has determined in writing that coverage would further the proprietary interests of the City.

(k)     "Subcontractor" means any person not an employee that enters into a contract (and that employs employees for such purpose) with (1) a contractor or subcontractor to assist the contractor in performing a service contract or (2) a contractor or subcontractor of a proprietary lessee or licensee or sublessee or sublicensee to perform or assist in performing services on the leased or licensed premises. Vendors, such as service contractors or subcontractors, of City financial assistance recipients shall not be regarded as subcontractors except to the extent provided in subsection (f).

(l)     "Willful violation" means that the employer knew of his, her, or its obligations under this article and deliberately failed or refused to comply with its provisions.

5

Exhibit 1 Page 08

**Sec. 10.37.2 Payment of Minimum Compensation to Employees**

(a) *Wages*

Employers shall pay employees a wage of no less than the hourly rates set under the authority of this article.  The initial rates were seven dollars and twenty-five cents ($7.25) per hour with health benefits, as described in this article, or otherwise eight dollars and fifty cents ($8.50) per hour.  With the annual adjustment effective July 1, 1998, such rates were adjusted to seven dollars and thirty-nine cents ($7.39) per hour with health benefits and eight dollars and sixty-four cents ($8.64) without. Such rates shall continue to be adjusted annually to correspond with adjustments, if any, to retirement benefits paid to members of the City Employees Retirement System ("CERS"), made by the CERS Board of Administration under $4.1040. The City Administrative Office shall so advise the DAA of any such change by June 1 of each year and of the required new hourly rates, if any.  On the basis of such report the DAA shall publish a bulletin announcing the adjusted rates, which shall take effect upon such publication.

(b) *Compensated days off*

Employers shall provide at least twelve (12) compensated days off per year for sick leave, vacation, or personal necessity at the employee's request. Employers shall also permit employees to take at least an additional ten (10) days a year of uncompensated time to be used for sick leave for the illness of the employee or a member of his or her immediate family where the employee has exhausted his or her compensated days off for that year.

**Sec. 10.37.3 Health Benefits**

Health benefits required by this article shall consist of the payment of at least one dollar and twenty-five cents ($1.25) per hour towards the provision of health care benefits for employees and their dependents.  Proof of the provision of such benefits must be submitted to the awarding authority to qualify for the wage rate in section 10.37.2(a) for employees with health benefits.

**Sec. 10.37.4 Notifying Employees of their Potential Right to the Federal Earned Income Credit**

Employers shall inform employees making less than twelve dollars ($12) per hour of their possible right to the federal Earned Income Credit ("EIC") under § 32 of the Internal Revenue Code of 1954, 26 U.S.C. § 32, and shall make available to employees forms informing them about the EIC and forms required to secure advance EIC payments from the employer.

**Sec. 10.37.5 Retaliation Prohibited**

6

Exhibit 1 Page 09

Neither an employer, as defined in this article, nor any other person employing individuals shall discharge, reduce in compensation, or otherwise discriminate against any employee for complaining to the City with regard to the employer's compliance or anticipated compliance with this article, for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

## Sec. 10.37.6 Enforcement

(a) An employee claiming violation of this article may bring an action in the Municipal Court or Superior Court of the State of California, as appropriate, against an employer and may be awarded:

(1) For failure to pay wages required by this article -- back pay for each day during which the violation continued.

(2) For failure to pay medical benefits -- the differential between the wage required by this article without benefits and such wage with benefits, less amounts paid, if any, toward medical benefits.

(3) For retaliation -- reinstatement, back pay, or other equitable relief the court may deem appropriate.

(4) For willful violations, the amount of monies to be paid under (1) - (3) shall be trebled.

(b) The court shall award reasonable attorney's fees and costs to an employee who prevails in any such enforcement action and to an employer who so prevails if the employee's suit was frivolous.

(c) Compliance with this article shall be required in all City contracts to which it applies, and such contracts shall provide that violation of this article shall constitute a material breach thereof and entitle the City to terminate the contract and otherwise pursue legal remedies that may be available. Such contracts shall also include a pledge that there shall be compliance with federal law proscribing retaliation for union organizing.

(d) An employee claiming violation of this article may report such claimed violation to the DAA which shall investigate such complaint. Whether based upon such a complaint or otherwise, where the DAA has determined that an employer has violated this article, the DAA shall issue a written notice to the employer that the violation is to be corrected within ten (10) days. In the event that the employer has not demonstrated to the DAA within such period that it has cured such violation, the DAA may then:

7

Exhibit 1 Page 10

(1) Request the awarding authority to declare a material breach of the service contract, proprietary lease or license, or financial assistance agreement and exercise its contractual remedies thereunder, which are to include, but not be limited to, termination of the service contract, proprietary lease or license, or financial assistance agreement and the return of monies paid by the City for services not yet rendered.

(2) Request the City Council to debar the employer from future City contracts, leases, and licenses for three (3) years or until all penalties and restitution have been fully paid, whichever occurs last. Such debarment shall be to the extent permitted by, and under whatever procedures may be required by, law.

(3) Request the City Attorney to bring a civil action against the employer seeking:

(i) Where applicable, payment of all unpaid wages or health premiums prescribed by this article; and/or

(ii) A fine payable to the City in the amount of up to one hundred dollars ($100) for each violation for each day the violation remains uncured.

Where the alleged violation concerns non-payment of wages or health premiums, the employer will not be subject to debarment or civil penalties if it pays the monies in dispute into a holding account maintained by the City for such purpose. Such disputed monies shall be presented to a neutral arbitrator for binding arbitration. The arbitrator shall determine whether such monies shall be disbursed, in whole or in part, to the employer or to the employees in question. Regulations promulgated by the DAA shall establish the framework and procedures of such arbitration process. The cost of arbitration shah be borne by the City, unless the arbitrator determines that the employer's position in the matter is frivolous, in which event the arbitrator shall assess the employer for the full cost of the arbitration. Interest earned by the City on monies held in the holding account shall be added to the principal sum deposited, and the monies shall be disbursed in accordance with the arbitration award. A service charge for the cost of account maintenance and service may be deducted therefrom.

(e) Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

### Sec. 10.37.7 Administration

The City Council shall by resolution designate a department or office, which shall promulgate rules for implementation of this article and otherwise coordinate administration of the requirements of this article ("designated administrative agency" - DAA). The DAA shall monitor compliance,

8

Exhibit 1 Page 11

including the investigation of claimed violations, and shall promulgate implementing regulations consistent with this article. The DAA shall also issue determinations that persons are City financial assistance recipients, that particular contracts shall be regarded as "service contracts" for purposes of section 10.37.1(j), and that particular leases and licenses shall be regarded as "proprietary leases" or "proprietary licenses" for purposes of section 10.37.1(i), when it receives an application for a determination of non-coverage or exemption as provided for in section 10.37.13. The DAA shall also establish employer reporting requirements on employee compensation and on notification about and usage of the federal Earned Income Credit referred to in § 10.37.4. The DAA shall report on compliance to the City Council no less frequently than annually.

During the first, third, and seventh years of this article's operation since May 5, 1997, and every third year thereafter, the Chief Administrative Officer and the Chief Legislative Analyst shall conduct or commission an evaluation of this article's operation and effects. The evaluation shall specifically address at least the following matters: (a) how extensively affected employers are complying with the article; (b) how the article is affecting the workforce composition of affected employers; (c) how the article is affecting productivity and service quality of affected employers; (d) how the additional costs of the article have been distributed among workers, their employers, and the City. Within ninety days of the adoption of this article, these offices shall develop detailed plans for evaluation, including a determination of what current and future data will be needed for effective evaluation.

## Sec. 10.37.8 Exclusion of Service Contracts from Competitive Bidding Requirement

Service contracts otherwise subject to competitive bid shall be let by competitive bid if they involve the expenditure of at least two-million dollars ($2,000,000). Charter § 387 shall not be applicable to service contracts.

## Sec. 10.37.9 Coexistence with Other Available Relief for Specific Deprivations of Protected Rights

This article shall not be construed to limit an employee's right to bring legal action for violation of other minimum compensation laws.

## Sec. 10.37.10 Expenditures Covered

This article shall apply to the expenditure -- whether through aid to City financial assistance recipients, service contracts let by the City, or service contracts let by its financial assistance recipients -- of funds entirely within the City's control and to other funds, such as federal or state grant funds, where the application of this article is consonant with the laws authorizing the City to expend such other funds.

9

Exhibit 1 Page 12

**Sec. 10.37.11 Timing of Application**

*(a) Original 1997 ordinance.*

The provisions of this article as enacted by City ordinance no. 171,547, effective May 5, 1997, shall apply to (1) contracts consummated and financial assistance provided after such date, (2) contract amendments consummated after such date and before the effective date of the 1998 ordinance which themselves met the requirements of former section 10.37.1(h) (definition of "service contract") or which extended contract duration, and (3) supplemental financial assistance provided after May 5, 1997 and before the effective date of the 1998 ordinance which itself met the requirements of section 10.37.1(c).

*(b) 1998 amendment.*

The provisions of this article as amended by the 1998 ordinance shall apply to (1) service contracts, proprietary leases or licenses, and financial assistance agreements consummated after the effective date of such ordinance and (2) amendments, consummated after the effective date of such ordinance, to service contracts, proprietary leases or licenses, and financial assistance agreements that provide additional monies or which extend term.

**Sec. 10.37.12 Supersession by Collective Bargaining Agreement**

Parties subject to this article may by collective bargaining agreement provide that such agreement shall supersede the requirements of this article.

**Sec. 10.37.13 Liberal Interpretation of Coverage; Rebuttable Presumption of Coverage**

The definitions of "City financial assistance recipient" in section 10.37.1(c), of "proprietary lease or license" in section 10.37.1(i), and of "service contract" in section 10.37.1(j) shall be liberally interpreted so as to further the policy objectives of this article. All recipients of City financial assistance meeting the monetary thresholds of section 10.37.1(c), all City leases and licenses (including subleases and sublicenses) where the City is the lessor or licensor, and all City contracts providing for services that are more than incidental, shall be presumed to meet the corresponding definition just mentioned, subject, however, to a determination by the DAA of non-coverage or exemption on any basis allowed by this article, including, but not limited to, non-coverage for failure to satisfy such definition. The DAA shall by regulation establish procedures for informing persons engaging in such transactions with the City of their opportunity to apply for a determination of non-coverage or exemption and procedures for making determinations on such applications.

**Sec. 10.37.14 Severability**

10

Exhibit 1 Page 13

1              If any provision of this article is declared legally invalid by any court of competent
2    jurisdiction, the remaining provisions shall remain in full force and effect.
3
4
5
6

11

Exhibit 1 Page 14

Sec. 2. The City Clerk shall certify to the passage of this ordinance and cause the same to be published in some daily newspaper printed and published in the City of Los Angeles.

I hereby certify that the foregoing ordinance was passed by the Council of the City of Los Angeles, at its meeting of _____ NOV 25 1998 _____.

J. Michael Carey, City Clerk

By _Maria Kostheruich_

Deputy

Approved _____

_____
Mayor

Approved as to Form and Legality

_____
JAMES K. HAHN, City Attorney

BY _____
FREDERICK N. MERKIN
Senior Assistant City Attorney

------------------------------------------------------------

        Said ordinance was presented to the Mayor on ___NOV 30 1998___;
the Mayor returned said ordinance to the City Clerk on ___DEC 11 1998___
without his approval or his objections in writing, being more than ten days
after the same was presented to the Mayor.
        Said ordinance shall become effective and be as valid as if the
Mayor had approved and signed it.  (Sec. 30, City Charter)

C.F.  _96-1111-S.1_

Exhibit 1 Page 15

# EXHIBIT 2

Print

Los Angeles Charter and Administrative Code

# ARTICLE 11
# LIVING WAGE

Section
10.37   Legislative Findings.
10.37.1   Definitions.
10.37.2   Payment of Minimum Compensation to Employees.
10.37.3   Health Benefits.
10.37.4   Notifying Employees of Their Potential Right to the Federal Earned Income Credit.
10.37.5   Retaliation Prohibited.
10.37.6   Enforcement.
10.37.7   Administration.
10.37.8   Exclusion of Service Contracts from Competitive Bidding Requirement.
10.37.9   Coexistence with Other Available Relief for Specific Deprivations of Protected Rights.
10.37.10   Expenditures Covered.
10.37.11   Timing of Application.
10.37.12   Supersession by Collective Bargaining Agreement.
10.37.13   Liberal Interpretation of Coverage; Rebuttable Presumption of Coverage.
10.37.14   Severability.

**Sec. 10.37.  Legislative Findings.**

The City awards many contracts to private firms to provide services to the public and to City government.  Many lessees or licensees of City property perform services that affect the proprietary interests of City government in that their performance impacts the success of City operations.  The City also provides financial assistance and funding to others for the purpose of economic development or job growth.  The City expends grant funds under programs created by the federal and state governments.  Such expenditures serve to promote the goals established for those programs by such governments and similar goals of the City.  The City intends that the policies underlying this article serve to guide the expenditure of such funds to the extent allowed by the laws under which such grant programs are established.

Experience indicates that procurement by contract of services has all too often resulted in the payment by service contractors to their employees of wages at or slightly above the minimum required by federal and state minimum wage laws.  Such minimal compensation tends to inhibit the quantity and quality of services rendered by such employees to the City and to the public.  Underpaying employees in this way fosters high turnover, absenteeism, and lackluster performance.  Conversely, adequate compensation promotes amelioration of these undesirable conditions.  Through this article the City intends to require service contractors to provide a minimum level of compensation that will improve the level of services rendered to and for the City.

The inadequate compensation typically paid today also fails to provide service employees with

Exhibit 2 Page 18

resources sufficient to afford life in Los Angeles. It is unacceptable that contracting decisions involving the expenditure of City funds should foster conditions placing a burden on limited social services. The City, as a principal provider of social support services, has an interest in promoting an employment environment that protects such limited resources. In requiring the payment of a higher minimum level of compensation, this article benefits that interest.

Nothing less than the living wage should be paid by the recipients of City financial assistance themselves. Whether they be engaged in manufacturing or some other line of business, the City does not wish to foster an economic climate where a lesser wage is all that is offered to the working poor. The same adverse social consequences from such inadequate compensation emanate just as readily from manufacturing, for example, as service industries. This article is meant to protect these employees as well.

The City holds a proprietary interest in the work performed by many employees employed by lessees and licensees of City property and by their service contractors and subcontractors. In a very real sense, the success or failure of City operations may turn on the success or failure of these enterprises, for the City has a genuine stake in how the public perceives the services rendered for them by such businesses. Inadequate compensation of these employees adversely impacts the performance by the City's lessee or licensee and thereby does the same for the success of City operations. By the 1998 amendment to this article, recognition is given to the prominence of this interest at those facilities visited by the public on a frequent basis, including but not limited to, terminals at Los Angeles International Airport, Ports O'Call Village in San Pedro, and golf courses and recreation centers operated by the Department of Recreation and Parks. This article is meant to cover all such employees not expressly exempted.

Requiring payment of the living wage serves both proprietary and humanitarian concerns of the City. Primarily because of the latter concern and experience to date regarding the failure of some employers to honor their obligation to pay the living wage, the 1998 amendments introduce additional enforcement mechanisms to ensure compliance with this important obligation. Non-complying employers must now face the prospect of paying civil penalties, but only if they fail to cure non-compliance after having been given formal notice thereof. Where non-payment is the issue, employers who dispute determinations of non-compliance may avoid civil penalties as well by paying into a City holding account the monies in dispute. Employees should not fear retaliation, such as by losing their jobs, simply because they claim their right to the living wage, irrespective of the accuracy of the claim. The 1998 amendments strengthen the prohibition against retaliation to serve as a critical shield against such employer misconduct.

SECTION HISTORY

Article and Section Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.1. Definitions.

The following definitions shall apply throughout this article:

(a)    "**Airport**" means the Department of Airports and each of the airports which it operates.

(b)    "**Airport Employer**" means an Employer, as the term is defined in this section, at the

Exhibit 2 Page 17

Airport.

(c)  **"Airport Employee"** means an Employee, as the term is defined in this section, of an Airport Employer.

(d)  **"Awarding authority"** means that subordinate or component entity or person of the City (such as a department) or of the financial assistance recipient that awards or is otherwise responsible for the administration of a service contract or public lease or license, or, where there is no such subordinate or component entity or person, then the City or the City financial assistance recipient.

(e)  **"City"** means the City of Los Angeles and all awarding authorities thereof, including those City departments which exercise independent control over their expenditure of funds, but excludes the Community Redevelopment Agency of the City of Los Angeles ("CRA"). The CRA is urged, however, to adopt a policy similar to that set forth in this article.

(f)  **"City financial assistance recipient"** means  any person who receives from the City discrete financial assistance for economic development or job growth expressly articulated and identified by the City, as contrasted with generalized financial assistance such as through tax legislation, in accordance with the following monetary limitations.  Assistance given in the amount of one million dollars ($1,000,000) or more in any twelve-month period shall require compliance with this article for five years from the date such assistance reaches the one million dollar ($1,000,000) threshold.  For assistance in any twelve-month period totaling less than one million dollars ($1,000,000) but at least one hundred thousand dollars ($100,000), there shall be compliance for one year if at least one hundred thousand dollars ($100,000) of such assistance is given in what is reasonably contemplated at the time to be on a continuing basis, with the period of compliance beginning when the accrual during such twelve-month period of such continuing assistance reaches the one-hundred thousand dollar ($100,000) threshold.

Categories of such assistance include, but are not limited to, bond financing, planning assistance, tax increment financing exclusively by the City, and tax credits, and shall not include assistance provided by the Community Development Bank.  City staff assistance shall not be regarded as financial assistance for purposes of this article.  A loan shall not be regarded as financial assistance.  The forgiveness of a loan shall be regarded as financial assistance.  A loan shall be regarded as financial assistance to the extent of any differential between the amount of the loan and the present value of the payments thereunder, discounted over the life of the loan by the applicable federal rate as used in 26 U.S.C. Sections 1274(d), 7872(f).  A recipient shall not be deemed to include lessees and sublessees.

A recipient shall be exempted from application of this article if:

(1)  it is in its first year of existence, in which case the exemption shall last for one (1) year,

(2)  it employs fewer than five (5) employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, or

(3)  it obtains a waiver as provided herein.

Exhibit 2 Page 18

A recipient - who employs the long-term unemployed or provides trainee positions intended to prepare employees for permanent positions, and who claims that compliance with this article would cause an economic hardship - may apply in writing to the City department or office administering such assistance, which department or office which shall forward such application and its recommended action on it to the City Council. Waivers shall be effected by Council resolution.

(g)   "**Contractor**" means any person that enters into:

  (1)   a service contract with the City,

  (2)   a service contract with a proprietary lessee or licensee or sublessee or sublicensee, or

  (3)   a contract with a City financial assistance recipient to assist the recipient in performing the work for which the assistance is being given. Vendors, such as service contractors, of City financial assistance recipients shall not be regarded as contractors except to the extent provided in Subsection (i).*

  *Technical correction due to re-lettering of subsections: "Subsection (f)" corrected to "Subsection (i)".

(h)   "**Designated Administrative Agency (DAA)**" means the Department of Public Works, Bureau of Contract Administration, who shall bear administrative responsibilities under this article.

(i)   "**Employee**" means any person - who is not a managerial, supervisory, or confidential employee and who is not required to possess an occupational license - who is employed

  (1)   as a service employee of a contractor or subcontractor on or under the authority of one or more service contracts and who expends any of his or her time thereon, including but not limited to: hotel employees, restaurant, food service or banquet employees; janitorial employees; security guards; parking attendants; nonprofessional health care employees; gardeners; waste management employees; and clerical employees;

  (2)   as a service employee - of a public lessee or licensee, of a sublessee or sublicensee, or of a service contractor or subcontractor of a public lessee or licensee, or sublessee or sublicensee - who works on the leased or licensed premises;

  (3)   by a City financial assistance recipient who expends at least half of his or her time on the funded project; or

  (4)   by a service contractor or subcontractor of a City financial assistance recipient and who expends at least half of his or her time on the premises of the City financial assistance recipient directly involved with the activities funded by the City.

(j)   "**Employer**" means any person who is a City financial assistance recipient, contractor, subcontractor, public lessee, public sublessee, public licensee, or public sublicensee and who is required to have a business tax registration certificate by Los Angeles Municipal Code §§

Exhibit 2 Page 19

CHAPTER 1 CONTRACTS GENERAL

21.00 - 21.198 or successor ordinance or, if expressly exempted by the Code from such tax, would otherwise be subject to the tax but for such exemption; provided, however, that corporations organized under §501(c)(3) of the United States Internal Revenue Code of 1954, 26 U.S.C. §501(c)(3), whose chief executive officer earns a salary which, when calculated on an hourly basis, is less than eight (8) times the lowest wage paid by the corporation, shall be exempted as to all employees other than child care workers.

(k)   **"Person"** means any individual, proprietorship, partnership, joint venture, corporation, limited liability company, trust, association, or other entity that may employ individuals or enter into contracts.

(l)   **"Public lease or license"**.

(a)   Except as provided in (l)(b)*, **"Public lease or license"** means a lease or license of City property on which services are rendered by employees of the public lessee or licensee or sublessee or sublicensee, or of a contractor or subcontractor, but only where any of the following applies:

*Technical correction due to re-lettering of subsections: "(i)(b)" corrected to "(l)(b)".

(1)   The services are rendered on premises at least a portion of which is visited by substantial numbers of the public on a frequent basis (including, but not limited to, airport passenger terminals, parking lots, golf courses, recreational facilities); or

(2)   Any of the services could feasibly be performed by City employees if the awarding authority had the requisite financial and staffing resources; or

(3)   The DAA has determined in writing that coverage would further the proprietary interests of the City.

(b)   A public lessee or licensee will be exempt from the requirements of this article subject to the following limitations:

(1)   The lessee or licensee has annual gross revenues of less than the annual gross revenue threshold, three hundred fifty thousand dollars ($350,000), from business conducted on City property;

(2)   The lessee or licensee employs no more than seven (7) people total in the company on and off City property;

(3)   To qualify for this exemption, the lessee or licensee must provide proof of its gross revenues and number of people it employs in the company's entire workforce to the awarding authority as required by regulation;

(4)   Whether annual gross revenues are less than three hundred fifty thousand dollars ($350,000) shall be determined based on the gross revenues for the last tax year prior to application or such other period as may be established by regulation;

Exhibit 2 Page 20

(5)   The annual gross revenue threshold shall be adjusted annually at the same rate and at the same time as the living wage is adjusted under section 10.37.2 (a);

(6)   A lessee or licensee shall be deemed to employ no more than seven (7) people if the company's entire workforce worked an average of no more than one thousand two-hundred fourteen (1,214) hours per month for at least three-fourths (3/4) of the time period that the revenue limitation is measured;

(7)   Public leases and licenses shall be deemed to include public subleases and sublicenses;

(8)   If a public lease or license has a term of more than two (2) years, the exemption granted pursuant to this section shall expire after two (2) years but shall be renewable in two-year increments upon meeting the requirements therefor at the time of the renewal application or such period established by regulation.

(m)   **"Service contract"** means a contract let to a contractor by the City primarily for the furnishing of services to or for the City (as opposed to the purchase of goods or other property or the leasing or renting of property) and that involves an expenditure in excess of twenty-five thousand dollars ($25,000) and a contract term of at least three (3) months; but only where any of the following applies:

(1)   at least some of the services rendered are rendered by employees whose work site is on property owned by the City,

(2)   the services could feasibly be performed by City employees if the awarding authority had the requisite financial and staffing resources, or

(3)   the DAA has determined in writing that coverage would further the proprietary interests of the City.

(n)   **"Subcontractor"** means any person not an employee that enters into a contract (and that employs employees for such purpose) with

(1)   a contractor or subcontractor to assist the contractor in performing a service contract or

(2)   a contractor or subcontractor of a proprietary lessee or licensee or sublessee or sublicensee to perform or assist in performing services on the leased or licensed premises.  Vendors, such as service contractors or subcontractors, of City financial assistance recipients shall not be regarded as subcontractors except to the extent provided in Subsection (i).*

*Technical correction due to re-lettering of subsections: "Subsection (f)" corrected to "Subsection (i)".

(o)   **"Willful violation"** means that the employer knew of his, her, or its obligations under this article and deliberately failed or refused to comply with its provisions.

Exhibit 2 Page 21

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (e), Ord. No. 176,155, Eff. 9-22-04; Subsec. (e), Ord. No. 176,283, Eff. 12-25-04, Oper. 9-22-04; Subsecs. (a) through (l) re-lettered (d) through (o), respectively and new Subsecs. (a), (b), and (c) added, Ord. No. 180,877, Eff. 10-19-09.

### Sec. 10.37.2.  Payment of Minimum Compensation to Employees.

(a)  **Wages.**  Employers shall pay Employees a wage of no less than the hourly rates set under the authority of this article.  The initial rates were seven dollars and twenty-five cents ($7.25) per hour with health benefits, as described in this article, or otherwise eight dollars and fifty cents ($8.50) per hour without health benefits.  With the annual adjustment effective July 1, 2009, together with all previous annual adjustments as provided by this subsection, such rates are ten dollars and thirty cents ($10.30) per hour with health benefits or, if health benefits are not provided, then fourteen dollars and eighty cents ($14.80) per hour for Airport Employees and eleven dollars and fifty-five cents ($11.55) per hour for all other Employees.  The hourly rate with health benefits to be paid to all Employees and the hourly rate without health benefits to be paid to Airport Employees shall be adjusted annually to correspond with adjustments, if any, to retirement benefits paid to members of the Los Angeles City Employees Retirement System (LACERS), made by the CERS Board of Administration under § 4.1040.  The Office of Administrative and Research Services shall so advise the DAA of any such change by June 1 of each year and of the required new hourly rates, if any.  On the basis of such report, the DAA shall publish a bulletin announcing the adjusted rates, which shall take effect upon such publication.

(b)  **Compensated Days Off.**  Employers shall provide at least twelve (12) compensated days off per year for sick leave, vacation, or personal necessity at the employee's request.  Employers shall also permit employees to take at least an additional ten (10) days a year of uncompensated time to be used for sick leave for the illness of the employee or a member of his or her immediate family where the employee has exhausted his or her compensated days off for that year.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (a), Ord. No. 173,285, Eff. 6-26-00, Oper. 7-1-00; Subsec. (a), Ord. No. 180,877, Eff. 10-19-09.

### Sec. 10.37.3.  Health Benefits.

(a)  **Health Benefits.**  The health benefits required by this article shall consist of the payment of at least four dollars and fifty cents ($4.50) per hour by Airport Employers and at least one dollar and twenty-five cents ($1.25) per hour by all other Employers towards the provision of health care benefits for Employees and their dependents.  Proof of the provision of such benefits must be submitted to the awarding authority to qualify for the wage rate in Section 10.37(a) for Employees with health benefits.  Airport Employees cannot waive the health benefits offered by an Airport Employer when the Airport Employer does not require an out-of-pocket contribution by the Airport Employee.  Consistent with and as shall be reflected in the hourly rates payable to Airport Employees as provided in 10.37.2(a) above, the amount of payment for health benefits by Airport

Exhibit 2 Page 22

Employers shall be adjusted annually to correspond with adjustments, if any, to retirement benefits paid to members of the Los Angeles City Employees Retirement System (LACERS), made by the CERS Board of Administration under § 4.1040. The Office of Administrative and Research Services shall so advise the DAA of any such change by June 1 of each year and of the required new hourly payments, if any. On the basis of such report, the DAA shall publish a bulletin announcing the adjusted payment, which shall take effect upon such publication.

(b) **Periodic Review.** At least once every three years, the Office of Administrative and Research Services shall review the health benefit payment by Airport Employers set forth in 10.37.3(a) to determine whether the payment accurately reflects the cost of health care and to assess the impacts of the health benefit payment on Airport Employers and Airport Employees and shall transmit a report with its findings to the Council.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99; In Entirety, Ord. No. 180,877, Eff. 10-19-09.

### Sec. 10.37.4.  Notifying Employees of their Potential Right to the Federal Earned Income Credit.

Employers shall inform employees making less than twelve dollars ($12) per hour of their possible right to the federal Earned Income Credit ("**EIC**") under Section 32 of the Internal Revenue Code of 1954, 26 U.S.C. Section 32, and shall make available to employees forms informing them about the EIC and forms required to secure advance EIC payments from the employer.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.5.  Retaliation Prohibited.

Neither an employer, as defined in this article, nor any other person employing individuals shall discharge, reduce in compensation, or otherwise discriminate against any employee for complaining to the City with regard to the employer's compliance or anticipated compliance with this article, for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.6.  Enforcement.

(a)  An employee claiming violation of this article may bring an action in the Municipal Court or

Superior Court of the State of California, as appropriate, against an employer and may be awarded:

(1)  For failure to pay wages required by this article - back pay for each day during which the violation continued.

(2)  For failure to pay medical benefits - the differential between the wage required by this article without benefits and such wage with benefits, less amounts paid, if any, toward medical benefits.

(3)  For retaliation - reinstatement, back pay, or other equitable relief the court may deem appropriate.

(4)  For willful violations, the amount of monies to be paid under (1) - (3) shall be trebled.

(b)  The court shall award reasonable attorney's fees and costs to an employee who prevails in any such enforcement action and to an employer who so prevails if the employee's suit was frivolous.

(c)  Compliance with this article shall be required in all City contracts to which it applies, and such contracts shall provide that violation of this article shall constitute a material breach thereof and entitle the City to terminate the contract and otherwise pursue legal remedies that may be available.  Such contracts shall also include a pledge that there shall be compliance with federal law proscribing retaliation for union organizing.

(d)  An employee claiming violation of this article may report such claimed violation to the DAA which shall investigate such complaint.  Whether based upon such a complaint or otherwise, where the DAA has determined that an employer has violated this article, the DAA shall issue a written notice to the employer that the violation is to be corrected within ten (10) days.  In the event that the employer has not demonstrated to the DAA within such period that it has cured such violation, the DAA may then:

(1)  Request the awarding authority to declare a material breach of the service contract, public lease or license, or financial assistance agreement and exercise its contractual remedies thereunder, which are to include, but not be limited to, termination of the service contract, public lease or license, or financial assistance agreement and the return of monies paid by the City for services not yet rendered.

(2)  Request the City Council to debar the employer from future City contracts, leases, and licenses for three (3) years or until all penalties and restitution have been fully paid, whichever occurs last.  Such debarment shall be to the extent permitted by, and under whatever procedures may be required by, law.

(3)  Request the City Attorney to bring a civil action against the employer seeking:

(i)  Where applicable, payment of all unpaid wages or health premiums prescribed by this article; and/or

(ii)  A fine payable to the City in the amount of up to one hundred dollars ($100) for each violation for each day the violation remains uncured.

Exhibit 2 Page 24

Where the alleged violation concerns non-payment of wages or health premiums, the employer will not be subject to debarment or civil penalties if it pays the monies in dispute into a holding account maintained by the City for such purpose. Such disputed monies shall be presented to a neutral arbitrator for binding arbitration. The arbitrator shall determine whether such monies shall be disbursed, in whole or in part, to the employer or to the employees in question. Regulations promulgated by the DAA shall establish the framework and procedures of such arbitration process. The cost of arbitration shall be borne by the City, unless the arbitrator determines that the employer's position in the matter is frivolous, in which event the arbitrator shall assess the employer for the full cost of the arbitration. Interest earned by the City on monies held in the holding account shall be added to the principal sum deposited, and the monies shall be disbursed in accordance with the arbitration award. A service charge for the cost of account maintenance and service may be deducted therefrom.

(e)   Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (d), Para. (1), Ord. No. 173,747, Eff. 2-24-01.

### Sec. 10.37.7. Administration.

The City Council shall by resolution designate a department or office, which shall promulgate rules for implementation of this article and otherwise coordinate administration of the requirements of this article ("**designated administrative agency**" - DAA). The DAA shall monitor compliance, including the investigation of claimed violations, and shall promulgate implementing regulations consistent with this article. The DAA shall also issue determinations that persons are City financial assistance recipients, that particular contracts shall be regarded as "**service contracts**" for purposes of Section 10.37.1(j), and that particular leases and licenses shall be regarded as "**public leases**" or "**public licenses**" for purposes of Section 10.37.1(i), when it receives an application for a determination of non-coverage or exemption as provided for in Section 10.37.13. The DAA shall also establish employer reporting requirements on employee compensation and on notification about and usage of the federal Earned Income Credit referred to in Section 10.37.4. The DAA shall report on compliance to the City Council no less frequently than annually.

During the first, third, and seventh years of this article's operation since May 5, 1997, and every third year thereafter, the Office of Administrative and Research Services and the Chief Legislative Analyst shall conduct or commission an evaluation of this article's operation and effects. The evaluation shall specifically address at least the following matters:

(a)   how extensively affected employers are complying with the article;

(b)   how the article is affecting the workforce composition of affected employers;

(c)   how the article is affecting productivity and service quality of affected employers;

(d)   how the additional costs of the article have been distributed among workers, their employers, and the City. Within ninety days of the adoption of this article, these offices

Exhibit 2 Page 25

shall develop detailed plans for evaluation, including a determination of what current and future data will be needed for effective evaluation.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99; Ord. No. 173,285, Eff. 6-26-00, Oper. 7-1-00; Ord. No. 173,747, Eff. 2-24-01.

### Sec. 10.37.8.  Exclusion of Service Contracts from Competitive Bidding Requirement.

Service contracts otherwise subject to competitive bid shall be let by competitive bid if they involve the expenditure of at least two-million dollars ($2,000,000).  Charter Section 372 shall not be applicable to service contracts.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99; Ord. No. 173,285, Eff. 6-26-00, Oper. 7-1-00.

### Sec. 10.37.9.  Coexistence with Other Available Relief for Specific Deprivations of Protected Rights.

This article shall not be construed to limit an employee's right to bring legal action for violation of other minimum compensation laws.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.10.  Expenditures Covered.

This article shall apply to the expenditure - whether through aid to City financial assistance recipients, service contracts let by the City, or service contracts let by its financial assistance recipients - of funds entirely within the City's control and to other funds, such as federal or state grant funds, where the application of this article is consonant with the laws authorizing the City to expend such other funds.

SECTION HISTORY

Added by Ord. No. 171,547, Eff. 5-5-97.
Amended by:  In Entirety, Ord. No. 172,336, Eff. 1-14-99.

### Sec. 10.37.11.  Timing of Application.

(a)   **Original 1997 Ordinance.**  The provisions of this article as enacted by City Ordinance
Exhibit 2 Page 26

No.171,547, effective May 5, 1997, shall apply to

   (1)   contracts consummated and financial assistance provided after such date,

   (2)   contract amendments consummated after such date and before the effective date of the 1998 ordinance which themselves met the requirements of former Section 10.37.1(h) (definition of "**service contract**") or which extended contract duration, and

   (3)   supplemental financial assistance provided after May 5, 1997 and before the effective date of the 1998 ordinance which itself met the requirements of Section 10.37.1(c).

   (b)   **1998 Amendment.**   The provisions of this article as amended by the 1998 ordinance shall apply to

   (1)   service contracts, public leases or licenses, and financial assistance agreements consummated after the effective date of such ordinance and

   (2)   amendments, consummated after the effective date of such ordinance, to service contracts, public leases or licenses, and financial assistance agreements that provide additional monies or which extend term.

   (c)   **2000 amendment.**   The provisions of this article as amended by the 2000 ordinance shall apply to

   (1)   service contracts, public leases or public licenses and City financial assistance recipient agreements consummated after the effective date of such ordinance and

   (2)   amendments to service contracts, public leases or licenses and City financial assistance recipient agreements which are consummated after the effective date of such ordinance and which provide additional monies or which extend the term.

   (d)   **2009 Amendment.**   The provisions of this article as amended by the 2009 ordinance shall become operative ninety (90) days following the effective date of the 2009 ordinance.

SECTION HISTORY

   Added by Ord. No. 171,547, Eff. 5-5-97.
   Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99; Subsec. (b), Subsec. (c) Added, Ord. No. 173,747, Eff. 2-24-01; Subsec. (d) Added, Ord. No. 180,877, Eff. 10-19-09.

### Sec. 10.37.12.  Supersession by Collective Bargaining Agreement.

   Parties subject to this article may by collective bargaining agreement provide that such agreement shall supersede the requirements of this article.

SECTION HISTORY

   Added by Ord. No. 171,547, Eff. 5-5-97.
   Amended by: In Entirety, Ord. No. 172,336, Eff. 1-14-99.

Exhibit 2 Page 27

### Sec. 10.37.13. Liberal Interpretation of Coverage; Rebuttable Presumption of Coverage.

The definitions of "**City financial assistance recipient**" in Section 10.37.1(c), of "**public lease or license**" in Section 10.37.1(i), and of "**service contract**" in Section 10.37.1(j) shall be liberally interpreted so as to further the policy objectives of this article. All recipients of City financial assistance meeting the monetary thresholds of Section 10.37.1(c), all City leases and licenses (including subleases and sublicenses) where the City is the lessor or licensor, and all City contracts providing for services that are more than incidental, shall be presumed to meet the corresponding definition just mentioned, subject, however, to a determination by the DAA of non-coverage or exemption on any basis allowed by this article, including, but not limited to, non-coverage for failure to satisfy such definition. The DAA shall by regulation establish procedures for informing persons engaging in such transactions with the City of their opportunity to apply for a determination of non-coverage or exemption and procedures for making determinations on such applications.

SECTION HISTORY

Added by Ord. No. 172,336, Eff. 1-14-99.
Amended by: Ord. No. 173,747, Eff. 2-24-01.

### Sec. 10.37.14. Severability.

If any provision of this article is declared legally invalid by any court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

SECTION HISTORY

Added by Ord. No. 172,336, Eff. 1-14-99.

# EXHIBIT 3

ORDINANCE NO. _____178084_____

An ordinance adding Article 4 to Chapter XVIII of the Los Angeles Municipal Code to require LAX-area hotels to pass along service charges to those hotel service workers who render the services for which the charges are collected.

## THE PEOPLE OF THE CITY OF LOS ANGELES
## DO ORDAIN AS FOLLOWS:

Section 1.  A new Article 4 is added to Chapter XVIII of the Los Angeles Municipal Code to read:

### ARTICLE 4

### HOTEL SERVICE CHARGE REFORM ORDINANCE

**SEC. 184.00.  PURPOSE.**

The Los Angeles International Airport (LAX) is among the world's busiest airports, hosting millions of travelers every year.  The City of Los Angeles (City) operates and maintains LAX, and as a result of this support the businesses in the area adjacent to LAX reap significant economic benefits.  In particular, the hotels in the LAX area enjoy the highest occupancy rate of all Los Angeles hotels due to their proximity to LAX.

Despite the high occupancy rates of hotels in the LAX area, many of these hotels fail to pay their service workers a living wage which in the City is currently $10.64 per hour without health benefits or $9.39 per hour with health benefits.  Because of the low hourly wages paid by these hotels, service employees naturally rely on gratuities paid by hotel customers.

In recent years, hotels in the LAX area have instituted the practice of adding a "service charge" of 15% to 20% of the bill for banquets and other large group events. The service charge is typically listed as a line item on the bill.  Some hotels pass a portion of the service charge to the workers who actually performed the services, while other hotels retain the entire service charge.  Currently, there is nothing illegal about this practice.  Since hotels have instituted the practice of adding service charges to bills, many hotel workers have reported a significant reduction in the gratuities they receive from hotel guests.  Thus, many hotel customers reduce or eliminate gratuities (tips) they would otherwise pay to service workers because they assume that the workers receive the "service charges," which are added to their bills.

By way of this ordinance, the City seeks to improve the welfare of service workers at the LAX-area hotels by ensuring that they receive decent compensation for the work they perform.  Accordingly, to the extent that LAX-area hotels institute or continue the practice of charging their customers "service charges," they will be required

1

Exhibit 3 Page 29

by this ordinance to pass the entire service charge on to the workers who actually performed the services for which the service charges are billed. Whereas the LAX-area hotels derive a distinct benefit from their location near LAX, they have both the ability and responsibility to support the local workforce by engaging in fair employment practices.

## SEC. 184.01. DEFINITIONS.

The following definitions shall apply to this chapter:

A. **"City"** means the City of Los Angeles.

B. **"Hotel"** means a residential building located within the area designated by ordinance as the Gateway to LA (Century Corridor) Property Business Improvement District (Century Corridor PBID) that is designated or used for lodging and other related services for the public, and containing 50 or more guest rooms, or suites of rooms. "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose, or providing services at the building. If the Century Corridor PBID ceases to exist, the boundaries at the time of dissolution shall remain in effect for purposes of this article.

C. **"Hotel Employer"** means a Person who owns, controls, and/or operates a Hotel, or a Person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the Hotel's purpose, or a Person who provides services at the Hotel.

D. **"Hotel Worker"** means any individual (1) whose primary place of employment is at a Hotel, (2) who is employed directly by the Hotel Employer or by a Person who has contracted with the Hotel Employer to provide services at the Hotel, and (3) who performs a service for which the Hotel Employer imposes a Service Charge. "Hotel Worker" does not include a managerial, supervisory, or confidential employee.

E. **"Person"** means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

F. **"Service Charge"** means all separately-designated amounts collected by a Hotel Employer from customers that are for service by Hotel Workers, or are described in such a way that customers might reasonably believe that the amounts are for those services, including but not limited to those charges designated on receipts under the term "service charge," "delivery charge," or "porterage charge."

G. **"Willful Violation"** means that the Hotel Employer deliberately failed or refused to comply with its provisions of this article.

2

Exhibit 3 Page 30

**SEC. 184.02.  HOTEL EMPLOYERS' RESPONSIBILITIES.**

A.  Service Charges shall not be retained by the Hotel Employer but shall be paid in the entirety by the Hotel Employer to the Hotel Worker(s) performing services for the customers from whom the Service Charges are collected.  No part of these amounts may be paid to supervisory or managerial employees.  The amounts shall be paid to Hotel Worker(s) equitably and according to the services that are or appear to be related to the description of the amounts given by the hotel to the customers.  The amounts shall be paid to the Hotel Workers in the next payroll following collection of an amount from the customer.  Without limitation of the foregoing:

    1.  Amounts collected for banquets or catered meetings shall be paid equally to the Hotel Workers who actually work the banquet or catered meeting; and

    2.  Amounts collected for room service shall be paid to the Hotel Workers who actually deliver food and beverage associated with the charge.

    3.  Amounts collected for porterage service shall be paid to the Hotel Workers who actually carry the baggage associated with the charge.

B.  This section does not apply to any tip, gratuity, money, or part of any tip, gratuity, or money that has been paid or given to or left for a Hotel Worker by customers over and above the actual amount due for services rendered or for goods, food, drink, or articles sold or served to the customer.

**Sec. 184.03.  RETALIATIORY ACTION PROHIBITED.**

A.  No Hotel Employer employing Hotel Workers shall discharge, reduce in compensation, or otherwise discriminate against any Hotel Worker for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

**Sec. 184.04.  ENFORCEMENT.**

A.  A Hotel Worker claiming violation of this article may bring an action in the Superior Court of the State of California, as appropriate, against a Hotel Employer and may be awarded:

    1.  For failure to pay Service Charges required by this article – Service Charge reimbursement for each violation.

    2.  For retaliatory action -- reinstatement, back pay, Service Charge reimbursement or other equitable relief the court may deem appropriate.

3. For Willful Violations, the amount of monies to be paid under Paragraphs 1 and 2 shall be trebled.

B. If a Hotel Worker is the prevailing party in any legal action taken pursuant to this article, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C. Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

## SEC. 184.05.  EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT.

All of the provisions of this article, or any part of this article, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in the agreement in clear and unambiguous terms.  Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute, or be permitted, as a waiver of all or any part of the provisions of this article.

## SEC. 184.06.  NO WAIVER OF RIGHTS.

Except for bona fide collective bargaining agreements, any waiver by a Hotel Worker of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable.  Any attempt by a Hotel Employer to have a Hotel Worker waive rights given by this article shall constitute a violation of this article.

## SEC. 184.07.  COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR SPECIFIC DEPRIVATIONS OF PROTECTED RIGHTS.

This article shall not be construed to limit a Hotel Worker's right to bring legal action for violation of other minimum compensation laws.

## SEC. 184.08. SEVERABILITY.

If any provision of this article is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

4

Exhibit 3 Page 32

Sec. 2.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that the foregoing ordinance was introduced at the meeting of the Council of the City of Los Angeles NOV 1 5 2006 , and was passed at its meeting of NOV 2 2 2006 .

FRANK T. MARTINEZ, City Clerk

By _____
                                        Deputy

Approved NOV 2 2 2006 _____

_____
                                        Mayor

Approved as to Form and Legality

ROCKARD J. DELGADILLO, City Attorney

By _Claudia culling for_
      ADRIENNE KHORASANEE
      Deputy City Attorney

Date _10/17/06_

File No. _06-0362_

5

Exhibit 3 Page 33

EXHIBIT 4



Los Angeles Municipal Code

# ARTICLE 4
# HOTEL SERVICE CHARGE REFORM ORDINANCE

**(Added by Ord. No. 178,084, Eff. 12/30/06.)**

Section

184.00  Purpose.
184.01  Definitions.
184.02  Hotel Employers' Responsibilities.
184.03  Retaliatory Action Prohibited.
184.04  Enforcement.
184.05  Exemption for Collective Bargaining Agreement.
184.06  No Waiver of Rights.
184.07  Coexistence with Other Available Relief for Specific Deprivations of Protected Rights.
184.08  Severability.
184.09  Administration.

### SEC. 184.00.  PURPOSE.

The Los Angeles International Airport (LAX) is among the world's busiest airports, hosting millions of travelers every year.  The City of Los Angeles (City) operates and maintains LAX, and as a result of this support the businesses in the area adjacent to LAX reap significant economic benefits.  In particular, the hotels in the LAX area enjoy the highest occupancy rate of all Los Angeles hotels due to their proximity to LAX.

Despite the high occupancy rates of hotels in the LAX area, many of these hotels fail to pay their service workers a living wage which in the City is currently $10.64 per hour without health benefits or $9.39 per hour with health benefits.  Because of the low hourly wages paid by these hotels, service employees naturally rely on gratuities paid by hotel customers.

In recent years, hotels in the LAX area have instituted the practice of adding a "service charge" of 15% to 20% of the bill for banquets and other large group events.  The service charge is typically listed as a line item on the bill.  Some hotels pass a portion of the service charge to the workers who actually performed the services, while other hotels retain the entire service charge.  Currently, there is nothing illegal about this practice.  Since hotels have instituted the practice of adding service charges to bills, many hotel workers have reported a significant reduction in the gratuities they receive from hotel guests.  Thus, many hotel customers reduce or eliminate gratuities (tips) they would otherwise pay to service workers because they assume that the workers receive the "service charges," which are added to their bills.

By way of this ordinance, the City seeks to improve the welfare of service workers at the LAX-area hotels by ensuring that they receive decent compensation for the work they perform.

Exhibit 4 Page 34

Accordingly, to the extent that LAX-area hotels institute or continue the practice of charging their customers "service charges," they will be required by this ordinance to pass the entire service charge on to the workers who actually performed the services for which the service charges are billed. Whereas the LAX-area hotels derive a distinct benefit from their location near LAX, they have both the ability and responsibility to support the local workforce by engaging in fair employment practices.

### SEC. 184.01.  DEFINITIONS.

The following definitions shall apply to this chapter:

A.  **"City"** means the City of Los Angeles.

B.  **"Hotel"** means a residential building located within the area designated by ordinance as the Gateway to LA (Century Corridor) Property Business Improvement District (Century Corridor PBID) that is designated or used for lodging and other related services for the public, and containing 50 or more guest rooms, or suites of rooms.  "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose, or providing services at the building.  If the Century Corridor PBID ceases to exist, the boundaries at the time of dissolution shall remain in effect for purposes of this article.

C.  **"Hotel Employer"** means a Person who owns, controls, and/or operates a Hotel, or a Person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the Hotel's purpose, or a Person who provides services at the Hotel.

D.  **"Hotel Worker"** means any individual (1) whose primary place of employment is at a Hotel, (2) who is employed directly by the Hotel Employer or by a Person who has contracted with the Hotel Employer to provide services at the Hotel, and (3) who performs a service for which the Hotel Employer imposes a Service Charge.  "Hotel Worker" does not include a managerial, supervisory, or confidential employee.

E.  **"Person"** means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

F.  **"Service Charge"** means all separately-designated amounts collected by a Hotel Employer from customers that are for service by Hotel Workers, or are described in such a way that customers might reasonably believe that the amounts are for those services, including but not limited to those charges designated on receipts under the term "service charge," "delivery charge," or "porterage charge."

G.  **"Willful Violation"** means that the Hotel Employer deliberately failed or refused to comply with its provisions of this article.

### SEC. 184.02.  HOTEL EMPLOYERS' RESPONSIBILITIES.

Exhibit 4 Page 35

A.   Service Charges shall not be retained by the Hotel Employer but shall be paid in the entirety by the Hotel Employer to the Hotel Worker(s) performing services for the customers from whom the Service Charges are collected.  No part of these amounts may be paid to supervisory or managerial employees.  The amounts shall be paid to Hotel Worker(s) equitably and according to the services that are or appear to be related to the description of the amounts given by the hotel to the customers. The amounts shall be paid to the Hotel Workers in the next payroll following collection of an amount from the customer.  Without limitation of the foregoing:

1.   Amounts collected for banquets or catered meetings shall be paid equally to the Hotel Workers who actually work the banquet or catered meeting; and

2.   Amounts collected for room service shall be paid to the Hotel Workers who actually deliver food and beverage associated with the charge.

3.   Amounts collected for porterage service shall be paid to the Hotel Workers who actually carry the baggage associated with the charge.

B.   This section does not apply to any tip, gratuity, money, or part of any tip, gratuity, or money that has been paid or given to or left for a Hotel Worker by customers over and above the actual amount due for services rendered or for goods, food, drink, or articles sold or served to the customer.

### SEC. 184.03.  RETALIATORY ACTION PROHIBITED.

A.   No Hotel Employer employing Hotel Workers shall discharge, reduce in compensation, or otherwise discriminate against any Hotel Worker for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

### SEC. 184.04.  ENFORCEMENT.

A.   A Hotel Worker claiming violation of this article may bring an action in the Superior Court of the State of California, as appropriate, against a Hotel Employer and may be awarded:

1.   For failure to pay Service Charges required by this article – Service Charge reimbursement for each violation.

2.   For retaliatory action – reinstatement, back pay, Service Charge reimbursement or other equitable relief the court may deem appropriate.

3.  For Willful Violations, the amount of monies to be paid under Paragraphs 1 and 2 shall be trebled.

B.   If a Hotel Worker is the prevailing party in any legal action taken pursuant to this article, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C.   Notwithstanding any provision of this Code or any other ordinance to the contrary, no

Exhibit 4 Page 36

criminal penalties shall attach for violation of this article.

## SEC. 184.05.  EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT.

All of the provisions of this article, or any part of this article, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in the agreement in clear and unambiguous terms.  Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute, or be permitted, as a waiver of all or any part of the provisions of this article.

## SEC. 184.06.  NO WAIVER OF RIGHTS.

Except for bona fide collective bargaining agreements, any waiver by a Hotel Worker of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable.  Any attempt by a Hotel Employer to have a Hotel Worker waive rights given by this article shall constitute a violation of this article.

## SEC. 184.07.  COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR SPECIFIC DEPRIVATIONS OF PROTECTED RIGHTS.

This article shall not be construed to limit a Hotel Worker's right to bring legal action for violation of other minimum compensation laws.

## SEC. 184.08.  SEVERABILITY.

If any provision of this article is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

## SEC. 184.09.  ADMINISTRATION.
(Added by Ord. No. 181,199, Eff. 7/24/10.)

The City Council shall by resolution designate the Bureau of Contract Administration to promulgate rules for implementation of this article and otherwise coordinate administration of the requirements of this article.

Exhibit 4 Page 37

# EXHIBIT 5

ORDINANCE NO. 178432

An ordinance adding Article 4 to Chapter X of the Los Angeles Municipal Code to create an Airport Hospitality Enhancement Zone.

**THE PEOPLE OF THE CITY OF LOS ANGELES
DO ORDAIN AS FOLLOWS:**

Section 1.  A new Article 4 is added to Chapter X of the Los Angeles Municipal Code to read:

**ARTICLE 4.
AIRPORT HOSPITALITY ENHANCEMENT ZONE ORDINANCE**

**SEC. 104.101.  PURPOSE.**

The Los Angeles International Airport (LAX) is among the world's busiest airports, hosting millions of travelers every year.  The Century Boulevard Corridor (Corridor) situated immediately adjacent to LAX serves as both the welcome mat to the City and the gateway to LAX.  The Corridor, which greatly and uniquely benefits from its proximity to LAX, could benefit even more from strategic public investments, especially infrastructure improvements, neighborhood beautification, and a conference center. Accordingly, it is the City's intent to promote the economic vitality of the Corridor by designating it as an Airport Hospitality Enhancement Zone within which the City will target new City resources, investment and benefits.

The hotels in the Corridor will not only derive significant and unique business benefits from their close proximity to LAX, a major public and City asset that produces numerous patrons of these hotels on a daily basis, but from the City's designation of the Corridor as an Airport Hospitality Enhancement Zone.  These benefits are unique as compared to any other industry in any other region of the City.  Accordingly, the City finds that it is appropriate to impose a regulatory requirement to pay a living wage on certain hotels in the Corridor, a requirement that has not otherwise been imposed except upon companies with certain types of business relationships with the City.  The City, as a provider of social support services and significant benefits through the City's designation of the Corridor as an Airport Hospitality Enhancement Zone, has an interest in promoting an employment environment that protects government resources and engages in responsible employment practices.  In requiring the payment of a higher minimum level of compensation, this article benefits that interest.

By way of this ordinance, the City seeks to improve and encourage the continuing growth and development of the business community in the Century Boulevard Corridor, while simultaneously improving the welfare of service workers at LAX-area hotels by ensuring that they receive decent compensation for the work they perform.  This ordinance provides for an investment in the workers, the local

1

Exhibit 5 Page 38

businesses, and the City at large by setting forth a plan that supports the labor and business communities located in the area adjacent to LAX.

## SEC. 104.102.  DEFINITIONS.

The following definitions shall apply to this article:

A.  **"City"** means the City of Los Angeles.

B.  **"Hotel"** means a residential building located within the Airport Hospitality Enhancement Zone that is designated or used for lodging and other related services for the public, and containing 50 or more guest rooms, or suites of rooms.  "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose or providing services at the building.  If the Century Corridor ) Property Business Improvement District ceases to exist, the boundaries at the time of dissolution shall remain in effect for purposes of this article.

C.  **"Hotel Employer"** means a Person who owns, controls, and/or operates a Hotel, or a Person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the Hotel's purpose, or a Person who provides services at the Hotel.

D.  **"Hotel Worker"** means any individual (1) whose primary place of employment is at a Hotel, and (2) who is employed directly by the Hotel Employer, or by a Person who has contracted with the Hotel Employer to provide services at the Hotel. "Hotel Worker" does not include a managerial, supervisory, or confidential employee.

E.  **"Person"** means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

F.  **"Service Charge"** means all separately-designated amounts collected by a Hotel Employer from customers that are for service by Hotel Workers, or are described in such a way that customers might reasonably believe that the amounts are for the service, including but not limited to those charges designated on receipts under the term "service charge," "delivery charge," or "porterage charge."

G.  **"Willful Violation"** means that the Hotel Employer deliberately failed or refused to comply with the provisions of this article.

## SEC. 104.103.  THE AIRPORT HOSPITALITY ENHANCEMENT ZONE.

A.  **Establishment of Zone.**  There is hereby established an Airport Hospitality Enhancement Zone.  The Airport Hospitality Enhancement Zone shall be the area designated by the boundaries of the Gateway to LA (Century Corridor) Property

2

Exhibit 5 Page 39

Business Improvement District (Century Corridor PBID), established by Ordinance Number 177211.

B. **Enhancements**. The City shall create enhanced and expanded City investments and incentives in the Airport Hospitality Enhancement Zone, including:

1. Conference Center

a. The City shall complete within 180 days of the effective date of the ordinance a study of possible locations for a conference center, including consideration of sites under control of City or LAWA.

b. The City shall complete within 180 days of the effective date of the ordinance a study of possible mechanisms to finance the construction and establishment of a conference center in the Airport Hospitality Enhancement Zone.

c. The City shall investigate LAWA participation in the financing of a conference center in the Airport Hospitality Enhancement Zone.

2. Workforce Development

a. CDD shall implement within 180 days of the effective date of the ordinance a workforce training program, which shall include one or more of customer service training, hospitality training, management training, and/or culinary arts training, for Hotel Workers. Training will occur at a location within the Airport Hospitality Enhancement Zone or within close proximity to the Airport Hospitality Enhancement Zone. Program(s) shall train 120 Hotel Workers per year for five years beginning in FY 2007-08. The City shall determine appropriate funding from among federal, state, and City funds.

b. CDD shall facilitate the provision of English as a Second Language courses by the Los Angeles Unified School District Adult Education Division or the Los Angeles Community College District, to Hotel Workers, with courses provided at Hotels where feasible and requested by Hotels in the Airport Hospitality Enhancement Zone.

3. Marketing

a. The City shall cause to be developed a program to market Hotels and other services in the Airport Hospitality Enhancement Zone.

b. The City shall grant $50,000 to the Century Corridor BID to prepare a market analysis and to develop materials and data from the

3

Exhibit 5 Page 40

analysis to use in attracting new business to the Airport Hospitality Enhancement Zone.

4. Business Development

a. In order to address office vacancy and generate business for Hotels in the Airport Hospitality Enhancement Zone, the Office of Finance shall develop and recommend within 90 days of the effective date of this ordinance a time-limited cap or reduction in business taxes for businesses that relocate from outside the City to vacant space in the Airport Hospitality Enhancement Zone.

b. In order to address the need for retail and restaurant services in the area and to generate business for Hotels in the Airport Hospitality Enhancement Zone, the Office of Finance shall develop and recommend within 90 days of the effective date of this ordinance a time-limited cap or reduction in business taxes for retail and restaurant businesses that open a new location in the Zone without closing any other location, if any, in the City.

5. Street Improvements

a. Bureau of Street Services shall develop and implement a program of directional/navigational signage to direct drivers to Hotels, rental car agencies, and other airport-related services in the Airport Hospitality Enhancement Zone.

b. Within nine months of the effective date of this ordinance, Bureau of Street Services shall commence construction of a $1 million set of street improvements, including new median islands, landscaping, refurbishment, and signage, for the portion of Century Boulevard between Aviation Boulevard and La Cienega Boulevard.

c. Bureau of Street Services shall develop within 60 days of the effective date of this ordinance a plan to expedite needed street and alley resurfacing and sidewalk repair in the Airport Hospitality Enhancement Zone, and shall commence this plan within 180 days of the effective date of this ordinance.

d. CAO and Bureau of Street Services shall report within 60 days of the effective date of this ordinance on options to finance and commence within one year construction of needed new sidewalks in the Airport Hospitality Enhancement Zone to facilitate pedestrian access from Hotels to public transit.

4

Exhibit 5 Page 41

6. Remote Check-In

CDD shall work with LAWA to facilitate the establishment of remote check-in facilities at each interested Hotel in Zone, including providing assistance as necessary to expedite or prioritize the establishment of these facilities as the network of region wide check-in locations grows.

7. Power Rate Incentive

The City shall investigate the feasibility of extending existing Enterprise and Empowerment Zone subsidized rate for electric power, or creating a new business development incentive rate to reduce office vacancy for buildings located within the Airport Hospitality Enhancement Zone.

8. Integrated Waste Management

In order to assist in realizing cost savings on hauling fees, Bureau of Sanitation shall work with interested businesses in the Airport Hospitality Enhancement Zone and Century Corridor BID to develop and implement within one year of the effective date of this ordinance a joint recycling and waste diversion program. Bureau of Sanitation's offered technical assistance shall include assistance in preparation of necessary bid documents, assistance in review of proposals and contract negotiations, preparation of outreach materials for staff, and training of staff.

## SEC. 104.104. PAYMENT OF MINIMUM COMPENSATION TO HOTEL WORKERS.

A. **Wages.** In accordance with section 104.106 of this article, Hotel Employers shall pay Hotel Workers a wage of no less than the hourly rates set under the authority of this article. The minimum compensation for each Hotel Worker shall be at least $9.39 per hour with health benefits, not including gratuities, Service Charge distributions, or bonuses, or $10.64 per hour without health benefits, not including gratuities, Service Charge distributions, or bonuses. These rates shall continue to be adjusted annually to correspond with adjustments, if any, to the Consumer Price Index for Urban Wage Earners and Clerical Workers in Los Angeles-Riverside Counties.

B. **Compensated Days Off.** Hotel Employers shall provide Hotel Workers at least twelve accrued compensated days off per year for sick leave, vacation, or personal necessity at the Hotel Worker's request. Hotel Employers shall also permit Hotel Workers to take at least an additional ten accrued days a year of uncompensated time to be used for sick leave for the illness of the Hotel Worker or a member of his or her immediate family where the Hotel Worker has exhausted his or her compensated days off for that year.

5

Exhibit 5 Page 42

C. **Mandatory Study**. After one year from the effective date of this ordinance, the CAO shall conduct a study and evaluation of the effect of this article on Hotels, Hotel customers, and Hotel Workers in the Airport Hospitality Enhancement Zone.

    1.  The study shall include consideration of:

        a.  the economic impact of the living wage requirement on Hotels and Hotel Workers, including any effects on worker retention and /or training;

        b.  the effects of having a non-tiered living wage requirement that applies to tipped and non-tipped Hotel Workers alike, including any wage compression among hotel employees and the effects of such compression on worker retention; and

        c.  the impact of the enhancements described in section 104.103 on Hotel customer base, income, and retention and training of Hotel Workers.

    2.  If the study is not completed within 15 months from the date of the effective date of this ordinance, the living wage provisions of this ordinance shall be suspended until the report is completed.

## SEC. 104.105. HEALTH BENEFITS.

A. **Rate**. Health benefits under this article shall consist of the payment of at least $1.25 per hour towards the provision of health care benefits for Hotel Workers and their dependents. Proof of the provision of these benefits must be kept on file by the Hotel Employer, if applicable.

B. **Mandatory Study**. Within six months of the effective date of this ordinance, the CAO shall complete a study of health benefits availability for Hotel Workers.

    1.  The study shall include consideration of:

        a.  available health benefits plans at businesses with similarly-sized employment forces, whether such plans generally require employee contribution and/or co-payments, and the amount of such employee contributions and/or co-payments;

        b.  prevailing, well-supported expert views, if any, on whether employee contributions and/or co-payments have a negative or positive effect on the cost of health care or on the quality of health care provided; and

6

Exhibit 5 Page 43

c. the City's ability, including applicable legal constraints, to secure high-quality health benefits for workers through regulation such as this article.

2. Upon completion of the study, the CAO shall also recommend whether the City should consider adjusting its living wage regulation for those Hotel Employers providing health benefits, for example by increasing the amount of the health benefits credit available to Hotel Employer or by permitting reasonable employee contributions or co-payments limited by regulation. If the study is not completed within 9 months from the date of the effective date of this ordinance, the living wage provisions of this ordinance shall be suspended until the report is completed.

C. This article is not intended to decrease the availability or utilization of employer-provided health benefits. The Hotel Employer has the sole choice whether or not to offer health benefits within the meaning of the section.

## SEC. 104.106.  INCREMENTAL APPLICATION OF LIVING WAGE PROVISIONS.

A. Upon the effective date of this ordinance, Hotel Employers shall pay Hotel Workers no less than $8.25 per hour with health benefits, not including gratuities, Service Charge distributions, or bonuses, or $9.50 per hour without health benefits, not including gratuities, Service Charge distributions, or bonuses.

B. On July 1, 2007, Hotel Workers shall be paid a living wage in its entirety, as required by section 104.104.A of this ordinance.

C. On January 1, 2008, Hotel Workers shall receive their first annual living wage adjustment, as specified in section 104.104.A of this ordinance, which requires annual adjustments to correspond to changes, if any, to the Consumer Price Index for Urban Wage Earners and Clerical Workers in Los Angeles-Riverside Counties.

## SEC. 104.107.  NOTIFYING HOTEL WORKERS OF THEIR POTENTIAL RIGHT TO THE FEDERAL EARNED INCOME CREDIT.

Hotel Employers shall inform Hotel Workers making less than $12 per hour of their possible right to the federal Earned Income Credit (EIC) under Section 32 of the Internal Revenue Code of 1954, 26 U.S.C. Section 32, and shall make available to Hotel Workers forms informing them about the EIC and forms required to secure advance EIC payments from the Hotel Employer.

## SEC. 104.108.  RETALIATORY ACTION PROHIBITED.

A. No Hotel Employer shall discharge, reduce in compensation, or otherwise discriminate against any Hotel Worker for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or

7

Exhibit 5 Page 44

her rights under this article by any lawful means, or for otherwise asserting rights under this article.

## SEC.104.109.  ENFORCEMENT.

A.  A Hotel Worker claiming violation of this article may bring an action in the Superior Court of the State of California against a Hotel Employer and may be awarded:

1.  For failure to pay wages required by this article -- backpay for each day during which the violation continued.

2.  For failure to pay health benefits -- the differential between the wage required by this article without benefits and the wage with benefits, less amounts paid, if any, toward health benefits.

3.  For retaliatory action -- reinstatement, backpay, and other legal or equitable relief the court may deem appropriate.

4.  For Willful Violations, the amount of monies to be paid under Paragraphs 1 through 3 shall be trebled.

B.  If a Hotel Worker is the prevailing party in any legal action taken pursuant to this section, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C.  Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

## SEC. 104.110.  EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT.

All of the provisions of this article, or any part of the article, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in that agreement in clear and unambiguous terms.  Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute or be permitted as a waiver of all or any part of the provisions of this article.

## SEC. 104.111.  ONE-YEAR WAIVER FOR CERTAIN HOTEL EMPLOYERS

This article is not intended to cause reduction in employment or work hours for Hotel Workers.  Therefore, a Hotel Employer that demonstrates to the Controller, by compelling evidence, that compliance with this article would require the Hotel Employer to reduce its workforce by more than 20 percent or curtail its Hotel Workers' total work hours by more than 30 percent, in order to avoid bankruptcy or a shutdown of the Hotel, may receive a waiver, valid for no more than one year, from the requirements in this article.  The Controller shall reach a determination only after reviewing and auditing, if

8

Exhibit 5 Page 45

necessary, the Hotel Employer's financial condition, with such review or audit paid for, at rates set by the Controller, by the Hotel Employer.  The Controller's determination on a waiver application shall be subject to review and reversal by a two-thirds vote of the City Council within 10 business days of the Controller's determination.

### SEC. 104.112.  NO WAIVER OF RIGHTS.

Except for bona fide collective bargaining agreements, any waiver by a Hotel Worker of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable.  Any attempt by a Hotel Employer to have a Hotel Worker waive rights given by this article shall constitute a violation of this article.

### SEC. 104.113.  COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR SPECIFIC DEPRIVATIONS OF PROTECTED RIGHTS.

This article shall not be construed to limit a Hotel Worker's right to bring legal action for violation of other minimum compensation laws.

### SEC. 104.114.  PROCEDURES FOR FURTHER REGULATION.

A.  The City shall not impose new regulatory requirements to pay a living wage exceeding applicable state or federal minimum wage requirements upon any business entity that does not have a business relationship with the City of Los Angeles in the future unless the City Council first secures a study that looks at the effects such a regulation would have:

    1.  on the industry and/or geographic location targeted, including any potential relocation or cessation of any business;

    2.  on the consumers or clients served by the industry and/or geographic location, including any increase in pricing they might face; and

    3.  on the city's and/or geographic location's ability to retain and attract new business to the area.

Such a study shall include an opportunity for public input, and the City Council will hear public testimony regarding the study at least two weeks before acting on any living wage proposal.

B.  The City shall not impose new regulatory requirements to pay a living wage unless the industry and region to be regulated receive business benefits stemming from a City asset that match or exceed the benefit from proximity to LAX received by Hotels in the Airport Hospitality Enhancement Zone.  Such benefits must be significant, but shall not include any of the following:

9

Exhibit 5 Page 46

      1.  use of city streets or sidewalks by customers or employees to access the businesses;

      2.  purchase of water and/or electrical power by the businesses from the City or Department of Water and Power;

      3.  provision of ordinary police, fire, and paramedic services to persons at the businesses;

      4.  City refuse collection from the businesses;

      5.  building or premises inspection by City departments for safety, emergency preparedness, and/or compliance with applicable regulation;

      6.  business or customer use of City facilities open to the general public; or

      7.  any other City service provided throughout the City to the general public and /or private businesses.

    C.  Notwithstanding the foregoing, the City shall not apply the requirements in the preceding section if the industry to be regulated has so many employees being paid less than living wage as to have a significant negative effect on the City economy as a whole.  The industry in question must have more than 15,000 employees working in the City.  Before acting on such a proposal, the City Council will request a panel of three economists to submit a written report to Council presenting their expert opinion as to whether the industry to be regulated has more than 15,000 employees working in the City and that the number of employees being paid less than a living wage is so substantial as to have a significant negative effect on the City economy as a whole.  The panel of three economists shall have one member selected by the County Federation of Labor, one member selected by the Los Angeles Area Chamber of Commerce, and one member selected by the other two members.

    D.  None of the procedures or intended requirements in this section shall apply to any living wage regulation that the City Council and Mayor decide to place before the voters for approval before the regulation takes effect.

## SEC. 104.115. SEVERABILITY.

    If any provision of this article is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect, excepting only that if section 104.104.A is held invalid, then section 104.103.B shall also be considered invalid and of no effect.

10

Exhibit 5 Page 47

Sec. 2.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that the foregoing ordinance was introduced at the meeting of the Council of the City of Los Angeles of **FEB 1 3 2007** and was passed at its meeting of **FEB 2 1 2007**.

FRANK T. MARTINEZ, City Clerk

By _____
                                              Deputy

Approved _____ FEB 2 6 2007 _____

_____
                                              Mayor

Approved as to Form and Legality

ROCKARD J. DELGADILLO, City Attorney

By _____
THERESA STAMUS
Assistant City Attorney

Date _February 13, 2007_

File No. _06-0362-S3_

11

Exhibit 5 Page 48

# EXHIBIT 6



Los Angeles Municipal Code

# ARTICLE 4
# AIRPORT HOSPITALITY ENHANCEMENT ZONE ORDINANCE

**(Article Repealed by Ord. No. 183,241, Eff. 11/10/14.)**

**Disclaimer:**
This Code of Ordinances and/or any other documents that appear on this site may not reflect the most current legislation adopted by the Municipality. American Legal Publishing Corporation provides these documents for informational purposes only. These documents should not be relied upon as the definitive authority for local legislation. Additionally, the formatting and pagination of the posted documents varies from the formatting and pagination of the official copy. The official printed copy of a Code of Ordinances should be consulted prior to any action being taken.

For further information regarding the official version of any of this Code of Ordinances or other documents posted on this site, please contact the Municipality directly or contact American Legal Publishing toll-free at 800-445-5588.

© 2015 American Legal Publishing Corporation
techsupport@amlegal.com
1.800.445.5588.

# EXHIBIT 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FORTUNA ENTERPRISES, L.P. d/b/a  )      CV 08-4373 SVW (MANx)
THE LOS ANGELES AIRPORT HILTON   )
HOTEL AND TOWERS, a Delaware     )      STATEMENT OF REASONING
limited partnership,             )      OUTLINING PRIOR DENIAL OF
                                 )      APPLICATION FOR TEMPORARY
              Plaintiff,         )      RESTRAINING ORDER
                                 )
      v.                         )
                                 )
THE CITY OF LOS ANGELES et al.,  )
                                 )
              Defendants.

///

///

Exhibit 7 Page 50

## I.  INTRODUCTION

Petitioner Fortuna Enterprises, L.P. d/b/a/ The Los Angeles Airport Hilton Hotel and Towers ("Petitioner" or "Hilton") alleges that the Airport Hospitality Enhancement Zone Ordinance (the "Ordinance") passed by the City of Los Angeles ("Defendant" or the "City") cannot be constitutionally applied to its hotel.  Petitioner applies for a Temporary Restraining Order granting it relief from the Ordinance. The Court previously denied Petitioner's Application on July 14, 2008. The Court now offers the reasons for its denial in this order.

## II.  FACTUAL BACKGROUND

Ordinance No. 178432, entitled the Airport Hospitality Enhancement Zone Ordinance, was adopted on February 21, 2007 by the Los Angeles City Council (the "Council") (Mot., at 1, 4; Opp., at 3.) This ordinance designates the "Century Boulevard Corridor" situated by the Los Angeles International Airport as an "Airport Hospitality Enhancement Zone" (the "Zone"). LAMC Section 104.101. The stated intent of the Ordinance the Council is to "promote the economic vitality of the Corridor" by targeting city resources in the Zone such as: workforce training programs for hotel workers; a study to construct a conference center; and funds for street improvements. Id. (Mot. at 4-5; Opp. at 3). The Ordinance also sets a minimum wage requirement for all hotels containing 50 or more guest rooms  within the Zone. However, the ordinance allows a hotel to avoid these

1    requirements if it can demonstrate that the Ordinance's requirements
2    are burdensome or if its workers have agreed to a waiver through a
3    collective bargaining agreement. LAMC Sections 104.110-111.

4        The Ordinance was scheduled to take effect on July 5, 2008. On
5    July 3, 2008 Plaintiffs requested a writ of mandate in Los Angeles
6    Superior Court. Defendant removed the case to this Court on July 2,
7    2008. Plaintiff filed the present Application for a Temporary
8    Restraining Order on July 7, 2007. The Court denied Plaintiff's
9    Application on July 14, 2008.

10

11   **III.  ANALYSIS**

12

13       **A.    Legal Standard for a Temporary Restraining Order ("TRO")**

14

15       Under Rule 65(b) of the Federal Rules of Civil Procedure, a
16   temporary restraining order may be granted without written or oral
17   notice to the adverse party or that party's attorney. Fed. R. Civ.
18   P. 65(b).[1] However, where, as here, the adverse party or that party's
19   attorney has received notice, the application may be treated as one
20   for a preliminary injunction.  See, e.g., Cumulus Media Inc. v.

21

22   _____
     [1] Rule 65(b) provides:
23           A temporary restraining order may be granted without written or
         oral notice to the adverse party or that party's attorney only
24       if (1) it clearly appears from specific facts shown by affidavit
         or by the verified complaint that immediate and irreparable
25       injury, loss, or damage will result to the applicant before the
         adverse party or that party's attorney can be heard in
26       opposition, and (2) the applicant's attorney certifies to the
         court in writing the efforts, if any, which have been made to
27       give the notice and the reasons supporting the claim that notice
         should not be required.
28   Fed. R. Civ. P. 65(b).

                                3

Exhibit 7 Page 52

1  Donovan, 2004 WL 2958416, at *1 (D. Or. Dec. 20, 2004); Border Power
2  Plant Working Group v. Dep't of Energy, 2003 WL 22331251, at *2 (S.D.
3  Cal. June 4, 2003); 11A Charles Alan Wright et al., Federal Practice
4  & Procedure § 2951, at 254 (2d ed. 1995) ("When the opposing party
5  actually receives notice of the application for a restraining order,
6  the procedure that is followed does not differ functionally from that
7  on an application for a preliminary injunction and the proceeding is
8  not subject to any special requirements." (footnote omitted)).

9       In any event, courts in the Ninth Circuit apply the same
10  standard to motions for a temporary restraining order that they do to
11  motions for a preliminary injunction. See, e.g., DHL Worldwide
12  Network v. Tradebeam, Inc., 2005 WL 196529, at *1 (N.D. Cal. Jan. 28,
13  2005) ("[I]n this circuit the standard for a temporary restraining
14  order is the same as for a preliminary injunction."); League of
15  Wilderness Defenders v. United States Forest Serv., 2004 WL 1068787,
16  at *2 (D. Or. May 12, 2004) (applying the preliminary injunction test
17  in determining whether to issue a temporary restraining order);
18  Ranchers Cattlemen Action Legal Fund v. Dep't of Agric., 2004 WL
19  1047837, at *5 (April 26, 2004) ("The standard for issuing a
20  temporary restraining order is substantially identical to the
21  standard for issuing a preliminary injunction."); Border Power Plant
22  Working Group, 2003 WL 22331251, at *2 ("[T]he Court finds persuasive
23  those cases employing the same standard to resolve a motion for a
24  temporary restraining order as a preliminary injunction."); Brown
25  Jordan Int'l, Inc. v. The Mind's Eye Interiors, Inc., 236 F. Supp. 2d
26  1152, 1154 (D. Haw. 2002) ("The standard for issuing a temporary
27
28

4

Exhibit 7 Page 53

1  restraining order is identical to the standard for issuing a

2  preliminary injunction.").

3

4  **B.   Legal Standard for a Preliminary Injunction**

5

6  In deciding whether to issue a preliminary injunction, a court

7  must balance the plaintiff's likelihood of success against the

8  relative hardship to the parties.  Walczak v. EPL Prolong, Inc., 198

9  F.3d 725, 731 (9th Cir. 1999).  A court may appropriately issue a

10  preliminary injunction where the "plaintiffs demonstrate either: (1)

11  a likelihood of success on the merits and the possibility of

12  irreparable injury; or (2) that serious questions going to the merits

13  were raised and the balance of hardships tips sharply in [their]

14  favor."  S.W. Voter Registration Educ. Project v. Shelley, 344 F.3d

15  914, 917 (9th Cir. 2003) (en banc) (internal quotation marks

16  omitted).  "These two alternatives represent 'extremes of a single

17  continuum,' rather than two separate tests."  Clear Channel Outdoor

18  Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003)

19  (quoting Walczak, 198 F.3d at 731).  "Thus, the greater the relative

20  hardship to the party seeking the preliminary injunction, the less

21  probability of success must be established by the party."  Beardslee

22  v. Woodford, 395 F.3d 1064, 1067 (9th Cir. 2005).

23  The district court must also consider whether the public

24  interest favors issuance of the injunction.  Id.  "This alternative

25  test for injunctive relief has been formulated as follows: a

26  plaintiff is required to establish '(1) a strong likelihood of

27  success on the merits, (2) the possibility of irreparable injury to

28

5

Exhibit 7 Page 54

1  plaintiff if preliminary relief is not granted, (3) a balance of
2  hardships favoring the plaintiff, and (4) advancement of the public
3  interest (in certain cases).'"  Shelley, 344 F.3d at 917-18 (quoting
4  Johnson v. Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995)).
5
6      C.  Likelihood of Success
7
8      Under these various tests, it is always necessary that
9  Plaintiff's claim have some small likelihood of success. However, it
10  is clear that Plaintiff's constitutional claims are highly
11  susceptible to dismissal under Federal Rule of Civil Procedure
12  12(b)(6) for failure to state a claim and so have little to no chance
13  of success.
14
15      1.  Equal Protection Claim
16
17      Hilton argues that the City's Ordinance violates its rights
18  under the Equal Protection Clause, United States Const. amend. XIV, §
19  1, and Article I, Section 7 of the California Constitution by: (1)
20  allowing unionized hotels within the Zone to be exempt from the
21  Ordinance through collective bargaining; (2) singling out a class of
22  hotel owners for disparate treatment from other business owners; (3)
23  by excluding hotels with less than 50 rooms; (4) excluding other
24  hotels located within Los Angeles and; (5) allowing a waiver of the
25  conditions of the Ordinance if the hotel employer would demonstrate a
26  reduction in workforce or total hours worked by employees. (Mot., at
27  14).
28

6

Exhibit 7 Page 55

1     The Fourteenth Amendment of the federal Constitution and Article

2   1, Section 7 of the California constitution each "prohibit denial to

3   persons of the equal protection of the laws." Britt v. City of Pomona

4   , 223 Cal.App.3d 265, 274 (1990). By and large, equal protection

5   analysis under the federal and California constitutions are

6   "'substantially similar.'" RUI One Corp. v. City of Berkeley, 371

7   F.3d 1137, 1154 (9th Cir. 2004) (quoting L.A. County v. S. Cal. Tel.

8   Co., 32 Cal.2d 378, 196 P.2d 773, 781 (1948)); see also, e.g., People

9   v. Hofsheier, 37 Cal.4th 1185, 1200-02 (2006) (construing federal

10  California equal protection guarantees together); Britt, 223 Cal.

11  App.3d at 274 (same); Cooper v. Bray, 21 Cal. 3d 841, 847-48 (1978)

12  (same); Brown v. Merlo, 8 Cal. 3d 855, 860 (1973) (same). As the

13  Plaintiff does not allege that application of the Ordinance impinges

14  on a fundamental right or targets a suspect class, it is subject only

15  to rational basis review. RUI One Corp., 371 F.3d at 1154. As defined

16  by the Supreme Court, particularly with regard to economic

17  regulations such as the Ordinance, rational basis review requires the

18  Court to "determine whether there is 'any reasonably conceivable

19  state of facts that could provide a rational basis for the

20  classification.'" Id. (quoting FCC v. Beach Communications, Inc., 508

21  U.S. 307, 313 (1993)); see also SeaRiver Maritime Financial Holdings,

22  Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002). In making this

23  determination, the Court need not determine the actual motive of the

24  Council in passing the Ordinance or engage in fact-finding with

25  regard to the rationality of conceivable motives. RUI One Corp., 371

26  F.3d at 1155. However, California Supreme Court has noted that, in

27  its view,  all formulations of the rational basis test 'require the

28

1    court to conduct [a] serious and genuine judicial inquiry into the

2    correspondence between the classification and the legislative goals."

3    Cooper, 21 Cal. 3d 848 (quoting Newland v. Board of Governors, 19

4    Cal. 3d 705, 711 (1977) (internal citations omitted)). The California

5    Supreme Court has further noted that any rationale for the

6    legislation at issue "must be 'plausible . . . and the factual basis

7    for that rationale must be *reasonably conceivable*." Hofsheier, 37

8    Cal.4th at 1201.  Whatever exact formulation of rational basis review

9    is applied, the Court finds it highly implausible that the Plaintiff

10   will be able state a viable equal protection claim.

11       Plaintiff essentially alleges that the Ordinance violates the

12   equal protection guarantees because it favors employees at larger

13   hotels in the Zone over smaller hotels, other businesses, and hotels

14   outside the zone. However, as the Supreme Court has noted, the scope

15   of coverage of a particular regulatory requirement is "virtually

16   unreviewable" and a "legislature must be allowed to approach a

17   perceived problem incrementally." FCC, 508 U.S. at 316. "'[R]eform

18   may take one step at a time, addressing itself to the phase of the

19   problem which seems most acute to the legislative mind. The

20   legislature may select one phase of one field and apply a remedy

21   there, neglecting the others.' " FCC, 508 U.S. 316 (quoting

22   Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955)).

23   Relying on these statements, the Ninth Circuit has rejected a federal

24   and California equal protection challenge to an analogous living wage

25   city ordinance targeting only employers of a certain size within a

26   certain zone of the City of Berkeley.  RUI One Corp. v. City of

27   Berkeley,  371 F.3d 1137, 1154 (9th Cir. 2004). The Ordinance states

28

8

Exhibit 7 Page 57

1  in its purpose section that the hotels in the Zone "derive
2  significant and unique business benefits from their close proximity
3  to LAX . . . [and] from the City's designation of the Corridor as an
4  Airport Hospitality Enhancement Zone. Accordingly, the City finds it
5  appropriate to impose a regulatory requirement to pay a living wage
6  on certain hotels in the Corridor. . . ." LAMC Section 104.101.
7  Plaintiff has not provided any reason to believe that the City's goal
8  of ensuring that  benefits the hotels in the Zone derive from their
9  location be passed on to their employees can be shown to be an
10  illegitimate one. It is entirely plausible that hotels derive
11  benefits from their location in the Zone in the form of greater
12  patronage that other businesses in the Zone and hotels outside the
13  Zone do not receive to the same extent and entirely legitimate that
14  the legislature may desire to ensure that some of those special
15  economic benefits are passed on to hotel employees. Furthermore, the
16  provisions of the Ordinance enforcing higher wages on certain hotels
17  appear to bear a rational relationship to this goal. The fact that
18  the Ordinance exempts smaller hotels and allows waiver of the
19  Ordinance's requirements could rationally arise from the
20  legislature's belief that not all hotels in the Zone could
21  economically sustain the wage requirements of the Ordinance and a
22  resultant desire to pursue reform incrementally.  Additionally, the
23  Ordinance's exceptions for workers party to a collective bargaining
24  agreement could rationally arise from the expectation that unionized
25  workers are better able to protect their interests with regard to
26  wages than non-unionized workers. See Viceroy Gold Corp. v. Aubry, 75
27  F.3d 482, 490-91 (9th Cir. 1996) ("Moreover, the California
28

9

Exhibit 7 Page 58

Legislature could rationally have believed that workers covered by collective bargaining agreements . . . .have greater power to ensure safe working conditions than workers with individual employment agreements.") Hence, on the whole, the Court finds it highly unlikely that Plaintiff will be found to have alleged a lack of rational basis for the Ordinance.

### 2.  Preemption

Plaintiff further alleges that the Ordinance is invalid because it is preempted by the National Labor Relations Act. Under Article VI of the Constitution states may not enact laws that conflict with federal statutes or their purposes. Pursuant to this principle, the Supreme Court has established two separate doctrine of preemption by the federal labor law. The first, referred to as <u>Garmon</u> preemption, "protects the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA." <u>Metropolitan Life Ins. Co. v. Massachusetts</u>, 471 U.S. 724, 749 (1985) (citing <u>San Diego Building Trades Council v. Garmon</u>, 359 U.S. 236, 749 (1959). <u>Garmon</u> preemptions "preempts state laws that attempt to regulate conduct which is either arguably protected or prohibited by the NLRA. The second, referred to as <u>Machinist</u> preemption, "protects against state interference with policies implicated by the structure of the Act itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." <u>Id.</u>; see <u>Machinists v. Wisconsin Employment Relations Comm'n</u>, 427 U.S. 132 (1976). Plaintiff alleges both types of

10

Exhibit 7 Page 59

1    preemption in its Application, though relying on the same case

2    citations for each.

3

4         i.   *Garmon Preemption*

5

6         Under <u>Garmon</u> preemption, the NLRA "preempts state laws that

7    attempt to regulate conduct which is either arguably protected or

8    prohibited by the NLRA." <u>Dillingham Const. N.A., Inc. v. County of</u>

9    <u>Sonoma</u>, 190 F.3d 1034, 1041 (9th Cir. 1999). The Court cannot find that

10   the Ordinance is subject to <u>Garmon</u> preemption because Plaintiff does

11   allege that the Ordinance seeks to regulate conduct regulated by the

12   NLRA. Plaintiff does not allege that the NLRA substantively regulates

13   work wages such that the Ordinance would be preempted on that basis.

14   See <u>Metropolitan Life Ins. Co. v. Massachusetts</u>, 471 U.S. 724, 748

15   (1985) (finding <u>Garmon</u> preemption not implicated by state law

16   establishing minimum welfare benefit plans because "[t]here is no claim

17   here that Massachusetts has sought to regulate or prohibit any conduct

18   subject to the regulatory jurisdiction of the NLRB, since the Act is

19   silent as to the substantive provisions of welfare-benefit plans")

20   <u>overruled in part on other grounds by</u> <u>Kentucky Ass'n of Health Plans,</u>

21   <u>Inc. v. Miller</u>, 538 U.S. 329 (2003); <u>Fort Halifax Packing Co., Inc.</u>

22   <u>v. Coyne</u>, 482 U.S. 1, 22 fn 16 (1987). Instead, Plaintiff alleges that

23   the Ordinance "improperly encourages the collective bargaining process"

24   by allowing union employees to undercut the minimum wage standards set

25   by the Ordinance through a collective bargaining agreement and through

26   waiver by the state Controller. (App., at 12.) The only authority that

27   Plaintiff claims applies <u>Garmon</u> preemption in such a fashion is <u>Bechtel</u>

28

1   Const., Inc. v. United Broth. of Carpenters & Joiners of Am., 812 F.2d

2   1220, 1226 (9th Cir. 1987). In that case, the Ninth Circuit found that

3   a state law setting a minimum wage for apprentices impermissibly

4   interfered with the collective bargaining process because the law

5   allowed a bargaining representative, with the approval of a state

6   agency, to negotiate wage levels below that normally mandated by the

7   law. Id. At 1226. The court found that, as a result, the law

8   "mandate[d] state interference in the collective bargaining process."

9   Id.   Plaintiff argues that as the Ordinance may similarly be undercut

10   by collective bargaining, it is similarly preempted. However, unlike

11   the state law at issue in Bechtel, the Ordinance does not require

12   approval by a state agency for any collective bargaining agreement.

13   Lacking such a provision, the Ordinance cannot be said to mandate state

14   interference in the collective bargaining process. See Associated

15   Builders and Contractors of Southern California, Inc. v. Nunn, 356 F.3d

16   979, 987-88 (9th Cir. 2004) ("The requirement of state approval caused

17   the Bechtel court to conclude that § 212(c) effectively gave

18   apprentices two bargaining representatives--the state and their

19   union--in violation of the NLRA."); Dillingham, 190 F.3d at 1041

20   (stating that the state law at issue in Bechtel impermissibly affected

21   collective bargaining "because the wage standards were not true legal

22   minimums and because the state became a second bargaining agent"

23   (emphasis added)). There is no indication in Bechtel that the mere fact

24   that a minimum wage standard could be undercut by either the typical

25   collective bargaining process or through separate appeal to a state

26   agency impermissibly involves the state in the collective bargaining

27   process such as to create Garmon preemption. Indeed, the Supreme Court

28

1  has specifically rejected the notion that a state law establishing a
2  minimum labor standard, such as a minimum wage, with an exception for
3  collective bargaining is subject to any NLRA pre-emption. Fort Halifax
4  Packing, 482 U.S. at 22. The Court instead found that such an
5  exception to a state-mandated minimum labor standard "strengthens the
6  case that the statute works no intrusion on collective bargaining."
7  Id.; see also Livadas v. Bradshaw, 512 U.S. 107, 131 (1994); Viceroy,
8  75 F.3d at 490-91. Hence, the Court has been provided with no legal
9  basis at this point to conclude that Plaintiff will succeed in its
10  Garmon preemption argument.
11
12     ii. Machinist Preemption
13
14     "Under the Machinists preemption doctrine, the NLRA preempts state
15  laws and state causes of action that regulate activity Congress
16  intended to leave unregulated." Dillingham Const., 190 F.3d at 1038.
17  Plaintiff asserts that the Ordinance is subject to Machinist preemption
18  because it "interferes with the fundamental balance of power between
19  labor and management and is contrary to the well settled doctrine that
20  negotiation of wages is left to the free market." (App., at 9.)
21  Plaintiff fails to offer any support for these general assertions,
22  which appear to be contradicted by clear precedent. As Plaintiff
23  acknowledges, the Supreme Court in Metropolitan Life held that "when
24  a state law establishes a minimal employment standard not inconsistent
25  with the general legislative goals of the NLRA, it conflicts with none
26  of the purposes of the act" and is not subject to Machinist preemption.
27  471 U.S. at 757. As the Supreme Court noted, "[m]inimum state labor
28

13

Exhibit 7 Page 62

1    standards affect union and nonunion employees equally, and neither

2    encourage nor discourage the collective-bargaining processes that are

3    the subject of the NLRA." Id. at 755. Plaintiff asserts the Ordinance

4    is not subject to the reasoning of Metropolitan Life because it does

5    not establish a true minimum wage, as the requirements of the Ordinance

6    can be undercut by either the collective bargaining process or waiver

7    by the state controller.   (App., at 10.) As a result, Plaintiff

8    asserts, "the wage rates established in the Ordinance do *not* affect

9    union and nonunion employees equally." (App., at 11.) However, as noted

10   above, the Supreme Court has specifically stated that the holding of

11   Metropolitan Life is just as, if not more applicable, to minimal

12   employment standards  that can be excepted by clear waiver in

13   collective bargaining arrangements. Fort Halifax, 482 U.S. at 22; see

14   also Livadas, 512 U.S. at 131; Viceroy, 75 F.3d at 489. Similarly, the

15   fact that the Ordinance can be waived independently of the collective

16   bargaining process by the state controller with regard to both

17   unionized or non-unionized employers based on financial need is not in

18   any  way the Court can discern material to Machinist preemption

19   analysis. Nor has Plaintiff provided any argument whatsoever as to why

20   this would be so.

21       The only authority relied on by Plaintiff provides no further

22   reason to conclude Plaintiff's argument has merit. Plaintiff again

23   relies on the holding in Bechtel and its elucidation by Dillingham to

24   support its view that the Ordinance is subject to Machinist preemption.

25   However, Bechtel does not even discuss Machinist preemption and, as

26   explained above, is wholly distinguishable on the facts from the

27   present case. Plaintiff also cites briefly to Chamber of Commerce of

28

14

Exhibit 7 Page 63

1    U.S. v. Bragdon, which found preempted an ordinance establishing a

2    detailed prevailing wage scheme for certain workers engaged in private

3    construction projects on the grounds that it was highly invasive of the

4    collective bargaining process. 64 F.3d 497 (9th Cir. 1995). However,

5    the Ninth Circuit has subsequently stated that Bragdon's holding was

6    limited to "extreme situations, when [state substantive labor

7    standards] are 'so restrictive as to virtually dictate the results of'

8    of collective bargaining." Associated Builders and Contractors of

9    Southern California, Inc. v. Nunn, 356 F.3d 979, 990 (9th Cir. 2004)

10   (quoting Bragdon, 64 F.3d at 501). Associated Builders also made clear

11   that the holding in Bragdon was applicable only to prevailing wage

12   laws, and not minimum wage laws such is at issue here. 356 F.3d at 991

13   fn 8. Plaintiff offers no direct argument as to why the holding in

14   Bragdon is nonetheless applicable to the present Ordinance, leaving the

15   Court to guess. The central similarity between the Ordinance at issue

16   here and that at issue in Bragdon that Plaintiff implies is that each

17   were issued pursuant to the state's regulatory authority and are

18   applicable only to limited industries as opposed to being laws of

19   general applicability. However, though Bragdon discussed this fact as

20   relevant to its preemption analysis, the Ninth Circuit has subsequently

21   recognized that "it is now clear in this Circuit that state substantive

22   labor standards, including minimum wages, are not invalid simply

23   because they apply to particular trades, professions, or job

24   classifications rather than to the entire labor market." Associated

25   Builders, 356 F.3d at 990. Therefore, again, on the argument presented

26   the Court has no basis to conclude that Plaintiff's Machinist

27   preemption argument will prevail.

28

15

Exhibit 7 Page 64

### 3.   Retroactivity

Plaintiff also raises a concern that the Ordinance may be applied retroactively to a time before the Ordinance was adopted as a result of the delay in its implementation. (App., 18-20.) Any argument as to retroactive application of the Ordinance is subject to dismissal for lack of ripeness at this time, however, as Plaintiff makes no assertion that anyone seeks at this time to apply the Ordinance in such a fashion. Should Defendant or some interested third-party seek to have the Ordinance applied retroactively,  Plaintiff may at that time seek relief against such application.

### D.   Remaining Equitable Factors

As Plaintiff has failed to meet its burden of offering argument demonstrating some modicum of  likelihood of success with regard to any of its claims, the Court cannot  find a temporary restraining order justified. Therefore, the Court need not undertake analysis of the remaining equitable factors or of Defendant's remaining defense at this time.

///

///

16

Exhibit 7 Page 65

### III. CONCLUSION

The Court denied Plaintiff Hilton's temporary restraining order for the reasons stated above. At such time as Defendant chooses to file a dispositive motion and Plaintiff presents clearer and more comprehensive argument in support of its claims, the Court will undertake further analysis of Plaintiff's position.

IT SO ORDERED.

DATED:_____August 12, 2008_____

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

17

Exhibit 7 Page 66