32    From the Pockets of Strangers

Exhibit 4 Page 163

Chapter 5

# Lodging Industry Work Force

One of the most important public benefits provided by an industry is employment of local residents. Compared to other regions, how successful is LA's Lodging industry in providing sustaining employment for residents?[17] We explore this question by using a type of data from the 2000 Census that allows us to see employment outcomes of individual residents, including their industry, occupation, earnings, employment status, and hours worked.[18]

## Geographic Concentration

How does the share of Los Angeles' labor force that finds Lodging industry jobs compare to the national average, and to the five comparison metropolitan



Figure 34

**Location Quotient for Lodging Industry Employment**

Data for Employer Labor Force from County Business Patterns 2002 and for Residential Labor Force from Census 2000

areas? We can answer this question using two types of information. Census data gives us information about all of the workers living in each region at the time of the 2000 Census who were currently employed and identified their employer as a lodging establishment. Our second source of data is County Business Patterns 2002, which gives us information reported by all of the Lodging industry employers located in each region.[19] This information is shown in Figure 34 and Table 3.[20]

The share of each region's labor force that finds jobs in the Lodging

Table 3

**Employment in the Lodging Industry**

US Census PUMS data for currently employed persons at the time of the 2000 Census and County Business Patterns data for establishment employment in 2002

| Metro Area | Census 2000 | | County Business Patterns 2002 | |
|---|---|---|---|---|
| | Lodging Industry Employment | Percent of Total Employment | Lodging Industry Employment | Percent of Total Employment |
| Las Vegas | 75,570 | 9.75% | 164,231 | 23.15% |
| LOS ANGELES | 32,765 | 0.83% | 36,478 | 0.96% |
| New York | 36,726 | 0.94% | 40,490 | 1.10% |
| Phoenix | 25,223 | 1.66% | 23,413 | 1.68% |
| San Diego | 20,950 | 1.58% | 25,340 | 2.34% |
| San Francisco | 15,986 | 1.74% | 23,668 | 2.52% |
| United States | 1,368,815 | 1.05% | 1,681,120 | 1.50% |

Exhibit 4 Page 164

industry compared to the overall US share is shown by the location quotient values in Figure 34.[21] Values greater than 1 represent above-average concentrations of Lodging industry employment and values below 1 represent below-average concentrations.

Figure 35

**Lodging Industry Wages as a Percent of the Living Wage**

1999 earnings reported in Census 2000 PUMS 5%;
2002 earnings reported in County Business Patterns



Measured by employment, LA's Lodging industry was only 79 percent as fully developed as in the overall US economy based on information reported by residents in the 2000 Census, and only 64 percent as fully developed as the US based on information reported by employers in 2002. The regions competing with LA for tourists all generate a larger share of employment through the Lodging industry than Los Angeles. The share of employment provided by the Lodging industry in Phoenix, San Diego and San Francisco is double the share in LA, and Las Vegas generates roughly a fifth of its jobs through the Lodging industry (including hotel-casinos).[22]

## Sustainable Earnings

### Industry Earnings

What are the average annual earnings in the Lodging industry and how do these earnings compare to living wage benchmarks for each region? How much do workers in different occupations within the Lodging industry earn?

By "living wage" we refer to the minimum earnings needed to meet basic family costs such as housing, food, childcare, transportation, and health care in different regions of the US. This benchmark is not linked to

Table 4
**Average Earnings in the Lodging Industry**

| Metro Area | 1999 Earnings Reported in the 2000 Census | | | County Business Patterns 2002 | |
|---|---|---|---|---|---|
| | Average Earnings | 1999 Living Wage | % 1999 Living Wage | Average Earnings | % 2002 Living Wage |
| New York | $29,565 | $36,899 | 80% | $29,071 | 73% |
| Las Vegas | $27,011 | $27,641 | 98% | $27,849 | 92% |
| San Francisco | $26,573 | $38,431 | 69% | $25,459 | 59% |
| San Diego | $23,285 | $29,055 | 80% | $20,067 | 60% |
| LOS ANGELES | $22,343 | $29,258 | 76% | $21,674 | 68% |
| Phoenix | $22,270 | $25,273 | 88% | $21,485 | 77% |

Exhibit 4 Page 165

living wage ordinances, but rather to the wages needed to maintain a minimal standard of living for a family based on the cost of living in different regions. In this report our benchmark is the cost for a family with just one parent and one child. The Economic Policy Institute calculated the living wage for regions throughout the United States, and is the source of living wage benchmarks for the six regions studied in this report.[23]

We can explore the overall level of earnings in the Lodging industry through the earned income that Lodging industry workers reported in the 2000 Census as well as through payroll tax reports from Lodging industry employers. Census earnings, which represent the total earnings of individual workers, are shown in Figure 35 and Table 4.[24] Similarly, employer wages for the jobs they provide are also shown in Figure 35 and Table 4. Since some people hold multiple jobs, the employer-reported wages from County Business Patterns tend to be lower than the worker-reported earnings from Census data, so our comments focus on Census earnings, which provide the most complete picture of the earned income of Lodging industry workers.

LA's Lodging workers have the second lowest earnings out of the six regions, even though LA has the third-highest cost of living, as shown in Table 4. Earnings in LA are $7,000 lower than in New York, $5,000 lower than in Las Vegas, and $4,000 lower than in San Francisco. When compared to the living wage benchmark, LA's wages are next to the lowest out of the six regions. The average Lodging industry worker in Los Angeles earned roughly three-quarters of a living wage.

*Occupational Earnings*

Lodging industry employment is concentrated in food preparation and serving occupations and building cleaning and maintenance occupations, as shown Table 5.[25] Forty-four percent of

### Table 5
### Major Occupations in the Lodging Industry, 2000
Workers employed in the lodging industry at the time of the 2000 Census

| Census Occupation | Las Vegas | Los Angeles | New York | Phoenix | San Diego | San Francisco |
|---|---|---|---|---|---|---|
| Lodging Managers | 1,709 | 2,401 | 1,931 | 1,635 | 1,275 | 1,143 |
| Security Guards & Related | 2,278 | 459 | 552 | 404 | 276 | - |
| Cooks | 2,569 | 1,287 | 1,044 | 1,031 | 774 | 903 |
| Food Preparation Workers | 1,930 | 199 | 688 | 342 | 178 | 120 |
| Bartenders | 1,998 | 589 | 409 | 370 | 305 | - |
| Waiters & Waitresses | 4,267 | 2,555 | 2,198 | 1,298 | 1,147 | 842 |
| Food Servers, Non-restaurant | 1,753 | 877 | 405 | 540 | 285 | 392 |
| Dining Attendants & Food Prep | 1,771 | 892 | 447 | 618 | 330 | 201 |
| Janitors & Building Cleaners | 1,946 | 1,668 | 1,999 | 639 | 816 | 865 |
| Maids & Housekeeping Cleaners | 10,442 | 5,995 | 8,572 | 3,134 | 3,437 | 2,811 |
| 1st-Line Mgrs. of Gaming Wkrs. | 2,025 | - | - | - | - | - |
| Gaming Services Workers | 5,406 | - | - | - | - | - |
| Baggage Porters, Bellhops | 1,830 | 693 | 1,611 | 351 | 544 | 692 |
| Cashiers | 3,814 | - | - | - | 232 | - |
| Hotel, Motel, & Resort Desk | 3,536 | 2,259 | 1,829 | 2,005 | 1,411 | 1,463 |
| Reservation & Transportation | 1,492 | 640 | 504 | 1,141 | 607 | 431 |
| **Total Workers** | **75,570** | **32,765** | **36,72** | **25,223** | **20,95** | **15,986** |

Exhibit 4 Page 166

36     From the Pockets of Strangers

Lodging industry workers in the six study areas were employed in these two job families. When we look at the average annual earnings of workers in the largest occupations, shown in Table 6,[26] we see that Lodging managers in 4 of the 6 regions (excluding Los Angeles and San Francisco), along

Table 6

Average Annual Earnings in the Lodging Industry, 1999

Workers employed in the lodging industry at the time of the 2000 Census

| Census Occupation | Las Vegas | Los Angeles | New York | Phoenix | San Diego | San Francisco |
|---|---|---|---|---|---|---|
| Lodging Managers | ▓▓▓▓▓ | $25,911 | ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ | $37,123 |
| Reservation & Transportation | $22,359 | | | | | |
| Bartenders | $26,192 | | | | | |
| Waiters & Waitresses | $27,519 | $20,900 | $34,550 | $16,069 | $17,831 | |
| Food Servers, Non-restaurant | $24,068 | | | | | |
| Cooks | $22,548 | $21,678 | | | | |
| Security Guards & Related | $25,959 | | | | | |
| Baggage Porters, Bellhops | $26,116 | | $25,569 | | | |
| Dining Attendants & Food Prep | $17,990 | | | | | |
| Hotel, Motel, & Resort Desk | $19,627 | $13,999 | $25,100 | $14,679 | $15,290 | $18,348 |
| Food Preparation Workers | $22,105 | | | | | |
| Janitors & Building Cleaners | $20,121 | $13,862 | $22,415 | | | |
| Maids & Housekeeping Cleaners | $21,030 | $15,180 | $22,091 | $9,855 | $11,287 | $18,623 |
| Cashiers | $18,896 | | | | | |
| 1st-Line Mgrs. of Gaming Wkrs | ▓▓▓▓▓ | | | | | |
| Gaming Services Workers | ▓▓▓▓▓ | | | | | |

with Las Vegas workers in two gaming occupations earned a living wage, as denoted by the shaded cells.  Workers in all other occupations and regions earned less than a living wage.


*Employee Benefits*

Wage levels do not tell the complete story of employee compensation, which also includes employee benefits such as health insurance and retirement funds.  Health and retirement benefits typically cost between $2 and $5 an hour depending on the type of coverage.  Unfortunately, data about the number of Lodging industry workers in each region who receive these benefits is not available.  However, anecdotal information suggests that Los Angeles workers are less likely to receive these benefits than workers in New York, San Francisco, or Las Vegas.


## Full Employment

Are Lodging industry employees typically able to obtain a full year of work?  What is the unemployment rate among Lodging industry workers?  We can explore both of these questions using Census data.  In the year preceding the Census, 1999, Lodging industry workers in Los Angeles worked an average of 1,750 hours, the shortest work year of any of the six study regions, as shown in Figure 36.[27]  This

Exhibit 4 Page 167

represents 84 percent of a full work year for Los Angeles workers.  At the high end, Lodging industry workers were on the job an average of 1,900 hours in Las Vegas, representing 91 percent of a full work year.

The shortfall from a full work year has the effect of reducing potential annual earnings in Los Angeles by 16 percent.  If the average worker had a full-time, year-around work schedule, instead of a 1,750 hour schedule, and still received the same Lodging industry wage, his or her earnings in 1999 would have been $26,556 instead of $22,343.  This would have raised the worker's earnings up to 91 percent of the living wage.



Figure 36
**Hours Worked in 1999 by Persons Employed in the Lodging Industry at the time of the 2000 Census**
Data from Census 2000 PUMS 5% sample

When we look at the unemployment rate for Lodging industry workers at the time of the 2000 Census we see the lowest rate in San Francisco, 3.7 percent; the second highest rate in Los Angeles, 8.7 percent; and the highest rate in San Diego, 9.5 percent, as shown in Figure 37.[28]  LA's Lodging industry unemployment rate was about two-thirds higher than the overall unemployment rate for the region – a pattern also seen in all of the other regions except Las Vegas.

Figure 37
**Unemployment Rate for Lodging Industry Workers and Total Labor Force**
US Census & Bureau of Labor Statistics, March 2000

| | Total Labor Force | Lodging Industry |
|---|---|---|
| San Francisco | 1.9% | 3.7% |
| Las Vegas | 5.8% | 4.3% |
| Phoenix | 2.6% | 5.2% |
| New York | 5.8% | 7.3% |
| Los Angeles | 5.3% | 8.7% |
| San Diego | 5.3% | 9.5% |

## Summary of Findings

- Measured by employment, the Lodging industry generates a smaller share of jobs in LA's economy than it does in the national economy - only 79 percent as many jobs based on information reported by residents in the 2000 Census, and only 64 percent as many jobs based on information reported by employers in 2002.

Exhibit 4 Page 168

- When the earnings that Lodging industry workers reported in the 2000 Census are compared to the living wage for one parent with one child in each region we see that workers typically earned from 69 to 98 percent of the living wage. The average Lodging industry worker in Los Angeles earned a little over three-quarters of the living wage.

- Lodging industry employment is concentrated in food preparation and serving occupations and building cleaning and maintenance occupations. Workers in these occupations in all six study regions earned less than the living wage.

- Lodging industry workers in Los Angeles reported working an average of 1,750 hours in 1999, the shortest work year of any of the six study regions. This shortfall from a full work year has the effect of reducing potential annual earnings by 16 percent.   At the same wage rate, full-time work would raise earnings for the average worker up to 91 percent of the living wage.

- LA's Lodging industry unemployment rate in 2000 was about two-thirds higher than the overall unemployment rate for the region – a pattern repeated in all of the other regions except Las Vegas.

Exhibit 4 Page 169

Chapter 6
# The Lodging Industry in Los Angeles

How many jobs and what level of wages does the Lodging industry provide in different areas within Los Angeles County?  What are the room rates and occupancy levels of hotels and motels in different areas?

We explore these questions using Lodging industry data and definitions of sub-county Lodging markets provided by PFK Consulting.  These Lodging markets are shown in the map below in Figure 38, with LA's Lodging establishments overlaid in varying sizes of dots representing the number of rooms at each location.

Figure 38
## Map of Lodging Establishments by Number of Rooms



Exhibit 4 Page 170

Case 2:14-cv-09603-AB-SS   Document 58-3   Filed 03/09/15   Page 9 of 72   Page ID #:1347

The map shows LA's Lodging industry concentrated a sprawling arc shaped like a backwards question mark that begins downtown, swings up into West Hollywood and Beverly Hills, extends down into West LA and Santa Monica, and ends with a leg reaching from the airport into the South Bay.  We have broken out information about LA's Lodging establishments in fifteen sub-county Lodging markets identified by PKF Consulting to assess local industry conditions.[29]

CITY OF LOS ANGELES
1.  Downtown
2.  East San Fernando Valley
3.  Hollywood
4.  Los Angeles International Airport (LAX) - Pacific Coast Highway
5.  South Los Angeles
6.  Westside
7.  West San Fernando Valley

BALANCE OF LOS ANGELES COUNTY
8.  Antelope and Santa Clarita valleys
9.  Beverly Hills - West Hollywood
10. Coastal (Malibu, Santa Monica, Venice, and Marina Del Rey)
11. Long Beach
12. Pasadena
13. San Gabriel Valley
14. South Bay
15. Whittier and the I-5 Corridor

We ask the reader to note that PFK Consulting, our preferred data source for sub-county Lodging data, uses a different sample of Lodging establishments to produce its reports than Smith Travel Research, our preferred data source for the county-level Lodging data used in previous chapters to compare LA to other regions in its competitive set.  These differences result in a slightly more upbeat picture of LA's Lodging industry from PFK, with occupancy rates for LA County 2 to 4 percentage points higher than those reported by Smith Travel Research, average room rates $20 to $25 higher, and average revenue per available room $15 to $20 higher.  Each data set provides a credible frame of reference for comparing Lodging industry conditions in different areas, but taken together they demonstrate that there is a margin of uncertainty about actual outcomes in the industry.

## Lodging Industry Size and Revenue

The average number of rooms available in each of PFK's LA market areas in 2004, and the average number occupied each night are shown in Figure 39.  Down-

Exhibit 4 Page 171

town LA had 9,100 rooms, with 5,600 or 62 percent occupied on a typical night. The swath of LA that includes Hollywood, West Hollywood, Beverly Hills, and West LA had 13,300 rooms, with 10,000 or 75 percent occupied. And the beach zone that includes the Coastal area, the airport and Pacific Coast Highway area, and the South Bay had 28,500 rooms, with 22,200 or 78 percent occupied.

This arc of hotels and motels reaching from downtown to the beach and extending into the South Bay, that we described earlier as resembling a backwards question mark, accounts for over half of the Lodging accommodations in Los Angeles County.  Downtown accounts for one-in-eleven available



Figure 39
**Average Daily Inventory of Rooms in LA's Lodging Markets in 2004**
Source: PKF Consulting, LA INC.

rooms and one-in-thirteen occupied rooms.  In contrast, the coastal stretch extending from Malibu to the South Bay accounts for more than one-in-three available and occupied rooms. Based both on number of available rooms and occupancy rates it is reasonable to conclude that Downtown Los Angeles is a second or third tier destination for business and vacation visitors to LA.

When we look at rooms occupied as a percent of rooms available we see that Downtown Los Angeles noticeably trailed other areas of LA, with a gap that widened after 2001.  This gap reflects the post-9/11 downturn in business travel, as well as the fact that in 2002 the convention centers in both San Diego and Anaheim were fully operational after being off-line for renovation and expan-

Figure 40
**Average Percent of Rooms Occupied in LA's Housing Markets**
Source: PKF Consulting

Exhibit 4 Page 172

42     From the Pockets of Strangers

sion.  Occupancy rates from 2000 through 2005 can be seen in Figure 40, where rates for Downtown and LA County are highlighted to stand out from the spaghetti effect of trend lines from the other sub-county market areas.[30]  Downtown had an occupancy rate of 61 percent in 2004 and a rate of 65 percent forecast for 2005, the lowest of any LA market area.  The International Airport and Pacific Coast Highway area had the highest rates, 80 percent in 2004 and 81 percent forecast for 2005, followed by hotel properties in the Whittier, Pasadena, Coastal, and South Bay areas.

LA's lodging markets show substantial variation in room rates.  Average daily rates in the International Airport area are 37 percent of the price in Bev-



Figure 41
Average Daily Room Rates in
LA's Lodging Markets
Source: PKF Consulting

erly Hills and West Hollywood, as shown in Figure 41.  Rates have remained relatively stable over the past four years, with decline in nearly all areas after 2001 and recovery in all areas in 2004 and 2005.  Downtown is in the middle of the range, with an average rate of $121 a night in 2004.

Average daily revenue for rooms reflects the effect of occupancy rates on room rates.  The Beverly Hills-West Hollywood and Coastal areas stand above all of the other areas, with average room revenue increasing sharply to $161 and $150 a night, respectively, in 2005, as shown in Figure 42.  The Downtown area reached $80 in 2005.  The lowest room revenue is in South Los Angeles, $58 a night.



Figure 42
Average Daily Revenue per Room in
LA's Lodging Markets
Source: PKF Consulting

Exhibit 4 Page 173

One perspective on the average revenue in 2004 of $74 for rooms in Downtown Los Angeles is that it was half of the $151 average 2004 revenue for rooms in New York.



Figure 43
**Estimated Lodging Industry 2004 Revenue in LA Markets**
Source: PKF Consulting

We can use this Lodging industry data to estimate the amount of revenue generated by LA's Lodging industry in each market area, bearing in mind the possibility that data from PKF Consulting may produce high-end estimates. When we multiply the average number of rooms occupied each day by average daily revenue per room, and then multiply this amount by the number of days in the year we get the annual revenue levels shown in Figure 43. The Coastal area is estimated to generate the most revenue - $254 million in 2004, followed by the Airport and Pacific Coast Highway area - $219 million, and then the Westside - $202 million. Downtown Lodging establishments are estimated to have generated $152 million in 2004.

## Convention Visitors



Figure 44
**Annual Number of Conventions in LA**

Conventions dramatically boost the number of high-outlay visitors in Downtown LA. These outlays include high-end lodging and meals, transportation services and retail shopping. The annual number of conventions held in Los Angeles in 2003 and 2004 was half the number held

Exhibit 4 Page 174

from 1998 through 2001, as shown in Figure 44.



Figure 45
**Attendance and Room Nights for LA Conventions**

Of course, the key factor for bringing visitors' dollars into LA's economy is not the number of conventions, but rather the number of visitors and the length of time they spend here. The number of convention attendees and the number of room nights they spent in LA peaked in 2000, as shown in Figure 45. This high volume of visitors was probably influenced by the fact that Anaheim's convention center was off line for renovation in 1998 and 1999, and San Diego's center was off-line from 1999 through 2001. The average annual number of room nights in 2002 to 2004 was only 48 percent as much as the average for 1998 to 2000. This suggests that LA has had only modest success competing with nearby convention centers since they reopened. It may also help explain the comparatively low occupancy rates in Downtown hotels over the past three years.

If attendance at LA conventions in 2004 had reached the annual average for 1998 to 2000, Downtown area hotels would have had another 168,000 room nights of occupancy, generating an additional $20 million in annual Lodging industry revenue alone. In addition to increased transient occupancy and sales taxes, the public sector would have benefited from much higher convention center revenue.

Figure 46
**LA County Wage and Salary Jobs in Hotels and Motels 1978-2004**




## Employment

Roughly 1 percent of LA's labor force works in the Lodging industry. Employment peaked in 1990 with about 42,000 workers who made up 1 percent of LA's wage and

Exhibit 4 Page 175

salary labor force, as shown in Figure 46. About a fifth of these jobs were lost in the 1990 aerospace recession, with a gradual recovery bringing employment up to 39,000 workers in 1998.  Roughly 3,000 jobs were lost in the 2001 recession and the post-9/11 downturn in travel.  The recovery has again been gradual, with about half of the lost jobs returning by the end of 2004.

When we look at Lodging industry workers as a share of the total wage and salary labor force employed in each area of LA, the pattern shown in Figure 47 emerges.[31]  Six areas have above-average concentrations of local jobs in the Lodging industry: 6.1 percent of people with jobs in Beverly Hills and West Hollywood are employed at Lodging establishments, 3.9 percent in the Coastal area, 2.7 percent in the Airport and Pacific Coast Highway area, 1.8 percent in the Westside, 1.5 percent in Long Beach, and 1.5 percent in Pasadena.

Figure 47

**Percent of Jobs in Each Area
Provided by Lodging**

Los Angeles County ES-202 data 2002

Figure 48

**Number of Jobs by Size of
Lodging Establishment**

It is also informative to look at the Lodging industry by size class of establishments, because as we will shortly see, this affects wage levels.  Seventy percent of LA's Lodging establishments have fewer than 20 employees, but these small establishments account for only 11 percent of Lodging industry jobs, as shown in Figure 46.  On the other hand, 10 percent of establishments have 100 or more employees, but these establishments account for 67 percent of workers employed by the industry.  A relatively small share of hotels account for most Lodging industry employment.

Exhibit 4 Page 176

46     From the Pockets of Strangers

Another window into employment conditions within LA's Lodging industry market areas is the unemployment rates reported in the 2000 Census by residents who worked in this industry, as shown in Table 7.[32]  This information is from workers who live in the market area, but some may work in a hotel or motel outside their area of residence.

We see the lowest unemployment rate, 4 percent, among Lodging industry workers living in

Table 7

Employment and Unemployment Among Lodging Industry Workers in Los Angeles County, 2000

Source: US Census 2000 PUMS 5% Sample

| Area | Currently Employed | Currently Unemployed | Employment Rate | Unemployment Rate |
|---|---|---|---|---|
| East San Fernando Vly | 1,778 | 83 | 96% | 4% |
| LAX, PCH, South Bay | 5,396 | 284 | 95% | 5% |
| Pasadena | 940 | 58 | 94% | 6% |
| **LA COUNTY** | **11,462** | **676** | **94%** | **6%** |
| Coastal, Bev Hills, West | 2,539 | 180 | 93% | 7% |
| Westside | 809 | 71 | 92% | 8% |
| San Gabriel Valley | 3,330 | 310 | 91% | 9% |
| South Los Angeles | 5,251 | 500 | 91% | 9% |
| Whittier, I-5 Corridor | 2,834 | 287 | 91% | 9% |
| Long Beach | 1,876 | 207 | 90% | 10% |
| Hollywood | 1,543 | 173 | 90% | 10% |
| West San Fernando Vly | 2,998 | 339 | 90% | 10% |
| Downtown | 1,488 | 182 | 89% | 11% |
| Antelope & S Clarita Vly | 1,156 | 275 | 81% | 19% |

*Residents reporting themselves to be Traveler Accommodations workers and identifying themselves as currently employed or unemployed at the time of the 2000 Census.*



Figure 49

**Average Monthly Earnings in Lodging Establishments**

Los Angeles County ES-202 data 2002

| Area | Earnings |
|---|---|
| Antelope & S Clarita Vly | 1,332 |
| San Gabriel Vly | 1,421 |
| Whittier/I-5 Cor | 1,492 |
| South Los Angeles | 1,503 |
| West S Fernando Vly | 1,611 |
| South Bay | 1,644 |
| Long Beach | 1,689 |
| LAX & Pac Coast Hwy | 1,694 |
| Pasadena | 1,749 |
| LOS ANGELES COUNTY | 1,885 |
| Hollywood | 1,953 |
| Coastal | 2,001 |
| Downtown | 2,121 |
| East SF Vly, Burbank | 2,177 |
| Westside | 2,209 |
| Beverly Hills & W Holly | 2,363 |

0    500   1,000  1,500  2,000  2,500

the East San Fernando Valley-Burbank-Glendale area, followed by 5 percent unemployment in the Airport-Pacific Coast Highway-South Bay Area.  The highest unemployment rate, 19 percent, was found among workers living in the Antelope and Santa Clarita Valleys, followed by an 11 percent unemployment rate among workers living Downtown.  These unemployment rates are for the time of the Census in April 2000.  It is likely that these unemployment rates increased following the 9/11 downturn in travel.

## Earnings

Looking now at wages reported by employers, we see that the average monthly wages reported for jobs in

Exhibit 4 Page 177

Lodging establishments countywide in 2002 were $1,885 a month, as shown in Figure 49.  The highest wages were paid by Lodging establishments in Beverly Hills and West Hollywood - $2,363, followed by the Westside - $2,209, then the East San Fernando Valley-Burbank-Glendale area - $2,177, with Downtown wages fourth highest at $2,121 a month.



Figure 50
**Average Monthly Wages for Lodging Industry Jobs by Establishment Size**
Los Angeles County 2002, ES-202 data

        The lowest wages were found in the Antelope and Santa Clarita valleys - $1,332, with the San Gabriel Valley next to the lowest at $1,421, and the Whittier-I-5 Corridor area third from the bottom at $1,492 a month.

        There is over a thousand dollars a month spread between the average wages paid to workers in the Antelope and Santa Clarita valleys compared to workers in Beverly Hills and West Hollywood.  Two of the factors that explain wage differences are level of unionization, which we do not explore in this report, and size of Lodging establishments, which we explore below.

Table 8
### Monthly Lodging Industry Earnings in 2002 by Geographic Area and Establishment Size

| Area | Employment Size Category | | | | | | |
|------|-----|-------|-------|-------|---------|------|-------|
|      | 1-9 | 10-19 | 20-49 | 50-99 | 100-199 | 200+ | Total |
| Beverly Hills & W Holly | 3,995 | 1,761 | 1,655 | 2,070 | 2,170 | 2,494 | 2,363 |
| Westside | 2,682 | 2,045 | 2,122 | 1,689 | 2,018 | 2,329 | 2,209 |
| East SF Vly, Burbank | 1,220 | 1,258 | 1,564 | s | 2,477 | 2,274 | 2,177 |
| Downtown | 1,309 | 1,318 | 1,303 | 1,671 | s | 2,305 | 2,121 |
| Coastal | 1,733 | 1,402 | 1,692 | s | 1,797 | 2,345 | 2,001 |
| Hollywood | 1,425 | 1,575 | 1,799 | 2,728 | s | s | 1,953 |
| **LOS ANGELES COUNTY** | **1,384** | **1,364** | **1,496** | **1,749** | **1,851** | **2,131** | **1,885** |
| Pasadena | 1,116 | 1,110 | 1,217 | 1,689 | s | 1,993 | 1,749 |
| LAX  & Pac Coast Hwy | 1,807 | 1,375 | 1,466 | 1,480 | 1,640 | 1,758 | 1,694 |
| Long Beach | 945 | 1,210 | 1,413 | 1,455 | s | 1,798 | 1,689 |
| South Bay | 1,359 | 1,258 | 1,712 | 1,775 | 1,700 | 1,699 | 1,644 |
| West S Fernando Vly | 1,156 | 1,948 | 1,455 | s | s | s | 1,611 |
| South Los Angeles | 1,163 | 1,042 | 1,323 | 1,590 | s | s | 1,503 |
| Whittier/I-5 Cor | 1,263 | 1,163 | 1,276 | 1,666 | s | s | 1,492 |
| San Gabriel Vly | 978 | 1,171 | 1,352 | 1,673 | s | s | 1,421 |
| Antelope & S Clarita Vly | 1,195 | 1,320 | 1,140 | s | s | s | 1,332 |

"s" indicates data suppression due to small sample of employers

        Lodging industry wages vary considerably based on the size of establishments, as shown in Figure 50.  Establishments with 200 or more employees paid an average of $2,131 a month in 2002, 54 percent more than the average of $1,384 paid by establishments with fewer than 10 employees.

Exhibit 4 Page 178

When we breakout establishments by size as well as geographic area, as shown in Table 8, we can filter out the effect that a large number of small establishments has on average wages in some areas.  Larger establishments pay higher average wages.  The overall trend is for progressively higher wages as establishments increase in size.  Countywide, establishments with 50 to 99 employees pay average wages that are 24 percent higher than those with 1-9 employees, and establishments with over 500 employees pay average wages that are 62 percent higher.  This holds true across LA.  The size of an establishment has more impact on wages than its location.

## Area Profiles

### CITY OF LOS ANGELES

### Downtown Los Angeles

Downtown is home to the market's largest hotels.  Downtown was heavily impacted by the post-9/11 downturn in travel and renewed competition from the San Diego and Anaheim convention centers, resulting in low occupancy rates.  Downtown is home to the Convention Center and a growing tourism complex extending from the Staples Center sports arena to expanding nightlife in the Historic District, major cultural sites on Grand Avenue, and the network of Union Station/Chinatown/ Olivera Street attractions.  It has the fourth-largest room inventory, the lowest occupancy rate, slightly above-average room rates, a below-average share of local jobs in Lodging, and the second highest unemployment rate and fourth-highest wages for Lodging workers.

### East San Fernando Valley, Burbank, Glendale

The East San Fernando Valley-Glendale-Burbank area has the fourth smallest room inventory, the third lowest Lodging industry revenue, below-average concentration of local workers in Lodging jobs, the lowest unemployment rate for Lodging industry workers, and the third-highest wages for Lodging industry workers.

### Hollywood

Hollywood has the fifth-smallest inventory of rooms, above-average occupancy and room rates, above average unemployment and slightly above-average wages for Lodging industry workers.

### Los Angeles International Airport (LAX)-Pacific Coast Highway

The LAX area is the region's other hub for large hotels, located mainly on Century Boulevard, just East of the airport.  This area has benefited from the high volume of domestic and international travel through LAX, both those who are

Exhibit 4 Page 179

tourists in LA, as well as those just passing through. This area has the largest room inventory, highest occupancy rate, the second-highest Lodging industry revenue in the county, the lowest room rates in the county, and an above-average concentration of local jobs in Lodging but below-average wages.

*South Los Angeles*

South Los Angeles has the third-lowest occupancy rate, second lowest room rate, lowest average daily revenue per available room, lowest revenue from Lodging, fourth-smallest share of local jobs in Lodging, and fourth-lowest wages for Lodging industry workers.

*Westside*

The West LA hotel market has seen significant recent expansion and renovation. The limited convention center and meeting space there competes with Downtown LA for some events. West LA has the ninth largest inventory of rooms but the third highest revenue of Lodging in the county, an above average concentration of local jobs in Lodging, and the second highest wages in the county for Lodging workers.

*West San Fernando Valley*

The San Fernando Valley hotel properties are concentrated in the Universal City area and the West Valley. It has below-average occupancy and room rates, the second-lowest share of the local labor force employed in Lodging, and the third-highest unemployment rate and fifth-lowest wages for Lodging workers.

### BALANCE OF LOS ANGELES COUNTY

*Antelope and Santa Clarita valleys*

The Antelope and Santa Clarita Valleys have the smallest inventory of rooms, above-average occupancy rate, below-average room rate, the second lowest revenue from Lodging, the fifth-smallest share of local jobs in Lodging, and the highest unemployment rate and the lowest wages for Lodging workers.

*Beverly Hills and West Hollywood*

Beverly Hills and West Hollywood have the highest room rates, slightly above-average occupancy rates, the highest average daily revenue per available room, the highest concentration of local jobs in the Lodging industry, and the highest average wages for Lodging industry workers.

*Coastal*

Beach community lodging properties are typically smaller than in Downtown LA, but capture a significant amount of travel and tourism business due to their

Exhibit 4 Page 180

close-to-the coast amenities.  These communities have the second-highest concentration of local jobs in Lodging of any area of the county, high occupancy rates, the second-highest room rates and average daily revenue per available room, the highest Lodging industry revenue in the county, and pay somewhat above-average wages to Lodging workers.

*Long Beach*
Long Beach has the fourth-lowest occupancy rate, below-average room rates and revenue per available room, an above-average concentration of local workers in Lodging jobs, above average unemployment, and below-average wages for Lodging industry workers.

*Pasadena*
The Pasadena-Arcadia area has the third-smallest room inventory, third-highest occupancy and room rates, third-lowest unemployment rate, and slightly below-average wages for Lodging industry workers.

*San Gabriel Valley*
The San Gabriel Valley has the third-largest room inventory, second-lowest occupancy rate, third lowest room rate, third-lowest concentration of local workers in Lodging industry jobs, above-average unemployment rate, and the second-lowest wages for Lodging industry workers.

*South Bay*
The South Bay has the second largest room inventory in the county, high occupancy rates, below-average room rates, the fourth-highest Lodging industry revenue, an average concentration of local jobs in Lodging, and below-average wages for these workers.

*Whittier/I-5 Corridor*
The Whittier-Interstate 5 Corridor area has the fifth-largest room inventory, second-highest occupancy rate, third-lowest room rate, lowest share of local workers employed in Lodging jobs, and the third-lowest wages for Lodging industry workers.

## Summary of Findings

- Downtown LA was particularly hard hit by the post-9/11 downturn in travel and renewed competition from the San Diego and Anaheim convention centers, with occupancy rates dropping to 50 percent in 2002 and reaching only 61 percent in 2004.

Exhibit 4 Page 181

- Downtown accounts for one-in-eleven available rooms and one-in-thirteen occupied rooms, making it a second or third tier destination for business and vacation visitors to LA.

- A relatively small share of hotels account for most Lodging industry employment. Ten percent of establishments have 100 or more employees, but these establishments account for 67 percent of workers employed by the industry.

- Lodging industry wages vary considerably based on the size of establishments. Establishments with 200 or more employees paid an average of $2,131 a month in 2002, 56 percent more than the average of $1,364 at establishments with 10 to 19 employees.

Exhibit 4 Page 182

52     From the Pockets of Strangers

Exhibit 4 Page 183

# Endnotes

[1] We use the geographic definitions established by Smith Travel Research.  The counties that make up the six metropolitan areas studied in this report are:

LAS VEGAS
    Mohave County, AZ
    Clark County, NV
    Nye County, NV
LOS ANGELES
    Los Angeles County, CA
NEW YORK
    Bronx County, NY
    Kings County, NY
    New York County, NY
    Putnam County, NY
    Queens County, NY
    Richmond County, NY

*New York continued:*
    Rockland County, NY
    Westchester County, NY
PHOENIX
    Maricopa County, AZ
    Pinal County, AZ
SAN DIEGO
    San Diego County, CA
SAN FRANCISCO
    Marin County, CA
    San Francisco County, CA
    San Mateo County, CA

[2] Peter D. Kuhbach, Mark A. Planting, and Erich H. Strassner, *Survey of Current Business,* "U.S. Travel and Tourism Satellite Accounts for 1998–2003," U.S. Bureau of Economic Analysis, September 2004, p. 45.

[3] Information about US tourism-related output, employment, the tourism ratio for each industry sector, and the definitions of industry sectors is from the Industry Economics Division (IED), Bureau of Economic Analysis BE-51, U.S. Department of Commerce.  The files used for this report contain data from the 1998-2003 U.S. Travel and Tourism Satellite Accounts (TTSA's) as published in "U.S. Travel and Tourism Satellite Accounts for 1998-2003," SURVEY OF CURRENT BUSINESS (Sept 2004).  This article provides further information about the definitions and conventions used in the travel and tourism satellite accounts and can be downloaded from the publications tab on the BEA web site, www.bea.gov.

The following table provides the crosswalk between BEA Travel and Tourism Satellite Accounts and NAICS industry codes that are used for reporting many types of industry data, as well as the tourism ratio for each BEA sector.  The tourism ratios were downloaded from the Bureau of Economic Analysis Satellite Industry Accounts Data, Travel and tourism data files, Annual estimates, 1998-2003, http://www.bea.doc.gov/bea/dn2/tourism_data.htm#ttdf

Industries in the Travel and Tourism Satellite Accounts and Tourism Ratio

TTSA Industries 2002 NAICS codes

| BEA TTSA Industry Sectors | Tourism Ratio | Code 1 | Code 2 | Code 3 | Code 4 | Code 5 | Code 6 | Code 7 | Code 8 | Code 9 | Code 10 | Code 11 | Code 12 | Code 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Traveler accommodations | 0.7319 | 7211 | 7212 | | | | | | | | | | | |
| Food services & drinking places | 0.1857 | 722 | | | | | | | | | | | | |
| Air transportation | 0.7949 | 481 | 4881 | | | | | | | | | | | |
| Rail transportation | 0.0444 | 48211 | 48821 | | | | | | | | | | | |
| Water transportation | 0.1743 | 483 | 4883 | | | | | | | | | | | |
| Interurban bus transportation | 0.9494 | 48521 | | | | | | | | | | | | |

*Corresponding NAICS Codes* (header spanning Code columns)

Exhibit 4 Page 184

54     From the Pockets of Strangers

| BEA TTSA Industry Sectors | Tourism Ratio | Corresponding NAICS Codes | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Code 1 | Code 2 | Code 3 | Code 4 | Code 5 | Code 6 | Code 7 | Code 8 | Code 9 | Code 10 | Code 11 | Code 12 | Code 13 |
| Urban transit systems & other transportation | 0.1495 | 4851 | 48532 | 4859 | 4884 | | | | | | | | | |
| Taxi service | 0.3570 | 48531 | | | | | | | | | | | | |
| Scenic & sightseeing transportation | 0.9740 | 487 | | | | | | | | | | | | |
| Automotive equipment rental & leasing | 0.5735 | 5321 | | | | | | | | | | | | |
| Automotive repair services | 0.0650 | 8111 | | | | | | | | | | | | |
| Parking lots & garages | 0.1512 | 81293 | | | | | | | | | | | | |
| Toll highways | 0.0739 | n.a. | | | | | | | | | | | | |
| Travel arrangement & reservation services | 0.9273 | 5615 | | | | | | | | | | | | |
| Motion pictures & performing arts | 0.1637 | 51213 | 7111 | 7115 | | | | | | | | | | |
| Spectator sports | 0.2708 | 7112 | 7113 | 7114 | | | | | | | | | | |
| Participant sports | 0.2770 | 71391 | 71392 | 71394 | | | | | | | | | | |
| Gambling | 0.3956 | 7132 | | | | | | | | | | | | |
| All other recreation & entertainment | 0.2749 | 1142 | 51912 | 71121 | 7121 | 7131 | | 7139 | | | | | | |
| Petroleum refineries | 0.0555 | 32411 | | | | | | | | | | | | |
| Industries producing nondurable PCE* commodities, excluding petroleum refineries | 0.0225 | 111 | 112 | 113 | 11411 | 212 | 22133 | 31 | 32 | 33 | 511 | 512 | 56142 | 811 |
| Wholesale trade & transportation services | 0.0171 | 42 | 48 | | | | | | | | | | | |
| Gasoline service stations | 0.0727 | 4471 | | | | | | | | | | | | |
| Retail trade services, excluding gasoline service stations | 0.0257 | 44 | 45 | | | | | | | | | | | |
| All other industries | 0.0004 | | | | | | | | | | | | | |

*PCE = Personal Consumption Expenditures

[4] The BEA sector labeled "Nondurable commodities" in Figures 1 and 2 is a large group of industries producing "nondurable personal consumption expenditure (PCE) commodities, excluding petroleum refineries."

[5] The Public Use Microdata Sample (PUMS) from the 2000 Census is the source of data used to obtain information about residents of Los Angeles County who are employed in tourism-linked jobs. This data is in the form of a sample of individual responses to the long-form Census questionnaire. Each individual response is weighted based on its representativeness of the overall population, making it possible to expand this data to represent the total population. The following PUMS data sets were used:
- 1% sample for all data points that reference U.S. totals
- 5% sample for all data points that reference states, metro areas, and any sub-national geography

*Age:*
Generally for any industry or occupation, PUMS only reports workers 16 years and older. However, to be sure that we only captured working age people, we sub-set the PUMS data to include only people who are sixteen years of age or older. There is no upper limit applied to the working age for PUMS data, thus the data includes anyone working in an industry or occupation even if they are past retirement age.

Record Counts:
In order to produce data that is reliable we established the following minimum thresholds for data that is included in this report:

*Employment:*
Minimum 10 records (unweighted records) for measures of employment or unemployment.

Exhibit 4 Page 185

*Wage-Salaries, Weeks worked 1999, Hours worked 1999, Hourly wages 1999:*
Minimum 50 records (unweighted records) for any of these measures.

*Industry and Occupation:*
For industries and occupations, PUMS reports the industry or occupation in which the respondent last worked, even if they are currently unemployed. Thus, we made the following assumptions:

a.  If a person reported being employed, then we assumed that the industry or occupation they reported is the industry or occupation in which they are currently employed.

b.  If a person reported being unemployed, we assumed that the industry or occupation they reported represents the industry or occupation from/ in which they were unemployed. Thus, we can identify industry and occupation unemployment rates as well as employment rates.

To assign 1999 wage and salary incomes to an industry or occupation, we assumed that for employed people, their current occupation or industry was the same in 1999. For people that reported being currently unemployed or out of the labor market we assumed that the industry or occupation they reported represents the industry and occupation in which they worked in 1999 if they report a wage-salary income for 1999.

[6] Employer-reported employment data is from County Business Patterns. The US Census Bureau, in addition to creating the census of population and housing every ten years, also releases a census each year of all business establishments with one or more paid employees. This series, called the County Business Patterns, details number of business establishments, their industry classification (NAICS), their amount of employment, their 1st quarter and annual payroll, and a breakdown of each industry by employment size of the establishments. The data in this section is drawn from the most recent year of this county-level data set, 2002. This data set excludes self-employed people, domestic service workers, railroad employees, agricultural production workers, most government employees, and employees on ocean-borne vessels. County Business Patterns provides the most detailed public domain data set available describing regional employment by industry, but there are at least three characteristics of this data that can produce different employment estimates than we get from Census data. First, County Business Patterns (CBP) describes jobs, not people; some people hold more than one job, potentially making CBP estimates higher than Census estimates. Second, CBP excludes self-employed individuals as well as individuals in the informal economy, potentially making CBP estimates lower than Census estimates. Third CBP describes jobs located in a region, regardless of where the workers live, whereas Census data describes workers living in a region, regardless of where their job is located. Depending on whether a region is a net importer or net exporter of workers, this difference can lead to higher employment estimates in either CBP or Census data.

[7] Information about the economy of each region was produced using IMPLAN input-output software to create a model of the economy of each region, using 2002 IMPLAN data for each county within each region. IMPLAN is an economic impact assessment software system created by the Minnesota IMPLAN Group. The IMPLAN system serves three functions: 1) data retrieval, 2) data reduction and model development, and 3) impact analysis. The IMPLAN database consists of two major parts: 1) a national-level technology matrix and 2) estimates of sectorial activity for final demand, final payments, industry output and employment for each county in the U.S. along with state and national totals. Input-output accounting describes commodity flows from producers to intermediate and final consumers. Using county-level data provided by IMPLAN it is possible to estimate each industry's: total purchases of commodities and services, employment, compensation to employees and owners, value added, indirect tax payments, and imports. Purchases for final use (final demand) drive the model, and the Bureau of Economic Analysis tourism ratios (shown in Figure 1) provide a basis for estimating the share of each industry's output that is linked to tourism.

The IMPLAN models created for each of the six regions studied in this report provide information about 509 sectors of the economy, showing linkages between each sector. In three instances the IMPLAN sectors roll up industries within two or more different BEA tourism sectors. In those instances we used 2002 County Business Patterns employment data for each of the six regions to disaggregate IMPLAN data by estimating

Exhibit 4 Page 186

the proportions of the IMPLAN sector that corresponded to each BEA sector. These estimates are shown below.

**Breaking Out IMPLAN Industry Sectors to Correspond with BEA Satellite Industry Accounts**

All Data is for 2002; Disaggregation is based on County Business Patterns employment data

| Tourism Ratio | BEA Satellite Industry Account | NAICS Code | NAICS Title | Las Vegas | Los Angeles | New York | Phoenix | San Diego | San Francisco |
|---|---|---|---|---|---|---|---|---|---|
| *Disaggregation of IMPLAN sector 395, Transit and ground passenger transportation, which includes Interurban bus transportation, Interurban charter bus transportation, Urban transit systems, and Taxi service* | | | | | | | | | |
| 14.95% | Urban transit systems and other transportation | 4851 48532 4859 | Urban transit systems, Limousine service, and Other ground passenger transportation | 32.5% | 74.9% | 80.8% | 83.0% | 86.0% | 70.2% |
| 94.94% | Interurban bus transportation | 48521 | Interurban bus transportation | 0.7% | 7.3% | 7.8% | 9.5% | 0.9% | 2.5% |
| 35.70% | Taxi service | 48531 | Taxi service | 59.8% | 3.1% | 1.4% | 1.5% | 6.0% | 10.9% |
| 82.92% | Interurban charter bus transportation | 48551 | Interurban charter bus transportation | 7.0% | 14.7% | 10.0% | 5.9% | 7.1% | 16.4% |
| *Disaggregation of IMPLAN sector 397, Scenic and sightseeing transportation and support, which includes Scenic and sightseeing transportation as well as support activities for transportation* | | | | | | | | | |
| 97.40% | Scenic and sightseeing transportation | 487 | Scenic & sightseeing transportation | 28% | 1% | 3% | 1% | 11% | 9% |
| 1.71% | Wholesale trade and transportation services | 488 | Transportation support activities | 72% | 99% | 97% | 99% | 89% | 91% |
| *Disaggregation of IMPLAN sector 418, Motion picture and video industries, which includes motion picture production as well as distribution.* | | | | | | | | | |
| 16.37% | Motion pictures and performing arts | 51213 | Motion Picture and Video Exhibition | 74.6% | 9.4% | 29.5% | 84.5% | 60.2% | 27.3% |
| 2.25% | Industries producing nondurable PCE commodities, excluding petroleum refineries | 512 | Balance of Motion picture and sound recording industries | 25.4% | 90.6% | 70.5% | 15.5% | 39.8% | 72.7% |

[8] Lodging industry data is derived from IMPLAN sector 479, which includes NAICS 72111, Hotels and motels, and NAICS 72112, Casino hotels.

[9] Indirect business taxes are paid by individuals to businesses, and then passed on to the government by businesses. These taxes include sales, excise and hotel room taxes.

[10] Jane Engle, "It's Taxation without Representation for Hotel Occupants," Los Angeles Times, August 22, 2004.

[11] An alternative way of looking at the share of industry returns that go to workers is to compute employee compensation as a percent of added value created by the industry in each region. In the IMPLAN model, value added is the sum of employee compensation, proprietor income (income received by individual owners), other property income (income received by corporations), and indirect business tax (taxes collected by the business establishment). The table below shows the share of value added that goes to employees

and owners (proprietors and corporations) in each region. The story is much the same as shown in Figure 22, where employee compensation is shown as a share of industry output (which includes the value of goods and services purchased from elsewhere). Lodging industry workers in Los Angeles receive the smallest share of locally added value, and owners the largest share, of any of the six regions studied.

| Metropolitan Area | Employee Compensation as % of Value Added in 2002 | Owner Income as % of Value Added in 2002 |
|---|---|---|
| Las Vegas | 46% | 35% |
| Los Angeles | 40% | 41% |
| New York City | 42% | 40% |
| Phoenix | 43% | 39% |
| San Diego | 42% | 40% |
| San Francisco | 42% | 39% |

[12] This is the Regional Purchase Coefficient (RPC) from the IMPLAN model for each region. An RPC represents the proportion of the total supply of a good or service required to meet a particular industry's intermediate demands and final demands that are produced locally. For example, an RPC value of 0.8 for the commodity "fish" means that 80 percent of the demand for fish (by fish processors, fish wholesalers, foreign exports, and others) are provided by local fishermen. The remainder, 20 percent, is imported.

[13] This information is from TIA TravelScope, which conducts a monthly survey of U.S. households and captures trip information for up to three trips per month. This data is then weighted and projected to reflect the demographics of the U.S. population. To collect these data, TravelScope uses a mail panel of U.S. households operated by National Family Opinion (NFO) Research, Inc. Each month, a representative sample of 25,000 households are mailed a questionnaire that asks the total number of trips of 50 miles or more away from home and/or overnight trips taken in the previous month by all members of the household. TIA obtains responses from an average of 5,000 traveling households each month.

[14] Each of the six cities, including LA, uses outside contractors to generate visitor estimates. For example, LA and San Diego contract with CIC Research. Due to different methodologies and data sources employed by each of the cities and our need for a consistent frame of reference to use in comparing cities, we opted to use visitor counts generated by TIA TravelScope in this study, although the number of visitors they report is lower than counts reported by each of the six cities we analyze.

[15] This ratio of hotel and motel rooms to labor force size uses Bureau of Economic Analysis data for total employment, including self-employed persons.

[16] The Cost of Living Index is from the US Department of Commerce, Census Bureau, *Statistical Abstract of the United States 2005-2005*, Table 701. The Index measures the relative price levels for consumer goods and services for a mid-management standard of living. The nationwide average equals 100, and each Index is read as a percent of the national average. The Index for each region in 2003, the most recent year for which data are available, was as follows: Las Vegas 103.0, Los Angeles 148.8, New York 217.1, Phoenix 98.5, San Diego 139.8, San Francisco 169.8, United States 100.0.

[17] The lodging industry includes NAICS 7211, Traveler accommodations (i.e., hotels and motels), and NAICS 7212, RV parks & recreational camps. Nationally, 98% of lodging industry employment is in NAICS 7211 and 2% is in NAICS 7212.

[18] The Public Use Microdata Sample (PUMS) from the 2000 Census is the source of data used to obtain information about residents of Los Angeles County who are employed in the lodging industry. A preceding endnote describes the conventions for using PUMS data in this report.

Exhibit 4 Page 188

[19] There are several noteworthy differences in these two data sets.  First, Census data is for people who live in each metropolitan area, but may commute out of the area for their job, whereas County Business Patterns data is for establishments located in each area, but the workers employed at these establishments may live outside the metropolitan area.  Second, Census data includes all people who report that they had earned income, including people who were self-employed or who worked in the informal economy, whereas County Business Patterns data reports only wage and salary employees, that is employees whose employers paid payroll taxes for them.  And third, Census data is for the year 2000, with annual earnings reported to the Census covering the preceding year, 1999, whereas the most recent year of County Business Patterns data, 2002, was used for this report.  The September 11, 2001 terrorist attack occurred between these two dates, reducing tourism in many regions.

[20] It should be noted that the lodging industry employment figures shown in Table 3 include all employment in this industry, rather than just the 73% of employment that is tourism-linked as was shown in earlier chapters.

[21] The percent of each metropolitan area labor force employed in the lodging industry is divided by the percent of the US labor force employed in this industry to calculate the location quotient (see Table 3 for these percents).

[22] In Table 3, only 9.75% of residents report being employed in the lodging industry, but lodging industry employers report providing 23.15% of all wage and salary employment in Las Vegas.  Part of this discrepancy appears to be that many people who describe themselves in the Census as working in the gambling industry are actually employed by establishments classified as NAICS 72112, Casino hotels.  Another part of the discrepancy is explained by the fact that the overall population of workers responding to the Census includes self-employed people and government employees, who are not reported in County Business Patterns data, resulting in a somewhat smaller share of the overall labor force being employed in the lodging industry that is shown by County Business Patterns.

[23] The Economic Policy Institute's living wage budgets can be downloaded from: http://www.epinet.org/content.cfm/datazone_fambud_budget.  These family budgets are for the year 1999. For a full explanation of the methodology used, see Appendix A in *Hardships in America*.

[24] Census data is from the PUMS 2000 5% sample, showing workers currently employed in the Lodging industry at the time of the Census in 2000.  County Business Patterns earnings are employer reported data for 2002.  The living wage standards are from the Economic Policy Institute and are for one parent with one child in 1999.  The estimate of the percent of the living wage that is provided by Lodging industry earnings reported in County Business Patterns 2002 incorporates estimated changes in the living wage in each region from 1999 to 2002, based on changes in the Consumer Price Index for each region.

[25] Table 5 shows workers employed in the Lodging industry at the time of the 2000 Census.  Data is from the PUMS 5% sample.  Employment data is suppressed if there were fewer than 10 PUMS records for a data point; a typical PUMS record represents 20 individuals, signifying that most blank cells represented fewer than 200 workers.  All occupations representing at least 2% of Lodging industry employment in at least one of the six areas studied are shown in Table 5.

[26] Table 6 shows workers employed in the Lodging industry at the time of the 2000 Census.  Data is from the PUMS 5% sample.  Earnings data is suppressed if there were fewer than 50 PUMS records for a data point; a typical PUMS record represents 20 individuals, signifying that most blank cells represented fewer than 1,000 workers.

[27] Total hours worked in 1999 were estimated by multiplying the number of hours per week typically worked by the number of weeks worked during the year, for workers employed in the Lodging industry at the time of the 2000 Census.  Data is from the Census 2000 PUMS 5% sample.

Exhibit 4 Page 189

[28] The Lodging industry unemployment rate was derived from Employment Status Recode variable in PUMS 5% sample: Unemployed / (Employed + Unemployed).  The metropolitan area unemployment rate for the total labor force is from Bureau of Labor Statistics report: "Metropolitan Area Employment and Unemployment: April 2000."

[29] LA Inc, the Convention and Visitors Bureau, provided the following breakout of ZIP codes estimated to correspond with each PFK Consulting region, and used to define Lodging industry markets in this report:

Antelope and Santa Clarita Valleys

91321  91350  91351  91354  91355  91381  91384  93243  93510  93532  93534  93535  93536  93543  93544
93550  93551  93552  93553  93560  93563  93591

Beverly Hills and West Hollywood

90069  90210  90211  90212

Coastal

90263  90265  90272  90290  90292  90401  90402  90403  90404  90405  90704  90707  90291  90293

Downtown

90012  90013  90014  90015  90017  90021  90071

East San Fernando Valley, Burbank, Glendale

90041  90042  90065  91020  91201  91202  91203  91204  91205  91206  91207  91208  91501  91502  91504
91505  91506  91521  91522  91523  91604  91608

Hollywood

90004  90020  90026  90027  90028  90029  90036  90038  90039  90046  90068

LAX, Pacific Coast Highway

90045  90230  90232  90245  90301  90302  90304  90305

Long Beach

90802  90803  90804  90805  90806  90807  90808  90810  90813  90814  90815  90822  90831  90840

Pasadena

91001  91006  91007  91011  91024  91101  91103  91104  91105  91106  91107  91108  91109  91123

San Gabriel Valley

90031  90032  90033  90063  91010  91016  91030  91702  91706  91711  91722  91723  91724  91731  91732
91733  91734  91740  91741  91744  91745  91746  91748  91750  91754  91755  91759  91765  91766  91767
91768  91769  91770  91773  91775  91776  91780  91790  91791  91792  91801  91803

South Bay

90078  90247  90248  90249  90250  90251  90254  90260  90266  90274  90275  90277  90278  90501  90502
90503  90504  90505  90506  90510  90710  90717  90731  90732  90744  90745  90746  90747

South Los Angeles

90001  90002  90003  90005  90006  90007  90008  90010  90011  90016  90018  90019  90037  90043  90044
90047  90056  90057  90059  90061  90062  90089  90303

West San Fernando Valley

91040  91042  91046  91214  91301  91302  91303  91304  91306  91307  91311  91316  91324  91325  91326
91330  91331  91335  91340  91342  91343  91344  91345  91352  91356  91361  91362  91364  91367  91371
91401  91402  91403  91405  91406  91411  91423  91436  91601  91602  91605  91606  91607

Westside

90024  90025  90034  90035  90048  90049  90064  90066  90067  90073  90077  90095

Whittier, I-5 Corridor

90022  90023  90040  90058  90201  90220  90221  90222  90240  90241  90242  90255  90262  90270  90280
90601  90602  90603  90604  90605  90606  90631  90638  90639  90640  90650  90660  90670  90701  90703
90706  90712  90713  90715  90716  90723

Exhibit 4 Page 190

60      From the Pockets of Strangers

[30] Occupancy rates, room rates, and average daily revenue per room from 2000 through 2005, shown in Figures 40-42, are not available for West LA or the East San Fernando Valley-Burbank areas in this data series.

[31] Although similar to County Business Patterns data in that it shows employer-reported wage and salary employment by place of employment, this data is from the ES-202 files of the California Employment Development Department's Unemployment Insurance program.

[32] This data is from the Census 2000 PUMS 5% Sample, which is reported for Public Use Microdata Areas (PUMAS) that typically have populations of about 150,000 residents. PUMA boundaries do not coincide exactly with Lodging market boundaries established by PKF Consulting for its Lodging industry data, although it is possible to identify clusters of PUMAS that correspond roughly with most of the PKF boundaries. In some instances PKF areas have been combined to create a better match with PUMA boundaries.

Exhibit 4 Page 191

# Impacts of Living Wages in the Airport Hospitality Enhancement Zone

Prepared for the
City of Los Angeles Administrative Officer
December 8, 2010

Economic Roundtable
www.economicrt.org

Exhibit 4 Page 192

# Executive Summary

This study of the Airport Hospitality Enhancement Zone examines the economic impacts of minimum compensation requirements, outcomes from the non-tiered living wage requirement for both tipped and non-tipped hotel workers, and the costs and possible benefits of training for hotel workers.

Hotels in the Airport Hospitality Zone are called upon by the City to pay workers a minimum of $10.30 an hour and $1.25 per hour in health benefits, or $11.55 an hour if health benefits are not provided. This is part of an overall strategy to strengthen both the business and the employment environment in the Century Boulevard corridor immediately adjacent to Los Angeles International Airport (LAX).

Information gathered and analyzed for this study indicates that living wage standards and the workforce training program have had positive, or at least not negative, impacts on hotels, hotel customers and hotel workers.

*Hotels*

Changes in employment rates for hotel workers in the Hospitality Zone compared to the City as a whole provide one form of evidence about whether the wage increases called for by the Hospitality Zone Ordinance had an adverse effect on business viability. The 2007 recession was accompanied by declining employment rates for the Citywide hotel labor force in 2008 and 2009. The Citywide percent of hotel workers who had any work in the preceding 12 months dropped from 96 percent in 2007 to 88 percent in 2009.

In contrast, the annual employment rate among all hotel workers in the Hospitality Zone increased from 95 percent in 2007 to 99 percent in 2009. Many factors other than payments to workers affect the viability of hotels, the most important of these being the number of visitors. Still, evidence of growing employment rates among hotel workers in the Hospitality Zone, in contrast to declining Citywide rates indicates that there is not evidence that wage increases had an adverse effect on the viability of hotels in the Hospitality Zone. Higher levels of employment are an indication that these hotels are doing well, particularly in comparison to hotels Citywide.

A workforce training program underwritten by the City is currently providing training for 282 new and experienced hotel workers at an average cost of $2,305 each. If this training extends the duration for which workers are retained in their jobs by increasing job satisfaction and opening opportunities for career advancement, it will create significant cost savings for employers. These savings come from reduced costs for managing terminations, filling vacancies, providing orientation and training, and the lost productivity of experienced workers. Each job turnover that is avoided is estimated to save employers $4,100 in direct and indirect costs.

Exhibit 4 Page 193

*Hotel Customers*

Hotels in the Century Boulevard corridor have access to 30 million passengers a year who pass through LAX, many of them needing a place to stay. Roughly 1.5 million passengers who arrived at LAX in 2009 are estimated to have stayed in high-end hotels in the Los Angeles area, and another 2.5 million are estimated to have stayed in mid-level hotels. This flow of visitors needing a hotel to stay in is the primary source of guests for the Hospitality Zone. A smaller but still important group of guests is local residents attending conferences and banquets, or spending the night at Hospitality Zone hotels. Local residents are estimated to account for 27 percent of guests.

The volume of passengers moving through Los Angeles International Airport declined 4 percent from 2007 to 2008, and then an additional 5 percent from 2008 to 2009. Nevertheless, annual earnings and employment rates of hotel workers in the Hospitality Zone do not reflect this downward trend, or the downward trend in earnings and employment for the Citywide hotel labor force. This is an indication hotel guests, who often have discretion about where they stay, are patronizing hotels in the Hospitality Zone and are happy with the services they receive there.

*Hotel Workers*

By 2009, the average earnings reported by maids and housekeepers in the Hospitality Zone had increased 15 percent over levels before the Ordinance was approved, earnings of all hotel service workers increased 18 percent, earnings of sales and office workers increased 2 percent, and earnings of the entire hotel labor force in the Zone increased 29 percent. In contrast, there was little overall change in wages for the City's total resident labor force of hotel workers from 2000 through 2009. The Airport Hospitality Zone Ordinance clearly resulted in significant wage increases for hotel workers.

Wages of workers in the Hospitality Zone are subject to the same wage floor, whether or not they receive tips. The average wage reported in 2009 by employers for non-tipped hotel workers is 14 percent higher than the average wage reported for tipped workers. For the most part, tipped employees have fewer hours of work than non-tipped employees and lower total earnings; although tips appear to slightly reduce the gap in wages in the Zone. It is reasonable to conclude that income received through tips does not unfairly advantage workers in tipped occupations compared to workers in non-tipped occupations.

The purpose of the workforce training program is to benefit hotels in the Hospitality Zone as well as hotel workers. Training is expected to lead to increased job satisfaction and opportunities for career advancement.

Improved employment and earnings outcomes for hotel workers in the Hospitality Zone are an indication of the overall strength of the LAX hotel cluster. Well-paid and well-trained workers appear to be contributing to the resilience of these hotels and the satisfaction of their customers.

Exhibit 4 Page 194

# Impacts of Living Wages in the Airport
# Hospitality Enhancement Zone

## Economic Impact of Minimum Compensation Requirements

Hotels in the Airport Hospitality Zone are called upon by the City to pay workers a minimum of $10.30 an hour and $1.25 per hour in health benefits, or $11.55 an hour if health benefits are not provided.  This is part of an overall strategy to strengthen both the business and the employment environment in the Century Boulevard corridor immediately adjacent to Los Angeles International Airport (LAX).[1]  This report provides information about the impacts of the Airport Hospitality Enhancement Zone Ordinance on workers and their employers.

The first section of this report analyzes economic impacts of the minimum compensation requirements.  We begin by defining earnings bands for hotels workers, which serve as benchmarks for assessing impacts.  We then look at the effect of the ordinance on hotel workers' salaries in the zone compared to hotel workers' salaries in the City as a whole.  In the last part of this section, we look briefly at the customer base for hotels inside the zone and in the balance of the City.

### Earnings Bands for Hotel Workers

The U.S. Census Bureau's 2009 American Community Survey estimates the earned income over the past 12 months of hotel workers residing in Los Angeles County.   The average earnings reported by hotel workers was $29,775 a year or $2,481 a month.[2]  The most reliable and detailed information about the wage *distribution* for occupations within Los Angeles' hotel industry comes from employer surveys carried out by the California Employment Development Department.  We applied this occupational wage *distribution* to the *average earnings* reported by hotel workers in the county to create the ten wage bands shown in Table 1.

Workers in the *first*, lowest and biggest of the ten wage bands earn 70 to 80 percent of the average industry wage, or $1,737 to $1,985 per month.  This band includes maids and housekeepers and accounts for 44 percent of all hotel workers.

Workers in the *second* band include foods service helpers and security guards.  They receive 81 to 90 percent of the industry average or $1,986 to $2,233 per month, and account for 16 percent of the industry labor force.

Workers in the *third* band include switchboard operators, waiters and bartenders.  They receive 91 to 100 percent of the industry average, or $2,234 to $2,482 per month, and account for 15 percent of the industry labor force.

Workers in the *fourth* band include cooks and bookkeepers.  They receive 101 to 110 percent of the industry average, or $2,483 to $2,729 per month, and account for 6 percent of the labor force.

Exhibit 4 Page 195

4    Economic Roundtable

Table 1
2009 Monthly Wage Bands for Hotel Workers in Los Angeles County

| Wage Band | Major Occupations in Band | Wage as % of Hotel Average | | Wage Range | | % of All Hotel Jobs |
|---|---|---|---|---|---|---|
| | | Low | High | Low | High | |
| 1 | Baggage Porters and Bellhops Laundry and Dry-Cleaning Workers Maids and Housekeeping Cleaners Janitors and Cleaners Grounds Cleaning and Maintenance Dishwashers Food Servers, Non-restaurant Cashiers | 70% | 80% | $1,737 | $1,985 | 44% |
| 2 | Hotel, Motel, and Resort Desk Clerks Dining Room, Cafeteria and Bar Helpers Hosts and Hostesses, Restaurant Security Guards | 81% | 90% | $1,986 | $2,233 | 16% |
| 3 | Switchboard Operators Office Clerks Waiters and Waitresses Bartenders | 91% | 100% | $2,234 | $2,482 | 15% |
| 4 | Cooks Bookkeeping, Accounting Clerks | 101% | 110% | $2,483 | $2,729 | 6% |
| 5 | Housekeeping Supervisors Maintenance and Repair Workers | 111% | 120% | $2,730 | $2,978 | 6% |
| 6 | Secretaries Massage Therapists | 121% | 130% | $2,979 | $3,225 | 1% |
| 7 | Managers of Food Preparation and Serving Office Managers | 131% | 150% | $3,226 | $3,721 | 4% |
| 8 | Personal Services Managers Meeting and Convention Planners | 151% | 170% | $3,722 | $4,218 | 1% |
| 9 | Sales Representatives Accountants and Auditors | 171% | 200% | $4,219 | $4,962 | 2% |
| 10 | Chefs and Head Cooks Lodging Managers Food Service Managers | 201% | 450% | $4,963 | $11,166 | 4% |
| AVERAGE – ALL HOTEL WORKERS | | 100% | | $2,481 | | 100% |

Sources: U.S. Census Bureau, 2009 American Community Survey for wage and salary income in the past 12 months for hotel workers 18-64 years of age residing in Los Angeles County with earned income.  California Employment Development Department Labor Market Information Division and Economic Roundtable for proportionate distribution of wages in hotel occupations.

Workers in the *fifth* band include housekeeping supervisors and maintenance workers.  They receive 111 to 120 percent of the industry average, or $2,730 to $2,978 per month, and account for 6 percent of the labor force.

Exhibit 4 Page 196

Workers in the *sixth* band include secretaries and massage therapists.  They receive 121 to 130 percent of the industry average, or $2,979 to $3,225 per month and account for 1 percent of the labor force.

Workers in the *seventh* band include food and office managers.  They receive 131 to 150 percent of the industry average, or $3,226 to $3,721 per month, and account for 4 percent of the labor force.

Workers in the *eighth* band include personnel managers and convention planners.  They receive 151 to 170 percent of the industry average, or $3,722 to $4,218 per month, and account for 1 percent of the labor force.

Workers in the *ninth* band include sales representatives and accountants.  They receive 171 to 200 percent of the industry average, or $4,219 to $4,962 per month, and account for 2 percent of the labor force.

Workers in the *tenth* and highest band include chefs and hotel managers.  They receive 201 to 450 percent of the industry average or $4,963 to $11,166 per month, and account for 4 percent of the labor force.

*Number of Hotel Workers in Each Wage Band.*

The average monthly wage and salary earnings reported by hotel workers within the Hotel Zone and outside of the Zone over the two-year period of 2008 to 2009 was: [3]

- Hotel Hospitality Zone $2,523
- Los Angeles City        $2,386
- Los Angeles County   $2,544

Applying the wage spread among occupations found in the state's survey of Los Angeles County hotel employers to the



Figure 1
Distribution of Hotel Workers by Wage Band
Average Wage and Salary Income for 2008 and 2009

Sources: California Employment Development Department, U.S. Census Bureau 2009 American Community Survey, Economic Roundtable

Exhibit 4 Page 197

average wage for each area, we can estimate the share of hotel jobs that fall in each wage band, as shown in Figure 1 (see endnote for supporting data). [4]

The Hotel Zone is very close to parity with the hotel wage distribution in Los Angeles County, with 45 percent of workers in the lowest wage band vs. 44 percent for the county.  The City of Los Angeles as a whole has 57 percent of hotel workers in the lowest wage band.  The wage profile in the Hotel Zone may well have been similar to this Citywide profile before minimum wage standards were established, raising the wage floor and quite likely the overall wage ladder in the Zone.

*Impacts of Wage Standards for Hotel Zone Workers*

We are able to determine wage trends for hotel workers using the Public Use Microdata Sample (PUMS) records released by the Census Bureau.  These records are the complete long-form census responses from individual households.  Each record is weighted so that the sample of responses can be expanded to represent the entire population.  The identities of individual respondents are masked in these records, and one of the ways that is done is by rolling up respondents' place of residence into Public Use Microdata Areas (PUMAs).



Figure 2
Public Use Microdata Areas Used to Identify
Workers Employed in the Hospitality Zone

Source: Economic Roundtable

The City of Los Angeles is broken out into 24 PUMAs.  We used data for 7 PUMAs that are within a 6-mile radius of the airport, some inside the City and some outside, to capture information about hotel workers who are likely to be employed in the Hospitality Zone.  Figure 2 shows a map of these PUMAs.

PUMS records from the 2000 decennial census and the American Community Survey from 2005 (when city-level data became available) to 2009 were filtered as follows to identify records of hotel workers:
- Employed in the Traveler Accommodations industry
- Wage and salary income in the past 12 months
- 18 to 64 years of age

Exhibit 4 Page 198

Case 2:14-cv-09603-AB-SS   Document 58-3   Filed 03/09/15   Page 37 of 72   Page ID #:1375



Figure 3
### Annual Earnings of Los Angeles City Residents Employed by Hotels, 2000 to 2009



*Source: U.S. Census Bureau, 2000 decennial census, 2005 to 2009 American Community Surveys.  Wages shown in 2009 dollars.*

Comparable data sets were assembled for both the City of Los Angeles and the 7 PUMAs where Hospitality Zone workers are most likely to reside.

When we look at the entire labor force of hotel workers residing in the City, there is little overall change in wages from 2000 through 2009, as shown in Figure 3.[5]  In addition to the total hotel labor force, earnings are broken out for three occupational groups:

- Maids and Housekeepers, who are the largest group of hotel workers
- Service workers, a job family that includes maids and housekeeping cleaners, cooks, waiters and waitresses, janitors, food servers, bartenders, baggage porters, dishwashers, and security guards.
- Sales and office workers, a job family of hotel workers that includes cashiers and sales representatives

Workers' annual earnings can change as the result of at least two things – changes in wage rate or changes in the number of hours worked in a year.  For example, the dip in earnings in 2005 was probably the result of fewer hours of work during the year.  From 2006 through 2009, after adjusting wages for all years to 2009

Exhibit 4 Page 199

8    Economic Roundtable



Figure 4
Annual Earnings of Hotel Workers Residing in the LAX Area, 2007 to 2009

*Source: U.S. Census Bureau, 2007 to 2009 American Community Surveys. Wages shown in 2009 dollars. Data years 2000, 2005 and 2006 are not shown because the annual sample of PUMS survey records for Los Angeles was too small to breakout wage trends among workers in the Hospitality Zone.*

dollars, the typical annual change in the earnings of LA City hotel workers shown in Figure 3 was very modest:

- $56 annual increase, or 0.3 percent, for maids and housekeepers
- $31 annual increase, or 0.1 percent, for all hotel service workers
- $124 annual increase, or 0.6 percent, for hotel sales and office workers
- $279 annual increase, or 1.0 percent, for all hotel workers

We see a different picture when we look at the wages of workers residing in the Hospitality Zone. The minimum wage provisions of the Airport Hospitality Enhancement Zone Ordinance took effect July 1, 2007, and required a minimum hourly wage of $8.25 with health benefits or $9.50 without health benefits. The minimum wage is adjusted annually based on changes in the Consumer Price Index. The minimum wage of $8.50 in 2007 was the equivalent of $17,160 in annual earnings for a full-time worker. Hotels with severe financial problems had the option of seeking a one-year waiver from the new wage requirements.

Exhibit 4 Page 200

Figure 5
Percent of Los Angeles City Residents Employed by Hotels with Earned Income in the
Preceding 12 Months, 2000 to 2009



Source: U.S. Census Bureau, 2000 decennial census, 2005 to 2009 American Community Surveys.

The earnings shown in Figures 3 and 4 represent wages received in the 12 months preceding the date when residents completed the Census questionnaire, and thus reflect earnings from January 2006 through December 2008. This means that wage increases resulting from the Hotel Zone Ordinance became completely apparent in 2009 data, when workers reported their 2008 earnings.

By 2007, the annual sample of PUMS survey records for Los Angeles had grown sufficiently large to breakout wage trends among workers in the Hospitality Zone. Annual average earnings from 2007 through 2009 are shown in Figure 4. [6]   However, the sample of records for Hospitality Zone workers in the occupational groups for maids and housekeepers, and sales and office workers are small, so these results should be treated cautiously.  Maids and housekeepers are part of the larger job family of service workers; if both demonstrate the same trends, the outcomes shown for maids and housekeepers are validated.  Similarly, if trends for the entire workforce of hotel workers are similar to those for occupational groups within this industry, this validates the trends for those occupational groups.  For the most part, this is the case with data for the Hotel Zone. On the other hand, if trends shown for smaller occupational groups diverge from those shown for larger groups, then data for the smaller groups is called into question.

Exhibit 4 Page 201



Figure 6
Percent of Hotel Workers Residing in the LAX Area with Earned Income in the
Preceding 12 Months, 2007 to 2009

Source: U.S. Census Bureau, 2007 to 2009 American Community Surveys.

In 2009, the average earnings reported by maids and housekeepers in the Zone were $17,192, an increase of 15 percent over earnings reported in the preceding year. Earnings increased 18 percent for all hotel service workers, 2 percent for sales and office workers, and 29 percent for the entire hotel labor force. *The Hotel Zone Ordinance clearly resulted in significant wage increases for hotel workers.* In comparison, the City's total resident labor force of hotel workers, shown in Figure 3, reported only a 5 percent change in earnings from 2008 to 2009 – a change only one-sixth as great as in the Hospitality Zone.[7]

*Employment Change in the Airport Hospitality Enhancement Zone*

Changes in employment rates for hotel workers in the Hospitality Zone compared to the City as a whole provide one form of evidence about whether the wage increases called for by the Hospitality Zone Ordinance had an adverse effect on business viability.

The 2007 recession was accompanied by declining employment rates for the City's resident hotel labor force in 2008 and 2009. The percent of workers who had any

Exhibit 4 Page 202

Figure 7
## Type of Accommodation Used by Passengers Arriving at LAX, 1994 to 2009



Source: Los Angeles World Airports for passenger volume, California Travel and Tourism Commission, 2009 data tables, for type of accommodation.

work in the preceding 12 months is shown in Figure 5.[8]  This Citywide annual employment rate dropped from 96 percent in 2007 to 88 percent in 2009.

In contrast, the annual employment rate among all hotel workers in the Hospitality Zone increased from 95 percent in 2007 to 99 percent in 2009, as shown in Figure 6.[9]  Many factors other than payments to workers affect the viability of hotels, the most important of these being the number of visitors.  Still, evidence of growing employment rates among hotel workers in the Hospitality Zone, in contrast to declining Citywide rates indicates that *there is not evidence that wage increases had an adverse effect on the viability of hotels in the Hospitality Zone.*

*Customer Base within and Outside the Hospitality Zone*

Hotels in the Century Boulevard corridor have access to a large flow of travelers needing a place to stay.  The United States Bureau of Economic Analysis (BEA) estimates that 73 percent of hotel business comes from travelers, with the remaining 27 percent coming from local residents.[10]  In the case of LAX hotels, the roughly three-quarters of guests who are travelers are most likely to be people who are arriving at the

Exhibit 4 Page 203

12    Economic Roundtable

Figure 8
Annual Household Income of Passengers Departing through LAX, 1994 to 2009



Source: Los Angeles World Airports for passenger volume, Applied Management and Planning Group 2006 Survey for household incomes of departing passengers.

airport.  Air travelers are the primary customer base for hotels in the Hospitality Zone. The volume of air travelers has declined with the recession, dropping 4 percent from 2007 to 2008, and then an additional 5 percent from 2008 to 2009.

Roughly 1.5 million passengers who arrived at LAX in 2009 are estimated to have stayed in high-end hotels in the Los Angeles area, and another 2.5 million are estimated to have stayed in mid-level hotels, as shown in Figure 7.[11]  This flow of visitors needing a hotel to stay in is the primary source of guests for the Hospitality Zone.  They are augmented by roughly another quarter of the customer base that is drawn from local residents, for example, people living in Los Angeles who come to banquets and conferences held at LAX hotels.

Two factors that determine whether passengers traveling through LAX stay at a hotel, and if they do, the type of hotel they stay at are whether they are visitors or local residents, and their income level.  The estimated income distribution of passengers departing from LAX is shown in Figure 8.[12]  In 2009, an estimated 9.2 million passengers departing through LAX had annual household incomes over $100,000 a year.  Assuming that 44 percent of these passengers were visitors rather than local

Exhibit 4 Page 204

residents, this means that an estimated 4 million passengers could reasonably afford to, and might have a need to stay at hotels in the LAX Hospitality Zone.

The Hospitality Zone has 14 percent of the hotel bed inventory in Los Angeles County and 29 percent of the bed inventory in the City of Los Angeles.[13] The customer base for the City includes visitors traveling through LAX whose destination is outside of the Hospitality Zone, visitors arriving by automobile, train and ship, and the roughly one-quarter of the customer base drawn from local residents attending conferences and banquets at local hotels.

*Conclusions about the Economic Impacts of Minimum Wage Requirements*

Information gathered and analyzed for this study indicates that living wage standards and the workforce training program have had positive, or at least not negative, impacts on hotels, hotel customers and hotel workers.

Evidence of growing employment rates among hotel workers in the Hospitality Zone, in contrast to declining Citywide rates indicates that there is not evidence that wage increases had an adverse effect on the viability of hotels in the Hospitality Zone. Higher levels of employment are an indication that these hotels are doing well, particularly in comparison to hotels Citywide.

Annual earnings and employment rates of hotel workers in the Hospitality Zone do not reflect the downward trend in airport passengers, or the downward trend in earnings and employment for the Citywide hotel labor force. This is an indication hotel guests, who often have discretion about where they stay, are patronizing hotels in the Hospitality Zone and are happy with the services they receive there.

The Airport Hospitality Zone Ordinance clearly resulted in significant wage increases for hotel workers. Improved employment and earnings outcomes for hotel workers in the Hospitality Zone are an indication of the overall strength of the LAX hotel cluster. Well-paid workers appear to be contributing to the resilience of Hospitality Zone hotels and the satisfaction of their customers.

## Non-tiered Living Wage Requirement for Both Tipped and Non-tipped Hotel Workers

*Tipped and Non-tipped Hotel Worker Wages Within and Outside the Hospitality Zone*

The minimum wage standard established by the Airport Hospitality Enhancement Zone Ordinance applies equally to both tipped and non-tipped employees. In this section we analyze the wages of these two groups of workers as the first step in analyzing their overall wage parity. Managers and supervisors are excluded from this analysis, as well as professional workers in occupations such as Meeting and Convention Planners and Accountants and Auditors. *Tipped* employees account for 51 percent of line workers in hotels and include:

- Baggage Porters and Bellhops

Exhibit 4 Page 205

- Bartenders
- Concierges
- Food Servers
- Maids and Housekeeping Cleaners
- Parking Lot Attendants
- Waiters and Waitresses

*Non-tipped* employees account for 49 percent of line workers in hotels and include:

- Bookkeeping, Accounting, and Auditing Clerks
- Cashiers
- Cooks, Restaurant
- Dining Room and Cafeteria Attendants and Bartender Helpers
- Dishwashers
- Food Preparation Workers
- Hosts and Hostesses, Restaurant, Lounge, and Coffee Shop
- Hotel, Motel, and Resort Desk Clerks
- Janitors and Cleaners, Except Maids and Housekeeping Cleaners
- Laundry and Dry-Cleaning Workers
- Maintenance and Repair Workers
- Sales Representatives
- Security Guards
- Switchboard Operators

By applying the occupational wage spread reported by hotel employers to the average 2009 earnings reported by hotel workers in Los Angeles County, Los Angeles City and the LAX Hospitality Zone, we obtain the average wages (before tips) for tipped and non-tipped line hotel workers shown in Table 2.

The average pre-tip wage reported by employers for non-tipped hotel workers is 14 percent higher than for tipped workers: $2,322 vs. $2043 Countywide, $2,178 vs. $1916 Citywide, and $2,303 vs. $2,027 in the LAX Hospitality Zone.

Table 2
Average Monthly Wage in 2009 Reported by Employers for Tipped and Non-Tipped Hotel Workers in Non-supervisory, Non-professional Occupations

|  | Los Angeles County | Los Angeles City | LAX Hospitality Zone |
|---|---|---|---|
| Tipped Workers | $2,043 | $1,916 | $2,027 |
| Non-tipped Workers | $2,322 | $2,178 | $2,303 |
| Percent Difference | 14% | 14% | 14% |

Sources: California Employment Development Department OES employer survey for wage spread among hotel occupations and U.S. Census Bureau 2009 American Community Survey for average earnings of hotel workers in each geographic area

Exhibit 4 Page 206

*Effect of Tips on Earnings Parity between Hotel Workers in Tipped and Non-tipped Line Occupations*

Little information is available about the income that Los Angeles hotel workers receive from tips. Our approach is to analyze post-tip outcomes in the form of number of hours worked and total earnings reported by workers. Then, we compare the post-tip earnings spread for tipped and non-tipped hotel workers to the spread reported by employers for pre-tip wages. This approach does not produce a specific estimate of the amount of income that workers receive through tips, but it does provide information about the effect of tips on earnings parity between hotel workers in tipped and non-tipped line occupations. This analysis is shown in Table 3.[14]

What we see for the most part is that tipped employees have fewer hours of work than non-tipped employees and lower total earnings, although tips appear to reduce the gap in wages that employers are shown paying in Table 2. When we look at the County, the City and the Hospitality Zone in Table 3, outcomes are least favorable for tipped workers in the Hospitality Zone. These employees report 19 percent fewer hours of work and post-tip earnings that are 13 percent lower than non-tipped workers. The magnitude of this post-tip wage gap for tipped workers should be viewed with caution because of the comparatively small sample size for the Hospitality Zone.[15] However, it is reasonable to conclude that *income received through tips does not unfairly advantage workers in tipped occupations compared to workers in non-tipped occupations.*

Table 3
Average Monthly Earnings, Hours Worked and Hourly Earnings in 2009
Reported by Tipped and Non-Tipped Hotel Workers in Non-supervisory, Non-professional Line Occupations (2009 dollars)

|  | Los Angeles County | Los Angeles City | LAX Hospitality Zone |
|---|---|---|---|
| *Average Monthly Earnings* |  |  |  |
| Tipped Workers | $1,811 | $1,936 | $1,755 |
| Non-tipped Workers | $1,881 | $1,780 | $2,349 |
| Percent Difference | 4% | -8% | 34% |
| *Average Monthly Hours Worked* |  |  |  |
| Tipped Workers | 139 | 146 | 139 |
| Non-tipped Workers | 147 | 138 | 165 |
| Percent Difference | 6% | -6% | 19% |
| *Average Hourly Earnings* |  |  |  |
| Tipped Workers | $13.04 | $13.25 | $12.64 |
| Non-tipped Workers | $12.80 | $12.91 | $14.24 |
| Percent Difference | -2% | -3% | 13% |

*Source: U.S. Census Bureau, 2009 American Community Survey, workers in the Traveler Accommodations industry, age 18-64 years, with wage and salary earnings in the past 12 months.*

*Average Training Cost per Hotel Worker within the Hospitality Zone*

The Airport Hospitality Enhancement Zone Ordinance calls for an investment in workers that includes a workforce training program underwritten by the City. This training is currently being provided by the California Labor Federation AFL/CIO under a $650,000 contract with the City's Community Development Department. The training includes:

Exhibit 4 Page 207

16    Economic Roundtable

- Boot camp training for new hires
- Career advancement training for room attendants
- Career advancement training for banquet servers

Training is provided in 40-hour training modules for 282 workers.  Most classes are planned to have 16 participants, and altogether, 11,280 person hours of training are planned.  The average training cost is $2,305 per worker who completes training.

Human capital investments in the form of worker training can increase productivity and reduce turnover.  If this training program extends the duration for which workers are retained in their jobs by increasing job satisfaction and opening opportunities for career advancement, it will create significant cost savings for employers.  This includes:

- Reduced termination costs for separation processing, exit interviews and accrued vacation
- Reduced vacancy costs for temporary help, preparing and running job ads, screening and interviewing applicants, checking references and finalizing hiring agreements
- Reduced orientation and training costs for new hires
- Reduced indirect costs for lost productivity of experienced workers, increased time spent supervising new workers, and decreased satisfaction on the part of customers served by inexperienced workers

The American Hotel and Motels Association cites a $4,100 turnover cost for line employees.  This includes $2,500 in direct costs and $1,600 in indirect costs.[16]

Exhibit 4 Page 208

## ENDNOTES

[1] The Airport Hospitality Enhancement Zone Ordinance, number 178432, was adopted by the Los Angeles City Council on February 21, 2007. As specified in Ordinance 177211, the Hospitality Zone includes properties along the north side of Century Boulevard between La Cienega Boulevard and Sepulveda Boulevard and along the south side of Century Boulevard from La Cienega Boulevard to Aviation Boulevard; and includes properties on the north side of 98th Street between Sepulveda Boulevard and Aviation Boulevard, and nearby properties that have addresses on La Cienega Boulevard, 102nd Street, 98th Street, and Aviation, Sepulveda and Airport Boulevards.

[2] U.S. Census Bureau, 2009 American Community Survey Public Use Microdata Sample for Los Angeles County and California Employment Development Department, industry-occupation matrix based on 2009 employment, http://www.labormarketinfo.edd.ca.gov/?pageid=1012.

[3] Wages in the preceding twelve months reported by hotel workers in the 2008 and 2009 American Community Survey were adjusted to 2009 dollars and averaged. Data for the two-year period was used to increase sample size. Average annual earnings reported by hotel workers countywide were higher for the combined two-year period of 2008-2009 than for 2009 alone because average annual earnings adjusted to 2009 fell from 2008 to 2009, from $31,532 to $29,775.

[4] Supporting data for Figure 1, Distribution of Hotel Workers by Wage Band:

| Wage Band | LA County | LA City | Hotel Zone |
|---|---|---|---|
| 1 | 43.9% | 57.0% | 44.6% |
| 2 | 16.1% | 5.1% | 15.5% |
| 3 | 14.6% | 18.9% | 14.6% |
| 4 | 6.5% | 5.8% | 6.5% |
| 5 | 5.8% | 1.3% | 5.8% |
| 6 | 1.3% | 2.2% | 1.3% |
| 7 | 3.5% | 1.9% | 3.6% |
| 8 | 1.5% | 2.6% | 1.4% |
| 9 | 2.2% | 1.5% | 2.2% |
| 10 | 4.5% | 3.7% | 4.5% |
| Total | 100.0% | 100.0% | 100.0% |

[5] Supporting data for Figure 3, Annual Earnings of Los Angeles City Residents Employed by Hotels, 2000 to 2009:

| | Year | Average Annual Earnings – 2009 $ | Number of workers | Number of records |
|---|---|---|---|---|
| Maids and Housekeepers | | | | |
| | 2000 | $15,389 | 3,932 | 194 |
| | 2005 | $13,489 | 4,774 | 34 |
| | 2006 | $16,261 | 3,405 | 30 |
| | 2007 | $14,724 | 4,733 | 33 |
| | 2008 | $17,470 | 4,175 | 35 |
| | 2009 | $17,670 | 3,776 | 34 |
| All Hotel Service Workers | | | | |
| | 2000 | $23,478 | 11,613 | 557 |
| | 2005 | $14,757 | 12,663 | 91 |
| | 2006 | $24,213 | 9,612 | 78 |
| | 2007 | $20,765 | 11,091 | 84 |
| | 2008 | $23,079 | 11,000 | 94 |
| | 2009 | $23,271 | 9,747 | 87 |
| All Hotel Sales and Office Workers | | | | |
| | 2000 | $25,457 | 3,091 | 160 |
| | 2005 | $26,134 | 2,318 | 24 |
| | 2006 | $22,459 | 3,460 | 32 |
| | 2007 | $21,481 | 3,213 | 25 |
| | 2008 | $27,778 | 3,601 | 31 |
| | 2009 | $18,841 | 3,743 | 30 |
| All Hotel Workers | | | | |

Exhibit 4 Page 209

18     Economic Roundtable

|  | 2000 | $26,984 | 17,864 | 870 |
|---|---|---|---|---|
|  | 2005 | $23,969 | 19,900 | 153 |
|  | 2006 | $27,518 | 17,385 | 145 |
|  | 2007 | $29,664 | 18,006 | 140 |
|  | 2008 | $27,864 | 16,722 | 146 |
|  | 2009 | $29,393 | 18,743 | 160 |

[6] Supporting data for Figure 4, Annual Earnings of Hotel Workers Residing in the LAX Area, 2000 to 2009:

|  | Year | Average Annual Earnings – 2009 $ | Number of workers | Number of records |
|---|---|---|---|---|
| Maids and Housekeepers |  |  |  |  |
|  | 2007 | $13,906 | 1,955 | 12 |
|  | 2008 | $14,957 | 1,994 | 12 |
|  | 2009 | $17,192 | 2,140 | 15 |
| All Hotel Service Workers |  |  |  |  |
|  | 2007 | $21,399 | 5,114 | 39 |
|  | 2008 | $20,404 | 4,650 | 34 |
|  | 2009 | $24,122 | 4,897 | 36 |
| All Hotel Sales and Office Workers |  |  |  |  |
|  | 2007 | $17,920 | 1,618 | 14 |
|  | 2008 | $26,786 | 1,538 | 13 |
|  | 2009 | $27,345 | 1,637 | 16 |
| All Hotel Workers |  |  |  |  |
|  | 2007 | $27,182 | 8,085 | 64 |
|  | 2008 | $26,417 | 7,456 | 56 |
|  | 2009 | $34,138 | 9,706 | 75 |

[7] The sample of records for Hotel Zone workers in the occupational groups for maids and housekeepers and sales and office workers are small, so these results should be treated cautiously. However, if anything, the smaller samples may understate the magnitude of changes in earnings. For example, hotel service workers, which include maids and housekeepers, show greater wage increases than maids and housekeepers by themselves. And the total hotel labor force in the Hotel Zone shows greater wage increases than service workers by themselves.

[8] Supporting data for Figure 5, Percent of Los Angeles City Residents Employed by Hotels with Earned Income in the Preceding 12 Months, 2000 to 2009:

|  | Year | Annual Employment Rate | Number of Records | Number of Workers |
|---|---|---|---|---|
| Maids and Housekeepers |  |  |  |  |
|  | 2000 | 84% | 232 | 4,678 |
|  | 2005 | 95% | 37 | 5,050 |
|  | 2006 | 96% | 32 | 3,551 |
|  | 2007 | 96% | 36 | 4,920 |
|  | 2008 | 91% | 39 | 4,585 |
|  | 2009 | 74% | 41 | 21,266 |
| All Hotel Service Workers |  |  |  |  |
|  | 2000 | 88% | 633 | 13,151 |
|  | 2005 | 96% | 96 | 13,147 |
|  | 2006 | 92% | 84 | 10,417 |
|  | 2007 | 93% | 93 | 11,872 |
|  | 2008 | 94% | 101 | 11,712 |
|  | 2009 | 83% | 99 | 11,759 |
| All Hotel Sales and Office Workers |  |  |  |  |
|  | 2000 | 86% | 187 | 3,607 |
|  | 2005 | 98% | 25 | 2,368 |
|  | 2006 | 88% | 34 | 3,929 |
|  | 2007 | 98% | 26 | 3,270 |
|  | 2008 | 98% | 32 | 3,674 |
|  | 2009 | 97% | 31 | 3,844 |
| All Hotel Workers |  |  |  |  |
|  | 2000 | 88% | 999 | 20,413 |
|  | 2005 | 96% | 163 | 20,771 |

Exhibit 4 Page 210

| | 2006 | 93% | 153 | 18,659 |
|---|---|---|---|---|
| | 2007 | 96% | 152 | 18,990 |
| | 2008 | 93% | 158 | 18,017 |
| | 2009 | 88% | 178 | 21,226 |

[9] Supporting data for Figure 6, Annual Percent of Hotel Workers Residing in the LAX Area with Earned Income in the Preceding 12 Months, 2007 to 2009:

| | Year | Annual Employment Rate | Number of Records | Number of Workers |
|---|---|---|---|---|
| Maids and Housekeepers | | | | |
| | 2007 | 90% | 15 | 2,177 |
| | 2008 | 100% | 12 | 1,994 |
| | 2009 | 100% | 15 | 2,140 |
| All Hotel Service Workers | | | | |
| | 2007 | 94% | 43 | 5,426 |
| | 2008 | 100% | 34 | 4,650 |
| | 2009 | 98% | 37 | 5,000 |
| All Hotel Sales and Office Workers | | | | |
| | 2007 | 92% | 16 | 1,768 |
| | 2008 | 95% | 14 | 1,611 |
| | 2009 | 100% | 16 | 1,637 |
| All Hotel Workers | | | | |
| | 2007 | 95% | 70 | 8,547 |
| | 2008 | 98% | 58 | 7,633 |
| | 2009 | 99% | 76 | 9,809 |

[10] Information about US tourism-related output employment and the tourism ratio for the Lodging sector sectors is from the Industry Economics Division (IED), Bureau of Economic Analysis BE-51, U.S. Department of Commerce. The files used for this report contain data from the 1998-2003 U.S. Travel and Tourism Satellite Accounts (TTSA's) as published in "U.S. Travel and Tourism Satellite Accounts for 1998-2003," Survey of Current Business" (Sept 2004). This article provides further information about the definitions and conventions used in the travel and tourism satellite accounts and can be downloaded from the publications tab on the BEA web site, www.bea.gov.

[11] The annual number of arriving passengers is from data released by Los Angeles World Airports, http://www.lawa.org/. The breakout of passengers by residents and visitors is based on a 2006 survey conducted for Los Angeles World Airports by Applied Management and Planning Group, Los Angeles, CA. The breakout of passengers by type of accommodation is based on 2009 statewide data prepared for the California Travel and Tourism by D. K. Shifflet & Associates, Ltd., VcLean, VA, www.dksa.com. The 2009 data about the share of passengers that are visitors, and the 2006 data about the type of accommodation used by visitors is applied to passengers arriving in all years from 1994 through 2009. Supporting data for Figure 7, Type of Accommodation Used by Passengers Arriving at LAX, 1994 to 2009 is as follows:

| Year | Residents | Visitors Not Staying in Hotels | Visitors Staying in Economy Hotels | Visitors Staying in Mid-Level Hotels | Visitors Staying in High-End Hotels |
|---|---|---|---|---|---|
| 1994 | 14,133,385 | 5,441,353 | 2,109,913 | 2,220,961 | 1,332,576 |
| 1995 | 14,937,927 | 5,751,102 | 2,230,019 | 2,347,389 | 1,408,433 |
| 1996 | 16,134,506 | 6,211,785 | 2,408,651 | 2,535,422 | 1,521,253 |
| 1997 | 16,704,184 | 6,431,111 | 2,493,696 | 2,624,943 | 1,574,966 |
| 1998 | 17,017,758 | 6,551,837 | 2,540,508 | 2,674,219 | 1,604,531 |
| 1999 | 17,909,151 | 6,895,023 | 2,673,580 | 2,814,295 | 1,688,577 |
| 2000 | 18,741,579 | 7,215,508 | 2,797,850 | 2,945,105 | 1,767,063 |
| 2001 | 17,135,033 | 6,596,988 | 2,558,016 | 2,692,648 | 1,615,589 |
| 2002 | 15,703,723 | 6,045,933 | 2,344,341 | 2,467,728 | 1,480,637 |
| 2003 | 15,385,410 | 5,915,683 | 2,293,836 | 2,414,564 | 1,448,739 |
| 2004 | 17,001,989 | 6,545,766 | 2,538,154 | 2,671,741 | 1,603,045 |
| 2005 | 17,270,441 | 6,649,120 | 2,578,230 | 2,713,927 | 1,628,356 |
| 2006 | 17,102,924 | 6,584,626 | 2,553,222 | 2,687,602 | 1,612,561 |
| 2007 | 17,468,820 | 6,725,496 | 2,607,845 | 2,745,100 | 1,647,060 |
| 2008 | 16,735,410 | 6,443,133 | 2,498,358 | 2,629,850 | 1,577,910 |
| 2009 | 15,810,274 | 6,086,955 | 2,360,248 | 2,484,472 | 1,490,683 |

Exhibit 4 Page 211

20    Economic Roundtable

[12] The annual number of departing passengers is from data released by Los Angeles World Airports, http://www.lawa.org/. The distribution of departing passengers by household income is based on a 2006 survey conducted for Los Angeles World Airports by Applied Management and Planning Group, Los Angeles, CA. The 2006 data about household income distribution is applied to passengers departing in all years from 1994 through 2009. Income data is shown in unadjusted 2006 dollars. Supporting data for Figure 8, Household Income of Passengers Departing through LAX, 1994 to 2009 is as follows:

| | Distribution of Departing Passengers by Annual Household Income in 2006 | | | | | | | | |
|------|----------|----------|----------|-----------|-----------|------------|------------|------------|-----------|
| Year | <$20K | $20-34K | $35-49K | $50-74K | $75-99K | $100-149K | $150-174K | $175-199K | $200-249K | $250K+ |
| 1994 | 1,740,141 | 1,740,141 | 3,480,281 | 5,510,446 | 4,930,399 | 4,060,328 | 2,030,164 | 580,047 | 580,047 | 1,160,094 |
| 1995 | 1,836,024 | 1,836,024 | 3,672,048 | 5,814,075 | 5,202,067 | 4,284,056 | 2,142,028 | 612,008 | 612,008 | 1,224,016 |
| 1996 | 1,966,041 | 1,966,041 | 3,932,082 | 6,225,797 | 5,570,450 | 4,587,429 | 2,293,715 | 655,347 | 655,347 | 1,310,694 |
| 1997 | 2,043,619 | 2,043,619 | 4,087,239 | 6,471,461 | 5,790,255 | 4,768,445 | 2,384,223 | 681,206 | 681,206 | 1,362,413 |
| 1998 | 2,078,215 | 2,078,215 | 4,156,430 | 6,581,015 | 5,888,276 | 4,849,169 | 2,424,584 | 692,738 | 692,738 | 1,385,477 |
| 1999 | 2,177,457 | 2,177,457 | 4,354,914 | 6,895,280 | 6,169,461 | 5,080,733 | 2,540,366 | 725,819 | 725,819 | 1,451,638 |
| 2000 | 2,281,084 | 2,281,084 | 4,562,168 | 7,223,432 | 6,463,071 | 5,322,529 | 2,661,264 | 760,361 | 760,361 | 1,520,723 |
| 2001 | 2,090,422 | 2,090,422 | 4,180,844 | 6,619,670 | 5,922,863 | 4,877,652 | 2,438,826 | 696,807 | 696,807 | 1,393,615 |
| 2002 | 1,899,875 | 1,899,875 | 3,799,750 | 6,016,271 | 5,382,980 | 4,433,042 | 2,216,521 | 633,292 | 633,292 | 1,266,583 |
| 2003 | 1,856,940 | 1,856,940 | 3,713,879 | 5,880,309 | 5,261,329 | 4,332,859 | 2,166,430 | 618,980 | 618,980 | 1,237,960 |
| 2004 | 2,045,654 | 2,045,654 | 4,091,309 | 6,477,905 | 5,796,021 | 4,773,194 | 2,386,597 | 681,885 | 681,885 | 1,363,770 |
| 2005 | 2,066,247 | 2,066,247 | 4,132,493 | 6,543,114 | 5,854,365 | 4,821,242 | 2,410,621 | 688,749 | 688,749 | 1,377,498 |
| 2006 | 2,056,189 | 2,056,189 | 4,112,377 | 6,511,264 | 5,825,868 | 4,797,773 | 2,398,887 | 685,396 | 685,396 | 1,370,792 |
| 2007 | 2,106,355 | 2,106,355 | 4,212,709 | 6,670,123 | 5,968,005 | 4,914,828 | 2,457,414 | 702,118 | 702,118 | 1,404,236 |
| 2008 | 2,017,819 | 2,017,819 | 4,035,638 | 6,389,761 | 5,717,154 | 4,708,245 | 2,354,122 | 672,606 | 672,606 | 1,345,213 |
| 2009 | 1,907,070 | 1,907,070 | 3,814,141 | 6,039,056 | 5,403,366 | 4,449,831 | 2,224,915 | 635,690 | 635,690 | 1,271,380 |

[13] Economic Roundtable (2006), "From the Pockets of Strangers," p. 41, www.economicrt.org.

[14] The estimate of number of hours worked is obtained by multiplying the number of weeks that workers report working in the past year by the number of hours they typically work each week. The estimated number of hours worked annually produced by this computation are likely to be imprecise, but this provides a useful benchmark for comparing hours of work and estimated hourly wages of tipped and non-tipped workers.

[15] The 2009 American Community Zone provides 49 records of hotel workers 18 to 64 years of age, with wage and salary income in the preceding 12 months who reside in the neighborhoods surrounding LAX shown in Figure 2. Using the person weights for these records, they represent 6,453 workers.

[16] Sasha Corporation (2007), "Compilation of Turnover Cost Studies," http://www.sashacorp.com/turnframe.html

Exhibit 4 Page 212

Attachment C

"Hotel Minimum Wage: Analysis of the Impact
on the City of Los Angeles of the Proposed
Minimum Wage for Hotel Works"

Exhibit 4 Page 213



CONSULTING GROUP

# Hotel Minimum Wage

## Analysis of the Impact on the City of Los Angeles of the Proposed Minimum Wage for Hotel Workers

June 3, 2014

Exhibit 4 Page 214

## Contents

ACKNOWLEDGEMENTS ................................................................................ 2

EXECUTIVE SUMMARY ............................................................................... 3

INTRODUCTION............................................................................................. 5

    Impacts of Minimum Wage Policies Generally ............................................ 5

    Existing Research ..................................................................................... 6

    Applying the Existing Research to the Current Proposal ............................ 9

ECONOMIC EFFECTS OF RAISING THE MINIMUM WAGE FOR HOTEL WORKERS...........10

    Increased Wages ................................................................................... 10

    Reductions in Employment .................................................................... 10

    Reduced Profits .................................................................................... 11

    Other Effects ....................................................................................... 12

    Increase in Local Economic Activity ...................................................... 12

    Impact on Room Rates ......................................................................... 12

    Reductions in Local Spending by Hotels................................................ 13

    Impact on New Hotel Development........................................................ 13

    Disruptions for Low Wage Workers....................................................... 14

CONCLUSION: INCREASE IN MINIMUM WAGE IMPLIES A TRADEOFF ........................14

    Features of the Proposed Minimum Wage to Consider ............................ 14

    Possible Avenues for Additional Research .............................................. 15

APPENDIX 1: REVIEW OF ECONOMIC ROUNDTABLE REPORTS ...................................16

APPENDIX 2: REFERENCES ...............................................................................19

Exhibit 4 Page 215

## ACKNOWLEDGEMENTS

The report was prepared by Matthew Newman and Shawn Blosser on behalf of the City of Los Angeles Office of the Chief Legislative Analyst and the Office of Economic Analysis, which provided funding for the project. The analysis presented and the conclusions of this report are those of the authors.

Exhibit 4 Page 216

## EXECUTIVE SUMMARY

This report presents an assessment of the potential impact of a minimum wage for hotel workers in the City of Los Angeles (the City).[1]

Minimum wage policies are generally intended to raise the wages of the lowest paid workers, and are frequently justified on the grounds that those working full time should not live in poverty. Beyond this basic argument, many have suggested that minimum wage policies can have other benefits, such as reducing income inequality and stimulating short-term economic growth. Others, however, have argued that increases in the minimum wage act to reduce employment among low-wage workers as employers look for ways to cut labor costs.

Assessing the likely impact of a minimum wage policy for Los Angeles hotel workers is complicated by the fact that most of the previous research on the topic has been conducted based on national or state level changes in the minimum wage, changes that effect low wage workers across industries. The effects of a local, single-industry minimum wage policy may well be quite different. Nevertheless, a careful review of the existing literature and an analysis of the economic factors likely to influence decisions made by employers and employees can point to some likely effects.

First, if a minimum wage for hotel workers were to be implemented, many workers would see a significant increase in their wages. These workers, in turn, would likely spend a fraction of these additional earnings in the City, thereby benefitting local firms and their workers. However, in response to the minimum wage increase, hotel profits would likely decline, and so too would the value of existing hotels; some hotel owners might be forced to sell or otherwise restructure their investments. Hotel owners would also seek ways to minimize the effects of a minimum wage increase, but most of the Los Angeles hotels subject to the new requirement would be limited in their ability to pass along any increased labor costs in the form of higher room rates.  The result would therefore likely be reductions in staffing levels and reductions in certain purchases of goods and services in the local economy. Both of these effects would lead to reductions in economic activity which would at least partially offset any gains in economic activity generated by increased spending by those hotel workers who received a raise under the policy.

---

[1] Specifically, the City is considering a policy that would establish a minimum wage of $15.37/hour for workers at hotels with 100 rooms or more and where workers are not subject to a collective bargaining agreement.

---

Exhibit 4 Page 217

While the precise extent of these effects cannot be known with certainty, both existing research and established economic theory nevertheless suggest that such effects are likely. Therefore, establishing a minimum wage policy for hotel workers represents an inherent trade off. Newly hired or current hotel workers who remain employed would likely see a benefit, as would businesses that sell goods and services to these workers; however, these benefits would come at the expense of laid-off hotel workers or those not hired in the first place, as well as hotel owners who would see their profits decline.

This report was based on a review of research conducted by others and submitted to the City, comment letters received by the City with respect to the proposed policy, and a review of the published research literature relating to minimum wage policies more generally. This report does not reflect the results of any new empirical analysis of the issues at stake. Nevertheless, the available material provides a significant amount of research, data, and analysis which can be used by the City in assessing the likely impacts of such a policy.

Exhibit 4 Page 218

## INTRODUCTION

This report seeks to provide an assessment of the likely effects of a minimum wage for hotel workers in Los Angeles.  Specifically, the City of Los Angeles is considering a policy that would establish a minimum wage of $15.37 per hour for workers at hotels with 100 rooms or more and where workers are not subject to a collective bargaining agreement.[2]

In an effort to develop a more firm footing on which to assess the likely effects of such a minimum wage policy, the City engaged the services of the Office of Economic Analysis to review the materials submitted to the City by various stakeholders and others, and to conduct an analysis of the previously published research into the effects of minimum wage policies more generally. The issues addressed in these materials have been incorporated – to the extent relevant – into the analysis presented in this report. Specific comments about the three research reports submitted can be found in Appendix 1: Review of Economic Roundtable Reports. The questions and issues raised in the comment letters have been addressed, to the extent data and research were available, in the body of this report.

### Impacts of Minimum Wage Policies Generally

Minimum wage policies are generally intended to raise the wages of the lowest paid workers, and are frequently justified on the grounds that those working full time should not live in poverty. Beyond this basic argument, many have suggested that minimum wage policies can have other benefits, such as reducing income inequality and stimulating short-term economic growth. This economic growth may occur because low income workers tend to spend much of their increased earnings in the local economy, thereby benefitting workers and employers at firms that supply goods and services to these workers. It has also been suggested that increases in the minimum wage can lead to other benefits for employers, such as reductions in absenteeism and turnover among affected employees.

These benefits notwithstanding, economists and business owners alike have suggested that increases in the minimum wage act to reduce employment among the low-wage workers these policies are intended to help. Whether and to what extent minimum wage policies in fact lead to job losses has long been a subject of debate among economists. Economic theory suggests that if wages are raised, employers will look for ways to cut labor costs by shifting more of the production process to capital equipment (e.g., by automating a process previously performed manually). Increases in the minimum

---

[2] According to the Economic Roundtable, 87 hotels in Los Angeles have 100 or more rooms. Of these 64 are not currently unionized and so would be affected by the new minimum wage policy. The current state minimum wage for California is set to rise to $9.00 per hour on July 1, 2014.

Exhibit 4 Page 219

wage may also act to increase worker productivity, which has the additional effect of reducing the number of workers or, alternatively, the number of work hours needed by employers. In addition to reducing employment, higher minimum wages may result in higher prices generally, leaving low-wage workers no better off in real terms. Finally, increases in the minimum wage may also reduce profits in affected firms, reducing the ability of and incentive for these firms to invest in expanding their businesses. Such increases could also encourage firms to relocate to other areas where wages are lower.

Because minimum wage laws are such a widely debated issue, a considerable amount of research into the effects of such policies has been conducted. Many of the economic effects of minimum wage policies can be expected to occur regardless of the jurisdiction and specifics of the policy at issue, and much of the research that has been conducted is therefore relevant to the proposal currently being considered by the City. However, many of the effects of a local policy such as the hotel worker minimum worker wage policy at issue in Los Angeles are unique to the specific proposal and jurisdiction in question. As a consequence, any effort to apply the existing research on minimum wages generally to the specific local policy in question must be careful to consider these unique circumstances.

### Existing Research

The minimum wage has been the subject of research by economists for many decades. In fact, it has been claimed that "the minimum wage-employment debate... is as old as the Department of Labor."[3] Much of this research has focused either on specific industries that tend to employ more low-wage workers, such as fast-food restaurants or retail stores, or on teenagers or other populations most likely to be directly affected by minimum wage laws.

Economic theory suggests that, in a competitive labor market, increases in the minimum wage should lead to reductions in employment, either in the number of jobs or the number of hours worked. Many studies have supported this conclusion.[4] For example, in their 2000 book *Minimum Wages*, economists David Neumark and William Wascher summarize the state of research existing at the time, concluding that "...the preponderance of evidence supports the view that minimum wages reduce the employment of low wage workers."[5] Neumark and Wascher also published a more recent review of the employment effects of the minimum wage in 2007. In this review they concluded that, "among the

---

[3] Neumark, et.al. (2013), p.1.
[4] See, for example, Brown (1999).
[5] Quoted in Schmitt (2013), p. 4.

---

Exhibit 4 Page 220

papers we view as providing the most credible evidence, almost all point to negative employment effects."[6]

Although many studies have found a negative relationship between increases in the minimum wage and the number of jobs for low wage workers, the findings of some recent empirical studies have been less clear regarding the relationship between minimum wage increases and employment. For example, a 2013 study analyzed payroll data from a large, national retailer and found that the 1996 increase in the federal minimum wage resulted in no statistically significant change in overall employment at the firm.[7] Similarly, a 2007 study analyzed the effects of San Francisco's inflation-indexed local minimum wage, which raised the city's minimum wage from the statewide level of $6.75 to $8.50 in 2004 and up to $9.14 by 2007. That study, which examined the impact on both fast-food and table-service restaurants, found no statistically significant change in employment in San Francisco restaurants, both in terms of headcount and in terms of full-time equivalents (FTEs).[8] Finally, in their recently published book, Dale Belman and Paul Wolfson provide a qualitative assessment of some 70 published articles on the impact of minimum wages on employment, as well as a meta-analysis using 439 distinct estimates of the effect of minimum wages from 23 of the studies reviewed. Based on this research, they conclude that "...if negative effects on employment are present, they are too small to be statistically detectable. Such effects would be too modest to have meaningful consequences in the dynamically changing labor markets of the United States."[9]

If economic theory indicates that raising the minimum wage should result in lower levels of employment, why have some empirical studies found little or no measurable effect? A 2013 report by John Schmitt considers just this question. In addition to the potential problems that plague any empirical study, such as data shortcomings, the author identifies several possible ways that workers and employers may adjust to modest minimum wage increases other than simply reducing the number of employees.[10] For example, employers might decrease the number of hours employees work, decrease non-wage benefits to these workers, or possibly reduce the salaries and benefits for higher

---

[6] Neumark and Wascher (2006).

[7] See Giuliano (2013).

[8] See Dube et al (2007). Note that this study relied on survey data collected from San Francisco restaurants, and included the number of part-time and full-time employees (headcount) as well as the average weekly hours worked for each. They constructed their full-time equivalent employment measure as the total number of hours worked divided by 40.

[9] See Belman, Dale, and Paul J. Wolfson. 2014. "The New Minimum Wage Research." *Employment Research.* 21(2): 4-5. (http://research.upjohn.org/empl_research/vol21/iss2/2). The full book is available at http://www.upjohninstitute.org/Publications/Titles/WhatDoestheMinimumWageDo.

[10] See Schmitt (2013). As the author points out, these adjustment options were first enumerated by Barry Hirsch, Bruce Kaufman, and Tatyana Zelenska in their 2011study entitled "Minimum Wage Channels of Adjustment" and published by the German Institute for the Study of Labor (https://www2.gsu.edu/~ecobth/IZA_KKZ_MinWageCoA_dp6132.pdf).

Exhibit 4 Page 221

paid employees in order to keep total labor costs in check, all of which could allow these firms to address the labor cost increase without reducing their total number of employees.  Depending upon the competitive landscape, firms may also be able to raise their prices and pass along much of their increased labor costs to their customers or accept lower profits in response to increases in the minimum wage. The exact mix of responses could vary widely by region or by industry, or even among specific firms in the same industry. For modest increases in the minimum wage, the combined effect of all of these alternative responses could offset the negative effects of such an increase on the number of jobs for low-wage workers.

In spite of the fact that some published research has not shown a consistent and statistically meaningful effect from minimum wage policies on job losses, several recent studies have concluded that increases in the minimum wage can and do, under many circumstances, lead to reductions in jobs or the number of hours worked. For example, David Neumark and his colleagues revisited the minimum wage in a 2013 paper, concluding that, "the evidence still shows that minimum wages pose a tradeoff of higher wages for some against job losses for others, and that policymakers need to bear this tradeoff in mind when making decisions about increasing the minimum wage."[11]

Perhaps the most relevant analysis of how a proposed minimum wage increase might impact employment was recently published by the nonpartisan Congressional Budget Office (CBO) in February 2014.[12] This report assessed the potential impact of a proposal to increase the federal minimum wage from its current rate of $7.25 per hour to either $9.00 or $10.10 per hour. The CBO conducted an extensive review of the published literature on the minimum wage, including both studies that found employment effects and studies that did not. Based on its extensive review of the existing literature, the CBO study concluded that (a) increases in the minimum wage can be expected to reduce (at least to some degree) the number of jobs for low wage workers and (b) a larger increase in the minimum wage will result in a greater reduction in employment.  In addition, the CBO research concluded that, while an increase in the minimum wage would likely boost economic activity in the short term as a result of increased earnings on the part of low-wage workers, it would ultimately lead to reductions in economic activity in the long term, as the overall productivity of the economy declines due to reductions in the workforce.[13]

---

[11] Neumark, et.al. (2013).
[12] Congressional Budget Office (2014).
[13] ibid., p. 8.

---

Exhibit 4 Page 222

### Applying the Existing Research to the Current Proposal

Although the existing research on the effects of the minimum wage generally is extensive, the applicability of this research to the circumstances in Los Angeles is limited, at least to some extent.

First, most of the existing research has been conducted based on state or national changes in the minimum wage. When a single jurisdiction such as the City of Los Angeles adopts a minimum wage requirement that applies just to a subset of the firms in one industry, the effects of such a policy may be very different. For example, one of the effects of an increase in the minimum wage enacted across an entire state might be an increase in prices, allowing employers to pass along at least some portion of their increased costs. Because all firms face a similar increase in costs, affected firms may have the ability to raise prices without the risk that some competing firms will be able to leave prices low. If a single jurisdiction increases the minimum wage, however, competing firms located just across jurisdictional boundaries will not see an increase in costs. In such a circumstance, the ability of affected firms to raise prices without losing business to unaffected competitors is diminished (relative to the case in which all affected firms face higher costs). Because the proposal under consideration applies only to large hotels within Los Angeles, affected hotels likely would not be able to raise prices substantially in response to their increased wage costs.

Second, as the CBO concluded, larger increases in the minimum wage will likely lead to larger reductions in jobs or hours worked. Much of the previously published research examined relatively small increases in the minimum wage. The proposed increase in the minimum wage for hotel workers in Los Angeles, in contrast, represents a relatively large increase, at least for some classes of workers. Because this increase is larger than most of the increases that have been the subject of previous research, the relevance of this previous research is limited.

Third, as discussed above, most empirical studies that focus on specific industries have estimated the effect of a national or state minimum wage increase on businesses such as fast-food restaurants or retail stores. These types of businesses will certainly see their hourly wage costs rise, but they may also see demand for their products increase, as at least some portion of their clientele will be the beneficiaries of the minimum wage increase. Put another way, to the extent that low-wage workers earn more as a result of the increased minimum wage, they are likely to demand more goods and services, including those provided by fast food restaurants, retail outlets, and other establishments that employ low-wage workers. This enables such businesses to maintain or possibly even increase the number of employees or the total hours worked. The minimum wage increase proposed by the City of Los Angeles, however, applies only to hotels within the city limits, and the employees of Los Angeles hotels are not likely to also be the clientele for these hotels. Furthermore, when the minimum wage is increased on a statewide or national basis, there is much less potential for the effects of the policy to "leak" out of the affected region. In contrast, when the minimum wage is increased in a single

Exhibit 4 Page 223

jurisdiction, many of the affected workers will spend their increased earnings on goods and services purchased outside of the local economy, thereby reducing the extent of any increase in economic activity stemming from these increased earnings. Therefore, while there could be some offsetting increases in low wage jobs in unaffected industries such as fast-food and retail, it is likely that either the number of jobs or the number of hours worked by hotel employees in Los Angeles would decline.

In spite of the limitations associated with applying the existing economic research to the case of a minimum wage increase for hotel workers in Los Angeles, we have attempted to utilize this research, combined with our review of research reports submitted by the Economic Roundtable, and a review of the comment letters submitted to the City to assess the likely effects of such a policy for the City of Los Angeles.

## ECONOMIC EFFECTS OF RAISING THE MINIMUM WAGE FOR HOTEL WORKERS

Raising the minimum wage for hotel workers would likely result in a series of economic effects for the affected workers, their employers, and the City's economy. The precise extent and magnitude of these effects is not subject to reliable estimation, at least not with currently available data. However, the nature of the effects is more readily ascertainable. How then, might workers, employers, and the Los Angeles economy generally be affected?

### Increased Wages

The first and most obvious effect of a minimum wage policy for hotel workers would of course be higher pay for these workers. Those hotel workers currently earning less than the proposed minimum wage of $15.37 per hour would receive a wage increase to bring their pay up to the established minimum. In addition, some workers currently earning wages just below the new minimum might also get raises to levels above the new minimum in order to maintain an established wage hierarchy (e.g., more experienced employees currently earning $14 per hour could see a raise to $16 per hour in order to ensure that more experienced workers are paid more than less experienced workers). A similar result might occur with respect to some hotel workers currently earning in excess of $15.37 per hour; some of these workers also would likely receive a raise in order to maintain a pay differential between staffing levels. For example a supervisor currently earning just above the $15.37 minimum might also receive a raise in response to the required raise for supervised, lower-wage staff in order to maintain a pay differential between supervisors and those they supervise.

### Reductions in Employment

As noted in the previous section, when faced with the increased labor costs associated with the proposed minimum wage increase, hotel owners or managers would have a number of options. One

Exhibit 4 Page 224

likely result would be an effort to reduce the impact of the wage increase through reductions in staffing levels. Although the precise extent of any such reductions is not known, it is nevertheless likely that many hotels would reduce staffing levels and/or reduce the number of hours employees work. Evaluating the extent of these reductions is the subject of much of the published research on the minimum wage, but the most relevant and reliable studies have found that at least some level of staffing reductions is likely.[14]

These likely staffing reductions would result from several factors. By increasing the wages for workers, employers have the option to fill positions with more experienced, well-trained, and productive employees. These more productive workers would be able to do more work per shift or per hour relative to lower-paid and less productive workers, thereby reducing the need for workers overall. In addition, employers may increase workloads, in effect demanding that their employees work harder in exchange for the additional pay.

Some employers might also invest in labor saving technologies or other equipment that reduces the need for workers. For example, some hotels might invest in automated check-in kiosks in order to reduce the number of front desk personnel needed. Finally, some hotels would undoubtedly look to reduce staffing simply as a means of cutting costs, for example by eliminating or reducing the least profitable or popular hotel services.

Together, these factors would likely act to reduce, at least to some extent, the number of hotel industry jobs in the City or the number of hours worked by hotel workers relative to what would have been the case absent such a policy.

### Reduced Profits

Another likely effect of the minimum wage policy would be a decline in hotel profits, at least for current hotel owners. For many if not all affected hotels, profits would decline in response to the cost increase represented by the higher minimum wage. This reduction in profits would in turn reduce the value of hotel properties. In some cases, the reduction in profits would simply mean reduced returns on existing investments. In others, however, it could force a hotel into bankruptcy or another form of financial restructuring. Such a bankruptcy, though it would represent a potentially significant financial loss for existing hotel owners, would not necessarily result in a hotel closure. Instead, it is likely that most such hotels would instead be sold – at a discounted price – to new owners. These new owners, facing lower

---

[14] See especially Congressional Budget Office (2014).

Exhibit 4 Page 225

6/3/14

financing costs as a result of the lower purchase price, could therefore more easily afford the higher wage costs required by the minimum wage policy and remain competitive.

## Other Effects

In addition to these likely first order effects, several additional economic effects would potentially occur as well.

### Increase in Local Economic Activity

As a result of the increase in wages paid to low wage workers, overall economic activity in the City would likely increase in the short term, although the extent of any such increase is unknown. That is, to the extent that the total take-home pay of Los Angeles hotel workers increases, these workers are likely to spend some portion of their increased earnings in the local economy, stimulating additional economic activity. Because a majority of these wage increases are likely to come from reduced profits or increased payments from hotel guests, this increase in economic activity would not be accompanied by an offsetting short term reduction in economic activity of a similar magnitude.[15]

If hotel owners find mechanisms to minimize the increase in overall payroll costs (for example by reducing staffing, hiring more productive workers, or increasing automation), the extent of any such increase in economic activity would be minimized, however. In the longer run, economic activity could be reduced if investment in new hotels is diminished or capital investments on the part of hotel owners are deferred (see below for a discussion of the likely effects on the incentive to invest in new hotels).

### Impact on Room Rates

Many hotels would likely seek to raise their rates in response to the increased labor costs. And, for those hotels that are able to raise rates without suffering a significant loss in business, a portion of the costs of the proposed policy would be borne by visitors to the City.

However, the ability of many hotels to raise rates is limited. Hotels that primarily compete with smaller hotels (those with less than 100 rooms), hotels that are located near the City's boundaries and therefore compete directly with hotels in neighboring jurisdictions, or those that compete for regional or national convention business would be limited in their ability to raise rates.

---

[15] Revenue from out of town visitors represents new money and therefore new economic activity from the standpoint of the City's economy. Revenue transferred from profits to employees would also largely represent new consumer spending in the local economy. And, while the reduction in profits might also be accompanied by a reduction in local consumer spending or a reduction in investment in the City, many hotel owners likely live, spend, and invest outside of the City of Los Angeles.

Exhibit 4 Page 226

Hotels that primarily compete with other affected hotels for business travelers (e.g., downtown hotels) might have a greater ability to raise rates, although even hotels in this category would face competition from neighboring jurisdictions and from other cities for convention business and therefore would have a limited ability to raise rates.

## Reductions in Local Spending by Hotels

Some hotels would also likely seek to address the increase in wage costs by reducing purchases of other goods and services, for example by delaying investments in facility upgrades or scheduled maintenance of hotel facilities. Hotels, like any profit maximizing business, already seek to keep costs as low as possible, so the extent of any such reductions is likely to be small. Nevertheless, some hotels would likely reduce some expenditures as a cost-saving measure. To the extent that these purchases of goods and services would have occurred in the local economy, a reduction in such purchases would result in a reduction in economic activity in the City, at least partially offsetting any increase in economic activity resulting from increased expenditures from hotel workers whose wages increase.

## Impact on New Hotel Development

Any action that raises costs for an industry without providing simultaneous opportunities to increase revenues will lower profits. And, as an industry becomes less profitable, incentives to invest in that industry are diminished. To the extent that wage costs increase for Los Angeles hotels, but hotel owners cannot raise prices or cut other costs to offset these wage increases, hotels would become less profitable. This reduction in profitability would put downward pressure on new development, reducing the likelihood (at least to some extent) that new hotels would be developed in the City.

The extent of this effect, however, is mitigated by the fact that many potential new hotels would be, practically speaking, exempt from such a policy. Most new hotels built in the city in the past several years have received a subvention of transient occupancy tax (TOT) revenues as an incentive offered to developers to build in the City. As a condition for receiving the incentives, these hotels have agreed to enter into collective bargaining agreements with their employees. Because hotels with unionized workers are to be exempt from the minimum wage policy, any new hotel that receives a TOT subvention and agrees to hire workers subject to a collective bargaining agreement would not feel the effects of a minimum wage policy. Assuming this incentive continues to be offered going forward, the impact on future development of a minimum wage policy is diminished. Should the City discontinue the current development incentive policy, the disincentive for future development would be much greater. Similarly, to the extent that certain classes of hotels are not eligible for or do not seek the incentive, there would be a disincentive to develop such a hotel in the City.

Exhibit 4 Page 227

Ultimately, the impact of a minimum wage policy on new hotel development would depend on whether and to what extent incentives offered to developers are sufficiently generous and broadly applied so as to mitigate the effects of lost hotel profits due to the minimum wage policy.

**Disruptions for Low Wage Workers**

Another potential effect of the proposed increase in the minimum wage is a disruption for many existing low wage workers. Because hotels would now be required to pay at least $15.37 per hour to all of their workers, the lowest skilled workers (such as those currently earning well below $15.37 per hour) would become relatively less attractive to employers. Instead, hotels would seek to hire the most qualified employee possible (for a given wage). Therefore, many hotels would likely seek to hire more experienced and productive workers, rather than continuing to employ or hire workers with more limited skills or experience.

## CONCLUSION: INCREASE IN MINIMUM WAGE IMPLIES A TRADEOFF

While the precise extent of the economic effects discussed in this report cannot be known with certainty, both existing research and established economic theory nevertheless suggest that such effects are likely. Therefore, establishing a minimum wage policy for hotel workers – at least to a certain extent – represents an inherent trade off. Newly hired and current hotel workers who remain employed would likely see a benefit in the form of higher wages, as would businesses that sell goods and services to these workers; however, these benefits would come at the expense of laid-off hotel workers or those not hired in the first place, as well as hotel owners who would see their profits decline.

### Features of the Proposed Minimum Wage to Consider

To the extent that the City chooses to adopt a minimum wage for hotel workers, several specific attributes of the policy are worthy of further consideration.

First, any such policy should be phased-in. The extent of the proposed increase in the minimum wage represents a relatively large increase for many classes of workers, and therefore represents a large increase in wage costs for employers. Allowing employers an opportunity to gradually adjust to the higher wage rates will help to minimize any adverse impacts or severe disruptions.

Exhibit 4 Page 228

Second, an exemption for tipped employees should be considered.[16] Many hotels workers who earn tips may already earn in excess of $15.37 per hour. Therefore, requiring hotels to pay these tipped employees at the new, higher rate would have the effect of pushing the wages for these employees above the $15.37 level. In addition, many tipped employees work in the food service area of affected hotels. Because hotel restaurants (and all food services to some extent) face competition from local restaurants not subject to the minimum wage policy, it is likely that such a policy would have a disproportionate effect on hotel restaurants and the workers at those restaurants.[17]

## Possible Avenues for Additional Research

To a great extent, the impact of a minimum wage policy such as that currently being considered is simply not knowable beforehand. As discussed earlier in this report, a significant body of research has been conducted into the effects of such policies. Even with hindsight, careful students of this topic have not been able to achieve a clear consensus with respect to the effects of minimum wage policies that have already been enacted. In this context, the potential for research to conclusively demonstrate the likely future effects of a proposed policy is limited.

Nevertheless, one avenue of research in particular may be worth pursuing. During the past several years, minimum wage policies for hotel workers were adopted in both the City of Long Beach and the LAX hospitality zone. Both of these policies are similar in many respects to the policy currently being considered for the entire City of Los Angeles. Anecdotal evidence suggests that some hotels in Long Beach may have reduced staffing levels in response to the minimum wage policy. However, we are not aware of any research or analysis that has been published which conclusively demonstrates (one way or the other) the impact of the Long Beach minimum wage policy on employment. The minimum wage policy for hotel workers in the LAX hospitality zone was the subject of a study by the Economic Roundtable. However, as noted in the Appendix to this report, this study does not provide a sufficient basis with which to judge the effects of the policy on hotel employment. Therefore, a study aimed at assessing the effects of these two minimum wage policies could help to shed some light on the limited question of what effects such policies might have on employment in the Los Angeles hotel industry. Addressing the broader question of the overall economic effects of such policies, including any short-term increase in economic activity and any long-run decrease in hotel development would be more complicated to analyze.

---

[16] Currently, the federal minimum wage law allows for a separate, lower minimum wage for tipped employees. However, California's minimum wage law offers no such exception. Therefore, any potential legal issues associated with excluding tipped employees would need to be addressed if such an exemption were to be considered.
[17] Note that legal and practical limitations may restrict, at least to some extent, the ability of the City to exempt tipped employees. This issue should be explored with the City Attorney.

Exhibit 4 Page 229

# APPENDIX 1: REVIEW OF ECONOMIC ROUNDTABLE REPORTS

The Economic Roundtable submitted three research reports to the City in response to a request for relevant research or information about the effects of the proposed hotel worker minimum wage policy.

The first of these reports, entitled "From the Pockets of Strangers," dates to 2006. This report describes the relative size and character of the City's tourism economy, identifies the benefits of tourism, and presents some recommendations for actions that could be taken to boost the tourism economy. While this report contains some useful information, the material, now more than eight years old, combined with a focus not directly relevant to the subject of the current minimum wage debate limits the relevance and usefulness of this report for purposes of evaluating the likely impacts of a minimum wage for hotel workers.

The second Economic Roundtable report, prepared in 2010 and entitled, "Impacts of Living Wages in the Airport Hospitality Enhancement Zone" is more directly on point with respect to helping to identify the likely effects of a minimum wage for hotel workers. However, two factors act to limit the usefulness of this report for the current purpose.

First, the report was prepared in December 2010, just a couple of years after the airport hospitality zone polices went into effect, and many of the economic impacts from such a policy can take years or longer to emerge. In addition, the policy was implemented in 2008 during a period of significant economic disruption brought about by the "great recession," making it difficult to separate out the effects of the policy from the economic conditions at the time.  For these reasons, any conclusions about the impact of such a policy coming so soon after the policy's implementation must be considered preliminary.

Second, and more importantly, the methodology used to analyze employment changes at affected hotels is too imprecise to allow for useful conclusions to be drawn. The conclusion of the report, namely that "living wage standards... have had positive, or at least not negative, impacts on hotels, hotel customers and hotel workers" relies primarily on changes in employment reported by survey respondents living close to or in the airport hospitality zone as compared to responses of those living elsewhere in the City. However, this approach is subject to two important limitations. First, the sample sizes used for many of the survey responses are quite small, with correspondingly large confidence intervals. This means that that the actual responses from the entire population of hotel workers could be quite different from the results reported by the relatively small number of workers who responded to the survey. Second, the conclusions rely on the assumption that the hospitality zone workers also live in the hospitality zone, while the non-hospitality zone workers do not live in the hospitality zone. In a City as mobile as Los Angeles, in which many commuters travel long distances (many from outside of the City or even the County) to work, this assumption would require stronger support than what is provided in the report if the report's conclusions were to be relied upon.

Exhibit 4 Page 230

In spite of these limitations, neither the age of the data nor the limitations in the methodology employed suggests that the conclusions presented are incorrect. In fact, it may well be the case that the conclusions presented are true. However, the material presented in the report does not provide a sufficient basis for drawing such conclusions.

The third Economic Roundtable report entitled "Repaying Hospitality" is directly aimed at the topic at hand. This 2013 report aims to address the question of what would be the economic effects of a minimum wage policy for hotel workers in Los Angeles. The report reaches two important, relevant conclusions. First, the report suggests that "a new minimum wage will not result in significant relocation or cessation of current hotel business."[18] Second, the report suggests that a hotel minimum wage policy would increase local economic activity as a result of the increased consumer spending on behalf of hotel workers.

As evidence to support the first conclusion with respect to hotel closures, the report cites the example of the airport hospitality zone, which, despite a minimum wage policy adopted in 2008, has not seen any hotel closures in the intervening period. The report also suggests that the relative strength of the Los Angeles hotel sector (with rising occupancy rates) and the fact that many hotels have existing customers loyal to the brand or individual property further suggest that closures are unlikely. While any assessment of the likelihood of hotel closures would be to some extent speculative, this conclusion nevertheless seems reasonable. As discussed in the body of this report, it is likely that a minimum wage policy would reduce the value of affected hotel properties. However, this does not necessarily mean that hotels would close as a result. Instead, some hotel owners may be forced to sell their properties to new owners. These new owners, facing lower financing costs as a result of the reduced purchase price, would therefore be able to afford to pay higher wages as required by the proposed minimum wage policy and still make a profit. It is certainly possible that some hotel owners would choose to convert their properties to alternative uses rather than continue to operate these properties as hotels. However, changes in hotel ownership are not uncommon, and therefore the most likely conclusion, as indicated by the Economic Roundtable, is that few if any hotels would close down and cease operating as a result of the minimum wage policy.

The report's second conclusion, that local economic activity would increase, is also supported by the available evidence. However, the magnitude of the expected increase presented in the study likely overstates the extent of the effect. First, the estimated increase in economic activity is based on the assumption that all workers currently earning less than the proposed minimum wage would get a raise

---

[18] Burns, Patrick, "Repaying Hospitality." Economic Roundtable 2013, p. 1.

Exhibit 4 Page 231

to $15.37 per hour. However, as noted in the body of this report, it is likely that, owing to increases in worker productivity and other factors, the number of workers in the Los Angeles hotel industry would decrease. To the extent that the number of affected workers is smaller, the size of the economic increase would be smaller as well. Second, as pointed out in the body of the Economic Roundtable report, the estimated economic impact does not reflect the likelihood that many hotels would seek to offset their higher wage costs by reducing purchases of other goods and services from the local economy. If local purchases are reduced, this would cause an offsetting reduction in economic activity. Similarly, because a fraction of hotel revenues comes from local residents (the report suggests that approximately one-quarter of revenues are from local customers), these residents would face higher costs to the extent that prices are increased. Therefore, any price increases passed on to local residents would cause an offsetting reduction in local economic activity, since these residents would have less to spend on other local goods and services. Therefore, the figure reported by the economic roundtable likely overstates the size of any increase in economic activity.

Finally, the report makes no effort to adjust the reported total economic benefit for the possibility that future hotel development could be curtailed. Estimating any such change is admittedly challenging and even speculative. Indeed, as the body of this report points out, any decreases in future development could be mitigated by the City's current practice of offering developers a subvention of transient occupancy tax revenues as an incentive to develop new hotels within the City. However, it is likely that at least some reduction in future development would nevertheless occur. Such a reduction in future development would result in reductions in economic activity relative to the level that would have occurred absent a minimum wage policy.

Exhibit 4 Page 232

## APPENDIX 2: REFERENCES

Belman, Dale, and Paul J. Wolfson. 2014. "The New Minimum Wage Research." *Employment Research*. 21(2): 4-5.

Burns, Patrick and Daniel Flaming. 2013. "Repaying Hospitality Economic Impacts of Raising Hotel Workers' Wages and Benefits in the City of Los Angeles." Economic Roundtable.

Card, David and Alan B. Krueger. 1994. "Minimum Wages and Employment: A Case Study of the Fast-Food Industry in New Jersey and Pennsylvania." *American Economic Review* 84, no. 4: 772-793.

Congressional Budget Office. February 2014. "The Effects of a Minimum-Wage Increase on Employment and Family Income."

Dube, Arindrajit; Reich, Michael; Naidu, Suresh (2007). "The Economic Effect of a Citywide Minimum Wage." *Industrial & labor Relations Review* 60 (4): pp. 552–643.

Flaming, Daniel, Patrick Burns and Brent Haydamack. 2006. "From the Pockets of Strangers." Economic Roundtable.

Economic Roundtable. 2010. "Impacts of Living Wages in the Airport Hospitality Enhancement Zone." Economic Roundtable.

Giuliano, Laura. 2013. "Minimum Wage Effects on Employment, Substitution, and the Teenage Labor Supply: Evidence from Personnel Data." *Journal of Labor Economics*. 31(1): 155-194.

Neumark, David and David Wascher. 2007. "Minimum Wages and Employment: A Review of Evidence from the New Minimum Wage Research." NBER Working Paper 12663.

Neumark, David, J.M. Ian Salas and William Wascher. 2013. "Revisiting the Minimum Wage-Employment Debate: Throwing Out the Baby with the Bathwater?" NBER Working Paper 18681.

Schmitt, John. 2013. "Why Does the Minimum Wage Have No Discernible Effect on Employment?" Center for Economic and Policy Research.

Wolfson, Paul and Dale Belman. 2014. "What Does the Minimum Wage Do?" Kalamazoo, MI: Upjohn Institute for Employment Research.

Comment letters submitted to the City:

Coby King and Stuart Waldman, Valley Industry and Commerce Association. March 13, 2014

Exhibit 4 Page 233

Adena Tessler, California Restaurant Association. March 24, 2014.

Lynn Morhfeld, California Hotel and Lodging Association. March 25, 2014.

Veronica Perez, Small Hotel Coalition for Jobs. March 25, 2014.

Robert Amano, Hotel Association of Los Angeles. March 25, 2014.

Robert Amano, Hotel Association of Los Angeles. March 11, 2014.

Carol Schatz, Central City Association. February 25, 2014.

Exhibit 4 Page 234