EXHIBIT 5

# CITY OF LOS ANGELES
### CALIFORNIA

**EAST HOLLYWOOD
NEIGHBORHOOD COUNCIL**

**GOVERNING BOARD OFFICERS**
Tereza Yerimyan, President
Cheron J. McAleece, Vice President
Marcelo Cabral, Treasurer
Arasele Torrez, Recording Secretary
Jeff Zarrinnam, Corresponding Treasurer
Donal Thoms-Cappello, Corresponding
Secretary
**GOVERNING BOARD MEMBERS**
Matt Benton              Shaon Nichols
Patrick Bustamante      Seta Panosian
Craig Cox                Bill Zide
Calixtho Lopes



**ERIC GARCETTI
MAYOR**

**EAST HOLLYWOOD
NEIGHBORHOOD COUNCIL**

**POSTAL MAIL**
P.O Box 292359
Los Angeles California 90029

**TELEPHONE**
TBD

**WEBSITE**
www.easthollywood.net

## Business Committee

June 12, 2014

Honorable Members of the Los Angeles City Council
City of Los Angeles
200 North Spring Street, 3rd Floor
Los Angeles, CA 90012

**Subject: Hotel Living Wage Ordinance – Council File: 14-0223**

Dear Members of the City Council:

The East Hollywood Neighborhood Council business committee held its regularly scheduled meeting on June 11, 2014 and has some concerns with the proposed hotel living wage ordinance as proposed on June 10th by members of the city council's Economic Development Committee.

The Economic Development Committee's approval came despite a consultant's report finding that increasing the minimum wage for hotel employees could cost some workers their jobs. The Committee also voted to draft the new city ordinance without first analyzing the economic impact on those workers, many of whom are our residents working in hotels and living in the East Hollywood district.

The East Hollywood neighborhood district has only one hotel that may be affected and no hotels have been built in this area in the last 50+ years. We need more hotels to create new sustainable jobs in our area.  There are no hotels in the pipeline or on the horizon to be built in the East Hollywood district.  The Blue Sky report findings clearly states the LWO will affect new hotel development which further decreases the attractiveness of any hotel developer building a job creating hotel in the East Hollywood district. Hotels employ more people than any other type of real estate development, not only during construction but also for the life of the asset. Hotel developments create long term jobs for members of our community and it is long term jobs that have been historically most endangered by an increase in the minimum wage.

East Hollywood is also an area designated in the President's Promise  Zone **initiative in an effort that will lend federal support to areas with high poverty rates to increase economic security, expand educational opportunities, increase access to quality, affordable housing, improve public safety and create jobs. The**

Exhibit 5 Page 235

Promise Zones were designed to receive a competitive advantage for the reasons cited, but most importantly to create jobs.

We have listened to our local businesses citing employment reduction as a key reason to oppose the bill. We have also heard the arguments in favor focusing on higher living standards in a city that has priced out many residents. Indeed, what good are more jobs if someone needs to have two of them just to pay the rent? However, the long term effects of this ordinance in an area that is just beginning to thrive must be balanced against the short term benefit for the city as a whole. The Promise Zone initiative will give us incredible tools to address the issues this ordinance seeks to mend without the possibility of hindering future growth.

The Economic Developments Committee's recommendations are not consistent with the Promise Zone initiative and we respectfully ask that the LWO motion be amended to specifically exclude the East Hollywood District and the entire Promise Zone areas from the proposed LWO ordinance so that we may work to attract hotel developers to the East Hollywood District and Promise Zone areas and create new sustainable jobs in our district!

Respectfully,

Leeor Maciborski
Business Committee, Co-Chair
East Hollywood Neighborhood Council


Cc: Via email
    The Honorable, Eric Garcetti, Mayor mayor.garcetti@lacity.org
    The Honorable Herb J. Wesson Jr., Council President CD10 councilmember.wesson@lacity.org
    The Honorable Gil Cedillo, Councilmember CD1 councilmember.cedillo@lacity.org
    The Honorable Paul Krekorian, Councilmember CD2 councilmember.krekorian@lacity.org
    The Honorable Bob Blumenfield, Councilmember CD3 councilmember.blumenfield@lacity.org
    The Honorable Tom LaBonge, Councilmember CD4 councilmember.Labonge@lacity.org
    The Honorable Paul Koretz, Councilmember CD5 paul.koretz@lacity.org
    The Honorable Nury Martinez, Councilmember CD6 councilmember.martinez@lacity.org
    The Honorable Felipe Fuentes, Councilmember CD7 councilmember.fuentes@lacity.org
    The Honorable Bernard Parks, Councilmember CD8 councilmember.parks@lacity.org
    The Honorable Curren D. Price Jr., Councilmember CD9 councilmember.price@lacity.org
    The Honorable Mike Bonin, Councilmember CD11 councilmember.bonin@lacity.org
    The Honorable Mitchell Englander, Councilmember CD12 councilmember.englander@lacity.org
    The Honorable Mitch O'Farrell, Councilmember CD13 councilmember.ofarrell@lacity.org
    The Honorable Jose Huizar, Councilmember CD14 councilmember.huizar@lacity.org
    The Honorable Joe Buscaino, Councilmember CD15 councildistrict15@lacity.org
    Gerry Miller, Chief Legislative Analyst gerry.miller@lacity.org
    John Wickham, Chief Legislative Analyst Office john.wickham@lacity.org
    Richard Williams, Office of the City Clerk    Richard.williams@lacity.org
    Miguel Santana, City Administration Officer Miguel.santana@lacity.org

Exhibit 5 Page 236

Contact Information
Neighborhood Council: Van Nuys Neighborhood Council
Name: George Christopher Thomas
Phone Number: (818) 605-8940
Email: george.thomas@vnnc.org
Date of NC Board Action: 07/09/2014
Type of NC Board Action: Against Proposal

Impact Information
Date: 07/11/2014
Update to a Previous Input: No
Directed To: City Council and Committees
Council File Number: 14-0223
Agenda Date:
Item Number: Proposed Living Wage Ordinance
Brief Summary: At the July General Meeting the VNNC took an official position on the
Proposed Living Wage Ordinance. (Hotel Living Wage - Council File 14-0223)
        Additional Information: The VNNC voted against the Proposed Living Wage
Ordinance. (Hotel Living Wage - Council File 14-0223) The VNNC does not support the
Proposed Living Wage Ordinance. (Hotel Living Wage - Council File 14-0223)

Exhibit 5 Page 237

www.VNNC.org

# General Meeting Agenda (VNNC)





Van Nuys Neighborhood Council
July 9th, 2014 (Wednesday 7:00-10:00pm)
6262 Van Nuys Blvd -- Van Nuys Neighborhood Council Chambers
@ Marvin Braude Building -- Van Nuys, CA 91401

**VN NC**

Van Nuys
Neighborhood Council

**Board of Directors**

President
GEORGE CHRISTOPHER THOMAS
Industrial #2

Vice President
HOWARD BENJAMIN
Industrial #1

Parliamentarian
JOSEF LAZAROVITZ
Commercial #2

Treasurer
JEANETTE HOPP
Resident Zone #1

Secretary
JOHN HENDRY
Resident Zone #3

Sergeant At Arms
PAUL ANAND
Commercial #3

MARILYN HAVARD
Resident At Large #1

JOHN CAMERA
Religious #1

ROLAND GUEVERA
Non-Profit Org #1

JERRY MARTIN
Stakeholder at Large

PENNY MEYER
Resident Zone 4

MARIA SKELTON
Renter at Large #2

DEREK WALEKO
Commercial #4

QUIRINO DE LA CUESTA
Resident #2

JEFFREY LYNN
Resident at Large #2

KATHLEEN PADDEN
Senior Representative

DANIEL LUNA
Renter At Large Zone #1

KAMBIZ MERABI
Commercial #1

LIZETTE ARZOLA
Non-Profit #2

VACANT
Youth
School Representative

P: 818-533-VNNC (8662)
INFO@VNNC.ORG

*Mailing Address:*
Van Nuys
Neighborhood Council
P.O. Box 3118
Van Nuys, CA 91407

1. Call to Order & Pledge of Allegiance to the United States of America
2. Roll Call (Quorum Call)
3. Comments from the Chair -- *Speaker Cards: 2 minutes, 1 Public Comment Time. (This includes speaker cards on any and all agenda items -- a limit of 10 minutes for the entire meeting per Stakeholders and Councilmembers alike)
4. Public Comment (On matters within the VNNC Board's Jurisdiction.)
5. Secretary's Report -- Vote on and Adopt June Minutes
6. Treasurer's Report -- Jeanette Hopp and/or Howard Benjamin (Second Signatory) -- Approve Treasurer's Report
7. Committee Chairperson's Reports, Budget Advocate's Report, Elected Officials' Reports & Election Chair's Report
8. New Business
    a. The VNNC to co-host the License Forum (Taller de Informacion Sobre Licencia de Conducir) that Assemblyman Adrin Nazarian is hosting and sponsoring. (Assembly Bill 60 Event)
    b. "First Annual Children's Day & Movie Night" at the Government Center. The VNNC needs to come together for a brainstorming and planning session. The VNNC also needs to finish planning and addressing the logistics to pull this event off.
    c. Approve Neighborhood Council Self-Assessment for Fiscal Year 2013-2014 - Summarizes how the VNNC performed last year based on the strategic plan and shows the board what worked and what didn't so the board can learn and improve. This information will be helpful in developing the strategic plan for next year.
    d. Approve Neighborhood Council Strategic Plan for Fiscal Year 2014-2015 - Approve VNNC's strategic plan for this year with an added focus on outreach and specific, measurable and performance metrics.
    e. Approve Neighborhood Council Outreach Survey for Fiscal Year 2014-2015 - (The Neighborhood Council's current outreach survey, which lists the Neighborhood Council outreach tools, is posted on the Neighborhood Council's webpage on www.EmpowerLA.org. The VNNC to provide any updates as necessary.)
    f. Approve Neighborhood Council Budget for Fiscal Year 2014-2015 - The Neighborhood Council's budget allocations should align with the goals of identified in the strategic plan for the year. A new change on the budget template is to include the Neighborhood Council's monthly recurring expenditures so that the Department of Neighborhood Empowerment can ensure timely transfer of funds to the NC's checking accounts each month to cover these expenses.
    g. Approve Neighborhood Council Board Vote Form - The Neighborhood Council's Budget Package for Fiscal Year 2014-2015 must be accompanied by the Neighborhood Council Board Vote Form showing that the board members approved the entire package.
    h. Finalize VNNC Retreat at Van Nuys Library and participation in Community Involvement Plan
    i. The VNNC to submit a Community Impact Statement (CIS) on Medical Marijuana Dispensaries. The VNNC to recommend each of the 15 Los Angeles City Council Districts in Los Angeles City have 9 Medical Marijuana Dispensaries per Council District. This would allow equal access to all patients with prescriptions, and not make Van Nuys the Medical Marijuana Dispensary Capital of Los Angeles

In compliance with Government Code section 54957.5, non-exempt writings that are distributed to a majority or all of the board in advance of a meeting, may be requested by emailing info@vnnc.org. Members of the public are invited to address the council on any items on the agenda prior to any action by the Council on that specific item. Member of the public may also address the board on any matter within the subject matter jurisdiction of the Council. The council will entertain such comments during the public comment period(s). Public comment will be limited to 10 minutes with 2 minutes per individual for each item addressed. The aforementioned limitation may be waived by the chairperson of the meeting. (Pursuant to Government Code Section 54954.3(b)) Members of the public who wish to address the council are urged to complete a speaker card and submit it to the President or Secretary prior to commencement of an agenda item. Cards are available at the back of the room. However, should a member of the public feel the need to address a matter while discussion of the item is in progress, a card may be presented to the President or Secretary prior to final consideration of the matter. In the interest of time, All Board & Public Comments will be limited to no more than 2-minutes unless otherwise adjusted at the discretion of the President. It is requested that individuals who require the services of a translator contact the Department of Neighborhood Empowerment 24 hours prior to the meeting. Whenever possible, a translator will be provided. SI REQUIERE SERVICOS DE TRADUCCION, FAVOR DE NOTIFICAR LA OFICINA CON 24 HORAS POR ANTICIPADO. As a covered entity under Title II of the Americans with Disabilities Act, the City of Los Angeles does not discriminate on the basis of disability and upon request, will provide reasonable accommodation to ensure equal access to its programs, services, and activities. Sign language interpreters, assistive listen service, or other auxiliary aids and/or services may be provided upon request. To ensure availability of services, please make you request at least 3 business days (72 hours) prior to the meeting you wish to attend by contacting Thomas Soong, Neighborhood Council Advocate at (866) LA HELPS.

Exhibit 5 Page 238

www.VNNC.org



# Van Nuys Neighborhood Council
# P.O. Box 3118
# Van Nuys, CA 91404-3118 (vnnc.org)



Van Nuys
Neighborhood Council
Board of Directors

President
GEORGE CHRISTOPHER THOMAS
Industrial #2

Vice President
HOWARD BENJAMIN
Industrial #1

Parliamentarian
JOSEF LAZAROVITZ
Commercial #2

Treasurer
JEANETTE HOPP
Resident Zone #1

Secretary
JOHN HENDRY
Resident Zone #3

Sergeant At Arms
PAUL ANAND
Commercial #3

MARILYN HAVARD
Resident At Large #1

JOHN CAMERA
Religious #1

ROLAND GUEVERA
Non-Profit Org #1

JERRY MARTIN
Stakeholder at Large

PENNY MEYER
Resident Zone 4

MARIA SKELTON
Renter at Large #2

DEREK WALEKO
Commercial #4

QUIRINO DE LA CUESTA
Resident #2

JEFFREY LYNN
Resident at Large #2

KATHLEEN PADDEN
Senior Representative

DANIEL LUNA
Renter At Large Zone #1

KAMBIZ MERABI
Commercial #1

LIZETTE ARZOLA
Non-Profit #2

VACANT
Youth
School Representative

P: 818-533-VNNC (8662)
INFO@VNNC.ORG

*Mailing Address:*
Van Nuys
Neighborhood Council
P.O. Box 3118
Van Nuys, CA 91407

      j. The VNNC to take an official position on the Proposed Living Wage Ordinance.  (Hotel Living Wage - Council File 14-0223)

      k. The VNNC to vote on electing a Co-Chair of the Public Safety Committee.

      l. Discussion & Debate of installing a Marilyn Monroe statue at the Orange Line Station in Van Nuys, and working alongside Metro/ the MTA on promoting public transportation, especially to visit the Marilyn Monroe statue.

      m. Create an Ad-Hoc Committee to establish a permanent home for the Museum of the San Fernando Valley. (Vote on Chair of Committee)

      n. Establish a clean up crew for North of Vanowen on Van Nuys Blvd.  VNNC to come up with a clean up plan and schedule possible dates for a clean up.  (Candido Marez)

   9. Announcements

   10. Adjournment

Exhibit 5 Page 239

# COMMITTEES

**Executive:** 1st Monday of every month (or 9 days prior to the meeting at 6:30 P.M.)
∆ Sets the agenda for board meetings, receives requests, and assigns tasks.
GEORGE CHRISTOPHER THOMAS, CHAIRMAN
HOWARD BENJAMIN, VICE PRESIDENT
JOHN HENDRY, SECRETARY
JEANETTE HOPP, TREASURER
JOSEF LAZAVORITZ, PARLIAMENTARIAN
**Location: 6240 Sylmar Street, 2nd floor Community Room**

**Safety:** 2nd Wednesday of every month prior to VNNC general board meeting at 6:00 P.M.
∆ Deals with community safety issues within the Van Nuys Neighborhood Council area.
JOSEF LAZAROVITZ, CHAIRMAN -- ADDITIONAL MEMBERS OF THE COMMITTEE -- (MARILYN HAVARD, PENELOPE MEYER, JOHN HENDRY, DONALD & PRUDENCE SCHULTZ) -- MARIA SCHERZER
**Location: Braude Center, 6262 Van Nuys Blvd, Room 1-A**

**Parks & Recreation:** 2nd Wednesday of every month prior to VNNC general board meeting at 6:00 P.M. or TBA
∆ Deals with issues concerning children and youth, park programs, facilities and playgrounds in the VNNC area.
MARIA SKELTON, CHAIRMAN -- ADDITIONAL MEMBERS OF THE COMMITTEE -- (JOHN CAMERA, ROLAND GUEVERA, MIRIAM FOGLER (STAKEHOLDER), MR. JAMES PIEPER)
**Location: Delano Recreation Center, 14100 Erwin Street, Van Nuys, CA.**

**Budget & Finance:** 2nd Wednesday of the month at 6:00pm (Right before the VNNC General Meeting)
∆ Deals with Van Nuys Neighborhood Council (VNNC) budgetary issues.
JEANETTE HOPP, CHAIRWOMAN
ADDITIONAL MEMBERS OF THE COMMITTEE -- (MARIA SKELTON, JENNIFER HUGHES (STAKEHOLDER))
**Location: TBD**

**Planning & Land Use:** 2nd Wednesday of every month prior to VNNC general board meeting at 6:00 P.M. or TBA
∆ Deals with planning, zoning and land use issues that affect the VNNC community, including proposals for new projects, zoning changes and variances, proposals for tenant improvement (T.I.) construction, building improvements and special uses, development, development of new business e.t.c.
QUIRINO DE LA QUESTA, CO-CHAIR -- JERRY MARTIN, CO-CHAIR -- ADDITIONAL MEMBERS OF THE COMMITTEE -- (JOHN HENDRY, HOWARD BENJAMIN, PENNY MEYER, PAUL ANAND, MARIA SCHERZER )
**Location: Braude Center, 6262 Van Nuys Blvd, Room 2B, Van Nuys, CA.**

**Government Relations/Rules & Bylaws:** Meetings held 2nd Wednesday of every month or TBA
∆ Deals with citywide issues, council files, actions of city officials and departments, bylaws, rules and regulations, policies and procedures.
CHAIRMAN PAUL ANAND -- ADDITIONAL MEMBERS OF THE COMMITTEE -- (JEANETTE HOPP, JOHN HENDRY, JENNIFER HUGHES (STAKEHOLDER), JOSEF LAZAROVITZ, PENNY MEYER, DEREK WALEKO)

**Outreach:** Meetings held last Thursday of every month. (Or possibly the 2nd Tuesday of the month) or TBA
∆ Deals with outreach to inform the VNNC community about board meetings, elections, committee meetings, projects and special events, e.t.c.
MARIA SKELTON, CHAIRWOMAN
ADDITIONAL MEMBERS OF THE COMMITTEE -- (  RICHARD HOPP)





**All calls should be after 8:30 A.M. or before 8:00 P.M.
Monday through Saturday.**

*For Non-Emergency City Issues Dial ~ 3 1 1*

Exhibit 5 Page 240

Contact Information
Neighborhood Council: South Robertson Neighborhood Council
Name: Doug Fitzsimmons
Phone Number: 213.804.6659
Email: dougfitzsimmons@soronc.org
Date of NC Board Action: 07/17/2014
Type of NC Board Action: General Comments

Impact Information
Date: 07/22/2014
Update to a Previous Input: No
Directed To: City Council and Committees
Council File Number: 14-0223
Agenda Date:
Item Number:
Brief Summary: The South Robertson NC supports the passage of a Living Wage ordinance for hotel employees. As a community bordered by two cities, however, SORO NC strongly urges the City Council to amend the proposed ordinance to incorporate appropriate protections for hotels under 200 rooms, particularly those within one mile of a bordering city that has not yet passed a comparable living wage ordinance.

Additional Information: Passed by SORO NC with a vote of 14 yes, 1 no, 3 abstain.

Exhibit 5 Page 241





# Motion to support a living wage ordinance for hotel workers

| | |
|---|---|
| **Agenda Item:** | GB071714-28 |
| **Date:** | 17 July 2014 |
| **Proposed By:** | Doug Fitzsimmons |

## Full Proposal

The City of Los Angeles is currently considering an ordinance that would raise the minimum wage for most hotel employees to $15.37/hour.

The proposal phases-in the increase over time. As now drafted, hotels with over 300 rooms would have until July 1, 2015; hotels with over 125 would have an additional year. Hotels facing financial hardships would be able to file for some level of exemption.

The benefits of the living wage ordinance are clear. Non-unionized hotel employees are among the lowest paid workers in the City. For struggling housekeepers, busboys and maintenance workers at large hotels, it provides a chance to escape poverty and, as Mayor Garcetti says, "build pathways to the middle class." The City's economy stands to benefit from their increased purchasing power, too, although to what degree is a matter of debate.

Which is not to say that the ordinance as written is perfect. A serious local concern is that hotels that closely border communities without a comparable living wage ordinance (such as Beverly Hills and Culver City) would be at a competitive disadvantage: unable to raise room rates above those set by over-the-border competitors, but still required to increase salaries. In a price-sensitive market, this would be felt most acutely in small to mid-sized hotels that don't enjoy the economies of scale that larger (200+ rooms) hotels enjoy (a situation that could lead to development of increasingly large hotels).

## Proposed Motion

I.   To support the passage of a City ordinance that phases in an increase to the minimum living wage of non-union hotel employees to $15.37/hour;

II.  As a community bordered by two cities, SORO NC further urges the City Council to incorporate appropriate protections for hotels under 200 rooms, particularly those within one mile of a bordering city that has not yet passed a comparable living wage ordinance;

III. To authorize SORO NC to file a Community Impact Statement to that effect.

## Considerations

| | | |
|---|---|---|
| **Committee review:**<br>*(highly recommended)* | Votes For: 0 | Against: |

**Amount previously allocated in Committee's working budget:**  $
*(applies to funding motions only)*

---

**Doug Fitzsimmons**
President

**Brian Kite**
Vice-President

**Terrence Gomes**
Treasurer

**Beth Ryan**
Secretary

**South Robertson Neighborhoods Council**

PO Box 35836
Los Angeles, CA 90035

**P:** (310) 295-9920
**F:** (310) 295-9906
**E:** info@soronc.org

**soronc.org**



City of Los Angeles Certified
Neighborhood Council

Exhibit 5 Page 242



**Arguments for:**

The living wage ordinance could have a dramatic positive for thousands of hotel employees City-wide.

Larger chain hotels and hotels that don't directly compete with hotels in other cities are more likely able to absorb the wage increases without laying off employees.

**Arguments against:**

The overall economic impact involves serious trade-offs that may result in lost jobs.

The goal should be to provide a living wage to the largest number of people possible.

Exhibit 5 Page 243



# GREATER ECHO PARK ELYSIAN NEIGHBORHOOD COUNCIL

**Community Impact Statement**
**CF: 14-0223**
**Living Wage Ordinance**



**PRESIDENT** KWAZI NKRUMAH
**VICE PRESIDENT**
MANICITO SANTOS
**TREASURER** EVA MEJIA
**CHIEF INFORMATION OFFICER**
PAUL BOWERS

**CERTIFIED NEIGHBORHOOD**
**COUNCIL     APRIL 16, 2002**
**TELEPHONE:** (213) 400-9155
**WEBSITE:** ECHOPARKNC.ORG
**EMAIL:** INFO@GEPENC.ORG
**MAILING ADDRESS:**
P.O. BOX 261046, LA CA 90026

### DISTRICT REPRESENTATIVES

| | | | | | |
|---|---|---|---|---|---|
| Veronica Arellano | D1 | Richard Courtney | D? | Santiago E. Perez | D? | Mellie Bautista | D5 |
| Matt Sharp | D1 | Ann-Marie Holman | D? | Paula Guadron | D4 | Carolina Jimenez | D5 |
| Katrina Bouza | D1 | Gordon H. Lake | D? | Tad Yenawine | D4 | Vincent Rodriguez | D5 |
| Eva Mejia | D2 | "Rio" Jill Contreras | D? | Avelyn J Tapia | D? | Alma Baja | D5 |

To: Honorable City Council, Los Angeles City Hall, 200 N. Spring Street, Room 395, Los Angeles, CA 90026

## Re: Council File 14-0223: Living Wage Ordinance

On July 29, 2014, the Greater Echo Park Elysian Neighborhood Council Board of Governors held a Brown Act—compliant noticed special meeting with a quorum of **16**; and with a vote of **15**-yes, **0**-opposition, and **1**-abstention, the GEPENC adopted the motion in support of Raise LA --Hotel Living Wage Ordinance which includes but is not limited to the following economic improvements for hotel workers in the hospitality and housekeeper categories as described in the policy:

- Raising the minimum wage of hotel workers to $15.00 an hour;
- An annual cost of living adjustments of either 2% or the consumer price index whichever one is greater;
- A minimum of 5-paid sick-days per year; and,
- Workers who perform services are to receive the tips that they have earned and are specifically left for them.

Kwazi Nkrumah, President of Greater Echo Park/Elysian Neighborhood Council (GEPENC)

September 3, 2014

Exhibit 5 Page 244

Contact Information
Neighborhood Council: Central San Pedro Neighborhood Council
Name: Sue Castillo
Phone Number: (310) 489-3026
Email: redsue12@gmail.com
Date of NC Board Action: 08/12/2014
Type of NC Board Action: For Proposal

Impact Information
Date: 09/09/2014
Update to a Previous Input: No
Directed To: City Council and Committees
Council File Number: 14-0223
Agenda Date:
Item Number:
Brief Summary: Resolved: The Central San Pedro Neighborhood Council supports a living wage policy for Los Angeles hotel workers that would raise the minimum wage at hotels with 125 or more rooms to $15.37/hr, with five guaranteed paid sick days, and tip protection.
Additional Information:

Exhibit 5 Page 245



# CENTRAL SAN PEDRO
# NEIGHBORHOOD COUNCIL

## WWW.CENTRALSANPEDRO.ORG

September 9, 2014

Mayor Eric Garcetti
200 N. Spring St.
Los Angeles, CA 90012

Councilman Joe Busciano
Harbor District Office
638 S. Beacon Street, Suite 552
San Pedro, CA 90731

**James P. Allen**
President

**Debbie Rouser**
Vice President

**Khixaan Obioma-Sakhu**
Secretary

**Danielle Sandoval**
Treasurer

**Donald Galaz**
Communications/Outreach

**Subject:**  Support for Living Wage Policy for Los Angeles Hotel Workers

Dear Mayor Garcetti and Councilmember Buscaino,

The Central San Pedro Neighborhood Council endorses the proposed Living Wage policy of $15.37 per hour, paid sick days, and tip protection for hotel workers at hotels with 125 or more rooms. We see this as creating a positive economic impact in our community where wages have not kept up with the cost of living.

Tourism is an important aspect of a vibrant economy and Los Angeles is predicted to have substantial growth in this sector. However, hotel workers continue to be paid at the lowest levels of the wage scale. We feel it is fair that our stakeholders, workers and employers, come together to improve the standard of living for the district.

As home to the Port of Los Angeles' World Cruise Center, Central San Pedro hosts two hotels that would be affected by this ordinance. With implementation of this policy these employers will be able to contribute more to the economy through increased payroll taxes, and workers will be able to spend more locally providing direct support of our neighborhood businesses and increasing sales tax revenue. Hotel management and guests will benefit by having a more stable, reliable, and healthy workforce.

We urge you to support this important policy for our community.

Sincerely,

James Preston Allen
President

1840 S. Gaffey Street, Box 212, San Pedro, CA  90731 • 310-918-8650

Exhibit 5 Page 246

Contact Information
Neighborhood Council: Historic Highland Park Neighborhood Council
Name: Fernando Villa
Phone Number: 619-992-7-764
Email: fernando.villa@highlandparknc.com
Date of NC Board Action: 09/04/2014
Type of NC Board Action: For Proposal

Impact Information
Date: 09/18/2014
Update to a Previous Input: No
Directed To: City Council and Committees
Council File Number: 14-0223
Agenda Date: 09/04/2014
Item Number:
Brief Summary: On September 18, 2014, at a duly noticed Brown Act compliant general
board meeting of the Historic Highland Park Neighborhood Council and behalf of our
stakeholders we are submitting a Community Impact Statement in support of Council File
Number 14-0223 (Imposing Living Wage / Hotel Employees / Hotels with 100 Rooms or more).
The Board voted unanimously in support.
Additional Information:

Exhibit 5 Page 247

# CITY OF LOS ANGELES

CALIFORNIA

**HISTORIC HIGHLAND PARK NEIGHBORHOOD COUNCIL**
Post Office Box 50791
Los Angeles, CA 90050
http://www.highlandparknc.com
Certified as NC #33 May 28, 2002

**DEPARTMENT OF NEIGHBORHOOD EMPOWERMENT**
200 N. Spring St. Ste.2005
Los Angeles, CA 90012
Telephone: (213) 978-1551

## OFFICERS
Monica Alcaraz PRESIDENT
Aaron Salcido FIRST VICE PRESIDENT
Diego R. Silva SECOND VICE PRESIDENT
Joan Potter TREASURER
Johanna Sanchez SECRETARY

## COMMITTEE CHAIRS
Monica Alcaraz EXECUTIVE
Joan Potter BUDGET and FINANCE
Diego Silva OUTREACH
Vacant seat RULES
Harvey Slater, Susanne Huerta LAND USE
Vacant seat PUBLIC SAFETY

## DIRECTORS AT LARGE
Liz Amsden, Manuel Avila, Linda (Boo) Caban, Javier Cabral,
Jessica Ceballos, Graeme Flegenheimer, Mauro Garcia,
Susanne Huerta, Stanley Moore, Amirah Noaman, Miguel
Ramos, Miranda Rodriguez, Harvey Slater, Fernando Villa



Council File Number 14-0223

The Historic Highland Park Neighborhood Council represents over 60,000 Los Angeles stakeholders who reside, own property, or conduct business in our neighborhood.   On behalf of our stakeholders we are submitting a Community Impact Statement in support of Council File Number 14-0223 (Imposing Living Wage / Hotel Employees / Hotels with 100 Rooms or more).

Los Angeles is an international destination, putting the tourism industry at the heart of our city's economy and making it one of our largest local employers - accounting for nearly one out of every ten jobs within Los Angeles.  Of those who live in Highland Park (90042), nearly 9% are employed by the accommodation and food services industry. Approximately 40 percent of Los Angeles' leisure and hospitality workers are living in poverty. This crucial sector of our economy is failing to live up to its potential as a positive economic driver within our communities. Instead it is contributing to the growing poverty and low quality of life for many Angelenos.  Adults, workers of color, and working poor families would see significant benefits of a pay increase.

In Highland Park the cost of housing has increased significantly and this will serve as an additional tool to help prevent additional displacement.  Therefore the HHPNC has agreed to support the passage of a City ordinance that phases in an increase to the minimum living wage of non-union hotel employees to $15.37/hour.  The proposal phases-in the increase of the minimum living wage over time. As now drafted, hotels with over 300 rooms would have until July 1, 2015; hotels with over 125 would have an additional year. Hotels facing financial hardships would be able to file for some level of exemption.

Exhibit 5 Page 248



**BEACON** ECONOMICS

To:        OFFICE OF HERB WESSON, COUNCIL PRESIDENT

FROM:      CHRISTOPHER THORNBERG, FOUNDING PARTNER

           BEACON ECONOMICS, LLC

DATE:      SEPTEMBER 22, 2014

SUBJECT:   LOS ANGELES HOTEL LIVING WAGE ORDINANCE QUESTIONNAIRE

Council President Wesson,

Below are the answers to the nine questions we were provided on the proposed Los Angeles Hotel Living Wage ordinance. I look forward to meeting with you on Tuesday to go through the analysis.

Please contact us if you need additional information.

Thanks,

Chris Thornberg

Exhibit 5 Page 249

1) <u>Does the hotel industry to be regulated have more than 15,000 employees working in the City?</u>

**No—by our estimate the number of workers in the part of the industry impacted by this ordinance is less than 15,000.**

We calculate that there are approximately 16,180 people employed by hotels & motels in the City of Los Angeles. This employment figure includes all hotel & motel workers, and not just those in hotels with 100 rooms or more that would be subject to the $15.37 living wage. We derived these numbers from an analysis of two data sources: the California Employment Development Department's (EDD) Monthly Labor Force Report for July 2014, and the Bureau of Labor Statistics Quarterly Census of Employment and Wages (QCEW). Using City level data from the EDD we estimate that as of the 4th quarter of 2013 there were approximately 16,825 people employed by hotels & motels in the City of Los Angeles.

| Hotel Type | City Employees | County Employees |
|---|---|---|
| Fewer than 100 or Less Employees | 3,881 | - |
| More than 100 Employees | 12,944 | - |
| Total | 16,825 | 41,391 |

Sources: EDD, QCEW

- City hotel employment is 40% of the County total, a similar ratio to overall employment. This was a surprise to us, since the City would seem to have a greater share of large hotels than the balance of the county. But it is worth noting, since it indicates that there is an active hotel industry outside the City that actively competes for visitors.

- Data from the CES survey suggests hotel employment has grown by 3.1% since the start of the year. This implies an additional 1,250 jobs countywide with 520 in the city. There are many new projects in the pipeline at the moment. According to PKF Consulting almost 5,000 new rooms are due to come on line, which would increase employment by an additional 400 to 600.

- Not all hotels would be impacted by the ordinance. According to the proposed statute, those hotels with more that 125 rooms would be subject to the ordinance. We cannot get data directly on employment by the number of rooms, but we can estimate that a hotel at such a size typically has more than 100 employees. Using County Business Patterns (CBP) data and information from the World Tourist Organization, we estimate that approximately 10% of hotels in the City of Los Angeles would be affected by this ordinance. This is less than the numbers from the EDD for the City of Los Angeles show. Analysis of the EDD data shows that about 15% of hotels in the city would be affected. These hotels are responsible for approximately 77% of employment in the

Exhibit 5 Page 250

industry. As such we believe there are roughly 13,000 impacted employees in the city, and this number will be less than 14,000 when the statute—if implemented—comes fully into effect.

## 2) Is the number of employees being paid less than a living wage so substantial as to have a significant negative effect on the City economy as a whole?

**No. The number of workers being covered by this statute represents a tiny fraction of the number of workers in the City earning less than $15.27 per hour. Additionally we also recognize that imposition of a high minimum wage will have some employment impact over time, which suggests that better wages for those in the industry will be offset in part by reduced employment opportunities.**

To answer this question, we have to calculate the number of hotel workers earning less than the proposed minimum wage, and in addition the number of workers in the entire city. To analyze this question, Beacon used County-level data as an approximation for the City of Los Angeles since there is a lack of city-specific data available for this type of analysis. The numbers used in this analysis were derived using data from the 2012 American Community Survey (ACS), as this is the only publically available data source that allows a rough calculation of hourly pay.[1] The ACS wage figure is adjusted to 2013 using the OES wage growth variable for the Los Angeles Metro Area.

- Beacon estimates from this data that in 2013 the average hourly wage for all hotel workers to be approximately $14.20 an hour, or $28,100 annually.

- This is 60% of the average hourly wage for the rest of the workers in the County of Los Angeles by the same data source.

- By this same data almost two thirds of the workforce for the hotel industry makes less than the proposed living wage, as can be seen in Table 1.

- *We can say with some certainty that these figures underestimate the true income being earned by employees in the industry.*

Looking at QCEW data for wages, the average annual salary for hotel and motel workers as of the fourth quarter of 2013 is 32,700, over 15% higher than the data from the ACS. This data is more accurate as it is pulled directly from the payroll records for companies in the industry for unemployment insurance purposes. Unfortunately it is not available on a worker-by-worker basis and thus cannot be used for the current project.

This discrepancy seems common in that the *ACS consistently yields lower wage estimates for all occupations than do other sources of wage data* such as the QCEW. The problem here is that the ACS data is self-reported by the workers, and it is commonly believed that people tend to over estimate the number of hours they worked the previous year, and underestimate their income because they forget to add back in certain deductions that may occur. This tends to bias the ACS estimate of hourly wages down.

---

[1] The 2013 ACS public use data files will be released by the Census on October 23rd.

Exhibit 5 Page 251

The ACS figures also point to an unusual income distribution, which raises red flags with us regarding the accuracy of the data. Approximately one quarter of the survey's respondents claim to have earned less than $8.00 per hour minimum wage that was in place in 2012. This seems implausible. Furthermore some shares of workers in the industry receive tip income, much of which is often not reported as income. By our count 5% of workers in the industry work as waiters, bartenders and valets—all occupations that receive generous tip compensation. Equivalently room cleaners also often receive small tips, albeit at a lower level. With this in mind we can estimate that roughly 40% to 50% of hotel employees current earn less than the proposed living wage level.

Table 1: Distribution of hourly pay for Los
Angeles County hotel workers
2012 American Community Survey

| Hourly Wage ($) | Annual Wage ($) | Distribution Percentile |
|---|---|---|
| 5.77 | 7,598 | 5 |
| 6.25 | 8,915 | 10 |
| 6.73 | 11,144 | 15 |
| 7.69 | 12,157 | 20 |
| 9.23 | 15,197 | 30 |
| 10.58 | 18,236 | 40 |
| 12.02 | 21,275 | 50 |
| 13.46 | 25,328 | 60 |
| 15.63 | 30,393 | 70 |
| 19.23 | 40,524 | 80 |
| 21.01 | 42,550 | 85 |
| 25.64 | 50,655 | 90 |
| 33.65 | 81,048 | 95 |

Table 2: Average hourly pay for Los Angeles
County hotel workers by age and hours
2012 American Community Survey

| Hourly Wage | | | | |
|---|---|---|---|---|
| 18-25 | $9.86 | Full-Time | $14.53 | 75% |
| 26-35 | $12.79 | Part-Time | $13.29 | 25% |
| 36-45 | $13.48 | | | |
| 46-55 | $16.85 | | Source: 2012 ACS | |
| 56 and older | $17.41 | | Adjusted to 2013 | |

Exhibit 5 Page 252

We also collected other information that may be relevant to the issue. Looking at hourly wage by age group. We collected data on part time and full time employment from the ACS, as well as by age group. These wage estimates are derived again from the ACS, so they are likely to be 15% to 20% lower than what they actually are. One question is about full time vs part time status.

- Approximately one fourth of workers in the industry are part time, working less than 35 hours per week.

- Part-time employees are also making less than full-time employees. ACS data implies that part-time hotel workers average hourly wages that are 8.5% less than full-time workers wages.

- There is also a distinct relationship between age and income in the data. Those older than 56 make nearly twice the hourly pay of those in the 18-25 age range. This suggests that there is a career ladder in the industry, meaning as workers become older they receive increasingly better compensation.

- An additional wrinkle in the data is that large hotels, the ones that are to be affected by this proposal, actually pay employees an average wage that is above the living wage laid out in this proposal. Below is a breakdown of hotel by number of employees.

Table 3: Average Annual pay for City of Los Angeles hotel workers 2013 EDD

| Hotel Type | Count | Employees | Average Wage |
|---|---|---|---|
| Less than 100 Employees | 271 | 3,881 | 27,191 |
| More than 100 Employees | 46 | 12,944 | 36,662 |
| Total | 317 | 16,825 | 34,478 |

Despite the fact that many more hotel workers are being paid less than a living wage compared to the rest of the workers in the County of Los Angeles, Beacon does not feel this is so substantial as to have a significant negative impact on the City economy as a whole. There are two reasons for this. This first is that this population represents a small portion of workers in the area. The second reason is that the workers who earn the least in the industry are not in dead end positions. Rather they can earn higher incomes in a number of different ways.

According to the latest employment report by the EDD, the City of Los Angeles has 1,553,700 employed workers as of 2013. The 16,180 workers we estimate to be employed by hotels in the City account for a mere 1.0% of total employment in the City of Los Angeles. So although a great deal of hotel workers are making below the proposed living wage, they represent a fraction of a fraction of the overall labor force and as such do not impose a significant negative impact on the economy.

As seen in the data above, workers who earn the least in the industry tend to be part time, young or work for smaller hotels. As such, they can improve their incomes by simply working

Exhibit 5 Page 253

for larger hotels, working full time or gaining experience. As such, earning a living wage can be obtained simply through efforts on the part of the workers in question.

3) <u>What have been the positive and negative impacts of the City's Airport Hospitality Enhancement Zone ordinance?</u>

Three major results can be stated about what happened in the LAX region since the enhancement zone has been put in place.

- Wages at the airport initially grew faster; however, wages in the rest of the city have caught up. As such, the actual current wage differential between the city and the rest of the region is negligible.
- There has been little significant impact on the performance of the hotels from a Rev Par (revenue per available room night) basis.
- Employment within the LAX area has significantly underperformed growth rates in the rest of the city.

The airport hotel minimum wage law went into effect in 2008. The pay increase was less than the current proposal at just above $10 per hour.

REVPAR growth for hotels in the airport area is lower than for the county overall. While the area has a higher occupancy rate, it also has lower daily rates. According to data from PKF consulting, REVPAR in 2005 prior to the local hike in the minimum wage was 7.7% lower. In 2013, the most recent data available, REVPAR was 7.5% lower.

Airport area hotels were able to grow REVPAR faster than the average hotel in Los Angeles County mostly due to the ability to increase occupancy rates faster than the rest of the County, in addition to already having above average occupancy rates before the recession. Airport hotels increased occupancy rates to from 81% to 87% between 2006 and 2013. This is in contrast to the slight bump from 77% to 79% experienced countywide. Increases in average daily hotel rates were in line with rate increases across the county, growing 15.5% from 2006 to 2013 compared to the 18.0% growth in the rest of the county.

This suggests that the hotels were able to 1) pass on the increased labor costs to customers without losing any business due to higher rates, or 2) they have been absorbing the impact through lower profits or 3) they have adjusted to the pay increase with investments in labor saving technologies and thus reducing employment.

To look into this, data from the QCEW was used to look at the wage effects as well as the level of employment. This information is shown in Figure 1. On the income side, it is true that the minimum wage ordinance did raise the relative pay for workers in the LAX area—but not by as much as might have been expected. In 2006, the average hotel worker in the LAX area earned 3.2% less than for the county overall, or about $900 less per year. When wages stagnated during the recession for the overall County, they rose in the airport region, likely due to the ordinance. In 2013, LAX hotel workers were earning 4% more than for the county overall—or about $1,300 more per year.

Exhibit 5 Page 254



Figure 1: Average Annual Hotel Wages
Source: QCEW, EDD, Beacon Economics

While the wage trends are not terribly dramatic, employment trends have been. Employment growth is very different between LAX hotels and hotels in the rest of the county. From mid-2006 to the end 2013, employment shrank 10.0% in LAX hotels and grew 9.2% throughout Los Angeles County. This is due almost exclusively to non-existent employment growth in LAX hotels post-recession, combined with a much larger drop in jobs during the recession, where, LAX hotel employment fell 20%, compared to a 7.4% drop for Los Angeles County.



Figure 2: Hotel Industry Employment Levels
(indexed)
Source: QCEW, EDD, Beacon Economics

Exhibit 5 Page 255

Table 4: Averages Wages & Employment for 11 LAX Hotels and Los Angeles
County Hotels

| | Average Wage | | % Change in Average Wage | | Employment | | % Change in Employment | |
|---|---|---|---|---|---|---|---|---|
| | LAX | Los Angeles County | LAX | Los Angeles County | LAX | Los Angeles County | LAX | Los Angeles County |
| 2006 | 27,182 | 28,084 | - | - | 2,735 | 37,912 | - | - |
| 2013 | 33,483 | 32,201 | 23.2% | 20.3% | 2,461 | 41,391 | -10.0% | 9.2% |

Source: Employment Development
Department

Overall, here are the positives and negatives usually associated with minimum wage
increases:

Potential Positives:
- Increased incomes for workers who received higher wages leads to higher spending in
  the economy.
- Higher incomes decrease Government welfare spending.

Potential Negatives:
- Increases in labor costs will have to be offset in one of, or a combination of the
  following ways:
  o Decreased profit margins as businesses absorb higher labor costs.
  o Increased prices as businesses pass through costs to consumers.
  o Decreased employment as businesses substitute of out of labor due to the
    increased input costs.

Summing up the previous data, while it is true that airport hotel worker wages look to have
grown by 2.9 percentage points more than hotel workers throughout the county from late 2006
to 2013, on the other side of the equation, the region's hotel employment declined by 10%. To
be fair, this cannot be exclusively linked to the LAX hotel minimum wage ordinance, but certainly
some of the blame can be laid there.

## 4) What provisions of the Long Beach "Minimum Wages for Hotel Workers" ordinance should be considered?

The Long Beach "Minimum Wages for Hotel Workers" ordinance features three major
components that are comparable to the proposed Los Angeles ordinance and consistent with
city policy to this point.

Exhibit 5 Page 256

- The Long Beach ordinance set a floor for the minimum wage by limiting the policy to hotels with 100 rooms or more. Like the proposed policy for Los Angeles, this floor allows smaller hotels more time to adapt to a wage increase without substantively increasing labor costs in the immediate term.
- The Long Beach ordinance provides an allotment of sick days for hotel workers that is actually smaller than the allotment set forth in the Los Angeles Airport Hospitality Enhancement Zone minimum wage increase several years ago. Los Angeles has proposed an allotment of 80 uncompensated hours off for sick days into its own plans, in addition to 96 hours of compensated time off per year.
- The Long Beach measure includes a measure allowing hotels to waive the minimum wage if the hotels and their workers engage in collective bargaining negotiations. Similarly, the Los Angeles proposal would introduce a waiver for hotels if the wage provisions are expressly waived in a collective bargaining agreement. These are measures that do not weaken the position of hotel workers while maintaining the negotiating position of hotel unions in Los Angeles. Indeed, in the case of Long Beach, the measure even led to unionization at two city hotels.

The Los Angeles minimum wage ballot measure for hotel workers is modeled very closely to the Long Beach ordinance, and the wage escalation for hotel workers is very similar in each piece of legislation. Each provides a safeguard to smaller hotels by limiting wage increase to workers at hotels with larger numbers of rooms. The Long Beach measure implemented a wage of $13 per hour in 2012 for hotels with 100 rooms or more, while the Los Angeles ordinance will implement a wage of $15.37 per hour for hotels with 300 or more rooms by July 2015 and for hotels with 125 rooms or more by July 2016.

The Long Beach measure's provision of five paid sick days per year for full-time employees is actually lower than the Los Angeles 2007 Airport Hospitality Enhancement Zone requirement of 12 paid sick, vacation, or personal days.[2] An allotment of sick days for Los Angeles's proposed citywide hotel wage ordinance would be consistent with existing policy.

Like the Long Beach ballot measure, Los Angeles's ordinance will include a waiver for employers entering into collective bargaining agreements with their workers. This is a union-strengthening measure that accommodates a proactive negotiating position for workers and does not exclude any specific class of hotel workers. Upon its implementation, the Long Beach ballot measure affected only 15 of the 17 hotels with 100 workers or more, as two hotels, Hotel Maya and the Queen Mary hotel, employed unionized workers.[3] Since then, workers at two other hotels, Hyatt

---

[2] http://clkrep.lacity.org/onlinedocs/2006/06-0362-s3_ord_178432.pdf.
[3] Silavent, Joshua H. "Measure N: Voters Approve $13 Wage and Benefits for Long Beach Hotel Workers." *Long Beach Business Journal*. 20 Nov. 2012.

Exhibit 5 Page 257

Regency Long Beach and Hyatt The Pike Long Beach, have elected to unionize,[4] leaving 13 hotels subject to the policy. Like the Long Beach measure, Los Angeles should ensure, as it has in the Airport Hospitality Enhancement Zone ordinance, that the waiver is only applicable if expressly waived in collective bargaining agreements.

## 5) <u>What provisions of the Seattle ordinance regarding minimum wage should be considered?</u>

The Seattle minimum wage ordinance, while more complex than the proposed Los Angeles ordinance and broader-based, may not establish a substantively different year-by-year wage increase between smaller firms and larger firms in the hotel industry.

- The Seattle ordinance applies to businesses citywide, rather than the hotel industry in specific.
- The Seattle ordinance sets different wage increases for businesses with 500 or more workers and those businesses with fewer than 500 workers, which, like the Los Angeles proposed ordinance, is designed to help smaller businesses adjust to the wage increase more slowly over time.
- However, by counting workers nationally rather than locally, the Seattle ordinance will likely put smaller businesses that are part of a franchise on the same track as much larger businesses. In the case of hotels, this could work to the detriment of hotels that have relatively few rooms but are franchises of much larger national hotel chains.

Table 5: Seattle Minimum Wage Ordinance, June 2014

| Date of Wage Increase | Minimum Wage, 500 or More Workers Nationally | Minimum Wage, 500 or More Workers Nationally with Medical Benefits | Minimum Wage, Fewer than 500 Workers Nationally | Minimum Compensation, Fewer than 500 Workers Nationally* (where applicable) |
|---|---|---|---|---|
| April 2015 | $11 per hour | $11 per hour | $10 per hour | $11 per hour |
| January 2016 | $13 per hour | $12.50 per hour | $10.50 per hour | $12 per hour |
| January 2017 | $15 per hour | $13.50 per hour | $11 per hour | $13 per hour |
| January 2018 | Raise equal to CPI increase | $15 per hour | $11.50 per hour | $14 per hour |
| January 2019 | Raise equal to CPI increase | Raise equal to CPI increase | $12 per hour | $15 per hour |

---

[4] http://www.presstelegram.com/general-news/20130901/long-beach-may-be-setting-for-further-push-on-living-wage-laws.

Exhibit 5 Page 258

| January 2020 | Raise equal to CPI increase | Raise equal to CPI increase | **$13.50** per hour | **$15.75** per hour |
| January 2021 | Raise equal to CPI increase | Raise equal to CPI increase | **$15** per hour | |
| January 2022 | Raise equal to CPI increase | Raise equal to CPI increase | **$15.75** per hour | |
| January 2023 | Raise equal to CPI increase | Raise equal to CPI increase | **$16.50** per hour | |
| January 2024 | Raise equal to CPI increase | Raise equal to CPI increase | **$17.25** per hour | |
| January 2025 | Raise equal to CPI increase | Raise equal to CPI increase | Equal to employees of businesses with 500 or more workers nationally | Minimum compensation no longer applies |

*Businesses may also pay an amount equal to the minimum wage for businesses with 500 or more employees, if lower.

The minimum wage in the City of Seattle stands at $9.32 per hour. The city's minimum wage ordinance, passed in June 2014, seeks to steadily raise the minimum wage to $15 per hour, which would lead the country. The wage ordinance implements a differentiated scale of wages distinguished by total number of workers, as Long Beach and Los Angeles do, but the floor is much higher—500 workers versus 125 workers—and union workers are not exempted. In April 2015, when the first changes go into effect, wage growth starts higher:

- $11 per hour for "large" businesses with 500 or more employees
- $10 per hour for "smaller" businesses with fewer than 500 employees

Wages also escalate more quickly through the phase-in period. For example:

- By January 2016, the minimum wage will increase to $13 per hour for large businesses, compared to $10.50 per hour for smaller businesses
- By January 2017, the minimum wage will increase to $13.50 per hour for large businesses, compared to $11 per hour for smaller businesses
- By January 2018, the minimum wage will increase in line with inflation for large businesses, compared to $11.50 per hour for smaller businesses
- The minimum wage in January 2017 will reach $15 per hour at large businesses but will not reach that level until January 2021 at smaller businesses.

Seattle has a substantially smaller proportion of lower-skilled workers than Los Angeles. The impact of the citywide ordinance will likely be much smaller than a comparable ordinance would be in Los Angeles. According to the 2013 U.S. Census American Community Survey, 12.9% of

Exhibit 5 Page 259

workers in the City of Seattle possess a high school diploma or equivalency or lower, compared to 40.6% of workers in the City of Los Angeles. Even by differentiating large businesses from small businesses, the Seattle ordinance would likely impact relatively few workers compared to a city like Los Angeles

However, the City of Seattle substantially widens the reach of the minimum wage ordinance by counting workers in other states as part of the total worker count. Businesses that employ less than 500 workers locally but are part of chains that employ more than 500 workers nationally are subject to a higher minimum wage increase every year through January 2025, in which the minimum wage at "smaller" businesses must equal the minimum wage at "large" businesses. In June, the International Franchise Association filed suit to block the implementation of the ordinance, claiming that the ordinance unfairly treats local small businesses as big businesses.[5]

Although the floor of the proposed Los Angeles ordinance is much lower than the Seattle ordinance, it sets a much more reasonable policy for small hotels, as it puts hotels of comparable *local* size on equal footing while still implementing the policy only on those businesses that will be less impacted by an increase in variable costs.

The Seattle ordinance differentiates the increase in the minimum wage during the phase-in period between businesses that offer minimum compensation (tips, bonuses, commissions) or medical benefits and those that do not. Businesses that offer medical benefits to their employees face a slower escalation in the minimum wage for their workers. For example, businesses with 500 or more employees must pay workers $15 per hour by January 2017, compared to January 2018 for businesses with 500 or more employees that provide medical benefits. At the same time, businesses with fewer than 500 employees and minimum compensation must provide workers either a minimum wage equal to that of businesses with 500 or more employees OR a minimum compensation that is marginally higher than the minimum wage for businesses with fewer than 500 employees. For example, this type of business would be required by January 2017 to pay a minimum wage of $15 per hour OR minimum *compensation* of $13 per hour. Meanwhile, the minimum wage for businesses with fewer than 500 employees would be slightly lower, at $11 per hour, at that time. However, by January 2025, all businesses must pay an equal minimum wage.

This is a mechanism to mitigate shocks to businesses in labor-intensive industries such as the hospitality industry with an abundance of workers earning wages through tips. In California, tip compensation is non-exempt; employers are required to pay workers the minimum wage even if those workers earn tips. Los Angeles's ordinance cannot differentiate businesses that employ tipped workers from those that do not. However, Seattle's ordinance provides a useful model for Los Angeles in terms of its sensitivity to different types of employers. If, during a phase-in period, a business opts to provide its workers with an equivalent or better benefit (such as a good health care plan) compared to a higher wage, it may reduce the impact of an increase in labor costs while not decreasing the benefit its workers receive under the new policy. Compare to the

[5] http://www.franchise.org/IFA_NEWS/IFA_Files_Lawsuit_Against_Seattle_for_Equal_Treatment/.

Exhibit 5 Page 260

collective bargaining agreement provision under the Los Angeles proposed ordinance. Employers gain some flexibility while their workers do not lose out under the new policy.

### 6) What provisions of the San Francisco ballot measure regarding minimum wage should be considered?

Like the Los Angeles proposal, the San Francisco minimum wage ballot measure has few variations in wages across businesses and few exemptions.

- Unlike the Seattle ordinance, the San Francisco ballot measure does little to protect smaller firms from potentially high labor cost increases in the short term.
- However, San Francisco has a very low percentage of lower-skilled workers whom this policy would likely impact—less than half the percentage of lower-skilled workers in Los Angeles.
- However, the model the San Francisco ballot measure sets of allowing few exemptions for categories of workers may be one to follow in the Los Angeles proposal. Only "government supported employees," which represent a small proportion of city workers, are exempt from the wage increase. This policy neither encourages nor discourages certain types of workers (younger workers, for instance) from finding jobs in the hotel industry due to differences in wages. By comparison, the Los Angeles proposal only exempts hotel workers under collective bargaining agreements that have waived the wage increase. No other category of workers are exempted.

Table 6: San Francisco Minimum Wage Ballot Measure, November 2014

| Date of Minimum Wage Increase | Minimum Wage |
|---|---|
| May 2015 | $12.25 per hour |
| July 2016 | $13 per hour |
| July 2017 | $14 per hour |
| July 2018 | $15 per hour |
| July 2019 | Raise equal to CPI increase |

The City of San Francisco's November 2014 minimum wage ballot measure, Measure J, is farther reaching than Seattle's ordinance. It is set to raise the city's minimum wage from $10.74 per hour at present to $15 per hour by July 2018.

As in Seattle, San Francisco's measure would likely impact far fewer businesses than would a comparable ordinance in Los Angeles, as the city has far fewer lower-skilled workers. Roughly 18.8% of workers in San Francisco possess a high school diploma or equivalency or below, compared to 40.6% of workers in Los Angeles. However, San Francisco's measure has few exemptions compared to the Seattle ordinance.

Exhibit 5 Page 261

The measure, set to take effect in May 2015 if passed, provides no minimum compensation credit to employers, and exemptions apply to only two small categories of workers. It sets a different wage for "government supported employees," which include:

- Residents under 18 and employed in after-school or summer jobs subsidized by federal, state, or local government, and
- Residents over 55 employed by a non-profit for core social services.

The minimum wage for these workers would increase to $12.25 per hour by May 2015 but would increase only in line with the growth of the San Francisco consumer price index each year beginning in July 2016.

These exemptions would clearly not apply to the Los Angeles hotel industry, but exemptions based on employee types more broadly warrant caution.

These exemptions could encourage hiring among certain categories of workers based on their labor costs. Specifically, exemptions may promote hiring among exempt workers that command lower wages and discourage hiring among nonexempt workers that command higher wages. The overall profile of hotel workers citywide would more closely mimic the existing, lower-wage profile than intended, while potentially leaving many workers that could currently benefit from the wage increase out of work. Inversely, however, some exemptions could provide a benefit to workers that may be struggling. Consider an exemption for workers age 21 and under. According to the 2013 U.S. Census American Community Survey, the unemployment rate in the City of Los Angeles for these workers is roughly 27%, including 20% among workers 20 to 21 years old. The unemployment rates among older age groups are significantly lower—for example, 8.9% of individuals in the Los Angeles labor force 35 to 44 years old are unemployed. An increase in hiring among younger workers, commanding lower wages, could be a significant benefit to young people struggling to find work. Ultimately, though, this might mean hiring lower-skilled, younger workers at the expense of some higher-skilled, older workers.

## 7) Provide a five to ten year history of sales, payroll, and employment data for the hotel industry within the Los Angeles – Long Beach – Santa Ana Metro Area. Include a list of typical payroll classifications with current average wages.

Hotels in the Los Angeles – Long Beach – Santa Ana MSA experienced a steep decline in REVPAR, payrolls, and employment in 2009 after reaching a pre-recession peak in 2008. Growth in all three categories resumed the following year in 2010 and as of 2014 REVPAR, payrolls, and employment are at all time highs.

For historical data on payrolls and employment in the hotel industry, Beacon used the County Business Patterns data released by the Census Bureau. Current average wage data for typical payroll classifications is taken from the 2013 Occupational Employment Statistics (OES) published

Exhibit 5 Page 262

by the Bureau of Labor Statistics (BLS). The RevPAR data used for analysis comes from Visiting California.

During 2008, shortly before the economic downturn, the hotel industry in the Los Angeles-Long Beach-Santa Ana Metro Area employed 69,309 people and had an annual payroll of $1.87 billion. The next year, the industry shed over 3,000 jobs and $120 million in payrolls, but was able to resume growth in both employment and payrolls the following year. Employment in the hotel industry rose to 68,095 in 2011 before contracting to 66,000 the following year. Payrolls on the other hand continued to grow, reaching a five-year high of $1.96 billion in 2012.

| Table 7: Total Employees and Payrolls for Los Angeles-Long Beach-Santa Ana, CA Metropolitan Statistical Area | | |
|---|---|---|
| Total Mid-March Employees | Total Annual Payroll ($1,000) | Year |
| 66,309 | 1,757,429 | 2007 |
| 69,720 | 1,872,589 | 2008 |
| 66,573 | 1,755,869 | 2009 |
| 67,383 | 1,822,428 | 2010 |
| 68,095 | 1,942,427 | 2011 |
| 65,999 | 1,956,211 | 2012 |

Overall Sales data is not accessible for the hotel industry, thus revenue per available room (RevPAR) will be used as a proxy for historic sales growth. Since the recession, RevPAR has grown significantly. RevPAR bottomed out at $68.82 in February of 2010 and has rebounded to an all time high of $107.03 as of March 2014, a 55.5% increase. The March 2014 RevPAR of $107.03 is also 14.6% above the prerecession peak. Overall, from January 2005 to March 2014, RevPAR has grown by 47.2% despite significant revenue decrease of 26.2% during the recession. The strong post-recession growth in RevPAR can be attributed equally to a rebound in occupancy rates and average daily room rates. After reaching a low in March of 2009, occupancy rates reached a 10-year high of 78.97% in January of this year, an increase of 16.78 percentage points from the trough of the recession. Average daily rates grew even more from trough-to-peak growing 28.8% from February 2010 to January 2014.

When looking at average wages for specific payroll classifications, Beacon elected to focus on a few occupations with a large amount of workers that would be affected by an increase in the living wage. The occupations highlighted are Maids, Bellhops, and Hotel Desk Clerks. The current average hourly wage for Maids and Housekeeping Cleaners in the Los Angeles MSA is $11.23, which is 37% less than the proposed living wage, but it is also 25% higher than the current minimum wage. Baggage Porters and Bellhops earn a slightly lower hourly wage than Maids at $11.14 an hour, while hotel and motel desk clerks earn an average hourly rate of $11.71. Overall, there are 41,600 workers in these occupations earning an average of $11.36 an hour.

Exhibit 5 Page 263

## 8) Would a regional tourism authority help or hinder the current trends in the hotel industry?

Data suggest that a regional tourism authority in Los Angeles might be a benefit to the City of Los Angeles by increasing visitor traffic to an already strong and growing tourism industry.

- Tourism in Los Angeles is already growing very quickly. Passenger traffic at LAX increased 6.9% from April-June 2013 to April-June 2014, compared to 5.2% statewide. International arrivals increased 9.9% in that time, compared to 8.9% statewide.
- Hawaii and New York tourism growth, measured by total visitor and international visitor counts, following implementation of a regional tourism authority suggest that the authority may have helped bring new visitors to those areas.
- A regional tourism authority like that of New England or the Central Coast may help to reduce marketing costs across member cities and to develop a marketable common brand or identity across those cities.

Current trends suggest that the hotel industry is already growing strongly as economic growth nationwide, as well as in countries in Asia and elsewhere, has led to substantial increases in business and leisure travel to Los Angeles. The question becomes whether a regional tourism authority would be able to leverage the existing demand for business and leisure travel into tourism in our city.

According to data from Visit California, the total number of domestic and international travelers through Los Angeles International Airport increased more quickly than across all California airports in both the near-term and longer-term. From April-June 2013 to April-June 2014:[6]
- Passenger traffic increased 6.9% at LAX compared to 5.2% statewide.
  - International arrivals increased 9.9% at LAX compared to 8.9% statewide.
- Over the course of the last three years, passenger traffic increased 13.5% at LAX compared to 12.2% statewide.
  - International arrivals increased at a slightly slower pace at LAX, 14.4%, compared to 17.8% statewide.
- The longer the window of observation, the stronger LAX appears in total visitor traffic relative to the state overall. Over the course of the last five years, passenger traffic increased 27.9% at LAX compared to 18.2% statewide.
  - International arrivals increased 33.9% at LAX compared to 35.2% statewide.

Hotel data from Visit California show how strongly the Los Angeles hospitality sector has grown in recent years. From February-April 2013 to February-April 2014:[7]

---

[6] Numbers are averaged across three months to reduce volatility from month-to-month statistics.

Exhibit 5 Page 264

- The occupancy rate among Los Angeles County hotels increased 3.0 percentage points to 79.1%.
  - The rate increased 7.8 percentage points over three years and 16.3 percentage points over five years.
- The revenue per available hotel room (REVPAR) shows even stronger growth. In one year—from February-April 2013 to February-April 2014—REVPAR in Los Angeles County increased 8.9% to $111.52.
  - In three years, REVPAR increased 27.0%; in five years, 55.0%.

Data from PKF Consulting shows that while the outlook is quite positive in many key locations of the city. For the 2014 year to date (January to June):
- REVPAR among downtown Los Angeles hotels increased 5.6% from the 2013 year to date.
- In the LAX airport area, REVPAR increased 10.9% in that time, while REVPAR in Hollywood increased 7.6%.
- Hotels in Beverly Hills and Santa Monica, both of which would stand to gain from a successful regional tourism authority, are showing strong growth as well. REVPAR in Santa Monica increased 9.8% from January-June 2013 to January-June 2014, while REVPAR in Beverly Hills increased 8.2% in that time.

Clearly, a regional tourism authority would not be tasked in the immediate future with turning around a struggling hotel industry but rather expanding on the industry's growth even more.

The LA 2020 Commission's *A Time for Action* report claims that New York and Hawaii have established regional tourism authorities that have helped tourism in those locations to grow. Tourism has grown significantly in those areas over time. According to *New York City Tourism: A Model for Success* by NYC & Company:[8]
- New York City visits increased from 43.8 million in 2006, the year the local tourism authority was created, to 52.0 million in 2012.
- International visits increased from 7.3 million in 2006 to 11.0 million in 2012.
- Hotel room nights sold increased from 22.4 million in 2006 to 29.0 million in 2012.

According to data from the Hawaii Tourism Authority,[9] the regional tourism authority established in 1998:
- Total visitor days across all Hawaiian islands increased by 1.9% to 57.4 million from 1990 to 1998.
- However, from 1998 to 2006, total visitor days increased by 20.3% to 69.1 million. This rapid rate of growth slowed in the next six years, increasing by 6.5% to 73.7 million from 2006 to 2012.

---

[8]

http://www.nycgo.com/assets/files/pdf/New_York_City_Tourism_A_Model_for_Success_NYC_and_Company_2013.pdf.

[9] http://www.hawaiitourismauthority.org/research/reports/historical-visitor-statistics/.

Exhibit 5 Page 265

- At the same time, across all Hawaiian islands, total visitors staying overnight or longer *decreased* 1.8% to 6.6 million from 1990 to 1998.
- From 1998 to 2006, total visitors staying overnight or longer increased 14.1% to 7.5 million, and from 2006 to 2012 increased 4.5% to 7.9 million.
    - Within this group, the number of international visitors increased 7.1% from 1990 to 1998 to 2.6 million, *decreased* 23.4% from 1998 to 2006 to 2.0 million, and increased 24.5% from 2006 to 2012 to 2.5 million.

These profiles of tourism in New York City and Hawaii suggest that a regional tourism authority *could have* increased tourism to these areas, but the data are not conclusive. Economic growth, not just locally but nationally and internationally, plays a fundamental role in increases and decreases in tourism over time. Tourism in Los Angeles is growing primarily because the local economy is getting stronger while cultural and other amenities are abundant. However, these regional tourism authorities appear to create a unified identity across different cities that may help in branding the region to travelers.

Similarly, the Central Coast Tourism Council was established to market the Monterey Bay, San Luis Obispo, Santa Barbara, and Ventura regions as parts of a whole Central Coast experience for tourists.[10] Regions like Santa Barbara and San Luis Obispo are marketed as wine tourist hubs, while Monterey Bay promotes its redwood forest hikes and renowned coastal towns and Ventura markets its farmlands, arts, and proximity to Los Angeles among other amenities. Despite the differences between these regions, both geographically and culturally, the Central Coast Tourism Council seeks to promote a unified brand of the Central Coast as a sort of oasis locale unlike the Bay Area or Southern California.

Likewise, Discover New England is a cooperative marketing entity funded by the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont that focuses on branding a common New England identity across these states to European travelers.[11] Discover New England promotes the seafood and shipping culture, fall foliage, winter resorts, harvests, and colonial history that American tourists may identify with some or all of those states but that may be unknown to European tourists. An regional tourism authority like these may help the City of Los Angeles to market itself in common with cities that share its cultural history and geographical amenities, such as Beverly Hills, Santa Monica, and West Hollywood.

These case studies suggest that there would likely be a positive impact to creating a regional tourism authority in the Los Angeles area. The authority would be able to reduce the costs of marketing for each of the citywide tourism organizations by pooling resources and helping to develop a common "brand" of the Los Angeles area across cities. The cases of New York and Hawaii suggest that their regional tourism authorities may be working. Given the current tourism climate in Los Angeles, the goal would not be to revive a lagging tourism sector but to take full advantage of the strong growth underway in the tourism sector.

---

[10] http://www.centralcoast-tourism.com/.
[11] http://www.discovernewengland.org/about-dne/.

Exhibit 5 Page 266

## 9) What have been the overall employment trends within the hotel industry in Los Angeles and Long Beach respectively?

Similar to the overall MSA, both Los Angeles and Long Beach hotels were negatively impacted by the recession and employment in both areas reached a pre-recession peak in early 2008 before bottoming out in the first half of 2010. Post-recession employment is at all time highs for Long Beach and Los Angeles hotels.

Beacon was unable to obtain hotel-industry-specific data for the City of Long Beach, but data for the Accommodations industry was available for analysis. From the first quarter of 2006 to the first quarter of 2008, employment in the Accommodations industry grew by 33.5% to a peak of 2,527 employees. Due to the recession, employment in Accommodations contracted 40.7% to 1,497 jobs before resuming growth in the second quarter of 2010. As of the third quarter of 2013, employment in Accommodations is 8.8% above the pre-recession peak, and has grown 9.2% from Q3 2012 to Q3 2013.

Employment data from the EDD for the City of Los Angeles is too volatile so we will examine employment data for Los Angeles County from the QCEW. From the first quarter of 2006 to the first quarter of 2008, employment in the Hotels and Motels industry grew by 6.2% to 38,975 employees. Due to the recession, employment in Hotels and Motels contracted 9.4% to 36,059 jobs before resuming growth in the first quarter of 2010. As of the fourth quarter of 2013, employment in Hotels and Motels is 4.0% above the pre-recession peak, and has grown 2.1% from Q4 2012 to Q4 2013.

Exhibit 5 Page 267



Public Benefit Research and Innovation
Phone (213) 892-8104
Fax (213) 291-9245
www.economicrt.org
315 West Ninth Street, Suite 502
Los Angeles, CA 90015

**ECONOMIC**
ROUNDTABLE

September 22, 2014

Honorable Herb J. Wesson, Jr.
President, Los Angeles City council
Councilmember, 10th District
200 North Spring Street, Room 430
Los Angeles, CA 90012

Dear Council President Wesson:

As per your letter of July 7, 2014, we submitted our responses to a series of questions on the proposed hotel minimum wage on September 3, 2014, in advance of the September 8 deadline. Because of this timeline, we did not get the opportunity to discuss the relationship of the hotel minimum wage to the Mayor's proposed city-wide minimum wage, and the related study conducted by the Institute for Research on Labor and Employment at the University of California, Berkeley, released just two days prior. We would like to take this opportunity to supplement our analysis.

Our purpose is not to evaluate the proposed city-wide minimum wage, or the study itself, only the relationship to the hotel minimum wage. The Berkeley study considers the impacts of a phased increased to $13.25 for all workers, after which wages would rise annually at the cost of inflation. In brief, the study suggests that such an increase would be largely beneficial to the local economy, and that a minimum of negative impacts would occur. It does identify two industries in which some greater effects may be felt—apparel manufacturing and restaurants.

As hotels include restaurants, and some have argued that hotel restaurants should not be treated differently than other restaurants, we felt it appropriate to consider the similarities and differences between the two industries.

First, it is important to note that the Berkeley study does suggest that in San Francisco, which has a city-wide minimum wage, the effects on restaurants were minimal, though not insignificant. Moreover, the study cites other analyses that indicate limited effects in other cities.

Exhibit 5 Page 268

Council President Wesson
September 22, 2014
Page 2

Nonetheless, it is important to consider, are hotels different from other industries, and should the city see them differently, in setting a minimum wage?

In some senses, cities, including Los Angeles, already do. Hotels are both uniquely subsidized and uniquely taxed. Cities have long recognized the need to stimulate tourism and have supported hotels in order to achieve that goal, for example, by building convention centers, which are often loss leaders, supporting marketing through convention and visitors bureaus and by directly subsidizing the construction of new hotels or the renovation of existing hotels. Many of Los Angeles's hotels have been built with such supports over the years.

Similarly, virtually all cities have a transient occupancy tax (TOT) or bed tax, paid by those who stay in hotels. This is one of the few, and one of the largest, specific taxes the city of Los Angeles has in one industry. The rationale, as we noted in our 2006 report "*From the Pockets of Strangers*," is both that cities can gain revenue from non-residents and that hotels are generally generating this revenue from relatively well-heeled travelers for whom an additional tax is not a great disincentive.

Such effects can be seen in hotel prices, which are widely variable. The cost of most goods or services is determined in part by the cost of producing them, and in part by the local economy—that is, the ability of local consumers to pay. Restaurant prices, for example, do not increase and decrease dramatically day to day because the local market has a meaningful role in determining those prices. Alternatively, hotel prices may be significantly different from week to week, month to month or year to year. They are set not by the local economy but by demand, which is generated externally, or by special offerings such as a convention.

As of this writing, Los Angeles County is experiencing record room rates and occupancy. According to Smith Travel Research, August was the best month ever on both counts in our history, and room rates leapt up $10 from the previous record set in July to a County-wide average of $164.

As a point of comparison, a decade ago, we found the County-wide average was $96 a night. Such increases are dramatically larger than increases in the costs of meals, and reflect the attractiveness of travel.

Exhibit 5 Page 269

Council President Wesson
September 22, 2014
Page 3

A second factor to consider is the impact on payroll and workers. In our 2013 study, *"Effects of a Fifteen Dollar an Hour Minimum Wage in the City of Los Angeles,"* we looked at which workers were paid the lowest, and which industries would have the greatest impact on payroll and revenue.

In that study, we considered restaurants and accommodations together, and found that the wage increase in those two industries would be 14% of industry revenue, second to agriculture in costs, while we found that 68% of workers in the two industries made below $15, far and away the greatest percentage.

However, in our *Repaying Hospitality* report later in the year, we looked only at the hotel industry, and found that the increased costs would represent approximately 4-5% of hotel industry revenue, while roughly 81% of hotel workers make below the proposed wage of $15.37.

Overall, this would mean that while the hotel industry has one of the highest percentages of workers below the proposed wage, it is in the lower tier of industries in terms of costs to increase wages.   The average wages paid to hotel workers in Los Angeles County and the average industry profit per worker is shown in *Figure 1.*  The average annual wage in 2012 was $30,632 and the average annual profit per worker is $23,763 (adjusted to 2014 dollars).

If the total cost of increasing the minimum wage for hotel workers to $15.37 was taken out of industry profits, rather than offset by small increases in room rates, industry profits would drop from $0.78 to $0.72 per $1.00 in wages paid to workers, as shown in *Figure 2.*



Figure 1
Annual Hotel Profit and Wages per Worker in Los Angeles County

*Source: Economic Roundtable analysis of payroll data from County Business Patterns and profit from IMPLAN.  Both in 2014 dollars.*

Figure 2
Impact of Raise LA on Hotel Profit per Worker

For every dollar spent on wages, the hotel earns 78-cents profit.



Passage of Raise LA



For every dollar spent on wages, the hotel earns 72-cents profit.

*Source: Economic Roundtable analysis of payroll data from County Business Patterns and profit from IMPLAN.  Both in 2014 dollars.*

Exhibit 5 Page 270

Council President Wesson
September 22, 2014
Page 4

Finally, we'd like to make one additional note about the hotel industry relative to other industries—ownership structure and capitalization. In 2013, there were 180 hotels sold in California for a total of $2.2 billion, an average price of $122 million per hotel. This price includes hotels both above and below the number-of-rooms threshold for this ordinance. To afford this, hotel owners are generally large, well-capitalized companies, and have varied and diversified holdings. Few if any hotels covered by the proposed ordinance do not fit this description.

Such statistics are not easily available for restaurants, in part because the industry is so varied. The costs of building or purchasing a taco stand versus a McDonalds versus a high end eatery vary widely. It is unlikely, however, that many restaurants are as well capitalized as even the least successful hotel covered by the proposed ordinance.

In short, it is our opinion that the hotel industry differs in key ways from many other industries in the city. It is a low-wage industry that is highly capitalized and highly subsidized, and its revenues are far less dependent on local consumer purchases than other industries. For that reason, we believe it is appropriate for the council, if it so choose, to treat the hotel industry in a manner separate from other industries.

We are available to answer any questions the City Council may have about the information provided in this supplemental letter.

Sincerely,

Daniel Flaming
President
(213) 892-8104  x204

Patrick Burns
Senior Researcher
(213) 892-8104  x203

cc: Office of Council President Herb Wesson: Andrew Westall
cc: Office of Councilmember Mike Bonin: Chad Molnar
cc: Office of Councilmember Curran Price: Marisa Alcaraz
cc: Office of Councilmember Nury Martinez: Jim Dantona

Exhibit 5 Page 271



PKF
CONSULTING
USA
A CBRE Company

September 22, 2014

Herb J. Wesson, Jr.
President, Los Angeles City Council
Councilmember, 10th District
200 North Spring Street, Room 430
Los Angeles, California 90012

Dear Mr. Wesson:

We have completed our analysis of the potential impact of the proposed City of Los of Angeles (LA) Living Wage Ordinance based upon the questions provided to us in your letter dated July 7, 2014. The answers provided herein are based on our present knowledge of the competitive lodging market as of the completion of our fieldwork in September 2014. The following report summarizes our findings and reflects the conclusion of our analysis.

The terms of this engagement are such that we have no obligation to revise this report to reflect events or conditions which occur subsequent to the date of completion of our fieldwork; however, we are available to discuss the necessity for revision in view of changes in the economy or market factors which have a material effect on the proposed property. This report is subject to the Statement of Assumptions and Limiting Conditions presented in the Addenda, as well as to any assumptions presented herein.

We appreciate the opportunity of working on this assignment and look forward to answering any questions you may have regarding our findings and conclusions presented herein.

Sincerely,

*PKF Consulting USA*

Bruce Baltin
Senior Vice President



**Introduction**

This report contains a comparative analysis of the proposed Living Wage Ordinance for the City of Los Angeles with the precedent ordinances implemented in the LAX Corridor, Long Beach, SeaTac Airport, Seattle and proposed in San Francisco. We have also provided trends in room sales, payroll, and unemployment rates within the hotel and motel industry for the Los Angeles Metropolitan Statistical Area (MSA). As part of our research, we interviewed hotel General Managers at properties within the LAX Corridor, City of Los Angeles, Long Beach and Seattle to understand how the precedent ordinances have impacted their hotel operations. Finally, we also interviewed hotel General Managers within the City of LA to ascertain how the proposed ordinance would potentially affect their operation

**Background**

The Los Angeles City Council introduced a motion on February 18, 2014 that would increase the minimum hourly minimum wage to $15.37 at all hotels in the City of LA with 100 or more guestrooms. The motion was co-sponsored by Council Members Mike Bonin (West LA - District 11), Nury Martinez (Northeast San Fernando Valley – District 6) and Curren Price (South LA and parts of Downtown – district 9). A copy of this ordinance is included in the Addenda at the end of this report.

When the Airport Hospitality Enhancement Zone was created in 1997, section 104.114 of the Los Angeles Municipal Code provided Procedures For Further Regulation. This section states that the City may not impose a living wage that exceeds the state or federal minimum wage upon any business entity that does not have a business relationship with the City of Los Angeles in the future, unless the City Council first secures a study that looks at the effects such a regulation would have on the:1) industry and/or geographic location targeted, 2) consumers or clients served by the industry and/or geographic location, including any price increases, and 3) the City's and/or geographic locations ability to attract and retain new business to the area. In addition, the industry on which the ordinance is imposed must receive business benefits from a City asset and must have more than 15,000 employees.

**City of Los Angeles Hotel Labor Force**

Per Smith Travel Research, the City of LA currently has approximately 350 hotel properties that currently offer almost 39,000 guestrooms. Using industry guidelines for staff to guestroom ratios, as well as data provided by the State of California Employment Development Department, We estimate that there are approximately 17,000 employees currently working in these 350 hotels.

*1*

Exhibit 5 Page 273

**Hotel Employee Living Wage Impact on the City Economy**

In our report dated June 24, 2014 that was prepared for the California Hotel & Lodging Association, we completed a detailed analysis using data from a recently compiled wage survey applied against the staffing model of a full-service, non-union hotel with approximately 400 rooms. The results showed that approximately 68.0 percent of the total employees (based on average pay rates for full-time equivalents – FTEs) were earning less than the proposed $15.37 living wage. However, if reported tips were considered, the number dropped to 48.0 percent. Because our methodology used a larger, full-service hotel as our example, it is our opinion that these percentages are likely overstated due to the larger number of employees in the entry-level and front-line positions as this type of hotel compared to the majority of the hotels in the City of Los Angeles.

Based upon our estimate of 17,000 total hotel employees within the City of Los Angeles and using the percentages mentioned above, this equates to more than 11,000 workers earning less than $15.37 without considering reported tips and almost 8,000 workers earning less than $15.37 if reported tips were included. Considering that Los Angeles has a workforce of more than 1.8 million people, the number of hotel workers earning less than the proposed living wage is less than 1.0 percent of the total workforce (with or without reported tips). Thus, in our opinion, the number of hotel employees currently earning less than the proposed minimum wage does not have a significant negative effect on the City economy as a whole.

**City Airport Hospitality Enhancement Zone Ordinance**

The LAX ordinance was implemented in January 1997, and increased the minimum wage for all workers in the designated airport corridor. At the time of implementation, the minimum wage increased from $6.75 to $10.64, which equated to a 36.6% wage increase. This large increase was very difficult for the airport-area industries to absorb at one time and much of this increase was not able to be passed on to the end consumer. Because the ordinance did not allow for a credit for employee-report tips, it was necessary to close hotel outlets (primarily food and beverage) and cut staff. Without the inclusion of reported tips, many employees who were already earning more than the new minimum wage lost their jobs as the hotels could not absorb the additional labor burden. Sadly, the employees that the ordinance was intended to help actually lost their jobs. On the positive side, the LAX ordinance affected all airport-related service industries, so there were no unfair competitive advantages created within the corridor. Additionally, healthcare costs for hourly employees were factored in when determining the employee's wage rates, which allowed hotels to continue to provide most of these benefits.

Exhibit 5 Page 274

**Long Beach "Minimum Wages for Hotel Workers" Ordinance Provisions**

In our opinion, there were no positive provisions in the "minimum wages for hotel workers" ordinance that was implemented in Long Beach in January 2012. When implemented, the ordinance imposed a 62.5 percent increase in the minimum wage for hourly employees. The ordinance affected only hotels with more than 99 rooms, which provided an operational disadvantage with local restaurants and competitive hotels outside of the boundaries of Long Beach. The ordinance was not enforced against union hotels, even though there were many positions at these union hotels that were paying below the new minimum living wage. Finally, the ordinance did not consider a healthcare credit or tip credit, which forced many hotels to reduce or eliminate healthcare funding for hourly employees, and cost many tipped employees, primarily in the food and beverage department, their jobs due to cost cutting measures, even though many of these employees were already earning well in excess of the new minimum wage.

**SeaTac Proposition 1**

This past January, a similar ordinance went into place for hospitality and transportation businesses in and around the Seattle/Tacoma International Airport. At the time of implementation, the ordinance increased the minimum wage by 63.2 percent, without the benefit of any sort of gradual ramp up of the increase. Similar to the Long Beach initiative, hotels with less than 100 rooms were exempt; however, it is these small hotels that many times are paying the lowest wages. On the positive side, both union and non-union businesses alike were affected, therefore no unfair competitive advantages were created.

**San Francisco Ballot Measure**

The proposed ballot measure is pretty straightforward in that it applies to all industries and does not exclude unionized businesses. The proposed implementation includes a ramp up of the 40% increase ($10.74 to $15.00) over a four-year period. A phased increase allows the businesses the ability to absorb and/or pass on these costs to the end consumer, so that a period of slow/negative job growth is not experienced in the local market that could result in employee layoffs.

Items that we would've liked to have seen included as part of the proposed ballot measure, would be the ability to pause the CPI increases during periods of economic downturn, and the CPI factor used should be the "general" CPI factor that everyone is familiar with and not the specific "worker" CPI index that is currently proposed in San Francisco. In addition, we recommend the inclusion of a wage-rate differential so that tipped employees currently earning more than the living wage, would not be subject to the proposed ordinance. Finally, we would've recommended a credit for health care costs that are paid by the employer.

Exhibit 5 Page 275

**History of Hotel Sales, Payroll and Employment Data for the Los Angeles MSA**

The following table provides a 10-year history of hotel room sales in the Los Angeles-Santa Ana MSA, calculated based upon the Transient Occupancy Tax (TOT) collections for each jurisdiction within Los Angeles and Orange Counties.

| | Hotel Rooms Revenue | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | City of Los Angeles and the Los Angeles MSA | | | | | | | |
| Year | City Of Los Angeles | % Change | Los Angeles County | % Change | Orange County | % Change | Total MSA | % Change |
| 2004 | $753,760,000 | N/A | $1,945,600,052 | N/A | $1,171,700,000 | N/A | $3,117,300,052 | N/A |
| 2005 | 982,703,571 | 30.4% | 2,285,983,301 | 17.5% | 1,253,400,000 | 7.0% | 3,539,383,301 | 13.5% |
| 2006 | 976,800,714 | -0.6% | 2,466,287,348 | 7.9% | 1,430,100,000 | 14.1% | $3,896,387,348 | 10.1% |
| 2007 | 1,035,046,429 | 6.0% | 2,634,958,566 | 6.8% | 1,555,900,000 | 8.8% | $4,190,858,566 | 7.6% |
| 2008 | 1,142,500,000 | 10.4% | 2,831,867,253 | 7.5% | 1,594,700,000 | 2.5% | $4,426,567,253 | 5.6% |
| 2009 | 1,048,635,714 | -8.2% | 2,521,139,040 | -11.0% | 1,417,100,000 | -11.1% | $3,938,239,040 | -11.0% |
| 2010 | 911,614,286 | -13.1% | 2,389,466,214 | -5.2% | 1,307,800,000 | -7.7% | $3,697,266,214 | -6.1% |
| 2011 | 1,036,914,286 | 13.7% | 2,651,945,461 | 11.0% | 1,454,500,000 | 11.2% | $4,106,445,461 | 11.1% |
| 2012 | 1,148,138,571 | 10.7% | 2,895,269,376 | 9.2% | 1,580,200,000 | 8.6% | $4,475,469,376 | 9.0% |
| 2013 | 1,198,735,714 | 4.4% | 3,101,323,127 | 7.1% | 1,717,400,000 | 8.7% | $4,818,723,127 | 7.7% |
| CAAG | 5.3% | | 5.3% | | 4.3% | | 5.0% | |

Source: Dean Runyan Associates

The data above shows that the City of LA and the combined MSA returned to pre-economic downturn levels in 2012.

The following table shows the average pay rates for selected front-line hotel positions over the past five years at hotels in the Los Angeles MSA. The full wage survey is presented in the Addenda at the end of this report.

*4*

Exhibit 5 Page 276

| Hourly Payroll Trends - Select Hotel Positions Los Angeles MSA | | | | | | |
|---|---|---|---|---|---|---|
| Position | 2010 | 2011 | 2012 | 2013 | 2014 | CAAG |
| Front Desk Agent | $13.44 | $13.89 | $14.12 | $14.74 | $15.06 | 2.9% |
| Bellperson* | 8.55 | 8.62 | 8.70 | 8.76 | 8.97 | 1.2% |
| Public Space Attendant | 11.84 | 12.30 | 12.74 | 13.10 | 13.51 | 3.4% |
| Room Attendant | 11.66 | 12.08 | 12.34 | 12.74 | 13.19 | 3.1% |
| Laundry Attendant | 12.35 | 12.51 | 13.00 | 13.95 | 14.11 | 3.4% |
| Restaurant Server* | 8.90 | 9.48 | 9.41 | 8.65 | 8.51 | -1.1% |
| Bartender* | 10.59 | 10.72 | 11.42 | 11.52 | 11.41 | 1.9% |
| Cocktail Server* | 8.40 | 8.21 | 8.45 | 8.43 | 8.55 | 0.4% |
| Room Service Server* | 8.28 | 8.24 | 8.37 | 8.47 | 8.57 | 0.9% |
| Mini-Bar Attendant | 11.68 | 12.07 | 12.14 | 12.71 | 12.83 | 2.4% |
| Banquet Server* | 9.33 | 9.72 | 8.91 | 9.73 | 9.75 | 1.1% |
| Banquet Set-Up* | 11.09 | 11.39 | 11.25 | 12.18 | 12.25 | 2.5% |
| Line Cook | 14.40 | 14.61 | 14.96 | 15.74 | 16.65 | 3.7% |
| Engineer (lowest skilled) | 16.57 | 16.98 | 17.30 | 18.73 | 17.18 | 0.9% |
| * Tipped employee - tips not included in wages shown. | | | | | | |
| Sorece: Executive HR Consulting Group | | | | | | |

The hourly wages shown above are yearly averages derived from wage surveys conducted by The Executive HR Consulting Group and the raw data from these studies is included in the Addenda at the end of this report. It should be noted that all of the sample hotels did not participate in the surveys each year, so the compound annual growth percentages are likely somewhat skewed. While the survey does not track reported tips for the tipped employees, we believe that if the tips were included, all of the tipped employee wages would be well in excess of the proposed living wage.

The following table provides a 10-year history of hotel/motel payroll and average wages.

| Hotel/Motel Payroll History Los Angeles MSA | | | | |
|---|---|---|---|---|
| Year | Total Payroll | % Change | Average Wage | % Change |
| 2004 | $1,420,766,000 | N/A | $24,772 | N/A |
| 2005 | 1,490,022,000 | 5% | 25,663 | 4% |
| 2006 | 1,601,063,447 | 7% | 27,048 | 5% |
| 2007 | 1,766,148,686 | 10% | 28,752 | 6% |
| 2008 | 1,840,931,241 | 4% | 29,309 | 2% |
| 2009 | 1,691,167,276 | -8% | 28,697 | -2% |
| 2010 | 1,762,937,812 | 4% | 29,716 | 4% |
| 2011 | 1,864,796,343 | 6% | 30,831 | 4% |
| 2012 | 2,008,648,338 | 8% | 32,380 | 5% |
| 2013 | 2,102,470,990 | 5% | 32,504 | 0% |
| CAAG | 4.5% | | 3.1% | |
| Source: US Bureau of Labor Statistics | | | | |

5

Exhibit 5 Page 277

The 10-year trend of the average hotel/motel wage shown above includes both exempt and hourly employees and indicates inflationary wage growth on a compound annual average basis was paid over the period.

The following table shows the average annual employment in the hotel/motel industry over the past 10 years, and year-to-date through the first quarter of 2014.

| | Los Angeles County | % Change | Orange County | % Change | Los Angeles MSA | % Change |
|---|---|---|---|---|---|---|
| **Average Annual Employment Hotel/Motel Industry** | | | | | | |
| 2004 | 36,613 | N/A | 20,763 | N/A | 57,376 | N/A |
| 2005 | 37,085 | 1.3% | 21,055 | 1.4% | 58,140 | 1.3% |
| 2006 | 37,333 | 0.7% | 21,846 | 3.8% | 59,179 | 1.8% |
| 2007 | 38,625 | 3.5% | 22,804 | 4.4% | 61,429 | 3.8% |
| 2008 | 39,428 | 2.1% | 23,175 | 1.6% | 62,603 | 1.9% |
| 2009 | 36,752 | -6.8% | 22,010 | -5.0% | 58,762 | -6.1% |
| 2010 | 37,625 | 2.4% | 21,557 | -2.1% | 59,182 | 0.7% |
| 2011 | 38,571 | 2.5% | 21,897 | 1.6% | 60,468 | 2.2% |
| 2012 | 39,598 | 2.7% | 22,625 | 3.3% | 62,223 | 2.9% |
| 2013 | 40,678 | 2.7% | 23,755 | 5.0% | 64,433 | 3.6% |
| CAAG | 1.2% | | 1.5% | | 1.3% | |
| YTD 03/13 | 39,894 | N/A | 23,004 | N/A | 62,898 | N/A |
| YTD 03/14 | 42,129 | 5.6% | 22,394 | -2.7% | 64,524 | 2.6% |
| Source: US Bureau of Labor Statistics | | | | | | |

The table above shows the jobs lost in the MSA during the economic downturn were finally replaced by 2013. This was accomplished primarily from the strengthening of the economy that has pushed occupancy levels to pre-recession levels.


### Impact of a Regional Tourism Authority

In our opinion, a regional tourism authority would definitely help hotels in the Greater Los Angeles area. There are 88 cities that comprise LA County and most visitors and many meeting planners do not know what the boundaries are between these various cities. While the Los Angeles Convention and Visitors Bureau has done its best to market all of the facets of the county -wide tourism offerings, the County  has historically provided a somewhat segmented approach to selling itself as a destination, compared to many of its competitor cities such as San Francisco, San Diego, and New York City.. Most of the various LA cities have acted independently from a tourism/hospitality standpoint as there has been no "over-arching" entity to promote Greater Los Angeles as a whole. Thus, instead of collaboration between all of these cities, they tend to act as competitors. For example, let's assume a meeting planner contacts local tourism representatives in San Pedro about holding a meeting, but San Pedro cannot accommodate the group because their hotels are already booked or the group is too large. When this happens, the meeting planner is usually told

"sorry, we can't help you", instead of: "we cannot help you, but my colleagues in Torrance can likely accommodate your needs.

There is one over-arching tourism entity in San Francisco, which has proved very successful. Stakeholders like to deal with one entity, and this interaction needs to be fluid and seamless. In this case, the regional tourism office can work with the larger groups and can do its best to insure that all areas of the region are fairly and equally represented. Thus, a regional tourism authority that links all of the various Destination Marketing Organizations within the County would help to streamline the marketing process. Since many of these jurisdictions delegate manpower to tourism generation, there must be duplication of effort in many cases.

**Job Impacts of the LAX and Long Beach Wage Initiatives**

Because the LAX hotels were not able to pass on the costs of the increased wages to their hotel guests, the affected hotels have had to implement cost-saving measures such as reduced staffing and benefits, and reduced hotel amenities. Most all affected hotels have experienced reduced staffing levels, with food and beverage receiving the largest portion of the cuts. One hotel reported a reduction of 84 hourly full-time equivalent employees (FTEs) since the ordinance was implemented, with 52 percent of these reductions occurring in food and beverage. Many of the affected hotels have eliminated room service and banquet and service charges, and have built these fees into the menu pricing. This makes it challenging for the sales team as they must explain the difference in pricing to potential clients. This also impacts banquet servers and bartenders as they are now paid a flat rate. The LAX hotels are now operating with a competitive disadvantage because some of their competitive set hotels, such as those in El Segundo, were not impacted by the ordinance.

In Long beach, at least two hotels have removed rooms from inventory in order to fall below the 100-room threshold. This has led to reduced revenue and staff cuts at these hotels. Another hotel has cut 25 FTEs (55,000 man hours) at the same time that occupancy has increased 7 points. The majority of these cuts were in the food and beverage department. One full-service hotel has calculated that the annual financial impact post-reduction of staff is approximately $785,000 in incremental wages, benefits, and payroll taxes. This impact would have been $1.5 million annually if the staff reductions had not been implemented. In many cases, the staff reductions have resulted in increased workloads, which have impacted service levels. Room service and banquet service charges are now built into menu pricing, which makes it difficult for the sales team to sell against Anaheim hotels.

Exhibit 5 Page 279

**Conclusions**

Based upon our internal analysis and the third-party research summarized herein, we believe that any ordinance that is implemented should be designed so that it benefits the greatest number of people, without placing an overly onerous burden on the City of Los Angeles hotels. Thus, we believe that a phased-in approach to the wage increase over several years will spread out the financial and operational impacts, allowing the hotels to adjust gradually to the increasing wages. This approach would hopefully prevent the loss of jobs that were experienced in the LAX, Long Beach and SeaTac Airport hotel markets. Additionally, we believe the prudent thing to do would be to include a provision for tip credits in the final wording of the ordinance. Tipped employees should be carved-out as most of these employees already earn well in excess of $15.37. Without this carve-out, many of the employees that the ordinance is designed to help could end up losing their jobs due to the almost-certain layoffs that have been previously experienced in the precedent hotel markets.

If the ordinance is implemented as currently proposed, there will also be a direct impact on new job creation as well, because developers will not want to risk an investment in new hotels due to the long-term real estate risks associated with development in areas with such high land costs. It should be noted that the compound average annual growth rate for new hotel supply in the City of LA is 0.7 percent from 1988 to the present day. This growth rate is significantly below the national average of 1.9 percent over this same period, and the result is an under-supply of hotel rooms in the market, particularly in Downtown. At present, the convention center is under-utilized due to its inability to attract larger groups because of a lack of hotel rooms in the immediate area. The issue with a lack of adequate new supply in Downtown is that it is currently not economically feasible to develop a hotel in Downtown and the proposed ordinance would only exacerbate the problem.

Similar to what happened in both the LAX Corridor and Long Beach, developers will likely shy away from future development deals if the proposed ordinance is implemented. No new hotels have been built in the LAX Corridor, and only one hotel (which was already under development when the ordinance was implemented) has been built in Long Beach, since their respective ordinances went into effect.

Based upon our research, we have determined that there are owners and potential investors who have slowed the progression of potential deals, and are waiting to see what is going to happen with the proposed ordinance. Three projects have been curtailed in Downtown alone. We believe that if the proposed ordinance is implemented for the City of LA, any new hotel development will likely take place outside if the city limits, which also translates to a loss of transient occupancy tax revenue (TOT).

Exhibit 5 Page 280

*ADDENDA*

Exhibit 5 Page 281