tion.

The fact that so many Angelenos live on so little has profound impacts. Many parents work two jobs, leaving them less time to be involved in their children's lives and education. Many live in substandard housing or have no savings, meaning they are just one setback from bankruptcy or homelessness. Bad schools, substandard healthcare, teenage pregnancies and other factors leave many stuck in a cycle of poverty that persists from one generation to the next.

Creating policies that help lift people out of poverty should be one of government's top priorities. Nevertheless, the proposal taking shape in City Hall to raise hotel workers' wages to $15.37 an hour in Los Angeles is not the right way to go about it.

**PHOTOS: A peek inside 5 doomed dictators' opulent lifestyles**

City Council members Mike Bonin, Curren Price and Nury Martinez have called for a hotel worker living wage as a way to "raise all boats" and address income inequality on a local level. However, their proposal unjustifiably singles out one industry, benefiting several thousand hotel employees while ignoring more than 1 million other low-wage workers. It would impose the second-highest minimum wage in the country for, say, a waiter in a Hilton hotel, while leaving a waiter at the restaurant next door — one that doesn't happen to be part of a hotel — with a guarantee of only $8 an hour (or $9 after July 1). The justification? Los Angeles hotels have low vacancy rates and are profitable.

That's not sound economic policy. It's simply a response — and a troubling one — to pressure from the hotel workers and their union, Unite Here. This time around, the

hotel workers have waged the most effective lobbying campaign. Next time it might be fast-food workers. Sorry, mall cashiers, you won't get a raise because the retailers threatened to leave and city leaders don't want to lose their sales tax revenue.

**PHOTOS: From the Fed to GM, 5 top-tier women trying to fix man-made messes**

Frankly, if the city's minimum wage is going to be raised, it makes sense to raise it for all city workers across the board.

In the past, L.A.'s political leaders have occasionally mandated a higher-than-minimum wage for certain workers whose employers, they argue, have received direct benefits from the city. The city decreed in 2007, for instance, that hotels near LAX must pay workers a living wage, now set at $12.16 an hour, because those hotels supposedly benefit from the city's investment in the airport. (This page strongly disagreed with that argument.) And the JW Marriott hotel downtown has to pay that same rate as part of an incentive package that gives it a $270-million break on city taxes through 2035.

But the 64 hotels that would be affected by the new proposal have sought nothing nor received anything special from the city. Unless you consider a public street or park or a medi-

Exhibit 5 Page 332

ocre Convention Center a unique benefit bestowed on the hotel industry.

**PHOTOS: How the Democrats can win back the House and keep the Senate**

There are other concerns. Would the higher wage for hotel workers lead to a loss of jobs or deter investment in new hotels in the city? Would it harm L.A. by offering a competitive advantage to hotels located just outside the city? These questions are to be addressed in a forthcoming study.

Generally, it is wiser to set minimum wages at a higher level of government, in order to have the broadest, fairest impact and to minimize the risk that businesses will move to cheaper locations. At the moment, President Obama is seeking to raise the federal minimum wage from $7.25 an hour to $10.10 — a proposal this page has supported — and California's leaders have rightly voted to raise the state wage to $10 an hour in 2016. Multimillionaire conservative Ron Unz is gathering signatures for a ballot initiative to boost the state's baseline pay to $12. If the City Council and Mayor Eric Garcetti are serious about raising all boats, they should dedicate their energy to policies that help the many instead of the few.

**Related Content**

Why help just L.A.'s hotel workers earn more?

Bring on the candidates — it's election season in California

On L.A. River restoration, it's time to think bigger

L.A. Fire Dept. shows how not to hire firefighters

New York has bike sharing. So does Chicago. So why doesn't L.A.?

For the homeless, taking shelter -- in a book

Have bike, will ride train -- if Metro will just provide more bike lockers

Cycling on the edge: Dodging cars and bike lane potholes

L.A.'s plan to make Figueroa a 'complete street' makes sense

Build My Figueroa, and let L.A.'s cyclists, and walkers, flourish

Exhibit 5 Page 333



March 13, 2014

Gerry Miller - Chief Legislative Analyst
Office of the CLA
200 N. Spring Street, Room 255
Los Angeles, CA. 90012

**SUBJECT: Hotel Living Wage Study**

Dear Mr. Miller,

The Valley Industry and Commerce Association (VICA) and our member hotels have voiced our concerns with the proposed hotel living wage ordinance and would like to thank you for choosing to study the effects of such a proposal before imposing it. VICA has compiled the list of questions below that we feel should be answered to ensure that the study accomplishes its goals in evaluating the real impacts of this proposal.

**Procedural Questions:**

- Who will be involved in conducting the study? This study has been referred the CLA's office, however, we feel an unbiased study should be conducted by the Office of Economic Analysis, since it was created for this purpose.

- What will be the CAO's role in the study? Following our discussions with several Councilmembers, they agreed that the CAO should work with the CLA through the course of this study, but in what capacity? How will the study elements be split by department?

- How will a full study that addresses all of the impacts of this proposal be conducted in just 45 days?

**Impacts Realized in Other Cities, Neighborhoods:**

- What have been the overall effects of the Living Wage Ordinance on employees around LAX, in Long Beach, in New York, and elsewhere?

    1. How many jobs were cut, or replaced by new, higher skilled employees after the ordinance went into effect?
    2. Of those who kept their jobs, how many experienced a reduction in hours per week and how many workload expectations were raised? (i.e. maid used to be responsible for 15 rooms an hour and is now expected to clean 22 an hour)
    3. How many employee benefits or free services were cut? (i.e. free employee lunches, recognition programs, insurance co-pays)

- What have been the costs to hotels from the increase?

    1. From other city examples, have managers or those paid above minimum wage asked for increased compensation as those who they oversee receive an increase (wage stratification)?  If so, what can we expect to be the overall cost of wage stratification to

Exhibit 5 Page 334

hotels, including the raise for minimum wage workers, further increases for other staff, and other costs tied to wages, such as workers' compensation, etc.

2. How have the hotels managed these costs?
3. What was the average increase in room rates/ banquet hall rates?
4. What has been the effect on hotel restaurants and bars as they implement this increase?
5. Have new hotels been built after the ordinance was put into place? How does this number compare with development numbers in previous years?
6. Have any previous examples raised minimum wage by nearly 80 percent, like the current proposal in L.A.? How large were their respective increases?

- What loss in tourism has been realized in these cities with rates that are disproportionate to competitive sets in bordering cities? How have the living wage hotels compared in tourism with their neighbors who are not required to pay a living wage?

**Questions regarding Specific City Zones:**

- As we all know, the Valley operates under a very different economic reality than other areas of the city, such as downtown where hotel development has been heavily city subsidized. For this reason, the study should analyze the impacts on a local basis instead of city wide, by dividing up the city into various zones. Once this has been done, we request that the following valley-specific questions be answered.

    1. What nexus is being used to justify including Valley hotels in this ordinance?
    2. How many tourists stay in Valley hotels to visit the "free" attractions listed in the motion?
    3. How are the data points listed in the motion different for Valley hotels in comparison to downtown? (i.e. Rev par, occupancy rates, ADR).
    4. How much effect do privately owned businesses or attractions located outside of the city (i.e. Magic Mountain, Universal, Burbank Studios) have on people staying in the Valley?

**Los Angeles Projections:**

- What will be the overall impact of the ordinance on the hotel industry in L.A.? What will be the specific impact on Valley hotels?

    1. What will be the average increase in room rates?
    2. How will these new labor rates affect tourism when less expensive options are available at bordering cities like West Hollywood, Burbank, and Beverly Hills, Anaheim?
    3. How will this potential loss of value affect the conferences and banquets, both large and small that regularly utilize hotel spaces? Will they be likely to stay in L.A., or move to a neighboring city?
    4. What will be the impact of L.A.'s lack of competitive pricing on online forums such as Priceline and Expedia?
    5. How will this loss of tourism and decrease in room stays affect the livelihood of hotels?
    6. How will this loss of tax revenue impact the city?
    7. Will hotel jobs be cut, replaced, or outsourced? Will hours be reduced or will workload per hour be increased?
    8. Will reduced profits affect loans as P/E ratios may drop below those required in loan agreements? Can the city be held liable for it being the cause of these business plan failures?
    9. How will higher costs affect hotel restaurants who compete with outside restaurants not impacted by this ordinance?
    10. What will be the effect on new investments/ renovations and new development in the city? How will this impact current and future jobs? Will developers instead build in surrounding cities?

Exhibit 5 Page 335

11. Do we expect any hotels to be forced to shut down as a result of this ordinance?

**Exemptions:**

- What would be the effects of an exemption for tipped employees?

    1. Would it be legal, under state law and the Department of Labor, to exempt tipped employees from the living wage ordinance?
    2. What is the average wage reported for a tipped employee? Hourly? Annually?
    3. What will be the effect of exempting tipped employees from the ordinance?
    4. What percentage of affected employees make $8.25 an hour? What percentage make over $15.37 an hour?

- What would be the impact of mandating a $15.37 floor for wages in future union contracts?

    1. Although we understand that current contracts cannot be changed, must future bargaining agreements also be exempted from the living wage?
    2. In the other city examples, how many hotels unionized after the living wage was imposed? How does this number compare with usual unionization in that area and across the country?

**Underlying Issues/ Alternatives:**

- What will be the impact on youth jobs and wages? (i.e. high school and college students)

- What alternatives have been considered to better address the issue of the wage gap and low purchasing power in Los Angeles?

- What is the benefit of instead addressing the underlying issues in the city and investing in job growth through economic development (i.e. phasing out of the business tax) as well as increased public-private partnerships with our schools, to match curriculum to workforce needs?

Thank you for your hard work on this important issue.

Sincerely,

Coby King
Chair

Stuart Waldman
President

Exhibit 5 Page 336



Richard Williams <richard.williams@lacity.org>

## Fwd: Living Wage Ordinance for Hotel Workers

1 message

**John Wickham** <john.wickham@lacity.org>                                              Fri, Mar 28, 2014 at 10:46 AM
To: Richard Williams <richard.williams@lacity.org>

I guess this should be on the file too.

John Wickham
Office of the Chief Legislative Analyst
phone: (213) 473-5738
fax: (213) 620-9869

---------- Forwarded message ----------
From: **Adena R. Tessler** <atessler@mercuryllc.com>
Date: Mon, Mar 24, 2014 at 4:40 PM
Subject: RE: Living Wage Ordinance for Hotel Workers
To: John Wickham <john.wickham@lacity.org>

I am representing the CA Restaurant Association and we do not have a report to put on file however we do have some questions:

1)    Will this living wage ordinance include restaurants that lease space in the designated hotels?  If so, what is the reasoning behind including them?

2)    In reviewing type of wage requirement in hotels in the LAX Corridor and in other Cities, how has an increase in living wage impacted the restaurants leasing space in the hotels.

Just want to make sure restaurants are not overlooked as far as economic impact.

**From:** John Wickham [mailto:john.wickham@lacity.org]
**Sent:** Monday, March 24, 2014 4:25 PM
**To:** Adena R. Tessler
**Subject:** Re: Living Wage Ordinance for Hotel Workers

Sorry, I hit send too fast. You can forward questions to me.

John Wickham
Office of the Chief Legislative Analyst
phone: (213) 473-5738

Exhibit 5 Page 337

fax: (213) 620-9869

On Mon, Mar 24, 2014 at 4:18 PM, Adena R. Tessler <atessler@mercuryllc.com> wrote:

Hello John,

Just checking in on the status of the economic impact study for the living wage proposal for Hotel Workers. I think the Economic Dev Committee asked for a 45 day turn around so I am wondering the status at this point. Do you know who is handling this and to whom I might direct my questions?

Please advise,

Adena Tessler



Adena R. Tessler
Vice President
444 South Flower Street | Suite 3675
Los Angeles, CA | 90071
213.624.1380 office | 323.646.2397 mobile
213.624.1387 fax
www.mercuryllc.com

Exhibit 5 Page 338

# SMALL HOTEL COALITION FOR JOBS

*325 West 8th Street, Suite 901, Los Angeles, CA 90014*
*(213) 221-7161*

<u>VIA ELECTRONIC MAIL</u>

March 25, 2014

The Honorable Curren Price
Chair, Economic Development Committee
Los Angeles City Hall
200 North Spring Street, Room 420
Los Angeles, CA 90012

**Re:   Proposed Living Wage Ordinance; Council File 14-0223**

Dear Councilmember Price:

This letter is submitted on behalf of the "Small Hotel Coalition for Jobs," a group of hotel owners who are concerned about the potential negative impacts the proposed living wage ordinance will have on small hotels.  We share your goal of reducing income disparity, and applaud your efforts to solicit and incorporate stakeholder input at such an early juncture. However, we have strong concerns about the singling out of one industry for this heavy mandate that we understand would immediately nearly *double* the current minimum wage.

Before moving this proposal forward, we do agree that a study of its economic impacts is absolutely imperative.  The city must recognize that small hotels – those under 200 rooms – operate under a completely different economic reality than the larger, often publicly- or syndicate-owned corporate hotels in Los Angeles.  Many are independent, family-owned businesses that provide a quality work environment – good wages, health benefits, and generous bonuses.  This, in turn, has resulted in many long-term satisfied employees. A one-size-fits-all model is rarely successful in a city as diverse as Los Angeles.  Thus, in the economic impact study, *we ask that you pay special attention to the issues we've identified that are unique to small hotel owners and consider increasing the 100-room threshold, or come up with an alternative method of determining to which hotels the new policy will apply, if any.*

## I.   <u>Large Corporate Hotels vs. Small Independent Hotels: Economies of Scale</u>

The average hotel size in the City of Los Angeles is 326 rooms, and most are affiliated with larger, public corporations.  Hotels with high room capacity generally benefit from economies of scale which allow them to efficiently distribute fixed costs.  They are able to share resources and materials, and the result is a lower product cost.  Smaller, independent hotels lack such economies of scale.  Small hotels operate under a different business model, and any substantial cost increase must be made up elsewhere.

Exhibit 5 Page 339

## II.    Loss of Jobs, Reduced Work Hours

Without an exemption, small hotel owners will be forced to cut costs to make ends meet. Many of these hotels operate on very tight profit margins, and any increase in the cost of labor threatens this delicate balance. Unfortunately, the likely result will be a loss of jobs, reduced work hours, more outsourcing, and fewer services provided to guests. For the city, this equates to more unemployment, less tax revenue and fewer consumers. This strategy is counterproductive, and hurts the families the city is trying to help. Our coalition is available to meet with the individuals who are preparing the economic impact study to provide more detailed information about these impacts, among others.

## III.    Tipped Employees and the Ripple Effect on Salaries

In addition, the proposed wage increase does not take into consideration that many tipped employees already make well over $15.37 an hour with tips. This will cause a devastating ripple effect on salaries – adding even more costs to hotels. If passed, tipped hourly employees will earn more than shift supervisors with more seniority or other employees with more advanced skill sets. This creates personnel problems that can only be solved by increasing managerial level salaries as well. This is financially infeasible and could lead to unintended consequences. This ripple effect will occur with non-tipped employees as well.

## IV.    Increased Costs Cannot be Recouped with Higher Room Rates

Despite prevailing beliefs, substantially increased operating costs cannot simply be passed onto consumers. Small hotels will not be able to recoup these costs with higher room rates because it will put them at a significant disadvantage versus others in their competitive set. If owners do decide to increase room rates, they will likely price themselves out of the market and consumers will head to hotels in City of Los Angeles adjacent communities such as West Hollywood, Santa Monica, Marina Del Rey, Pasadena, Burbank, Glendale, El Segundo, Torrance and Simi Valley, which are not subject to wage ordinances of this kind. It is important that these issues, and pricing vis-a-vis cities adjacent to Los Angeles, be carefully studied.

In addition, an arbitrarily set 100-room threshold will put small hotels in the 100-200 room category at a competitive disadvantage with small hotels under 100 rooms. Those in the latter category will not have to raise room rates to offset wage increases and will take market share away from other small hotels in the City.

## V.    Reduction of Hotel Development

Another issue to consider is the potential reduced development of hotels in the 100-room range, such as adaptive reuse projects vital to Downtown's renaissance and other independent hotels throughout the City. If projects do not "pencil out" in Los Angeles, adjacent communities will once again reap the benefits of our high cost of doing business. Los Angeles will be hurt as more hoteliers choose to develop elsewhere. Permanent and construction jobs will be lost as well as an ongoing revenue stream of Transient Occupancy Tax the city would otherwise collect.

2

Exhibit 5 Page 340

## **Conclusion**

Finally, this proposal may bring about the unintended consequence of minimizing job opportunities for youth. The hotel industry accounts for a large majority of seasonal and temporary jobs for young workers, and hotel owners will be inclined to hire more experienced workers at such a high starting wage. We strongly urge you to carefully examine these important issues, and be mindful of the impact this proposal will have on small hotels in the City. We thank you for your consideration and the opportunity to continue working with you.

Sincerely,

Veronica Perez
Small Hotel Coalition for Jobs


Cc:    The Honorable Paul Krekorian
       The Honorable Jose Huizar
       The Honorable Gil Cedillo
       The Honorable Nury Martinez
       John Wickham, Chief Legislative Analyst's Office
       Richard Williams, Office of the City Clerk

3

Exhibit 5 Page 341



**Hotel Association of Los Angeles**

March 25, 2014

Honorable Members of the Economic Development Committee
C/O John Wickham
Office of the Chief Legislative Analyst
200 N. Spring Street, Room 255
Los Angeles, CA  90012

Re: CLA Request for Study Points Inclusions

Dear Committee Members:

The Hotel Association of Los Angeles (HALA) and our member hotels and affiliates have been actively engaged in the proposed living wage ordinance and continue to voice our strong concerns to its negative impacts on existing hotel positions, future job creation, new hotel development and tax generation for municipal revenues.

We commend your decision to move forward with an economic analysis and would like to submit our points and questions and concerns relative to a comprehensive and unbiased study to evaluate the severe impacts of this proposal.

We have consulted with globally recognized economists, numerous industry experts across the nation including PKF Consulting USA and local hoteliers to consider the impacts and have compiled the list of guidelines, points and questions which need to be addressed in the proposed study.

We respectfully submit the attached document and look forward to continued dialogue with the city committees, members of council and administrative offices to participate in follow up discussions.

Sincerely,

Robert Amano
Executive Director

Cc: EDC Members -Chairman Price, Vice Chairman Krekorian, CM Huizar, CM Cedillo, CM Martinez



*Points for Economic Analysis Study*

* Study of the impact of LAX living wage. How were hotel operations, service levels, and employment levels affected, if at all, from the passage of the 2006/2007 Airport Hospitality Enhancement Zone Hotel Workers Living Wage Ordinance?

* Research analogous situations (Long Beach). Similarly, have hotel operations been materially altered since the passage of Measure N which took effect in December 2012? Further, did any hotels decrease their amount of available rooms so as to fall below the 100 room threshold, therefore making them exempt from the new law? Has there been any chill on hotel development in Long Beach since that time?

* Are there precedents in other cities for a minimum wage standard for hotel properties only? If so, what is the scope of hotels and jobs covered? Are there union or exemptions that are considered within these ordinances?

* What are the wage and earning benefits of the proposed living wage? An estimate of projected hourly wage increases should be compared to current wage and earnings estimates.

* Survey General Managers within the City of Los Angeles to determine likely operational changes, i.e., job loss, hour cuts, position/services elimination that may occur if the proposed wage increase is enacted.

* Would the proposed ordinance lead to a cut back, or elimination of entry level positions so as to avoid exposure to potential wage increases?

* Tip credit exemption. Can and should the proposed living wage ordinance being considered by the City Council apply to restaurant servers and other tipped employees that actually earn substantially more than minimum wage? Would the consideration of a tip credit allow hotel managers and operators to maintain a similar level of staff if this option is included as a provision in the proposed ordinance? What are the average hourly wages of tipped employees and what is the range of earnings?

* Whether the proposed wage increase would curtail new hotel development in the City of Los Angeles from an investor/developer prospective? That is - would potential developers of new hotels instead chose other Southern California cities in which to construct their desired hotel projects?

* What is the collective potential negative impact of the proposed legislation in terms of the loss of tax revenues to the City of Los Angeles from new and existing hotel operations, as well as the potential loss of new jobs being created and materials and goods being sold in the connection with new hotel developments in the City?

* What will be the impact to third party vendors such as night cleaners, valet parking services and others?

* What would be the indirect charge to the economy if jobs are lost and hotels spend less on goods and services?



March 25, 2014

Honorable Members of the Economic Development Committee
c/o Gerry Miller
Office of the Chief Legislative Analyst
200 North Spring Street, Room 255
Los Angeles, CA  90012

Dear Committee Members:

Thank you all for recently meeting with me recently.

As voiced in our meetings, the California Hotel & Lodging Association believes that a mandate to increase wages for only hotel employees to $15.37 per hour will negatively impact the City of Los Angeles.

It's for that reason we are supportive of the Economic Development Committee's directive to study the economic impact of such a mandate.   It is our request that the Office of Economic Analysis (OEA), which was established by the City Council for the purpose of incorporating economic impact analysis into the City's legislative decision-making process conduct this research on behalf of the Council.  OEA already has considerable experience in such endeavors, and familiarity with the hotel industry via the economic impact analysis of the proposed downtown stadium and convention center project.

Areas of analysis should include:

- By what means has the wage been determined to be $15.37 per hour? With the Affordable Care Act being implemented, how its implementation effect this figure, if at all?
- Competitive Issues:
    - Convention/Group/Corporate business:
        - What would be the ability for area hotels to compete for future convention business with Anaheim, San Diego, and San Francisco?
        - How does the competitive environment change for group and corporate meetings with surrounding areas such as West Hollywood, Pasadena, Marina Del Rey, and others as well as regional competitors in Southern California?
    - Restaurant/Catering/Banquets:
        - How would such a mandate impact restaurants and food service in hotels?
        - What is the rationale for exempting an identical business, such as a restaurant or meeting venue, just because it is not in a hotel?

   

*PROTECTING THE RIGHTS & INTERESTS OF THE CALIFORNIA LODGING INDUSTRY.*

414 Twenty-Ninth Street | Sacramento, CA 95816-3211 | 916.444.5780 | www.calodging.com

Exhibit 5 Page 344

- o General Operations:
  - ▪ Complete a comprehensive hotel & lodging industry wage survey.
  - ▪ Identify operational changes (pricing, reduction in hours, services elimination, etc.) that further compound the ability to compete with other regional hotel properties?
- o Size of Hotels:
  - ▪ What will be the economic impact of hotels reducing the number of rooms (see Long Beach example below)?
  - ▪ How many employees will be displaced by these room reductions and what is the impact upon the City of Los Angeles?
  - ▪ What is the economic rationale for the size of an impacted hotel proposed to be 100 rooms or greater?
  - ▪ What is the difference in a 100 room hotel from a 300 room hotel (for example) that would justify the increased wage mandate?
- • Future Development:
  - o How will this impact the ability to attract hotel development/financing?
  - o Published reports indicate the Los Angeles Convention Center needs 4,000 additional hotel rooms to begin to be competitive – how does this mandate effect the development and/or timing of any future development?
  - o If there would be an impact on development, how would this effect the City's ability to attract marquee events, such as the Olympics?
- • Exemptions:
  - o What is the economic rationale for exempting hotels with collective bargaining agreements?
    - ▪ Why don't union employees deserve a living wage?
  - o What is the rationale for including tipped employees that effectively earn a wage above the proposed mandate?
- • Review of comparable circumstances:
  - o LAX Living Wage:
    - ▪ What is the nexus (equivalent to LAX) for expanding this mandate, and why just hotels? Why wouldn't other employees deserve this increased wage?
    - ▪ Why are businesses with collective bargaining agreements exempt and what is the economic analysis to employee wages.
    - ▪ Of businesses that don't provide the higher tiered rate (excluding health care benefits), how many employees utilized the additional hourly rate to purchase health care coverage?
  - o Long Beach Living Wage:
    - ▪ What is the impact on the (at least) 75 employees who lost jobs as a direct result of this measure?
    - ▪ What is the effect of the loss of revenue and taxes from the closure of 41 and 75 rooms, respectively, from the two area hotels which reduced their room numbers?

Exhibit 5 Page 345

- ▪ Of all hotel employees, how many were effected and how many did not receive the living wage increase because they worked in union hotels?
- Administration:
  - ○ What is the annual cost to the City of Los Angeles to implement, monitor, and respond to issues related to this mandate?
  - ○ How many employees would be required to administer this mandate?
  - ○ How would the tax collection receipts be affected?

In addition to these limited issues, the economic firm chosen to perform this economic analysis should be agreeable to all stakeholders in this matter, studying the issue broadly and in its entirety. The premise of raising wages to create additional spending must be coupled with the cost of providing these wages and the reduction of jobs and income which will also affect the economy.

Thank you for your consideration.

Sincerely,

Lynn S. Mohrfeld, CAE
President & CEO


cc:    Chair Price
       Vice Chair Krekorian
       Councilmember Cedillo
       Councilmember Huizar
       Councilmember Martinez

Exhibit 5 Page 346

# MINIMUM WAGE & POVERTY IN SAN DIEGO

*June 2014*



A STUDY BY:

IN PARTNERSHIP WITH:





Exhibit 5 Page 347

## Section I – Executive Summary ............................... 3

## Section II – The Purpose of Minimum Wage ........ 7
Increasing Workers' Rights and Bargaining Power ............................................. 7
Reducing Income Inequality and Fighting Poverty ........................................... 7

## Section III – Minimum Wage is Rising ................. 8
The Beginnings of Minimum Wage in the United States and California .......... 8
Minimum Wage is Increasing State-wide .......................................................... 8
The Proposal Before the San Diego City Council .............................................. 9

## Section IV – Poverty in San Diego ........................ 12
Historical Perspective ........................................................................................ 12
Alternative Measures of Poverty ....................................................................... 13
Demographics ................................................................................................... 14

## Section V – Minimum Wage and the Economy ... 20
Profile of Minimum Wage Earners .................................................................. 20
Federal Economic Impacts ............................................................................... 26
Income Redistribution ...................................................................................... 26
Automation ....................................................................................................... 29
Increased Prices ................................................................................................ 30
Informal Economy ........................................................................................... 32

## Section VI – Impacts on Businesses .................... 33
Studio Diner ..................................................................................................... 34
Ace Hardware Downtown ................................................................................ 35
Seabreeze Books and Charts ............................................................................. 36
Phil's BBQ ........................................................................................................ 37

## Section VII – Poverty Reduction Best Practices .. 38
Housing First .................................................................................................... 38
Career Ladders and Focused Workforce Development ...................................... 42
Earned Income Tax Credit ............................................................................... 44

Exhibit 5 Page 348

# EXECUTIVE SUMMARY

A STUDY BY:


San Diego County **Taxpayers Association**

IN PARTNERSHIP WITH:


**SAN DIEGO** ™ **REGIONAL CHAMBER OF COMMERCE**

# MINIMUM WAGE & POVERTY IN SAN DIEGO


Studio Diner in Kearny Mesa will have to compensate for upcoming minimum wage increases by increasing prices and downsizing.

*June 2014*

The San Diego County Taxpayers Association, in partnership with the San Diego Regional Chamber of Commerce, produced a comprehensive analysis of minimum wage, poverty and related issues, including the potential impacts of raising the minimum wage in San Diego. The full study can be found at www.sdcta.org.

## Finding #1

Many **small businesses predict** they will have to **downsize** and **cut hours** as a result of minimum wage increases.

Some businesses may benefit from increased purchasing power of low-wage workers. However, local businesses expressed several concerns including pressure to increase prices and reduce payroll. Harry Schwartz, co-owner of Ace Hardware Downtown, is concerned that the higher prices will push even more customers to online retailers. He is also reconsidering expansion plans in the City of San Diego.


Phil's BBQ predicts that downgrading its employee benefit package will be one of many steps it is forced to take to offset increased wages.

Exhibit 5 Page 29

# Finding #2

When **businesses are forced to pay** increased wages, most of **those dollars do not reach families** living in poverty.



**Increasing the minimum wage is an inefficient tool for reducing poverty because the majority of low-wage workers do not live in low-income households.** People living in poverty are the ones who are supposed to benefit from increases to the minimum wage, but relatively few do. Studies show less than 20 cents of each dollar in increased wages reach families living in poverty.

# Finding #3

**Sacramento** is imposing **minimum wage increases** **totaling 38%.** The **proposal** before the San Diego **City Council** would commit to increases totaling **64%.**

Economists disagree about the effects of increasing the minimum wage and whether it will help people living below the poverty line. Many argue minimum wage hikes will result in job losses. The local economic impacts of the state's increase can provide insight specific to San Diego. **The proposal before the San Diego City Council would commit to additional increases without a clear understanding of how our economy will react to the two State-imposed minimum wage hikes beginning in July 2014.**

If the proposal before the City Council is passed, the minimum wage will increase from $8.00 to $13.09 over three-year period.



Exhibit 5 Page 350



All Phil's BBQ employees earn above minimum wage – and most receive tips. Tipped employees bring home between $14 and $50 per hour, and full-time employees receive health benefits.

# Finding #4

## The **minimum wage hike** proposal before the City Council is based on a flawed study.

The Center for Policy Initiatives (CPI) has calculated that $13.09 is the hourly wage required to sustain a single adult on a "budget for no-frills living" in San Diego. The proposal before the City Council adopts this calculation.

**However, the CPI calculation unreasonably incorporates the full cost of a one-bedroom apartment, even though many people opt to share two-bedroom apartments regardless of income level.** Replacing the cost of a one-bedroom apartment with half the cost of a two-bedroom apartment – as reported from the same source – brings the wage needed to support a "budget for no-frills living" to $11.24 per hour. Additionally, neighborhood-level data reveals opportunities for low-income workers to live on $10.89 to $10.99 per hour.

### Monthly Costs in San Diego County

| | Center for Policy Initiatives (CPI) Calculation 1-Bedroom Apartment | Studio Apartment | Shared 2-Bedroom Apartment |
|---|---|---|---|
| Housing | $1,032 | $939 | $677 |
| Food | $270 | $270 | $270 |
| Transportation | $290 | $290 | $290 |
| Healthcare | $137 | $137 | $137 |
| Miscellaneous | $173 | $173 | $173 |
| Taxes | $402 | $402 | $402 |
| Total Houshold Income Needed Monthly | $2,305 | $2,211 | $1,949 |
| Total Income Needed Yearly | $27,655 | $26,532 | $23,388 |
| **Hourly Wage Needed When Working 40 Hours/Week** | **$13.09** | **$12.76** | **$11.24** |

Sources: SDCTA, CPI, U.S. Department of Housing and Urban Development

Exhibit 5 Page 351

# Finding #5

**Automation** and **globalization** are **depressing wages** for low-skilled labor. **Workforce development** and **education** are **at the heart** of the wage issue.

Technology and automation have reduced the need for low-skilled employees. One study estimates that the U.S. economy has lost two million clerical jobs due to automation since 2007. **Another study estimates that approximately 47 percent of U.S. jobs are at risk of being replaced by computerization over the next two decades.** This means education and workforce development provide the best opportunities for adapting to our changing global economy.

# Finding #6

## Several steps must be taken to meaningfully **reduce poverty**.

Best practices for fighting poverty include staying the course on eradicating chronic homelessness, bolstering workforce development, and establishing State Earned Income Tax Credits. **Efforts to reduce poverty are most effective, and carry the fewest negative economic impacts, when several approaches are taken together.**



Ann Kinner owns Seabreeze Books and Charts off Rosecrans. She pays a part-time employee $1 an hour above minimum wage to help run the shop. Ann anticipates having to cut this employee's hours or let her go when wages are increased.

Exhibit 5 Page 52



Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

## Section II – The Purpose of Minimum Wage

The first step in objectively analyzing the idea of increasing the minimum wage is to establish the purpose of increasing the minimum wage. There are generally two overlapping arguments for increasing the minimum wage. The first is that raising the minimum wage can act as a safety net promoting workers' rights for low-wage workers that have less bargaining power than employers. The second is that the minimum wage is a tool that can be used to fight income inequality and poverty. Ultimately, both are about reducing poverty.

### Increasing Workers' Rights and Bargaining Power

As stated earlier, one common argument is that the minimum wage supports workers' rights and bargaining power. In a 2004 report, The Economic Policy Institute[1] takes the position that "The free market fails to set a fair price when one side holds all the bargaining chips." It argues that low-wage workers do not tend to have the option of withdrawing their labor from the market so employers can exploit this by pushing the worker to accept less compensation than they might otherwise.

Making a similar argument by using data comparing rising corporate profits to laborers' share of income, Ezra Klein, editor of the Washington Post "Wonkblog" and columnist at the Washington Post[2] says:

> "There are many explanations for why labor's share of income is falling. Globalization, automation, skills based technological chance and the decline of unions all play a part. But in the end, all these explanations end up saying the same thing: Most workers have less power to negotiate raises then they did a generation ago. And that's truest for those who are making the least money and holding the fewest skills."

Klein does note that there are potentially better options to help workers such as expansions of the Earned Income Tax Credit that could help a broader swath of the population, but he says the minimum wage is determined to be the most politically feasible option.

### Reducing Income Inequality and Fighting Poverty

Much of the language used by policy-makers indicates that the minimum wage is seen as a way to address income inequality and help the poor. Poverty reduction and income redistribution are portrayed as the main goals of minimum wage increases and there have been extensive writings on how, in these individuals' opinions, the benefits of this objective for a minimum wage increase outweigh the costs.[3]

In a December 4, 2013 speech, President Obama called income inequality "the defining challenge of our time" and called for a minimum wage increase because "there are airport workers, and fast-food workers, and nurse assistants, and retail salespeople who work their tails off and are still living at or barely above poverty."

---

[1] Chapman, Jeff; Ettlinger, Michael. Economic Policy Institute. "The Who and Why of Minimum Wage." August 6, 2004.
[2] Klein, Ezra. The Washington Post. "This Graph is the Best Argument for Raising the Minimum Wage." February 14, 2013.
[3] Konczal, Mike. The Washington Post. "Economists Agree: Raising the Minimum Wage Reduces Poverty." January 4, 2014.

Exhibit 5 Page 353

San Diego County
**Taxpayers Association**

Taxpayers watchdog since 1945
707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

## Section III – Minimum Wage is Rising

### The Beginnings of Minimum Wage in the United States and California

The first national minimum wage law was established under President Franklin Deleanor Roosevelt in response to the Great Depression,[4] and was enacted as The Fair Labor Standards Act in 1938. The law was intended to serve multiple purposes. President Roosevelt framed the bill as both an income redistribution program and a moral obligation in his message to Congress. Clearly invoking the workers' rights and bargaining power argument, he stated that we should be able to give "all our able-bodied working men and women a fair day's pay for a fair day's work" and "A self-supporting and self-respecting democracy can plead no justification for the existence of child labor, no economic reason for chiseling workers' wages or stretching workers' hours."

The following figure traces minimum wage as it has changed in California and the nation as a whole. The figure also expresses California's minimum wage adjusted for inflation.

*Figure 1: History of Minimum Wage in the U.S. and in California*



Sources: SDCTA, California Department of Industrial Relations, U.S. Bureau of Labor Statistics.

### Minimum Wage is Increasing State-wide

Although the federal minimum wage is $7.25 an hour, states are able to raise this minimum. On September 18, 2013, the California State Legislature passed California Assembly Bill 10 (AB 10), and on September 25, 2013, Governor Jerry Brown signed the bill into law.[5] AB 10 (which amended Section 1182.12 of the California Labor Code) officially raises the minimum wage in California to $9 per hour after July 1, 2014, and up to $10 per hour after January 1, 2016.[6]

---

[4] Grossman, Jonathan. United States Department of Labor. "Fair Labor Standards Act of 1938: Maximum Struggle for a Minimum Wage."
[5] LegiScan. "California Assembly Bill 10." 2013.
[6] California Legislative Information. "AB-10 Minimum Wage: Annual Adjustment." 2013.

Exhibit 5 Page 354



Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA  92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

Arguments in favor of the new law center on the idea that the high cost-of-living in California justifies a significant increase in the state's minimum wage. According to the author of AB 10, Assembly Member Luis Alejo, the minimum wage has not kept pace with the cost-of-living in California, and this has resulted in a decrease in purchasing power for the state's workers. Assembly Member Alejo and others have argued that stagnating wages and inflation continue to result in middle-class families falling down the economic ladder and the decline of the middle-class in places like California.

The bill's proponents further argue that this decrease in purchasing power for California's workers has a widespread effect on the state's entire economy. The loss of purchasing power hurts individuals directly by reducing what they are able to purchase while, at the same time, indirectly disadvantaging businesses facing decreased sales. Assembly Member Alejo has concluded that the minimum wage increase associated with AB 10 "Simply gives hardworking Californians the dignity and respect to provide for their families with their own hard-earned wages."[7]

Many business groups opposed AB 10 and argued that the increase in minimum wage represented by the bill will cause substantial damage to small businesses across the state.[8] The California Restaurant Association argued that an increase in minimum wage means an increase in operating costs for businesses. The groups argued that as operating costs increase, employers will be able to hire fewer and fewer workers, which in turn leads to higher unemployment rates and lower production totals; large businesses with greater profit margins may not be affected, but smaller businesses with thin profit margins will have no choice but to lay off workers as wages increase.[8] Opponents of the bill have also argued that the minimum wage increase will not have its intended effect because of the true population demographics of minimum wage earners, many of which are teenagers seeking extra income and not poor adults looking to support themselves and their families.[8]

## The Proposal Before the San Diego City Council

Then-Interim Mayor Todd Gloria first publicly stated his intent to increase the minimum wage in San Diego during his State of the City address on January 15, 2014.[9] In the following excerpt from his speech, the issues of income redistribution and poverty reduction are clearly addressed:

> *"Our local economy is only truly strong if it works for all San Diegans. The high cost of living, coupled with growing income inequality, is a threat to our ability to build a great city. San Diego must not be divided between the very wealthy and the very poor. A great city must have a vibrant and growing middle class. That is why I believe it is time to support an increased minimum wage for San Diego.*

---

[7] Thompson, Don. Associated Press. "Bill Would Give California Among Highest Minimum Wages." September 13, 2013.
[8] Jennings, Lisa. Nation's Restaurant News. "California to Increase Minimum Wage." September 13, 2013.
[9] Gloria, Todd. "2014 State of the City Address." January 14, 2014.



*Taxpayers watchdog since 1945*

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

> *No one who works full-time should live in poverty. According to the Center on Policy Initiatives, 28% of full-time, year-round employees earned less than the $30,000 which is what is needed to live self-sufficiently in San Diego. A full-time minimum wage job in San Diego pays about half that amount. Although California's minimum wage is scheduled to increase in 2016, that translates into an annual salary of less than $21,000, which is simply not enough in a city with a high a cost of living like ours."*

In an April 23, 2014 news release, Council President Gloria said "This measure will allow more hardworking San Diegans to make ends meet." The phrase "making ends meet" was also the title of a January 2014 report by the Center for Policy Initiatives (CPI).[10] The Research Director at CPI also spoke at the press conference and Council President Gloria has consistently referred to the CPI report.

The CPI report estimates $2,305 per month to be the income a single adult would need to earn to pay for a "monthly budget for no-frills living." This monthly income equates to $13.09 per hour for full-time work.

The argument by Council President Gloria is essentially that employers should be required to pay, at a minimum, enough to allow an employee to take care of themselves – to be self-sufficient. That number, according to CPI, is $13.09. In addition, the proposal would automatically increase the minimum wage each year by linking it to an inflation index and would require employers to allow full-time employees to accumulate sick days at a rate of five days per year.

*$13.09*

As mentioned above, the $13.09 figure proposed by Council President Gloria is consistent with a CPI report entitled "Making Ends Meet" that was released earlier this year. This report was center-stage at both the press conference announcing the details of the proposed ballot measure and the associated news release.

Nearly half (44.8% or $1,032) of the $2,305 per month figure is reserved for housing. The amount designated by the report's author for housing is the FY 2014 San Diego County fair market rent for a one-bedroom apartment as reported by the U.S. Department of Housing and Urban Development. The figure is based on surveys and reflects the 40th percentile for rent for standard-quality living conditions of recent movers – meaning that 40 percent of those households that have recently moved are paying less than $1,032, and an estimated 60 percent are paying more.[11]

The same source also reports the rental amount for an efficiency apartment of $939 per month. It would have clearly been more appropriate for CPI to use this figure due to the claimed focus on a "budget for no-frills living.". Making that adjustment would bring the hourly wage necessary for a "budget for no-frills living" down to $12.76.

---

[10] Center on Policy Initiatives. "Making Ends Meet 2014." 2014.
[11] U.S. Department of Housing and Urban Development. "FY 2014 Fair Market Rent Documentation System."

Page 10 of 46

Exhibit 5 Page 356



Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA  92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

While it may be the preference of some low-wage earners to pay more in order to have their own studio apartment, others might prefer to share a two-bedroom apartment. Regardless of preference, a "budget for no-frills living" would take advantage of the cheaper of these reasonable options. Also used in the CPI study, in a similar calculation, is the housing figure from the same source for a two-bedroom apartment of $1,354 per month. Substituting half of this figure to reflect the cost of sharing a two-bedroom apartment would bring the necessary hourly wage down to $11.24 for a "no-frills budget."

## Housing Options

All of the figures referred to above are based on the 40th percentile of standard-quality rent as stated earlier. A single adult working 40 hours per week on a tight budget would benefit from choosing the most financially feasible living situation. While this statement is in no way intended to suggest that the source is inappropriate, it is intended to acknowledge that the estimate for housing costs is higher than 40 percent of the stock of like apartments.

While there is a distribution of rents in every community, rents are also largely dependent on neighborhood. According to a fall 2013 survey from the San Diego County Apartment Association, the average price for a two-bedroom apartment in the community of Normal Heights is $1,266. The average prices for a two-bedroom apartment in the communities of Imperial Beach and North Park are estimated at $1,249 and $1,230, respectively. In the context of ensuring that the minimum wage is adequate to fund a "budget for no-frills living," these three communities, along with sharing a two-bedroom apartment, provide just a few examples of housing options that would all require earning less than $11.25 per hour if we maintain all other categorical costs produced by CPI: Normal Heights at $11.00, Imperial Beach at $10.95, and North Park at $10.89.

## Tying the Minimum Wage to Inflation

The primary concern with automatic increases in minimum wage based on an inflation index such as the Consumer Price Index (CPI) is bypassing the public debate that is necessary to best ensure responsible policy.

If a proposal such as Council President Gloria's were to be passed by voters, San Diego would not benefit from any information regarding the impacts of raising minimum wage in San Diego that would be uncovered during the four pre-determined increases occurring through 2017. Each year, the minimum wage would increase absent a correction by San Diego voters.

Exhibit 5 Page 357



707 Broadway, Suite 905, San Diego, CA  92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

*Taxpayers watchdog since 1945*

# Section IV – Poverty in San Diego

At its core, minimum wage is intended to reduce poverty. If we intend to be successful in reducing poverty, we should start with a thorough understanding of the impoverished in San Diego, rather than hastily moving toward one approach to address it.

As seen in the following figure, San Diego's poverty rate is lower than that of California or the United States as a whole. Socioeconomic factors such as age, race, and hours-worked play a critical role in assessing poverty in San Diego. Throughout this section, we examine these factors in order to gain an understanding of those in poverty within San Diego.

*Figure 2: Poverty Rate by Jurisdiction (2012)*

| | City of San Diego | San Diego County | California | United States |
|---|---|---|---|---|
| Poverty Rate | 15.5% | 15.0% | 17.0% | 15.9% |

Source: American Community Survey

## Historical Perspective

Taken in the perspective of the last half-century, poverty rates are currently higher than the average over the past 50 years. Upon reviewing the decennial census, it can be seen that poverty rates in 2010 are higher than any census since 1960. For San Diego County in particular, the poverty rate from 2010 (14.8 percent) is equal to that of 1960 – four years before President Lyndon B. Johnson declared war on poverty.

*Figure 3: Poverty Rate Over Time by Jurisdiction*



Source: U.S. Census; U.S. Census Small Area Income and Poverty Estimates

Exhibit 5 Page 358



Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

Changes in poverty rates are not only apparent with long-term comparisons, but are also significant in recent years. Since 2000, when the poverty rate in San Diego County was 9.2 percent, poverty rates have increased locally, statewide, and nationwide. It is only in the last year of available data (2012) that a decrease in poverty has been seen in San Diego County. Between 2011 and 2012, San Diego County's poverty rate fell from 15.2 percent to 15.1 percent.

## Alternative Measures of Poverty

There is no single universally-accepted measure of poverty. However, the United States does have an official poverty measure (OPM) based off poverty thresholds. There are 48 different poverty thresholds that take into account age, family size and number of related children under the age of 18. This metric for poverty was first established using 1963-1964 information from the U.S. Department of Agriculture on food budgets designed for families under economic stress and is updated annually using the Consumer Price Index.[12] Beyond the updates for inflation there have been few updates to how the official poverty rate is measured.

The Census Bureau has another, non-official method for measuring poverty known as the Supplemental Poverty Measure (SPM). The SPM is an attempt to update the official measure so that it more accurately reflects the poverty level of the demographic examined. To do this, the SPM includes a more inclusive measure of income and expenditures, more specific geographic application, and a more well-rounded system for updating poverty thresholds.[13] Using the SPM generally results in higher calculated poverty rates than indicated by the OPM. These findings are not universally applicable to all demographics as certain groups, like children, appear to experience less poverty under the SPM than the OPM.

There are other organizations besides the U.S. Census Bureau that attempt to measure poverty in ways different than the OPM. One such example that differs from both poverty measures put forth by the U.S. Census Bureau is the California Poverty Measure (CPM). This measure "follows in the spirit of the research of SPM…with some adjustments to account for underreporting of safety net program benefits and for various factors that are unique to California."[14] When adjusting for the CPM, California's 2011 poverty rate was 22.0 percent compared to the OPM of 16.2 percent and San Diego County's poverty rate was 22.7 percent compared to the OPM of 14.9 percent. By taking into account differences in living expenses that may present themselves at the state and county level, the CPM shows a poverty rate that is significantly higher than when those same expenses are assumed to be consistent across boundaries.

While the SPM and the CPM both estimate higher poverty rates overall, not all alternative measures of poverty act in this way. There are some alternative measures of poverty that place the poverty rate below the OPM. For example, prior to the SPM, the U.S. Census Bureau attempted to develop a variety of alternative poverty measures which "tend to show

---

[12] U.S. Census Bureau. "How the Census Bureau Measures Poverty." Accessed March 21, 2014.
[13] Short, Kathleen. U.S. Census Bureau. "The Research Supplemental Poverty Measure: 2012." November 2013.
[14] Wimer, Christopher; et al. The Stanford Center on Poverty and Inequality. "A Portrait of Poverty within California Counties and Demographic Groups." October 2013.

Exhibit 5 Page 359



lower levels of poverty than the official measure in any year."[15] Another example in which poverty rates appear lower than the OPM can be seen with the National Academy of Science (NAS) measure of poverty. The NAS developed multiple methods for measuring poverty based on such variables as medical expenses and cost-of-living. Under some of these measures, poverty rates appear to be lower than under the OPM.[16]

There are many more possible measures of poverty than those listed, and those presented are far from an exhaustive list. The OPM has the largest collection of data, which allows for both broader and deeper analyses of different demographics. Furthermore, the OPM is still the official measure employed in the determination of different benefits for individuals and, as such, is the most relevant measure of poverty to be examined. The OPM will be used for the remainder of this section unless stated otherwise.

## Demographics

*Age*

In general, the younger the individual, the more likely it is that they are in poverty. This is especially true for children, who are dependent upon a guardian to provide for them. Children under the age of 18 are more greatly impacted by poverty than any other age group in San Diego. Seniors are the least likely to be in poverty with a poverty rate for San Diego County of 9.5 percent. The relationship between age and poverty rates does not only exist for broad categories such as children, adults and seniors, but can be further broken down to show that the relationship between age and poverty rate applies within categories as well.

*Figure 4: Poverty Rate by Age and Jurisdiction (2012)*

| | City of San Diego | San Diego County | California | United States |
|---|---|---|---|---|
| Children Under 18 | 21.4% | 19.8% | 23.8% | 22.6% |
| Adults (18-64) | 14.5% | 14.3% | 15.6% | 14.8% |
| 18-24 | 28.3% | 22.0% | 24.3% | 25.7% |
| 25-34 | 12.0% | 12.9% | 16.3% | 16.3% |
| 35-44 | 12.7% | 14.9% | 15.1% | 13.3% |
| 45-54 | 11.4% | 12.5% | 12.3% | 11.4% |
| 55-64 | 10.1% | 10.5% | 11.5% | 10.7% |
| Seniors (65+) | 10.0% | 9.5% | 10.4% | 9.5% |

Source: U.S. Census American Community Survey

New research shows that the rate of poverty for the elderly may not be properly represented by traditional poverty statistics. This research suggests that the elderly are particularly vulnerable to poverty, especially if they live alone, because of a lack of income and proneness to injury and disease. As such, the UCLA Center for Health Policy Research and the Insight Center for Community Economic Development have created the Elder Index to properly represent the poverty rate of the elderly. This new measure takes into account cost-of-living per county for the elderly. These costs include housing, food and medical expenses.

[15] National Poverty Center. "Poverty Facts."
[16] National Academy of Science. "Official and National Academy of Science (NAS) Based Poverty Rates: 1999-2012."

**Taxpayers watchdog since 1945**

707 Broadway, Suite 905, San Diego, CA  92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

These medical expenses can be dramatically higher for elders and "Elder Index calculations that include long-term care costs show that the basic cost of living for elders with disabilities is 20-100 percent higher than for those without disabilities."[17]

With this in mind, the Elder Index calculates the cost-of-living for the elderly so that it may be compared with the federal poverty level. The data shows that the cost-of-living for the elderly is, at minimum, 145 percent of the federal poverty level. This 145 percent is for a single elderly person who owns a home without a mortgage. For those who are single but paying a mortgage on their home, the cost-of-living is 314 percent of the federal poverty level.[18] So, the statistics showing that older people experience lesser rates of poverty may not be true.

It is also the case that younger children are more likely to be affected by poverty than older children. According to The Stanford Center on Poverty and Inequality, 24.9 percent of children under the age of six are below the poverty level compared to 23.1 percent of all children in California.[19]

*Gender*

Women are more likely to be under the poverty level than their male counterparts. In San Diego County, there are nearly 31,000 more women in poverty than men.[20] This disparity in poverty rates on the basis of gender is consistent with state and national figures.

*Figure 5: Poverty Rate by Gender and Jurisdiction (2012)*

|  | City of San Diego | San Diego County | California | United States |
|---|---|---|---|---|
| Male | 14.4% | 14.1% | 15.9% | 14.6% |
| Female | 16.5% | 15.9% | 18.0% | 17.2% |

Source: U.S. Census American Community Survey

This can be partially explained by the large quantity of single mothers and the high poverty rates that are associated with being a single mother. In San Diego County, there are 55,808 single-parent, male-headed families compared to 132,389 single-parent, female-headed families.[21] A 2013 study from The Center for the Next Generation examined the head of households for these families to assess the poverty rates for single-parents. They found that San Diego County single-parent females who are heads of household had a poverty rate of 32.4 percent, while single-parent households, for both men and women, had a poverty rate of 28.1 percent.[22]

In terms of poverty, this gender gap can be traced back over time. The Center for the Next Generation report stated that "while the poverty rates rise and fall in tandem with the

[17] UCLA Center for Health Policy Research. "The Elder Index™."2012.
[18] UCLA Center for Health Policy Research. "San Diego County, CA 2011 Elder Economic Security Standard™ Index." Accessed March 21,2014.
[19] Wimer, Christopher; et al. The Stanford Center on Poverty and Inequality. "A Portrait of Poverty within California Counties and Demographic Groups." October 2013.
[20] American Community Survey. 2012
[21] Ibid.
[22] Fuentes, Rey; O'Leary, Ann; Barba, James. The Center for the Next Generation. "Prosperity Threatened: Perspectives on Childhood Poverty in California." January 6, 2013.

Exhibit 5 Page 361



San Diego County **Taxpayers Association**

*Taxpayers watchdog since 1945*

707 Broadway, Suite 905, San Diego, CA  92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

business cycle, at all points in the business cycle the female poverty rate is higher than the male poverty rate."[23] Examined nationally it can be seen that the gender gap, in terms of percentage difference, is smaller now than it has been in the past, however that wage gap has yet to disappear and can still be seen prominently throughout the nation, the state of California, and locally in San Diego County and the City of San Diego.

*Figure 6: National Poverty Rate by Gender, 1966 to 2010*



Source: Jacobsen, Joyce P. "Closing the Gender Gap: What Would It Take?" 2013.

*Race/Ethnicity*

Poverty rates vary greatly depending on race and ethnicity. In all areas examined (city, county, state, and national), whites experienced the lowest level of poverty, followed by Asians, then Hispanics, leaving Blacks and "other" groups (including mixed-race) with the highest rates of poverty. Asians and whites consistently fall below the population average while Blacks and Hispanics consistently fall below that figure.

---

[23] Jacobsen, Joyce P. "Closing the Gender Gap: What Would It Take?" 2013.

Exhibit 5 Page 362

San Diego County **Taxpayers Association**

Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

*Figure 7: Poverty by Race and Jurisdiction (2012)*



Source: American Community Survey

There exists a critical difference between the City of San Diego and the other three areas examined. While the City of San Diego is mostly urban, San Diego County, California and the United States all have large rural populations. Within cities, there are typically increased concentrations of people in poverty and "sharply divergent patterns of poverty concentration between racial minorities and whites" according to William Julius Wilson, the author of "When Work Disappears: The World of the New Urban Poor."[24]

*Education*

The more educated a person is, the less likely they are to be in poverty. In the City of San Diego, those that do not have a high school diploma or an equivalent level of education experience a poverty rate of 28.9 percent. This rate is higher than any categorization by race, age, gender, or even hours-worked. This demonstrates that education is one of the most, if not the most, important factors in explaining poverty. As seen in Figure 8, those that have attained a high school degree, or equivalent, are almost half as likely as those who have not to be in poverty. Individuals that have a high school education and nothing more experience a 14.9 percent poverty rate.

In addition, education beyond high school corresponds with even lower poverty rates. According to the 2009 report "Closing the Graduation Gap," "acquiring education and training beyond high school offers further substantial benefits" in reducing poverty.[25] Those that earn an Associate's degree or have attended some form of college experience a poverty rate of 10.2 percent – just above one-third of the poverty rate experienced by individuals with no high school diploma. The population with a Bachelor's degree or higher have a poverty rate of only 5.6 percent. More education consistently leads to less poverty at the county, state and federal level.

---

[24] Wilson, William Julius. "When Work Disappears: The World of the New Urban Poor." 1997.
[25] Swanson, Christopher B.. Editorial Projects in Education Research Center. "Closing the Graduation Gap: Educational and Economic Conditions in America's Largest Cities." April 2009.

Page 17 of 46

Exhibit 5 Page 363



Taxpayers watchdog since 1945
707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

*Figure 8: Poverty Rate by Education and Jurisdiction (2012)*

|  | City of San Diego | San Diego County | California | United States |
|---|---|---|---|---|
| Less than High School Degree | 28.9% | 24.3% | 26.6% | 28.0% |
| High School Graduate (or equivalent) | 14.9% | 15.7% | 16.0% | 14.3% |
| Some College/Associates Degree | 10.2% | 12.5% | 11.4% | 10.8% |
| Bachelor's Degree or Higher | 5.6% | 5.3% | 5.4% | 4.5% |

Source: American Community Survey


*Hours-Worked*

Not surprisingly, full-time work leads to less poverty and those that do not work full-time are more likely to be in poverty. In the City of San Diego part-time workers have a poverty rate of 18.2 percent – over six times higher than full-time workers at 2.8 percent. Further, over a quarter of those that do not work are in poverty in the City of San Diego (25.8 percent). This can similarly be seen at the county, state, and national levels.

*Figure 9: Poverty Rate by Hours-Worked and Jurisdiction (2012)*

|  | City of San Diego | San Diego County | California | United States |
|---|---|---|---|---|
| Full-Time | 2.8% | 2.7% | 3.4% | 3.0% |
| Part-Time | 18.2% | 15.9% | 18.2% | 18.8% |
| Did Not Work | 25.8% | 24.9% | 25.0% | 23.9% |

Source: American Community Survey


Simply dividing hours-worked into these three categories however, fails to capture the whole picture. The category "part-time" can be divided further into either voluntary or involuntary part-time work. As defined by the Bureau of Labor Statistics, involuntary part-time workers "worked fewer than 35 hours because of slack work or business conditions or because they could not find full-time work" for at least one week of the year.[26] In contrast, voluntary part-time workers are workers who normally work part-time by choice.[27]

This distinction is especially significant given that there has been a considerable increase in involuntary part-time workers in recent years. According to the Carsey Institute at the Scholars' Repository, nationally, the rate for women involved in involuntary part-time work "more than doubled between 2007 and 2012, from 3.6 percent to 7.8 percent, and the rate for men also more than doubled from 2.4 percent in 2007 to 5.9 percent by 2012."[28] The Carsey Institute concluded that with this increase of involuntary part-time workers, it is now extremely relevant to examine this group separately from voluntary part-time workers.[29]

---

[26] U.S. Bureau of Labor Statistics. "Report 1041: A Profile of the Working Poor, 2012." April 2013.
[27] Glauber, Rebecca. Carsey Institute at the Scholars' Repository. "Wanting More but Working Less: Involuntary Part-Time Employment and Economic Vulnerability." July 23, 2013.
[28] Ibid.
[29] Valleta, Rob; Bengali, Leila. Federal Reserve Bank of San Francisco. "What's Behind the Increase in Part-Time Work?" August 26, 2013.

Exhibit 5 Page 364



**Taxpayers watchdog since 1945**

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

*Figure 10: National Poverty Rate by Type of Part-Time Work (2012)*

|  | National Poverty Rate |
|---|---|
| Voluntary Part-Time | 11.1% |
| Involuntary Part-Time | 25.8% |

Source: U.S. Bureau of Labor Statistics

The poverty rates for both voluntary and involuntary part-time workers are higher than the poverty rates for full-time workers. However, the difference between the two groups is dramatic. Those that voluntarily work part-time are more than three times as likely to be in poverty as those that work full-time. Involuntary part-time workers are more than eight times as likely to be in poverty than full-time workers.

Exhibit 5 Page 365



Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

# Section V – Minimum Wage and the Economy

In this section, research related to the economic impact of increasing the minimum wage is reconciled with research about poverty, industry research, and interviews with San Diego businesses.

Findings from this section include that many small businesses have legitimate concerns regarding the impact of a minimum wage increase on them. Many predict they will have to downsize and cut hours. While conflicting research suggests that businesses may benefit from increased purchasing power from low-wage workers, it is clear that not all businesses would benefit. Local businesses expressed several concerns including pressure to increase prices and reduce payroll. Harry Schwartz, co-owner of Ace Hardware Downtown, is concerned that the higher prices will push even more customers to online retailers. He is also reconsidering expansion plans in the City of San Diego.

Research estimating the effectiveness of increasing the minimum wage at decreasing poverty is more clear. When businesses are forced to pay increased wages, most of those dollars do not reach families living in poverty. Increasing the minimum wage is an inefficient tool for reducing poverty because the majority of low-wage workers do not live in low-income households. People living in poverty are the ones who are supposed to benefit from increases to the minimum wage, but relatively few do. Studies show less than 20 cents of each dollar in increased wages reach families living in poverty. This is consistent with the percentage of low-wage earners living below the poverty line. Average income for families with minimum wage earners is over $53,000 a year.

Economic research points to workforce development and education being at the heart of the diminishing wages and poverty issues in the United States. Globalization and technology including automation have reduced the need for low-skilled employees. One study estimates that the U.S. economy has lost two million clerical jobs due to automation since 2007. Another study estimates that approximately 47 percent of U.S. jobs are at risk of being replaced by computerization over the next two decades. This means education and workforce development provide the best opportunities for adapting to our changing global economy.

## Profile of Minimum Wage Earners

*Age*

Above all other demographic factors, age is the strongest predictor in regards to whether or not a worker earns the minimum wage. As stated in a 2013 U.S. Bureau of Labor Statistics Report, "while workers under age 25 represented only about one-fifth of hourly paid workers, they made up about half of those paid the federal minimum wage."[30] Nearly 20 percent of workers age 16-19 earn the federal minimum wage or less, compared to three percent of workers 25 or older.[31]

---

[30] U.S. Bureau of Labor Statistics. "Minimum Wage Workers Account for 4.7 Percent of Hourly Paid Worker in 2012." March 25, 2013.
[31] U.S. Bureau of Labor Statistics. "Characteristic of Minimum Wage Workers, 2013." March 2014.

Exhibit 5 Page 366



Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA  92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

In California, young people earn the minimum wage more often than any other age group –
38.5 percent of individuals earning less than $10 per hour in California are under the age of
30 according to a Sacramento Bee data analysis.[32] A recent study by the National University
System Institute for Policy Research stated that 55 percent of low-wage earners (defined as
earning the full-time equivalent of $11 or less) in the City of San Diego are under the age of
30.[33]

*Figure 11: Low-Wage Workers by Age*



Source: SDCTA, Sacramento Bee, National University System Institute for Policy Research

*Gender*

According to the U.S. Bureau of Labor Statistics, "about five percent of women had wages
at or below the federal minimum wage compared to about three percent of men."[34] This
disparity in the rates of minimum wage earners between men and women holds regardless of
age, as can be seen in Figure 12. The difference between the number of men and women
earning the federal minimum wage is not isolated to one age group. Women are more likely
to earn the minimum wage or less amongst all age groups. The largest difference between
the two genders exists in the two youngest age groups. As older groups are examined this
disparity closes significantly, but is never fully eliminated.

---

[32] Reese, Phillip. The Sacramento Bee. "California Minimum Wage Hike Would Boost Pay for More than 1
Million Full Time Workers." September 12, 2013.
[33] National University System Institute for Policy Research. "San Diego's Low Wage Workforce: A Complex
Portrait." May 21, 2014.
[34] U.S. Bureau of Labor Statistics. "Characteristic of Minimum Wage Workers, 2013." March 2014.

Exhibit 5 Page 367

San Diego County **Taxpayers Association**

Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

*Figure 12: U.S. Workers Earning the Federal Minimum Wage by Age & Gender (2012)*



Source: U.S. Bureau of Labor Statistics

In the City of San Diego, there are slightly more women than men (52 percent versus 48 percent) in the low-wage workforce, while men make up a larger portion of the overall workforce.[35]

*Race/Ethnicity*

In California, 61.7 percent of those that earn under $10 per hour are Hispanic or Latino,[36] while only 38.2 percent of the population of California is Hispanic or Latino.[37] For the City of San Diego, whites slightly outnumber Latinos in the low-wage workforce, but Hispanics/Latinos tend to be highly overrepresented. Hispanics/Latinos make up 38 percent of the low-wage workforce despite making up only 28 percent of the total city workforce and 30 percent of the city's total population.[38]

---

[35] National University System Institute for Policy Research. "San Diego's Low Wage Workforce: A Complex Portrait." May 21, 2014.
[36] Reese, Phillip. The Sacramento Bee. "California Minimum Wage Hike Would Boost Pay for More than 1 Million Full Time Workers." September 12, 2013.
[37] American Community Survey. 2012.
[38] National University System Institute for Policy Research. "San Diego's Low Wage Workforce: A Complex Portrait." May 21, 2014.

Exhibit 5 Page 368

![San Diego County Taxpayers Association]

Taxpayers watchdog since 1945

707 Broadway, Suite 905, San Diego, CA 92101
P: (619) 234-6423 • F: (619) 234-7403 • www.sdcta.org

*Figure 13: Californians Earning $10/hr or Less by Race*



Source: SDCTA, Sacramento Bee

*Education*

Individuals with lower educational achievement are more likely to earn the minimum wage than those with more education. Nationally, "10 percent of those without a high school diploma earn the federal minimum wage or less, compared to about 4 percent of those who had a high school diploma (with no college) and about 2 percent of college graduates."[39] However, it is important to note that many teenagers who earn minimum wage have yet to graduate high school, but will go on to do so.

Similar to national data, Californians with less education are more likely to earn lower wages. The largest group earning less than $10 per hour in California is those that have not graduated high school, representing 36.2 percent of all people earning less than $10 per hour.[40] It is important to note that the data for California only includes full-time workers so it is unlikely that many high school students, who have yet to graduate, add greatly to this figure. Californians with at least a 4-year college degree have the lowest poverty rate, at 10.8 percent.[41]

In the City of San Diego, 23 percent of low-wage workers have a high school diploma or its equivalency as their highest attained level of education.[42] At the same time, 17 percent of low-wage workers have not graduated high school at all, only 16 percent have a bachelor's degree as their highest attained level of education, and only 7 percent have earned a graduate's degree.[43]

---

[39] U.S. Bureau of Labor Statistics. "Characteristics of Minimum Wage Workers, 2013." March 2014.
[40] Reese, Phillip. The Sacramento Bee. "California Minimum Wage Hike Would Boost Pay for More than 1 Million Full Time Workers." September 12, 2013.
[41] Ibid.
[42] National University System Institute for Policy Research. "San Diego's Low Wage Workforce: A Complex Portrait." May 21, 2014.
[43] Ibid.

Exhibit 5 Page 369