**Introduction**

Employment and careers compose a key function in modern society and communities, and they significantly benefit the people who have them.  According to a report from the Robert Wood Johnson Foundation (2013), employment has been linked to relatively healthier lives, healthier home environments, safer neighborhoods, better nutrition, higher quality childcare, and more educational opportunities.  Conversely, unemployment and underemployment (inconsistent or unstable work) lead to negative outcomes such as increases in blood pressure, unhealthy coping behaviors, and increased depression (Robert Wood Johnson Foundation, 2013).  Additionally, laid-off Americans are 83 percent more likely than their fully employed counterparts to develop stress-related health conditions (Robert Wood Johnson Foundation, 2013).

Employment also leads to positive psychological benefits.  Graetz (1993) found that those who were employed reported a 23 percent lower level of psychological distress than those who were unemployed.  Reemployment may reverse the negative psychological effects caused by unemployment, including reducing depression (Kessler, Turner, & House, 1988).  A recent report, commissioned by the National Institutes of Health, suggested that gaining employment and consequently getting off of welfare programs, reduced mothers' drinking problems and rates of depression (Zabkiewicz & Schmidt, 2009).  Damaske (2011) suggested that employment has positive familial outcomes beyond income, such as strengthening familial bonds and creating a sense of contribution to the family by each worker.

While employment plays a role in a community's psychological and physical health, it also influences the economic vitality of a community.  Wages significantly affect how people are able to gain employment and can influence job losses.

The federal proposal to increase the minimum wage by 39 percent from the current level of $7.25 to $10.10 per hour (U.S. CBO, 2014) represents a significant change.  A report by the U.S. Congressional Budget Office (2014) of the U.S. Congress, estimated the current administration's proposed extreme minimum wage increase to $10.10 per hour would increase levels of unemployment and negatively affect the nation's budget deficits.  This report discusses the potential benefits and pitfalls of increasing the minimum wage, and presents economic impact analyses for the U.S.

7

Exhibit 5 Page 401

overall, and for the city of Los Angeles with a focus on the L.A. proposal for an extreme increase to $15.37 per hour.

## Background

Evidence of both positive and negative effects of raising minimum wages has been reported both within and outside the United States.  This literature review focuses on the American perspective regarding the economic impacts that could result from significant increases in minimum wages, i.e., extreme minimum wage increases.  This perspective focuses on effects specific to the hotel industry, an industry that in some geographic areas has been singled out for local minimum wage increases (Rainey, 2014a). An executive summary of this literature review is included in the appendix to this report.

*Benefits of a Minimum Wage Increase*

Raising the minimum wage has recently been heralded as a way to aid labor markets and the overall economy in the U.S.  Claims in the popular press have been made that raising the minimum wage will reduce poverty (Konczal, 2014), increase employment (Berman, 2013), and provide relief for workers earning a low wage (Rainey, 2014b).  Claims of benefits of an extremely high increase in the minimum wage are reported to be grounded in empirical data.

One reported benefit of a higher minimum wage is positive effects on employment conditions.  It has been demonstrated that a rise in the minimum wage may increase the ratio of permanent to temporary workers in organizations as they convert more workers to full-time status (Dolado, Kramarz, Machin, Manning, Margolis, Teulings, & Keen, 1996).  Dolado et al (1996) posit the reason for this conversion is an attempt by employers to increase the output of each person on the payroll when wages are relatively high.  Unlike temporary workers, permanent workers have a significant cost of severance, which tends to lead to relatively higher employment levels in slumping organizations.  Dolado et al (1996), however, are silent as to the effect regarding those who are not converted from part-time to full-time status within an organization; it is

8

Exhibit 5 Page 402

possible that those who do not get converted to full-time employment lose employment altogether.

Brenner (2005) echoes the positive employment benefit of relatively high minimum wages by suggesting that in conditions of relatively high minimum wages, firms may be more likely to employ relatively fewer part time employees and engage more full-time workers. Reducing part-time employment for the sake of full-time employment may be beneficial; however, it could lead to detrimental outcomes for certain members of communities. Many women after child rearing are either forced or choose to "pull back" from the workforce by taking on part-time employment (Damaske, 2011). Additionally, 78 percent of young adults with autism who were able to graduate from high school, were only able to find part-time employment (Taylor & Seltzer, 2011). If an increase in the minimum wage converts part-time employment opportunities to full-time opportunities, communities may suffer as mothers, autistic individuals, and others who seek part-time work may find it more difficult to secure suitable employment.

Currently, what is being proposed in some municipalities such as Los Angeles, and was enacted on January 1, 2014, at SeaTac (Seattle airport area), is an extreme increase in minimum wage levels to approximately $15 per hour. The city of Seattle is now considering a minimum wage of $15.00 per hour (Wilson, 2013). Washington State's minimum wage is currently over $9.00 per hour, and is the highest in the country. If the latest Seattle proposal is passed, the minimum wage would increase by 61 percent. In Los Angeles, the proposed increase in the minimum wage would apply to workers employed at hotels of 100 rooms or more, and would increase the minimum wage rate from the state minimum of $8.00 to $15.37 per hour, for a 92 percent increase (Rainey, 2014a) as shown in the following graph.

9

Exhibit 5 Page 403



Also, the San Diego city council proposal to increase the minimum wage to $13.09 per hour would result in a 64 percent increase (Horn, 2014), and the proposal being considered by the Providence, RI, city council to increase the minimum wage to $15.00 per hour for hotel workers would result in an 88 percent increase (Fredericks, 2014).

Another reported benefit of an extreme increase in the minimum wage is the increased earnings, and in turn, spending power of those who are employed at the higher wage rate. In a study at the San Francisco airport (where a 22 percent increase in the minimum wage took place in 2000) conducted after the substantial minimum wage increase, workers were reported to have had lower levels of absenteeism and turnover, and higher levels of morale and productivity (Reich, Hall & Jacobs, 2005). A reduction of turnover and absenteeism is a logical outcome, in this instance, as the workers could easily see that similar employment anywhere else in the city would result in an earnings reduction. However, an extreme increase in the minimum wage may not have the same effect at the state or national level.

Exhibit 5 Page 404

It has been reported that a proposed 39 percent increase in the federal minimum wage from $7.25 to $10.10 per hour would raise an estimated 900,000 people out of poverty (U.S. CBO, 2014), and an increase (similar to that of the San Francisco airport workers) of 24 percent to $9.00 per hour, would raise an estimated 300,000 people out of poverty (U.S. CBO, 2014).   Being able to legislate a reduction in poverty levels is tempting, but the same report indicates that doing so would reduce overall employment, suggesting an extreme rise in the minimum wage may merely cycle different people in and out of poverty.  Economists have observed this issue for decades. As Stigler (1946, p. 363) stated, "The connection between hourly wages and the standard of living of the family is thus remote and fuzzy.  Unless the minimum wage varies with the amount of employment, number of earners, non-wage income, family size, and many other factors, it will be an inept device for combatting poverty even for those who succeed in retaining employment.  And if the minimum wages varies with all these factors, it will be an insane device."

It has been suggested that improved earnings of workers would contribute in a small way to reducing federal budget deficits in the short term by decreasing the number of people eligible for federal assistance programs (U.S. CBO, 2014).  The caveat to this short-term reduction of the federal budget deficit is that in the long term, the deficit is expected to increase if those who lose their jobs are unable to secure new employment in the labor market with the higher minimum wage (U.S. CBO, 2014).

*Drawbacks of a Minimum Wage Increase*

While some benefits of an extremely high minimum wage have been posited, significant drawbacks have also been reported.  One such drawback is increased prices to consumers.  In two studies regarding the restaurant industry, minimum wage increases resulted in increased prices for consumers (Aaronson, 2001; Aaronson, French & MacDonald, 2008).  Aaronson et al (2008) concluded that every one percentage point increase in the lowest wage results in a .07 percent increase in prices.  For businesses with a relatively higher proportion of employees earning the minimum wage, such as fast food, the estimated price increase is 1.6 percent for every 10.0 percent increase in the

11

Exhibit 5 Page 405

minimum wage.  Aaronson (2001) suggested that in markets where prevailing low-skill wages far exceed minimum wages, minimum wage increases have limited effects on market wages and costs; however, where the opposite is true, the effect is significant.

In a study of the San Francisco airport area, additional costs were passed on as a result of a minimum wage hike.  The companies who serviced the airport charged higher fees to the airlines flying into and out of San Francisco at the rate of an additional $1.42 per arriving passenger (Reich, Hall & Jacobs, 2005).  In a study of firms in Boston after the city passed a minimum wage increase that applied only to firms with a large portion of revenues from city contracts, prices did not increase, but rather profitability declined (Brenner, 2005).  It appears that the affected firms in Boston may not have had the ability to increase prices due to the nature of their business contracts with the city.   In conclusion, there appears to be a consistent relationship between an increase in the wage floor and an increase in prices to consumers.  Even nominal increases to the minimum wage are expected to flow through either to consumers or the profit margins of companies.

In the current debate regarding minimum wage increases, governmental entities are proposing what could be classified as an extreme minimum wage increase.  Increases being proposed in Seattle would increase the minimum wage by 61 percent (Wilson, 2013), in Los Angeles by 92 percent (Rainey, 2014b), in San Diego by 64 percent (Horn, 2014), in Providence by 88 percent (Fredericks, 2014), and nationally by 39 percent (U.S. CBO, 2014).  The stark increase may have unique outcomes in the national and local economies, especially as it pertains to employment levels.

The typical effect of a relatively high minimum wage is an adverse impact on employment.  Economists have long understood the link between high minimum wage increases and increases in unemployment.  Stigler (1946) suggested that the link was present because the cost of labor increases, which in turn decreases the amount that is produced by an individual per dollar in wages.  An established minimum wage above the wage equilibrium level has been shown to lead to a fall in employment in the U.S. (Brown, Gilroy and Kohn 1982; Card, Katz, and Drueger, 1993).  Stewart (2004) showed

Exhibit 5 Page 406

a link that for all workers (men and women, youth and adult), an increase in the minimum wage reduced employment, and did so even for those who were earning greater than a ten percent premium over the minimum wage prior to the increase. Evidence from Russia (a nation experiencing rapid increases in minimum wages) shows that every 1.0 percent increase in the Kaitz ratio [4] leads to a 0.047 percent increase in unemployment (Muravyev & Oshchepkov, 2013). Russia experienced increases of the Kaitz ratio of approximately 100 percent in one year due to increases in the minimum wage, resulting in an overall 4.7 percent increase in unemployment (Muravyev & Oshchepkov, 2013).

An increase in the U.S. minimum wage to $10.10 per hour would change the American Kaitz ratio from .35 to .49,[5] or a 40 percent increase. If the minimum wage were increased to $10.10 per hour, an estimated 500,000 people would lose their jobs, and if the minimum wage increased to $9.00 per hour, an estimated 100,000 people would lose their jobs (U.S. CBO, 2014). An historical example of how the minimum wage can adversely affect employment can be found in the Americas when Puerto Rico increased its minimum wage to be consistent with the mainland U.S. In the late 1970s and early 1980s, the extreme minimum wage increase significantly increased unemployment, particularly in low wage sectors of the Puerto Rican labor market (Castillo-Freeman & Freeman, 1992). Migration from Puerto Rico to the mainland U.S. increased during this time from the unemployed population after the minimum wage hike, particularly among relatively uneducated and low-skilled migrants (Castillo-Freeman & Freeman, 1992).

Muravyev and Oshchepkov (2013) found that when unemployment occurs due to increases in the minimum wage, people take on more informal, i.e., "under-the-table" work, where they do not pay taxes or receive legal protections, and typically earn below the minimum wage. Informal work increased in Russia when minimum wages increased (Muravyev and Oshchepkov, 2013). Increasing informal work may lead to immeasurable outcomes, such as a lack of access to affordable health care. After the Supreme Court of

---

[4] The Kaitz ratio is the ratio of the minimum wage to the average wage.

[5] The Kaitz ratio was calculated using the average wage in the United States based on the Social Security Administration's estimation.

Exhibit 5 Page 407

the U.S. upheld the individual mandate of the Affordable Care Act requiring all citizens to have health insurance (Sacks, 2012), those who have gained informal work will have to pay out of pocket to become compliant.  Additionally, engaging in informal work will put people at risk by not having access to workers compensation claims, unemployment benefits, and they may not be able to cite their experience on their resumes when searching for better jobs.

Wage growth actually slowed in the United Kingdom during periods following minimum wage increases (Stewart, 2004).  When the federal minimum wage increased in the U.S. in 1991, the restaurant industry in Texas experienced a narrowing of the wage dispersion (Katz & Krueger, 1992).   This narrowing occurred largely because those workers who were earning the lowest wages received a raise, but managers were reluctant to significantly increase the wages of the highest paid workers resulting in relatively more low-wage workers.   Wage growth is only one part of remuneration that could decrease as a result of an extreme minimum wage increase.

Along with wages, hotel employers often offer benefits such as health insurance, paid time off, job training, free meals, free parking and retirement plans.  However, low-wage workers are less likely to have access to most types of employment benefits than high-wage workers as outlined in Table 1. As a result, the previously discussed creation of relatively more low-wage workers in the U.S. hotel industry as a result of wage rate increases could mean that relatively more hotel workers would be vulnerable to the effects of benefit decreases.

Exhibit 5 Page 408

**Table 1 - Employment Benefits Access by Wage Group**

| Benefit | Low-Wage Workers | Mid-Wage Workers | High-Wage Workers |
|---|---|---|---|
| Health coverage for an individual | 42% | 87% | 94% |
| Health coverage for individuals and families | 34% | 78% | 87% |
| Paid time off for illness | 39% | 74% | 90% |
| Paid vacation | 51% | 89% | 88% |
| Paid holidays | 46% | 86% | 89% |
| Defined benefit pension | 16% | 39% | 48% |
| Retirement plan with employer contributions | 32% | 72% | 87% |
| Job training or education | 45% | 64% | 81% |

Adapted from: Families and Work Institute, 2006

In countries such as the United Kingdom and Japan, where the government regulates benefits like vacation days, paid time off for illness, and health insurance, employers have limited discretion regarding how benefits are provided, and there is no relationship between minimum wage and benefit changes (Kanki, 2013). Similarly, in France where the government regulates such benefits, the minimum wage is increased and decreased in conjunction with these "social security" benefits (Kanki, 2013). The U.S., however, does not have laws regarding most benefits and employment, with the major exception being the recent Affordable Care Act which was upheld by the Supreme Court of the U.S. (Sacks, 2012). It is conceivable given the flexibility that American employers have in paying benefits, (that employers in the United Kingdom, France, and Japan do not), that with large increases in minimum wages, benefits will be reduced. Evidence from Chile suggests that as minimum wages increased, the matching individual contributions from employers to deferred benefits like unemployment insurance for workers declined (Ferrada, 2010). As in the U.S., employers in Chili have flexibility regarding employment benefits. Considering the evidence from Chile and the freedom U.S. employers have to offer benefits, it is quite possible that workers in the U.S. would

15

Exhibit 5 Page 409

experience a reduction in the total benefits to which they have access as a result of an extreme increase in the minimum wage. Early evidence from SeaTac suggests that benefit reductions may have already occurred in that area as a result of the January 1, 2014, extreme minimum wage increase (Ng, 2014).

*The Hotel Industry*

Increasing the minimum wage would create conditions where hotels would operate under a higher cost structure. Unfortunately, even to the extent some costs could be passed along to guests in the form of higher room rates, hotel operators would be likely to experience decreased profitability. O'Neill and Mattila (2007) found that hotels with relatively higher room rates are no more profitable than hotels with lower room rates. Competent hotel managers are always trying to maximize their room rates (Noone, Kimes, Mattila & Wirtz, 2009). Under conditions where management is already maximizing rates, they may not be able to increase rates to make up for increased labor costs resulting from an extreme minimum wage increase. If a hotel operation were to reduce employment levels to control costs, or to keep staffing levels in line with a decrease in business levels, the outcome may backfire, further hurting profitability. Employees in the hotel industry sometimes work long hours and report high levels of stress, so reducing staff levels could contribute to work overloads, and in turn, drive turnover (O'Neill & Davis, 2011). Furthermore, if staffing levels are reduced, employee stress levels in hotels could increase as a result of longer and more unpredictable hours (Cleveland, O'Neill, Himelright, Harrison, Crouter & Drago, 2007), contributing to a vicious cycle of high wages leading to high turnover, high stress and high health care costs. Turnover has been estimated to reduce profitability in hotels by an average of $7,500 per hotel property for every 1.0 percent increase in turnover (Simons & Hinkin, 2001).

Such reductions in profitability may not seem to be a significant impact to large companies like Hilton Worldwide or Marriott International. However, according to STR (formerly Smith Travel Research, 2013), as of year-end 2012, Hilton Worldwide franchised 3,102 hotels while directly managing only 272 hotels, and Marriott franchised 2,404 hotels while only directly managing 697 hotels. This model of franchising their

Exhibit 5 Page 410

properties has evolved as the primary method of operation of American hotel companies, and most hotel companies franchise at an even higher rate than Hilton and Marriott (STR, 2013). Out of these two companies, a total of 5,506 hotels were owned and managed by entities other than the parent companies. The owners may be large real estate companies, but more likely would be small business entrepreneurs who only own one or two hotels as their primary source of income. If turnover were to increase by a modest amount of five percent, a single hotel owner would see a reduction of $37,500 in profitability.

The effects of extreme minimum wage increases may be particularly acute in certain less profitable sectors of the hotel industry. For example, hotels owners with food and beverage operations may simply close their restaurants rather than attempt to operate them in a highly unprofitable fashion. Such operations are labor intensive, so closing them could result in very high levels of unemployment.

Room service departments are becoming less profitable in today's market (Brancatelli, 2013). Given a reduction in overall demand, entire room service departments may be cut to reduce costs, as has already occurred at the Hilton New York in response to high wage rates, and is being considered by a number of other U.S. hotel operators with food and beverage services (Brancatelli, 2013). Hotel restaurants account for a significant portion of revenue (35 percent on average) for full-service hotels (Schmidgall, 2006); however, they are often underperforming and are at risk of being eliminated from hotels in instances of rising costs (Canina & Carvell, 2005) such as wage rates. Hotel room departments typically operate at an average departmental profit margin of 74 percent, whereas food and beverage departments' profit margin is typically 32 percent, and much of that profit is in the more lucrative catering and events business, rather than in restaurant operations.

Once non-departmental overhead expenses are considered, such as utility costs, marketing expenditures, maintenance expenses, and other administrative costs, typical hotel food & beverage operations barely break even. Schmidgall (2006) found that hotel restaurants are highly labor intensive. Therefore, a large increase in the minimum wage would be a particularly negative event, and it is plausible that an extreme increase in the minimum wage would hasten the elimination of restaurants and room service in hotels

17

Exhibit 5 Page 411

and corresponding job losses because many hotel owners would not continue such operations at a loss.

*Los Angeles and Biloxi*

The effects of extreme minimum wage increases would have different results in different cities. To provide a demonstration, two relatively generalizable metropolitan areas of different sizes and located in different regions of the U.S. are evaluated as explanatory cases in this paper. Namely, in Biloxi, MS, and Los Angeles, CA, the effects of extreme minimum wage increases would be deleterious to the health of the hotel industry in both municipalities, but for different reasons.

Biloxi employment has not fully recovered from the most recent economic recession or from the two Gulf tragedies of Hurricane Katrina and the Deep Water Horizon oil spill. Biloxi's unemployment rate was at 8.2 percent in 2013, up from 5.2 percent in 2004, the year before Hurricane Katrina (U.S. BLS, 2014a). Los Angeles' employment levels have been deeply affected by the most recent recession. The unemployment level in Los Angeles was 4.8 and 5.6 percent in 2006 and 2007, respectively, however, it increased to 10.7 percent in 2013 (U.S. BLS, 2014a). Both Biloxi and Los Angeles had unemployment levels higher than the national average in 2013, which was 6.7 percent (U.S. BLS, 2014a). In fact, as of December 2013, Los Angeles had the 305th lowest level of employment and Biloxi had the 248th lowest level of employment of any metropolitan area in the U.S. (U.S. BLS, 2014b). Each of these two labor markets would be a prime candidate for employment market improvements.

Both cities also have strong hotel markets, with Biloxi being a Gulf coast resort destination, and Los Angeles being the country's second largest city, and a hub of commerce and culture. The examples of Biloxi and Los Angeles highlight how other areas of the nation may be adversely affected by extreme minimum wage increases, as well.

In Biloxi, the minimum wage would increase due the raising of the federal minimum wage. This 39 percent increase in the minimum wage would result in higher hotel prices for this Gulf coast resort destination. Biloxi has a low wage model in the hotel industry compared to the nearby alternative of New Orleans. Table 2 compares the

18

Exhibit 5 Page 412

differences in median wages for hotel employees between the two cities, national median wages, and percentage change in the wage that would be required based on a proposed increase in the minimum wage to $10.10 per hour.

**Table 2 - Median Wage Differences between Biloxi, MS and New Orleans, LA**

| Position | Biloxi | Percent Change to $10.10 | New Orleans | Percent Change to $10.10 | National | Percent Change to $10.10 |
|---|---|---|---|---|---|---|
| Hotel Front Desk | $9.60 | 5.2 % | $11.13 | N/A | $10.56 | N/A |
| Bellhops | $8.52 | 18.5% | $9.17 | 10.1% | $9.64 | 4.8% |
| Housekeeping | $9.44 | 7.0% | $9.72 | 3.9% | $10.49 | N/A |
| Concierge | $8.60 | 17.4% | $9.63 | 4.9% | $13.10 | N/A |

Source: U.S. BLS, 2014b

With an increase in the minimum wage to $10.10 per hour, hotels in Biloxi, would be affected to a far greater degree than hotels in New Orleans and would be affected more than average hotels nationally. Hotel managers in Biloxi would most likely raise their room rates making the destination significantly more expensive. The increase in the minimum wage would narrow the gap between what hotels in New Orleans and Biloxi charge, potentially driving more business to New Orleans, further reducing employment in Biloxi. If hotels in Biloxi were unable to raise their rates, they would be forced to lay off employees to maintain their profit margins. In either scenario, the city of Biloxi would not only lose out on hotel business and earned income tax of the workers who would lose their jobs, but the city would also lose out on occupancy tax from overnight hotel guests, and sales taxes from whatever those guests purchased while in town. The national minimum wage in the case of Biloxi would be detrimental, as Dolando et al (1996, p. 329) state, "a single national minimum wage is then an extremely blunt policy instrument, being set too low in some markets (employment could be raised by having a higher minimum) and too high in other markets (employment is reduced)."

The city of Los Angeles is proposing a new, higher minimum wage strictly for

Exhibit 5 Page 413

hotel workers of $15.37 per hour (Rainey, 2014a).  The increase for the city of Los Angeles would apply only locally, so other destinations in California would not be required to comply with the new wage rate.  Hotels in Anaheim, for example, would be able to maintain their profit margins and rates, while hotels in Los Angeles would be forced to either accept lower profit margins, charge higher rates, or both.  If a result of the proposed wage increase in Los Angeles were to be an increase in prices at hotels, travel demand most likely would weaken as transient and group travelers would seek better deals elsewhere.

If the proposals for increases in the minimum wages for both Los Angeles and the U.S. are passed, the wages in Los Angeles would rise much higher than elsewhere in the country.  Table 3 outlines how much wages would increase in hotels in Los Angeles and Anaheim based on the new minimum wage structures.

**Table 3 - Median Wage Differences between Los Angeles and Anaheim**

| Position | Los Angeles | Percent Change to $15.37 | Anaheim | Percent Change to $10.10 |
|---|---|---|---|---|
| Hotel Front Desk | $10.95 | 40.4 % | $11.26 | N/A |
| Bellhops | $9.59 | 54.5% | $9.63 | 4.8% |
| Housekeeping | $10.23 | 50.2% | $14.26 | N/A |
| Concierge | $14.22 | 8.1% | $9.98 | 1.2% |

Source: U.S. BLS, 2014b

The increase in the cost structure would impact Los Angeles in a much more notable way than other cities in southern California.  The hotels in the city of Anaheim would see a negligible increase in labor costs, while hotels in the city of Los Angeles would experience increases of over 50 percent in some departments as noted in Table 2.  Given such increases in the wages for Los Angeles hotels, hotel prices would be likely to increase, and group and transient business would be likely to go to other markets.  The city of Los Angeles currently has unemployment levels greater than 10 percent (U.S.

20

Exhibit 5 Page 414

BLS, 2014a), and could ill afford to put more of its population out of work. The city of Anaheim, however, may experience a windfall in occupancy, tax dollars, and employment due to higher demand in their local hotels. Other enterprises that receive business from tourists in L.A. would be negatively affected, other tax revenues would be reduced and improvements to urban infrastructure relying on tax revenues could be compromised.

### Summary Regarding Extreme Wage Rate Increases

Legislation which proposes extreme minimum wage increases would have detrimental effects on the hotel industry, and as the examples of Biloxi and Los Angeles show, these effects would not be uniform. Hotel prices would increase while profitability would decrease as a result of national or local extreme minimum wage laws. Additionally, due to lower profitability, the industry would be forced into layoffs, and/or to maintain profitability, hotel guests would experience higher prices. Even if higher prices were to be charged, the potential exists for hotels to lose guests to competitors as is likely in such cities as Biloxi and Los Angeles. Even more detrimental to the hotel industry would be if rates are increased, and as a result, trips are canceled altogether. If there are fewer travelers, all markets and hotels would lose out on revenues, hamstringing the industry across the nation.

If hotel managers in such cities as Biloxi and Los Angeles were unable to adjust their rates according to their new cost structures, employment would suffer as more expensive labor would need to be cut. Some hotels may not be able to survive the new environment and would close their doors altogether, negatively affecting employment and tax revenue.

An additional detrimental outcome may be a slowing of hotel construction in local areas. Profitability has been linked to the market value of hotels (O'Neill, 2004), and therefore, with relatively low profit margins, newly constructed hotels would have decreased market values and could be sold at lower prices, further stunting local economies. If the industry's business model produces lower returns, business for hotel brokers, construction workers, hotel workers, food suppliers, guest room amenity

Exhibit 5 Page 415

suppliers, laundry companies, etc., could suffer, especially in the case of hotel closures. Ultimately, investment in hotels would decrease, and the value of existing properties would decline, further contributing to sluggish industry performance.  O'Neill (2004) found that the net operating income (a common metric for measuring hotel unit profitability) determines a hotel market value by a product of 5.615, so every $1,000 loss in profitability would result in a $5,615 value decrease per hotel guest room.  Lower profitability of hotels would produce lower levels of employment in the industry, lower levels of employment in the industries that support and are supported by the hotel industry, lower levels of investment in hotels, and lower tax revenues for the municipalities in which hotels are located.  An estimate of the economic impact is presented in the next section of this report.

Beyond the business side of the hotel industry, there is a human element, as well. The hotel industry is one where entrepreneurs can get started, and where hard work and humble beginnings turn into massive success stories.  Take Isadore Sharp and Four Season Hotels as one such example of entrepreneurial success.  On March 20, 1961, Mr. Sharp entered the hotel industry while still in his 20s with a 125-room motel in Toronto, Canada (Four Season History, 2014).  It took Mr. Sharp more than five years to get enough investors behind his vision to start his hotel career, and through persistent work and dedication, he was able to turn that single motel into one of the most recognizable luxury brands in the world.  Creating a less profitable environment through extremely high minimum wages may prevent people such as Isadore Sharp from convincing investors to create the next great hotel company.

The hotel industry is more than a vehicle for entrepreneurship because there is a strong tradition of promoting and progressing careers from within.  For example, Bob McCarthy, Marriott International's chief operations officer who retired in February of 2014, spent 38 years with the company starting as an hourly waiter in a Marriott hotel restaurant outside Philadelphia, PA (Marriot News Center, 2013).  Such entry-level roles as Mr. Sharp and Mr. McCarthy held, are seen as traditional "routes to the top" in the hotel industry where there are numerous egalitarian stories of people starting in hourly positions and rising to high level, executive leadership positions (Cleveland et al, 2007).

22

Exhibit 5 Page 416

**An Estimate of the Economic Impact of an Extreme Minimum Wage Increase on the Hotel Industry**

According to the U.S. Congressional Budget Office (2014), the effects of extreme increases in the minimum wage would be both positive and negative.  Overall, real family income[6] would increase by $2 billion, with 16.5 million workers being directly affected by having their wages increase; however, per person, this increase amounts to only $121 per worker in real income.  The U.S. Congressional Budget Office (CBO) report (2014) also suggests that 900,000 people would be raised above the poverty line by an increase of the minimum wage to $10.10 per hour, while 500,000 would lose their jobs.  The same report (U.S. CBO, 2014) suggests that there also would be 15.6 million workers who experience wage rate increases, but who still would not pay federal income taxes, due to relatively low family income.  The U.S. CBO (2014) anticipates corporate profits to decline due to slimmer profit margins which would reduce tax revenues overall through reductions in corporate income and personal income taxes paid by those who own businesses.  Higher prices for goods and services would decrease demand, and lower demand might also reduce local sales taxes, such as hotel occupancy taxes.  Additionally, more workers would become eligible for federally subsidized health insurance under the nation's new Affordable Care Act, and in states that have not accepted the insurance exchanges, the workers would remain eligible for Medicaid (U.S. CBO, 2014).

Based on the proposed minimum wage increases, hotels in Biloxi and Los Angeles, for example, would experience average daily rate increases of between 2.7 percent and 6.4 percent,[7] assuming rates could be increased.  If rates were successfully raised, demand would decrease resulting in lower occupancies for hotels in those areas.  Demand nationally may decrease, as well, as hotel prices become more expensive overall.  If prices were not increased, then profit margins would decrease as a product of more expensive labor costs.  As a result of reduced demand and/or profitability, hotel values would decrease and development would slow.

---

[6] Family income after adjusting for inflation and taxes
[7] Aaronson (2001) found that prices increase 7% of the increase in the wage floor; i.e., in Biloxi, a 39% increase in the minimum wage from $7.25 to $10.10 per hour, multiplied by 7%, equals a 2.7% increase in prices (0.39 x 0.07 = 0.027, or 2.7%); in L.A., a 92% increase in the minimum wage from $8.00 to $15.37 per hour, multiplied by 7%, equals a 6.4% increase in prices (0.92 x 0.07 = 0.064, or 6.4%)

23

Exhibit 5 Page 417

A Corgel and Lane (2013) study on price elasticity in the U.S. lodging market found that lodging demand would be reduced by 16 percent of an average daily rate increase, absent economic growth.   As previously discussed, the proposed extreme minimum wage increase in Los Angeles would result in a 6.4 percent increase in hotel room rates. This increase would result in a 2.4 percent decrease in demand.[8] In 2013, 27.2 million hotel room nights were occupied in Los Angeles (Los Angeles Tourism & Convention Board, 2014). Thus, the decrease in occupied room nights in Los Angeles due to the proposed extreme minimum wage increase would be 652,800[9] room nights for the year.  With the L.A. city average daily rate of $162.53 (Baltin, 2014), an estimated $106.1 million would be lost in hotel room revenue, and an estimated $16.4 million would be lost in city occupancy taxes, using the 15.5 percent hotel occupancy tax rate for L.A.  To make up the expected lost revenue of $106.1 million, hotel owners would look to reduce costs, most likely resulting in layoffs

Demand for hotels may decline in a market with an extreme minimum wage because prices have been shown to rise with increases in the minimum wage (Aaronson 2001: Aaronson et al., 2008).  The current proposal is to increase the minimum wage by 39 percent in the United States, as previously discussed.  However, research by Katz and Kruegar (1992) observed that in an environment where increases to the minimum wage are occurring, the effects of raising the minimum wage also effect workers who earn up to a 10 percent premium on the new minimum, essentially raising the wage floor of low wage workers above the newly established minimum wage.  Katz and Kruegar (1992) suggest this effect occurs because employers maintain a certain amount of their wage hierarchies; therefore, the increase in the wage floor (an artificial bottom for wages in a given market, not necessarily the true minimum wage) may actually be a 49 percent increase (39% + 10% where 39% is the true increase and 10% is the assumed premium on low wage workers).  The 49 percent increase in the wage floor would be expected to raise prices in hotels by 3.4 percent.[10]  Corgel and Lane (2013) suggested that an artificial increase in prices (an increase in prices not brought about due to increased demand or

---

[8] 6.4% (price increase) x 16% (demand reduction) = 2.4% demand reduction
[9] 27.2 million room nights x .024 (demand reduction) = 652,800 lost room nights
[10] 0.49 x 0.07 = 0.034, or 3.4%, where 49% is the percent of wage increase and 7% is the Aaronson (2001) price flow through factor, as previously presented

24

Exhibit 5 Page 418

other market factors) would lower demand by a factor of 16 percent of the price increase, as previously discussed.  Based on the calculated price increase of 3.4 percent, and Corgel and Lane's (2013) assumption of the prices for hotels being relatively inelastic at the rate of 0.16, then a 0.5 percent decrease (0.034 x -0.16 = -0.005, or 0.5 percent) in hotel demand would be expected where 3.4 percent is the anticipated rate at which prices would increase, and 16 percent is the Corgel and Lane (2013) finding regarding the rate at which demand would fall.

In 2013, the average daily rate for a hotel in the U.S. was $110.33, and approximately 3,040,000 hotel room nights were occupied in the U.S. per day, or 1.11 billion room nights for the year (PWC, 2014). Therefore, based on these figures, 5,550,000 room nights would be lost due to the extreme minimum wage increase,[11] and $612,330,000 in room revenue would be lost.[12]  In the U.S., local hotel room occupancy taxes range from 6.0 to 17.0 percent of the room rate, with an average of 11.5 percent (Proto Planning Travel Agency, 2014). Thus, approximately $70.4 million would be lost in hotel room taxes nationally due to the $612,330,000 reduction in room revenue.[13]

As a result of wage rate increases, the hotel industry would not only earn less, but spend less as a result of lower demand.  Hotels spend an estimated $25 to $38 per occupied room (Toh, DeKay & Raven, 2011) to cover expenses.  After removing estimated housekeeping labor expenses (assuming a half hour of wages at the national median wage rate for housekeepers of $10.49 per hour as presented in Table 2), that leaves $19.75 to $32.75 that hotels spend per occupied room on items such as guest room amenities (soap, shampoo, conditioner, lotion, etc.), energy (electricity, water, natural gas, etc.), and laundry services (cleaning the sheets, linens, towels, etc.).  Assuming that an extreme increase in the minimum wage decreases national demand for hotel rooms by an estimated 5,550,000 room nights annually as presented previously, U.S. hotels would spend an estimated $145.7[14] million dollars less in the overall economy due to a reduction in need for items like soap, cleaning supplies, water, and laundry services. L.A.

---

[11] 1.11 billion total room nights x 0.5% = 5,550,000 room nights lost
[12] 5,550,000 room nights x $110.33 ADR = $612,330,000 lost room revenue
[13] $612,330,000 lost room revenue x 0.115 = $70.4 million
[14] ($19.75 + $32.75) / 2 (average cost per occupied room) x 5,550,000 (estimated reduction in rooms sold) = $145.7 million

25

Exhibit 5 Page 419

hotels would spend an estimated $17.1[15] million dollars less in the overall economy based on its extreme minimum wage proposal.

A reduction in hotel demand would have deleterious effects on employment in the industry, as well. An estimated 1,586 housekeepers would lose their jobs in the U.S. due to the drop off in demand nationally,[16] and approximately 187 housekeepers would lose their jobs in L.A.[17] Housekeeping would not be the only department to experience reduced employment numbers, but other room department positions like front office attendants, bellhops, and concierges could be cut, as well. Additionally, support departments like reservations may experience a decline in employment levels to adjust the costs appropriately for lower demand. Finally, with fewer guests in hotels, fewer meals would be served, reducing food and beverage staff, and possibly elimination of struggling services like room service, as previously discussed. The loss in revenue in food and beverage may contribute to even more job losses through continuing the trend of eliminating the service from hotels altogether (Canina & Carvell, 2005). An estimated $214.3 million would be lost in hotel food and beverage revenue as a result of lower hotel demand in the U.S.,[18] and an estimated $37.1 million would be lost in hotel food and beverage revenue in the city of L.A.[19] To compensate for the reduced food and beverage revenues, hotel operators in the U.S. would need to eliminate 21.2 million wage hours at the $10.10 rate, or 10,609 food and beverage jobs would be lost.[20] In L.A., hotel operators would need to cut 2.4 million wage hours at the $15.37 rate, or 1,207 food and

---

[15] ($19.75 + $32.75) / 2 (average cost per occupied room) x 652,800 (estimated reduction in rooms sold) = $17.1 million

[16] 5,550,000 room nights (estimated reduction in national demand per year) / 14 (number of rooms a housekeeper cleans in an average day) = 396,429 shifts; 396,429 / 250 (number of shifts worked in a year based on 5 shifts per week for 50 weeks per year) = 1,586 people

[17] 652,800 room nights (estimated reduction in L.A. demand per year) / 14 (number of rooms a housekeeper cleans in an average day) = 46,629 shifts; 46,629 / 250 (number of shifts worked in a year based on 5 shifts per week for 50 weeks per year) = 187 people

[18] $612,330,000 (total estimate of annual lost rooms revenue to the hotel industry) x 35% (average percent of F&B revenue to rooms revenue; Schmidgall, 2006) = $214,320,000 in lost F&B revenue

[19] $106,100,000 (total estimate of annual lost rooms revenue in L.A.) x 35% (average percent of F&B revenue to rooms revenue; Schmidgall, 2006) = $37,100,000 in lost F&B revenue

[20] $214.3 million / $10.10 per hour = 21.2 million wage hours / 40 (hours worked per week) / 50 (number of weeks worked per year) = 10,609 F&B jobs lost

26

Exhibit 5 Page 420

beverage jobs would be lost.[21] In summary, at least 12,195 jobs would be lost (1,586 + 10,609) in the U.S., and 1,394 jobs would be lost in L.A. (187 + 1,207).[22]

In addition to the negative effects of job losses, lower revenues, less money being circulated back into the economy by paying suppliers, and reduced hotel room tax collections, the hotel industry would suffer from a loss of hotel valuation. O'Neill (2003) found that for every percentage point in occupancy lost, a hotel value would drop by $690 per room. The previously discussed 0.5 percent reduction in national hotel demand would result in a 0.3 percent reduction in occupancy based on the 2013 U.S. occupancy level of 62.3 percent (PWC, 2014), or a $207 loss in value per room.[23] Based on the 4.92 million hotel rooms in the U.S. (PWC, 2014), the reduction in value would be $1.02 billion.[24] Based on the 97,032 hotel rooms in L.A., the reduction in value would be $20.1 million.[25] It is plausible that the reduction in value would be even greater than $20.1 million at the 87 L.A. hotels with 100 or more guest rooms if they were required to implement the extreme $15.37 per hour minimum wage.

On average, every one percentage point in occupancy equates to $61,864 in hotel profitability (O'Neill & Mattila, 2007). Given the previously discussed 0.3 percent reduction in occupancy, hotel profitability would be would be reduced by $18,559.[26] Given the 52,529 hotels in the U.S. (STR, 2013), the total profitability reduction in the U.S. would be $974.9 million.[27] Assuming a 15 percent corporate tax rate, if U.S. hotel profitability decreased by $974.9 million, corporate taxes would be reduced by $146.2 million. Given 1,038 hotels in L.A., the total profitability reduction in L.A. would be $19.3 million,[28] and assuming a 15 percent corporate tax rate, corporate taxes would be reduced by $2.9 million. It is possible that the reduction in taxes would be even greater than $2.9 million at the 87 L.A. hotels with 100 or more guest rooms if they were

---

[21] $37.1 million / $15.37 per hour = 2.4 million wage hours / 40 (hours worked per week) / 50 (number of weeks worked per year) = 1,207 F&B jobs lost

[22] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments

[23] 62.3% x 0.5% = 0.3%

[24] $207 value loss per room x 4.92 million rooms = $1.02 billion

[25] $207 value loss per room x 97,032 rooms = $20.1 million

[26] $61,864 x 0.3 = $18,559

[27] $18,559 x 52,529 hotels = $974.9 million

[28] $18,559 x 1,038 hotels = $19.3 million

Exhibit 5 Page 421

required to implement the extreme $15.37 per hour minimum wage.

The total economic impact of an extreme minimum wage increase would be a significant strain on the U.S. economy, and would result in sluggish hotel industry performance. Table 4 outlines the total estimated economic impact to the U.S. hotel industry as a result of an extreme minimum wage increase to $10.10 per hour.

**Table 4 - Economic Impact of Extreme Minimum Wage Increase on the Hotel Industry and Nation**

| Affecting Factor | Impact | Result in Dollars |
|---|---|---|
| Lower Demand | Reduced annual guest room revenue | $612.3 million |
| Lower Demand | Reduced annual food & beverage revenue | $214.3 million |
| Lower Demand | Fewer guest rooms occupied resulting in less money spent for supplies | $145.7 million |
| Lower Demand | Loss of housekeeping and F&B staff (total job loss at 12,195)[29] | $320.2 million[30] |
| Lower Demand | Loss of hotel values | $1.02 billion |
| Lower Demand | Lower hotel occupancy taxes collected | $70.4 million |
| Lower Profitability | Lower corporate taxes paid | $146.2 million |
| **Total** | | **$2.53 billion** |

---

[29] 12,195 (number of lost jobs) x $21,008 (full-time annual salary at $10.10 per hour) x 1.25 (the calculation assumes a 25% premium for benefits at the new $10.10 minimum wage rate) = $320,200,000
[30] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments.

Exhibit 5 Page 422

The following chart displays the types and quantities of negative economic impact anticipated in the U.S. from a minimum wage increase to $10.10 per hour.



29

Exhibit 5 Page 423

Table 5 outlines the total estimated economic impact to the L.A. hotel industry as a result of an extreme minimum wage increase to $15.37 per hour.

**Table 5 - Economic Impact of Extreme Minimum Wage Increase on the L.A. Hotel Industry and Community**

| Affecting Factor | Impact | Result in Dollars |
|---|---|---|
| Lower Demand | Reduced annual guest room revenue | $106.1 million |
| Lower Demand | Reduced annual food & beverage revenue | $37.1 million |
| Lower Demand | Fewer guest rooms occupied resulting in less money spent for supplies | $17.1 million |
| Lower Demand | Loss of housekeeping and F&B staff (total job loss at 1,394)[31] | $55.7 million[32] |
| Lower Demand | Loss of hotel values | $20.1 million |
| Lower Demand | Lower hotel occupancy taxes collected | $16.4 million |
| Lower Profitability | Lower corporate taxes paid | $2.9 million |
| **Total** | | **$255.4 million** |

---

[31] 1,394 (number of lost jobs) x $31,970 (full-time annual salary at $15.37 per hour) x 1.25 (the calculation assumes a 25% premium for benefits at the new $15.37 minimum wage rate) = $55,700,000

[32] Note that this estimate is a conservative one assuming the only jobs lost are in the housekeeping and F&B departments, not other departments.

Exhibit 5 Page 424

The following chart displays the types and quantities of negative economic impact anticipated in L.A. from a minimum wage increase to $15.37 per hour.



In summary, the total estimated initial economic impact to the U.S. hotel industry as a result of the proposed extreme minimum wage increase to $10.10 per hour, considering loss of revenue, loss of jobs, loss of money going back into the economy, i.e., "trickle-down effect," loss in property value, and the reduction in payment of taxes would equate to roughly $2.53 billion dollars.[33] In L.A., the total estimated initial economic impact to the hotel industry as a result of the proposed extreme minimum wage increase to $15.37 per hour is estimated at $255.4 million. Such impact does not include the likely

---

[33] Note that this estimate is a conservative one assuming the national $10.10 minimum wage increase is passed, and no higher local minimum wage legislation goes into effect. Also, other local taxes were not considered in the national number; therefore, the total economic impact is likely greater than $2.53 billion.

Exhibit 5 Page 425

effects of extreme minimum wage increase on promoting an underground economy, i.e., "under-the-table" work. Further, these figures represent estimated economic impact during the initial year; long-term effects would be greater.

32

Exhibit 5 Page 426

## Appendix - Executive Summary of Literature Review

A literature review regarding extreme minimum wages revealed the following:

- Extreme minimum wage increases are being proposed in Los Angeles that would increase the minimum wage by 92 percent (Rainey, 2014), and nationally by 39 percent (U.S. CBO, 2014).
- In Los Angeles, the proposed increase in the minimum wage would apply only to hotel workers, and would increase the minimum wage rate from the state minimum of $8.00 to $15.37 per hour (Rainey, 2014).
- After approval of an extreme minimum wage at the Seattle airport area (SeaTac), the city of Seattle is considering a local minimum wage of $15.00 per hour (Wilson, 2013). Washington State's minimum wage is currently over $9.00 per hour, the highest in the country.
- Additional extreme minimum wage increases have been proposed in San Diego at $13.09 per hour (Horn, 2014), and in Providence, RI, at $15 per hour for hotel workers only (Fredericks, 2014).
- The federal proposal would increase the minimum wage from the current level of $7.25 to $10.10 per hour (U.S. CBO, 2014).
- Researchers have long questioned the value and benefits of minimum wages, in general, and extreme minimum wage increases, in particular. Stigler (1946) stated, "Unless the minimum wage varies with the amount of employment, number of earners, non-wage income, family size, and many other factors, it will be an inept device for combatting poverty even for those who succeed in retaining employment. And if the minimum wages varies with all these factors, it will be an insane device."
- In the restaurant industry, minimum wage increases resulted in increased prices for consumers (Aaronson, 2001; Aaronson, French & MacDonald, 2008).
- In the San Francisco airport area, additional costs were passed on from a minimum wage hike. The companies who serviced the airport charged higher fees at the rate of $1.42 per arriving passenger (Reich, Hall & Jacobs, 2005).
- In Boston, after the city passed a minimum wage increase that applied only to firms with a large portion of revenues from city contracts, prices did not increase, but profitability declined (Brenner, 2005).
- If the federal minimum wage were increased to $10.10 per hour, an estimated 500,000 people would lose their jobs. If the minimum wage increased to $9.00 per hour, an estimated 100,000 people would lose their jobs (U.S. CBO, 2014).
- Evidence from Russia (a nation experiencing rapid increases in minimum wages) shows that every 1.0 percent increase in the Kaitz ratio[34] leads to a 0.047 percent increase in unemployment (Muravyev & Oshchepkov, 2013). Russia experienced increases of the Kaitz ratio of approximately 100 percent in one year due to increases in the minimum wage, resulting in an overall 4.7 percent increase in unemployment (Muravyev & Oshchepkov, 2013).
- Muravyev and Oshchepkov (2013) found that when unemployment occurs due to

---

[34] The Kaitz ratio is the ratio of the minimum wage to the average wage.

33

Exhibit 5 Page 427

increases in the minimum wage, people take on more informal, i.e., "under-the-table" work, where they do not pay taxes or receive legal protections, and typically earn below the minimum wage.  Informal work increased in Russia when minimum wages increased. Increasing informal work may lead to unmeasurable outcomes, such as a lack of access to affordable health care.

- Jobs are linked to functional communities, including relatively safe neighborhoods, healthy home environments, healthy lives, good nutrition, high quality childcare, and educational opportunities.  Conversely, unemployment leads to negative outcomes such as increases in blood pressure, unhealthy coping behaviors, stress related conditions and increased depression (Robert Wood Johnson Foundation, 2013).

- After the Supreme Court of the U.S. upheld the individual mandate of the Affordable Care Act (Sacks, 2012), those who have gained informal work will have to pay out of pocket to become compliant.  Additionally, engaging in informal work will put people at risk by not having access to workers compensation claims, unemployment benefits, and they may not be able to cite their experience on their resumes when searching for better jobs.

- In the late 1970s and early 1980s, the extreme minimum wage increase in Puerto Rico significantly increased unemployment, particularly in low wage sectors. (Castillo-Freeman & Freeman, 1992).  Migration from Puerto Rico to the mainland U.S. increased, particularly among relatively uneducated and low-skilled migrants (Castillo-Freeman & Freeman, 1992).

- Workers in the U.S. hospitality industry could be particularly vulnerable to the effects of benefit decreases as a result of extreme wage rate increases because unlike countries in Europe and Asia, the U.S. has limited laws regarding linking most benefits and employment, with the primary exception being the Affordable Care Act. Such benefit decreases occurred in South America in concert with minimum wage increases (Ferrada, 2010).

34

Exhibit 5 Page 428

# References

Aaronson, D. (2001). Price pass-through and the minimum wage. *Review of Economics and Statistics 83* (1): 158-169.

Aaronson, D. French, E. & MacDonald, J. (2008). The minimum wage, restaurant prices, and labor market structure. *Journal of Human Resources 43* (3): 688 - 720.

Baltin, B. (2014). GHN market report: Los Angeles County. *Global Hospitality Resources.* Proprietary Report.

Brancatelli, J. (2013, July 17). It's the end of hotel rooms service as we know it, and I feel fine. *The Business Journals* Retrieved from http://www.bizjournals.com/bizjournals/blog/seat2B/2013/07/room-service-part-of-hotel-adaption.html?page=all.

Berman, J. (2013, December 19). $10.10 minimum wage would actually create new jobs: Study. *Huffington Post* Retrieved from http://www.huffingtonpost.com/2013/12/19/1010-minimum-wage_n_4474183.html.

Brenner, M. D. (2005). The Economic Impact of the Boston Living Wage Ordinance. *Industrial Relations: A Journal of Economy and Society 44* (1): 59 - 83.

Brown, C. Gilroy, C. & Kohen, A. (1982). The effect of the minimum wage on employment and unemployment. *Journal of Economic Literature* 20 (2): 487 – 528.

Canina, L. & Carvell, S. (2005).  Lodging demand for urban hotels in major metropolitan markets. *Journal of Hospitality and Tourism Research* 29: 291 – 311.

Card, D. L. Katz, L. F. & Kruegar, A. B. (1993). An evaluation of recent evidence of the federal minimum wage. *Industrial and Labor Relations Review* 46 (1): 38 – 54.

Castillo-Freeman, A., & Freeman, R. B. (1992). When the minimum wage really bites: the effect of the U.S.-level minimum on Puerto Rico. In *Immigration and the workforce: Economic consequences for the United States and source areas* (pp. 177-212). University of Chicago Press.

Cleveland, J. N., O'Neill, J. W. Himelright, J. L. Harrison, M. M. Crouter, A. C. & Drago, R. (2007). Work and family issues in the hospitality industry: Perspectives of entrants, managers, and spouses. *Journal of Hospitality & Tourism Research 31* (3): 275 - 298.

Corgel, J. & Lane, J. (2013). Hotel Industry Demand Curves. *PKF Consulting – Hotel Horizons:* 7 – 13.

35

Exhibit 5 Page 429

Damaske, S. (2011). *For the Family: How Class and Gender Shape Women's Work*. New York, N.Y.: Oxford University Press.

Dolado, J. Kramarz, F. Machin, S. Manning, A. Margolis, D., Teulings, C. & Keen, M. (1996). The economic impact of minimum wages in Europe. *Economic policy* 319-372.

Families and Work Institute (2006). What do we know about entry-level, hourly employees" *Research Brief No. 1* Retrieved from http://familiesandwork.org/eproducts/brief1.pdf.

Ferrada, C. (2010). Individual savings accounts in Chile: Income vs. substitution effects and saving responses. *Manuscript, Chicago University*.

Freeman, A. C. & Freeman, R. B. (1991). Minimum wages in Puerto Rico: Textbook case of a wage floor?  NBER Working Paper no. 3759. Cambridge, Mass. National Bureau of Economic Research, June.kat.

Four Seasons History (2014). Retrieved from http://www.fourseasons.com/about_four_seasons/1960_to_1969/.

Fredericks, Z. (2014). Hotel workers petition to raise minimum wage. *The Brown Daily Herald* April 15.

Graetz, B. (1993). Health consequences of employment and unemployment: Longitudinal evidence for young men and women. *Social Science & Medicine* 36 (6): 715 – 724.

Horn, J. (2014). Is minimum wage hike right for San Diego? *The San Diego Union Tribune* April 26.

Kanki, C. (2011). Legal structure of, and issues with, Japan's regional minimum wage system: Comparative study of the UK and French systems, including the social security systems. *Minimum Wage in Japan 8* (2): 55 – 70.

Katz, L. F. & Krueger, A. B. (1992). *The effect of the minimum wage on the fast food industry* (No. w3997). National Bureau of Economic Research.

Kessler, R. C. Turner, J. B. & House, J. S. (1988). Effects of unemployment on health in a community survey: Main, modifying, and mediating effects. *Journal of Social Issues* 44(4): 69 – 85.

Konczal, M. (2014, January 4). Economists agree: Raising the minimum wage reduces poverty.  *The Washington Post* Retrieved from http://www.washingtonpost.com/blogs/wonkblog/wp/2014/01/04/economists-agree-raising-the-minimum-wage-reduces-poverty/.

36

Exhibit 5 Page 430

Los Angeles Tourism & Convention Board. (2014, May 9). L.A. tourism board announces tourism job growth and record visitor spending during national travel & tourism week celebration. Press Release.

Marriott New Center (2013).  Retrieved from http://news.marriott.com/2013/09/marriott-chief-operations-officer-robert-bob-mccarthyto-retire-in-february.html.

Muravyev, A. & Oshchepkov, A. (2013). Minimum wages and labor market outcomes: evidence from the emerging economy of Russia. *Higher School of Economics* Research Paper No. WP BRP, 29.

Ng, A. (2014). What SeaTac tells us about $15 minimum wage. *Northwest Asian Weekly* May 22.

Noone, B. Kimes, S. Mattila, A. & Wirtz, J. (2009). Perceived service encounter pace and customer satisfaction: An empirical study of restaurant experiences. *Journal of Service Management* 20 (4): 380 – 403.

O'Neill, J. W. & Mattila, A. S. (2007). The debate regarding profitability: hotel unit and hotel brand revenue and profit relationships. *Journal of Travel & Tourism Marketing, 21* (2-3): 131 - 135.

O'Neill, J. W. & Davis, K. (2011). Work stress and well-being in the hotel industry. *International Journal of Hospitality Management 30* (2): 385 - 390.

O'Neill, J. W. (2004). An automated valuation model for hotels. *Cornell Hotel and Restaurant Administration Quarterly* 45 (3): 260 - 268.

O'Neill, J. W. (2003). ADR rule of thumb: Validity and suggestions for its application. *Cornell Hotel and Restaurant Administration Quarterly* 44 (4): 7-16.

Proto Planning Travel Agency (2014). Hotel occupancy tax rates for U.S. cities. Proprietary Report.

PWC (2014, January). *PricewaterhouseCoopers Hospitality Directions.* Proprietary report.

Rainey, J. (2014a, February 18). L.A. council to consider hiking minimum wage to $15.37 at big hotels. *Los Angeles Times* Retrieved from http://www.latimes.com/local/lanow/la-me-ln-minimum-wage-20140217,0,1713172.story#axzz2thzfIuUz.

Exhibit 5 Page 431

Rainey, J. (2014b, February 14). For workers on the bottom rung, wage hike could make big difference. *Los Angeles Times* Retrieved from http://www.latimes.com/business/la-me-la-wage-hike-20140215,0,1788883.story?track=rss#axzz2tNQvTlCz.

Reich, M. Hall, P. & Jacobs, K. (2005). Living wage policies at the San Francisco airport: Impacts on workers and businesses. *Industrial Relations: A Journal of Economy and Society 44* (1): 106 - 138.

Robert Wood Johnson Foundation. (2013). *Stable jobs = healthier lives* [Brochure]. Retrieved from http://www.rwjf.org/en/blogs/new-public-health/2013/01/stable_jobs_health.html.

Sacks, M. (2012, June, 28). Supreme court health care decision: Individual mandate survives. *Huffington Post* Retrieved from http://www.huffingtonpost.com/2012/06/28/supreme-court-health-care-decision_n_1585131.html.

Schmidgall, R. (2006). *Hospitality industry managerial accounting* (6th ed.). Lansing, MI: Educational Institute of the American Hotel & Lodging Association.

Simons, T. & Hinkin, T. (2001). The Effect of Employee Turnover on Hotel Profits A Test Across Multiple Hotels. *Cornell Hotel and Restaurant Administration Quarterly 42* (4): 65 - 69.

STR (2013). Hotel Industry Foundations. Presented at the International Council of Hotel Restaurant and Institutional Educators Conference, St. Louis, MO.

Statistica (2012). Hotel average daily rate in Los Angeles from Q1 2010 to Q1 2013. Retrieved from http://www.statista.com/statistics/202389/average-daily-rate-of-hotels-in-los-angeles/.

Stewart, M. B. (2004). The impact of the introduction of the UK minimum wage on the employment probabilities of low-wage workers. *Journal of the European Economic Association 2* (1): 67 - 97.

Stigler, G. J. (1946). The economics of minimum wage legislation. *The American Economic Review* 358 - 365.

Taylor, J. L. & Seltzer, M. M. (2011). Employment and post-secondary educational activities for young adults with autism spectrum disorders during the transition to adulthood. *Journal of Autism and Developmental Disorders* 41 (5): 566 – 574.

Toh, R. S. DeKay, D. F. & Raven, P. (2011). Travel planning searching for and booking hotels on the internet. *Cornell Hospitality Quarterly* 52 (4): 388 – 398.

Exhibit 5 Page 432

U.S. Bureau of Labor Statistics. (2014a). *Databases, Tables & Calculators by Subject.* Retrieved from http://data.bls.gov/timeseries/LAUMT282506000000004?data_tool=XGtable.

U.S. Bureau of Labor Statistics. (2014b). *Local Area Unemployment Statistics.* Retrieved from http://www.bls.gov/web/metro/laummtrk.htm.

U.S. Bureau of Labor Statistics. (2014c). *At a glance:  Accommodations and food service sector.* Retrieved from http://www.bls.gov/iag/tgs/iag72.htm.

U.S. Congressional Budget Office. (2014). *The effects of a minimum wage increase on employment and family income.* Retrieved from http://www.cbo.gov/sites/default/files/cbofiles/attachments/44995-MinimumWage.pdf.

Wilson, R. (2013, September 25). Is Seattle headed for a $15 minimum wage? *The Washington Post* Retrieved from http://www.washingtonpost.com/blogs/govbeat/wp/2013/09/25/is-seattle-headed-for-a-15-minimum-wage/.

Zabkiewicz, D. & Schmidt, L. A. (2009). The mental health benefits of work: do they apply to welfare mothers with a drinking problem? *The Journal of Behavioral health Services & Research* 36 (1): 96 – 110.

Exhibit 5 Page 433



# TAKE A MOMENT...

June 2, 2014

Matthew Newman
Blue Sky Consulting Group
1939 Harrison Street #211
Oakland, CA 94612

Phone: 510.654.6100 x202
Email: mnewman@emailbluesky.com

Dear Mr. Newman:

My name is Paul Gibbs and I am the General Manager at the Crowne Plaza Los Angeles Int'l. Airport Hotel in the City of Los Angeles.

I'm writing today because I understand that the Blue Sky Consulting Group is currently conducting a review of the potential economic impact of the proposed Living Wage hike of $15.37 per hour for all hotels in the City of Los Angeles with 100 or more rooms. I want to take the time to tell you about my hotel and I ask that you please include my concerns in your ongoing review.

The Hotel Industry in Los Angeles contributed $179 million in Transient Occupancy Tax (TOT) to the City of Los Angeles in the 2012-13 Fiscal Year. In 2013, Los Angeles experienced a record breaking 42.2 million visitors, bringing $16.5 billion in direct spending and $30.5 billion in total economic benefits to the City along with 324,000 jobs throughout the County.

Hotels like mine play an integral role in tourism in Los Angeles. We provide quality jobs, good wages, and we contribute millions of dollars to the City's General Fund each year. My concern with the living wage proposal is that it unfairly targets just one industry, the Hotel Industry, without knowing what the possible unintended consequences will be on the Los Angeles economy as a whole.

My hotel has 613 rooms and we provide more than 230 full-time jobs for our employees. These employees are paid very well due to local LAX Living Wage Ordinance and provided with good benefits for them and their families. If this minimum wage hike is passed, my hotel will be forced to cut back on full-time employees, delay construction and improvement projects, and possibly close or scale back on other hotel amenities including room service, our new restaurants, and more. The unintended consequences of this type of Living Wage increase will be dramatic, and they will have a negative impact on the people who the City is trying to help the most.

LOS ANGELES-INTL AIRPORT
T  310 642 7500   F  310 417 1608   E     W  www.crowneplaza.com/lax-intlapt
A  5985 West Century Boulevard, Los Angeles, CA  90045-5403 USA

Exhibit 5 Page 434



# TAKE A MOMENT...

**Let me repeat that once again for the record. My hotel, located in the City of Los Angeles, will be forced to layoff some employees and cut the hours for other employees if this Living Wage increase is passed.**

A study that was recently released by the Fraser Institute concluded, *"When governments mandate a wage above the prevailing market rate, employers respond by cutting back on jobs, hours, and on-the-job training. Less skilled workers—those with fewer qualifications and experience—end up as collateral damage in the process."*

I worry that if this minimum wage is passed, this is exactly what will happen. A Living Wage increase for only one industry in one city will make my hotel less competitive with hotels in our neighboring cities – forcing me to cut back on jobs at my location. I do not want to have to do this, but I need to remain competitive with other hotels in the region.

I thank you for your careful consideration of my concerns and I hope that I can count on you to produce a fair and accurate report for the City of Los Angeles that includes my concerns.

Sincerely,

**Paul Gibbs**
**General Manager**
**Crowne Plaza LAX**



Richard Williams <richard.williams@lacity.org>

## Fwd: Living Wage Hike in Los Angeles

**John Wickham** <john.wickham@lacity.org>                    Tue, Jun 3, 2014 at 1:29 PM
To: Richard Williams <richard.williams@lacity.org>

Richard,

Can you add this to the Council File for 14-0223?

John Wickham
Office of the Chief Legislative Analyst
phone: (213) 473-5738
fax: (213) 620-9869


---------- Forwarded message ----------
From: **Mike Shoffit** <MShoffit@ardenthotels.com>
Date: Tue, Jun 3, 2014 at 11:14 AM
Subject: Living Wage Hike in Los Angeles
To: "john.wickham@lacity.org" <john.wickham@lacity.org>


Dear Mr. Wickham:


My name is Mike Shoffit and I am the General Manager at the Historic Mayfair Hotel in the City of Los Angeles.


I'm writing today because I understand that the Blue Sky Consulting Group is currently conducting a review of the potential economic impact of the proposed Living Wage hike of $15.37 per hour for all hotels in the City of Los Angeles with 100 or more rooms. I want to take the time to tell you about my hotel and I ask that you please include my concerns in your ongoing review.


The Hotel Industry in Los Angeles contributed $179 million in Transient Occupancy Tax (TOT) to the City of Los Angeles in the 2012-13 Fiscal Year. In 2013, Los Angeles experienced a record breaking 42.2 million visitors, bringing $16.5 billion in direct spending and $30.5 billion in total economic benefits to the City along with 324,000 jobs throughout the County.


Hotels like mine play an integral role in tourism in Los Angeles. We provide quality jobs, good wages, and we contribute millions of dollars to the City's General Fund each year. My concern with the living wage proposal is that it unfairly targets just one industry, the Hotel Industry, without knowing what the possible unintended consequences will be on the Los Angeles economy as a whole.


My hotel has 195 rooms and we provide more than 60 full-time jobs for our employees. These employees are paid very well and provided with good benefits for them and their families. If this minimum wage hike is passed, my

Exhibit 5 Page 436

hotel will be forced to cut back on full-time employees, delay renovation (which is estimated to be $7 million) and expansion projects, and possibly close or scale back on other hotel amenities including room service, our coffee shop, and more. The direct consequences to the Mayfair Hotel will be approximately $900,000 in wages and payroll taxes. The unintended consequences of this type of Living Wage increase will be more dramatic, and they will have a negative impact on the people who the City is trying to help the most.

**Let me repeat that once again for the record. My hotel, located in the City of Los Angeles, will be forced to layoff some employees and cut the hours for other employees if this Living Wage increase is passed.**

A study that was recently released by the Fraser Institute concluded, "*When governments mandate a wage above the prevailing market rate, employers respond by cutting back on jobs, hours, and on-the-job training. Less skilled workers—those with fewer qualifications and experience—end up as collateral damage in the process.*"

I worry that if this minimum wage is passed, this is exactly what will happen. A Living Wage increase for only one industry in one city will make my hotel less competitive with hotels in our neighboring cities. This will lower occupancy therefore forcing me to cut back on jobs at my hotel. I do not want to have to do this, but I need to remain competitive with other hotels in the region.

I thank you for your careful consideration of my concerns and I hope that I can count on you to produce a fair and accurate report for the City of Los Angeles that includes my concerns.

Sincerely,

**Mike Shoffit**

**General Manager**

**The Historic Mayfair Hotel**

Mike Shoffit

General Manager

The Historic Mayfair Hotel

Exhibit 5 Page 437

1256 West 7th Street | Los Angeles, CA 90017

Tel (213) 632-1200 | Fax (213) 484-6438

www.MayfairLA.com

*Connect with us below...*



Exhibit 5 Page 438



● 626 Wilshire Blvd.          ● telephone  213.624.1213
Suite 200                    facsimile  213.624.0858
Los Angeles, CA  90017       www.ccala.org

June 6, 2014

The Honorable Curren Price, Jr.
Chairman, Economic Development Committee
Los Angeles City Council
200 N. Spring Street, Room 420
Los Angeles, CA  90012

**Re: Blue Sky Study**

Dear Chairman Price:

As you know, the Central City Association is very concerned about the potential consequences of a mandate to increase the minimum pay for all hotel employees in the city to $15 per hour.  We believe that the negative impacts to Downtown, to the hotel industry, to the city's economy and tax base and to the city's ability to compete for tourist dollars and for new businesses will greatly outweigh the gains that will be seen by a small number of hotel employees who do not already make $15 per hour.

We were, therefore, encouraged to see that you and your colleagues chose to have a study of the economic impacts of the proposal completed and evaluated by the City Council before moving forward with a wage mandate.  The instructions that the City gave Blue Sky Consulting in how to prepare that study were far too limited however.  The consultant should have been tasked with studying the actual impacts in instances where hotel wages were raised by specific cities. Long Beach and the Century Blvd. hotels in Los Angeles are two examples that could be easily studied to find the overall impacts of these policies on hotels and their workforces.

The instructions that were apparently given to the consultant do not reflect our understanding of what the committee's instructions were. The City merely asked Blue Sky to do a review of existing literature on minimum wage increases and did not ask for a comprehensive study on the effects of this policy on the businesses and employees it will touch. Nonetheless, the conclusions of this report should cause you and your co-authors to halt your efforts to impose this new wage scale. Blue Sky anticipates that some hotel employees will see wage increases, which we agree will happen. They also say in agreement with us that some portion of employees will lose their jobs while others will have their hours cut.

Furthermore, the ensuing decline in profitability will mean hotel investment in the city will slow. We are aware of at least two potential hotel developments that would have been done in the Downtown area (without need for TOT subvention) that were

Exhibit 5 Page 439

O F F I C E R S
Steven A. Flores, Chair
(Oh) Lincuvoul
Dennis Franson, Treasurer
Eugene Property Development Company
David E. Wright, Executive Vice Chair
Pharma AE American Pipeline
Patrick D. Spillane, Executive Vice Chair
504 Bank Estate Group
Thomas S. Sayles, Executive Vice Chair
University of Southern California
Martha Saucedo, Executive Vice Chair
AEG
Robert Jernigan, Executive Vice Chair
Gensler
Bud Ovrom, Executive Vice Chair
Brookfield Office Properties
Timothy K. McEvoy, State Executive
Cleartail
Sean M. Foley Immediate Past Chair
C.B. Rush
Carol E. Schatz, President & CEO
Central City Association

V I C E   C H A I R S
454 Ventures
Wit West Olympic Blvd L2
AC Martin and Martha Project Management
AEG
Allen Matkins
Altera Vidal
American Commercial Equities
Angie Fashion Buildings
Arentfx
Autobahntec Lubdatevdin & Sisco
A T & T
Bank of America
Bank of the West
Boston Capital Partners
Boston Economics e
BOST Partners
Brookfield Office Properties
California Apartment Association
Callison Capital Medical area
Capital Foresight
CBRE
Central Sky Development Group
Cleefe Incentive
CIM Foundt
Chase Bank Company
Chevron Products Company
Church & State
Cholai Environmental Services
City National Bank
City Fow
Combill County Management
Coffee International
Commonwealth Land Title Insurance Company
Commonwealth Partners
Conference Sh
Confluence & Wakefield
Department of Water & Power
D La Fleur
Direction Dispatche
E of M ChirroyCompany
Equity Southland
EVO Properties
EVO2
Film L.A.
Fiddy L London
Forest City Development
Fox Entertainment Group
Frontier Restaurant Group
G. Allan Kingston
Gensler
Glaser Weil Fink Jacobs
L.B.A Realty
LA Realty
Legendary Investors Group
Lockton Insurance Brokers
Look Land
Los Angeles Athletic Club
Los Angeles Business Journal
Los Angeles Community College District
Los Angeles Dodgers
Los Angeles Metropolis Hospital Foundation
Los Angeles Marriott Inn
Los Angeles United Investment Company
Los Angeles World Airports
Loyola Law School
Loyola Marymount University
Walt Israel Hotel Management
Manatt, Phelps & Phillips
Mayer Brown
Mitsubishi
Majors, Nara, Silbak, Silco & Felcon
Macondo Center
Mitsubishi State Distri
Morund
Millennium Mayor Ilotel
MolinTotos Amendens of Aperts
Munger, Tolles & Olson
Municipal Contemporary Art
Museum Court
NBC Universal
Newhall Land
O'Malone & Myers
Pearl Group
Pico Lab
Portsound Hotera
Prial City
Rent Suite
Prudent Realty
Pathfinding Aquatic & Wake
PCL Construction Services, Inc
Pauline Selec & Weiss
Platte III America Fyche
Premier Acess Corp Services
Providence Health & Services - California
Pussess
Rutgers Gracery Company
Report Hargen H F L F
Robinson Lelpresa
Roeing Realty Partners
River A Schofel
Shammas Group
Shepard Mullin
Send Dipal Serv
Stockl Tenant
USS Diaties
Songf Primeciu Entertainment
Southern California Edison
Southern California Gas Company
Southwest Airlines
Stanford Parking Corporation
State Farm Insurance Company
Steiner Architect
Symon Property Development Group
The City Market of Los Angeles
The Colburn School
The Fallon
The Industrial Company
The Port
Tognes Smith Studio
Twitter Construction Inc
U. S. Bank
U.S. Tenor
U V L A
Urban Semi
Universon Solutions
United Parcel Service
Universal Production Series
University of Southern California
UBS Corporation
Van De Kamp Consulting
Van Wagner Communications
Verizon
Veronica Perez & Associates
Waganon of America
Venue
Walmart Stores
Walt Disney Company
Watemarties Properties
Wells Fargo
Westin Bonaventure Hotel & Suite
Williams & Larkin
WoodPartner
Spectdo&Rogers

canceled as a result of the living wage motion being introduced. At least one more new hotel project in Downtown is in limbo awaiting the outcome of this process – a project that will not be financially sustainable with a $15.37 wage. What the report does not talk about is the number of jobs that will never come about as a result of that slowdown. These are construction jobs and full time hotel jobs. Each of these three new hotels would create 200 to 300 construction jobs and 150 to 300 full time staff jobs. These are just three projects in a small area of the city and these are just the projects that we are aware of. We are sure that other investors have walked away from hotel projects in Downtown and elsewhere in Los Angeles – at the cost of a significant number of jobs. In a city that still has an unemployment rate near 10 percent, this must be a critical consideration for you.

If you and your colleagues believe that you must continue on this course - and I hope that you will not - then instruct the City Administrative Officer to task Blue Sky or another reputable economist to conduct a study that determines the actual impacts of this policy on hotels and their workforces around the city. We are resubmitting our questions from February because they still need to be addressed. The answers to these questions can be determined after consulting with hotel owners, managers and developers in Los Angeles, Long Beach and other cities. You need to know how many employees will see a raise – and by how much. But you also need to know how many employees will lose their jobs, lose hours, lose benefits, and how many people will not have new jobs because new hotel development has moved to other cities.

CCA requests that you end the attempt to increase the minimum wage of hotel employees in the City of Los Angeles. But, if you are determined to keep trying to do so, get all of the facts. Do a study that allows you to judge this policy on its merits, not just on its intentions.

Sincerely,

Carol E. Schatz
President & CEO

cc:  The Honorable Paul Krekorian, Councilmember
     The Honorable Jose Huizar, Councilmember
     The Honorable Gil Cedillo, Councilmember
     The Honorable Nury Martinez, Councilmember
     Gerry Miller, Chief Legislative Analyst
     Miguel Santana, City Administrative Officer

Exhibit 5 Page 440

**Questions for Citywide Living Wage Hotel Employee Economic Impact Study**

- Who will do the study?
    - The study must be conducted by a reputable economist who isn't using data to drive an outcome and who is interested in the economic impacts, not the social outcomes

- What have been the overall effects of the LWO on the hotels along the Century Blvd. Corridor?
    - What are those effects when the data is adjusted to account for the growth in the US economy and growth in overall travel from the time the wage was implemented until today?
- What was the cost to hotels from the increase?
    - How did the hotels manage those costs?
        - Absorption? Passed on to guests? Reduced staff levels or hours?
- How have the Century Blvd. hotels compared with hotels in El Segundo and elsewhere in that area that do not have a $13-plus hour minimum wage?
- What has been the effect on the hotel restaurants, bars, room service (food & Beverage) at those hotels?
- How many hotels signed CBAs on Century Blvd. and how does this compare to the county and to national averages?

- Similarly, what have been the effects of the hotel LWO increases in Long Beach and in cities such as New York and elsewhere?
    - Have new hotels been built in Long Beach?
    - Have New York hotels stopped various services and cut jobs?

- What will be the effects on the hotel industry if a $15 per hour minimum wage is imposed?
    - What will be the average increase in room rates?
    - How will that increase affect tourism and room stays?
    - Will higher room rates mean less spending in other areas of the local economy like restaurants, museums, taxis, retailers, etc.?
    - Will hotel jobs be cut? Will hours and shifts be cut?
    - Will reduced profits affect existing loans as P/E ratios or profits may drop below those required in loan agreements?
- How will higher costs affect hotel restaurants, especially those in areas where they compete with non-hotel restaurants nearby?
- What is the average reported wage for a tipped employee?
    - What will be effect of not including tipped employees whose reportable wages exceed $15/hour in the mandated increase?
    - What percentage of the non-tipped employee workforce makes $8.25 / hour? What percentage already makes over $15 / hour?
        - How many of those employees below $15 / hour have healthcare plans? How many employers can be expected to drop healthcare coverage?
- What will be the overall effect on a hotel's food and beverage operations if the wage is raised to $15 per hour?
    - Does the effect grow, diminish or stay constant as the number of rooms in a hotel affected by the wage mandate is raised?

Exhibit 5 Page 441

- What will be the effect on investments into renovation of existing hotels?
  - What will be the job impacts?
  - What will be the long term impacts to those hotels?

- How will this wage increase affect investments into new hotels?
  - Will size matter? (i.e., will investors still put money into large 400-plus room hotels but not 120-room hotels? Or vise versa?)
  - What are the effects if this is levied on 100+ room hotels vs. 200+ room hotels vs. 300+ room hotels or vs. 400+ room hotels?
    - Are the effects more deleterious to smaller hotels? And if so, how?
- Will hotel developers build in surrounding cities that do not have a citywide $15 hotel wage mandate instead of LA?
- How many developments can we expect to leave LA (not be built) and how many construction, full-time staff and third-party service provider jobs will be lost as a result?
- What will be the effect on "boutique" hotel investment and construction?

- What will be the effect on Downtown hotels of an LWO?
- What will be the effect on Downtown if no more boutique hotels are built in the area?
  - What will the ripple effect be on other new businesses coming into Downtown?
- What will be the overall effect on the Convention Center if the 5,000 new hotel rooms that are needed go unbuilt?
- Adaptive Reuse has been instrumental in revitalizing portions of Downtown and in bringing in new hotel brands to the city. What are the costs associated with building a hotel through adaptive reuse versus ground-up construction?
  - Do these costs make it more difficult to build a hotel through adaptive reuse?
  - Will the added costs from a living wage mandate make investors more likely to abandon an adaptive reuse hotel project than a ground-up project?
  - Is it more difficult to finance a hotel project that uses adaptive reuse than through ground-up construction?
    - If so, do the lower P/E ratios mean that banks will not give loans or may call in existing loans to adaptive reuse hotels?
  - How many construction jobs are created per room for an adaptive reuse hotel? And how does that compare to ground-up hotels?

- Has a study ever been done about raising a minimum wage, even for one industry sector, by nearly 80%? What were the effects on the economy of such an increase?
  - What is the largest mandated wage increase and what were the effects?

- What is the actual effect of "free" tourist attractions such as Griffith Park, Venice Beach, Hollywood Blvd., modernizing LAX, modernizing the Convention Center or investments in public transportation on bringing in visitors who stay at hotels in the City of Los Angeles?
  - How many of those visitors can be attributed solely to those attractions and not other factors in whole or in part?
- Excluding the Convention Center, do these other "free attractions" have any effect on visitors' decisions to stay in Los Angeles? In other words, if Hollywood Blvd. did not exist, how many visitors who stay in Los Angeles would actually travel elsewhere and how many room nights are affected?

Exhibit 5 Page 442

- ○ How much effect does a privately owned business have in these areas ability to draw tourists (e.g., the Chinese Theater as part of Hollywood Blvd.)
- ○ How much does the County's operation of a state asset such as the beach at Venice Beach compare with the city's investment there?
- How big is the impact of the Convention Center?
- How much impact does the lack of an easy-to-navigate, user-friendly public transportation system that actually gets people to where they want to go (compared to NY, Paris, London, SF) adversely affect people coming or staying in Los Angeles?
- How much effect do attractions that are either not free or not in the City of Los Angeles have on people staying at hotels in the City of Los Angeles (e.g., the Rose Parade or a Staples Center concert)?
- How much does LAX's poor image negatively affect the ability of the city to attract tourists?
- How many room nights are lost to other city's because of the poor quality and small size of the Convention Center?

Exhibit 5 Page 443



**LYNN S. MOHRFELD, CAE**
President & CEO

OFFICERS

CHAIR
**BIMAL PATEL, CHA**
Concept Hotels
*Mountain View*

VICE CHAIR
**TERRI A. HAACK**
Terranea Resort
*Rancho Palos Verdes*

SECRETARY/TREASURER
**THOMAS KLEIN**
Fairmont Hotels & Resorts
*San Francisco*

PAST CHAIR
**RICK ANDERSON**
Casa Tropicana
Boutique Hotel
*San Clemente*

June 6, 2014

The Honorable Curren Price, Jr.
Chairman, Economic Development Committee
Los Angeles City Council
200 North Spring Street, Room 420
Los Angeles, CA  90012

Dear Chairman Price:

On behalf of the California Hotel & Lodging Association, I am reaching out to the members of the Economic Development Committee and the entire City Council in response to the June 3, 2014 report conducted by Blue Sky Consulting entitled *Analysis of the Impact on the City of Los Angeles of the Proposed Minimum Wage for Hotel Workers.*

While the report acknowledged the effects of higher wages and increased spending of these workers, it largely concentrated on lost jobs, those not hired because of the wage increase, lost benefits, a decline in hotel development, lost hotel profits, and competitive pressures. Overall, the report clearly indicates there are trade-offs and that economic effects are likely. As such, the California Hotel & Lodging Association requests an end the attempt to increase the minimum wage of hotel employees in the City of Los Angeles.

If the council continues to pursue this issue, an economic impact study should be undertaken, as instructed by the committee.  The study cites a reference that is over twenty years old as well as citing a study that "relies on survey data collected from...restaurants."   A policy of this magnitude should not rely on secondary research and information re-purposed for consideration of an economic impact upon the workers of another industry.  Implementing policy based on it having "some likely effects" is a disservice to workers who would be affected – the committee and council should, at a minimum, have a clear picture of these effects.  As such, the California Hotel & Lodging Association is re-submitting its original questions – these and the concerns of other organizations clearly have not yet been addressed by this effort.

Two new studies have been released this week that should be considered as well.  One report, conducted by Pennsylvania State University[1], estimates, conservatively, the total economic impact of the proposed minimum wage increase on the Los Angeles hotel industry and community would be $255.4 million. This figure includes reduced annual food & beverage revenue, loss of jobs, loss of hotel values as well as other impacts.  (See attached.)

_____

[1] *Extreme Wage Initiatives & The Hotel Industry: Impact on Local Communities and The Nation.* John W. O'Neill, Ph.D. School of Hospitality Management. The Pennsylvania State University, June 2014.

*Protecting the
rights and interests
of the California
lodging industry*

414 29TH STREET
SACRAMENTO, CA
95816-3211
916.444.5780
www.calodging.com

Exhibit 5 Page 444

The Pennsylvania State University study also explains the proposed Los Angeles increase will weaken demand in the City as "transient and group travelers would seek better deals elsewhere." It also points out that the "city of Los Angeles currently has unemployment levels greater than 10 percent and could ill afford to put more of its population out of work."

Another study, released this week by the San Diego County Taxpayers Association[2], (see attached), provides an overview of increasing the minimum wage in San Diego, a municipality that is considering a much lesser increase. This study predicts that small businesses "will have to downsize and cut hours as a result of minimum wage increases." This study also discusses the proposed increase relative to the increases in the minimum wage already set to be enacted statewide of $9 in July of this year and $10 in January of 2016. There is not a clear understanding of how the economy will react to the two state-imposed minimum wage hikes beginning in less than 30 days.

The commissioned report from Blue Sky Consulting concludes that "establishing a minimum wage policy for hotel workers represents an inherent trade-off." We, at the California Hotel & Lodging Association, are greatly concerned for our workers and the effects of an unknown "trade off."

It's for these reasons we encourage the City to discontinue its efforts to raise the minimum wage for our industry.

Thank you for your consideration.

Sincerely,

Lynn S. Mohrfeld, CAE
President & CEO

cc:    Mayor Garcetti
       Councilmember Cedillo
       Councilmember Krekorian
       Councilmember Blumenfield
       Councilmember Labonge
       Councilmember Koretz
       Councilmember Martinez
       Councilmember Fuentes
       Councilmember Parks
       Councilmember Wesson
       Councilmember Bonin
       Councilmember Englander
       Councilmember O'Farrell
       Councilmember Huizar
       Councilmember Buscaino

---

[2] *Minimum Wage & Poverty in San Diego.* San Diego County Taxpayers Association, June 2014.

Exhibit 5 Page 445

 

June 9, 2014

Honorable Eric Garcetti
Mayor of Los Angeles

Honorable Curren Price
Chairman, City Council Economic Development Committee

Dear Mayor Garcetti and Chairman Price:

A few months ago, the City of Los Angeles commissioned the Blue Sky Consulting Group to analyze the current proposal to create a minimum wage of $15.37 per hour for employees working in Los Angeles hotels with 100 or more rooms. This report was released last week.

The independent Blue Sky Consulting report confirmed all of the concerns that the Hotel Industry in Los Angeles has repeatedly expressed regarding this proposed mandatory wage increase. Specifically, this report affirmed that this mandate for Los Angeles hotels would:

- Lead to a loss of hotel jobs and a loss in hotel employee hours worked, thereby hurting those who the policy is intended to help.
- Put hotels in the City of Los Angeles at a competitive disadvantage to their counterparts in neighboring cities, causing a downward spiral of a loss of revenue, employment, and Transient Occupancy Tax (TOT) to the City.
- Discourage, if not completely eliminate, desperately needed new hotel developments in Los Angeles.
- Diminish construction and maintenance projects at the impacted hotels – causing a loss in well paying construction jobs and negatively impacting the visitor experience.
- Lead to a reduction of hotel amenities including restaurants, room service, etc. again leading to a loss of jobs and a diminished visitor experience.

The 16-page Blue Sky report – an independent report commissioned by the City of Los Angeles - makes approxmiately15 references to the fact that a mandated wage increase for Los Angeles hotels will lead to job losses and a reduction in hours worked for hotel employees.

A sample of some of the statements from the report regarding job losses includes:

"*Most of the Los Angeles hotels subject to the new requirement would be limited in their ability to pass along any increased labor costs in the form of higher room rates. The result would therefore likely be reductions in staffing levels*." Page 3

"*Economists and business owners alike have suggested that increases in the minimum wage act to reduce employment among the low-wage workers these policies are intended to help.*" Page 5

Exhibit 5 Page 446

*"Economic theory suggests that, in a competitive labor market, increases in the minimum wage should lead to reductions in employment, either in the number of jobs or the number of hours worked. Many studies have supported this conclusion."* Page 6

*"...a more recent review of the employment effects of the minimum wage in 2007…concluded that among the papers we view as providing the most credible evidence, almost all point to negative employment effects."* Pages 6 & 7

According to the Congressional Budget Office (CBO), *"Increases in the minimum wage can be expected to reduce the number of jobs for low wage workers and a larger increase in the minimum wage will result in a greater reduction in employment."* Page 8

*"…it is likely that either the number of jobs or the number of hours worked by hotel employees in Los Angeles would decline."* Page 10

*"Together, these factors would likely act to reduce… the number of hotel industry jobs in the City or the number of hours worked by hotel workers relative to what would have been the case absent such a policy."* Page 11

*"…these benefits would come at the expense of laid-off hotel workers or those not hired in the first place."* Page 14

These quotes are just a sample of the large number of statements and conclusions written in the Blue Sky report that predict job and working hour losses with a new wage policy.

In addition to the numerous references to the certain loss of jobs and hotel employee hours worked through a mandated hotel wage increase, the Blue Sky report discusses the competitive disadvantage that this increase would have on local hotels. This disadvantage will include a number of unintended consequences such as the elimination of new hotel developments in Los Angeles, a decrease in renovations and facility upgrades, and the possible relocation of existing Los Angeles hotels to other nearby municipalities.

Some statements regarding these issues from the Blue Sky report include:

*"Such increases could also encourage firms to relocate to other areas where wages are lower."* Page 6

*"In the longer run, economic activity could be reduced if investment in new hotels is diminished or capital investments on the part of hotel owners are deferred."* Page 12

*"Some hotels would also likely seek to address the increase in wage costs by reducing purchases of other goods and services, for example by delaying investments in facility upgrades or scheduled maintenance of hotel facilities."* Page 13

*"This reduction in profitability would put downward pressure on new development, reducing the likelihood that new hotels would be developed in the City."* Page 13

The Blue Sky report goes on to state that if the City of Los Angeles decides to move forward with a mandated wage increase for local hotels, additional study on the impacts of such a

Exhibit 5 Page 447

policy is needed. Specifically, the report states, *"Anecdotal evidence suggests that some hotels in Long Beach (where a hotel wage increase was enacted) may have reduced staffing levels in response to the minimum wage policy"* (Page 15). It goes on to further recommend, *"A study aimed at assessing the effects of these two minimum wage policies (Long Beach and LAX area hotels) could help to shed some light on the limited question of what effects such policies might have on employment in the Los Angeles hotel industry"* (Page 15).

The Hotel Industry in Los Angeles contributed $179 million in Transient Occupancy Tax (TOT) to the City of Los Angeles in the 2012-13 fiscal year. It is expected that in the current fiscal year, Los Angeles hotels will contribute even more TOT revenue to the City's General Fund. For decades now, our hotels have served as partners with the City to promote tourism, Los Angeles based conventions, and economic activity. We provide quality jobs with good benefits for our employees and serve as a key driver in our City's economy.

**We have warned our elected officials that the unintended consequences of a mandated wage hike for LA hotels would be devastating. The Blue Sky Consulting Group report – a report that was commissioned by the City – has now confirmed our position**.

It is our sincere hope that this independent analysis will provide our City leaders with the data that you need to discontinue any and all efforts to establish an artificial wage increase for Los Angeles hotels. However, in the event that the City decides to move forward with such an effort, we request that the Hotel Association of Los Angeles, the Los Angeles Chamber of Commerce, and other key stakeholders from the business community are included as partners in future discussions impacting the hotel industry. Our hotels employ tens of thousands workers, we pay our fair share in taxes, we serve as the anchor for tourism in Los Angeles, and we are good corporate citizens. In short, we view ourselves as partners with the City of Los Angeles and we want to be at the table for this discussion and any future efforts that will have a dramatic impact on our industry.

We thank you for taking the time to hear our concerns and we trust that once you read the report, you will come to the same conclusions that we have – a mandated wage increase for Los Angeles hotels will have an incredibly negative impact on jobs and the economy in our City.

Sincerely,

**Bob Amano**
Executive Director
Hotel Association of Los Angeles

**Gary Toebben**
President & CEO
Los Angeles Chamber of Commerce

CC:     Los Angeles City Council President Herb Wesson
        Members of the Los Angeles City Council
        Chief Legislative Analyst Sharon Tso
        City Administrative Officer Miguel Santana

Exhibit 5 Page 448

# SMALL HOTEL COALITION FOR JOBS

*325 West 8th Street, Suite 901, Los Angeles, CA 90014*
*(213) 221-7161*

Date: _6/10/14_
Submitted in _Econ Dev._ Committee
Council File No: _14-0223_
Item No.: _1_
~~Supply:~~ _Communication from the public_

**VIA ELECTRONIC MAIL**

March 25, 2014

The Honorable Curren Price
Chair, Economic Development Committee
Los Angeles City Hall
200 North Spring Street, Room 420
Los Angeles, CA 90012

Re:   **Proposed Living Wage Ordinance; Council File 14-0223**

Dear Councilmember Price:

This letter is submitted on behalf of the "Small Hotel Coalition for Jobs," a group of hotel owners who are concerned about the potential negative impacts the proposed living wage ordinance will have on small hotels. We share your goal of reducing income disparity, and applaud your efforts to solicit and incorporate stakeholder input at such an early juncture. However, we have strong concerns about the singling out of one industry for this heavy mandate that we understand would immediately nearly *double* the current minimum wage.

Before moving this proposal forward, we do agree that a study of its economic impacts is absolutely imperative. The city must recognize that small hotels – those under 200 rooms – operate under a completely different economic reality than the larger, often publicly- or syndicate-owned corporate hotels in Los Angeles. Many are independent, family-owned businesses that provide a quality work environment – good wages, health benefits, and generous bonuses. This, in turn, has resulted in many long-term satisfied employees. A one-size-fits-all model is rarely successful in a city as diverse as Los Angeles. Thus, in the economic impact study, *we ask that you pay special attention to the issues we've identified that are unique to small hotel owners and consider increasing the 100-room threshold, or come up with an alternative method of determining to which hotels the new policy will apply, if any.*

## I.   Large Corporate Hotels vs. Small Independent Hotels: Economies of Scale

The average hotel size in the City of Los Angeles is 326 rooms, and most are affiliated with larger, public corporations. Hotels with high room capacity generally benefit from economies of scale which allow them to efficiently distribute fixed costs. They are able to share resources and materials, and the result is a lower product cost. Smaller, independent hotels lack such economies of scale. Small hotels operate under a different business model, and any substantial cost increase must be made up elsewhere.

Exhibit 5 Page 449

## II.  Loss of Jobs, Reduced Work Hours

Without an exemption, small hotel owners will be forced to cut costs to make ends meet. Many of these hotels operate on very tight profit margins, and any increase in the cost of labor threatens this delicate balance. Unfortunately, the likely result will be a loss of jobs, reduced work hours, more outsourcing, and fewer services provided to guests. For the city, this equates to more unemployment, less tax revenue and fewer consumers. This strategy is counterproductive, and hurts the families the city is trying to help. Our coalition is available to meet with the individuals who are preparing the economic impact study to provide more detailed information about these impacts, among others.

## III.  Tipped Employees and the Ripple Effect on Salaries

In addition, the proposed wage increase does not take into consideration that many tipped employees already make well over $15.37 an hour with tips. This will cause a devastating ripple effect on salaries – adding even more costs to hotels. If passed, tipped hourly employees will earn more than shift supervisors with more seniority or other employees with more advanced skill sets. This creates personnel problems that can only be solved by increasing managerial level salaries as well. This is financially infeasible and could lead to unintended consequences. This ripple effect will occur with non-tipped employees as well.

## IV.  Increased Costs Cannot be Recouped with Higher Room Rates

Despite prevailing beliefs, substantially increased operating costs cannot simply be passed onto consumers. Small hotels will not be able to recoup these costs with higher room rates because it will put them at a significant disadvantage versus others in their competitive set. If owners do decide to increase room rates, they will likely price themselves out of the market and consumers will head to hotels in City of Los Angeles adjacent communities such as West Hollywood, Santa Monica, Marina Del Rey, Pasadena, Burbank, Glendale, El Segundo, Torrance and Simi Valley, which are not subject to wage ordinances of this kind. It is important that these issues, and pricing vis-a-vis cities adjacent to Los Angeles, be carefully studied.

In addition, an arbitrarily set 100-room threshold will put small hotels in the 100-200 room category at a competitive disadvantage with small hotels under 100 rooms. Those in the latter category will not have to raise room rates to offset wage increases and will take market share away from other small hotels in the City.

## V.  Reduction of Hotel Development

Another issue to consider is the potential reduced development of hotels in the 100-room range, such as adaptive reuse projects vital to Downtown's renaissance and other independent hotels throughout the City. If projects do not "pencil out" in Los Angeles, adjacent communities will once again reap the benefits of our high cost of doing business. Los Angeles will be hurt as more hoteliers choose to develop elsewhere. Permanent and construction jobs will be lost as well as an ongoing revenue stream of Transient Occupancy Tax the city would otherwise collect.

2

Exhibit 5 Page 450

## **Conclusion**

Finally, this proposal may bring about the unintended consequence of minimizing job opportunities for youth.  The hotel industry accounts for a large majority of seasonal and temporary jobs for young workers, and hotel owners will be inclined to hire more experienced workers at such a high starting wage.  We strongly urge you to carefully examine these important issues, and be mindful of the impact this proposal will have on small hotels in the City.  We thank you for your consideration and the opportunity to continue working with you.

Sincerely,

Veronica Perez
Small Hotel Coalition for Jobs


Cc:     The Honorable Paul Krekorian
        The Honorable Jose Huizar
        The Honorable Gil Cedillo
        The Honorable Nury Martinez
        John Wickham, Chief Legislative Analyst's Office
        Richard Williams, Office of the City Clerk

3

Exhibit 5 Page 451

Date: 6/10/14
Submitted in *Econ. Dev.* Committee
Council File No: 14-0223
Item No.: 1



Prepared by the Blue Sky Consulting Group

*Communication from the Public*

# Impact of Establishing a Minimum Wage for Hotel Workers in Los Angeles — Summary of Findings

- This document presents an assessment of the potential impact of a minimum wage for hotel workers in the City of Los Angeles (the City) based on an analysis of existing research.[1]
- The likely effects of such a policy were it to be implemented include the following:
  - Many workers would see a significant increase in their wages.
  - Workers would likely spend a fraction of their additional earnings in the City, thereby benefitting local firms and their workers.
  - Hotel profits would likely decline, and so too would the value of existing hotels.
  - Some hotel owners might be forced to sell or otherwise restructure their investments.
  - Most hotel owners would be limited in their ability to pass along any increased labor costs in the form of higher room rates.
  - Hotel owners would look to cut expenses through reductions in staffing levels and reductions in certain purchases of goods and services in the local economy, partially offsetting any gains in economic activity generated by increased spending by hotel workers who receive a raise under the policy.
  - The reduction in profitability for hotels would reduce the likelihood (at least to some extent) that new hotels would be developed in the City. The extent of this effect is mitigated by the fact that many potential new hotels would have unionized workforces and therefore not be subject to the minimum wage.
- In summary, establishing a minimum wage policy for hotel workers represents an inherent trade off. Newly hired or current hotel workers who remain employed would likely see a benefit, as would businesses that sell goods and services to these workers; however, these benefits would come at the expense of laid-off hotel workers or those not hired in the first place, as well as hotel owners who would see their profits decline.

---

[1] This document is a summary of a larger report prepared by the Blue Sky Consulting Group entitled, "Hotel Minimum Wage: Analysis of the Impact on the City of Los Angeles of the Proposed Minimum Wage for Hotel Workers."

Prepared for the Los Angeles Office of the Chief Legislative Analyst and the Office of Economic Analysis — June 9, 2014

Exhibit 5 Page 452



**LOS ANGELES COUNTY
FEDERATION OF LABOR,
AFL-CIO**

**Maria Elena Durazo**
*Executive Secretary-Treasurer*

**Ricardo F. Icaza**
*President*

July 23, 2014

Council President Herb Wesson
200 North Spring Street, Room 430
Los Angeles, CA 90012

Re: Appointees to the Hotel Living Wage Economist Panel

*RECEIVED JUL 28 2014*

*ANSW ES SHO COPY TO CITY CLERK*

*#14-0223*

Dear Council President Wesson:

The LA County Federation of Labor appoints the following to the Hotel Living Wage Economist Panel:

1. Daniel Flaming, President of Economic Roundtable, 315 West Ninth Street, Suite 502, Los Angeles, California 90015 Telephone: (213) 892-8104

After much consideration between Mr. Toebben and I, below is our appointee to the Hotel Living Wage Economist Panel:

2. Mr. Chris Thornberg, Founding Partner of Beacon Economics 5777 West Century Boulevard, Suite 895, Los Angeles, California 90045, Telephone: 310.571.3399

Should you have any questions please do not hesitate to contact me directly at 213-381-5811 ext. 120.

Sincerely,

*Maria Elena Durazo*

Maria Elena Durazo
Executive Secretary-Treasurer
Los Angeles County Federation of Labor, AFL-CIO

cc:   Holly Wolcott, Interim City Clerk, City of Los Angeles
      Gary Toebben, President, LA Area Chamber of Commerce
      Nury Martinez, Councilmember 7th District
      Curren Price, Councilmember 9th District
      Mike Bonin, Councilmember 11th District

2130 W. James M. Wood Blvd.

Los Angeles, CA 90006

(213) 381-5611

fax (213) 383-0772

Exhibit 5 Page 453



LOS ANGELES AREA
CHAMBER OF COMMERCE

RECEIVED JUL 24 2014

AW
JW
EJ
SW
copy
to
city Clerk

#14-0223

July 23, 2014

Honorable Herb J. Wesson, Jr.
Council President
200 N. Spring Street, Room 430
Los Angeles, CA 90012

**Re:**    **Economist Panel Selection and Reports Request**

Dear Council President Wesson:

In response to your letter of June 7, 2014, the Los Angeles Area Chamber of Commerce has selected PKF Consulting USA as its economist in accordance with Chapter X, Article 4, Section 104.114(c) of the Los Angeles Municipal Code. A brief bio for the company is attached along with the contact information for Bruce Baltin, Senior Vice President, PKF Consulting USA.

I am also pleased to report that the Chamber and the County Federation of Labor have agreed on Beacon Economics as the third economist to be appointed to study the hotel mandatory wage proposal. A brief bio of the company is enclosed and so is the contact information for Chris Thornberg, President and Founder of Beacon Economics.

As per your letter, we are also sending a copy of this response to the City Clerk's Office.

Thank you for the opportunity to serve the city. We look forward to the Chamber's continued involvement in this process.

Very truly yours,

Gary Toebben
President & CEO

CC: City Clerk, City of Los Angeles

350 S. Bixel St. | Los Angeles, CA 90017 | P: 213.580.7500 | F: 213.580.7511 | lachamber.com

Exhibit 5 Page 454



**PKF**
CONSULTING
USA
A CBRE Company

# **About** Us



**PKF CONSULTING USA**

As a point of background, we would like to provide you with a brief overview of our Firm. PKF Consulting USA ("PKF") is a division of the CBRE Group (NYSE:CBG), the largest real estate services firm in the World. PKF USA is a national firm of management consultants, appraisers, real estate brokers and industry specialists who provide a full range of services to the hospitality and tourism industries. Headquartered in San Francisco, the Firm has offices in Boston, New York, Philadelphia, Portland, ME, Atlanta, Miami, Washington, D.C., Houston, Dallas, Indianapolis, Los Angeles, Seattle, Sacramento, and Bozeman with nearly 100 professionals and support staff.

Our Firm is comprised of two integrated divisions which provide consulting and research services to the hospitality industry.

**Consulting**

Our consulting group provides advisory services and industry expertise to help our private and public sector clients in planning, developing, managing, financing, problem-solving, improving operations, and valuing hotels and other hospitality assets, as well as destinations. Our engagements range from market and financial feasibility studies to investment structuring, and from appraisals to asset management.

Our consulting group is constantly providing clients both large and small with the most constructive and valuable advice in the industry, performing feasibility and market studies, acquisition due diligence and valuations involving hotels, resorts, restaurants, golf courses, and a variety of mixed-use developments and other hospitality products. We have the distinct advantage of being the only hospitality consulting firm with its own, proprietary database of U.S. hotel financial statistics.

**Research**

PKF Hospitality Research owns the database for *Trends® in the Hotel Industry*, the statistical review of U.S. hotel operations which first appeared in 1935 and has been published every year since. PKF's professionals use the *Trends®* database to assist their clients in making informed decisions. In addition, the *Trends®* data is used to produce custom financial reports for clients that enable them to benchmark hotel revenues, expenses, and profits.

Beginning in 2007, PKF unveiled its powerful *Hotel Horizons®*, an economics-based hotel forecasting model that projects five years of supply, demand, occupancy, ADR, and RevPAR for the U.S. lodging industry. *Hotel Horizons®* reports are published on a quarterly basis for 50 markets and six national chain-scales.

With a long-standing tradition of tracking and forecasting the lodging industry, our Research Group has the technical capacity to conduct custom research, the analytical skills to interpret the data, and the access necessary to gather confidential performance information from the industry.

**PKF Consulting USA Services include:**

- Asset Management and Management Company Selection
- Real Estate Appraisals and Business Valuation
- Market and Financial Feasibility Studies
- Litigation Support and Expert Testimony
- Acquisition Due Diligence
- Operational Studies

- Tourism and Recreational Studies
- Resort and Recreation Services
- Conference, Convention, and Public Assembly Facilities
- Financial Benchmarking
- Econometric Forecasting
- Custom Research

**Local Market Knowledge**

Our Firm has conducted numerous appraisals and market demand studies for existing and proposed hotels in the local market area. Given the historical role of PKF Consulting in the hospitality and real estate industries, and our knowledge of the local market, we are of the opinion that there is no firm that can provide the services available through us. More background and information on our Firm can be obtained from our web site at www.pkfc.com.

**PKF Consulting USA**
A CBRE Company

865 South Figueroa Street, Suite 3500
Los Angeles, California 90017
tel: (213) 680-0900
fax: (213) 623-8240
www.pkfc.com

Exhibit 5 Page 455



## Gary Toebben

| | |
|---|---|
| **Full Name:** | Bruce Baltin |
| **Last Name:** | Baltin |
| **First Name:** | Bruce |
| **Job Title:** | Senior Vice President |
| **Company:** | PKF Consulting USA |

**Business Address:** 865 S. Figueroa Street
Suite 3500
Los Angeles, CA 90017
United States of America

**Home Address:** United States of America

| | |
|---|---|
| **Business:** | +1 213 861 3309 |
| **Mobile:** | +1 562 822 5228 |
| **Other Fax:** | +1 213 623 8240 |
| **Business Fax:** | (213) 623-8240 |

| | |
|---|---|
| **E-mail:** | Bruce.Baltin@pkfc.com |
| **E-mail Display As:** | Bruce.Baltin@pkfc.com |

| | |
|---|---|
| **Web Page:** | www.pkfc.com |

1

Exhibit 5 Page 456



**BEACON** ECONOMICS

## ABOUT BEACON ECONOMICS

Beacon Economics is one of California's leading economic research and consulting firms, specializing in economic and revenue forecasting, economic impact analysis, economic policy analysis, regional economic analysis, real estate market and industry analysis, and EB-5 Visa analysis. The firm's internationally recognized forecasters were among the first and most accurate predictors of the U.S. mortgage market meltdown that began in 2007 – and among a relatively small handful of researchers who correctly calculated the depth and breadth of the financial and economic crisis that followed. Known for delivering independent and rigorous analysis, Beacon Economics gives its clients an understanding of economic trends, data, and policies that helps strengthen strategic decisionmaking about investment, revenue, and policy. Clients range from the State of California to Fortune 500 companies to major cities and universities. Visit Beacon Economics' website at www.BeaconEcon.com to learn more.

Exhibit 5 Page 457

## Gary Toebben

| | |
|---|---|
| **Full Name:** | Mr. Christopher Thornberg |
| **Last Name:** | Thornberg |
| **First Name:** | Christopher |
| **Job Title:** | Principal |
| **Company:** | Beacon Economics |
| | |
| **Business Address:** | 2478 Roscomare Road |
| | Los Angeles, CA  90077 |
| | |
| **Business:** | (310) 472-3274 |
| **Mobile:** | (310) 739-3286 |
| | |
| **E-mail:** | christopher.thornberg@beaconecon.com |
| **E-mail Display As:** | Christopher Thornberg (christopher.thornberg@beaconecon.com) |
| | |
| **Web Page:** | http://www.beaconecon.com |

Principal

Beacon Economics

2478 Roscomare Rd

Los Angeles, CA 90077

P: 310 472 3274

C: 310 739 3286

Chris@beaconecon.com

www.beaconecon.com

1

Exhibit 5 Page 458



Public Benefit Research and Innovation
Phone (213) 892-8104
Fax (213) 291-9245
www.economicrt.org
315 West Ninth Street, Suite 502
Los Angeles, CA 90015

**ECONOMIC**
ROUNDTABLE

September 3, 2014

Honorable Herb J. Wesson, Jr.
President, Los Angeles City council
Councilmember, 10th District
200 North Spring Street, Room 430
Los Angeles, CA 90012

Dear Council President Wesson,

We write this letter in response to your letter to the County Federation of Labor dated July 7, 2014 requesting opinions from a panel of three economists on a series of questions related to the proposed hotel minimum wage ordinance currently being considered by the Los Angeles City Council. We are honored to have been selected to be part of this panel.

We have responded to the questions below, grouping our responses in several categories.

### Impact of Proposed Ordinance

It is our understanding that these first two questions relate to the requirements for future regulation in the Airport Hospitality Enhancement Zone (AHEZ) ordinance, and are, in effect, asking whether the ordinance will affect an industry of a significant size with a significant number of workers earning low wages. The answer to those questions, in short, is yes.

In 2013, we released a report entitled "*Repaying Hospitality*," which estimated the potential effects of requiring a minimum wage for hotel workers. As part of this analysis, we determined that there are approximate 17,005 people employed in hotels in the City of Los Angeles. We derived these numbers from an analysis of three data sources: the US Census Bureau's *County Business Patterns* from 2011, the California Employment Development Department's (EDD) *Quarterly Census of Employment and Wages* for 2011; and the, US Census Bureau's *American Community Survey* for 2013; .

In that report, we estimate that at least half of these employees earn below the proposed wage of $15.37. We further estimate that the overwhelming majority

Exhibit 5 Page 459

Council President Wesson
September 3, 2014
Page 2

(approximately 80 percent) of these hotel employees live in households where the average income is below $50,000 per year, while the median household income for LA County is over $56,000.

**Effects of Airport Hospitality Enhancement Zone**

In 2010, at the request of the CAO, we prepared a report analyzing the effects of the Airport Hospitality Enhancement Zone (AHEZ). At that time, we determined that the earnings of the hotel labor force in the zone had increased 29 percent, while wages at hotels throughout the city went up just 5 percent during the same time period. We also determined that as of that time, there was no evidence that wage increases had an adverse effect on the viability of hotels. In particular, we found no indication that employment at the hotels in the zone had decreased. In our more recent Repaying Hospitality, we have found that earnings in AHEZ are up 15 percent overall in inflation-adjusted dollars, while employment changes have essentially mirrored those across the city.

Another issue raised by some concerned about this ordinance is the impact on room rates or occupancy. These are generally measured using Revenue per Available Room (RevPar), which combines both factors. Prior to the ordinance, the Airport area's RevPar was approximately $59, tied for second lowest in the lowest in the region. Today, it is approximately $102, well ahead of 5 other Los Angeles submarkets. The Airport submarket also performed well relative to the South Bay, its nearest competitor, which increased from $80 to $113.50. The airport area increased more than the South Bay in both absolute numbers ($43.00 vs. $33.50) and percentage (67 percent vs. 40 percent).[1]

**Comparison with Long Beach, Seattle and San Francisco Ordinances**

The proposed ordinance is similar in key respects to the existing Long Beach hotel minimum wage ordinance, the recently adopted Seattle minimum wage ordinance and the proposed increase of the existing San Francisco minimum wage ordinance.

First, each city has chosen to raise wages to a roughly similar amount. As of July 1, 2018, the wage in Seattle for most businesses, including virtually all hotels,

---

[1] Sources: Flaming, Daniel, Patrick Burns, and Brent Haydamack. 2006. *From the Pockets of Strangers: Economic Impacts of Tourism in Los Angeles and Five Competing Metropolitan Destinations*, Economic Roundtable. Newer numbers are from PKF Hospitality Research. 2014. *Los Angeles Hotels Trend Report: April 2014.*

Exhibit 5 Page 460

Council President Wesson
September 3, 2014
Page 3

will be $15 an hour or more. The wage in San Francisco, assuming the November initiative is successful, will be $15. The wage in Long Beach for hotels will, assuming inflation increases at a similar rate, be $14.70, while the wage in Los Angeles hotels will be approximately $16 assuming inflation increases.

Each city has also chosen not to allow for other forms of compensation, including tips, bonuses or health care, to be counted as wages. Seattle does allow smaller businesses to opt to pay a larger amount in "compensation" that includes such other forms of compensation, but that is only for smaller businesses, and is only during an initial phase-in period.

Each city has chosen to require employers to provide sick days to their employees, though Seattle and San Francisco did so in a separate ordinance while Long Beach included the required in its minimum wage ordinance, as Los Angeles has done in past minimum wages.

Finally, each ordinance includes a cost of living adjustment tied to inflation, ensuring that wages continue to rise and reducing the need for the council to revisit the ordinance every few years as occurs at the state and national level.

All of these provisions seem common and best practices, and exist in Los Angeles's proposed ordinance.

There are several key differences between the ordinances.

First, the cities take different approaches to enforcement. San Francisco, Long Beach and Los Angeles's past living wage ordinances all rely on affected workers to enforce their rights in the courts, while Seattle's ordinance does not allow for "private right of action," and instead proposes that city government established a mechanism for enforcement. Seattle's system is far more expensive and burdensome to city government, and also seems to rely on workers filing complaints with a system they are less likely to know—the city rather than the courts, the more common instrument—and thus may result in less effective enforcement at greater cost.

The cities have also chosen different strategies to deal with small employers. Long Beach established a room threshold of 100 rooms, similar to the proposed 125-room threshold in Los Angeles. Seattle established an employee threshold of 500 employees nationally, and counts franchisees as employees. That means most hotels, which are managed or franchises by national chains, are considered

Exhibit 5 Page 461

Council President Wesson
September 3, 2014
Page 4

as larger businesses anyway. This method of differentiation is controversial, and has resulted in a lawsuit by franchisees. It is also more difficult to count employees than rooms. San Francisco initially used a very low 10-employee threshold, but that exemption long-ago expired, and small businesses are treated the same as large businesses. We believe the room threshold used in LA and Long Beach is easier to monitor.

The cities also have different waiver provisions. Long Beach and past LA ordinances have a collective bargaining waiver, while San Francisco and Seattle do not. Seattle and past LA ordinances have a hardship waiver, while San Francisco and Long Beach do not. San Francisco has a waiver for certain categories of non-profit employees and Seattle has a waiver for certain categories of youth. The first two waiver provisions rely on categories of employers, rather than employees, and are designed to allow business to negotiate with employees to raise benefits if workers choose, or to help companies deal with rough circumstances. These seem sensible to us, so long as they must be specifically approved by all parties and are not automatic. This is the case in past LA ordinances. The second category of waivers either do not apply (there are no non-profit hotels) or could create perverse incentives (if some employees are cheaper than others, hotels would be incentivized to employ more part-time youth than full-time adults supporting families), and thus we do not recommend such waivers.

**Employment, Payroll and Wage Trends for the Hotel Industry in the Los Angeles-Orange County Area**

We have compiled an 8 year history of employment, payroll and wage data for the hotel industry within the Los Angeles-Long Beach-Santa Anna Metro Area. Sales is not included because the Economic Roundtable does not have this data for both counties.

*Employment*

This area, which includes Los Angeles and Orange Counties combined, had a total of 66,550 hotel employees in 2012. The historical employment trend is shown in Figure 1.

Exhibit 5 Page 462

Council President Wesson
September 3, 2014
Page 5

Figure 1: Total Hotel Employment in the Los Angeles-Long Beach-Santa Ana Metro Area, 2008-2012



Economic Roundtable analysis; U.S. Census Bureau. 2014. Los Angeles Co., CA: 2005-2012 County Business Patterns (NAICS).

Los Angeles County's has accounted for 62 percent of the Metro Area's total hotel industry employment over this period, and 19 percent of the state's total. These data do not account for unreported employees paid under the table. The data table for Figure 1 is below.

| Geography | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| LA MSA | 61,630 | 63,701 | 67,251 | 70,367 | 67,136 | 68,481 | 69,271 | 66,550 |
| LA County | 39,234 | 40,451 | 41,943 | 43,693 | 40,462 | 41,523 | 41,807 | 40,910 |
| Or. County | 22,396 | 23,250 | 25,308 | 26,674 | 26,674 | 26,958 | 27,464 | 25,640 |
| California | 202,085 | 207,643 | 213,949 | 235,337 | 218,373 | 215,211 | 220,342 | 227,954 |

*Annual Hotel Industry Payroll*

The total payroll of hotels in the Los Angeles-Long Beach-Santa Anna Metro Area was $1.78 billion in 2012, adjusted to current dollars. Due in part to the great

Exhibit 5 Page 463

Council President Wesson
September 3, 2014
Page 6

recession, annual payroll for the industry has fluctuated, reaching a previous highpoint of $1.87 billion in 2008, as shown in Figure 2.

Figure 2: Total Hotel Payroll in the Los Angeles-Long Beach-Santa Ana Metro Area, 2008-2012, Adjusted to Mid-2014 Dollars



Source: Economic Roundtable analysis; U.S. Census Bureau. 2014. *American Community Survey 1-yr. Public Use Microdata Sets (PUMS), 2005-2012*; U.S. Census Bureau. 2014. Los Angeles Co., CA: *2005-2012 County Business Patterns (NAICS)* [Table] ; U.S. Bureau of Labors Statistics, *Consumer Price Index - All Urban Consumers, All Items: Los Angeles-Riverside-Orange County, CA*, Data extracted August 2014, Base Period: 1982-84 = 100.

The data table for Figure 2 is shown below, in millions of dollars.

| Geography | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| LA MSA | $1,652 | $1,616 | $1,756 | $1,865 | $1,747 | $1,795 | $1,711 | $1,784 |
| LA County | $967 | $1,129 | $1,095 | $1,190 | $1,086 | $1,109 | $1,012 | $1,152 |
| Or. County | $705 | $483 | $661 | $662 | $644 | $673 | $702 | $605 |
| California | $5,188 | $5,260 | $5,628 | $6,353 | $5,680 | $5,377 | $8,205 | $5,428 |

Exhibit 5 Page 464

Council President Wesson
September 3, 2014
Page 7

*Average Annual Wages*

The annual average wages earned by all hotel workers employed within the Los Angeles-Long Beach-Santa Anna Metro Area was $26,809 in 2012 (adjusted to mid-2014 dollars), which includes those working full- and part-time hours. The trend in annual wages within the Metro Area has been stagnant aside from a slight increase in 2008; Adjusted for inflation into 2014 dollars, 2012 average wages are no higher than those earned in 2005. This trend of recent wage stagnation in the hotel industry is shown in Figure 3.

Figure 3: Average Annual Hotel Wages Earned in the Los Angeles-Long Beach-Santa Ana Metro Area, 2008-2012, Adjusted to Mid-2014 Dollars



Source: Economic Roundtable analysis; U.S. Census Bureau, 2014. *American Community Survey 1-yr. Public Use Microdata Sets (PUMS), 2005-2012;* U.S. Bureau of Labors Statistics, *Consumer Price Index - All Urban Consumers, All Items: Los Angeles-Riverside-Orange County, CA,* Data extracted August 2014, Base Period: 1982-84 = 100.

The data table for Figure 3 is shown below.

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| Avg. Wages | $26,803 | $25,374 | $26,105 | $29,562 | $26,017 | $26,206 | $24,698 | $26,809 |

Exhibit 5 Page 465

Council President Wesson
September 3, 2014
Page 8

*Average Wages for Typical Payroll Classifications (Occupations)*

Average annual wages for hotel workers employed in the Los Angeles-Long
Beach-Santa Ana Metro Area varied by position in 2012, from $57,544 for

Figure 4: Average Annual Hotel Wages Earned in the Los Angeles-Long Beach-Santa Ana Metro Area,
2008-2012, Adjusted to Mid-2014 Dollars



Source: Economic Roundtable analysis; U.S. Census Bureau. 2014. *American Community Survey 1-yr. Public Use Microdata
Set (PUMS), 2005-2012*; U.S. Bureau of Labors Statistics, *Consumer Price Index - All Urban Consumers, All Items: Los Angeles-
Riverside-Orange County, CA*, Data extracted August 2014, Base Period: 1982-84 = 100.. Note: These four hotel occupations
represent 60 percent of hotel employment; other jobs are not statically reliable for displaying average annual wage data.

managers to $17,883 for maids and housekeepers in current dollars. Figure 4
shows the trends over time.

The data table for Figure 4 is shown below.

| Occupation | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| Lodging Managers | $67,551 | $62,292 | $70,535 | $65,792 | $47,992 | $58,684 | $54,145 | $57,544 |
| Waiters and Waitresses | $30,384 | $28,373 | $33,052 | $24,026 | $32,447 | $29,259 | $29,444 | $29,255 |
| Maids and Housekeepers | $16,286 | $17,562 | $16,540 | $18,489 | $17,639 | $18,351 | $19,746 | $17,883 |
| Desk Clerks | $19,857 | $12,836 | $18,006 | $15,536 | $15,856 | $20,408 | $16,480 | $25,821 |

Exhibit 5 Page 466

Council President Wesson
September 3, 2014
Page 9

**Regional Tourism Authority**

We had not previously considered the idea of a Regional Tourism Authority, but
understand it was recently suggested in the 2020 Commission's "A Time for
Action" report. That report cited Hawaii and New York as examples of the
benefits of such authorities in attracting more tourists.

Hawaii created its authority in 1998, and the effect does appear substantial,
though what other factors may be related is unknown. Nonetheless, according to
this site, from 1990 to 1998, visitors to Hawaii went from just 56.4 million to
57.3 million, while after the authority was created, visitors have increased from
$56.4 million to $73.7 million in 2012. The increase began immediately, dipped
following 9/11, and then visitor numbers have steadily increased since that time.

New York created a public-private regional authority called NYC Go in 2006.
The results there overall are less obvious, though international visitors do appear
to have increased substantially. From 2000 to 2006, visitors to New York rose
from 36.2 million to 43.8 million, while from 2006 to 2012, visitors rose to 52.7
million. Visitors did increase slightly more in the latter period, but only by about
200,000 per year. However, international visitors increased substantially; after
changing from just 6.8 million to 7.3 million from 2000 to 2006, the number
jumped to 10.9 million in 2012. As international visitors generally stay longer
and spend more, this represents a real value to New York City.

As a point of comparison, from 2006 to 2012, visitors to Los Angeles also
increased substantially, from 35.7 to 41.4 million. This is a smaller increase than
experienced in both Hawaii and New York. While there are many factors that
result in visitors to a region, it does appear a regional tourism authority could
have some benefit to Los Angeles based on the experiences of these two regions.

**Overall Evaluation of Long Beach & Los Angeles Hotel Minimum Wage
Ordinances**

Our research has found that hotel workers are among the lowest-paid in the
formal economy, and that workers in Los Angeles are paid lower wages than
workers in LA's competitor cities, such as New York, San Francisco, Las Vegas
and even San Diego.

Exhibit 5 Page 467

Council President Wesson
September 3, 2014
Page 10

We have studied the effects of the ordinance adopted in Los Angeles in 2007, affecting airport-area hotel workers. These workers were previously among the lowest paid workers, and the hotel submarket was among the lower performing submarkets. Since the passage of the ordinance, wages and earnings have increased significantly, and workers in these hotels now appear to make at above the average wage and earnings for the region. Hotel performance has not suffered, and in fact, the submarket has not only improved earnings per room by 2/3rds, this improvement is greater than the rest of the region, and has allowed the submarket to climb past four other submarkets.

We have not looked at the results in Long Beach as extensively; less than two years in, the results may not be yet evident. Looking at RevPar, Long Beach has increased slightly from 2013 to 2014, and occupancy in particular has increased rather than decreased, suggesting that the wage increase did not result in lost business. No hotels have closed, though one hotel did reduce the number of rooms it had available to rent to get below the 100-room threshold, but hotel management told the Long Beach Business Journal this did not result in any job loss.[2]

We are available to answer any questions the City Council may have about the information provided in this letter.

Sincerely,

Daniel Flaming
President
(213) 892-8104  x204

Patrick Burns
Senior Researcher
(213) 892-8104  x203

cc: Office of Council President Herb Wesson: Andrew Westall
cc: Office of Councilmember Mike Bonin: Chad Molnar
cc: Office of Councilmember Curran Price: Marisa Alcaraz
cc: Office of Councilmember Nury Martinez: Jim Dantona

---

[2] Silavent, Joshua. 2013. "Downsizing, Layoffs, Collective Bargaining Measure N And Its Consequences" Long Beach Business Journal, January 15, 2013. http://lbbusinessjournal.com/long-beach-business-journal-newswatch/189-13-01-14/1201-downsizing-layoffs-collective-bargaining-measure-n-and-its-consequences.html

Exhibit 5 Page 468



**California National Organization for Women**
915 L Street, Suite C245  Sacramento, CA 95814
916-442-3414   www.canow.org

September 22, 2014

Councilman Curren Price
200 N. Spring Street, Room 420
Los Angeles CA 90012
Fax: 213 473-5946

RE:  **Hotel Living Wage, Council 14-0223**

Dear Councilman Price:

I am writing on behalf of the California National Organization for Women ("California NOW") in support for the Hotel Living Wage.  The evidence is clear; there is a need for every worker to have at least 5 paid sick days and a living wage.

More than three in four food service and hotel workers (78 percent) don't have a single paid sick day. Workers in child care centers and nursing homes also overwhelmingly lack paid sick days.

**Women are a large majority of minimum wage earners.**

- Women make up about two-thirds of all workers who are paid minimum wage or less, and 60 percent of full-time minimum wage workers. Women are also two-thirds of workers in tipped occupations. These workers provide care for children and frail elders, clean homes and offices, and wait tables.

- Women of color are disproportionately represented among minimum wage workers. Twenty-two percent of minimum wage workers are women of color, compared to less than 16 percent of workers overall.

- More than three-quarters of women earning the minimum wage are age 20 or older, and most do not have a spouse's income to rely on.

**What is also clear; the majority of Hotel Industry employees are women of color.  43% live below the poverty line, and work two jobs to support themselves and their families.**

*Est. 1975 California NOW is the largest feminist organization in the state*
❖ Patricia Bellasalma President ❖

Exhibit 5 Page 469

By raising the minimum wage for hospitality workers, we create a more just society that lifts working women out of poverty and improves the quality of life for over 40,000 workers and their families.

For all of the foregoing reasons, California NOW strongly supports Hotel Living Wage.


For Equality & in Solidarity,

Patricia Bellasama, J.D.
President, California National Organization for Women



THE BEVERLY GARLAND

September 22, 2014

Hon. Herb J. Wesson, Jr.
President, City Council
200 N. Spring Street, Room 430
Los Angeles, CA 90012

**Re: CF#14-0223 Citywide Hotel Worker Minimum Wage Ordinance**

Dear Mr. Wesson,

It is with the gravest concern that I address you today regarding the fate of my Family's 46-year-old business and our 200 employees.

As you may know, my family committed to bank finance a complete renovation of the 250-room Beverly Garland Hotel and Restaurant in the East San Fernando Valley. In order to attract international tourists, entertainment business people, and the neighborhood community our renovation includes dropping the Holiday Inn franchise, renovation of the Hotel's rooms and meeting spaces and hiring more skilled employees. We believe this will provide a great lift to East Valley experience. Already we have added an additional 50 employees and, with the re-launch of a neighborhood orientated restaurant, we will add approximately another 25 employees. Even though we are only half way through our changes, the response from the community and international travelers has been an astounding success.

However, I must inform you that these positive changes are in imminent danger from the proposed $15.37 wage hike. We have run the numbers. The Hotel earns a 10% profit. The proposed wage hike would eliminate the total profit and add a 29% deficit. There would be no way to make our loan payment with an added 2 million in wages, work comp, and payroll taxes. In order to mitigate these costs, we would have to cut nearly 30% of our workforce, go from full medical benefits to minimum, eliminate our free employee meal program, and discontinue leadership trainings. Even if we could stay open, the necessary job eliminations would reduce our fledgling upscale hotel to limited service and probably require us to re-employ a budget franchise. Rate growth would reverse, as would our

4222 Vineland Ave. North Hollywood, CA 92602 | 818.980.8000 |
beverlygarland.com

Exhibit 5 Page 471

contribution to City Taxes. It would also be a quality-of-life blow to a community struggling to attract tourism and a higher standard of business. Finally, we would be forced to stop the restaurant re-development and go back to coffee shop style limited service.

I am a supporter of wage growth. I am already working on developing a sustainable model with the Mayor's proposed $13.27 wage. Under that model the Hotel just might be able to sustain itself and continue to offer its choice employee benefits and guest satisfaction.

I implore you to consider the consequences of your vote this week on the proposed $15.37. I understand and champion it's great intention, but its intention **will fail** with the lay-offs that it will cause. In addition, it will create a radically uneven playing field between all businesses and drive occupancy and taxes to areas like West Hollywood who is currently constructing six new upscale Hotels.

This proposal, as written, once again underscores the disconnect between downtown and the San Fernando Valley. Our Valley businesses simply do not have the advantages of Downtown/LAX business sector. You will once again create the perfect argument for why the Valley should again consider ceding from the City. With the diverse business zones created by such a spread out city, the City Council must consider an ordinance of such great impact and its affects across the different business zones before unilaterally imposing it across the board.

Most likely, my family will be forced to close the Beverly Garland and return it to the bank.  This would cause a lay-off all 200 employees, a loss of one large destination for tourism and travel, reduced occupancy taxes to the City, and the loss of a budding new resource for the East Valley...everything your meeting last week was supposed to prevent.

The future of our forty-six year old business, a community partner as you witnessed on our visit last week, and 200 Valley jobs....is in your hands.

Most sincerely,

James F. Crank
Asset Manager

4222 Vineland Ave. North Hollywood, CA 92602 | 818.980.8000 |
beverlygarland.com

Exhibit 5 Page 472



Richard Williams <richard.williams@lacity.org>

## Fw: Letter to Council President Herb Wesson

**Robert M Amano** <bobamano@sbcglobal.net>                   Mon, Sep 22, 2014 at 3:24 PM
Reply-To: Robert M Amano <bobamano@sbcglobal.net>
To: "richard.williams@lacity.org" <richard.williams@lacity.org>

Please include letter below in documents for CF# 14-0223.
Thank you.

*Bob Amano*
*Executive Director*
*Hotel Association of Los Angeles*
*T: 213.239.5607*
*F: 213.239.5617*


----- Forwarded Message -----
**From:** Mike Shoffit <MShoffit@ardenthotels.com>
**To:** "Robert M Amano (bobamano@sbcglobal.net)" <bobamano@sbcglobal.net>
**Sent:** Monday, September 22, 2014 2:44 PM
**Subject:** Letter to Herb Wesson


September 22, 2014


Hon. Herb J. Wesson Jr.
President, City Council
200 North Spring Street, Room 430
Los Angeles, CA 90012


Re: CF#14-0223 citywide hotel workers minimum wage ordnance

Dear Hon. Mr. Wesson,

My name is Mike Shoffit and I am the General Manager of the Historic Mayfair Hotel at 1256 West 7th Street. We employee roughly 60 people on a full and part time basis. We are currently undergoing a $13 – $15 million dollar renovation to the hotel. This current ordnance plan is very narrow in scope (only downtown hotels) and puts an undo burden on the selected hotels. While this increase will have a tremendous negative impact on the hotels, it affects so few people overall that economic impact you are looking for, will not be achieved. This new wage ordnance will immediately impact our operation by over $900,000 in wages, payroll taxes and other payroll related costs. This will cause us to cut our staff (loss of jobs) and cut our services to the guests. This may make us reduce the size of the financial investment in the hotel (our renovation). This increase puts all the downtown hotels at an unfair competitive advantage with the surrounding hotels that are not subject to this ordnance. This ordnance will have a very negative affect on an industry that is bringing $16.5 billion in direct spending and $30.5 billion in total economic benefits to the city. For

Exhibit 5 Page 473

Los Angeles to continue to grow, it needs tourism  and this ordnance will do nothing but drive a stake in to the heart of an industry that is helping Los Angeles grow. Please vote against this ordnance. Thank You

**Mike Shoffit**
General Manager

The Historic Mayfair Hotel
1256 West 7th Street | Los Angeles, CA 90017
Tel (213) 632-1200 | Fax (213) 484-6438
www.MayfairLA.com

*Connect with us below...*



Exhibit 5 Page 474



**PKF**
CONSULTING
USA
A CBRE Company

September 22, 2014

Herb J. Wesson, Jr.
President, Los Angeles City Council
Councilmember, 10th District
200 North Spring Street, Room 430
Los Angeles, California 90012

Dear Mr. Wesson:

We have completed our analysis of the potential impact of the proposed City of Los of Angeles (LA) Living Wage Ordinance based upon the questions provided to us in your letter dated July 7, 2014. The answers provided herein are based on our present knowledge of the competitive lodging market as of the completion of our fieldwork in September 2014. The following report summarizes our findings and reflects the conclusion of our analysis.

The terms of this engagement are such that we have no obligation to revise this report to reflect events or conditions which occur subsequent to the date of completion of our fieldwork; however, we are available to discuss the necessity for revision in view of changes in the economy or market factors which have a material effect on the proposed property. This report is subject to the Statement of Assumptions and Limiting Conditions presented in the Addenda, as well as to any assumptions presented herein.

We appreciate the opportunity of working on this assignment and look forward to answering any questions you may have regarding our findings and conclusions presented herein.

Sincerely,

*PKF Consulting USA*

Bruce Baltin
Senior Vice President



**Introduction**

This report contains a comparative analysis of the proposed Living Wage Ordinance for the City of Los Angeles with the precedent ordinances implemented in the LAX Corridor, Long Beach, SeaTac Airport, Seattle and proposed in San Francisco. We have also provided trends in room sales, payroll, and unemployment rates within the hotel and motel industry for the Los Angeles Metropolitan Statistical Area (MSA). As part of our research, we interviewed hotel General Managers at properties within the LAX Corridor, City of Los Angeles, Long Beach and Seattle to understand how the precedent ordinances have impacted their hotel operations. Finally, we also interviewed hotel General Managers within the City of LA to ascertain how the proposed ordinance would potentially affect their operation

**Background**

The Los Angeles City Council introduced a motion on February 18, 2014 that would increase the minimum hourly minimum wage to $15.37 at all hotels in the City of LA with 100 or more guestrooms. The motion was co-sponsored by Council Members Mike Bonin (West LA - District 11), Nury Martinez (Northeast San Fernando Valley – District 6) and Curren Price (South LA and parts of Downtown – district 9). A copy of this ordinance is included in the Addenda at the end of this report.

When the Airport Hospitality Enhancement Zone was created in 1997, section 104.114 of the Los Angeles Municipal Code provided Procedures For Further Regulation. This section states that the City may not impose a living wage that exceeds the state or federal minimum wage upon any business entity that does not have a business relationship with the City of Los Angeles in the future, unless the City Council first secures a study that looks at the effects such a regulation would have on the:1) industry and/or geographic location targeted, 2) consumers or clients served by the industry and/or geographic location, including any price increases, and 3) the City's and/or geographic locations ability to attract and retain new business to the area. In addition, the industry on which the ordinance is imposed must receive business benefits from a City asset and must have more than 15,000 employees.

**City of Los Angeles Hotel Labor Force**

Per Smith Travel Research, the City of LA currently has approximately 350 hotel properties that currently offer almost 39,000 guestrooms. Using industry guidelines for staff to guestroom ratios, as well as data provided by the State of California Employment Development Department, We estimate that there are approximately 17,000 employees currently working in these 350 hotels.

**Hotel Employee Living Wage Impact on the City Economy**

In our report dated June 24, 2014 that was prepared for the California Hotel & Lodging Association, we completed a detailed analysis using data from a recently compiled wage survey applied against the staffing model of a full-service, non-union hotel with approximately 400 rooms. The results showed that approximately 68.0 percent of the total employees (based on average pay rates for full-time equivalents – FTEs) were earning less than the proposed $15.37 living wage. However, if reported tips were considered, the number dropped to 48.0 percent. Because our methodology used a larger, full-service hotel as our example, it is our opinion that these percentages are likely overstated due to the larger number of employees in the entry-level and front-line positions as this type of hotel compared to the majority of the hotels in the City of Los Angeles.

Based upon our estimate of 17,000 total hotel employees within the City of Los Angeles and using the percentages mentioned above, this equates to more than 11,000 workers earning less than $15.37 without considering reported tips and almost 8,000 workers earning less than $15.37 if reported tips were included. Considering that Los Angeles has a workforce of more than 1.8 million people, the number of hotel workers earning less than the proposed living wage is less than 1.0 percent of the total workforce (with or without reported tips). Thus, in our opinion, the number of hotel employees currently earning less than the proposed minimum wage does not have a significant negative effect on the City economy as a whole.

**City Airport Hospitality Enhancement Zone Ordinance**

The LAX ordinance was implemented in January 1997, and increased the minimum wage for all workers in the designated airport corridor. At the time of implementation, the minimum wage increased from $6.75 to $10.64, which equated to a 36.6% wage increase. This large increase was very difficult for the airport-area industries to absorb at one time and much of this increase was not able to be passed on to the end consumer. Because the ordinance did not allow for a credit for employee-report tips, it was necessary to close hotel outlets (primarily food and beverage) and cut staff. Without the inclusion of reported tips, many employees who were already earning more than the new minimum wage lost their jobs as the hotels could not absorb the additional labor burden. Sadly, the employees that the ordinance was intended to help actually lost their jobs. On the positive side, the LAX ordinance affected all airport-related service industries, so there were no unfair competitive advantages created within the corridor. Additionally, healthcare costs for hourly employees were factored in when determining the employee's wage rates, which allowed hotels to continue to provide most of these benefits.

Exhibit 5 Page 477

**Long Beach "Minimum Wages for Hotel Workers" Ordinance Provisions**

In our opinion, there were no positive provisions in the "minimum wages for hotel workers" ordinance that was implemented in Long Beach in January 2012. When implemented, the ordinance imposed a 62.5 percent increase in the minimum wage for hourly employees. The ordinance affected only hotels with more than 99 rooms, which provided an operational disadvantage with local restaurants and competitive hotels outside of the boundaries of Long Beach. The ordinance was not enforced against union hotels, even though there were many positions at these union hotels that were paying below the new minimum living wage. Finally, the ordinance did not consider a healthcare credit or tip credit, which forced many hotels to reduce or eliminate healthcare funding for hourly employees, and cost many tipped employees, primarily in the food and beverage department, their jobs due to cost cutting measures, even though many of these employees were already earning well in excess of the new minimum wage.


**SeaTac Proposition 1**

This past January, a similar ordinance went into place for hospitality and transportation businesses in and around the Seattle/Tacoma International Airport. At the time of implementation, the ordinance increased the minimum wage by 63.2 percent, without the benefit of any sort of gradual ramp up of the increase. Similar to the Long Beach initiative, hotels with less than 100 rooms were exempt; however, it is these small hotels that many times are paying the lowest wages. On the positive side, both union and non-union businesses alike were affected, therefore no unfair competitive advantages were created.


**San Francisco Ballot Measure**

The proposed ballot measure is pretty straightforward in that it applies to all industries and does not exclude unionized businesses. The proposed implementation includes a ramp up of the 40% increase ($10.74 to $15.00) over a four-year period. A phased increase allows the businesses the ability to absorb and/or pass on these costs to the end consumer, so that a period of slow/negative job growth is not experienced in the local market that could result in employee layoffs.

Items that we would've liked to have seen included as part of the proposed ballot measure, would be the ability to pause the CPI increases during periods of economic downturn, and the CPI factor used should be the "general" CPI factor that everyone is familiar with and not the specific "worker" CPI index that is currently proposed in San Francisco. In addition, we recommend the inclusion of a wage-rate differential so that tipped employees currently earning more than the living wage, would not be subject to the proposed ordinance. Finally, we would've recommended a credit for health care costs that are paid by the employer.

Exhibit 5 Page 478

**History of Hotel Sales, Payroll and Employment Data for the Los Angeles MSA**

The following table provides a 10-year history of hotel room sales in the Los Angeles-Santa Ana MSA, calculated based upon the Transient Occupancy Tax (TOT) collections for each jurisdiction within Los Angeles and Orange Counties.

| | Hotel Rooms Revenue<br>City of Los Angeles and the Los Angeles MSA | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | City Of<br>Los Angeles | %<br>Change | Los Angeles<br>County | %<br>Change | Orange<br>County | %<br>Change | Total<br>MSA | %<br>Change |
| 2004 | $753,760,000 | N/A | $1,945,600,052 | N/A | $1,171,700,000 | N/A | $3,117,300,052 | N/A |
| 2005 | 982,703,571 | 30.4% | 2,285,983,301 | 17.5% | 1,253,400,000 | 7.0% | 3,539,383,301 | 13.5% |
| 2006 | 976,800,714 | -0.6% | 2,466,287,348 | 7.9% | 1,430,100,000 | 14.1% | $3,896,387,348 | 10.1% |
| 2007 | 1,035,046,429 | 6.0% | 2,634,958,566 | 6.8% | 1,555,900,000 | 8.8% | $4,190,858,566 | 7.6% |
| 2008 | 1,142,500,000 | 10.4% | 2,831,867,253 | 7.5% | 1,594,700,000 | 2.5% | $4,426,567,253 | 5.6% |
| 2009 | 1,048,635,714 | -8.2% | 2,521,139,040 | -11.0% | 1,417,100,000 | -11.1% | $3,938,239,040 | -11.0% |
| 2010 | 911,614,286 | -13.1% | 2,389,466,214 | -5.2% | 1,307,800,000 | -7.7% | $3,697,266,214 | -6.1% |
| 2011 | 1,036,914,286 | 13.7% | 2,651,945,461 | 11.0% | 1,454,500,000 | 11.2% | $4,106,445,461 | 11.1% |
| 2012 | 1,148,138,571 | 10.7% | 2,895,269,376 | 9.2% | 1,580,200,000 | 8.6% | $4,475,469,376 | 9.0% |
| 2013 | 1,198,735,714 | 4.4% | 3,101,323,127 | 7.1% | 1,717,400,000 | 8.7% | $4,818,723,127 | 7.7% |
| **CAAG** | **5.3%** | | **5.3%** | | **4.3%** | | **5.0%** | |
| Source: Dean Runyan Associates | | | | | | | | |

The data above shows that the City of LA and the combined MSA returned to pre-economic downturn levels in 2012.

The following table shows the average pay rates for selected front-line hotel positions over the past five years at hotels in the Los Angeles MSA. The full wage survey is presented in the Addenda at the end of this report.

4

Exhibit 5 Page 479

| **Hourly Payroll Trends - Select Hotel Positions** | | | | | | |
| **Los Angeles MSA** | | | | | | |
| Position | 2010 | 2011 | 2012 | 2013 | 2014 | CAAG |
|---|---|---|---|---|---|---|
| Front Desk Agent | $13.44 | $13.89 | $14.12 | $14.74 | $15.06 | 2.9% |
| Bellperson* | 8.55 | 8.62 | 8.70 | 8.76 | 8.97 | 1.2% |
| Public Space Attendant | 11.84 | 12.30 | 12.74 | 13.10 | 13.51 | 3.4% |
| Room Attendant | 11.66 | 12.08 | 12.34 | 12.74 | 13.19 | 3.1% |
| Laundry Attendant | 12.35 | 12.51 | 13.00 | 13.95 | 14.11 | 3.4% |
| Restaurant Server* | 8.90 | 9.48 | 9.41 | 8.65 | 8.51 | -1.1% |
| Bartender* | 10.59 | 10.72 | 11.42 | 11.52 | 11.41 | 1.9% |
| Cocktail Server* | 8.40 | 8.21 | 8.45 | 8.43 | 8.55 | 0.4% |
| Room Service Server* | 8.28 | 8.24 | 8.37 | 8.47 | 8.57 | 0.9% |
| Mini-Bar Attendant | 11.68 | 12.07 | 12.14 | 12.71 | 12.83 | 2.4% |
| Banquet Server* | 9.33 | 9.72 | 8.91 | 9.73 | 9.75 | 1.1% |
| Banquet Set-Up* | 11.09 | 11.39 | 11.25 | 12.18 | 12.25 | 2.5% |
| Line Cook | 14.40 | 14.61 | 14.96 | 15.74 | 16.65 | 3.7% |
| Engineer (lowest skilled) | 16.57 | 16.98 | 17.30 | 18.73 | 17.18 | 0.9% |
| * Tipped employee - tips not included in wages shown. | | | | | | |
| Sorece: Executive HR Consulting Group | | | | | | |

The hourly wages shown above are yearly averages derived from wage surveys conducted by The Executive HR Consulting Group and the raw data from these studies is included in the Addenda at the end of this report. It should be noted that all of the sample hotels did not participate in the surveys each year, so the compound annual growth percentages are likely somewhat skewed. While the survey does not track reported tips for the tipped employees, we believe that if the tips were included, all of the tipped employee wages would be well in excess of the proposed living wage.

The following table provides a 10-year history of hotel/motel payroll and average wages.

| **Hotel/Motel Payroll History** | | | | |
| **Los Angeles MSA** | | | | |
| Year | Total Payroll | % Change | Average Wage | % Change |
|---|---|---|---|---|
| 2004 | $1,420,766,000 | N/A | $24,772 | N/A |
| 2005 | 1,490,022,000 | 5% | 25,663 | 4% |
| 2006 | 1,601,063,447 | 7% | 27,048 | 5% |
| 2007 | 1,766,148,686 | 10% | 28,752 | 6% |
| 2008 | 1,840,931,241 | 4% | 29,309 | 2% |
| 2009 | 1,691,167,276 | -8% | 28,697 | -2% |
| 2010 | 1,762,937,812 | 4% | 29,716 | 4% |
| 2011 | 1,864,796,343 | 6% | 30,831 | 4% |
| 2012 | 2,008,648,338 | 8% | 32,380 | 5% |
| 2013 | 2,102,470,990 | 5% | 32,504 | 0% |
| CAAG | **4.5%** | | **3.1%** | |
| Source: US Bureau of Labor Statistics | | | | |

5

Exhibit 5 Page 480

The 10-year trend of the average hotel/motel wage shown above includes both exempt and hourly employees and indicates inflationary wage growth on a compound annual average basis was paid over the period.

The following table shows the average annual employment in the hotel/motel industry over the past 10 years, and year-to-date through the first quarter of 2014.

| | Average Annual Employment Hotel/Motel Industry | | | | | |
|---|---|---|---|---|---|---|
| | Los Angeles County | % Change | Orange County | % Change | Los Angeles MSA | % Change |
| 2004 | 36,613 | N/A | 20,763 | N/A | 57,376 | N/A |
| 2005 | 37,085 | 1.3% | 21,055 | 1.4% | 58,140 | 1.3% |
| 2006 | 37,333 | 0.7% | 21,846 | 3.8% | 59,179 | 1.8% |
| 2007 | 38,625 | 3.5% | 22,804 | 4.4% | 61,429 | 3.8% |
| 2008 | 39,428 | 2.1% | 23,175 | 1.6% | 62,603 | 1.9% |
| 2009 | 36,752 | -6.8% | 22,010 | -5.0% | 58,762 | -6.1% |
| 2010 | 37,625 | 2.4% | 21,557 | -2.1% | 59,182 | 0.7% |
| 2011 | 38,571 | 2.5% | 21,897 | 1.6% | 60,468 | 2.2% |
| 2012 | 39,598 | 2.7% | 22,625 | 3.3% | 62,223 | 2.9% |
| 2013 | 40,678 | 2.7% | 23,755 | 5.0% | 64,433 | 3.6% |
| CAAG | 1.2% | | 1.5% | | 1.3% | |
| YTD 03/13 | 39,894 | N/A | 23,004 | N/A | 62,898 | N/A |
| YTD 03/14 | 42,129 | 5.6% | 22,394 | -2.7% | 64,524 | 2.6% |
| Source: US Bureau of Labor Statistics | | | | | | |

The table above shows the jobs lost in the MSA during the economic downturn were finally replaced by 2013. This was accomplished primarily from the strengthening of the economy that has pushed occupancy levels to pre-recession levels.


## Impact of a Regional Tourism Authority

In our opinion, a regional tourism authority would definitely help hotels in the Greater Los Angeles area. There are 88 cities that comprise LA County and most visitors and many meeting planners do not know what the boundaries are between these various cities. While the Los Angeles Convention and Visitors Bureau has done its best to market all of the facets of the county -wide tourism offerings, the County  has historically provided a somewhat segmented approach to selling itself as a destination, compared to many of its competitor cities such as San Francisco, San Diego, and New York City.. Most of the various LA cities have acted independently from a tourism/hospitality standpoint as there has been no "over-arching" entity to promote Greater Los Angeles as a whole. Thus, instead of collaboration between all of these cities, they tend to act as competitors. For example, let's assume a meeting planner contacts local tourism representatives in San Pedro about holding a meeting, but San Pedro cannot accommodate the group because their hotels are already booked or the group is too large. When this happens, the meeting planner is usually told

Exhibit 5 Page 481

"sorry, we can't help you", instead of: "we cannot help you, but my colleagues in Torrance can likely accommodate your needs.

There is one over-arching tourism entity in San Francisco, which has proved very successful. Stakeholders like to deal with one entity, and this interaction needs to be fluid and seamless. In this case, the regional tourism office can work with the larger groups and can do its best to insure that all areas of the region are fairly and equally represented. Thus, a regional tourism authority that links all of the various Destination Marketing Organizations within the County would help to streamline the marketing process. Since many of these jurisdictions delegate manpower to tourism generation, there must be duplication of effort in many cases.

## Job Impacts of the LAX and Long Beach Wage Initiatives

Because the LAX hotels were not able to pass on the costs of the increased wages to their hotel guests, the affected hotels have had to implement cost-saving measures such as reduced staffing and benefits, and reduced hotel amenities. Most all affected hotels have experienced reduced staffing levels, with food and beverage receiving the largest portion of the cuts. One hotel reported a reduction of 84 hourly full-time equivalent employees (FTEs) since the ordinance was implemented, with 52 percent of these reductions occurring in food and beverage. Many of the affected hotels have eliminated room service and banquet and service charges, and have built these fees into the menu pricing. This makes it challenging for the sales team as they must explain the difference in pricing to potential clients. This also impacts banquet servers and bartenders as they are now paid a flat rate. The LAX hotels are now operating with a competitive disadvantage because some of their competitive set hotels, such as those in El Segundo, were not impacted by the ordinance.

In Long beach, at least two hotels have removed rooms from inventory in order to fall below the 100-room threshold. This has led to reduced revenue and staff cuts at these hotels. Another hotel has cut 25 FTEs (55,000 man hours) at the same time that occupancy has increased 7 points. The majority of these cuts were in the food and beverage department. One full-service hotel has calculated that the annual financial impact post-reduction of staff is approximately $785,000 in incremental wages, benefits, and payroll taxes. This impact would have been $1.5 million annually if the staff reductions had not been implemented. In many cases, the staff reductions have resulted in increased workloads, which have impacted service levels. Room service and banquet service charges are now built into menu pricing, which makes it difficult for the sales team to sell against Anaheim hotels.

Exhibit 5 Page 482

**Conclusions**

Based upon our internal analysis and the third-party research summarized herein, we believe that any ordinance that is implemented should be designed so that it benefits the greatest number of people, without placing an overly onerous burden on the City of Los Angeles hotels. Thus, we believe that a phased-in approach to the wage increase over several years will spread out the financial and operational impacts, allowing the hotels to adjust gradually to the increasing wages. This approach would hopefully prevent the loss of jobs that were experienced in the LAX, Long Beach and SeaTac Airport hotel markets. Additionally, we believe the prudent thing to do would be to include a provision for tip credits in the final wording of the ordinance. Tipped employees should be carved-out as most of these employees already earn well in excess of $15.37. Without this carve-out, many of the employees that the ordinance is designed to help could end up losing their jobs due to the almost-certain layoffs that have been previously experienced in the precedent hotel markets.

If the ordinance is implemented as currently proposed, there will also be a direct impact on new job creation as well, because developers will not want to risk an investment in new hotels due to the long-term real estate risks associated with development in areas with such high land costs. It should be noted that the compound average annual growth rate for new hotel supply in the City of LA is 0.7 percent from 1988 to the present day. This growth rate is significantly below the national average of 1.9 percent over this same period, and the result is an under-supply of hotel rooms in the market, particularly in Downtown. At present, the convention center is under-utilized due to its inability to attract larger groups because of a lack of hotel rooms in the immediate area. The issue with a lack of adequate new supply in Downtown is that it is currently not economically feasible to develop a hotel in Downtown and the proposed ordinance would only exacerbate the problem.

Similar to what happened in both the LAX Corridor and Long Beach, developers will likely shy away from future development deals if the proposed ordinance is implemented. No new hotels have been built in the LAX Corridor, and only one hotel (which was already under development when the ordinance was implemented) has been built in Long Beach, since their respective ordinances went into effect.

Based upon our research, we have determined that there are owners and potential investors who have slowed the progression of potential deals, and are waiting to see what is going to happen with the proposed ordinance. Three projects have been curtailed in Downtown alone. We believe that if the proposed ordinance is implemented for the City of LA, any new hotel development will likely take place outside if the city limits, which also translates to a loss of transient occupancy tax revenue (TOT).

Exhibit 5 Page 483

*ADDENDA*

Exhibit 5 Page 484

*ADDENDUM A*

*CURRENT LOS ANGELES CITY COUNCIL MOTION*

Exhibit 5 Page 485

FEB 1 8 2014

ECONOMIC DEVELOPMEN

## M O T I O N

By maintaining free public tourist attractions like Hollywood Boulevard, Griffith Park and Venice Beach, modernizing LAX, upgrading the Convention Center and helping to build the public transportation system that will carry visitors around the city, to and from hotels, the City of Los Angeles has made significant financial investments to create a climate that has allowed the hospitality industry to thrive in Los Angeles. The City's investments have proven helpful for the hospitality industry, which has enjoyed three consecutive years of growth, and which boasts an occupancy rate of 75.4% (far better than the national average of 62%) and a "revenue per room available" rate of $100 – a 12-year high for LA. Since hotels receive definite benefits from City assets and investments, it is fair and reasonable that these hotels pay their employees a fair wage - especially when doing so would so greatly benefit the people of and the economy in Los Angeles.

According to the Economic Development Department, 43% of the people who work in hotels in Los Angeles earn wages that still put them far below the federal poverty line. Wages paid to hotel employees are economically restrictive and prevent many hospitality employees from having purchasing power at local businesses, which has a devastating toll on Los Angeles' local economy. According to research done by the Economic Policy Institute, increasing wages for hotel workers could generate more than $70 million in economic activity for Los Angeles.

Income inequality is one of the most pressing economic, social and civil rights issues facing Los Angeles, and establishing a fair wage for hotel employees will help raise thousands of Angelenos out of poverty. Economic studies have made the circumstances of those living paycheck to paycheck clear, and hotel employees should not be forced to work two or three jobs to provide food and shelter for their families.

Several cities, including Santa Monica and West Hollywood, have realized the value in providing enhanced wages for employees in the hotel and tourism industry, and voters in the City of Long Beach adopted a living wage for hotel workers by a nearly 2-1 margin just last year.

In 2007, the Los Angeles City Council passed a living wage ordinance for workers employed in hotels near LAX, and in 2009 passed an ordinance that raised the wages for airport employees. The living wage for airport employees has resulted in higher pay and real benefits for low-income families, and the hotels around LAX have continued to thrive. In recent years, LAX passenger traffic has steadily increased (4.7% increase in 2013, following a 3% increase in 2012) as the city has invested in infrastructure that draws tourists to Los Angeles.

**I THEREFORE MOVE** that the City Council instruct the CLA to secure a study and provide for public input of the Citywide economic impacts of imposing a living wage of $15.37 for hotel employees at hotels with more than 100 rooms; and

**I FURTHER MOVE** that, if supported by the study, the City Council request the City Attorney to work with the CLA and CAO in preparing and presenting an ordinance that requires a living wage for hotel workers at hotels with more than 100 rooms.

PRESENTED BY:

MIKE BONIN
Councilmember, 11th District

NURY MARTINEZ
Councilmember, 6th District

CURREN D. PRICE, Jr.
Councilmember, 9th District

SECONDED BY:

FEB 1 8 2014

Exhibit 5 Page 486

*ADDENDUM B*

*WAGE SURVEYS*

Exhibit 5 Page 487

HOURLY COMPENSATION SURVEY   YEAR 2014



2014 HOURLY COMPENSATION SURVEY - THE RESULTS
ZONES 1 - 4

**HOURLY SUMMARY COMPENSATION**

| POSITION TITLES | Zone 1 Min | Zone 1 Max | Zone 1 Avg | Zone 2 Min | Zone 2 Max | Zone 2 Avg | Zone 3 Min | Zone 3 Max | Zone 3 Avg | Zone 4 Min | Zone 4 Max | Zone 4 Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OFFICE & CLERICAL** | | | | | | | | | | | | |
| Benefits Coordinator | 21.72 | 21.72 | 21.72 | | | | 22.00 | 22.00 | 22.00 | 18.00 | 19.00 | 19.00 |
| HR Coordinator | 19.80 | 20.11 | 20.06 | 19.47 | 20.07 | 19.77 | 18.69 | 20.01 | 19.67 | 17.46 | 17.95 | 17.89 |
| Employment Coordinator | | | | | | | 14.00 | 14.50 | 14.50 | | | |
| HR Representative/Clerk | 15.34 | 15.34 | 15.34 | | | | 14.50 | 17.25 | 16.00 | | | |
| HR Assistant | 15.00 | 15.00 | 15.00 | 15.50 | 15.50 | 15.50 | 14.73 | 17.41 | 16.08 | 15.50 | 15.96 | 15.50 |
| Safety Coordinator | | | | 16.50 | 16.50 | 16.50 | 17.40 | 17.40 | 17.40 | 18.18 | 18.18 | 18.18 |
| File Clerk | | | | | | | | | | | | |
| Receptionist | 16.14 | 16.14 | 16.14 | | | | | | | 16.00 | 19.69 | 18.19 |
| Executive Administrative Assistant to GM | 22.84 | 22.84 | 22.84 | 25.73 | 26.36 | 26.05 | 21.78 | 23.46 | 22.73 | 19.76 | 24.35 | 25.21 |
| Administrative Assistant to a Manager | 18.27 | 18.57 | 18.42 | 18.45 | 22.41 | 20.58 | 16.34 | 18.70 | 17.68 | 15.98 | 21.90 | 17.87 |
| Design Assistant | | | | | | | 16.22 | 18.13 | 18.13 | | | |
| Intern | 10.00 | 10.00 | 10.00 | 9.00 | 9.00 | 9.00 | 14.46 | 14.46 | 14.46 | 10.00 | 10.00 | 10.00 |
| **FINANCE** | | | | | | | | | | | | |
| Paymaster | 24.14 | 25.39 | 24.64 | 23.24 | 23.24 | 23.24 | 21.95 | 23.78 | 23.23 | 22.63 | 22.63 | 22.63 |
| Payroll Clerk | | | | 21.65 | 21.65 | 21.65 | 19.52 | 20.27 | 19.77 | 16.00 | 24.10 | 21.60 |
| Accounting Coordinator | 20.00 | 20.00 | 20.00 | 15.91 | 15.91 | 15.91 | 20.65 | 20.65 | 20.65 | 17.98 | 18.90 | 18.90 |
| Accounts Payable Clerk | 17.83 | 18.41 | 18.18 | 19.60 | 19.60 | 19.60 | 17.11 | 18.90 | 18.38 | 16.83 | 18.47 | 17.37 |
| Accounting Clerk | 17.41 | 18.16 | 17.66 | 20.69 | 20.92 | 20.80 | 17.78 | 18.59 | 18.76 | 16.69 | 20.17 | 18.50 |
| Accounts Receivable Clerk | 17.53 | 17.98 | 17.90 | 19.33 | 19.51 | 19.42 | 17.60 | 19.40 | 18.46 | 17.23 | 19.65 | 18.86 |
| Lead Night Auditor | | | | 17.15 | 17.15 | 17.15 | 15.00 | 17.19 | 15.80 | | | |
| Night Auditor | 14.91 | 15.66 | 15.35 | 18.21 | 19.74 | 18.98 | 15.13 | 15.83 | 15.43 | 14.00 | 16.01 | 14.34 |
| Day Auditor | 16.44 | 16.85 | 16.85 | 20.61 | 20.61 | 20.61 | 19.34 | 20.00 | 19.67 | 18.19 | 19.39 | 18.79 |
| Purchasing Agent | | | | 18.04 | 19.88 | 18.96 | 14.50 | 18.85 | 14.50 | 14.77 | 17.70 | 15.98 |
| Purchasing Administrative Assistant | | | | 14.55 | 14.55 | 14.55 | 15.38 | 15.38 | 15.38 | 16.00 | 16.48 | 16.48 |
| General Cashier | 17.14 | 17.57 | 17.36 | 19.57 | 19.57 | 19.57 | 17.95 | 19.18 | 18.73 | 16.83 | 17.71 | 17.71 |
| Credit & Collections Clerk | | | | | | | 18.00 | 22.50 | 19.48 | | | |
| Accounting Analyst/Cost Analyst | 21.47 | 21.47 | 21.47 | | | | | | | 20.00 | 22.00 | 21.00 |
| Senior Clerk | | | | | | | 22.50 | 26.50 | 24.50 | | | |
| **STOREROOM** | | | | | | | | | | | | |
| Supervisor | 18.90 | 18.90 | 18.90 | 20.72 | 21.22 | 21.06 | 17.57 | 19.76 | 19.01 | 13.10 | 13.10 | 13.10 |
| Storeroom Clerk | 15.21 | 15.35 | 15.28 | 16.83 | 17.29 | 16.98 | 13.93 | 15.53 | 14.44 | 12.75 | 14.93 | 13.14 |
| Lead Storeroom Clerk | 21.25 | 21.25 | 21.25 | | | | 14.94 | 15.24 | 14.94 | 15.00 | 16.88 | 16.41 |
| Receiving Clerk | 15.39 | 15.39 | 15.39 | 17.94 | 18.41 | 18.11 | 14.19 | 14.72 | 14.46 | 13.69 | 14.19 | 13.94 |
| **F&B CASHIER** | | | | | | | | | | | | |
| Head Cashier | | | | | | | | | | | | |
| Room Service Cashier | 15.72 | 15.72 | 15.72 | 17.29 | 17.29 | 17.29 | 12.46 | 14.03 | 13.10 | 11.50 | 15.53 | 11.87 |
| Room Service Cashier (3rd shift) | | | | | | | 11.50 | 11.50 | 11.50 | | | |
| Restaurant Cashier | 12.78 | 12.93 | 12.93 | | | | 13.68 | 14.81 | 14.24 | | | |
| **CULINARY** | | | | | | | | | | | | |
| Kitchen Supervisor | 17.99 | 19.07 | 18.66 | 18.67 | 19.14 | 18.91 | 17.50 | 19.95 | 18.97 | 18.00 | 22.59 | 16.28 |
| Garde Manger | 17.96 | 18.69 | 17.98 | 19.91 | 19.91 | 19.91 | 19.01 | 19.01 | 19.01 | 11.00 | 14.00 | 12.33 |
| Assistant Garde Manger | | | | | | | 18.08 | 19.92 | 19.92 | | | |
| Butcher | | | | 20.52 | 20.52 | 20.52 | 25.72 | 25.72 | 25.72 | 16.96 | 20.58 | 20.15 |
| Pastry Chef | 19.75 | 19.75 | 19.75 | 15.20 | 15.20 | 15.20 | 19.00 | 19.00 | 19.00 | 28.05 | 28.05 | 28.05 |
| Assistant Pastry Chef | | | | 20.49 | 20.49 | 20.49 | 21.22 | 23.37 | 23.37 | 18.90 | 19.49 | 18.68 |
| Pastry Cook I | 18.44 | 18.44 | 18.44 | 17.20 | 17.56 | 17.34 | 16.64 | 17.02 | 17.02 | 14.06 | 15.07 | 14.65 |
| Pastry Cook II (baker) | 17.08 | 17.08 | 17.08 | 17.66 | 17.88 | 17.83 | 16.42 | 17.76 | 17.76 | 14.96 | 15.30 | 14.77 |
| **MAIN KITCHEN / BANQUETS** | | | | | | | | | | | | |
| Lead Cook (Cook I) | 18.05 | 18.15 | 18.15 | 18.21 | 18.94 | 18.57 | 17.30 | 18.30 | 17.97 | 14.86 | 17.10 | 15.81 |
| Main Cook (Cook II) | 16.35 | 16.59 | 16.59 | 17.29 | 17.47 | 17.38 | 15.03 | 16.51 | 16.05 | 13.63 | 16.07 | 14.40 |
| Prep Cook (Cook III) | 15.59 | 15.69 | 15.69 | 16.35 | 16.45 | 16.36 | 12.90 | 14.56 | 13.95 | 12.56 | 13.88 | 12.77 |
| Pantry (Entry Level) | 13.15 | 14.74 | 13.68 | 16.29 | 16.68 | 16.49 | 13.06 | 13.98 | 13.52 | 11.62 | 13.10 | 11.76 |
| Cook (3rd shift) | 17.80 | 17.80 | 17.80 | 18.40 | 18.40 | 18.40 | 12.75 | 15.00 | 13.88 | 13.66 | 14.35 | 14.17 |
| Lead Pantry | | | | 19.15 | 19.15 | 19.15 | 16.00 | 16.00 | 16.00 | | | |
| Banquet Cook | 17.09 | 17.59 | 17.59 | | | | | | | | | |
| Apprentice | 10.85 | 10.85 | 10.85 | 10.00 | 10.00 | 10.00 | | | | 10.00 | 10.00 | 10.00 |
| Buffet Runner/Food Runner | 9.00 | 9.00 | 9.00 | 10.86 | 10.86 | 10.86 | 13.27 | 13.27 | 13.27 | 11.00 | 14.85 | 11.13 |
| **GOURMET or SPECIALTY RESTAURANT** | | | | | | | | | | | | |
| Lead Cook (Cook I) | 18.23 | 18.23 | 18.23 | 17.71 | 18.13 | 17.87 | 16.85 | 19.35 | 19.35 | 14.71 | 15.77 | 14.95 |
| Main Cook (Cook II) | 16.85 | 16.85 | 16.85 | 16.07 | 16.81 | 16.30 | 16.52 | 17.77 | 17.77 | 13.18 | 14.63 | 13.53 |
| Prep Cook (Cook III) | 15.50 | 15.50 | 15.50 | 15.67 | 15.91 | 15.73 | 14.06 | 15.43 | 15.43 | 12.13 | 12.56 | 12.26 |
| Pantry (Entry Level) | 14.15 | 14.15 | 14.15 | 16.47 | 16.47 | 16.47 | 17.88 | 17.88 | 17.88 | 11.43 | 12.54 | 11.49 |
| Specialty Cook | | | | | | | 18.08 | 19.92 | 19.92 | | | |
| Sushi Cook | 22.35 | 22.35 | 22.35 | | | | | | | 16.00 | 16.73 | 16.73 |
| **MAIN RESTAURANT** | | | | | | | | | | | | |
| Lead Cook (Cook I) | | | | 19.21 | 19.21 | 19.21 | 17.39 | 18.26 | 18.26 | 15.98 | 17.56 | 16.46 |
| Main Cook (Cook II) | 18.55 | 18.55 | 18.55 | 16.48 | 17.39 | 16.93 | 16.93 | 17.88 | 16.23 | 14.05 | 14.68 | 14.32 |
| Prep Cook (Cook III) | 17.80 | 17.80 | 17.80 | 15.88 | 16.08 | 15.93 | 12.43 | 14.91 | 14.56 | 12.81 | 14.27 | 13.13 |
| Pantry (Entry Level) | | | | 17.14 | 18.05 | 17.49 | | | | | | |
| **EMPLOYEE CAFETERIA** | | | | | | | | | | | | |
| Supervisor | 14.63 | 14.63 | 14.63 | 19.10 | 19.10 | 19.10 | 17.56 | 18.74 | 18.74 | 16.99 | 17.04 | 16.99 |
| Cook | 15.72 | 15.72 | 15.72 | 16.34 | 17.18 | 16.83 | 15.59 | 16.25 | 16.13 | 12.05 | 12.75 | 13.16 |
| Server | 14.20 | 14.28 | 14.28 | 16.18 | 16.18 | 16.18 | 11.11 | 13.35 | 12.63 | 10.85 | 11.56 | 11.45 |
| Utility | 15.37 | 15.37 | 15.37 | 15.10 | 15.10 | 15.10 | 12.53 | 13.59 | 13.04 | 11.00 | 12.84 | 11.57 |
| **STEWARDING** | | | | | | | | | | | | |
| Supervisor | 17.34 | 17.36 | 17.36 | 17.98 | 18.82 | 18.32 | 16.17 | 17.32 | 16.98 | 14.15 | 16.28 | 15.53 |

Exhibit 5 Page 488

HOURLY COMPENSATION SURVEY · YEAR 2014

ECG

## 2014 HOURLY COMPENSATION SURVEY · THE RESULTS
### ZONES 1 - 4

| POSITION TITLES | ZONE 1 Minimum Pay | Maximum Pay | Average Pay | ZONE 2 Minimum Pay | Maximum Pay | Average Pay | ZONE 3 Minimum Pay | Maximum Pay | Average Pay | ZONE 4 Minimum Pay | Maximum Pay | Average Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **HOURLY SUMMARY COMPENSATION** | | | | | | | | | | | | |
| Night Cleaner Supervisor | | | | | | | 13.00 | 13.00 | 13.00 | | | |
| Night Cleaner | $ 20.14 | $ 20.14 | $ 20.14 | $ 17.10 | $ 17.10 | $ 17.10 | 12.38 | 13.02 | 12.70 | 13.15 | 15.07 | 14.07 |
| Steward | $ 14.28 | $ 14.28 | $ 14.28 | $ 14.41 | $ 15.01 | $ 14.70 | 12.25 | 13.51 | 12.96 | 10.82 | 12.84 | 11.35 |
| Pot Washer | | | | $ 11.33 | $ 12.00 | $ 11.66 | | | | 11.00 | 12.57 | 12.04 |
| Ware Washer | $ 9.00 | $ 10.44 | $ 9.78 | | | | 11.29 | 12.29 | 11.79 | 12.10 | 12.10 | 12.10 |
| Banquet Runner | $ 16.10 | $ 16.10 | $ 16.10 | | | | 12.95 | 13.32 | 13.32 | | | |
| | | | | | | | | | | | | |
| **ROOM SERVICE - IN ROOM DINING** | | | | | | | | | | | | |
| Supervisor | | | | $ 14.35 | $ 14.35 | $ 14.35 | 16.37 | 16.37 | 16.37 | 13.89 | 13.89 | 13.89 |
| Order Taker | $ 15.45 | $ 15.45 | $ 15.45 | $ 14.42 | $ 14.85 | $ 14.54 | 12.94 | 13.62 | 13.47 | 11.53 | 13.00 | 12.28 |
| Server | $ 8.94 | $ 9.28 | $ 9.07 | $ 8.16 | $ 8.21 | $ 8.20 | 8.26 | 8.94 | 8.64 | 8.07 | 8.72 | 8.38 |
| Bus Person | $ 16.15 | $ 16.15 | $ 16.15 | $ 13.51 | $ 13.51 | $ 13.51 | 10.35 | 11.02 | 10.85 | | | |
| Captain | | | | $ 14.10 | $ 14.10 | $ 14.10 | | | | 10.50 | 10.50 | 10.50 |
| | | | | | | | | | | | | |
| **GOURMET RESTAURANT** | | | | | | | | | | | | |
| Supervisor | $ 19.25 | $ 19.25 | $ 19.25 | $ 21.00 | $ 21.00 | $ 21.00 | 17.60 | 20.10 | 19.35 | 18.00 | 18.00 | 18.00 |
| Host Person/Greeter | $ 16.33 | $ 16.33 | $ 16.33 | $ 15.38 | $ 15.46 | $ 15.42 | 14.12 | 15.06 | 14.57 | 10.67 | 12.66 | 11.24 |
| Server | $ 9.05 | $ 9.05 | $ 9.05 | $ 8.07 | $ 8.07 | $ 8.07 | 8.10 | 8.60 | 8.32 | 8.00 | 8.85 | 8.33 |
| Busperson | $ 11.60 | $ 11.60 | $ 11.60 | $ 10.55 | $ 10.80 | $ 10.65 | 10.84 | 11.64 | 11.52 | 8.08 | 9.51 | 8.63 |
| Food Runner | $ 12.78 | $ 12.78 | $ 12.78 | $ 11.41 | $ 11.66 | $ 11.55 | 11.18 | 11.82 | 11.74 | 9.17 | 10.05 | 9.61 |
| Captain | | | | | | | 15.00 | 16.00 | 15.50 | | | |
| Sommelier/Wine Steward | | | | $ 16.00 | $ 16.00 | $ 16.00 | | | | | | |
| | | | | | | | | | | | | |
| **CAFÉ or MAIN RESTAURANT** | | | | | | | | | | | | |
| Supervisor | $ 15.73 | $ 16.87 | $ 15.80 | $ 23.39 | $ 23.39 | $ 23.39 | 16.78 | 18.03 | 17.64 | 16.75 | 18.66 | 17.81 |
| Host Person/Greeter | $ 13.17 | $ 13.49 | $ 13.26 | $ 15.01 | $ 15.27 | $ 15.14 | 13.22 | 14.46 | 13.60 | 10.60 | 11.61 | 10.82 |
| Server | $ 9.34 | $ 9.34 | $ 9.34 | $ 8.23 | $ 8.23 | $ 8.23 | 8.08 | 8.34 | 8.22 | 8.06 | 8.60 | 8.26 |
| Busperson | $ 10.83 | $ 10.83 | $ 10.83 | $ 11.03 | $ 11.03 | $ 11.03 | 10.39 | 11.38 | 10.74 | 8.30 | 8.95 | 8.45 |
| | | | | | | | | | | | | |
| **MINI BAR** | | | | | | | | | | | | |
| Supervisor | $ 15.00 | $ 15.00 | $ 15.00 | $ 16.40 | $ 16.40 | $ 16.40 | | | | | | |
| Attendant | $ 13.12 | $ 13.87 | $ 13.53 | $ 14.13 | $ 14.19 | $ 14.15 | 12.48 | 13.21 | 13.06 | 10.38 | 10.65 | 10.56 |

CONFIDENTIAL

Exhibit 5 Page 489

2

HOURLY COMPENSATION SURVEY - YEAR 2014

ECG

2014 HOURLY COMPENSATION SURVEY - THE RESULTS
ZONES 1 - 4

| POSITION TITLES | HOURLY SUMMARY COMPENSATION | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ZONE 1 | | | ZONE 2 | | | ZONE 3 | | | ZONE 4 | | |
| | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay |
| **CONCIERGE - CLUB LOUNGE** | | | | | | | | | | | | |
| Concierge/Host | $ 15.80 | $ 15.80 | $ 15.80 | $ 18.64 | $ 18.64 | $ 18.64 | 16.00 | 16.30 | 16.30 | 15.00 | 16.12 | 15.55 |
| Food Attendant | $ 13.45 | $ 13.45 | $ 13.45 | | | | 10.17 | 13.63 | 13.36 | | | |
| **BEVERAGE OUTLET** | | | | | | | | | | | | |
| Beverage Outlet Supervisor | | | | $ 14.00 | $ 14.00 | $ 14.00 | 18.80 | 19.39 | 19.39 | 16.30 | 18.05 | 17.42 |
| Head Bartender | $ 17.15 | $ 17.15 | $ 17.15 | $ 19.68 | $ 19.68 | $ 19.68 | 12.43 | 13.18 | 12.80 | | | |
| Service Bartender | | | | $ 14.61 | $ 14.61 | $ 14.61 | 17.78 | 17.78 | 17.78 | 8.00 | 8.00 | 8.00 |
| Bartender | $ 11.88 | $ 11.88 | $ 11.88 | $ 11.91 | $ 12.11 | $ 12.04 | 11.83 | 12.65 | 12.23 | 8.79 | 10.69 | 9.49 |
| Café Bartender | | | | | | | | | | 10.00 | 10.00 | 10.00 |
| Host Person/Greeter | $ 16.59 | $ 16.59 | $ 16.59 | $ 16.01 | $ 16.01 | $ 16.01 | 14.70 | 14.70 | 14.70 | 8.00 | 8.00 | 8.00 |
| Cocktail Server | $ 9.04 | $ 9.04 | $ 9.04 | $ 8.05 | $ 8.05 | $ 8.05 | 8.80 | 8.91 | 8.88 | 8.10 | 8.72 | 8.25 |
| Barback | $ 11.78 | $ 11.78 | $ 11.78 | $ 13.26 | $ 13.26 | $ 13.26 | 11.69 | 11.91 | 11.88 | 8.75 | 10.00 | 9.14 |
| Front Bartender (night club) | | | | | | | | | | | | |
| Food Runner (Beverage Outlet) | $ 13.68 | $ 13.68 | $ 13.68 | $ 9.97 | $ 9.97 | $ 9.97 | 12.91 | 13.14 | 13.14 | 8.63 | 8.63 | 8.63 |
| **OTHER OUTLETS** | | | | | | | | | | | | |
| Snack bar/Coffee Attendant | $ 13.00 | $ 13.21 | $ 13.21 | $ 16.27 | $ 16.27 | $ 16.27 | 15.21 | 15.54 | 15.38 | 11.25 | 13.82 | 11.49 |
| Cashier | $ 12.55 | $ 12.55 | $ 12.55 | $ 16.27 | $ 16.27 | $ 16.27 | | | | 10.66 | 11.85 | 11.35 |
| Barista Line Server (i.e.: Starbucks) | $ 13.22 | $ 13.22 | $ 13.22 | $ 16.27 | $ 16.27 | $ 16.27 | 12.46 | 14.46 | 13.08 | 12.50 | 13.19 | 12.67 |
| **BANQUET FOOD SERVICE** | | | | | | | | | | | | |
| Captain | $ 12.76 | $ 12.86 | $ 12.80 | $ 11.03 | $ 11.07 | $ 11.05 | 11.27 | 12.71 | 11.91 | 10.12 | 11.72 | 10.77 |
| Captain including tips | $ 16.80 | $ 16.80 | $ 16.80 | $ 22.76 | $ 22.76 | $ 22.76 | 16.95 | 16.95 | 16.95 | 40.13 | 40.13 | 40.13 |
| Server | $ 10.42 | $ 10.64 | $ 10.55 | $ 9.96 | $ 9.96 | $ 9.96 | 9.62 | 10.74 | 10.11 | 8.06 | 8.76 | 8.36 |
| Server including tips | $ 8.00 | $ 8.00 | $ 8.00 | $ 20.66 | $ 20.66 | $ 20.66 | 14.31 | 19.50 | 14.31 | 32.00 | 32.00 | 32.00 |
| Bus Person | $ 13.45 | $ 13.45 | $ 13.45 | $ 11.26 | $ 11.26 | $ 11.26 | 10.46 | 10.81 | 10.73 | | | |
| Bus Person including tips | | | | | | | | | | | | |

CONFIDENTIAL

Exhibit 5 Page 490

3

HOURLY COMPENSATION SURVEY · YEAR 2014

 ECG

## 2014 HOURLY COMPENSATION SURVEY - THE RESULTS
### ZONES 1 - 4

| POSITION TITLES | ZONE 1 Min | Max | Avg | ZONE 2 Min | Max | Avg | ZONE 3 Min | Max | Avg | ZONE 4 Min | Max | Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BANQUET BEVERAGE SERVICE** | | | | | | | | | | | | |
| Banquet Beverage Captain | 12.25 | 12.25 | 12.25 | 9.03 | 9.03 | 9.03 | 9.75 | 9.75 | 9.75 | 9.75 | 11.84 | 9.93 |
| Banquet Beverage Captain -including tips | | | | | | | | | | 35.00 | 35.00 | 35.00 |
| Bartender | 11.27 | 11.27 | 11.27 | 12.89 | 12.89 | 12.89 | 13.22 | 14.15 | 13.62 | 8.28 | 9.65 | 8.69 |
| Bartender including tips | | | | | | | 16.36 | 16.36 | 16.36 | 32.00 | 32.00 | 32.00 |
| Barback | | | | 12.26 | 12.26 | 12.26 | 12.86 | 13.03 | 12.95 | | | |
| Barback including tips | | | | | | | 14.97 | 14.97 | 14.97 | | | |
| **BANQUET SET UP** | | | | | | | | | | | | |
| Supervisor | 13.96 | 14.27 | 14.27 | 14.00 | 14.00 | 14.00 | 15.92 | 16.67 | 16.29 | 9.21 | 12.96 | 11.07 |
| Supervisor including tips | | | | | | | | | | | | |
| Lead Houseperson | 13.59 | 14.99 | 14.79 | 16.68 | 16.68 | 16.68 | 12.56 | 14.85 | 12.85 | 10.60 | 10.60 | 10.60 |
| Lead Houseperson including tips | | | | | | | 17.20 | 17.20 | 17.20 | | | |
| Houseperson | 13.08 | 13.18 | 13.18 | 13.58 | 13.71 | 13.62 | 12.01 | 13.14 | 12.44 | 9.33 | 10.58 | 9.76 |
| Houseperson including tips | 14.05 | 14.05 | 14.05 | | | | 16.70 | 16.70 | 16.70 | 16.27 | 16.27 | 16.27 |
| **HOUSEKEEPING** | | | | | | | | | | | | |
| Office Supervisor | 15.57 | 16.02 | 16.43 | 17.92 | 17.92 | 17.92 | 14.61 | 16.83 | 15.23 | 15.63 | 17.33 | 16.05 |
| Dispatcher | 15.18 | 15.18 | 15.18 | 16.73 | 17.57 | 17.15 | 15.15 | 16.09 | 15.79 | 12.45 | 13.15 | 12.80 |
| Expediter | | | | | | | | | | | | |
| Night Lead Houseperson | 12.25 | 13.08 | 12.85 | | | | 14.04 | 14.04 | 14.04 | 12.15 | 13.65 | 13.35 |
| Shampoo Person | 16.15 | 16.15 | 16.15 | 15.77 | 15.77 | 15.77 | | | | 9.68 | 9.68 | 9.68 |
| Public Space Cleaner | 14.62 | 14.64 | 14.64 | 14.33 | 14.80 | 14.61 | 12.17 | 13.56 | 12.93 | 11.02 | 13.38 | 11.85 |
| Floor Technician (Marble/Carpets, etc.) | 11.00 | 12.75 | 11.33 | 17.36 | 17.36 | 17.36 | 15.97 | 15.97 | 15.97 | 14.10 | 14.33 | 14.10 |
| Houseperson | 13.22 | 13.87 | 13.58 | 14.15 | 15.20 | 14.67 | 12.43 | 13.98 | 13.03 | 11.36 | 12.70 | 11.80 |
| Floor Supervisor | 14.80 | 15.42 | 15.24 | 16.99 | 17.30 | 17.16 | 15.74 | 16.53 | 16.33 | 14.41 | 15.51 | 15.23 |
| Room Attendant | 13.37 | 13.85 | 13.68 | 13.94 | 14.69 | 14.31 | 12.23 | 13.70 | 12.96 | 11.01 | 12.99 | 11.81 |
| Turndown Attendant | 15.78 | 15.78 | 15.78 | 14.77 | 15.31 | 15.03 | 12.33 | 13.64 | 12.82 | 10.72 | 12.02 | 11.28 |
| Deep Cleaning Attendant | 19.65 | 19.65 | 19.65 | 17.25 | 17.25 | 17.25 | 10.00 | 15.00 | 12.12 | 11.39 | 14.18 | 12.75 |
| Housekeeping Clerk | 15.09 | 15.09 | 15.09 | 17.07 | 17.07 | 17.07 | 15.11 | 15.11 | 15.11 | 12.00 | 16.20 | 14.72 |
| Butler | | | | | | | | | | 15.00 | 16.48 | 15.44 |
| Head Butler | | | | | | | | | | | | |
| Shampoo/Marble Technician | | | | 18.04 | 18.04 | 18.04 | | | | | | |
| Window Washer | 16.15 | 16.15 | 16.15 | | | | 14.00 | | | 13.00 | 17.55 | 13.37 |
| **LAUNDRY** | | | | | | | | | | | | |
| Supervisor | 19.60 | 19.60 | 19.60 | 17.77 | 18.48 | 18.12 | 14.04 | 15.15 | 14.59 | 14.07 | 15.58 | 15.27 |
| Utility Attendants | 13.96 | 14.53 | 14.35 | 14.77 | 16.41 | 15.63 | 12.30 | 13.98 | 13.62 | 10.42 | 12.25 | 10.80 |
| Washer | 15.45 | 15.45 | 15.45 | 15.47 | 15.47 | 15.47 | 11.58 | 12.98 | 12.54 | 12.25 | 14.35 | 12.99 |
| Presser | | | | 16.22 | 16.40 | 16.35 | 13.71 | 14.21 | 13.96 | | | |
| Sorter | | | | 16.30 | 16.30 | 16.30 | 13.33 | 13.33 | 13.33 | 12.45 | 12.45 | 12.45 |
| Uniform Room Attendant | 15.35 | 15.37 | 15.37 | 15.80 | 15.80 | 15.80 | 13.66 | 14.06 | 14.06 | 11.79 | 13.36 | 12.40 |
| Alterationist | 16.15 | 16.15 | 16.15 | 16.16 | 16.16 | 16.16 | 13.62 | 15.00 | 14.85 | 13.65 | 14.74 | 14.38 |
| Dry Cleaner | | | | 18.06 | 18.88 | 18.47 | 16.97 | 16.97 | 16.97 | 14.53 | 20.10 | 18.44 |
| **SECURITY & PARKING** | | | | | | | | | | | | |
| Security Supervisor | 19.18 | 19.43 | 19.36 | 19.97 | 20.70 | 20.34 | 17.38 | 18.69 | 18.32 | 17.06 | 19.25 | 18.09 |
| Security Dispatcher | | | | | | | | | | 13.00 | 13.00 | 13.00 |
| Security Officer | 16.29 | 16.46 | 16.40 | 16.07 | 17.39 | 16.70 | 14.01 | 15.36 | 14.54 | 13.18 | 15.16 | 13.69 |
| Security Officer (3rd shift) | 17.30 | 17.47 | 17.18 | 17.90 | 17.90 | 17.90 | 13.94 | 15.75 | 15.08 | 14.42 | 15.15 | 14.73 |
| Parking Lot Attendant | 8.25 | 8.25 | 8.25 | 10.70 | 17.99 | 14.34 | 9.00 | 10.00 | 9.50 | | | |
| Parking Lot Dispatcher | 14.75 | 14.75 | 14.75 | | | | | | | | | |
| **FRONT DESK / OPERATIONS** | | | | | | | | | | | | |
| Supervisor | 16.65 | 17.35 | 16.93 | 18.81 | 19.17 | 18.99 | 16.58 | 18.18 | 17.47 | 17.51 | 19.37 | 18.01 |
| Front Desk Clerk | 15.14 | 15.60 | 15.36 | 16.36 | 17.19 | 16.70 | 14.35 | 15.63 | 14.76 | 13.14 | 14.22 | 13.41 |
| Front Desk Clerk (3rd shift) | 16.37 | 17.03 | 16.43 | 18.56 | 18.58 | 18.57 | 15.11 | 16.71 | 15.87 | 14.83 | 14.83 | 14.83 |
| Front Office Runner | | | | | | | | | | | | |
| Reservations Supervisor | 18.88 | 18.88 | 18.88 | 19.65 | 20.32 | 20.10 | 17.49 | 17.49 | 17.49 | 16.69 | 18.25 | 17.41 |
| Reservations Agent | 15.16 | 15.16 | 15.16 | 17.35 | 17.68 | 17.55 | 14.60 | 15.89 | 15.27 | 13.06 | 14.28 | 13.83 |
| Group Coordinator | 16.10 | 16.91 | 16.71 | 17.81 | 17.81 | 17.81 | 17.82 | 19.32 | 18.18 | 14.48 | 16.09 | 15.04 |
| Concierge | 15.70 | 16.03 | 15.87 | 16.13 | 17.09 | 16.60 | 14.58 | 16.23 | 15.79 | 12.81 | 14.71 | 13.53 |
| Head Concierge | 20.04 | 20.04 | 20.04 | 20.28 | 20.28 | 20.28 | 17.60 | 17.78 | 17.78 | 17.59 | 18.90 | 17.59 |
| Lobby Attendant | 9.00 | 10.57 | 10.44 | 16.49 | 16.49 | 16.49 | 13.81 | 13.81 | 13.81 | 13.00 | 13.86 | 13.21 |
| Rooms Controller | 19.67 | 19.67 | 19.67 | 18.55 | 18.55 | 18.55 | 12.00 | 18.00 | 12.20 | 14.48 | 15.25 | 15.12 |
| Management Trainee (in development) | | | | 18.05 | 18.05 | 18.05 | 19.81 | 19.81 | 19.81 | | | |
| **COMMUNICATIONS / PBX** | | | | | | | | | | | | |
| Supervisor | 16.69 | 17.10 | 17.10 | 17.73 | 17.73 | 17.73 | 15.58 | 18.08 | 16.27 | 16.43 | 19.13 | 18.04 |
| Operator | 14.39 | 14.57 | 14.52 | 16.25 | 16.53 | 16.40 | 13.85 | 15.47 | 14.67 | 12.95 | 14.88 | 13.40 |
| Operator (3rd shift) | 15.43 | 15.43 | 15.43 | | | | 14.64 | 16.31 | 15.25 | 14.15 | 15.05 | 15.05 |
| **UNIFORM SERVICE** | | | | | | | | | | | | |
| Guest Relations Coordinator | | | | 20.00 | 20.00 | 20.00 | | | | 15.00 | 15.51 | 15.00 |
| Guest Service Supervisor | 17.57 | 17.81 | 17.81 | 15.76 | 15.76 | 15.76 | 16.50 | 16.50 | 16.50 | 15.68 | 15.68 | 15.68 |
| Guest Service Attendant | | | | | | | | | | 9.25 | 9.25 | 9.25 |
| Bell Captain | 11.87 | 12.56 | 12.56 | 11.32 | 12.04 | 11.73 | 9.75 | 11.36 | 10.65 | 11.90 | 14.1/ | 12.48 |
| Driver | | | | 13.35 | 13.99 | 13.75 | 11.36 | 11.86 | 11.61 | 12.00 | 12.44 | 12.44 |
| Bell Attendant | 9.40 | 9.42 | 9.41 | 8.83 | 9.91 | 9.03 | 8.47 | 9.15 | 8.68 | 8.46 | 9.22 | 8.73 |
| Door Person | 11.37 | 11.37 | 11.37 | 8.73 | 9.48 | 9.10 | 11.97 | 12.42 | 12.14 | 9.20 | 9.84 | 9.36 |
| Valet / Garage Attendant | 10.91 | 10.91 | 10.91 | 9.73 | 11.53 | 10.02 | 8.56 | 10.16 | 9.05 | 8.20 | 8.83 | 8.53 |
| Garage Cashier | 13.10 | 13.50 | 13.10 | 13.80 | 13.80 | 13.80 | 12.83 | 12.83 | 12.83 | 9.70 | 9.76 | 9.70 |
| **ENGINEERING** | | | | | | | | | | | | |
| Supervisor | 25.53 | 26.87 | 25.80 | 26.05 | 27.17 | 26.47 | 25.49 | 27.82 | 27.14 | 23.39 | 27.47 | 26.77 |
| Coordinator | 19.25 | 19.25 | 19.25 | 19.33 | 19.33 | 19.33 | 17.13 | 18.18 | 17.31 | 17.17 | 19.61 | 18.02 |

HOURLY COMPENSATION SURVEY - YEAR 2014

 ecg

## 2014 HOURLY COMPENSATION SURVEY - THE RESULTS
### ZONES 1 - 4

| POSITION TITLES | ZONE 1 | | | ZONE 2 | | | ZONE 3 | | | ZONE 4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay |
| Painter | $ 18.71 | $ 19.59 | $ 19.59 | $ 22.98 | $ 24.12 | $ 23.55 | 18.73 | 19.32 | 18.98 | 16.42 | 20.45 | 17.68 |
| Mechanical Engineer | $ 27.96 | $ 27.96 | $ 27.96 | $ 34.15 | $ 34.15 | $ 34.15 | 19.25 | 25.03 | 24.39 | 21.03 | 23.89 | 23.89 |
| General Maintenance | $ 15.58 | $ 19.17 | $ 16.79 | $ 20.44 | $ 21.53 | $ 20.98 | 21.94 | 23.29 | 22.59 | 15.46 | 24.34 | 21.58 |
| Engineer 1 (low skill) | $ 16.66 | $ 17.68 | $ 17.35 | $ 17.74 | $ 18.74 | $ 18.38 | 17.13 | 18.43 | 17.75 | 14.70 | 16.02 | 15.24 |
| Engineer 2 (medium skill) | $ 20.43 | $ 21.24 | $ 20.65 | $ 20.27 | $ 21.23 | $ 20.70 | 19.76 | 22.11 | 21.08 | 17.33 | 20.89 | 18.59 |
| Engineer 3 (high skill) | $ 24.06 | $ 24.16 | $ 24.16 | $ 24.60 | $ 25.26 | $ 25.02 | 24.61 | 26.62 | 26.07 | 20.11 | 23.77 | 21.22 |
| Utility Engineer (entry level) | $ 19.46 | $ 19.46 | $ 19.46 | | | | 15.15 | 15.35 | 15.25 | 17.00 | 30.36 | 23.59 |
| Carpenter | $ 24.05 | $ 24.05 | $ 24.05 | $ 30.93 | $ 30.93 | $ 30.93 | 21.84 | 22.84 | 22.34 | 19.61 | 24.87 | 24.68 |
| **SALES/MKTG, CATERING & CONV SVC** | | | | | | | | | | | | |
| Receptionist | $ 15.52 | $ 16.83 | $ 16.83 | | | | | | | | | |
| Administrative Assistant | $ 18.13 | $ 18.40 | $ 18.27 | $ 19.20 | $ 20.52 | $ 19.76 | 17.16 | 19.05 | 17.99 | 15.06 | 17.86 | 15.63 |
| Event/Social Media Admin Assistant | | | | | | | 20.15 | 20.15 | 20.15 | 16.17 | 18.80 | 16.20 |
| Social Media / Marketing Coordinator | $ 19.58 | $ 19.58 | $ 19.58 | $ 23.91 | $ 25.60 | $ 24.76 | 12.00 | 18.00 | 13.46 | 21.23 | 21.23 | 21.23 |
| Sales / Catering Coordinator | $ 18.00 | $ 18.77 | $ 18.28 | $ 20.37 | $ 20.96 | $ 20.67 | 17.37 | 19.64 | 17.89 | 15.69 | 17.84 | 16.41 |
| Wedding Coordinator | | | | | | | | | | 15.25 | 15.25 | 15.25 |
| Marketing Coordinator | | | | | | | | | | | | |
| Sales Systems Analyst | $ 19.34 | $ 19.34 | $ 19.34 | $ 19.50 | $ 21.25 | $ 20.69 | 17.16 | 18.20 | 18.20 | 20.28 | 20.28 | 20.28 |
| Tour Coordinator | | | | | | | | | | | | |
| Convention/Conference Svcs Coordinator | $ 17.19 | $ 18.34 | $ 17.72 | $ 19.20 | $ 19.20 | $ 19.20 | 18.76 | 19.52 | 19.35 | 18.00 | 18.00 | 18.00 |
| Meeting Concierge | | | | $ 15.50 | $ 18.60 | $ 16.21 | 16.71 | 18.92 | 18.92 | 16.00 | 16.00 | 16.00 |
| VIP Coordinator | $ 21.63 | $ 21.63 | $ 21.63 | | | | | | | | | |
| **AUDIO VISUAL** | | | | | | | | | | | | |
| Audio Visual Supervisor | | | | | | | | | | | | |
| Audio Visual Technician | | | | | | | 14.42 | 16.52 | 15.47 | | | |
| **INFORMATION TECHNOLOGY / MIS** | | | | | | | | | | | | |
| MIS Coordinator | | | | $ 29.57 | $ 29.57 | $ 29.57 | 20.00 | 23.00 | 21.50 | 16.00 | 17.72 | 16.00 |
| PC Specialist | $ 18.55 | $ 18.55 | $ 18.55 | $ 21.06 | $ 21.36 | $ 21.21 | 18.77 | 20.77 | 19.77 | | | |
| Computer Programmer | | | | | | | 27.00 | 27.81 | 27.81 | | | |

CONFIDENTIAL

Exhibit 5 Page 492

HOURLY COMPENSATION SURVEY · YEAR 2014



## 2014 HOURLY COMPENSATION SURVEY · THE RESULTS
### ZONES 1 · 4

| POSITION TITLES | ZONE 1 Minimum Pay | Maximum Pay | Average Pay | ZONE 2 Minimum Pay | Maximum Pay | Average Pay | ZONE 3 Minimum Pay | Maximum Pay | Average Pay | ZONE 4 Minimum Pay | Maximum Pay | Average Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GROUNDS · LANDSCAPING** | | | | | | | | | | | | |
| Grounds Supervisor | | | | $ 24.65 | $ 24.65 | $ 24.65 | 15.00 | 16.20 | 16.20 | | | |
| Grounds Keeper | | | | $ 14.70 | $ 15.74 | $ 15.22 | 11.27 | 14.06 | 12.96 | 10.72 | 13.29 | 11.46 |
| Landscaper | | | | | | | | | | | | |
| Floral Attendant | | | | | | | | | | | | |
| **SPA / HEALTH CLUB / RETAIL** | | | | | | | | | | | | |
| Spa Supervisor | $ 17.93 | $ 17.93 | $ 17.93 | $ 19.00 | $ 19.00 | $ 19.00 | 17.02 | 18.45 | 18.12 | 15.56 | 17.70 | 16.91 |
| Front Desk Spa · Reception/Scheduler | $ 15.25 | $ 15.25 | $ 15.25 | $ 15.87 | $ 16.27 | $ 16.06 | 15.13 | 15.42 | 15.42 | 10.71 | 12.11 | 11.24 |
| Lounge Attendant | | | | $ 13.00 | $ 15.91 | $ 14.24 | 15.59 | 15.59 | 15.59 | 9.40 | 9.77 | 9.40 |
| Massage Therapist | | | | $ 8.20 | $ 8.20 | $ 8.20 | 11.81 | 11.96 | 11.96 | 8.00 | 9.00 | 8.30 |
| Esthetician | $ 8.00 | $ 8.00 | $ 8.00 | $ 8.20 | $ 8.20 | $ 8.20 | 8.41 | 8.61 | 8.61 | 8.00 | 8.50 | 8.29 |
| Nail Technician | $ 8.00 | $ 8.00 | $ 8.00 | $ 8.80 | $ 8.80 | $ 8.80 | 9.12 | 9.42 | 9.42 | 8.00 | 8.50 | 8.23 |
| Hair Stylist | | | | | | | 8.24 | 8.83 | 8.83 | | | |
| Health Club Attendant (Cleaning/Janitorial) | | | | $ 14.68 | $ 14.68 | $ 14.68 | 13.10 | 14.03 | 13.95 | 10.00 | 12.21 | 10.46 |
| Retail Specialist | | | | $ 15.88 | $ 17.65 | $ 16.48 | 17.98 | 19.23 | 19.23 | 16.50 | 19.50 | 18.65 |
| Retail Clerk/Attendant | $ 14.63 | $ 14.63 | $ 14.63 | | | | 13.65 | 14.02 | 14.02 | 10.24 | 11.71 | 10.76 |
| Child Activities Leader | | | | $ 14.00 | $ 14.42 | $ 14.21 | 10.50 | 11.00 | 10.75 | 13.15 | 15.90 | 14.10 |
| Aerobics / Pilates / Yoga Instructor | | | | | | | 18.12 | 21.42 | 19.92 | 17.49 | 18.14 | 17.91 |
| **GOLF / TENNIS / POOL / CNTRY CLB** | | | | | | | | | | | | |
| Golf Supervisor | | | | | | | | | | | | |
| Golf Pro | | | | | | | | | | | | |
| Golf Caddy | | | | | | | | | | | | |
| Golf Instructor | | | | | | | | | | | | |
| Greens Keeper | | | | | | | | | | | | |
| Spray Technician (greens) | | | | | | | | | | | | |
| Irrigators | | | | | | | | | | 25.33 | 25.33 | 25.33 |
| Head Mechanic | | | | | | | | | | 25.33 | 25.33 | 25.33 |
| Mechanic | | | | | | | | | | 22.33 | 22.33 | 22.33 |
| Equipment Operator | | | | | | | | | | | | |
| Bag Room Attendant | | | | | | | | | | | | |
| Golf Shop Retain Attendant | | | | | | | | | | | | |
| Buyer (Golf Outlet) | | | | | | | | | | | | |
| Foreperson | | | | | | | | | | | | |
| Golf Lead Server | | | | | | | | | | | | |
| Golf Server | | | | | | | | | | | | |
| Tennis Supervisor | | | | | | | | | | | | |
| Tennis Coordinator | | | | | | | | | | | | |
| Tennis Instructor | | | | | | | | | | 10.67 | 11.85 | 11.85 |
| Tennis Lead Server | | | | | | | | | | | | |
| Tennis Server | | | | | | | | | | | | |
| Tennis Bartender | | | | | | | | | | | | |
| Pool Supervisor | $ 18.29 | $ 18.79 | $ 18.54 | | | | | | | 8.00 | 8.00 | 8.00 |
| Pool Lead Server | | | | | | | 14.84 | 14.87 | 14.84 | | | |
| Pool Server | $ 9.44 | $ 9.44 | $ 9.44 | $ 8.85 | $ 8.85 | $ 8.85 | 8.29 | 8.42 | 8.42 | 8.00 | 8.00 | 8.00 |
| Pool Bartender | $ 14.54 | $ 14.54 | $ 14.54 | $ 13.84 | $ 13.84 | $ 13.84 | | | | 8.00 | 8.00 | 8.00 |
| Aquatics Coordinator/Pool Concierge | | | | | | | | | | | | |
| Aquatics Instructor | | | | | | | 14.00 | 15.00 | 14.50 | | | |
| Lead Life Guard | | | | | | | | | | | | |
| Life Guard | | | | | | | 10.75 | 11.25 | 11.00 | | | |
| Lead Pool Attendant | | | | $ 14.69 | $ 14.69 | $ 14.69 | | | | | | |
| Pool Attendant | $ 14.80 | $ 14.80 | $ 14.80 | $ 12.84 | $ 14.51 | $ 13.26 | 12.52 | 13.06 | 13.06 | 10.00 | 11.26 | 10.32 |
| Fitness Attendant | $ 14.25 | $ 14.25 | $ 14.25 | | | | 11.87 | 11.87 | 11.87 | | | |
| Country Club Lead Server | | | | | | | | | | | | |
| Country Club Server | | | | | | | | | | | | |
| County Club Bartender | | | | | | | | | | | | |
| Artist in Residence | | | | | | | | | | | | |
| Camp Counselor | | | | | | | | | | | | |
| Night Shift Differential Amount | | | | | $ 1.06 | | | | | | | |
| Do you cap ($) hourly positions: | | 0 | | | 0 | | | 0 | | | 0 | |
| If yes, at what year are most capped: | | | | | | | | | | | | |


ECG

2013 HOURLY COMPENSATION SURVEY · THE RESULTS
ZONES 1 - 4

### HOURLY SUMMARY COMPENSATION

| POSITION TITLES | Zone 1 | | | Zone 2 | | | Zone 3 | | | Zone 4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay | Minimum Pay | Maximum Pay | Average Pay |
| **OFFICE & CLERICAL** | | | | | | | | | | | | |
| Benefits Coordinator | 19.21 | 23.65 | 20.99 | | | | 21.00 | 22.00 | 21.50 | 20.42 | 20.76 | 20.59 |
| HR Coordinator | 18.78 | 19.85 | 19.03 | 17.60 | 19.32 | 17.75 | 17.73 | 19.15 | 18.93 | 17.71 | 18.98 | 18.32 |
| Employment Coordinator | | | | | | | | | | 18.00 | 18.00 | 18.00 |
| HR Representative/Clerk | | | | | | | | | | | | |
| HR Assistant | 15.50 | 16.83 | 16.17 | 15.88 | 15.88 | 15.88 | 14.95 | 15.62 | 15.62 | 14.75 | 17.55 | 16.15 |
| Safety Coordinator | | | | | | | 17.20 | 17.20 | 17.20 | | | |
| File Clerk | 10.66 | 10.66 | 10.66 | | | | | | | | | |
| Receptionist | 14.25 | 18.10 | 15.25 | | | | | | | 10.75 | 17.89 | 15.05 |
| Executive Administrative Assistant to GM | 21.96 | 22.80 | 22.30 | 22.94 | 25.14 | 23.34 | 22.38 | 24.38 | 23.38 | 19.44 | 25.26 | 23.53 |
| Administrative Assistant to a Manager | 17.08 | 18.75 | 17.92 | 19.34 | 21.59 | 19.76 | 17.01 | 18.93 | 17.92 | 14.75 | 20.64 | 16.82 |
| Design Assistant | | | | | | | | | | | | |
| Intern | | | | 9.00 | 9.00 | 9.00 | | | | | | |
| **FINANCE** | | | | | | | | | | | | |
| Paymaster | 23.21 | 26.25 | 25.48 | 22.37 | 22.37 | 22.37 | 22.50 | 23.75 | 23.13 | 20.44 | 22.79 | 21.84 |
| Payroll Clerk | 16.00 | 16.00 | 16.00 | | | | 18.67 | 21.73 | 20.91 | 20.96 | 23.34 | 22.15 |
| Accounts Payable Clerk | 18.10 | 19.96 | 18.99 | 18.53 | 19.03 | 19.03 | 17.95 | 19.15 | 18.97 | 18.62 | 20.70 | 19.39 |
| Accounting Clerk | 16.85 | 17.85 | 17.25 | 18.59 | 18.59 | 18.59 | 15.00 | 17.00 | 16.39 | 18.98 | 20.66 | 19.82 |
| Accounts Receivable Clerk | 17.09 | 17.91 | 17.45 | 19.68 | 20.18 | 20.18 | 17.74 | 19.14 | 18.34 | 18.03 | 21.54 | 19.82 |
| Lead Night Auditor | | | | 15.00 | 19.00 | 17.50 | 18.37 | 18.37 | 18.37 | 17.24 | 21.11 | 19.18 |
| Night Auditor | 16.84 | 16.84 | 16.84 | 15.80 | 17.05 | 16.27 | 13.85 | 16.52 | 15.13 | 13.98 | 15.62 | 13.98 |
| Day Auditor | 18.43 | 19.69 | 18.57 | 18.74 | 18.74 | 18.74 | 18.66 | 18.66 | 18.66 | 19.25 | 21.11 | 20.18 |
| Purchasing Agent | | | | 17.68 | 19.01 | 18.01 | 16.87 | 17.98 | 17.25 | 14.21 | 17.30 | 15.51 |
| Purchasing Administrative Assistant | | | | | | | 15.75 | 16.75 | 16.25 | 14.45 | 14.45 | 14.45 |
| General Cashier | 16.81 | 18.36 | 17.74 | 18.68 | 18.68 | 18.68 | 16.89 | 17.14 | 17.01 | 18.24 | 19.78 | 19.01 |
| Credit & Collections Clerk | 14.00 | 17.78 | 14.50 | | | | 17.00 | 25.16 | 19.57 | | | |
| Senior Clerk | | | | | | | | | | 20.56 | 23.14 | 21.85 |

CONFIDENTIAL

Exhibit 5 Page 494

7



**2013 HOURLY COMPENSATION SURVEY · THE RESULTS**
ZONES 1 - 4

### HOURLY SUMMARY COMPENSATION

| POSITION TITLES | Z1 Min | Z1 Max | Z1 Avg | Z2 Min | Z2 Max | Z2 Avg | Z3 Min | Z3 Max | Z3 Avg | Z4 Min | Z4 Max | Z4 Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STOREROOM** | | | | | | | | | | | | |
| Supervisor | 19.62 | 20.25 | 20.21 | 20.54 | 20.54 | 20.54 | 17.28 | 18.92 | 18.43 | 13.50 | 18.77 | 16.13 |
| Storeroom Clerk | 14.61 | 15.26 | 14.74 | 16.41 | 16.41 | 16.41 | 13.84 | 15.48 | 14.59 | 11.67 | 14.72 | 12.62 |
| Lead Storeroom Clerk | | | | | | | | | | | | |
| Receiving Clerk | 15.53 | 15.53 | 15.53 | 17.94 | 17.98 | 17.96 | 15.12 | 15.87 | 15.87 | 14.26 | 16.11 | 15.13 |
| **F&B CASHIER** | | | | | | | | | | | | |
| Head Cashier | | | | | | | | | | 10.35 | 11.50 | 10.74 |
| Room Service Cashier | 12.50 | 15.87 | 13.11 | 12.80 | 13.70 | 13.25 | 12.04 | 14.68 | 14.18 | 12.25 | 14.33 | 12.91 |
| Room Service Cashier (3rd shift) | 14.25 | 14.25 | 14.25 | 11.00 | 11.00 | 11.00 | 12.00 | 12.00 | 12.00 | | | |
| Restaurant Cashier | 12.43 | 14.12 | 12.63 | 12.00 | 12.00 | 12.00 | 13.13 | 14.70 | 14.07 | | | |
| **CULINARY** | | | | | | | | | | | | |
| Kitchen Supervisor | 17.84 | 19.86 | 18.88 | 16.57 | 16.95 | 16.76 | 17.06 | 19.15 | 18.15 | 17.50 | 22.93 | 20.13 |
| Garde Manger | 16.68 | 16.68 | 16.68 | 19.01 | 19.01 | 19.01 | 16.30 | 18.05 | 18.05 | 10.00 | 18.23 | 13.98 |
| Assistant Garde Manger | | | | | | | | | | | | |
| Butcher | 17.95 | 18.28 | 18.28 | 19.53 | 19.53 | 19.53 | | | | 19.58 | 19.86 | 19.58 |
| Pastry Chef | 19.39 | 19.39 | 19.39 | | | | 18.81 | 18.81 | 18.81 | 18.27 | 18.27 | 18.27 |
| Assistant Pastry Chef | 19.40 | 19.40 | 19.40 | | | | | | | 17.99 | 19.57 | 17.99 |
| Pastry Cook I | 17.68 | 17.68 | 17.68 | 16.60 | 17.16 | 16.88 | 16.52 | 17.10 | 17.10 | 15.21 | 17.23 | 16.32 |
| Pastry Cook II (baker) | 16.95 | 17.20 | 17.08 | 16.57 | 16.90 | 16.66 | 16.73 | 16.73 | 16.73 | 13.77 | 15.78 | 14.56 |
| **MAIN KITCHEN / BANQUETS** | | | | | | | | | | | | |
| Lead Cook (Cook I) | 17.51 | 17.71 | 17.62 | 16.98 | 18.23 | 17.42 | 16.93 | 18.16 | 17.55 | 14.21 | 18.54 | 16.26 |
| Main Cook (Cook II) | 16.06 | 16.80 | 16.30 | 15.70 | 16.66 | 16.21 | 14.67 | 16.57 | 15.72 | 12.90 | 15.73 | 14.18 |
| Prep Cook (Cook III) | 14.70 | 15.16 | 14.76 | 14.40 | 15.13 | 14.60 | 11.77 | 13.54 | 12.73 | 11.50 | 13.52 | 12.56 |
| Pantry (Entry Level) | 12.98 | 14.93 | 13.95 | 16.69 | 16.69 | 16.69 | 14.03 | 16.22 | 15.71 | 12.35 | 12.35 | 12.35 |
| Cook (3rd shift) | | | | 18.09 | 18.09 | 18.09 | 14.46 | 15.34 | 14.88 | 15.00 | 15.00 | 15.00 |
| Lead Pantry | | | | 15.88 | 15.88 | 15.88 | 17.31 | 17.31 | 17.31 | | | |
| Banquet Cook | 17.41 | 17.41 | 17.41 | | | | 14.11 | 16.05 | 16.05 | 18.40 | 18.40 | 18.40 |
| Apprentice | 10.50 | 10.50 | 10.50 | 9.00 | 9.00 | 9.00 | | | | 10.00 | 10.00 | 10.00 |
| Buffet Runner/Food Runner | 12.56 | 16.45 | 12.56 | 13.00 | 13.00 | 13.00 | 13.39 | 13.50 | 13.46 | 8.74 | 11.62 | 9.74 |
| **GOURMET RESTAURANT** | | | | | | | | | | | | |
| Lead Cook (Cook I) | | | | 16.62 | 16.93 | 16.74 | 16.59 | 17.71 | 17.15 | 15.90 | 18.23 | 16.99 |
| Main Cook (Cook II) | | | | 15.21 | 16.20 | 15.59 | 16.34 | 16.98 | 16.55 | 13.84 | 15.88 | 14.72 |
| Prep Cook (Cook III) | | | | 14.82 | 14.91 | 14.86 | 12.16 | 13.51 | 12.83 | 12.10 | 14.11 | 12.77 |
| Pantry (Entry Level) | | | | 16.23 | 16.23 | 16.23 | 17.48 | 17.48 | 17.48 | 12.18 | 16.33 | 12.56 |
| **MAIN RESTAURANT** | | | | | | | | | | | | |
| Lead Cook (Cook I) | 17.80 | 17.85 | 17.83 | 16.33 | 16.38 | 16.34 | 14.84 | 17.50 | 15.62 | 14.65 | 18.17 | 16.18 |
| Main Cook (Cook II) | 16.65 | 16.78 | 16.78 | 16.20 | 16.20 | 16.20 | 16.05 | 16.83 | 16.43 | 12.72 | 14.36 | 13.57 |
| Prep Cook (Cook III) | 15.53 | 15.53 | 15.53 | 15.76 | 15.87 | 15.82 | 12.88 | 15.40 | 13.96 | 12.17 | 13.75 | 12.93 |
| Pantry (Entry level) | 13.40 | 13.40 | 13.40 | 16.69 | 16.69 | 16.69 | | | | 11.55 | 13.15 | 12.43 |
| **EMPLOYEE CAFETERIA** | | | | | | | | | | | | |
| Supervisor | 15.19 | 17.07 | 15.31 | 19.23 | 19.23 | 19.23 | 15.25 | 16.57 | 15.67 | 16.16 | 17.01 | 16.89 |
| Cook | 15.28 | 16.07 | 15.48 | 15.99 | 16.49 | 16.28 | 15.14 | 15.78 | 15.69 | 12.53 | 12.93 | 12.72 |
| Server | 13.89 | 15.28 | 13.90 | 16.44 | 16.61 | 16.53 | 12.88 | 15.02 | 14.47 | | | |
| Utility | 14.09 | 14.09 | 14.09 | 13.26 | 14.95 | 13.74 | 12.32 | 12.82 | 12.57 | 11.23 | 12.93 | 12.07 |
| **STEWARDING** | | | | | | | | | | | | |
| Supervisor | 16.22 | 17.53 | 16.80 | 16.36 | 17.03 | 16.62 | 15.42 | 16.92 | 15.90 | 14.13 | 16.78 | 15.98 |
| Night Cleaner Supervisor | | | | 13.00 | 13.00 | 13.00 | | | | 12.64 | 12.64 | 12.64 |
| Night Cleaner | 12.95 | 12.95 | 12.95 | 14.64 | 14.64 | 14.64 | 12.90 | 14.58 | 14.25 | 13.59 | 13.90 | 13.75 |
| Steward | 13.64 | 14.28 | 13.73 | 12.88 | 14.00 | 13.30 | 11.86 | 13.66 | 12.87 | 10.81 | 12.96 | 11.54 |
| Pot Washer | | | | 12.25 | 13.25 | 12.75 | | | | 11.00 | 12.26 | 11.84 |
| Ware Washer | | | | 15.50 | 15.50 | 15.50 | | | | | | |
| Banquet Runner | | | | | | | 12.77 | 14.62 | 14.23 | | | |
| **ROOM SERVICE - IN ROOM DINING** | | | | | | | | | | | | |
| Supervisor | 15.25 | 18.73 | 15.85 | 15.30 | 15.92 | 15.61 | 17.62 | 17.62 | 17.62 | 12.88 | 13.88 | 13.21 |
| Order Taker | 14.59 | 15.33 | 14.73 | 14.83 | 15.55 | 15.12 | 13.43 | 15.23 | 14.46 | 11.65 | 13.84 | 12.37 |
| Server | 8.77 | 8.98 | 8.79 | 8.49 | 9.65 | 8.52 | 8.05 | 8.58 | 8.31 | 8.06 | 8.67 | 8.26 |
| Bus Person | 14.55 | 14.55 | 14.55 | 12.95 | 12.95 | 12.95 | 10.49 | 11.95 | 11.49 | 8.50 | 8.50 | 8.50 |
| Captain | | | | 10.95 | 10.95 | 10.95 | | | | 11.33 | 14.73 | 12.62 |
| **GOURMET RESTAURANT** | | | | | | | | | | | | |
| Supervisor | 17.00 | 18.74 | 17.33 | | | | 17.07 | 18.07 | 17.57 | 16.33 | 19.05 | 17.94 |
| Host Person/Greeter | 14.94 | 15.61 | 15.02 | 15.09 | 15.96 | 15.46 | 13.53 | 14.57 | 13.79 | 11.82 | 13.48 | 12.41 |
| Server | 8.59 | 8.59 | 8.59 | 8.06 | 8.13 | 8.06 | 8.00 | 8.37 | 8.17 | 8.41 | 9.94 | 8.95 |
| Busperson | 11.30 | 11.30 | 11.30 | 9.95 | 10.25 | 10.00 | 10.13 | 11.15 | 11.37 | 8.42 | 9.76 | 8.96 |
| Food Runner | 11.80 | 11.80 | 11.80 | 10.79 | 10.91 | 10.81 | 12.92 | 14.32 | 13.68 | 8.44 | 9.10 | 8.75 |
| Captain | | | | 12.00 | 12.00 | 12.00 | | | | | | |
| Sommelier/Wine Steward | 15.00 | 15.00 | 15.00 | 19.12 | 21.36 | 20.24 | | | | 14.50 | 20.30 | 17.40 |
| **CAFE or MAIN RESTAURANT** | | | | | | | | | | | | |
| Supervisor | 15.44 | 16.60 | 15.66 | 16.00 | 19.71 | 17.86 | 15.45 | 17.21 | 15.96 | 16.50 | 16.75 | 16.63 |
| Host Person/Greeter | 12.69 | 14.16 | 13.48 | 14.10 | 14.45 | 14.29 | 14.06 | 15.34 | 14.72 | 11.80 | 13.37 | 12.40 |
| Server | 9.66 | 9.66 | 9.66 | 8.19 | 8.69 | 8.29 | 8.16 | 8.69 | 8.28 | 8.09 | 9.00 | 8.35 |
| Busperson | 10.88 | 10.88 | 10.88 | 10.56 | 10.81 | 10.73 | 10.72 | 11.56 | 11.31 | 8.42 | 9.48 | 8.64 |
| **MINI BAR** | | | | | | | | | | | | |
| Supervisor | | | | 16.00 | 16.00 | 16.00 | | | | | | |
| Attendant | 13.12 | 13.34 | 13.26 | 12.63 | 13.14 | 12.91 | 12.74 | 12.74 | 12.74 | 11.00 | 12.81 | 11.95 |
| **CONCIERGE - CLUB LOUNGE** | | | | | | | | | | | | |
| Concierge/Host | 13.48 | 14.08 | 13.73 | 17.74 | 17.74 | 17.74 | 14.45 | 16.19 | 15.73 | 12.98 | 15.23 | 13.34 |

HOURLY COMPENSATION SURVEY - YEAR 2013

ECG

2013 HOURLY COMPENSATION SURVEY - THE RESULTS
ZONES 1 - 4

**HOURLY SUMMARY COMPENSATION**

| POSITION TITLES | ZONE 1 Minimum Pay | Maximum Pay | Average Pay | ZONE 2 Minimum Pay | Maximum Pay | Average Pay | ZONE 3 Minimum Pay | Maximum Pay | Average Pay | ZONE 4 Minimum Pay | Maximum Pay | Average Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Food Attendant | $ 12.55 | $ 12.55 | $ 12.55 | | | | $ 12.76 | $ 14.88 | $ 14.35 | | | |
| **BEVERAGE OUTLET** | | | | | | | | | | | | |
| Beverage Outlet Supervisor | $ 20.00 | $ 20.00 | $ 20.00 | | | | $ 18.02 | $ 18.02 | $ 18.02 | $ 15.00 | $ 15.00 | $ 15.00 |
| Head Bartender | $ 13.39 | $ 15.89 | $ 14.59 | $ 15.39 | $ 15.39 | $ 15.39 | $ 18.76 | $ 12.64 | $ 12.20 | $ 13.84 | $ 15.84 | $ 14.79 |
| Service Bartender | $ 10.00 | $ 13.00 | $ 12.50 | $ 14.34 | $ 14.34 | $ 14.34 | $ 13.21 | $ 14.44 | $ 14.40 | $ 11.99 | $ 11.99 | $ 11.99 |
| Bartender | $ 11.53 | $ 11.97 | $ 11.80 | $ 11.88 | $ 12.43 | $ 12.05 | $ 11.45 | $ 12.84 | $ 12.24 | $ 9.41 | $ 10.75 | $ 9.99 |
| Café Bartender | | | | | | | | | | | | |
| Host Person/Greeter | $ 15.79 | $ 15.79 | $ 15.79 | $ 16.57 | $ 16.57 | $ 16.57 | $ 14.11 | $ 14.11 | $ 14.11 | $ 8.00 | $ 8.00 | $ 8.00 |
| Cocktail Server | $ 8.99 | $ 8.99 | $ 8.99 | $ 8.07 | $ 8.07 | $ 8.07 | $ 8.00 | $ 8.30 | $ 8.04 | $ 8.53 | $ 8.70 | $ 8.62 |
| Barback | $ 10.38 | $ 10.73 | $ 10.48 | $ 12.67 | $ 12.82 | $ 12.74 | $ 13.02 | $ 14.03 | $ 13.90 | $ 8.64 | $ 9.18 | $ 8.93 |
| Front Bartender (night club) | | | | $ 8.00 | $ 8.00 | $ 8.00 | | | | $ 8.25 | $ 9.23 | $ 8.58 |
| **OTHER OUTLETS** | | | | | | | | | | | | |
| Snack bar/Coffee Attendant | $ 12.27 | $ 13.41 | $ 12.65 | $ 15.37 | $ 15.37 | $ 15.37 | $ 14.51 | $ 15.60 | $ 15.60 | $ 10.50 | $ 15.47 | $ 11.46 |
| Cashier | $ 12.43 | $ 14.12 | $ 12.59 | $ 15.37 | $ 15.37 | $ 15.37 | $ 13.09 | $ 16.36 | $ 16.36 | | | |
| Barista Line Server (i.e.: Starbucks) | $ 13.55 | $ 13.55 | $ 13.55 | $ 14.31 | $ 14.31 | $ 14.31 | $ 14.21 | $ 16.39 | $ 15.84 | $ 12.50 | $ 12.81 | $ 12.59 |
| **BANQUET FOOD SERVICE** | | | | | | | | | | | | |
| Captain | $ 15.90 | $ 16.57 | $ 16.07 | $ 12.66 | $ 12.76 | $ 12.66 | $ 10.85 | $ 12.04 | $ 11.58 | $ 11.46 | $ 12.76 | $ 11.73 |
| Captain including tips | | | | $ 21.63 | $ 21.63 | $ 21.63 | $ 39.05 | $ 39.05 | $ 39.05 | $ 10.75 | $ 10.75 | $ 10.75 |
| Server | $ 11.51 | $ 11.89 | $ 11.70 | $ 9.40 | $ 9.45 | $ 9.40 | $ 8.96 | $ 9.96 | $ 9.36 | $ 8.06 | $ 8.89 | $ 8.45 |
| Server including tips | $ 8.00 | $ 8.00 | $ 8.00 | | | | $ 29.49 | $ 29.49 | $ 29.49 | $ 8.00 | $ 8.00 | $ 8.00 |
| Bus Person | $ 11.35 | $ 11.35 | $ 11.35 | $ 11.26 | $ 11.26 | $ 11.26 | $ 9.61 | $ 10.37 | $ 10.37 | $ 10.08 | $ 10.70 | $ 10.23 |
| Bus Person including tips | | | | | | | | | | | | |
| **BANQUET BEVERAGE SERVICE** | | | | | | | | | | | | |
| Banquet Beverage Captain | $ 12.15 | $ 12.15 | $ 12.15 | $ 9.03 | $ 9.03 | $ 9.03 | $ 12.82 | $ 12.82 | $ 12.82 | $ 8.25 | $ 9.50 | $ 9.36 |
| Banquet Beverage Captain  including tips | | | | | | | | | | | | |
| Bartender | $ 9.95 | $ 9.95 | $ 9.95 | $ 17.88 | $ 17.88 | $ 17.88 | $ 11.42 | $ 13.15 | $ 12.62 | $ 8.57 | $ 10.03 | $ 9.32 |
| Bartender including tips | | | | | | | $ 35.27 | $ 35.27 | $ 35.27 | $ 8.00 | $ 8.00 | $ 8.00 |
| Barback | | | | $ 12.26 | $ 12.26 | $ 12.26 | $ 11.24 | $ 13.43 | $ 12.84 | | | |
| Barback including tips | | | | | | | | | | $ 8.00 | $ 8.00 | $ 8.00 |
| **BANQUET SET UP** | | | | | | | | | | | | |
| Supervisor | $ 14.55 | $ 15.81 | $ 14.91 | $ 16.50 | $ 16.50 | $ 16.50 | $ 14.97 | $ 16.47 | $ 15.72 | $ 10.81 | $ 15.32 | $ 12.68 |
| Supervisor including tips | | | | | | | | | | | | |
| Lead Houseperson | $ 13.41 | $ 14.27 | $ 14.27 | $ 16.08 | $ 16.25 | $ 16.08 | $ 12.86 | $ 14.01 | $ 12.86 | $ 11.65 | $ 11.65 | $ 11.65 |
| Lead Houseperson including tips | | | | | | | $ 35.22 | $ 35.22 | $ 35.22 | | | |
| Houseperson | $ 13.14 | $ 14.66 | $ 13.87 | $ 13.03 | $ 13.14 | $ 13.07 | $ 11.90 | $ 13.31 | $ 12.29 | $ 8.93 | $ 10.47 | $ 9.48 |
| Houseperson including tips | | | | | | | $ 20.45 | $ 20.45 | $ 20.45 | $ 9.50 | $ 9.50 | $ 9.50 |
| **HOUSEKEEPING** | | | | | | | | | | | | |
| Office Supervisor | $ 16.83 | $ 16.83 | $ 16.83 | $ 15.70 | $ 16.18 | $ 15.94 | $ 13.71 | $ 17.17 | $ 15.22 | $ 15.75 | $ 17.01 | $ 16.39 |
| Dispatcher | $ 14.46 | $ 14.46 | $ 14.46 | $ 15.63 | $ 16.94 | $ 16.20 | $ 14.33 | $ 15.28 | $ 15.14 | $ 13.50 | $ 14.68 | $ 14.11 |
| Expediter | | | | | | | | | | | | |
| Night Lead Houseperson | $ 17.75 | $ 17.75 | $ 17.75 | | | | $ 14.34 | $ 14.34 | $ 14.34 | $ 12.59 | $ 14.33 | $ 12.92 |
| Shampoo Person | $ 14.55 | $ 15.57 | $ 15.06 | | | | | | | | | |
| Public Space Cleaner | $ 13.93 | $ 14.47 | $ 14.18 | $ 13.60 | $ 14.22 | $ 13.80 | $ 11.77 | $ 12.99 | $ 12.50 | $ 11.23 | $ 12.65 | $ 11.91 |
| Floor Technician (Marble/Carpets, etc.) | | | | $ 16.80 | $ 16.80 | $ 16.80 | $ 14.40 | $ 14.40 | $ 14.40 | $ 11.83 | $ 15.22 | $ 13.15 |
| Houseperson | $ 13.48 | $ 14.17 | $ 13.59 | $ 13.07 | $ 14.40 | $ 13.73 | $ 11.81 | $ 13.53 | $ 12.56 | $ 11.30 | $ 12.97 | $ 11.93 |
| Floor Supervisor | $ 15.16 | $ 16.20 | $ 15.41 | $ 15.20 | $ 16.53 | $ 15.79 | $ 15.88 | $ 16.50 | $ 16.15 | $ 14.85 | $ 16.02 | $ 15.70 |
| Room Attendant | $ 13.23 | $ 14.16 | $ 13.40 | $ 12.80 | $ 14.17 | $ 13.34 | $ 11.70 | $ 13.77 | $ 12.71 | $ 10.82 | $ 12.69 | $ 11.51 |
| Turndown Attendant | $ 13.90 | $ 14.00 | $ 13.95 | $ 13.62 | $ 14.68 | $ 13.95 | $ 11.47 | $ 13.17 | $ 12.32 | $ 10.68 | $ 12.52 | $ 11.69 |
| Deep Cleaning Attendant | $ 15.05 | $ 15.05 | $ 15.05 | $ 16.35 | $ 16.35 | $ 16.35 | $ 15.54 | $ 19.25 | $ 16.58 | $ 12.00 | $ 14.14 | $ 13.07 |
| Housekeeping Clerk | $ 15.22 | $ 15.22 | $ 15.22 | $ 16.17 | $ 16.17 | $ 16.17 | $ 14.87 | $ 14.87 | $ 14.87 | $ 11.88 | $ 15.55 | $ 14.14 |
| Butler | | | | | | | | | | $ 15.00 | $ 18.62 | $ 16.68 |
| Head Butler | | | | | | | | | | $ 18.00 | $ 25.74 | $ 21.87 |
| Shampoo/Marble Technician | | | | $ 12.88 | $ 15.26 | $ 13.51 | $ 10.86 | $ 13.35 | $ 11.38 | $ 16.52 | $ 16.52 | $ 16.52 |
| **LAUNDRY** | | | | | | | | | | | | |
| Supervisor | $ 14.13 | $ 15.03 | $ 14.69 | $ 16.28 | $ 16.82 | $ 16.61 | $ 14.18 | $ 16.05 | $ 15.03 | $ 14.14 | $ 16.85 | $ 15.95 |
| Utility Attendants | $ 13.77 | $ 13.60 | $ 13.48 | $ 12.31 | $ 14.09 | $ 12.94 | $ 12.01 | $ 13.92 | $ 13.15 | $ 10.92 | $ 12.92 | $ 11.64 |
| Washer | $ 14.75 | $ 14.75 | $ 14.75 | $ 15.90 | $ 15.90 | $ 15.90 | $ 10.92 | $ 12.30 | $ 11.92 | $ 12.01 | $ 16.09 | $ 13.25 |
| Presser | | | | $ 15.47 | $ 15.64 | $ 15.59 | $ 14.99 | $ 14.99 | $ 14.99 | $ 16.24 | $ 21.22 | $ 17.96 |
| Sorter | | | | $ 13.97 | $ 15.08 | $ 14.32 | $ 12.75 | $ 12.75 | $ 12.75 | | | |
| Uniform Room Attendant | $ 14.14 | $ 15.35 | $ 14.43 | $ 14.82 | $ 15.00 | $ 14.93 | $ 13.32 | $ 14.36 | $ 14.36 | $ 11.72 | $ 12.72 | $ 12.24 |
| Alterationist | $ 14.55 | $ 15.41 | $ 15.41 | $ 15.61 | $ 15.61 | $ 15.61 | $ 15.59 | $ 15.59 | $ 15.59 | $ 13.87 | $ 15.40 | $ 13.95 |
| Dry Cleaner | | | | $ 17.27 | $ 18.74 | $ 18.37 | $ 16.03 | $ 16.03 | $ 16.03 | $ 11.47 | $ 15.61 | $ 13.54 |
| **SECURITY & PARKING** | | | | | | | | | | | | |
| Security Supervisor | $ 16.55 | $ 19.23 | $ 17.51 | $ 18.77 | $ 19.09 | $ 18.94 | $ 17.46 | $ 18.26 | $ 17.86 | $ 17.71 | $ 20.70 | $ 19.16 |
| Security Dispatcher | | | | | | | | | | $ 10.00 | $ 13.94 | $ 13.00 |
| Security Officer | $ 15.77 | $ 16.79 | $ 16.21 | $ 15.72 | $ 16.68 | $ 15.99 | $ 14.02 | $ 17.14 | $ 14.46 | $ 13.33 | $ 16.02 | $ 14.50 |
| Security Officer (3rd shift) | $ 16.80 | $ 16.97 | $ 16.88 | $ 15.27 | $ 17.36 | $ 16.49 | $ 14.04 | $ 15.35 | $ 14.50 | $ 14.42 | $ 14.91 | $ 14.83 |
| Parking Lot Attendant | | | | | | | $ 9.00 | $ 10.00 | $ 9.50 | | | |
| Parking Lot Dispatcher | | | | | | | | | | | | |
| **FRONT DESK / OPERATIONS** | | | | | | | | | | | | |
| Supervisor | $ 16.65 | $ 17.75 | $ 17.01 | $ 17.06 | $ 17.78 | $ 17.46 | $ 16.35 | $ 18.55 | $ 17.40 | $ 16.32 | $ 17.48 | $ 16.80 |
| Front Desk Clerk | $ 15.15 | $ 15.75 | $ 15.30 | $ 15.23 | $ 16.07 | $ 15.62 | $ 13.97 | $ 15.75 | $ 14.67 | $ 13.36 | $ 14.05 | $ 13.37 |
| Front Desk Clerk (3rd shift) | $ 16.69 | $ 16.81 | $ 16.69 | $ 17.24 | $ 17.54 | $ 17.43 | $ 15.28 | $ 15.82 | $ 15.78 | $ 13.93 | $ 14.40 | $ 14.16 |
| Front Office Runner | | | | | | | | | | | | |
| Reservations Supervisor | $ 19.25 | $ 19.25 | $ 19.25 | $ 18.41 | $ 18.41 | $ 18.41 | $ 15.20 | $ 15.20 | $ 15.20 | $ 17.42 | $ 17.57 | $ 17.57 |
| Reservations Agent | $ 15.26 | $ 15.70 | $ 15.27 | $ 15.76 | $ 16.06 | $ 15.88 | $ 14.89 | $ 16.69 | $ 16.22 | $ 13.35 | $ 14.86 | $ 14.19 |
| Group Coordinator | $ 15.48 | $ 23.22 | $ 17.53 | $ 18.42 | $ 18.42 | $ 18.42 | $ 17.25 | $ 18.66 | $ 18.14 | $ 14.50 | $ 17.19 | $ 16.40 |
| Concierge | $ 15.07 | $ 16.07 | $ 15.77 | $ 15.80 | $ 16.32 | $ 16.11 | $ 18.46 | $ 15.61 | $ 15.43 | $ 12.87 | $ 15.34 | $ 14.42 |
| Head Concierge | $ 18.45 | $ 22.89 | $ 19.97 | $ 19.31 | $ 19.31 | $ 19.31 | $ 18.39 | $ 18.39 | $ 18.39 | $ 10.33 | $ 10.33 | $ 10.33 |

Exhibit 5 Page 496